IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND FOR PRELIMINARY INJUNCTION

Pursuant to FED. R. CIV. P. 65, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction to enjoin enforcement of two clauses and one word in House Bill 13-1224 ("HB 1224"), which is scheduled to take effect on July 1, 2013, until there is a resolution on the merits of Plaintiffs' claims.

### I.    D.C.COLO.LCIVR 7.1(A) CERTIFICATION.

Plaintiffs' counsel has conferred with counsel for the Governor regarding the subject matter of this motion, and the Governor opposes the relief sought.

### II.    INTRODUCTION AND SUMMARY OF ARGUMENT.

HB 1224 is widely known as a ban on so-called "large capacity" ammunition magazines. Its central feature is a general prohibition on the ownership and sale of ammunition magazines that hold more than 15 rounds of ammunition after it becomes effective on July 1, 2013. Although Plaintiffs challenge that core provision in this lawsuit, it is not the subject of this motion. Rather, this motion seeks only to preserve the status quo with respect to two ancillary provisions of HB

1

1224 on the grounds that they are unconstitutionally vague and, to the extent they are not vague, are facial violations of the Second Amendment. Simply put, these portions of HB 1224 sweep so broadly that people are left to guess what they mean, including those who are in the business of selling these magazines and those who are charged with enforcing them. Rather than risk criminal sanctions for an incorrect guess, Plaintiffs and others will choose to forgo otherwise constitutionally protected conduct. The Court should delay the effectiveness of these limited provisions until it can consider all the facts and assess their constitutionality.

First, HB 1224's definition of "Large-capacity magazines" includes not only those that actually hold more than fifteen rounds, but also those that are "designed to be readily converted" to hold more than fifteen rounds. This motion is directed only at the "designed to be readily converted" language because it is unconstitutionally vague. Magazines are made in sizes less than fifteen rounds. However, the majority of such box and tube magazines contain removable base plates and end caps, and thus can be "readily converted" to magazines exceeding 15 rounds via both commercially-available and readily-fabricated methods. The bill as written has the effect of banning most magazines of any size. Moreover, a person who wants to sell or purchase a magazine that holds fewer rounds may not be able to determine if the magazine can be converted, much less whether it was "designed" for that purpose. A criminal statute which creates such inherent uncertainty is vague, unenforceable, and a violation of the Fourteenth Amendment of the United States Constitution.

Second, HB 1224 contains provisions that "grandfather" magazines of more than 15 rounds that are owned as of July 1, 2013, but only if the owner maintains "continuous possession" of the magazines thereafter. The "continuous possession" requirement is unconstitutionally vague

because it could reasonably be interpreted as prohibiting permanent or long-term transfers of magazines of more than 15 rounds, or it could criminalize even the most innocent and constitutionally protected types of temporary transfers of magazines and firearms, such as lending the firearm and magazine to a family member for self-defense or leaving the firearm and magazine with a licensed firearms dealer for repairs.

The Colorado Attorney General issued a "Technical Guidance" letter setting forth the State's current, non-binding position on how it believes both provisions should be interpreted. Setting aside that the letter is non-binding, it does nothing to resolve the problems with either provision. The Attorney General's position is that "continuous possession" is maintained so long as the magazine remains in the "continual physical presence" of the owner and is transferred to another with the "expectation that it will be promptly returned." This nearly useless "clarification" nonetheless violates the Second Amendment because it bans any routine, lawful sharing of firearms with affected magazines between family members, safety instructors, and firearms dealers, which chills fundamental Second Amendment rights. Indeed, despite the Attorney General's opinion, the plain language of HB 1224 itself does not permit *any* transfers of otherwise-grandfathered magazines.

Accordingly, Plaintiffs ask this Court to enjoin enforcement of both the "designed to be readily converted" and "continuous possession" requirements within HB 1224. Neither the Defendant nor the public interest will be harmed by the requested relief because Plaintiffs merely seek to preserve the status quo while the Court determines the constitutionality of these provisions.

### III.   ARGUMENT.

#### A.   Legal Standards.

Plaintiffs seek a temporary restraining order and preliminary injunction against the Defendant pursuant to FED. R. CIV. P. 65. The decision to grant such relief is within the Court's sound discretion. *See, e.g., Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir. 2001) (reviewing district court's decision on preliminary injunction for abuse of discretion). The object of such relief is to preserve the status quo, so that the rights of the parties at final hearing may be determined without injury to either. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992) ("The primary function of a preliminary injunction is to preserve the status quo pending a final determination of the rights of the parties . . . in order to preserve the power to render a meaningful decision on the merits.").

To obtain a preliminary injunction, the moving party must establish:

> (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Id*.

"When a party seeking a preliminary injunction satisfies the first three requirements, the standard for meeting the fourth 'probability of success' prerequisite becomes more lenient." *Id*. "The movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id*. In the instant case, the first three requirements are clearly satisfied, making a preliminary injunction proper if Plaintiffs' arguments on the constitutional merits are serious enough to be "fair ground for litigation."

### B.      H.B. 13-1224.

HB 1224 (Attachment A) criminally punishes any person "who sells, transfers, or possesses" what the bill calls a "large-capacity magazine." The maximum sentence is twelve months imprisonment, or a one thousand dollar fine, or both. Attachment A at 2; *see* Colo. Rev. Stat. § 18-1.3-501(1)(a). The bill defines "large-capacity magazine" as any fixed or detachable magazine, box, drum, feed strip, or "similar device capable of accepting, or that is ***designed to be readily converted*** to accept, more than fifteen rounds of ammunition." *Id.* at 1-2 (emphasis added).

HB 1224 purports to "grandfather" currently-owned magazines which actually hold more than fifteen rounds or which are "designed to be readily convertible" to do so. The "grandfathered" owner may "possess" magazines, but temporary "transfers" are forbidden. In order to maintain the highly restrictive "grandfathered" status afforded by HB 1224, the owner must maintain "continuous possession of the large-capacity magazine." *Id.* at 3. The bill does not define "continuous possession."

### C.      The Attorney General's Technical Guidance Letter.

On May 16, 2013, Attorney General John Suthers issued a "Technical Guidance" letter ("the Letter," Attachment B) at the Governor's request which purports to resolve some of the vagueness and ambiguity problems identified in Plaintiffs' Complaint.  While the Letter provides the Attorney General's opinion on how HB 1224 should be interpreted and enforced, this guidance is not legally binding and has no effect on the actual provisions of HB 1224 itself.  *See Colorado Min. Ass'n v. Board of County Com'rs of Summit County*, 199 P.3d 718, 731 (Colo. 2009) (courts may consult and take into account an agency's guidance, rules, and determinations,

but they do not bind the courts' construction of the applicable law); Attachment B at 1 ("this guidance is not binding on the courts").

### ("Designed to Be Readily Converted")

In the Letter, the Attorney General states that the bill's definition of a "large capacity magazine" does not include every magazine that could conceivably be converted to a "large capacity magazine" "simply because" the magazine has a removable base plate or other similar features.  Attachment B at 2. Rather than providing any bright-line test, the Letter concludes that a magazine's "features" "must be judged objectively to determine whether they were 'designed to be readily converted to accept more than fifteen rounds.'" The Letter does not further define what "judged objectively" means nor does it define who or what does the judging or what process would be employed to make the necessary determinations.

### ("Continuous Possession")

The Letter also states that only "temporary transfers" of "grandfathered" magazines are permissible, and only so long as the magazine remains in the "continual physical presence" of the owner. Furthermore, any "temporary transfer" must also be done with the "expectation that it will be promptly returned." *Id.*

**D.     The Plaintiffs Will Suffer Immediate and Irreparable Harm in the Absence of Injunctive Relief.**

**1.     The Harm That Plaintiffs Will Suffer Is Irreparable.**

The Plaintiffs will suffer irreparable harm in the absence of immediate injunctive relief. "Although there is no black letter definition for what constitutes irreparable injury, the essence of the concept requires a substantial threat of harm to the movant that cannot be compensated by money." *Harvey Barnett, Inc. v. Shidler*, 143 F. Supp. 2d 1247, 1255 (D. Colo. 2001); *see also*

*Mountain Medical Equipment, Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848 (D. Colo. 1984). The threat encompasses actions that are "about to occur." *Id* at 848. "The notion of irreparable injury thus only refers to harm that might occur *pendent lite* if the preliminary injunction is not granted." *Id.*

Violations of enumerated constitutional rights are *per se* "irreparable injury" in the Tenth Circuit. *Pinson v. Pacheco*, 397 Fed. Appx. 488, 491-92 (10th Cir. 2010) (Eighth Amendment); *Edmisten v. Werholtz*, 287 Fed. Appx. 728 (10th Cir. 2008) (Eighth Amendment); *Kikumura v. Hurley*, 242 F. 3d 950, 963 (10th Cir. 2001) (First and Fifth Amendments).

As detailed throughout this motion, if HB 1224's "designed to be readily converted" and "continuous possession" elements are permitted to be enforced as-written, the Plaintiffs and the public at large will suffer direct and irreparable infringements of their constitutional rights, as well as an unconstitutional chilling effect on the exercise of these constitutional rights.

HB 1224's prohibition of magazines "designed to be readily" converted to prohibited larger magazines will cause irreparable harm to citizens, business owners, and law enforcement officials because it plainly violates the Second and Fourteenth Amendments. Due to its vagueness, the language of the statute has the potential to criminalize the ordinary use of a huge range of commonly-used firearms in Colorado because nearly all magazines may be considered illegal. Apart from the obvious incalculable financial burdens this will place on firearms dealers and recreational facilities, this prohibition directly impacts the fundamental rights of ordinary citizens to own and use common firearms and firearm magazines for their intended lawful purposes, such as self-defense.

Additionally, HB 1224's prohibition of simple transfers of "grandfathered" magazines in the most harmless of contexts (such as loans between family and friends, or transfers for purposes of repair, maintenance, or training) is a patent violation of fundamental Second and Fourteenth Amendment rights that cannot be redressed by financial compensation, which would be impossible to calculate and may be unavailable in any event due to the Eleventh Amendment. Even as interpreted by the Attorney General, HB 1224 prohibits many "temporary transfers" of "grandfathered" magazines for innocent purposes (such as loans between family and friends, or transfers for purposes of repair, maintenance, or training). Such a prohibition is an immediate and patent violation of fundamental Second and Fourteenth Amendment rights that cannot be redressed by financial compensation.

The *per se* irreparable injury of the violation of constitutional rights is aggravated by irreparable harm to law enforcement and licensed firearm dealers. Neither the Attorney General, licensed firearms dealers, nor the Sheriffs have any way to know which magazines are "designed" by their manufacturers to be readily converted to prohibited larger magazines. It will be impossible for the Sheriffs or any other law enforcement officers to enforce "designed to be readily converted" in a consistent and non-arbitrary way. Similarly, lawfully licensed firearms dealers are forced to speculate as to which magazines can be lawfully sold or transferred after July 1, 2013. Should they guess incorrectly, the affirmative defense offered by the Technical Guidance will provide little comfort in the face of a criminal prosecution.

Similarly, if the Sheriffs attempt to enforce the ban on the transfer of "grandfathered" magazines and the "continuous possession" mandate, the Sheriffs will have to commit facially

unconstitutional acts, such as arresting someone who has left a magazine at a gunsmith for repair or cleaning.

### 2. The Harm that Plaintiffs Will Suffer Is Imminent.

The irreparable harm is imminent. HB 1224 is scheduled to take effect on July 1, 2013. The irreparable violation of the Plaintiffs' constitutional rights will take place the moment HB 1224 goes into effect.

In the context of a constitutional injury, the Tenth Circuit distinguishes between injuries which take place, and injuries which might or might not occur at some future time. *See Pinson v. Pacheco*, 397 Fed. Appx. 488, 491-92 (10th Cir. 2010) (Eighth Amendment) (prisoner's speculation that he might some day be attacked by gangsters was not an imminent injury); *Edmisten v. Werholtz*, 287 Fed. Appx. 728 (10th Cir. 2008) (denial of medical treatment, causing chronic pain and inability to eat solid foods was obviously imminent); *Kikumura v. Hurley*, 242 F. 3d 950, 963 (10th Cir. 2001) (denial of pastoral visit for prisoner).

Unlike in *Pinson*, Plaintiffs are not speculating that they may suffer an injury sometime in the future. As in *Edmisten* and *Kikumura*, Plaintiffs have detailed specific injuries that are certain to occur on July 1. After July 1, Plaintiffs will immediately be chilled from exercising their Second Amendment rights to buy, sell, and use magazines by the uncertainty as to what magazines are illegal because of HB 1224's unconstitutionally vague "designed to be readily converted" language. Based on HB 1224's "continuous possession" requirement, Plaintiffs will also be forbidden from lending otherwise legal "grandfathered" magazines and associated firearms with a gunsmith for repair or maintenance, or temporarily transferring their magazines and associated firearms to family members.

These imminent and irreparable constitutional injuries are all the more aggravated for some of the Plaintiffs. Sheriffs are required to enforce "all laws of the State of Colorado." Colo. Rev. Stat. § 16-2.5-103. But the Colorado Constitution, which is superior to any state legislature bill, requires that Sheriffs, as civil officers, "subscribe an oath or affirmation to support the constitution of the United States." Colo. Const., art. XII, § 8. Under the Colorado Constitution, Sheriffs are elected directly by the People. Colo. Const., art. XIV, § 8. The Sheriffs face the dilemma of a statutory requirement to enforce the facially unconstitutional provisions of HB 1224 while also being constitutionally compelled to comply with the United States Constitution. Licensed firearms dealers are faced with a similar dilemma: stop selling all magazines and associated firearms that may potentially fall into the "designed to be readily converted" category and risk bankruptcy and business failure, or be subjected to potential criminal prosecution under HB 1224.

Consistent enforcement of HB 1224 as written will be impossible and will result in unlawful arrests, discordant legal opinions, and a massive burden to both the public and law enforcement. Sheriffs and licensed firearms dealers will be compelled to ascertain whether some magazines of 15 rounds or less are "designed to be readily converted" to prohibited larger magazines—an impossible task that is prone to all manner of mistakes and inconsistencies. Further, all or many simple temporary transfers of one "grandfathered" magazine to another person will be a potential crime based on the "continuous possession" requirement, and Sheriffs will be required to enforce these vague and facially unconstitutional laws. Even if the Attorney General's Technical Guidance letter constitutes binding law (which it does not), Sheriffs will still be forced to

determine whether a particular "temporarily transferred" magazine was in the owner's "continual physical presence" and was loaned with the "expectation that it will be promptly returned."

**E.    The Certain Injury to the Plaintiffs Outweighs any Potential Damage that the Proposed Injunction Would Cause the Defendant.**

The Plaintiffs seek only to preserve the status quo so that a trial can be held without either the Plaintiffs or the Defendant having been injured. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992). An injunction would protect the Plaintiffs because, among other things, it would 1) allow for the Sheriffs to continue with their duties without being compelled to make arrests or otherwise investigate possible crimes based on vague or facially unconstitutional language; 2) permit licensed firearms dealers, gunsmiths, shooting ranges, and other persons engaged in lawful businesses to continue to do so without fear of criminal prosecution; and, 3) permit lawful firearm owners to continue to own, operate, leave for repair/maintenance, and lend legal firearms and magazines to others for lawful purposes.

An injunction will not harm the Defendant. Defendant will simply continue to enforce all of the many Colorado gun control laws which *are* constitutional, while the Court determines the constitutionality of HB 1224.

Significantly, granting the motion does not in any way impinge Defendant's desire to freeze the number of so-called "large capacity magazines" in Colorado. Plaintiffs are not seeking a preliminary injunction on HB 1224's ban on sales. Granting the motion would merely allow the owners of "grandfathered" magazines to continue with the ordinary and constitutionally-protected activities such as having magazines repaired for safety, or allowing a family member to use an owner's firearm and its associated magazine. Granting the motion would likewise allow

the continuing sale and use of magazines of fifteen rounds or less without fear of criminal prosecution or civil lawsuits.

## F.   The Proposed Injunctive Relief Will Not Be Adverse to the Public Interest.

The public interest is served by the requested injunction. Indeed, an injunction will *benefit* the public interest because it will temporarily prevent the enforcement of laws that potentially infringe on the public's fundamental constitutional rights. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (citation omitted)). If the Court permits the most-plainly unconstitutional language of HB 1224 to take effect on July 1, 2013, the infringements of constitutional rights will, as a matter of law, inflict irreparable injury on the Plaintiffs and the firearm-owning or firearm-using public at large. Conversely, awarding injunctive relief will simply preserve the status quo until the Court determines the constitutionality of HB 1224.

## G.   Plaintiffs Are Likely to Prevail on the Merits Because the Challenged Language of HB 1224 Is Unconstitutionally Vague.

Vague statutes such as HB 1224 violate the Due Process Clause of the Fourteenth Amendment to the Constitution. "[T]he terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. . . and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393. A statute may be unlawful if it either fails to give fair warning of

prohibited conduct or if it "allows for arbitrary enforcement." *United States v. Forbes*, 806 F. Supp. 232, 237 (D. Colo. 1992).

### 1.   "Designed to be readily converted."

"Designed to be readily converted" is a term that does not exist in Colorado statutes, or in the statutes of any other State. Yet HB 1224 provides no hint about what the term means. A statute may be unconstitutionally vague if it is silent on an issue that would be expected to be within its scope, or is otherwise susceptible to more than one reasonable interpretation. *People v. Carrillo*, 297 P.3d 1028, 1032 (Colo. App. 2013); *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 256 (Colo. App. 2009).

Moreover, because HB 1224 contains no scienter requirement, it is "little more than 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)). As the Colorado Supreme Court wrote, in striking down a clause in a gun control law as void for vagueness, "ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence." *Robertson v. City & County of Denver*, 874 P.2d 325, 335 (Colo. 1994).

The Sixth Circuit came to a similar conclusion in striking down a provision of an ordinance banning semiautomatic handguns that are a "modification" of an automatic handgun. The Sixth Circuit ruled that the ordinance did not provide sufficient information "to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage." *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (6th Cir. 1998). Plaintiffs and all citizens are faced with the

same conundrum in trying to determine if their magazines were "designed" to be readily converted.

The crux of HB 1224's vagueness is that it requires ordinary citizens and Sheriffs to know the intent of a magazine's designer—persons both unknown and unknowable in most cases.  HB 1224 declares that some magazines of 15 rounds or less are illegal, but provides no hint about what physical features of a such magazines make it illegal. The ban on whatever is "designed to be readily converted" necessarily requires firearm owners, firearms dealers and law enforcement officials to make a judgment about the magazine designer's intent—an impossible task which will inevitably lead to arbitrary enforcement based on varying guesses about what the magazine designer was thinking.

Like ordinary gun-owning citizens, the Plaintiff Sheriffs and firearms dealers have no way to know with certainty whether any particular magazine is lawful or contraband. Thus the Sheriffs are unable to uniformly enforce HB 1224. Similarly, the Plaintiff firearms dealers, owners, and trade associations do not know whether selling, acquiring, or temporarily transferring various magazines of less than 15 rounds starting on July 1 will subject them to criminal prosecution. The chilling effect on the exercise of constitutional rights is severe.

### a. The Technical Guidance Confirms the Vagueness of "Designed to Be Readily Converted."

Even if the Attorney General's non-binding, readily-changeable guidance Letter were legally enforceable, the vagueness problem would be aggravated. The Letter purports to offer safe harbor for some magazines of 15 rounds or less if two conditions are met: the magazine has "design features that fulfill more than one function, *and* whose function is not specifically to increase the capacity of a magazine." Attachment B (emphasis added). When one considers that

the statute applies to ordinary consumers, the problems created by this "clarification" are self-evident.

The first condition is fulfilled by every magazine with a removable base plate or end cap because the removability fulfills both the function of repair/cleaning and the function of extendability. But a person may not be aware of the second function, particularly if they are only interested in owning one magazine.

The second condition requires law enforcement, sellers and users to determine if the magazine designer also "specifically" designed the magazine for convertibility, notwithstanding the fact that the particular design feature serves other purposes, such as cleaning and maintenance. One small capacity magazine designer might never have considered extendability when designing his magazine, while another designer may have been fully aware that his magazine was extendable, but may have been neutral or adverse to the possibility that a third party would produce aftermarket extenders for his magazine. Yet another designer might have fully intended that the removable base plate would facilitate expansion of his magazine. These designers were "specifically" thinking about the "function" of their base plates in opposite ways. Yet all of the magazines are equally "readily convertible" since the base plate comes off easily and there are extenders manufactured by third parties available for all three. Neither the gun-owning public nor law enforcement have any means of discerning the designer's specific intent and, therefore, the Attorney General's guidance on this matter does nothing to resolve HB 1224's inherent vagueness and unenforceability.

2.      **"Continuous possession"**

After July 1, 2013, the "grandfathered" owner of a magazine exceeding 15 rounds may continue to "possess" the magazine if she owns the magazine on HB 1224's effective date and maintains "continuous possession" of the magazine going forward. Attachment A at 3. Notably, while HB 1224 allows a person to "possess" "grandfathered" magazines after July 1, 2013, it says nothing about the possibility of "transfers." *Id.*

As discussed, the term "continuous possession" is not defined anywhere in HB 1224. Whether an owner's possession is "continuous" is the key issue in determining whether the owner and temporary transferee of the magazine is committing a crime under HB 1224. As written, the phrase could ostensibly require owners of "grandfathered" magazines to keep them in their possession at all times, or it could simply prohibit ownership transfers or long-term loans.

Other statutes and common law concepts interpreting the phrase "continuous possession" suggest the latter interpretation.  For example, Colorado's sales tax statutes state that if a lease or contract which gives a person the "right to continuous possession or use for more than three years of any article of tangible personal property," the lease or contract is taxed the same as the sale of that property. Colo. Rev. Stat. § 39-26-102. Conversely, if the person only acquires the "right to continuous possession or use for three years or less of any article of tangible personal property under a lease or contract" no sales tax is due (as long as the lessor himself paid the sales tax when buying the property). Colo. Rev. Stat. § 39-26-713(1)(a).  The statutes do not require the lessor to maintain literally continuous possession of the property; nor do the statutes forbid the lessee to lend the property to persons who are not in the "continual physical presence" of the

lessee. *See Colorado Dep't of Rev. v. City of Aurora*, 32 P.3d 590, 593 (Colo. App. 2001) (City of Aurora liable for unpaid sales tax when it failed to either pay sales tax upon acquiring golf carts or paying sales tax *when it rented the golf carts to others*). Similarly, the "continuous possession" requirement to establish a prescriptive easement does not require the person claiming the easement to "physically possess[] the land every moment of every day." *Martini v. Smith*, 18 P.3d 776, 781 (Colo. App. 2000). Nor does common law "continuous possession" for a prescriptive easement or adverse possession forbid the possessor from inviting other people to use the real property, even when the possessor is not present.

However, these reasonable, every-day interpretations are inapplicable given the plain language of HB 1224, which allows "grandfathered" owners only to "possess" magazines after July 1, 2013, only if they maintain "continuous possession" after that date. This language, especially as interpreted by the Attorney General, more likely than not means that transfers of *any kind* are illegal, or that merely leaving the house without the grandfathered magazine breaks the chain of "continuous possession."

Can a magazine owner who goes on vacation store the magazine at a neighbor's home? Only if the neighbor never touches the magazine? When, if ever, can an owner who must maintain "continuous possession" allow someone else to hold the magazine? When the owner is being instructed in safe firearms handling by someone else? When a competitor at a target shooting competition loans a magazine to a fellow competitor whose own magazine is malfunctioning? What if the owner leaves the firing line for 20 minutes, to go to the bathroom at the range's indoor clubhouse? These are just a handful of scenarios implicated by HB 1224's complete lack of guidance as to what constitutes "continuous possession."

Because HB 1224 provides absolutely no guidance as to what "continuous possession" actually *does* mean, the phrase is unconstitutionally vague and ambiguous.   *See Carrillo*, 297 P.3d at 1032 (a statute is ambiguous if is silent on an issue that would be expected to be within its scope).   Further, because "continuous possession" is undefined, and because whatever it means is not what the same phrase means within other Colorado statutes or in the common law, law enforcement officers—including the 55 Plaintiff Sheriffs—will inevitably have varying and inconsistent interpretations of the term. *See Apodaca*, 232 P.3d at 253 (terms are ambiguous when it is possible to interpret them in more than one way); *Forbes*, 806 F. Supp. at 237 (statute is unconstitutional when it will result in arbitrary enforcement).

Therefore, the Plaintiffs are likely to prevail on the merits because HB 1224 is unconstitutionally vague and violates the Due Process Clause of the Fourteenth Amendment.

> **H.      Plaintiffs Are Likely to Prevail on the Merits Because the Challenged Language of HB 1224 Is Vague Under the Fourteenth Amendment and Violates the Second Amendment.**

> **1.      The Second Amendment Forbids Bans on Small Magazines.**

Plaintiffs will demonstrate at trial that the "designed to be readily converted language" of HB 1224 is unconstitutionally ambiguous in violation of the Fourteenth Amendment for all the reason stated above. A person of average intelligence will be unable to discern what conduct is forbidden, and that uncertainly will lead to inconsistent enforcement and a chilling effect on the exercise of a constitutional right. HB 1224 may be stricken for vagueness alone, but the underlying constitutional right will also be established at trial.

As detailed above, the phrase "designed to be readily converted" potentially outlaws a (currently unknowable) group of magazines of 15 rounds or less which in fact have not been

converted to hold more than fifteen rounds. This prohibition expressly violates the Second Amendment.

The Second Amendment is not solely about firearms. The Amendment protects the right to keep and bear "arms." Arms are anything which are useful for offense or defense. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The arms which the Second Amendment protects are those typically possessed by law-abiding citizens for lawful purposes. *Id.* at 626-29.

The Second Amendment is not limited to firearms only; it necessarily covers everything which is necessary to the proper function of a firearm—such as ammunition. *See United States v. Pruess*, 703 F.3d 242, 245 n.1 (4th Cir. 2012) (treating Supreme Court legal rule about guns as having the same meaning for ammunition); *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").

Magazines are necessary to the function of a firearm. All tube magazines and some box magazines are integral to the gun itself. They are removable only to the extent that any firearm can be disassembled. Whether removable or not, the box magazines is necessary to the function of a firearm. After all, ammunition too is removable, and it too is necessary to firearm function.

The Supreme Court in *Heller* taught that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. *Heller*, 554 U.S. at 628. Most handguns made presently use magazines. As of 2011 (the latest year for which data are available), 82% of

handguns manufactured in the United States are semi-automatic.[1] Accordingly, magazines of 15 rounds or fewer are the sort of "arms" "typically possessed by law-abiding citizens for lawful purposes" and are therefore within the protections of the Second Amendment. *See Heller*, 554 U.S. at 625.

Whether by vague chilling or outright prohibition, "designed to be readily converted" casts into grave doubt the ownership, sale, acquisition, and temporary transfer of an enormous class of arms. Whereas the unconstitutional ordinance in *Heller* banned all handguns, HB 1224 is even more sweeping.  It effectively outlaws or disables 82% of currently-manufactured handguns and a large fraction of rifles. This is a straightforward violation of *Heller*'s holdings that widespread handgun bans and bans against fully functional firearms in the home are unconstitutional. *See Heller*, 554 U.S. at 630 (ordinance requiring disassembly of a firearm while the firearm is in the owner's home is unconstitutional because the ordinance made it impossible for citizens to use legal firearms for the core Second Amendment purpose of self-defense).

Thus, for the reasons detailed above, a prohibition on some or most magazines of 15 rounds or fewer imposes an unconstitutional burden on Second Amendment rights.  Therefore, even if the phrase "designed to be readily converted" is not unconstitutionally vague, the Plaintiffs are nonetheless likely to prevail on the merits because the "designed to be readily converted" prohibition expressly violates constitutional protections under the Second Amendment.

---

[1]  Bureau of Alcohol, Tobacco, Manufacturing and Explosives, Annual Firearms Manufacturing and Export Report 2011 (2,598,133 "pistols"; 572,867 "revolvers"), https://www.atf.gov/files/statistics/download/afmer/2011-final-firearms-manufacturing-export-report.pdf.

**I.      Plaintiffs Are Likely to Prevail on the Merits Because HB 1224's "Continuous Possession" Requirement Are Unconstitutional under the Second Amendment.**

A citizen's right to "keep" arms includes the right to "take them to have them repaired." *Andrews v. State*, 50 Tenn. 165, 1871 WL 3579 at *2 (1871). *Andrews* is favorably cited in *Heller*. *Heller*, 554 U.S. at 608, 629. More generally, the Second Amendment protects all "lawful purposes" of keeping and bearing arms. *See id.* at 625.

HB 1224 criminally punishes anyone who "transfers" a "large capacity magazine." HB 1224 allows "grandfathered" owners to "possess" (but not to engage in "transfers" of) such a magazine if the owner maintains "continuous possession" of the "grandfathered" magazine.  The Attorney General's Technical Guidance purports to interpret "continuous possession" as allowing "temporary transfers" if the transferee is in the "continual physical presence" of the owner. Attachment B. Even if the Attorney General's interpretation is construed as binding throughout the State, the following scenarios will become crimes in Colorado on July 1, unless the Plaintiffs' requested preliminary relief is granted:

- The owner leaves the house for several hours. The spouse and all family members are specifically authorized by the owner to use a firearm and its magazine for lawful self-defense in case of home invasion. While the owner is gone, the wife or other family member holds the firearm (which contains the magazine) for a moment, or for a longer period, or picks it up to move it from one room to another.

- With the owner's permission, a family member or friend takes the firearm and its magazine to a target range. While the owner remains at home, the transferee practices gun safety at the target range.

- A reserve member of the Armed Forces is called to duty for several months. While the serviceperson is away from home, his or her family members are authorized to use the magazine and its associated firearm for lawful self-defense, target practice, and other lawful activities. The family members do so.

21

- A woman has a Concealed Carry Permit issued by her local Sheriff, pursuant to Colorado's Concealed Carry Act. COLO. REV. STAT. §§ 18-12-201 et seq. She sometimes leaves her home unaccompanied by her husband, and therefore not in his "continual physical presence." Outside the home, the woman sometimes carries her husband's gun and its associated magazine in various public places, in full compliance with the Concealed Carry Act and all other laws related to the carrying of firearms.

- A magazine needs to be repaired. The owner brings the magazine to a licensed gunsmith. (A person who is engaged in the business of repairing firearms is required to have a Federal Firearms License, similar to a person who is engaged in the business of selling firearms. 27 C.F.R. § 478.11.) The owner leaves the magazine with the gunsmith for several weeks. After the magazine is repaired, the owner picks up the magazine from the gunsmith and pays for it.

- The owner's firearm is not functioning properly. The gunsmith explains to the owner that in order for the gunsmith to test the firearm's function, before and after repair, the gunsmith needs to use the firearm's magazine. The owner leaves the firearm and its magazine with the gunsmith. Four days later, the gunsmith has completed the repair work on the firearm, and has used the magazine to test the firearm for proper function when feeding ammunition. The owner picks up the firearm from the gunsmith and brings it home.

- The Technical Guidance protects gunsmiths who provide while-you-wait service. Some such gunsmiths might immediately test fire the gun and magazine, have all the replacement parts on hand, and instantly begin repair immediately of a gun or magazine. The owner patiently waits in the store, in the "continual physical presence" of the gunsmith. But  during the gunsmith's several hours of work, the owner steps outside the gunsmith's shop in order to take a phone call, smoke a cigarette, or run errands.

- The owner's neighbor is being threatened by a violent stalker, who is the subject of a protective order. The owner lends the firearm to his neighbor for 48 hours. The neighbor wears the firearm and its magazine in a holster at her home when she is awake, and keeps the firearm and the magazine nearby when she is asleep.

- The owner is about to go on a month-long vacation. She wants to make sure that the magazine is not stolen. She gives the magazine to her neighbor, who stores the magazine in a locked safe.

- The owner is going to visit a relative who lives in Salt Lake City. The owner drives to Denver International Airport. In compliance with all federal laws involving the transportation of firearms, the owner checks the firearm and the unloaded magazine (which is outside the firearm) in a locked case. Airline personnel take possession of the case and of the firearm and magazine therein. The airline employees place the case in the baggage compartment of the airplane. After the airplane lands, the owner retrieves the case, firearm, and magazine at Salt Lake City International Airport. The owner's possession and transportation of the firearm and the magazine are fully compliant with all Utah laws.

In every one of the above scenarios, every person is guilty of a crime punishable by a year in jail unless preliminary relief is granted against HB 1224.

HB 1224's broad ban on legitimate activities with firearms and their associated magazines burdens the exercise of Second Amendment rights, including "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. Some of what is banned is parallel to two of the provisions which were held unconstitutional in *Heller*. The District Council in *Heller* banned functional firearms in the home by requiring that arms always be disassembled or locked. *Id.* at 630. HB 1224 does the same by allowing a husband to let his wife use his gun for self-defense in the home, but forbidding the wife to use the magazine, which is necessary for the firearm to be functional. This makes it "impossible for citizens to use them for the core lawful purpose of self-defense." *Id*.

Thus, in the absence of injunctive relief, the practical effect of HB 1224's "continuous possession" requirement will be the widespread criminalization of the most innocuous and otherwise lawful transfers and uses of ordinary firearms and firearm magazines. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," the prohibition of ordinary uses of ordinary guns and associated magazines "would fail constitutional

muster." *See Heller*, 554 U.S. at 628. Therefore, Plaintiffs are likely to succeed on the merits because HB 1224's "continuous possession" requirement for existing owners infringes the right to keep and bear arms.

### CONCLUSION

Plaintiffs request that this Court grant a temporary restraining order and preliminary injunction against the enforcement of several provisions of HB 1224 until the Court makes its determination as to whether HB 1224, as written, violates the Second and Fourteenth Amendments of the United States Constitution. Those provisions are:

- "or that is designed to be readily converted to accept"

- "and (II) maintains continuous possession of the large-capacity magazine."

In addition, Plaintiffs request that this Court grant a temporary restraining order and preliminary injunction against the enforcement of the word "transfers" as used in the paragraph of HB 1224 to be codified at Colo. Rev. Stat. § 18-12-302(1)(a).

Dated this 12th day of June, 2013.

Respectfully submitted,


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**


Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY**


Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

Marc F. Colin
BRUNO, COLIN & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@brunolawyers.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2013, I have caused to be presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following e-mail address:

David B. Kopel                    david@i2i.org

Jonathan M. Anderson              jmanderson@hollandhart.com

Douglas Abbott                    dabbott@hollandhart.com

Marc F. Colin                     mcolin@bcjlpc.com

Anthony J. Fabian                 fabianlaw@qwestoffice.net

Matthew Groves                    matt.grove@state.co.us

Kathleen Spalding                 kit.spalding@state.co.us

Jonathan Fero                     jon.fero@state.co.us

David Blake                       david.blake@state.co.us

Daniel D. Domenico                dan.domenico@state.co.us

     /s/ Peter J. Krumholz
     HALE WESTFALL LLP
     1445 Market Street, Suite 300
     Denver, CO 80202
     Phone: (720) 904-6022
     Fax: (720) 904-6020
     rwestfall@halewestfall.com