IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado *et. al.*;

      Plaintiffs

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

### SUPPLEMENTAL BRIEF REGARDING PLAINTIFF'S STANDING AND OTHER ISSUES RAISED BY THE COURT

---

      Plaintiffs, by and through their counsel, file this Supplemental Brief Regarding Plaintiff's Standing and Other Issues Raised by the Court, and in support thereof states the following:

**I.      THECOURT CAN, AND SHOULD, ISSUE A TEMPORARY RESTRAINING ORDER PENDING THE PRELIMINARY INJUNCTION HEARING ON JULY 10, 2013.**

      At the Court's hearing on June 17, 2013, the Court requested the Plaintiffs to brief whether FED. R. CIV. P. 65 may be invoked to request a temporary restraining order ("TRO") under the circumstances presented, and without meeting the conditions listed in FED. R. CIV. P. 65(b). As discussed below, this Court may issue a temporary restraining order against enforcement of HB 1224 until the Court's scheduled July 10, 2013 hearing, because the conditions in Rule 65(b) do not apply where notice to the opposing party has been provided.  The Court should so issue a TRO here to preserve the status quo and prevent the irreparable and immediate harm to the Plaintiffs that will occur after HB 1224 takes effect on July 1, 2013.

The Court's hesitation to issue a TRO at the June 10, 2013 status conference may stem from the portion of FED. R. CIV. P. 65(b) that provides that a court may issue a TRO for a maximum of fourteen days *without notice* to the adverse party only under the following conditions:

(1)  the moving party must submit an affidavit or verified complaint clearly showing that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, FED. R. CIV. P. 65(b)(1)(A);

(2) the movant's attorney must certify in writing any efforts made to give notice to the adverse party, and the reasons why notice should not be required, FED. R. CIV. P. 65(b)(1)(B); and

(3)  Any TRO issued without notice must state the date and time it was issued and why the order was issued without notice, and describe the injury at issue and state why it is irreparable. FED. R. CIV. P. 65(b)(2).

However, when a party moves for a TRO, and the adverse party receives notice of the requested relief, the motion is to be evaluated under the same standard as a motion for a preliminary injunction. *Akbar v. Borgen*, 796 F. Supp. 1181, 1185 (E.D. Wis. 1992) (treating motion for a TRO as a motion for preliminary injunction); *Escobar v. Jones*, Civ. Action No. 09-cv-2207, 2012 WL 6212846 at *2 (D. Colo. Nov. 21, 2012) ("Where an opposing party has notice, the procedure and standards for issuance of a TRO mirror those for a preliminary injunction.").

In situations, such as this case, when the opposing party has notice of the requested TRO but no hearing has occurred, courts will typically apply the fourteen-day limitation for the TRO, but dispense with the other conditions for issuing a TRO without notice. *E.g., Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D.C. Del. 1987) (limiting the duration of the requested relief but otherwise treating the motion for a TRO the same as a motion for preliminary injunction); *Tracy v. Robbins*, 40 F.R.D. 108, 111 (D.S.C. 1966) (lack of proper verification of complaint was not fatal to TRO request because, in part, the opposing party received timely notice of the requested relief); *Burnette v. Haywood County Bd. of Educ.*, No.

06-1197, 2007 WL 2915413 at *2 (W.D. Tenn. Aug. 1, 2007) (Rule 65(b)'s requirements for issuing a TRO without notice were inapplicable because the opposing party's attorney was, in fact, served with a copy of the motion for a TRO).

Although motions for TRO's made with notice to the opposing party and motions for preliminary injunctions are evaluated under the same set of factors, the nature of the relief granted by TRO's is much more limited. TRO's under FED. R. CIV. P. 65 are an appropriate remedy where, as here, imminent and irreparable harm will occur to the moving party before the court can conduct a hearing on the motion for a preliminary injunction. "Applicants for injunctive relief occasionally are faced with the possibility that irreparable injury will occur before the hearing for a preliminary injunction required by Rule 65(a) can be held." 11A FEDERAL PRACTICE & PROCEDURE: CIVIL § 2951 (2d ed. 1995). In such cases, the TRO is "designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." *Id.*; *see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No 70*, 415 U.S. 423, 439 (1974) (TRO should be restricted to their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer); *Garcia v. Yonkers School Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (citation omitted) (a TRO is only intended to "preserve an existing situation *in status quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction"). Thus, the relief afforded by TRO's is much more limited in scope than that afforded by preliminary injunctions, and may be granted by the court "***with or without notice*** to the adverse party." 11A FEDERAL PRACTICE & PROCEDURE: CIVIL § 2951 (2d ed. 1995) (emphasis added).

The Plaintiffs' requested TRO conforms to the purposes of FED. R. CIV. P. 65 and TRO's in general. The parties will not be able to argue the merits of the Plaintiffs' requested injunctive relief until July 10, 2013—ten days after HB 1224 goes into effect. Accordingly, as fully described in their Motion for Preliminary Injunction and Temporary Restraining Order (Doc. No. 29), the Plaintiffs will suffer immediate and irreparable injury before they have the opportunity to argue the merits of their Motion and this Court has the opportunity to rule on it. A TRO is necessary to preserve the status quo until the Court is given the opportunity to hear arguments from both sides and decide whether a preliminary injunction is appropriate.

Thus, FED. R. CIV. P. 65 gives the Court the authority to issue a TRO enjoining enforcement of HB 1224 until the parties can argue the merits of the Plaintiffs' requested injunctive relief at the Court's scheduled hearing on July 10, 2013. Because Defendant received notice of the Plaintiffs' requested relief and has the ability to contest the same, FED. R. CIV. P.'s 65(b)'s conditions for issuing TRO's without notice (verified complaint or supporting affidavit, attorney certification regarding lack of notice, etc.) are inapplicable. Moreover, the requested TRO will not exceed fourteen days, and will only apply from July 1 through July 10—the date of the hearing.

Accordingly, this Court should issue a temporary restraining order (in the manner set forth in Plaintiffs' motion) to preserve the status quo for ten days until the July 10, 2013, hearing. *See Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1551 (D. Kan. 1993) (The issuance of temporary restraining orders and other preliminary injunctive relief under FED. R. CIV. P. 65 is within the sound discretion of the court.). As will be more fully discussed below in Section II(b), Defendant is the proper party and a temporary restraining order against Defendant will properly restrain the enforcement of HB 1224.

## II.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE CONSTITUTIONALITY OF HB 1224.

Article III of the United States Constitution restricts the jurisdiction of federal courts to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To establish a case or controversy, a plaintiff bears the burden of demonstrating:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *see also Finstuen v. Crutcher*, 496 F.3d 1139, 1142-43 (10th Cir. 2007) (noting that "Article III standing … requires that a plaintiff establish injury-in-fact, causation, and redressability."). Essentially, the "[s]tanding doctrine addresses whether, at the inception of the litigation, the plaintiff had suffered a concrete injury that could be redressed by action of the court." *WildEarth Guardians v. Public Service Co. of Colorado*, 690 F.3d 1174, 1182 (10th Cir. 2012).

### a.   *Plaintiffs Have Suffered Injuries-In-Fact.*[1]

This is a pre-enforcement challenge to HB 1224. In general, Plaintiffs contend that certain provisions of HB 1224 are wholly incompatible with the Second Amendment and Supreme Court precedent. As noted in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Plaintiffs need not violate HB 1224 and risk prosecution in order to challenge it. *Ezell*, 651 F.3d at 695-96; *accord Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 198 (1979) ("When contesting the constitutionality of a criminal statute, it is not necessary that the plaintiff first

---

[1]  The claims of Plaintiffs Colorado Farm Bureau and Colorado Youth Outdoors' primarily involve HB 1229, which is not at issue in the Motion for Preliminary Injunction and Temporary Restraining Order.  Accordingly, the standing of those two organizations will not be addressed in this brief.

expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims

deters the exercise of his constitutional rights.") (internal quotations omitted). Indeed, "[t]he very

existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper,

because a probability of future injury counts as 'injury' for the purpose of standing." *Ezell*, 651

F. 3d at 696. (internal quotations and citations omitted).

As noted above, Plaintiffs injuries must be (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical, to satisfy the "injury-in-fact" requirement. *See Friends

of the Earth*, 528 U.S. at 180-81. Economic injury is the paradigmatic form of an injury-in-fact.

*See e.g., Association of Data Proc. Serv. Org., Inc. v. Camp*, 397 U.S. 150, 154 (1970)

("Certainly, he who is likely to be financially injured, may be a reliable private attorney general

to litigate the issues of the public interest …") (internal quotations and citations omitted);

*Schrader v. New Mexico*, 361 Fed.Appx. 971, 974 (10th Cir. 2010) ("Pecuniary injury is

sufficient to confer standing."). All Plaintiffs, as detailed below, have suffered an injury-in-fact.

i.      Plaintiffs Licensed Firearms Dealers

HB 1224 causes Plaintiffs licensed firearms dealers injuries-in-fact in several ways. First,

Plaintiffs suffer an injury-in-fact because each of them face a "credible threat" of criminal

prosecution under HB 1224 that will immediately chill them from exercising their Second

Amendment rights to buy, sell, and use the prohibited magazines. *See Association of Date

Processing Service Orgs.*, 397 U.S.at 153-154  (recognizing that "aesthetic, conservational, and

recreational" injury is sufficient for standing); *Bronson v. Swensen*, 500 F.3d 1099, 1107-1110

(10th Cir. 2007) (discussing the "credible threat" requirement). Currently, every Plaintiff

licensed firearms dealer has in its inventory and on order multiple magazines which hold 15 or

fewer rounds of ammunition, virtually all of which have removable base plates, which may

render these magazines and their associated firearms illegal after July 1, 2013. In order for these Plaintiffs' businesses to stay in operation, they must be able to continue to sell those magazines and associated firearms in their current inventories or which are on order. However, because virtually all semi-automatic handgun magazines have removable base plates and the intent of the designer of those magazines cannot be ascertained, in order to stay in business, these Plaintiff licensed firearms dealers must speculate as to the intent of every designer of a 15 round or less magazine and risk criminal prosecution should their speculation prove to be in error. Thus, the Plaintiff licensed firearms dealers are left with the Hobson's Choice of business failure or criminal prosecution.

Plaintiffs licensed firearms dealers also have an injury-in-fact because they have and will continue to suffer economic injury because HB 1224 prevents them from selling the bulk of their existing inventory, which includes both magazines with a capacity of 15 rounds or less with removable base plates and those capable of holding more than 15 rounds, as well as the firearms associated with both such magazines. As outlined in the First Amended Complaint, Plaintiffs licensed firearms dealers have invested substantial amounts of money in existing inventories of firearms with magazines of all sizes with removable base plates. *See* First Amended Complaint [Doc. No. 22], ¶ 136. HB 1224 will preclude the Plaintiff licensed firearms dealers from selling the majority of their firearm and magazine inventories which are their primary source of income. A prohibition which precludes the sale of more than 80% of the products upon which the Plaintiff licensed firearms dealers rely for the continued success of their business operations will be economically devastating.

The majority, if not all, of the Plaintiff licensed firearms dealers have received orders from customers for magazines and associated firearms in the Fall of 2012. These orders include

magazines and associated firearms which hold 15 rounds or less, but which also have a removable base plate, as well as those with greater magazine capacity. As noted in Plaintiffs' Amended Complaint (Doc. No. 22), because of HB 1224, manufacturers have refused to fill these purchase orders; thereby rendering the Plaintiff licensed firearms dealers unable to fill these orders and complete the sale of these arms. *See* Plaintiffs' Amended Complaint (Doc. No. 22), Para. 130-131. Because Plaintiff firearms dealers are unable to fill these purchase orders, HB 1224 has prevented them from gaining the revenue they would otherwise have received.

Finally, HB 1224's grandfather clause and "continuous possession" requirement also cause Plaintiffs licensed firearms dealers an injury-in-fact. In particular, HB 1224 contains no definition of, or direction as to, what it means to have "continuous possession." Therefore, these Plaintiffs will be forced to decipher that language on their own, and determine whether "continuous possession" exists (a) when one person finances the purchase of the firearms, but another physically possesses it, (b) when the firearms are locked in a storage compartment for safekeeping, and (c) when an employee is repairing a firearm or magazine within Plaintiff licensed firearms dealers' stores, among other things. Based on the nature of Plaintiff licensed firearms dealers businesses, they will instantly be in violation of HB 1224's "continuous possession" requirement.

Based on the foregoing, Plaintiff licensed firearms dealers have and will continue to suffer an injury-in-fact that is concrete, particularized, actual, and imminent, not conjectural or hypothetical, based on HB 1224's "designed to be readily converted" and "continuous possession" clauses.

    ii.    Plaintiff Magpul Industries, Inc.

As alleged in the First Amended Complaint, Magpul Industries Inc. ("Magpul") is a firearms accessories manufacturer that manufactures and sells firearm magazines in a variety of sizes. First Amended Complaint, (Doc. No. 22), ¶ 155. Magpul manufactures and sells magazines in sizes larger than fifteen rounds, including magazines with a thirty round capacity that are commonly supplied with new firearms. After July 1, 2013, by virtue of HB 1224, Magpul will no longer be able to sell those magazines in Colorado, losing the business associated with those sales.

Additionally, Magpul manufactures and sells magazines with a capacity of less than fifteen rounds. HB 1224's ambiguous prohibition of  magazines "designed to be readily converted" to hold more than fifteen rounds subjects Magpul and its customers to uncertainty as to which, if any, magazines it can sell in Colorado without risking criminal prosecution after July 1, 2013. All such magazines Magpul manufactures have removable base plates and are thus capable of being expanded to hold more than fifteen rounds of ammunition. *Id.* ¶¶ 156, 158. Apart from the constitutional ramifications of HB 1224's effect on Magpul, a literal reading of HB 1224 will effectively preclude Magpul from selling *any* magazines in Colorado because nearly all small capacity magazines can be converted to illegal large capacity magazines because of their inherent design. *Id.* ¶ 159.

Like the other Plaintiffs, Magpul also has an injury-in-fact because of the "credible threat" of criminal prosecution under HB 1224 that will immediately chill it from exercising its Second Amendment right to sell and distribute the prohibited magazines. *See Bronson*, 500 F.3d at 1107-1110 (discussing the "credible threat" requirement). Thus, based on the foregoing, Plaintiff Magpul has already and will continue to suffer injuries that are concrete, particularized, and imminent.

### iii.   Plaintiff David Strumillo

David Strumillo is a retired police officer. He owns and possesses many magazines and firearms that would be outlawed by HB 1224. If HB 1224 goes into effect, then it will immediately chill Plaintiff Strumillo's Second Amendment constitutional rights to own, possess, and transfer nearly every firearm and magazine because it could be "designed to be readily converted" to hold greater than 15 rounds.

One of Plaintiff Strumillo's friends is currently serving in the United States Armed Forces, overseas. Before leaving Colorado, the friend gave Mr. Strumillo his magazines, because the friend will be away from Colorado for a long period of time. The friend chose Mr. Strumillo as bailee because he considered Mr. Strumillo to be a conscientious and responsible guardian, who would carefully store the magazines and ensure that they did not fall into the wrong hands, and that the magazines would be properly stored to protect from rust or other damage. The magazines hold more than 15 rounds.

On July 1, 2013, Mr. Strumillo and his friend will automatically become criminals under HB 1224. The possessor of the magazines (Mr. Strumillo) will be in Colorado. The owner of the magazines will be on another continent. Hence, the owner will not be in "continuous possession" of the magazines. In violation of the Attorney General's guidance Letter, the owner will certainly not be in the "continual physical presence" of Mr. Strumillo, and the owner will not have "the expectation that [the magazines] will be promptly returned."

A preliminary injunction or temporary restraining order would provide relief. With the elimination of the "continuous possession" language, Mr. Strumillo can continue to store the magazines for the owner. With the elimination of the "transfers" ban, Mr. Strumillo can return the magazines to the owner when the owner returns to Colorado.

### iv.   Plaintiffs David Bayne and Dylan Harrell

There is no question that each of the individual disabled plaintiffs will suffer a concrete, particularized harm if HB 1224 is enforced against them. *Ezell*, 651 F.3d 684, 695 (7th Cir. 2011) ("We note . . . that the district court did not address the individual plaintiffs' standing, probably because it is not in serious doubt."). Messrs. Bayne and Harrell will suffer injury because the enforcement of HB 1224 will mean that they will be unable to determine whether their existing magazines of 15 rounds or less are covered by the phrase "designed to be readily converted," thus chilling their Second Amendment rights to use handguns for common and lawful purposes, including self-defense in their homes. Moreover, as disabled persons who have and need magazines using more than 15 rounds, the restrictions placed on them by HB 1224 (i.e., what constitutes "continuous possession") impair any reasonable ownership of such magazines., Finally, Messrs. Bayne and Harrell will be injured by the enforcement of HB 1224 because it will impact their ability to use certain magazines for target shooting and hunting.

### v.   Plaintiff Outdoor Buddies, Inc.

The "continuous possession" requirement of HB 1224's "grandfather" clause presents a serious problem for Outdoor Buddies, because firearms are frequently loaned to individuals in connection with the programs and activities of Outdoor Buddies. In addition, HB 1224's magazine ban will affect the types of firearms that Outdoor Buddies can use for its activities, including firearms with magazines of 15 rounds or fewer, based on the vague phrase "designed to be readily converted" contained in HB 1224. In short, Outdoor Buddies will suffer a concrete and particularized harm if HB 1224 goes into effect on July 1, 2013.

### vi.   Plaintiff Family Shooting Center ("FSC")

Plaintiff Hamilton Family Enterprises, Inc, d/b/a Family Shooting Center at Cherry Creek State Park incorporates by reference herein the law pertaining to the legal standards for standing in this matter cited by Plaintiff Magpul Industries, Inc, *supra*.

As alleged in the First Amended Complaint, Plaintiff Hamilton Family Enterprises, Inc, is a Colorado corporation which owns the concession authorizing the operation of the shooting facility at Cherry Creek State Park known as Family Shooting Center at Cherry Creek State Park ("Family Shooting Center" or "FSC").   Family Shooting Center is a multi-discipline shooting facility that includes a rifle range, pistol range, law-enforcement range, sporting clays and five-stand range, a trap range using both electric and hand launching stations, a shotgun patterning board, and an archery range.  FSC is the largest public outdoor shooting facility on the Front Range in Colorado; over 64,000 shooters used the facility in 2012, and that number has grown each year since 2004.  Nearly all persons who shoot at FSC pay some form of use fee at either individual or group rates, which is the primary source of revenue for Hamilton Family Enterprises.

In addition to operation, supervision and maintenance of the shooting facilities, FSC also makes available for use by qualified members of the public firearms that are equipped with magazines of standard issue having capacities of more than fifteen rounds or that have smaller magazines that may be convertible to more than 15 rounds.  FSC also sells firearms equipment and accessories, which includes standard magazines for many firearms whose capacities exceed fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.  A large number of rifle and pistol magazines sold and/or in use at FSC prior to July 1, 2013 will be illegal to transfer after that date.  Historically, 20-30% of gross FSC revenues have been the sales of equipment, accessories and ammunition.  Sales this year of equipment and accessories has

grown to nearly half of FSC's gross revenues.  HB 1224 will drastically reduce these sales/revenues.

Per contract requirements of its concession, FSC is currently in the process of adding a "move-and-shoot" pistol range which will permit law enforcement, private security and civilians with concealed carry permits to engage in more dynamic practical firearms practice and training. This new range constitutes a significant capital investment by Hamilton Family Enterprises.  The new laws will have a significant impact on the viability of this new range in that nearly all shooters who are expected to utilize this particular range frequently use firearms that accept magazines with capacities of greater than fifteen rounds.

FSC hosts all type and manner of firearms use, training and practice.  In addition to hosting recreational shooters in all disciplines (rifle, pistol, shotgun), FSC is utilized by law enforcement and firearms instructors for all types and levels of training, hunter safety education handling and live-fire practice, fundraisers and competitive matches in all shooting disciplines, including those for disabled and/or handicapped shooters , e.g. Wounded Warrior Project and the National Veterans Wheelchair Games.  The majority of shooters who use FSC facilities, whether informally or competitively, own and shoot firearms that use, as standard equipment, magazines whose capacities exceed fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.

Since enactment of the statutes in question, the operators of FSC have been frequently contacted by current and potential patrons of their facilities regarding the legality of the use of standard firearms that accept or use magazines exceeding fifteen rounds and smaller magazines that may be convertible to more than 15 rounds.  Many have expressed apprehension in bringing their firearms to FSC after July 1, 2013.  These shooters do not want to risk inadvertently

running afoul of the law, particularly because the range is known to have a frequent and substantial presence of law enforcement personnel who would be compelled to enforce the new magazine laws.  The vagueness and uncertainly of the laws pertaining to magazine capacities and transfer prohibitions have made it unnecessarily and unreasonably unclear as to how FSC should guide/direct its clientele and/or modify its rules, operations and monitoring of its shooting ranges in order to avoid both civil and criminal liability.

Just as Plaintiff Magpul Industries injuries are concrete, particularized, and imminent, so are FSC's injuries, which are attributable to the Defendant's action of signing HB 1224 into law. A favorable decision for the Plaintiffs will redress these injuries by allowing FSC to legally expand and operate its business without unreasonable uncertainly and concern for the legal operation of their facilities and its legal use by its patrons.

b.      *Plaintiffs' Injuries Are Traceable to Defendant Governor Hickenlooper.*

There is no question that the Governor is the proper defendant in a declaratory judgment action seeking to hold a state statute unconstitutional under the United States Constitution. The principal of causation for constitutional standing requires a plaintiff's injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (internal quotations omitted). "It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007).

The issue was determined definitively in *Ainscough v. Owens*, 90 P.3d 851 (Colo. 2004). In *Ainscough*, the Colorado Supreme Court made a broad inquiry into the role of the Governor in

defending litigation directed against the State of Colorado, statutes passed by the General

Assembly, and actions by the Executive Branch of Colorado's government. In part, the Court

stated:

> The Governor of Colorado is unique in that he is the 'supreme executive," and it
> is his responsibility to ensure that the laws are faithfully executed. Colo. Const.
> art IV, § 2 ("The supreme executive power of the state shall be vested in the
> governor, who shall take care that the laws be faithfully executed."). Therefore,
> when a party sues to enjoin or mandate enforcement of a statute, regulation,
> ordinance, or policy, it is not only customary, but entirely appropriate for the
> plaintiff to name the body ultimately responsible for enforcing that law.
> Moreover, when that body is an administrative agency, or the executive branch of
> government, or even the state itself, the Governor, in his official capacity, is a
> proper defendant because he is the state's chief executive. For litigation purposes,
> the governor is the embodiment of the state.

*Ainscough v. Owens*, 90 P.3d 851, 858 (Colo. 2004). Surveying a number of cases involving

challenges to state law, including the federal equal protection challenge to the citizen initiative

involving restrictions on the rights of persons based upon their sexual orientation, in *Romer v.

Evans*, 517 U.S. 620 (1996), the Colorado Supreme Court held that "[t]his case and the many

others like it clearly demonstrate that when challenging the constitutionality of a statute   . . . ,

the Governor is an appropriate defendant due to his constitutional responsibility to uphold the

laws of the state and to oversee Colorado's executive agencies."  *Id.* at 858.

Because Defendant Governor Hickenlooper is the state's chief executive and he is charged

with ensuring that Colorado laws are faithfully executed, Plaintiffs injuries are traceable to him

and they satisfy the second prong for standing. *See Sportsmen's Wildlife Defense Fund v. U.S.

Dept. of the Interior*, 949 F. Supp. 1510, 1514-15 (D. Colo. 1996) (finding that based on the

Colorado Constitution, the plaintiff's injury is fairly traceable to the Governor and he is a proper

party).

   c.    *Plaintiffs' Injuries Will Be Redressed by a Preliminary Injunction.*

Similar to the causation requirement, there can be no question that a temporary restraining order and preliminary injunction issued by this Court against Defendant Governor Hickenlooper would be effective statewide and bind all local law enforcement officers. The Tenth Circuit has stated that "the requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1233 (10th Cir. 2010). "[W]here a plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in the complaint." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011). "It must be the effect of the court's judgment on the defendant that redresses the plaintiff's injury, whether directly or indirectly." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005).

In *American Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999), the Tenth Circuit rejected an attempt by local district attorneys in New Mexico to avoid being bound by an injunction issued in a case brought against the Governor and the Attorney General of New Mexico to invalidate a state criminal statute as being unconstitutional.  Upholding the injunction against enforcement of the criminal statute, the Tenth Circuit noted: "To the extent district attorneys would attempt to enforce [the enjoined statute], an injunction against the governor and attorney general prohibiting such enforcement binds those attorneys."  *Id.* at 1163.

Accordingly, the Governor is a proper defendant in this case, and a temporary restraining order and preliminary injunction against him would be effective throughout the State of Colorado.

> d.    Plaintiffs NSSF, CSSA, Outdoor Buddies, Women for Concealed Carry , and Colorado Outfitters Association Have Standing to Bring This Action by Virtue of Their Representational Standing.

The National Shooting Sports Foundation ("NSSF"), the Colorado State Shooting Association ("CSSA"), Outdoor Buddies, Women for Concealed Carry, and Colorado Outfitters Association also have standing to bring this action against the Defendant because of their "representational standing." An organization may have representational standing by virtue of the standing of its individual members under certain circumstances. Specifically, an organization has representational standing "only if: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Save our Snowplanes v. Salazar*, 333 Fed. Appx. 355, 359 (10th Cir. 2009).

NSSF is a national trade association for firearms, ammunition, and the hunting and shooting sports industries. First Amended Complaint, Doc. No. 22 ¶ 113. Its membership includes federally licensed firearms manufacturers, distributors, and retailers; companies manufacturing, distributing, and selling shooting and hunting related goods and services; sportsmen's organizations; public and private shooting ranges, gun clubs; publishers; and individuals, with more than 300 members residing and conducting business in Colorado. *Id.* ¶ 114. Each of its members' business interests, livelihoods, and fundamental Constitutional rights will be adversely affected by HB 1224. *Id.* ¶ 115.

Similarly, as previously alleged, CSSA is the oldest state-wide shooting and firearms association in Colorado, established in 1926. *Id.* ¶ 139. It has approximately 1,500 dues-paying members, as well as twenty businesses and club members with approximately 20,000 associated members. *Id.* ¶ 140. Its membership includes hunters, competitive shooters, recreational shooters, firearms instructors, active and retired law enforcement officers, crime prevention

advocates, firearms and equipment dealers and wholesalers, and other Second Amendment advocates. *Id.* ¶ 140. CSSA membership is *required* to compete in any sanctioned state and regional competitive firearms matches in Colorado. *Id.* ¶ 145. CSSA alleges that each of its members' business interests, livelihoods, and fundamental constitutional rights will be adversely affected by HB 1224. *See, e.g.*, *Id.* ¶¶ 190, 203, 219, 226, 228, 233, 241, 244.

Outdoor Buddies, Inc. ("Outdoor Buddies"), which was founded in 1984, is an all-volunteer non-profit organization based in Colorado. Its mission is to provide opportunities to enjoy the outdoors to those who have been deprived of it due to various physical disabilities. Outdoor experiences provided through Outdoor Buddies include, among other things, hunting and target shooting. *Id.* ¶ 160. Outdoor Buddies has approximately 760 individual members, approximately two-thirds of whom are disabled member of the community who need special assistance with the use of firearms. Each of the members of Outdoor Buddies, including Plaintiffs David Bayne and Dylan Harrell, will be adversely affected by HB 1224, in violation of their Second Amendment rights. *E.g., id.* ¶ 227.

Women for Concealed Carry is a 26 U.S.C. § 501(c)(4) nonprofit organization registered in the State of Colorado. Women for Concealed Carry supports women's rights to effective self-defense against physical harm by protecting women's rights to carry concealed firearms, and the organization conducts outreach and education to support policies that defend that right. Members of the organization use and carry magazines which would be banned under HB 1224, thereby violating their Second Amendment rights as defined under *Heller*. *Id.* ¶ 231, 234, 241, 244.

The Colorado Outfitters Association is an organization dedicated to improving the Colorado outfitting industry's standards and the quality of services provided by professional outfitters in Colorado. The Association represents approximately 790 professional hunting, fishing, and

camping outfitters and guides based in Colorado.  *Id.* ¶ 163. The chilling effect of the potential

legal perils for non-resident hunters caused by HB 1224, particularly in not knowing which

magazines are "designed to be readily converted," harms all Colorado outfitters.

The Plaintiffs' First Amended  Complaint thoroughly details the myriad of constitutional

violations and financial burdens that implementation of HB 1224 will impose on the general

public, including the individual members of NSSF, CSSA,  Outdoor Buddies, Women for

Concealed Carry, and Colorado Outfitters Association. *See, e.g. id.* ¶¶ 217-19, 224-28, 230-35,

240-44. These members all have standing to sue in their own right. Indeed, approximately half of

the Plaintiff licensed firearms dealers are members of NSSF, and they undoubtedly have standing

to bring this action based on HB 1224's imminent damage to their livelihoods and constitutional

rights. Similarly, all 55 Plaintiff Sheriffs, as well as the Family Shooting Center, are members of

CSSA and, as discussed in this brief, they all have individual standing to bring this action based

on HB 1224's imminent damage to their law enforcement duties, livelihoods, and constitutional

rights. Plaintiffs David Bayne and Dylan Harrell are members of Outdoor Buddies, and as

discussed above, there is no doubt that they have standing to bring their claims in this action.

Even assuming *arguendo* that NSSF,CSSA, Outdoor Buddies, Women for Concealed Carry,

and the Colorado Outfitters Association will not directly suffer injuries from the enforcement of

HB 1224, all of these organizations still have standing by virtue of the constitutional and

financial injuries that their members will suffer from HB 1224's enforcement  *See Sierra Club v.*

*Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1084 (D. Colo. 2001) (an organization has

standing to sue even if it has not been injured itself so long as the association's members satisfy

the constitutional minimums of Article III). For example, the manufacturer and retailer members

of NSSF are injured because they will not be permitted to sell magazines, or firearms so

equipped, larger than 15 rounds in Colorado.  Those same members will face uncertainty and risk criminal prosecution and further reduced sales because the designed to be "readily converted language" may prohibit sales of nearly all magazines of any size.

Further, the interests that these Plaintiffs seek to protect (namely Second and Fourteenth Amendment protections) are clearly germane to their purposes. The NSSF's purpose, among other things, is to promote, protect, and preserve hunting and shooting sports on behalf of its members and the general public. The CSSA's purpose, among other things, is to provide shooting opportunities for law-abiding Colorado residents, to provide a united voice to all levels of government to defend the shooting sports, and to protect the Constitution of the United States. The interests Outdoor Buddies seeks to protect – the Second Amendment rights of its members – is germane to its organizational purpose, which is to provide outdoor experiences to disabled individuals, including hunting and target shooting. The self-defense interests that Women for Concealed Carry seeks to protect in this lawsuit is germane to its organizational purpose, which is to support women's rights to effective self-defense. Finally, in bringing this lawsuit, the Colorado Outfitters Association seeks to protect the interests of Colorado outfitters and the outfitting industry, which is its core organizational purpose.

Neither the claims asserted nor the relief requested require the participation of each and every member of NSSF, CSSA, Outdoor Buddies, Women for Concealed Carry, and Colorado Outfitters Association.  Their requested relief will remedy the injuries of its members attributable to the Defendant's enforcement of HB 1224. *See Sierra Club*, 176 F. Supp. 2d at 1084. Thus, NSSF, CSSA, Outdoor Buddies, Women for Concealed Carry, and Colorado Outfitters Association all have associational standing to be named Plaintiffs in this action.

> e.      *Plaintiffs 55 Colorado Sheriffs Have Standing to Challenge HB 1224*

*e.  Plaintiffs 55 Colorado Sheriffs Have Standing to Challenge HB 1224*

i.    The Sheriffs' Individual Second and Fourteenth Amendment Rights

Every Sheriff in this case is a law-abiding citizen of the United States of America. As such, every Sheriff has an individual Second Amendment right to keep and bear arms, and an individual Fourteenth Amendment right not to be subject to vague laws which chill the exercise of the Second Amendment rights.

While the individual Sheriffs do keep and bear arms pursuant to their duties as Sheriffs, and in compliance with their Offices' established rules about which firearms may be used during the course of official duties, the individual Sheriffs **also** own and use firearms and magazines personally. Like the other plaintiffs in this case, they do so for a wide variety of lawful purposes of arms ownership, all such purposes being protected by *Heller* and *McDonald*. *District of Columbia v. Heller*, 554 U.S. 570, 577, 620, 624, 625, 628, 630 (2008) ("lawful purpose" or "lawful purposes"); *McDonald v. Chicago*, 130 S.Ct. 3020, 3023, 3030, 3036, 3044 (2010) (same).

Sheriffs are particularly interested in personally exercising the "core" Second Amendment right lawful self-defense, of "hearth," "home," and "family." *Heller*, 554 U.S. at 573-75, 577, 615-16, 625, 628-630, 632, 634-36. *McDonald v. Chicago*, 130 S.Ct. at 3026-27, 3036, 3039, 3041, 3044, 3047, 3049-50. Sheriffs are often away from their home. Disgruntled or mentally ill persons sometimes come to their homes and threaten family members. Such threats to family members also materialize away from home. One reason the Sheriffs wish to personally own firearms and magazines is to share them with family members who need them for self-defense.

Especially in lower-population communities, it is impossible for out-of-uniform Sheriffs or their families to blend into the background. Everyone knows who they are and where they live.

Credible threats to the families are common, including within the last year. One Sheriff drives 40 minutes each way every Sunday in order at attend church in a different, highly-populated county, where he can be somewhat anonymous; he fears that attending church in his own county could endanger the other parishioners, if a dangerous local person decided to attack the Sheriff while he was at church.

Moreover, all of the Sheriffs know that they will eventually retire from their positions as law enforcement officers. At that time, they will possess no law enforcement duty arms, and none of the law enforcement exemptions of HB 1224 or 1229 will apply to them. Yet for the rest of the lives they and their families will continue to face the danger of retaliation from the many criminals whom they have arrested, or from any other person who may bear a grudge. Their current public service in law enforcement makes their present and post-retirement needs for armed self-defense particularly acute.

In regards to the preliminary injunction, the Sheriffs, like other plaintiffs, suffer the irreparable injuries of not knowing what magazines are legal for them to purchase, possess, or transfer for personal and family use, being prohibited from allowing family members or close friends to use their magazines for lawful self-defense, and not being able to leave their personal magazines with gunsmiths for repair.

In short, as American citizens the Sheriffs have and assert the same individual constitutional rights as do the other plaintiffs, except that they do so with particular acuity in light of the present and future risks that they and their families face because of the Sheriffs' public service. The Sheriffs and their families have already made substantial sacrifices for the public interest. It is in the public interest that they not be forced to face even greater risks by being disarmed on July 1 from using the magazines that they have decided are the best for family protection.

ii.     The Sheriffs in their Official Capacity

Besides having standing as individual American citizens, the Sheriffs also have standing in their official capacity. Their office, and their direct election by the People, is established by the Colorado Constitution. Colo. Const. Art. XIV, § 8. The election of Sheriffs is one of the oldest elements of our tradition of ordered liberty, lauded by Blackstone, and dating back to Saxon times.[2] To Thomas Jefferson, "the office of sheriff" was "the most important of all the executive officers of the county."[3]

iii.    Damage to Law Enforcement Efficiency

Unless temporary or preliminary relief is granted, then beginning in July 2013, the Sheriffs will have to divert resources from enforcing Colorado's present laws which enhance public safety, and begin enforcing the unconstitutionally vague and/or facially unconstitutional provisions of HB 1224. The diversion of resources will immediately impair the operational efficiency of the Sheriffs' Offices. Sheriffs have standing to challenge a statute which may distract them from the performance of their duties.

The United States Supreme Court decision, *Printz v. United States*, involved challenges by Sheriffs to a federal statute which ordered the Sheriffs to carry out background checks on handgun buyers. 521 U.S. 898 (1997). The Sheriffs argued that they did not wish to perform the

---

[2] W. BLACKSTONE, 1 COMMENTARIES, ch. 13, para. 3 (1765-69): In Saxon times, "sheriffs were elected: following that still old fundamental maxim of the Saxon constitution, that when any officer was entrusted with such power, as if abused might tend to the oppression of the people, that power was delegated to him by the vote of the people them selves."

[3]    Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), http://www.let.rug.nl/usa/presidents/thomas-jefferson/letters-of-thomas-jefferson/jefl246.php. Kercheval was a Virginia attorney and historian. An excerpt from the cited letter appears in a panel on the Jefferson Memorial. "Quotations on the Jefferson Memorial," Official Monticello website, http://www.monticello.org/site/jefferson/quotations-jefferson-memorial.

checks, in part, because doing so would distract them from other law enforcement duties which they considered to be more important.

The *Printz* case was the culmination of a number of Sheriff lawsuits on the same issue, filed in a variety of states. In those cases, the defendant repeatedly attacked the Sheriffs' standing, and repeatedly lost. *See* Koog/McGee v. United States, 79 F.3d 452, 458-459 (5th Cir. 1996) (standing because the federal statute substantively enlarged the duties and authority given to the Sheriffs without the States' permission), rev'g *Koog v. United States*, 852 F. Supp. 1376, 1380 (W.D. Tex. 1994) (Sheriff Koog had standing because he would be required to perform certain acts which he believed to be unconstitutional), and aff'g *McGee v. United States*, 863 F. Supp. 321, 325 (because Sheriffs may be sued in civil rights actions, it would be unfair to deny them the same access to the courts when they suffer an actual injury), earlier proceeding 849 F. Supp. 1147 (S.D. Miss. 1994); *Mack v. United States*, 66 F.3d 1025, 1029-1030 (9th Cir. 1995), rev'g 856 F. Supp. 1372, 1377 (D. Ariz. 1994) (federal statute forced Sheriff to violate his oath) and rev'g *Printz v. United States*, 854 F.Supp. 1503, 1508-1509 (D. Mont. 1994) (forced reallocation of resources; violation of oath); *Romero v. United States*, 883 F.Supp. 1076, 1080 (W.D.La. 1995) (diversion of resources; compelled enforcement of a statute that the Sheriff and his constituents considered unconstitutional); Frank v. United States, 78 F.3d 815, 823 (2d Cir. 1996) (discussed *infra*), rev'g 860 F.Supp. 1030 (D.Vt. 1994) (standing existed because the Sheriff was forced to enforce laws he believed were unconstitutional).

The Second Circuit held:

> It is this administrative burden added to the sheriff's regular workload that permits plaintiff to maintain his Tenth Amendment challenge. Interference with the functions of a local unit of government is an injury that may give a litigant standing. For standing purposes, the 'slender' burden on the Sheriff was 'sufficient for constitutional purposes.' The harm, 'need not be monumental.'

*Frank v. United States*, 78 F.3d 815, 823-24 (2d Cir. 1996), judgment vacated on other grounds, 521 U.S. 1114 (1997).

The D.C. Circuit adhered to *Printz* in *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002). There, the Circuit Court pointed out that in *Printz,* "the Court reached the merits of a Tenth Amendment challenge to the Brady Act in cases brought by county sheriffs. Neither the majority opinion nor the opinions of the five Justices who wrote separately questioned the sheriffs' standing to sue." *Id.* Therefore, to require state authorization for a federal lawsuit by a Chief Law Enforcement Officer "would be to depart from our decision in the *FOP* case, and perhaps the Supreme Court's disposition of *Printz.*" *Id.* at 13-14.

As noted above, because of the breadth and uncertainty of HB 1224, for the Plaintiff Sheriffs to enforce it they will have to divert a large portion of resources, which will distract them from their other important duties. Accordingly, Sheriffs, like other Chief Law Enforcement Officers (CLEOs), have standing to sue in federal court regarding gun control laws.

The 55 Colorado Sheriffs do not seek the particular preliminary relief here because enforcement time will be huge. They seek relief because any amount of enforcement time will be poisonous.

Sheriffs depend on good community relations. People who trust the Sheriffs will call in tips, and are cooperative witnesses. Arrest just one person in a county because he left a magazine in a repair shop overnight? The trust and respect of many citizens would be forfeited in an instant. A Temporary Restraining Order is necessary to prevent even a single occurrence of such an event.

 "It is the duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties…." C.R.S. § 30-10-516. To be peace-keepers, to enforce ordered

liberty, to deserve the trust of the citizens, Sheriffs must not be compelled to enforce irrationally harsh laws such as "continuous possession."

   iv.  Third Party Standing

Law enforcement executives have third-party standing to raise the constitutional rights of other persons. The foundational case is *Fraternal Order of Police v. United States*, 152 F.3d 998, 1001–1002 (D.C. Cir. 1998) (*FOP I*), on rehearing of merits, 173 F.3d 898 (1999) (*FOP II*). The Fraternal Order of Police is a private association whose members include Chief Law Enforcement Officers, as well as rank and file officers. Plaintiffs in *FOP* argued that a 1996 federal statute prohibiting gun possession by anyone convicted of misdemeanor domestic violence was unconstitutional. Essentially, the basis for the plaintiffs' challenge was that the misdemeanor disarmament law also applied to the duty weapons of law enforcement officers, while a federal statute against gun possession by convicted *felons* had an exception for law enforcement officers.

The CLEOs asserted the Equal Protection rights of subordinate officers, and argued that a gun ban for misdemeanants but not for felons failed the rational basis test. On the merits, the argument was not successful, but the D.C. Circuit concluded that the CLEOs had standing for two reasons. First, *FOP I* held that CLEOs had a sufficient relationship with their subordinates such that the CLEOs had third party standing to assert the Equal Protection rights of the subordinates. *FOP I*, 152 F.3d at 1002.

Then, *FOP II* added that the CLEOs were directly injured by being unable to choose the subordinates whom they considered to be well-suited for carrying firearms; so the CLEOs had standing to raise a Tenth Amendment claim. *FOP II*, 173 F.3d at 904-05.

Like the plaintiffs in *Fraternal Order of Police*, the Sheriffs here are complaining about the particular injury of the disarmament of persons whom they wish to be armed. Under Colorado law, Sheriffs have the authority to appoint "non-certified" persons as deputies. At the Sheriff's discretion, the appointments may be for a limited time or for a particular task. *See* C.R.S. §§ 16-2.5-103(2); 30-10-506. Because of HB 1224, such deputies appointed by the Sheriffs will be deprived of possessing and using the magazines which may be most effective for law enforcement needs.

This is a paradigm of the Court's two-element rule for third-party standing in *Singleton v. Wulff*, 428 U.S. 106 (1976). First, "[i]f the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." Second, whether "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 113-114.

Both elements are present here. The activity the Sheriffs wish to pursue (calling on temporary deputies) is inextricably bound up with the public's enjoyment of the Second Amendment right to bear arms. Further, Sheriffs are a particularly "effective a proponent of the right." With their perspectives of the possibilities of natural or man-made disasters, they are strong proponents of the Second Amendment rights of citizens as a defense of law and order in case of emergency.

More broadly, the Sheriffs believe that effective law enforcement is supported when law-abiding citizens who wish to be armed can do so, including with magazines of the particular sizes which are best-suited for each citizen's needs and capabilities. When the public is disarmed, victims are less able to protect themselves; so the Sheriffs' jobs are that much harder.

The Sheriffs have been elected to represent the public safety interests of all the People. Thus, the Sheriffs are especially suited for third-party standing, in support of the law-abiding gun owners of their counties.

>    v.    Colorado State Court Precedent

In 1990, the Colorado General Assembly enacted a statute which set training requirements for Sheriffs. This violated the Colorado Constitution, because "the office of county sheriff was created by the Colorado Constitution, which establishes the qualifications for holding this office. See Colo. Const. art. XIV, §§ 8, 10." *Jackson v. State*, 966 P.2d 1046, 1051 (Colo. 1998). Sheriff Richard Jackson filed suit, and argued that the state statute was unconstitutional. The state district court agreed with him, and on direct appeal, so did the unanimous Colorado Supreme Court.

As *Jackson* demonstrates, County Sheriffs have standing to sue in Colorado on constitutional issues in Colorado state courts. In contrast, county officials who only perform ministerial duties do not. *Board of County Commissioners of Boulder County v. The Fifty-First General Assembly of the State of Colorado*, 198 Colo. 302, 307, 599 P.2d 887 (1979). *Lamm v. Barber*, 192 Colo. 511, 565 P.2d 538 (1977) (County Assessor); *Ames v. People*, 26 Colo. 83, 90, 56 P. 656, 658 (1899) (County Assessors). These cases are irrelevant to the Sheriffs, for the duties of Sheriffs and their Deputies are "highly discretionary." *Nichols v. Hurley*, 921 F.2d 1101, 1109 (10th Cir., 1990)

>    vi.    Political Subdivision Doctrine

Pursuant to the political subdivision doctrine, federal courts often refuse to hear cases in which a state's political subdivision raises a federal constitutional challenge to a state government action. There are three reasons why this general rule does not control the present

case. First, a Sheriff is not a "political subdivision." Second, even if the individual Sheriffs were "political subdivisions," they have a "personal stake" in the case that provides standing even for employees of political subdivisions. Third, even if the Court finds that the Sheriffs are political subdivisions and have no personal stake, Tenth Circuit precedent allows political subdivisions to raise structural constitutional claims.

Moreover, because the Sheriffs certainly have standing as individual citizens asserting their Second Amendment rights (Part II.e.1) and because other plaintiffs have standing for every claim involving the motion (Part II.a-d.) it is not necessary for this Court to delve into the unresolved questions of political subdivision standing as applied to the Sheriffs.

> I.     A Sheriff is not a "political subdivision" and Sheriffs have a "personal stake"

The instant case is brought in the name of the Sheriffs, and not of the Sheriffs' Offices. The latter might involve a political subdivision, but the former does not. *Cf. Freedom Colorado Information, Inc. v. El Paso County Sheriff's Dept.*, 196 P.3d 892, 892 (Colo. 2008) (plaintiff sued the "El Paso County Sheriff's Department; and Terry Maketa, in his official capacity as the El Paso County Sheriff, an elected official of El Paso County, Colorado, a political subdivision.").

In the Sixth Circuit Court of Appeals, an individual Sheriff acting in his official capacity claimed that he was a "political subdivision," for a case under the Securities Litigation Uniform Standards Act. He supported his claim by pointing out that he was bringing a class action suit on behalf of the Sheriff's Department's employees. The Court observed that it "may strain" the statute's language to call an individual Sheriff a political subdivision. Because the case could be resolved without deciding the issue, the Sixth Circuit did not determine whether the statute could bear such a strain. *Demings v. Nationwide Life Ins. Co.*, 593 F.3d 486, 491-92 (6th Cir. 2010).

No class action is involved in the instant case; however doubtful the notion of an individual Sheriff as a political subdivision was in Demings, it more doubtful here.

A political subdivision has standing when there is a "personal stake." In *Board of Education v. Allen*, two local school boards (certainly political subdivisions) brought a First and Fourteenth Amendment challenge to a New York State statute requiring the boards to provide free textbooks to private school students. 392 U.S. 236 (1968). The New York State courts were closely divided on the issue of standing, but the U.S. Supreme Court was not. Justice White's majority opinion stated:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step -- refusal to comply with § 701 -- that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation. *Baker v. Carr*, 369 U.S. 186, 204 (1962).

392 U.S. 236, 242 n.5 (1968). Neither Justice Harlan's concurrence nor the three dissents disagreed with the majority about standing.

In the instant case, the Sheriffs also wish to adhere to their constitutional oath of office. Like the School Boards, the Sheriffs too face the diminution of their resources for serving the public. Each of the Plaintiff Sheriffs has the primary obligation to obey and enforce the United States Constitution as well as the Constitution of the State of Colorado. The Sheriffs, therefore, cannot enforce a statute that violates the fundamental constitutional rights of the citizens of Colorado. As such, just like in *Allen*, *supra*, these Sheriffs have a "personal stake in the outcome of this litigation" and the political subdivision doctrine does not preclude them from bringing claims.

*Allen* did not say that the risk of losing a job is the *only* interest that can give rise to political subdivision standing. Rather, *Allen* cited the ordinary rule that standing requires a "personal

stake in the outcome." *Id.* In the Tenth Circuit's most recent case on the political subdivision doctrine, the Court distinguished *Allen*. After quoting the relevant *Allen* text, a divided panel wrote: "This passage makes clear that the situation in *Allen* is very different from the situation here. In *Allen*, standing was based on the individual board members' personal stake in losing their jobs." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011).

The Sheriffs meet the highly restrictive standard of *Hugo*. The *Hugo* Court recognized if the plaintiffs *had* been in danger of losing their jobs, the plaintiffs would have had standing under the political subdivision doctrine.

A death in the family is worse than losing a job. As detailed in Part II.e.1, HB 1224 aggravates the already-present risks to the lives of the Sheriffs and their families. The Sheriffs have an enormous "personal stake," and therefore have standing under the Tenth Circuit's interpretation of *Allen*.

II.   The Constitutional provisions at issue are distinct from those which have been decided by the Tenth Circuit.

If it were decided that an individual Sheriff is a political subdivision, and that mortal peril to one's family does not constitute a sufficient "personal stake," the next question would be whether the constitutional claims raised by the Sheriffs are foreclosed by the Tenth Circuit's precedents on political subdivision standing.

The Tenth Circuit has decided several cases on whether a political subdivision has standing to invoke a particular constitutional provision. The results are: Equal Protection: No. *City of Herriman v. Bell,* 590 F.3d 1176 (10th Cir. 2010); *City of Moore, Oklahoma v. Atchison, Topeka, & Santa Fe Ry. Co.,* 699 F.2d 507, 511-12 (10th Cir. 1983). Supremacy Clause: Yes. *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998). Dormant Commerce Clause: No. *Hugo*, *supra*.

The cases have some broad statements do not have to be treated as absolute rules. The Tenth Circuit's political subdivision methodology favors such a reading. As the Panel wrote in *Branson*, "Despite the sweeping breadth" of an opinion's language about political subdivision standing, one should follow the opinion's "limited proposition." *Branson*, 161 F.3d at 628.

Suppose that instead follows the broadest language of *Hugo* and *Branson*, that "a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights." A political subdivision may only bring actions based on "collective or structural rights." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir., 2011). If so, the Sheriffs in their official capacity have standing to raise structural constitutional rights.

a.   Fourteenth Amendment

The first such structural right is the Fourteenth Amendment's Due Process prohibition on vague laws.

To be sure, the right not to be subject to vague laws is an individual right; all the other plaintiffs have raised that right, and as individual American citizens, the Sheriffs assert that same right. However, the Sheriffs in their official capacities also raise a separate type of right, for which standing is not foreclosed by *Hugo* and its ancestors. The Sheriffs' claim in this regard is not "don't make me obey that law," nor is the claim "I don't want to enforce that law." Rather, their claim is "I don't know what 'law' I am supposed to enforce."

It is axiomatic that in a nation governed by the Rule of Law, the law enforcement officers must know what law they are supposed to enforce. This is a structural right of the deepest kind. The Fourteenth Amendment protects political subdivisions by ensuring that the laws which they must enforce are clear and not vague. This is absolutely necessary to the legitimate existence of

political subdivisions and all levels of government in nations which are governed by the Rule of Law.

Without a clear Rule of Law to enforce, a political subdivision ceases to exist in a legitimate sense, and degenerates into arbitrary force. The Fourteenth and Fifth Amendment prohibitions of vague "laws" are essential to the Rule of Law. Therefore, the Sheriffs have standing to assert the structural Due Process guarantee that law enforcers must be able to know what the law is.

### a.   Second Amendment

The Second Amendment right to keep and bear arms is an individual right belonging to all Americans for all lawful purposes, like the First Amendment freedom of speech and other fundamental rights. *Heller*, *supra*; *McDonald*, *supra*. In addition, the Second Amendment formally announces an intended third-party beneficiary: the state militias. Before *Heller*, some lower courts misread the Second Amendment, and thought that the individual Second Amendment right exists *only* when it is in direct service of state militias. *Heller* corrects this error, and affirms the traditional American understanding that the Second Amendment right to keep and bear arms is for all law-abiding citizens, **and** that an intended beneficiary of that right is the state militia system. Article I of the Constitution makes it clear that the militias exist for the benefit of the both the states and the federal government, and are subject to the overlapping control of both. U.S. Const., art. I, § 8, cl. 15-16. Thus, the Second Amendment is partly (although not exclusively) a "structural" right enacted for the benefit of state and local governments.

Besides the militia, there is another beneficiary of the Second Amendment: the *posse comitatus.* For at least the last millennium in our legal system, Sheriffs have had the authority to summon armed able-bodied citizens to assist law enforcement. *See*, *e.g. Filarsky v. Delia*, 132

S.Ct. 1657, 1664 (2012); *In re Moyer*, 35 Colo. 159, 166-67, 85 P. 190 (Colo. 1904) ("the sheriff of a county, aided by his deputies or posse comitatus in suppressing a riot.").[4]

This long-standing authority of Sheriffs is given modern protection in statutes such as C.R.S. §§ 16-3-202(1) ("A peace officer making an arrest may command the assistance of any person who is in the vicinity."); 18-8-107 (A class 1 petty offense for anyone "unreasonably refuses or fails to aid the peace officer in effecting or securing an arrest or preventing the commission by another of any offense.")

The *posse comitatus* was well-known to the Founders. In *Federalist no. 29*, Alexander Hamilton addressed a then-current controversy about the proposed Constitution: that the federal government would have the power to call forth the militia, but not to summon the *posse comitatus*.

When James Madison was Secretary of State, he sent written instructions ordering an official to "call for the assistance of the good citizens of the district, as the posse comitatus" to enforce the terms of the Louisiana Purchase. *Livingston v. Dorgenois*, 11 U.S. (7 Cran.) 577, 579 (1813).

The Second Amendment names an intended beneficiary: the militia. Creating the conditions for a well-regulated, functional militia also has the obvious and inescapable benefit of ensuring a strong and vigorous *posse comitatus*. A well-armed population fosters both.

---

[4] *See also In re Quarles*, 158 U.S. 532 (1895) ("It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country"); *Cunningham v. Neagle*, 135 U.S. 1, 65 (1890) ("marshals of the United States, with a posse comitatus properly armed and equipped"); 1866 Civil Rights Act § 5, 14 Stat. 28 (Empowering federal civil rights commissioners to appoint "suitable persons… to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty."); Joanne Eldridge, *County Sheriffs In Colorado: Beyond the Myth*, COLO. LAWYER *19 (Feb. 2009).

Like the Second Amendment, the Colorado Constitution's right to arms has a dual nature: It is the right "to keep and bear arms in defense of his home, person and property, **or** in aid of the civil power when thereto legally summoned." Colo. Const., art. II, § 13.

A deep analysis of the multi-faceted nature of the right to keep and bear arms is an interesting academic question; it is a necessary question to resolve if one must decide whether the Sheriffs' assertion of the Second Amendment is prohibited by *Hugo*'s political subdivisions doctrine. To even get to the *Hugo* question, one must first decide whether a Sheriff is a political subdivision, and whether mortal peril does or does not count as a "personal stake" under *Hugo*'s reading of *Board of Education v. Allen.*

> vii.    The Issue of Sheriffs' Standing is Irrelevant

Because sufficient plaintiffs clearly have standing to raise all the claims at issue in the Motion, this Court need not decide whether additional plaintiffs, such as the Sheriffs, have standing.

In 2010, a large number of Attorneys General, including the Colorado Attorney General, filed a lawsuit challenging the individual mandate in the Affordable Care Act. Defendants argued that the Attorneys General did not have standing to challenge the individual mandate. The Attorney General responded with a brief arguing that his standing was irrelevant, since other plaintiffs had standing. Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, State of Florida, by and through Bill McCollum, Attorney General of the State of Florid et al., *Florida ex rel. Bondi v. U.S. Dept. of Health and Human Services*, 780 F.Supp.2d 1256 (N.D. Fla. 2011), 2010 WL 3163990.

The District Court agreed:

> This eliminates the need to discuss the standing issue with respect to the other state plaintiffs, or the other asserted bases for standing. *See Watt v. Energy Action Educ.*

*Found.,* 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264 n. 9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); *see also Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996) (if standing is shown for at least one plaintiff with respect to each claim, "we need not consider the standing of the other plaintiffs to raise that claim").

780 F.Supp.2d at 1274.

The District Court granted relief to the Attorney General on the individual mandate. On appeal, the Attorney General again urged the court not to consider standing. Opening / Response Brief of Appellee/Cross-Appellant States of Florida, by and through Pam Bondi, Attorney General of the State of Florida et al., *Florida ex rel. Atty. Gen. v. U.S. Dept. of Health and Human Services*, 648 F.3d 1235 (11ᵗʰ Cir., 2011) (Nos. 11-11021, 11-11067), 2011 WL 1944107, *67.

The Eleventh Circuit agreed:

Although the question of the state plaintiffs' standing to challenge the individual mandate is an interesting and difficult one, in the posture of this case, it is purely academic and one we need not confront today. The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing. Because it is beyond dispute that at least one plaintiff has standing to raise each claim here—the individual plaintiffs and the NFIB have standing to challenge the individual mandate, and the state plaintiffs undeniably have standing to challenge the Medicaid provisions—this case is justiciable, and we are permitted, indeed we are obliged, to address the merits of each. Accordingly, we turn to the constitutionality of the Act.

648 F.3d at 1243-44.

Importantly, in *Ezell v. City of Chicago*, the Seventh Circuit noted this rule of law when considering the organizational plaintiffs' standing to challenge the constitutionality of a city ordinance that mandated fire-range training as a prerequisite to lawful gun ownership, but prohibited all firing ranges in the City. *See Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir.

2011). There, the court stated: "[t]he district court's emphasis on the organizational plaintiffs' standing us puzzling. As we have noted, it's clear that the individual plaintiffs have standing. Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not. *Ezell*, 651 F.3d at 696, n.7. (internal quotations omitted).

A core principle of federal standing is that federal courts do not spend time deciding abstract questions that will not determine the outcome of the case. As detailed *supra*, there can be no serious dispute that at least some of the plaintiffs have standing to challenge the language at issue in the preliminary injunction motion. Therefore, this Court should not consider the Attorney General's theories about the Sheriffs' standing in their official capacity. As to the Sheriffs' standing in their individual capacity, as citizens and gun owners, there cannot be an argument that they have any less standing than do the other plaintiff individual gun owners and plaintiff associations which include gun owners.

## CONCLUSION

For the reasons set forth herein and above, Plaintiffs have standing to challenge the constitutionality of HB 1224. Moreover, the Court has the authority to issue a temporary restraining order pursuant to Fed.R.Civ.P. 65.

Dated this 20th day of June, 2013.

Respectfully submitted,


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

**ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO**

Jonathan M. Anderson
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**


Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY**

Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

ATTORNEY FOR LICENSED FIREARMS DEALERS


Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
501 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK