## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado, *et al.,*

Plaintiffs,

v.

JOHN W. HICKENLOOPER
in his official capacity as Governor of the State of Colorado,

Defendant.

## GOVERNOR'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [DOCS. 29 AND 37]

Defendant, Governor John W. Hickenlooper, by and through undersigned counsel, responds as follows to Plaintiffs' motion for a temporary restraining order and preliminary injunction.

## INTRODUCTION

During the 2013 legislative session the Colorado General Assembly adopted several firearms regulation measures, two of which—a limitation on the capacity of certain magazines (House Bill 13-1224) and an expansion of the background check requirement for firearms purchases (House Bill 13-1229)—are the subject of this lawsuit. Plaintiffs, a confederation of county sheriffs, firearms dealers, gun owners and others, filed suit against the Governor, asking this Court to declare both provisions unconstitutional and enjoin their enforcement.

Plaintiffs filed the instant motion less than three weeks before the legislation's effective date of July 1, 2013, seeking a preliminary injunction and a temporary restraining order against the enforcement of three provisions in the large-capacity magazine bill.  They supplemented their motion on June 20, 2013.

Plaintiffs' motion is somewhat narrower than the relief sought in the First Amended Complaint.  It does not challenge the core of HB 1224, which as of July 1, 2013 prohibits the new acquisition of magazines that can hold more than fifteen bullets. Nor does the motion challenge HB 1229, which expands the background check requirement for firearms purchases. The great bulk of Colorado's new gun control laws will therefore take effect, as planned, on July 1 regardless of the outcome of these preliminary proceedings.

Plaintiffs' motion for a preliminary injunction instead asserts that the following provisions of HB 1224 are unconstitutionally vague: 1) the prohibition on magazines that are "designed to be readily converted" to hold more than fifteen rounds; 2) the grandfather clause of HB 1224; and 3) the ban on "transfers" of large-capacity magazines after July 1, 2013.  Plaintiffs also contend that these three provisions, when read broadly, violate the Second Amendment.

Firearms regulation became the subject of intense national debate in the wake of the mass murders in Aurora, Colorado, and Newtown, Connecticut in 2012. During legislative debate in Colorado, the bills challenged here were widely discussed and publicly criticized by, among others, many of the Plaintiffs in this case.  Much of the rhetoric mirrored the allegations that now appear in the

Plaintiffs' complaint and preliminary injunction motion—which argue, for example, that HB 1224's prohibition on magazines that are "designed to be readily converted" to hold more than fifteen rounds amounts to a ban on virtually all functional semi-automatic firearms.  To clear up this sort of widespread misconception about the intent and scope of HB 1224, the Governor's signing statement rejected a broad interpretation of the bill, instead maintaining "that the large capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the 14th Amendment." *See* Ex. A.  The Governor went on to request that the Colorado Department of Public Safety, in consultation with the Attorney General, issue "Technical Guidance on how the law should be interpreted and enforced in Colorado." *Id.*

The Attorney General released his official written interpretation of HB 1224 in the form of the Technical Guidance requested by the Governor the day before Plaintiffs filed this lawsuit.  *See* Ex. B.  The Technical Guidance directly addressed the two provisions of HB 1224 challenged here.  Noting that "[t]he phrase 'designed to be readily converted to accept more than fifteen rounds of ammunition' has prompted questions regarding the scope of the definition," the Technical Guidance acknowledged that there is a distinction between a magazine that *is capable* of being expanded to more than fifteen rounds, for example by the purchase of additional parts, and one whose objective features demonstrate that it has been *designed* for quick and ready expansion.  Thus, the Technical Guidance rejected the notion Plaintiffs' claims depend on: that a magazine meets the "designed"

requirement "simply because it includes a removable baseplate which may be replaced with one that allows the magazine to accept additional rounds." *Id.* Such magazines, which constitute the bulk of those Plaintiffs worry about, do not fall within the scope of the law as interpreted by the Governor, the Attorney General, and the Department of Public Safety.

The Technical Guidance also addressed the grandfather clause of HB 1224, which permits one who "owns" a large-capacity magazine before July 1, 2013, to continue to keep and use it, provided that he or she "maintains continuous possession" of it thereafter. The Attorney General stated that the bill could not be reasonably construed as "barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee," and that "an owner should not be considered to have 'transferred' a large-capacity magazine or lost 'continuous possession' of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned." *Id.*

Colorado law protects an individual from criminal liability for prohibited conduct if the conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." Colo. Rev. Stat. § 18-1-504(2)(c). The guidance is the official written interpretation of not only the Attorney General and the Colorado Department of Public Safety, but also the

Governor—whom Plaintiffs have identified as being "the proper defendant" due to his constitutional responsibility "to ensure that all laws of the state are faithfully executed." 1st Am. Compl. [Doc. 22], at ¶ 172. Thus, by the plain terms of subsection 18-1-504(2)(c), the Technical Guidance *is* binding. Moreover, this Court is in a position to ensure that it will remain so by virtue of the Governor's proposal to stipulate to the entry of a preliminary injunction that is consistent with Technical Guidance's interpretation of the challenged law. *See* Def.'s Mot. for Certification of Questions of Law to Colo. Sup. Ct. [Doc. 26].

Thus, in the Governor's view, the preliminary injunction that the Plaintiffs request—one that depends on an unjustifiably broad reading of HB 1224 that no party to this case agrees is appropriate—is unnecessary.

## ARGUMENT

### I.   Issuing a Temporary Restraining Order Would Be Inappropriate and Inequitable.

As a preliminary matter, Plaintiffs maintain in their supplemental brief that the Court may issue a temporary restraining order. Yet Plaintiffs acknowledge that Federal Rule of Civil Procedure 65(b)(1)(A) requires them to submit either "an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result." Pls.' Suppl. Br. Regarding Pls.' Standing & Other Issues Raised By the Court [Doc. 37], at 2. Since they have done neither, no evidence supports their request and the Court cannot issue a temporary restraining order. Nor does applying the label of "preliminary injunction" rather than "TRO" excuse the Plaintiffs from having to provide adequate evidence in support of their

motion.  Plaintiffs "must present more than mere allegations" in order to secure provisional injunctive relief.  *See Kansas City, Kansas Fraternal Order of Police, Lodge No. 4 v. Kansas City,* 620 F. Supp. 752, 768 (D. Kan. 1984).  Although Plaintiffs need not "present all of their evidence" at this stage, *Valdez v. Applegate,* 616 F.2d 570, 572 (10th Cir. 1980), "[t]he burden is, of course, on the movant to establish his right to such relief," *Penn v. San Juan Hosp., Inc.* 528 F.2d 1181, 1185 (10th Cir. 1975).

In addition, Plaintiffs' reliance on out-of-Circuit authority highlights that Rule 65(b) only provides for the issuance of temporary restraining orders without notice to the other side.  When notice is afforded, Rule 65(a) only provides for the issuance of a preliminary injunction.  Thus, the plain language of the Rule indicates that temporary restraining orders are appropriate at the earliest possible stage to prevent "immediate and irreparable injury, loss, or damage . . . before the adverse party can be heard."  Fed. R. Civ. P. 65(b)(1)(A).  Here, the Defendant will have been heard upon the filing of this responsive brief, and there is no possible injury to Plaintiffs until HB 1224 takes effect on July 1, 2013.

That nine days will pass until this Court's docket allows for a hearing is a consequence of Plaintiffs' own making.  HB 1224 was signed by the Governor on March 20, 2013, *see* Exhibit A, and the Plaintiffs announced their plans to file this lawsuit shortly thereafter.  *See* Tom McGhee, "Colorado Sheriffs Planning Lawsuit to Block New Gun Laws," Denver Post (Apr. 9, 2013), *available at* http://www.

denverpost.com/breakingnews/ci_22988195/colorado-sheriffs-planning-lawsuit-block-new-gun-laws.  Yet they did not file their complaint until May 17, 2013, and then waited until June 12, 2013 to move for an injunction and restraining order. *See RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1211 (10th Cir. 2010) (noting that "delay in seeking preliminary relief cuts against finding irreparable injury").

## II.     Plaintiffs Have Failed to Clearly and Unequivocally Show Entitlement to the Extraordinary Remedy of a Preliminary Injunction.

The dispute at issue in this preliminary stage is actually quite narrow and dependent on the interpretation of state law.  *See generally* Doc. 26.  Plaintiffs are attacking a straw man—a legal interpretation of HB 1224 that no one, and certainly not the Defendant or anyone under his control, is taking.  Indeed, the Defendant has already officially adopted and continues to advocate a narrow, reasonable interpretation of HB 1224.  Plaintiffs' motion does not assert that this narrower reading of Colorado law violates the Constitution; instead, the Motion asks the Court to reject that narrower reading and instead adopt a broad, unconstrained reading of HB 1224 that turns on its head the judiciary's "duty to construe statutes in a constitutional manner, and to save a statute, if possible, rather than strike it down."  *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1121 (10th Cir. 2008).

Given that the Defendant (as well as the Attorney General) has already bound himself to such an interpretation, Plaintiffs' assertions of harm, as well as

their chances of prevailing on the merits, are inadequate to meet the exceptionally high burden required for an injunction of this sort.[1]

### A.    Standards for injunctive relief.

Because a preliminary injunction is an extraordinary remedy, Plaintiffs must show that their right to this form of relief is clear and unequivocal. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Plaintiffs, as movants, bear the burden of establishing that (1) they will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs damage the proposed injury may cause the opposing party; (3) the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits. *Id.*

It is the Plaintiffs' burden to establish that each of the first three factors tips in their favor. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003). As Plaintiffs point out, in some cases where the moving party has established that the first three facts "tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed." *Id.* at 1189.

This approach does not apply, however, in cases like this one, involving a pre-enforcement challenge to a state statute. As the Tenth Circuit has held, a party attempting to enjoin governmental action taken in the public interest pursuant to a

---

[1] The Court asked the parties to specifically address whether an injunction could bind the State of Colorado and all of its agents, see Fed. R. Civ. P. 65(d)(2)(B), when the Governor is the only named defendant. Plaintiffs cite dispositively to *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999), for the proposition that an injunction against the Governor of New Mexico would bind that state's district attorneys. It is worth noting that the holding in *Johnson* is in tension with Plaintiffs' argument that the stipulated injunction already proposed by the Governor fails to protect them from rogue prosecutions.

statutory or regulatory scheme must satisfy the more rigorous "substantial likelihood of success" requirement regardless of the determination of the first three factors. *Id.* This is consistent with the Supreme Court's longstanding skepticism of preliminary injunctions that restrain the enforcement of state statutes. *See Cavanaugh v. Looney,* 248 U.S. 453, 456 (1919); *Ex Parte Young,* 209 U.S. 123, 166–67 (1908). Here, Plaintiffs seek to enjoin a statute that was duly adopted by the Colorado General Assembly and signed by the Governor. Although they argue that the Court should apply a "fair ground for litigation" standard to the merits prong of their motion, Doc. 29 at 4, a heightened standard in fact applies. This Court should not issue a preliminary injunction unless Plaintiffs are able to establish that their right to an injunction is "reasonably free from doubt," and that they will suffer a "great and irreparable injury" unless it is issued. *Ex Parte Young,* 209 U.S. at 166–67.

## B.     Standard of review and burden of proof.

Plaintiffs raise facial vagueness challenges to HB 1224, arguing that "designed to be readily converted" could be interpreted as referring to features common to a large majority of magazines that are compatible with semi-automatic handguns and rifles, and that as a consequence, Plaintiffs will not know which magazines are legal and which are not. Attempting to import the concept of "chilling" from First Amendment vagueness jurisprudence, Plaintiffs argue that implementation of the challenged language will result in the *de facto* prohibition of virtually all semi-automatic magazines, thereby also violating the Second

Amendment because, due to concerns about the statute's asserted vagueness, prospective owners will allegedly refrain from acquiring any magazines at all after the effective date.

In a similar manner, Plaintiffs facially challenge the "continuous possession" provision of the grandfather clause, complaining that "HB 1224 provides absolutely no guidance as to what 'continuous possession' actually *does* mean," and offering a parade of horribles intended to highlight alleged ambiguities in the statute and Technical Guidance. Doc. 29 at 18, 21–23.

"Facial challenges are strong medicine," and for that reason the Tenth Circuit Court of Appeals has cautioned that courts "must be vigilant in applying a most exacting analysis to such claims." *Ward v. Utah*, 398 F.3d 1239, 1246–47 (10th Cir. 2005). Vagueness challenges can take two forms: 1) claims that a law "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or 2) claims that a law encourages arbitrary or discriminatory enforcement. *Doctor John's v. City of Roy,* 465 F.3d 1150, 1158 (10th Cir. 2006) (citing *Hill v. Colo.,* 530 U.S. 703, 732 (2000)). Arbitrary or discriminatory enforcement claims, however, cannot be brought as part of a pre-enforcement challenge at all. *See Gonzales v. Carhart,* 550 U.S 124, 150 (2007). Pre-enforcement challenges such as this one, by definition do not involve evidence that the challenged law has been, or could be "enforced in a discriminatory manner or with the aim of inhibiting [constitutionally protected conduct]." *Hoffman Estates v. Flipside, Inc.,* 455 U.S. 489, 503 (1982). Thus, only the first type of claim is at issue

10

here.  But to succeed, Plaintiffs must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that "vagueness permeates the text of [the] law." *Ward,* 398 F.3d at 1246–47 (citing *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999)).

### C.    Plaintiffs have not shown that the asserted harm to them outweighs the State's powerful interest in assuring the safety of Colorado's citizens.

Plaintiffs argue that the balance of harms tips in their favor because, they allege, enforcement of the challenged provisions would: 1) require sheriffs "to make arrests or otherwise investigate possible crimes based on vague or facially unconstitutional language"; 2) cause dealers and other businesses to operate without certainty as to what magazines are legal; and 3) prevent owners of large-capacity magazines from treating those magazines as they always have in the past.

Plaintiffs claim that maintaining the status quo will not injure the state's interests at all.  But an injunction against a duly enacted state law frustrates the will of the citizens of that state, as expressed through their duly elected representatives.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J.) (denying application for stay as Circuit Justice, and noting state "suffers a form of irreparable injury" any time it "is enjoined by a court from effectuating statutes enacted by representatives of its people").

The will of Colorado's voters was expressed by the General Assembly in favor of protecting public safety.  The State has a "*duty* under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and

welfare of the people." *People v. Blue*, 544 P.2d 385, 390–91 (Colo. 1975) (emphasis added) (citing cases).  The General Assembly passed the ban on high-capacity magazines in the wake of a mass shooting in Aurora, Colorado, in which the shooter used one or more high capacity magazines to kill 12 people and wound 58 more. Later that year, the shooter in Newtown, Connecticut also used a rifle equipped with large-capacity magazines to kill 26 people, 20 of whom were 6- and 7-year-old children. To be sure, the debate on HB 1224 was vigorous, and Plaintiffs plainly disagree that the bill appropriately addresses the public safety concerns that motivated its passage.  But no matter how vehemently Plaintiffs disagree, HB 1224 is the judgment of the individuals and institutions that have the constitutional power to make policy judgments about how to protect the safety of Colorado's citizens.  The injury to the public interest if an injunction is issued would substantially outweigh the injuries that Plaintiffs assert they will suffer if the challenged provisions go into effect as the legislature intended.

> **D.   Plaintiffs will not suffer irreparable injury if the Court declines to enjoin the challenged portions of HB 1224.**

In their initial motion, Plaintiffs suggest three types of harm they fear if HB 1224 goes into effect: *per se* harm caused by alleged injury to their Second Amendment rights; "incalculable financial burdens" to the plaintiffs whose business interests will be affected by the law; and harm caused to the plaintiff sheriffs by their confusion about what the law asks them to do.  In their supplemental brief, Plaintiffs provide further detail about these alleged harms, although they generally

hew to the three broad categories identified in the original motion.  Plaintiffs'
additional allegations of harm include claims that:

- Licensed firearms dealers and Magpul (a manufacturer of magazines)
  face a credible threat of prosecution that will chill their exercise of
  their rights to buy and sell large capacity magazines, which for the
  dealers will be economically devastating.  Doc. 37 at 6–9.

- Individual plaintiff David Strumillo currently owns large-capacity
  magazines, and will suffer a "chilling" effect as a result of the
  legislation, and will also be subject to criminal liability on July 1st
  because he is holding large-capacity magazines for a friend deployed
  overseas.  *Id.* at 10.

- Individual plaintiffs David Bayne and Dylan Harrell will be unable to
  determine if their existing 15-round or less capacity magazines will be
  prohibited or if they will be able to purchase magazines of any size,
  thereby chilling their right to use firearms for home self-defense,
  target shooting, and hunting.  *Id.* at 11.

- Plaintiff Outdoor Buddies will be unable to continue its practice of
  loaning firearms to individuals because it is unsure whether the
  magazines that it apparently loans along with those firearms qualify
  as large capacity magazines.  *Id.*

- Plaintiff Hamilton Family Enterprises will lose revenue from magazine sales and a planned new range that may no longer be economically viable. *Id.* at 12–13.

- In their Supplemental Brief, the plaintiff sheriffs now announce that they are actually suing in both their official and personal capacities, and not, as the First Amended Complaint suggests, in their official capacities alone. *Id.* at 21. The Sheriffs thus claim that they are doubly injured, first by their purportedly conflicting obligations to follow both the Constitution and state statute, and second by the adverse effect that HB 1224 will allegedly have on their ability to effectively defend themselves and their families from the heightened threats inherent in their occupation. *Id.* at 21–22, 26.

Notably, all of these fears—at least to the extent that they rely on the statute's ostensible vagueness—depend on ignoring or rejecting the possibility of a reasonable narrowing interpretation of the law, as has already been undertaken by the Technical Guidance. In other words, the harms alleged by Plaintiffs in their preliminary injunction motion would exist[2] only if this Court were to adopt Plaintiffs' untenable interpretation of HB 1224. Any decision to adopt Plaintiffs' interpretation that nearly all magazines and therefore nearly all firearms are

---

[2] Plaintiffs have not asserted any actual threats by any other entity to enforce the law in a manner inconsistent with the Guidance or otherwise in line with the extremely broad reading they offer up. In fact, many of the Plaintiffs are sworn law enforcement officers who have publicly announced that the challenged provisions are unenforceable in practice, and that in any event they will *refuse* to enforce them.

prohibited would by necessity require both rejection of the Technical Guidance and refusal to exercise judicial interpretive authority, either directly or through the certification process. The Technical Guidance, which interprets the phrase "designed to be readily converted" and explains the "continual physical presence" requirement, strikes a reasonable middle ground and draws a bright line rule that offers substantial certainty to high-capacity magazine owners and potential borrowers trying to comply with the law.

Moreover, even accepting the assertion that the impact on the business plaintiffs will be "incalculable," such harms are not only speculative, but are quantifiable and therefore do not qualify as irreparable. *See Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1354 (10th Cir. 1989). Those plaintiffs who are claiming that HB 1224 will harm their business interests surely track sales and inventory. Even assuming that a quantified loss in sales would occur, and even if it did, assuming that it would somehow amount to an injury at all, the fact that the business plaintiffs may not be able to predict with certainty what will happen after July 1 does not mean that any such injuries are irreparable or even difficult to calculate.[3] Moreover, because the dealers claim only

---

[3] Of course, it appears that the plaintiff dealers have actually enjoyed a substantial windfall from the legislation's impending effective date. *See, e.g.*, Kim Bhasin, "Top Ammo Supplier Sells 3 1/2 Years Worth of Assault Rifle Magazines in 72 Hours," Business Insider (Dec. 26, 2012), *available at* http://www.businessinsider.com/ brownells-magazine-sales-2012-12 (reporting online retailer's "unprecedented" sales jump following Sandy Hook massacre). Moreover, even leaving that windfall aside, HB 1224 may very well lead to an *increase* in magazine sales for the dealers over the long term. Once the law goes into effect, if a gun owner wants to carry more

an economic impact, and cannot assert a direct Second Amendment infringement, this Court should apply the "less strict vagueness test" outlined in *Hoffman Estates,* 455 U.S. at 498 (noting that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action").

With respect to the alleged Second Amendment harms, Plaintiffs conflate the first prong of the preliminary injunction analysis with the last, claiming in essence that irreparable injury exists because the challenged portions of HB 1224 will violate their constitutional rights if implemented, thereby resulting in *per se* irreparable injury.  Doc. 29 at 7.  Even assuming that a deprivation of Second Amendment rights, however slight, can amount to a *per se* irreparable injury,[4] Plaintiffs' preliminary injunction motion fails to establish that the challenged

---

than 15 rounds of ammunition for his or her firearm, he or she will now have to buy multiple magazines instead of one.

[4] This is far from a settled question.  Although a deprivation of certain enumerated constitutional rights often is considered irreparable harm (most commonly under the First Amendment), courts around the country have consistently declined to import First Amendment equitable concepts wholesale into Second Amendment cases.  *See, e.g., Kachalsky v. County of Westchester,* 701 F.3d 81, 92 (2nd Cir. 2012) ("[I]t would be . . . imprudent to assume that the principles and doctrines developed in connection with the **First Amendment** apply equally to the Second.").  This distinction has extended to the preliminary injunction context, in which courts have declined to conclude that a deprivation of asserted Second Amendment rights, standing on its own, automatically amounts to an irreparable harm.  *See, e.g. Plastino v. Koster,* 2013 WL 1769088, at *9 (E.D. Mo. April 24, 2013); *but see Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011).  And for good reason—a state's interest in protecting public safety is fundamentally different from its role in regulating speech.

language will cause any harm to their Second Amendment rights at all.  Indeed, the core of the Second Amendment—the right to individual self-defense in the home—is not compromised at all by reasonable limitations on magazine size.  *See Heller v. Dist. of Columbia,* 670 F.3d 1244, 1262 (D.C. Cir. 2011) (*Heller II*) (affirming, under intermediate scrutiny, a ten-round limitation on magazine size).  A magazine is not a firearm, and with the exception of a few antiques, the Defendant is unaware of any gun necessary for self-defense that can only be fired with a magazine with a capacity greater than 15 rounds.  Indeed, Plaintiffs do not even seek to preliminarily enjoin HB 1224's outright ban on magazines that accept over 15 rounds at all.  And in any event, there remain many handguns and other options for home defense that do not raise even the theoretical risk that Plaintiffs assert they fear.[5]

Even if the Second Amendment guaranteed a right to possess and use magazines holding more than fifteen rounds, there can be no dispute it is a personal right tied at its core to the defense of home and hearth.  *See Dist. of Columbia v. Heller,* 554 U.S. 570, 635 (2008).  The corporate plaintiffs, even assuming they enjoy the right to bear arms on equal footing with individual persons, allege the use and sale of high-capacity magazines for purposes other than direct self-defense.  The

---

[5] For example, some firearms such as revolvers do not utilize magazines to hold and advance ammunition into the firing chamber, and most such weapons accept fewer than 15 rounds. Moreover, not all magazines have removable baseplates that would possibly allow conversion to higher capacities.  In any event, the Technical Guidance permits Coloradans to purchase semi-automatic firearms and use them with magazines that have removable baseplates.  As Plaintiffs admit, this amounts to a huge proportion of commercially available magazines.

Second Amendment offers no guarantee to corporations a particular business market in firearms leisure, training, or enthusiasm. Absent is any allegation that HB 1224 would utterly eradicate any individual plaintiff's ability to obtain either the firearms or training necessary to defend himself.

If it is large-capacity magazines they prefer, every individual plaintiff in this case, including the sheriffs, may possess them after July 1st, provided that they obtained them before that date and maintain continuous possession of them thereafter. The grandfather clause of HB 1224 eliminates the possibility of any irreparable harm to any individual plaintiff who currently owns or desires to own magazines with a capacity greater than 15 rounds. *Cf. Salt Lake Tribune Publ. Co. v. AT&T Corp.,* 320 F.3d 1081, 1106 (10th Cir. 2003) (holding that self-inflicted harm is not irreparable). Simply being prohibited from purchasing and transferring large capacity magazines months after HB 1224 was enacted is not irreparable harm.

Plaintiffs also claim that "law enforcement," including the sheriffs, will suffer irreparable harm due to their alleged confusion about what the law means and their obligation "to commit facially unconstitutional acts, such as arresting someone who has left a magazine at a gunsmith for repair or cleaning." Doc. 29 at 8–9. Not only does this conflate the question of irreparable injury with the merits, it demonstrates a misunderstanding of sheriffs' authority to enforce duly enacted statutes, Colo. Rev. Stat. § 16-2.5-103(1), while fulfilling their duty to "keep and preserve the peace," Colo. Rev. Stat. § 30-10-516. HB 1224 is not a ban on all firearms or an

entire class of guns; it is a limitation on magazine capacity.  As interpreted by the Technical Guidance, HB 1224 draws bright-line rules for law enforcement that could only be made vague by creating an absolute conflict with the Second Amendment that just does not exist.

Moreover, to the extent that Plaintiffs suggest that law enforcement might be financially liable for "commit[ting] facially unconstitutional acts" when complying with the statute, they not only ignore the protections available to them under principles of qualified immunity, but also the fact that any such damages, although exceptionally unlikely, would be compensable and therefore do not qualify as irreparable injury.  "The doctrine of qualified immunity provides that [w]hen government officials are performing discretionary functions, they will not be held liable for their conduct unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell v. Maynard*, 80 F.3d 1433, 1447 (10th Cir. 1996) (internal quotation marks and citations omitted).  As discussed in detail below, HB 1224 is similar to many other provisions that have passed muster in other jurisdictions.  Simply put, enforcement of the statute as written would come nowhere near to violating clearly established statutory or constitutional rights of which a reasonable person in the sheriffs' position would have known.  *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Finally, the supplemental allegation that individual plaintiff Strumillo will become subject to criminal liability on July 1st because he is storing high-capacity magazines for a non-plaintiff friend fails to establish any irreparable injury.  Doc.

37 at 10.  To avoid criminal liability, Strumillo does not require an injunction; he has a number of options.  Among other things, he could purchase or dispose of the magazines before July 1st, put them into a safety deposit box that the owner controls, or return the magazines to the owner's spouse, if any.  According to the allegation, Strumillo has no ownership interest in the stored magazines.  Consequently, the only potential injury would be to his standing as perceived by his friend, which hardly calls for an injunction.[6]

### E.   Plaintiffs are unlikely to succeed on their facial challenge to the three provisions of HB 1224 that they seek to preliminarily enjoin.

Plaintiffs make two arguments to support their asserted likelihood of success on the merits on their facial challenges to HB 1224. First, they assert that the terms "designed to be readily converted" and "continuous possession" are unconstitutionally vague on their face.  Second, they assert that those two phrases, as well as HB 1224's prohibition on "transfers" of large-capacity magazines, facially violate the Second Amendment.  They have failed, however, to meet their burden of showing either argument has the requisite likelihood of success.

---

[6] The Court has asked the parties to address the standing of any party for whom a harm is identified in conjunction with the motion for preliminary injunction.  While the Governor has serious reservations about the Article III standing of several plaintiffs (particularly the sheriffs, who in their official capacities are subdivisions of the state, *see, e.g.*, *Romer v. Bd. of County Comm'rs,* 956 P.2d 566, 574 (Colo. 1998)), he does not contest that at least one or more of the remaining plaintiffs has made a sufficient allegation of Article III standing to warrant the Court's exercise of subject matter jurisdiction at this early stage of the case.  Because, as argued above, no plaintiff has established the type of harm that is a prerequisite to the issuance of a preliminary injunction, this Court need not reach the question of the Plaintiffs' standing at this time.

### 1.   The challenged provisions of HB 1224 are not facially vague.

To succeed in their facial vagueness claim, Plaintiffs must show, at a minimum, that HB 1224 would "be vague in the vast majority of its applications." *Doctor John's*, 465 F.3d at 1157.  The law need not be free from any hint of ambiguity to survive Plaintiffs' facial vagueness challenge.  "[A] statute with some arguably vague elements is not automatically vague on its face in violation of the Fourteenth Amendment." *Dias v. City & County of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009); *see also Hejira Corp. v. MacFarlene*, 660 F.2d 1356, 1367 (10th Cir. 1981) ("We acknowledge that it is not necessary for reasonable men to consistently reach the same conclusion in applying objective standards to a given factual situation. Thus, the fact that different minds may reach different results when seeking to determine whether a given object falls within the statutory definition of drug paraphernalia does not render the statute void for vagueness.").

Plaintiffs' likelihood-of-success argument relies on the misplaced assumption that this Court (and, for that matter, any court that might apply HB 1224) will adopt extreme interpretations of HB 1224 that the Governor, the Colorado Department of Public Safety, and the Attorney General have formally rejected.  For example, Plaintiffs assert that "[HB 1224] effectively outlaws or disables 82% of currently-manufactured handguns and a large fraction of rifles"[7] because it makes

---

[7] As explained below, this conflates regulation of magazines, which can be replaced, with the weapons themselves.  Many handguns and rifles do, indeed, accept magazines, and many of those magazines do, indeed, have removable baseplates. But magazines can be and are made that do not have removable baseplates, so even under Plaintiffs overly broad interpretation of the magazine restrictions, there is no

unlawful *any* magazine with a removable base plate.  Doc. 29 at 20.  They further reject a "reasonable, every-day" reading of "continuous possession" that would allow gun owners to temporarily transfer their grandfathered large-capacity magazines for lawful purposes such as repair or target practice.  *Id.* at 17.  This unjustified position ignores that federal and state courts have "a duty to construe statutes in a constitutional manner, and to save a statute, if possible, rather than strike it down." *Stout*, 519 F.3d at 1121; indeed, it depends on this Court doing just the opposite.  A reasonable reading of HB 1224—like the one embodied in the Technical Guidance— would allow gun owners to reasonably use their firearms with a variety of commercially-available magazines.  Plaintiffs cannot earn an injunction by foisting an untenable interpretation of HB 1224 on the public, Colorado law enforcement officials, and this Court.  *See United States v. McGarity*, 669 F.3d 1218, 1235 (11th Cir. 2012) ("[T]he defendants' purportedly absurd constructions of [the statute] do not require us to invalidate the statute wholesale.").

> a) **"Designed to be readily converted" is not vague in the vast majority of its applications, and the Supreme Court has held that the term "designed" can constitutionally define unlawful conduct.**

Plaintiffs assert that "'[d]esigned to be readily converted' is a term that does not exist in Colorado statutes," and "HB 1224 provides no hint about what the term means."  Doc. 29 at 13.  Federal and state courts, however, routinely encounter

---

reason that *any* handgun or rifle that accepts removable magazines will be outlawed or disabled.  The only types of weapons that actually would be effectively disabled are those that cannot take new magazines.  Defendant believes that these are few, and Plaintiffs have not asserted claims about any of them.  And as noted, even these are not outlawed or disabled—only their sale or transfer is.  *See supra* n.5.

statutory terms that are not specifically defined.  The response is to engage in the routine task of statutory interpretation, not to invalidate undefined terms, even those that may contain some ambiguous potential applications.  *See, e.g., United States v. Graham,* 305 F.3d 1094, 1101-03 (10th Cir. 2002) (applying rules of statutory construction to undefined terms in federal firearms statute).   In the context of a facial vagueness challenge, this surgical approach must prevail over Plaintiffs' blunt method of doing away entirely with legislatively-enacted language simply because a troublesome interpretation could be imagined.  *See Stout*, 519 F.3d at 1121; *see also Robertson v. City & County of Denver,* 874 P.2d 325, 334 (Colo. 1994).   Exercising caution of this type is consistent with the Supreme Court's traditional skepticism of facial challenges.  For example, in *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008), the court declined the plaintiffs' invitation to facially invalidate the statute, holding:

> In determining whether a law is facially invalid,  we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases. The State has had no opportunity to implement I-872, and its courts have had no occasion to construe the law in the context of actual disputes arising from the electoral context, or to accord the law a limiting construction to avoid constitutional questions. Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

*Id.* at 449-50.  The federal circuits have taken a similar approach. *See, e.g. Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 580 (5th Cir.

2012) ("As we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.' Our analysis therefore cannot focus upon the marginal cases in which an ordinarily plain statutory command can nonetheless yield some mote of uncertainty.") (quoting *Hill*, 530 U.S. at 733); *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) ("[O]ur task is not to dream scenarios in which a regulation might be subject to a successful vagueness challenge. The Supreme Court has instructed that 'speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."") (quoting *Hill*, 530 U.S. at 733).

Using traditional tools of statutory interpretation, the phrase "designed to be readily converted" is much narrower than Plaintiffs assert it to be, and it certainly does not, under any reasonable reading, ban all "box and tube magazines [that] contain removable base plates and end caps." Doc. 29, at 2.

### (1)   "Designed"

"A principal meaning of 'design' is '[to] fashion according to a plan.'" *Hoffman Estates*, 455 U.S. at 501 (quoting *Webster's New Int'l Dictionary of the English Language* 707 (2d ed. 1957)). "Designed is clear in its meaning, which is that the item is predetermined for a particular use." *Hejira Corp.*, 660 F.2d at 1362. Moreover, in applying this definition, an item must be judged "by virtue of its objective features, *i.e.*, features designed by the manufacturer." *Hoffman Estates*, 455 U.S. at 501.

Plaintiffs' argument mirrors that of the decision reversed by the Supreme Court in *Hoffman Estates*:

> "The Court of Appeals objected that 'designed . . . for use' is ambiguous with respect to whether items must be inherently suited only for drug use; whether the retailer's intent or manner of display is relevant; and whether the intent of a third party, the manufacturer, is critical, since the manufacturer is the 'designer' . . . . [W]e conclude that this language is not unconstitutionally vague on its face.
>
> The Court of Appeals' speculation about the meaning of 'design' is largely unfounded.

*Id.* at 500.

In *Hoffman,* the Court recognized that it is not the intent of the manufacturer that governs the analysis, but the objective features of the regulated item that control.  The Court explained that it is "plain that the standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features, *i.e.,* features designed by the manufacturer" and that this objective standard would not cover "items which are principally used for nondrug purposes, such as ordinary pipes, are not 'designed for use' with illegal drugs."  *Id.* at 501.  The same reasoning applies here, where it is plain that items whose features show they are principally meant to be readily converted into larger-capacity magazines are within the standard, while those that are typically included for other purposes, such as removable baseplates, are not.

"The crux" of Plaintiffs vagueness argument "is that [HB 1224] requires ordinary citizens and Sheriffs to know the intent of a magazine's designer."  Doc. 29 at 14.  This might indeed be troubling, if it were true.  Happily, it is not.  "Designed"

is a not uncommon term in the law, and it has been upheld against vagueness challenges repeatedly, including in some cases involving language very similar to that challenged here.

For example, in *Richmond Boro Gun Club v. City of New York,* 97 F.3d 681 (2d Cir. 1996), the plaintiff organization challenged a New York City ordinance that criminalized the possession or transfer of assault weapons within the city, arguing in part that the ordinance's definition of "assault weapon" was unconstitutionally vague.  The challenged portion of the statute defined an "assault weapon" as "[a]ny part, or combination of parts, *designed or redesigned or intended to readily convert* a rifle or shotgun into an assault weapon." *Id.* at 683 (quoting ordinance) (emphasis added).  The plaintiffs contended that "a rifle manufacturer's intent in designing a gun may not easily be discernible from the mere appearance of a weapon."  *Id.* at 685.  Relying on the Supreme Court's opinion in *Hoffman Estates,* however, the Second Circuit held that "the 'designed' standard," in the context of drug paraphernalia, encompassed "at least an item that is principally used with illegal drugs by virtue of its objective features."  *Richmond Boro Gun Club,* 97 F.3d at 685 (quoting *Hoffman Estates,* 455 U.S at 501).  The Second Circuit then affirmed the trial court's opinion that the evidence in the record demonstrated that "the objective features of at least some of these firearms clearly bring them within the 'designed' standard" of the challenged ordinance.  *Richmond Boro Gun Club,* 97 F.3d at 686.  The court thus rejected the plaintiffs' facial vagueness challenge.

A similar phrase is also used to define "machine gun" for purposes of federal law.  The statute defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  28 U.S.C. § 5845(b). The language of that definition, along with similar language found in several other closely related federal statutes that use similar language, has been upheld against vagueness challenges.  *See, e.g.*, *United States v. M-K Specialties Model M-14 Machinegun Serial #1447797*, 424 F. Supp. 2d 862, 872 (N.D. W. Va. 2006) ("The claimants, however, have cited no case that strikes down any such provision in § 5845 as unconstitutionally vague. . . . .  Section 5845(b) provides fair notice to a person of ordinary intelligence that certain conduct is forbidden by the statute. Therefore, the Court finds that the phrase 'can be readily restored' is not unconstitutionally vague.").

In light of this case law, the Colorado General Assembly cannot be said to have intended that the term "designed" must rest on the intent of some unknown manufacturer.  Indeed, that is the thrust of Colorado law.  Relying on *Hoffman Estates*, the Colorado Supreme Court has held that the term "designed" *cannot* be judged based on the intent of a third party; the objective characteristics of a particular item govern the inquiry.  *See High Gear & Toke Shop v. Beacom*, 689 P.2d 624, 632 (Colo. 1984).  The Colorado Supreme Court has adhered to this point in the context of firearm regulation, rejecting the notion that an ordinary person could be expected to intuit or research the "design history" of a particular gun in

order to independently assess whether it was prohibited by the challenged city ordinance.  *Robertson,* 874 P.2d at 334.

The Colorado General Assembly is presumed to be aware of these cases.  *See e.g.*, *Thompson v. People*, 510 P.2d 311, 313 (Colo. 1973), and the state Legislature intends to pass laws that comply with the Colorado and United States Constitutions, Colo. Rev. Stat. § 2-4-201(1)(a).  Thus, while Plaintiffs are generally correct that a statute requiring individuals to discern another's subjective intent can be vague, as a matter of law, it is beyond dispute that this is not what the Colorado General Assembly can be assumed to have intended.

### (2)   "Readily converted"

"Readily," meanwhile, means "in a prompt manner" or "in a manner indicating or connoting ease."  *Am. Heritage Dictionary* 1159 (4th ed. 2004).  "[M]ost notably," the term connotes "speed, ease, and efficiency."  *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421 (6th Cir. 2006) (quoting *Webster's Third New Int'l Dictionary* 1889 (1981)).

Finally, "converted" means "to change (something) from one use, function, or purpose to another."  *Am. Heritage Dictionary* 313.

### (3)   "Designed to be readily converted"

Thus, the entire phrase "designed to be readily converted" means a magazine that, judged by its objective features, reveals that it is typically used in a way that is quickly, easily, and efficiently changed from accepting 15 rounds or fewer to more

than 15 rounds.  Applied to specific ammunition magazines, this legal standard easily distinguishes between those that are prohibited and those that are lawful:

- **Telescoping Magazine** (*see* Ex. C): An expandable magazine that with the depression of a single tab, telescopes to a larger-capacity configuration would be a "large capacity magazine" if the magazine accepted more than 15 rounds of ammunition in its telescoped state.[8]

- **20-Round AR-15 Magazine with Removable Limiter** (*see* Ex. E): A 20-round magazine with a removable limiter that temporarily prevents it from accepting more than 15 rounds is a "large capacity magazine."  This is because the only reason to remove the limiter would be to increase the capacity of the magazine.  Judged objectively, a removable limiter is designed to enable the magazine to be readily converted from a 15-round to a 20-round configuration.

- **30-Round AR-15 Magazine with Permanently-Affixed Limiter** (*see* Ex. F): A similar limiter that has been welded or epoxied to the frame of the 30-round magazine such that the limiter cannot be removed is not a "large capacity magazine."  Not only is this magazine not "designed to be readily converted to accept more than 15 rounds of ammunition"; it has been "permanently altered" to comply with HB 1224.

- **Standard Box Magazine with Removable Baseplate** (*see* Ex. G): The type of magazine that Plaintiffs most fear would be rendered illegal by HB 1224 is a standard magazine with a removable base plate that accepts 15 or fewer rounds.  These types of magazines are *not* large capacity magazines.  The baseplates themselves do not enable the magazines to be

---

[8] The Governor is not aware of a magazine currently in production that telescopes from a less-than-15-round configuration to a greater-than-15-round configuration. HB 1224, however, was written to ensure that future innovations in the market could not easily circumvent the 15-round limit on ammunition magazines.  *See Exotic Coins, Inc. v. Beacom,* 699 P.2d 930, 945 (Colo. 1985) (explaining that although statute must define criminal offense with sufficient definiteness to give fair warning of prohibited conduct, it must also be general enough to address problem under varied circumstances and during changing times).  Experience in other states has shown that some retailers and purchasers will try to exploit any actual or perceived loophole in such regulations.  *See* Ex. D (San Francisco City Attorney press release announcing lawsuit against importers of large-capacity magazine "repair" kits).

expanded, and they serve functions aside from expansion—notably, they allow the magazine to be cleaned and repaired. To actually convert them to higher capacity, one must purchase additional equipment or permanently alter their operation mechanically. Unless so altered, they are not prohibited.

- **Magazine coupler** (*see* Ex. H): A coupler that physically attaches two magazines together (an effect that could be accomplished just as easily with a few inches of duct tape), and "allows the user to attach two magazines together for more efficient speed reloads," would not create a single large-capacity magazine. Because the second magazine must be inserted into the firearm separately—and only after the first magazine has been exhausted—this accessory does not convert two complying magazines into one non-compliant magazine.

Plaintiffs' baseless assumption that HB 1224 is broad enough to prohibit not just large-capacity magazines, but "82% of currently-manufactured *handguns*," Doc. 29 at 20 (emphasis added), illustrates how unreasonably they have interpreted the statute's language.[9] *See Heller II*, 670 F.3d at 1262 ("[T]he prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves."). First, many magazines are interchangeable and replaceable; it does not follow from the prohibition of a particular magazine that any firearm to which it may be attached is also prohibited. The law may "contain ambiguities," but a "person of ordinary intelligence" still has a "reasonable opportunity to know what is prohibited," and

---

[9] Plaintiffs also unreasonably read the Technical Guidance. They first claim that "a person may not be aware" that a particular feature of a magazine was designed to allow ready expansion. *Id.* at 15. Under the framework described above, a person of "ordinary intelligence" would be able to fairly distinguish between a magazine objectively "designed" for use with more than 15 rounds and one not so designed. *Cf. Hoffman Estates*, 455 U.S. at 500–02. Second, they claim that "[n]either the gun-owning public nor law enforcement have any means of discerning the designer's specific intent." Doc 29 at 15. As explained above, "the designer's specific intent" is irrelevant; the test turns on the objective features of a particular magazine.

the danger of "arbitrary and discriminatory enforcement" is minimized. *Hoffman Estates*, 455 U.S. at 498 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)); *see also Hejira Corp.*, 660 F.2d at 1367.  And in the unlikely event that the purported ambiguities remained after applying the rules of statutory construction, any danger that HB 1224 would lead to unpredictable and unjust convictions would be virtually eliminated by: 1) application of the affirmative defense in Colo. Rev. Stat. § 18-1-504(2)(c); 2) the availability of an as-applied challenge; or 3) as a last resort, application of the rule of lenity, which ensures that ambiguities in a criminal statute must be interpreted in favor of the defendant.  *See, e.g.*, *People v. Thoro Products Co.,* 70 P.3d 1188, 1198 (Colo. 2003).

> **b)**   **"Continuous Possession" is not vague in the vast majority of its applications, and Plaintiffs cannot prevail by rejecting common-sense interpretations of the term.**

Plaintiffs similarly claim that because HB 1224 "provides absolutely no guidance as to what 'continuous possession' actually *does* mean, the phrase is unconstitutionally vague."  Doc. 29 at 18.  They again make little attempt to define the term, preferring it to be struck down rather than reasonably construed.  While they proffer several allegedly "reasonable, every-day interpretations," which would "not require [a large capacity magazine owner] to maintain literally continuous possession of the property" or to "physically possess the [magazine] at every moment of every day," Doc. 29 at 16–17 (citing Colo. Rev. Stat. §§ 39-26-102, -713(1)(a); *Martini v. Smith*, 18 P.3d 776, 781 (Colo. App. 2000)), Plaintiffs dismiss them out of hand,  This Court need not and should not do so.

There is nothing vague about the "continuous possession" requirement. The chief definition of "possession" is "the fact of having or holding property in one's power; the exercise of dominion over property." *Black's Law Dictionary* 1281 (9th ed. 2009). "Continuous" simply means "uninterrupted in time, sequence, substance, or extent." *Am. Heritage Dictionary* 310.

Applying these principles to avoid the horribles paraded by Plaintiffs has already been done. The Technical Guidance creates a bright line rule—and a safe harbor until the meaning of the provision is definitively determined by Colorado courts—that offers substantial certainty to large-capacity magazine owners (and borrowers) who wish to comply with the law. Under the guidance, if a person remains in the physical presence of the magazine, or ensures that the magazine is secured while the individual is absent, the "continuous possession" requirement is satisfied. Merely holding or even firing bullets from another's magazine in that person's physical presence is not a transfer and does not break the owner's continuous possession. Nor can there be any genuine confusion about use of grandfathered magazines by a spouse. *See* Colo. Rev. Stat. 14-10-113 (defining "marital property" and providing that anything acquired during marriage other than inheritance or gift is property of both people in marriage); *see also* Colo. Rev. Stat. § 14-15-107(5)(a) (importing definition of "marital property" to civil unions). The Governor, meanwhile, asks that the Court, faced with this broad-based constitutional challenge, follow the normal course: construe the law in a way that ensures it will be applied constitutionally. The Court's role is not to strike down HB

1224 if there is a possibility that it can be interpreted to be consistent with the Constitution. *See People v. Longoria*, 862 P.2d 266, 270 (Colo. 1993) ("when reviewing a statute upon a challenge of unconstitutionality due to vagueness, the duty of the reviewing court is to construe the statute so as to uphold its constitutionality whenever a reasonable and practical construction may be applied to the statute"); *Stout*, 519 F.3d at 1121. Instead, when evaluating a statute that is subject to several interpretations, the Court must select the one that best harmonizes both legislative intent and constitutional requirements. *See People v. R.M.D.,* 829 P.2d 852, 853 (Colo. 1992).

The question at this stage is whether Plaintiffs have met their heavy burden to show that "continuous possession," in the vast majority of its applications, is so vague that it simply cannot be enforced. Plaintiffs have failed to do so. They are not entitled to a preliminary injunction striking down the "continuous possession" requirement of HB 1224 as unconstitutionally, and facially, vague.

### 2. The Second Amendment does not prevent reasonable restrictions on the size of ammunition magazines.

Plaintiffs' second argument is that three provisions of HB 1224— "designed to be readily converted," "continuous possession," and "transfer"—are so onerous that they will prevent gun owners from exercising their Second Amendment right to defend their homes. Again, Plaintiffs reach this conclusion by reading HB 1224 unreasonably, transparently seeking to invalidate the statute rather than to find ways to apply it in a constitutional manner. At least for the purposes of their motion, they do not challenge the statute otherwise.

### a)      HB 1224 does not "ban" small magazines.

The mere existence of a removable base plate does not change a less-than-16-round magazine into a "large-capacity" magazine.  As explained above, the term "designed to be readily converted" contemplates design features specifically intended to increase magazine capacity, not features that may exist for purposes such as maintenance.  Yet Plaintiffs insist that HB 1224 "outlaws or disables 82% of currently-manufactured handguns" because it prohibits "some or most magazines of 15 rounds or fewer."  Doc. 29 at 20.

If, like the law struck down in *Heller*, the intent and effect of HB 1224 were to absolutely *ban* a large majority of handguns and make them entirely unusable for self-defense, HB 1224 would likely violate the Second Amendment.[10]  *See Heller*, 554 U.S. at 628–29 ("The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family' would fail constitutional muster.") (internal citations and footnotes omitted).

---

[10] The Governor does not concede that regulation of ammunition magazines always triggers the Second Amendment, nor does he concede that HB 1224's narrow restrictions do so.  But he agrees that a state may not circumvent the Second Amendment by regulating magazines and ammunition in such a way as to make guns completely unusable for home defense.  *Cf. Ezell,* 651 F.3d at 711–13 (Rovner, J., concurring).

But no party to this lawsuit claims that HB 1224 could or will be applied in that manner.[11]  As already noted, because plentiful ammunition options exist for virtually every semi-automatic firearm, banning a certain magazine – or even, applying Plaintiffs' untenable approach, a large subset of what is commercially available – would come nowhere near rendering the firearm itself useless.  In any event, the Governor has repeatedly offered to stipulate to an injunction that would memorialize, and make judicially binding on him and his agents, a more reasonable interpretation of the law that would be available to individuals as an affirmative defense against any rogue prosecution.  This interpretation would allow individuals to purchase and possess a wide range of commercially-available magazines that accompany many firearms used for self-defense, including those at issue in *Heller*.

A facial challenge is not a license to indiscriminately strike down a statute duly passed by a state legislature and signed by a state's governor.  Nothing about HB 1224 suggests an intent on the part of the legislature to prevent the use of firearms for home and self defense.  Plaintiffs have failed to establish that HB 1224 "is incapable of valid application." *Dias*, 567 F.3d at 1179–80.  Their facial Second Amendment claim does not establish the likelihood of success necessary to justify a preliminary injunction.

---

[11] And indeed, Plaintiffs have not made any allegation that any law enforcement source anywhere believes the law should be so interpreted and applied.

**b)** **The "continuous possession" requirement and the prohibition on "transfers" of large-capacity magazines do not infringe the Second Amendment right of self-defense.**

Plaintiffs' Second Amendment challenge to the terms "continuous possession" and "transfer" in HB 1224 likewise fail to justify the extreme remedy of a preliminary injunction. As an initial matter, Plaintiffs have not, at this stage, sought to enjoin the application of HB 1224 to magazines that are currently capable of accepting more than 15 rounds of ammunition. On July 1, individuals will be unable to purchase, and the plaintiff dealers will be unable to sell, new magazines that accept over 15 rounds absent after-market alteration. These preliminary proceedings, as framed by Plaintiffs, will not change that fact.

Plaintiffs have instead chosen to attack the grandfather clause of HB 1224, a provision that seeks to *accommodate* the use of large-capacity magazines for those who owned them before the law's effective date. The General Assembly could have chosen to ban large capacity magazines entirely, as the District of Columbia did in a statute passed in the wake of the Supreme Court's decision in *Heller*. That law prohibits, without any exceptions and without a grandfather clause, magazines that accept more than ten rounds of ammunition, D.C. Code § 7-2506.01, and as noted above, was recently upheld by the D.C. Circuit in *Heller II*.

Yet Plaintiffs claim that HB 1224, a much more modest statute, "ban[s] functional firearms in the home." Doc. 29 at 23. They allege a number of hypothetical situations that they claim would violate the "continuous possession" requirement and run afoul of HB 1224's prohibition on "transfers" of large capacity

magazines.  These, they say, illustrate a "widespread criminalization of the most innocuous and otherwise lawful transfers and uses of ordinary firearms and firearm magazines." *Id.* at 23.

This is hyperbole.  Nothing in HB 1224 bans "functional firearms."  Those who own a firearm with a large-capacity magazine, and wish to transfer it to a friend or family member without triggering HB 1224 at all, may simply purchase a magazine that accepts 15 or fewer rounds.  Indeed, Plaintiffs may purchase as many 15-round magazines as they please, and transfer each of them to a friend or family member along with the firearm that goes with them.  Alternatively, Plaintiffs may "permanently alter" their large-capacity magazines to ensure they accept no more than 15 rounds of ammunition and then transfer them without restraint.  Plaintiffs do not allege that all of their firearms will not "function" with a 15-round magazine—nor could they credibly do so.  Plaintiffs cannot invalidate a statute simply because it attempts to *accommodate* their desire to own large-capacity magazines.  *Cf. Heller*, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution.  The Constitution leaves the District of Columbia a variety of tools for combating that problem . . . .") (emphasis added); *Heller II*, 670 F.3d at 1268 n.** ("[A] number of states and municipalities, representing over one fourth of the Nation's population, ban semi-automatic rifles or assault weapons, and these bans are by no means 'significantly narrower' than the District's ban.").

In any event, Plaintiffs again seek to invalidate HB 1224 rather than suggest an interpretation of it that would address their purported Second Amendment objections.  Even if the "continuous possession" requirement and the prohibition on "transfers" did amount to a "ban" on "functional firearms" under Plaintiffs' expansive reading, Plaintiffs fail to explain why a narrower reading would not save the statute.

## CONCLUSION

For the reasons stated and authorities cited above, the Defendant requests that this Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 24th day of June, 2013.


JOHN W. SUTHERS
Attorney General


*s/ Matthew D. Grove*
**Daniel D. Domenico***
Solicitor General
**David C. Blake***
Deputy Attorney General
**Kathleen Spalding***
Senior Assistant Attorney General
**Jonathan P. Fero***
Assistant Solicitor General
**Matthew D. Grove***
Assistant Attorney General
*Counsel of Record

## CERTIFICATE OF SERVICE

       I hereby certify that on <u>June 24</u>, <u>2013</u> I served a true and complete copy of the foregoing GOVERNOR'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| | |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | DAbbott@hollandhart.com |
| | |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| | |
| Marc F. Colin | mcolin@bcjlpc.com |
| | |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

<u>*s/ Matthew D. Grove*</u>

39