IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, *et al.*,

      Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

      Defendant.

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND TEMPORARY RESTRAINING ORDER**

---

## INTRODUCTION

The Defendant's response avoids any acknowledgement of the Second Amendment rights at issue, the degree of infringement on them, or the requirement that Defendant meet some heightened standard of scrutiny to justify any infringement.  Instead, Defendant attempts to transform this case into one involving a traditional exercise of police power with the corollary deferential standard of review.  Just as the Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), rejected the City of Chicago's attempt to recast the nature of the dispute – and its failure to meet its burden to justify the infringements on Second Amendment rights – this Court should reject Defendant's similar attempt here.  *Ezell*'s two-step Second Amendment analysis, overlaid on the traditional preliminary injunction elements, demonstrates why injunctive relief is appropriate in this case.

Defendant incessantly invokes the "Technical Guidance" as a talisman, and he posits new arguments to show how "designed to be readily converted" and "continuous possession" actually

mean something in yet another attempt to stave off HB 1224's patent Fourteenth Amendment vagueness problems.  However, Defendant's latest attempt to provide certainty fails, as explained in Part III of this reply.

Plaintiffs will first discuss why this Court has the power to issue a TRO and why Defendant's opposition to this point is entirely baseless.  Next, Plaintiffs' will focus on *Ezell*, Defendant's refusal to address the essential points under the Second Amendment, and why injunctive relief is appropriate.  Finally, Plaintiffs will show why Defendant did not, and cannot, fix the Fourteenth Amendment vagueness and related Second Amendment problems with HB 1224's "designed to be readily converted" and "continuous possession" language.

## ARGUMENT

## I.      THIS COURT CAN ISSUE A TRO PENDING THE PRELIMINARY INJUNCTION HEARING

Defendant argues that a temporary restraining order ("TRO") is inappropriate because Rule 65 does not permit TROs when the adverse party has received notice, and that a TRO is inequitable because the ten-day gap between the implementation of HB 1224 and the injunction hearing is the result of Plaintiffs' delay.  Resp. at 5-7.  Neither of these arguments has merit.

First, Defendant summarily concludes that Plaintiffs are not entitled to a TRO because Plaintiffs did not submit an affidavit or verified complaint in accordance with Rule 65(b)(1)(A) and therefore "no evidence supports [Plaintiffs'] request and the Court cannot issue a temporary restraining order."  Resp. at 5.  This argument ignores the plain language of the Rule and the

Court's ability to fashion appropriate injunctive relief when circumstances so require (as they do here).[1]

Rule 65(b)(1) states that a court may only issue a TRO without written or oral notice when specific facts in a verified complaint or affidavit demonstrate that immediate and irreparable injury will result to the movant "before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1).  Because the remedy granted by ex parte TROs is "so drastic and may have such adverse consequences," the authority to issue ex parte restraining orders must be "carefully hedged in Rule 65(b) by protective provisions."  *Pan Am. World Airways v. Flight Engineers' Intern. Ass'n*, 306 F.2d 840, 843 (2d Cir. 1962).  These protective provisions (apart from the Rule's limitation on the duration of TROs) are simply not applicable when the adverse party has been given notice and the opportunity to contest the requested relief.[2]  *See Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F. Supp. 655, 658 (D. Del. 1987).

---

[1]  To the extent that Defendant's complaint regarding the absence of a Verified Complaint or supporting affidavits has merit, which it does not, such concerns are resolved by the attached Declarations incorporated herein as Exhibits A through D.

[2]  Defendants' assertion that a TRO cannot be issued with notice is contrary to case law.  *E.g., H-D Mich., LLC v. Hellenic Duty Free Shops*, 694 F.3d 827, 844 (7th Cir. 2012) ("the language of Rule 65(b)(2) and the great weight of authority support the view that 28 days is the outer limit for a TRO without the consent of the enjoined party, ***regardless of whether the TRO was issued with or without notice***") (emphasis added); *Vaughan v. Bank of America, NA*, 2010 WL 3273052, at *2 (Aug. 18, 2010) (denying motion for TRO without notice, but ordering a hearing on plaintiff's motion for TRO with notice); *Nutrasweet Co. v. Vit-Mar Enterprises, Inc.*, 112 F.3d 689, 692 (3d Cir. 1997) ("The most prevalent view is that a temporary restraining order, ***even if issued with notice***, cannot be continued beyond the periods prescribed in Fed.R.Civ.P. 65(b) . . . .") (emphasis added); *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp.2d 581, 598 (W.D. Pa. 2009) (contemplating issuance of TROs with notice); *Casa Editrice Bonechi S.R.L. v. Irving Weisdorf & Co.*, 1995 WL 731633, at *2 (S.D.N.Y. Dec. 8, 1995) ("There is no indication in Rule 65(b) that temporary restraining orders ***granted with notice*** to the defendant also must expire after ten days.") (emphasis added).

Here, the Defendant has full notice, and a verified complaint or affidavits are not required.  If the adverse party has notice, courts will simply analyze the request under the same standards as a motion for preliminary injunction.  *Escobar v. Jones*, 2012 WL 6212846, at *2 (D. Colo. Nov. 21, 2012) ("Where the opposing party has notice, the procedure and standards for issuance of a temporary restraining order mirror those for a preliminary injunction." (citation omitted)).  However, the fact that the adverse party has notice of the TRO motion does not automatically convert the motion into a motion for preliminary injunction because a TRO and a preliminary injunction *are two distinct remedies*.  The sole purpose of a TRO is to preserve the status quo and prevent irreparable harm just so long as necessary to hold a hearing, and no longer.  *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974).  Conversely, a preliminary injunction may be unlimited in duration and may require action or inaction beyond merely preserving the status quo.  *See Prudential Ins. Co. v. Inlay*, 728 F.Supp.2d 1022, 1027 (N.D. Iowa 2010).  Thus, Defendant's argument that the Court can only issue a preliminary injunction under Rule 65 because he received notice of Plaintiffs' requested TRO is legally erroneous.

Lastly, Defendant's reliance on *RoDa Drilling Co. v. Siegal* to assert that the irreparable harm that will result from HB 1224's implementation between July 1, 2013 and July 10, 2013 "is a consequence of Plaintiffs' own making" is flawed.  *See* Resp. at 6-7.  First, *RoDa Drilling Co.* discussed the propriety of a preliminary injunction, not a TRO.  552 F.3d 1203, 1205-06 (10th Cir. 2009).  Second, while the court recognized that delay in seeking preliminary relief cuts against finding irreparable injury, the court noted that "delay is but one factor in the irreparable harm analysis, and in *Kansas Health Care Association*, we held that a ***three-month delay*** in

filing did not defeat a claim of irreparable injury when the delay was attributable to plaintiff's attempts to negotiate and the need for further documentation of the harm." *Id.* at 1211 (emphasis added) (citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1544 (10th Cir. 1994)).  Following *Kansas Health Care Association*, the court concluded that the moving party's delay did not warrant a finding of no irreparable harm because the delay in filing the complaint and seeking injunctive relief arose from attempts to resolve the dispute. *Id.* at 1212.

Here, Plaintiffs' requested TRO is not inequitable because of any supposed delay attributable to Plaintiffs.  Between the time Plaintiffs filed their complaint on May 17, 2013 and subsequently filed their motion for preliminary injunction and TRO on June 12, 2013, the parties were discussing a stipulation regarding how HB 1224 should be interpreted and enforced.  Moreover, the selection of the July 10 hearing date was not within Plaintiffs' control.  Further, Plaintiffs filed their motion for preliminary injunction and TRO a mere 26 days after they filed their complaint.  Thus, the ten-day gap between when HB 1224 goes into effect and when this Court can hear the merits of Plaintiffs' motion for preliminary injunction is not the result of any inexcusable delay attributable to Plaintiffs, and the details set out in Plaintiffs' motion and in the attached declarations establish irreparable harm to support a TRO.

## II.     DEFENDANT FAILS TO ACKNOWLEDGE THE APPROPRIATE TESTS FOR ASSESSING PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF

Throughout the beginning of his brief, Defendant goes to great lengths to try to convert this Second Amendment challenge into one involving a typical challenge of a State's exercise of its police power not involving either a fundamental constitutional right or, relatedly, heightened

scrutiny.  The Defendant's attempt here mirrors the City of Chicago's attempt to avoid issuance

of a preliminary injunction in *Ezell*, and should be rejected.

> **A.      Defendant, Not Plaintiffs, Must Meet a Heightened Standard**

Defendant asserts that because this case involves an enactment by the Colorado General

Assembly, "a heightened standard [that Plaintiffs must meet] applies."   Resp. at 9.   The

Defendant then argues that a "most exacting analysis" must be applied to Plaintiffs' claims of

facial unconstitutionality, *id.* at 10, and that the "powerful interest in assuring the safety of

Colorado's citizens" necessarily "outweigh[s] the injuries that Plaintiffs' assert they will suffer if

the challenged provisions go into effect as the legislature intended."  *Id.* at 12.

In *Ezell*, the Seventh Circuit rejected such an approach.  Noting that "[i]t's true that

Second Amendment litigation is new," and that the Chicago ordinance at issue banning shooting

ranges "is unlike any firearms law that has received appellate review since *Heller*," the court

explained that it was not "without a framework for how to proceed."  651 F.3d at 700.  Taking

into account the well-established structures from First Amendment analysis, the Seventh Circuit

adopted a basic two-part inquiry.  First, does the prohibition/regulation at issue involve the

Second Amendment at all?  Some prohibitions and regulations simply do not infringe Second

Amendment rights and Second Amendment scrutiny ends there.  *Id.* at 702-03.  Second, "*[i]f the

government cannot establish this*," that is, that no Second Amendment right is implicated, or the

inquiry is "inconclusive," or it is "*not* categorically unprotected," "then there must be a second

inquiry into the strength of the government's justification for restricting or regulating the

exercise of Second Amendment rights."  *Id.* at 703 (first emphasis added, second in original).

The second step "requires the court to evaluate the regulatory means the government has chosen

and the public benefits end it seeks to achieve.  Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right."  *Id.*

As for the appropriate standard, the Seventh Circuit stated that "broadly prohibitory laws restricting . . . core Second Amendment right[s] . . . are categorically unconstitutional. . . . For all other cases, however, we are left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights; the answer to the Second Amendment 'infringement' question depends on ***the government's ability*** to satisfy whatever standard of means-end scrutiny is held to apply."  *Id.* (emphasis added).

It is Defendant, not Plaintiffs, who must demonstrate in the first instance that the specific prohibitions and restrictions do not involve Second Amendment rights or that any restrictions on such rights satisfy heightened scrutiny.

**B.      Defendant Cannot Meet His Burden to Show No Infringement**

Defendant does not even attempt to demonstrate that there is no infringement on Plaintiffs' Second Amendment rights. Rather, Defendant appears to suggest either that no rights exist or that any infringement would be trivial because the "Technical Guidance" solves all problems.  The "Technical Guidance" is discussed below.  In any event, Defendant has failed to demonstrate that the specific restrictions in this case ("designed to be readily converted" and "continuous possession") do not infringe on Plaintiffs' Second Amendment rights.  Defendant's failure rests on a profound misunderstanding of the Second Amendment.

### 1.      Individual Plaintiffs, Including the Sheriffs

According to Defendant, he has not violated the Second Amendment because HB 1224 does not "***utterly eradicate*** any individual plaintiff's ability to obtain either the firearms or training necessary to defend himself." Resp. at 18 (emphasis added). The *Heller* decision rejects such a standard.   In *Heller*, as Petitioner the District of Columbia pointed out, the handgun prohibition did not prevent people from engaging in self-defense with rifles or shotguns. To the *Heller* Court, this fact was irrelevant.  *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).

Here, magazines are integral to the use of firearms, and magazines of 16 rounds or more are integral to the firearms that many of the Plaintiffs use to protect themselves, their families, and their property.  *Compare Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").  The "designed to be readily converted" language outlaws or chills ownership and use of magazines of 15 rounds or less, and the "continuous possession" limitation on ownership and use of magazines of 16 rounds or more makes the "grandfather" right next to meaningless.[3]  Defendant wholly fails to meet his burden to address these infringements.

---

[3]   The Defendant makes the following bald statement: "The grandfather clause of HB 1224 ***eliminates*** the possibility of any irreparable harm to any individual plaintiff who currently owns or desires to own magazines with a capacity greater than 15 rounds."  Resp. at 18.   This statement is typical of the Defendant's categorical, conclusory assertions that do not even attempt to address the actual harms described by Plaintiffs or the Defendant's burden to justify them under *Heller*, *McDonald* and, inter alia, *Ezell*.

2.      **FFL Plaintiffs and Magpul**

Defendant suggests that the FFL Plaintiffs and Magpul have no Second Amendment rights themselves, that any injury is simply economic, and, accordingly, they cannot possibly suffer an irreparable injury.  Defendant's theory is that businesses whose core activity involves a constitutional right actually have no rights themselves; only their customers do.  This would not be true in a First Amendment context. *See American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323 (7th Cir. 1985) (booksellers brought successful First Amendment challenge to ordinance prohibiting them from selling certain sexually-themed materials), *aff'd*, 475 U.S. 1001 (1986). It would not be true in an abortion rights context. *See Planned Parenthood v. Danforth*, 428 U.S. 52, 62 (1976) (abortion provider doctors had standing to sue against statute controlling how they provided abortions).

In a Second Amendment context, businesses also have their own constitutional rights which they can invoke. *See Ezell*, 651 F.3d at 696 ("Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to 'act[ ] as [an] advocate[ ] of the rights of third parties who seek access to' its services."); *see also United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (If laws restricting commercial sale of arms were not subject to heightened scrutiny, "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*."); *City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972) (Ordinance violated state constitutional right to arms. "As an example, we note that this ordinance would prohibit gunsmiths, pawnbrokers and sporting goods stores from carrying on a substantial part of their

business. Also, the ordinance appears to prohibit individuals from transporting guns to and from such places of business.").

Of course FFLs, like bookstores, also have third-party standing on behalf of their customers. *See Ezell*, 651 F.3d at 696; *Kole v. Village of Norridge*, -- F.Supp.2d --, 2013 WL 1707951, at *7 (N.D. Ill. Apr. 19, 2013); *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (standing to mount pre-enforcement challenge).

Defendant also contends that the economic damages HB 1224 will cause Plaintiff licensed firearms dealers and Magpul are "not only speculative, but are quantifiable and therefore do not qualify as irreparable." Resp. at 15. Thus, Defendant argues that because the impact on the "business Plaintiffs" is, in part, an economic injury, they have not satisfied the irreparable harm element for a preliminary injunction. This position, however, is contrary to Tenth Circuit authority.

"Under the Eleventh Amendment, states are generally immune from suits brought in federal court by their own citizens, by citizens of other states, by foreign sovereigns, and by Indian tribes." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010); *see also* U.S. CONST. amend. XI. Moreover, C.R.S. § 24-10-106 provides that the State of Colorado is immune from suits that lie in tort or could lie in tort except for the limited areas in which sovereign immunity is explicitly waived. The State of Colorado has not waived sovereign immunity for instances such as this where a plaintiff in a pre-enforcement challenge to the implementation of a new state statute suffers significant economic and other damages as a result of the enactment of the state statute. *See* C.R.S. § 24-10-106(1)(a)-(h). As such, Plaintiff licensed firearms dealers and Magpul will be unable to recover for the significant economic injury HB

1224 has and will continue to cause because the Eleventh Amendment and Colorado's statutory grant of sovereign immunity preclude a suit for money damages against the State of Colorado.

As noted by the Tenth Circuit in *Crowe & Dunlevy, P.C. v. Stidham*, "[w]hile economic loss is usually insufficient to constitute irreparable harm, the imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." 640 F.3d 1140, 1157 (10th Cir. 2011) (internal quotations and citations omitted); *see also, e.g., Chamber of Commerce*, 594 F.3d at 770-71; *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). Accordingly, because Plaintiff licensed firearms dealers and Magpul will be unable to recover the economic damages caused by HB 1224 from Defendant, they satisfy the irreparable harm requirement.

In sum, Defendant has not even attempted to show that the challenged provisions at issue do not infringe on Plaintiffs' Second Amendment rights. Instead, Defendant invents his own constitutional standard that he can do whatever he wants as long as he does not "utterly eradicate" the Second Amendment right of individuals.  And Defendant considers economic harm suffered by the FFL Plaintiffs and Magpul to be essentially irrelevant.  Defendant has failed to meet the first prong of the two-part *Ezell* test to demonstrate there is no injury to Plaintiffs' Second Amendment rights.

### C. Defendant Has Offered No Justification Warranting Infringement on Plaintiffs' Constitutional Rights

Defendant here does not directly acknowledge the existence of Second Amendment rights in this case, nor the infringement on those rights caused by "designed to be readily converted" and "continuous possession," nor Defendant's own duty to meet some heightened level of scrutiny.  Again, *Ezell* is instructive.  There, the City of Chicago, like Defendant here,

tried to belittle the injuries to the plaintiffs and did not try to justify the actual infringements. The Seventh Circuit described the City's burden: "[T]he City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified." 651 F.3d at 709. The Seventh Circuit then explained why the City failed to meet its burden, warranting issuance of a preliminary injunction: "At this stage of the proceedings, the City has not come close to satisfying this standard. In the district court, the City presented no data or expert opinion to support the range ban." *Id.*

Similarly, Defendant here posits a series of state interests and legal arguments that he insists justifies any (unacknowledged) harms caused by HB 1224. These asserted interests and legal argument do not come close to satisfying Defendant's burden.

### 1. Defendant's General Statements About Public Interest are Insufficient

Defendant makes two general arguments on the public interest which purport to justify the infringements at issue. First, Defendant says that the General Assembly has the authority to create laws for public safety. This is true, but equally true as a general proposition is that any exercise of the police power must comply with the United States Constitution. Defendant's platitude does not carry his burden of proof.

Second, Defendant repeatedly invokes the Newtown and Aurora murders as the public interest against preliminary relief. At trial, Plaintiffs will show that the entirety of HB 1224 is deadly and dangerous. But the present motion is very narrow. Defendant's assertions of Newtown-Aurora public interests would, if valid at all, only relate to the ban on magazines greater than 15 rounds. In the next several weeks until a full trial on the merits can be had, there

is *no* public interest in preventing grandfathered owners from having their magazines repaired, or from loaning those magazines to other law-abiding persons for lawful self-defense.  Moreover, there is *no* public interest in enforcing the completely unintelligible prohibition on magazines "designed to readily converted." As detailed in Plaintiffs' original motion, in Plaintiffs' response to the motion to certify, and below, Defendant keeps changing his mind about what the "designed" phrase means. Until he can at least settle on something, the public interest strongly favors protecting the people of Colorado from criminal prosecution under an extremely vague bill.

### 2.      Defendant's Vagueness Defense Misses the Point

Defendant attempts to treat persons who exercise Second Amendment rights as if they were illegal drug users. He ignores that the United States Constitution does not guarantee a right to possess drug paraphernalia. The Constitution does expressly guarantee the right to possess two items which are essential to ordered liberty: "Arms" and a "press." U.S. CONST., amends. I-II.

Defendant places heavy reliance on the drug paraphernalia case, *Hoffman Estates v Flipside*, 455 U.S. 489 (1982). Even if "Arms," like "drug paraphernalia," were not in the Constitution, *Flipside* would be inapposite to the motion. The ordinance enacted by Hoffman Estates only applied to the commercial sale of certain items, not to their possession. Thus, the Court found that the ordinance's "designed" language was not unconstitutionally vague *for commercial businesses*. *See* 455 U.S. at 501 "(A business person of ordinary intelligence)". "[E]conomic regulation is subject to a *less strict vagueness test*. . . . This ordinance simply regulates business behavior . . ." *Id.* at 498, 499 (emphasis added).  In contrast, HB 1224 goes much further, and criminalizes the possession of items by ordinary citizens.

13

Moreover, in the context of a business regulation claim raised only by a business, the *Flipside* court minimized the issue of standards of enforcement: "In reviewing a business regulation for facial vagueness, however, the principal inquiry is whether the law affords fair warning of what is proscribed," rather than whether enforcement standards are vague. 455 U.S. at 503.  But in the instant case, the Sheriffs are directly raising the problem that was not at issue for the business-only facial challenge in *Flipside*: HB 1224 "provides insufficient standards for enforcement." *Id.*

Besides that, the *Flipside* court rejected the drug paraphernalia vendor's facial challenge because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495. As the briefing in the instant case has detailed, nothing is "clearly proscribed" by "designed to be readily converted." Even if that language did clearly proscribe some magazines (discussed *infra*), many of the Plaintiffs, including the Sheriffs and almost all the rest of non-FFL Plaintiffs, do not own such magazines.

Defendant cites two cases which did not find statutory language with "designed" to be unconstitutionally vague in the context of a gun control statute. Both cases were decided under the lower standard of review when a law's possible vagueness does not affect a constitutional right.

In *Richmond Boro Gun Club*, the Second Circuit in 1996 was reviewing a challenge to a New York City gun control ordinance. The court's reasoning was explicitly premised on the plaintiffs' concession that no fundamental right was involved:

> They concede that the local law does not infringe upon a fundamental constitutional right. Courts rarely invalidate a statute on its face because of

> alleged vagueness if the statute does not relate to a fundamental constitutional right (usually first amendment freedoms) and if the statute provides "minimally fair notice" of what the statute prohibits.

*Richmond Boro Gun Club v. City of New York*, 97 F.3d 681, 684 (2d Cir. 1996) (citation omitted).   Following *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), it is indisputable that the Second Amendment is a fundamental right, and the relatively loose approach of the *Richmond Boro* case is not applicable.

For the same reason, *United States v. M-K Specialties Model M-14 Machinegun*, 424 F.Supp.2d 862 (N.D.W.Va. 2006), also cited by Defendant, does not support Defendant's argument. Like *Richmond Boro*, the *M-K Specialties* case was decided under a standard that did not involve fundamental constitutional rights. This was correct, because machine guns are not among the "arms" that are protected by the Second Amendment. *See Heller*, 554 U.S. at 627.

Defendant's citations to cases using a weak standard of review of vagueness not affecting constitutional rights are inapposite. Again, Defendant has failed to meet his burden of heightened scrutiny.

## III.   DEFENDANT MISCHARACTERIZES THE TECHNICAL GUIDANCE, WHICH DOES NOT MEET THE DEFENDANT'S BURDEN NOT TO INFRINGE SECOND AMENDMENT RIGHTS; NOR DO DEFENDANT'S LATEST ITERATIONS OF "DESIGNED TO BE READILY CONVERTED" AND "CONTINUOUS POSSESSION" MEET DEFENDANT'S BURDEN

Defendant's brief is replete with reliance on the "Technical Guidance" and superlative characterizations of it. *E.g.*, Resp. at 14 ("a reasonable narrowing interpretation of the law"); 15 ("strikes a reasonable middle ground and draws a bright line rule that offers substantial certainty"); 19 ("draws bright-line rules for law enforcement").   What Defendant's brief lacks is

any showing that the "Technical Guidance" in fact provides a "bright-line rule" that offers "substantial certainty."

## A.     "Designed to Be Readily Converted"

As noted in Plaintiffs' TRO/preliminary injunction motion and in their response to the motion to certify questions to the Colorado Supreme Court, nowhere is there any suggested clear definition of "designed to be readily converted."  Defendant's response, discussed more fully below, offers yet new interpretations which still fail to provide any certainty.

Before turning to Defendant's continued shortcomings, one point should be squarely addressed: Defendant flatly asserts that "Plaintiffs' motion does not assert that this narrower reading of Colorado law violates the Constitution." Resp. at 7.  It most certainly does.  Motion for Temporary Restraining Order and Preliminary Injunction at 3, 5-6, 14-15, 17, 21.

Plaintiffs have raised the issue that "designed to be readily converted" can be read to outlaw all magazines, regardless of size, which have a removable base plate (a/k/a "floor plate"). Defendant scoffs, characterizes the Plaintiffs' argument as a "straw man," and as an interpretation made "unreasonably" and by "no one." Actually, it is the interpretation of HB 1224's prime sponsor.

*Prime Sponsor's Intent*

A few days before the Governor signed HB 1224, KUSA News reported on the base plate issue, and interviewed HB 1224 prime sponsor Rep. Rhonda Fields.

KUSA: So you're viewing this as a relatively broad interpretation of that clause; if it's capable of having its capacity increased at all above 15, it's out?

Rep. Fields: It will be illegal.

Later in the interview, she added "I'm not envisioning changing that [her bill] because of a little plate you can pull out." *See True Scope of Gun Bill Questioned*, KUSA.com, Mar. 14, 2013, http://www.9news.com/rss/story.aspx?storyid=323800 (the segment with Rep. Fields begins at about 1:40).

The opponents of HB 1224 agreed with Rep. Fields about its meaning. On Second Reading on the Senate floor, five senators spoke at length and in detail about the sweeping scope of "designed to be readily converted." Senator Lundberg even held up a magazine, and attached an extender which he had built with a 3-D printer. Minority Leader Cadman disassembled a magazine, showing how the base plate is removed. No supporter of HB 1224, including the Senate sponsor, said anything to contradict the five Senators' explanations of "readily converted."[4]

While Rep. Fields, the prime sponsor of HB 1224, had a clear idea of what magazines would be banned (nearly all of them), Defendant has now offered three different interpretations.

---

[4] Colorado State Senate, audio recording of the Senate floor, Mar. 8, 2013, at 7:47:50 (Sen. Lundberg) (demonstration of adding an extender) (HB 1224 bans "virtually all magazines regardless of what their original manufactured capacity is because you can convert them and add an extension to them."); 8:42:55 (Sen. Lundberg) (bans "virtually every magazine"); 9:39:25 (Sen. Cadman) (demonstration of removal of base plate) ("If you can clean them so you can keep using them they are now illegal"); 10:21:00 (Sen. Lundberg) (demonstration of removal of base plate on a 10-round magazine, and adding an extension he made with a 3D printer) ("They're all illegal, that's the way 1224 works. . . . Don't fool me with some rhetoric that small magazines are acceptable, they are not."); 10:41:01 (Sen. Lambert) ("The way the bill reads, the PMAG 10 is illegal because it is readily converted."); 12:13:44 (Sen. Brophy) ("you won't be able to purchase any new ones after July 1st of this year because they are all readily convertible"); 13:12:10 (Sen. Cadman) ("now that no new magazines can be sold in Colorado. That's what this bill is saying."), *available at* http://coloradoga.granicus.com/MediaPlayer.php?view_id=42&clip_id=3229.   Plaintiffs would have preferred to provide this Court with a printed transcript of the Senate debate; Defendant's counsel promised Magistrate Judge Watanabe on May 30 that they would provide Plaintiffs with the legislative record.  As of this filing, it has not yet been provided.

The "Technical Guidance" says that magazines with removable base plates would not be deemed prohibited by this language "simply because" of the base plate.  Each magazine would be subject to an "objective test" to see whether the magazine was "designed to be readily converted." No further information was provided about what "objective" features of a magazine made it "designed to be readily converted."[5]

Three weeks later, in Defendant's June 10 motion for certification, Defendant posited that the "designed" language covered "magazines that are ***principally*** used with ***extensions or devices that increase the combined capacity*** to more than 15 rounds." Motion to Certify at 6 (emphasis added). Defendant did not suggest how anyone, let alone an ordinary citizen, was supposed to know whether a magazine is "principally" used with extenders to "increase the combined capacity." According to the certification motion, "designed" was really about addition. The prohibited magazines were ones that were "principally" used to grow too big (13 + 3 = 16), whereas the legal magazines were not "principally" used with extensions, and presumably generally remained at their original size.

Defendant now appears to have come to the realization that Plaintiffs were correct in their Complaint, Motion and Supplemental Brief: there is no objective physical feature on any box

---

[5] The Attorney General's Technical Guidance is dated "May 16," but was not announced to the public until after Plaintiffs filed their lawsuit. The Guidance has never been sent to the Sheriffs by the Attorney General. There is no indication that it has been sent to any of Colorado's numerous municipal or other local law enforcement agencies. Finding it on the Attorney General website requires working backwards through several pages of press releases, until one arrives at May 17. The Guidance does ***not*** appear to website users who search for keywords such as "magazine" or "continuous." That is because the Attorney General uploaded only an image of the Technical Guidance, rather than a file in which the words are searchable.

magazine with a removable base plate which makes it more or less extendible than any other box magazine with a removable base plate.

### New Definition in Response Brief

Now, Defendant's latest theory, as articulated in his Response Brief, is that "designed to be readily converted" never had anything to do with extenders.  The "extensions or devices" language that Defendant wanted to certify to the Colorado Supreme Court appears nowhere in the Response Brief.  Instead, according to Defendant, everyone has always known all along that the "Technical Guidance" is really about limiters.  Whereas the Defendant on June 10 was certain that the "Technical Guidance" was about addition, the Defendant now appears certain that the "Technical Guidance" is and always has been about subtraction – the removal of a limiter.  Resp. at 29

### Magazines with limiters

In some States, for some types of hunting, a firearm must be temporarily limited to a certain capacity. A "limiter" can be used for this purpose. (For a shotgun, the limiter is called a "plug.")   In the small number of States which restrict magazine capacity in general, manufacturers commonly sell magazines with limiters.  For example, a 17-round magazine may have a 2-round limiter, in order to comply with a 15-round limit in a certain state.

Defendant now says that "designed to be readily converted" applies to magazines with limiters, and the test is how the limiter is attached to magazine:

- If the limiter is unattached, simply sitting on the base plate, then the magazine is illegal, according to Defendant.

- On the other hand, if the limiter is epoxied or welded, then the magazine is "not designed to be readily converted," according to Defendant. Resp. at 29.

Defendant has apparently not decided what the rule is if the limiter is attached by a pin. This in fact is how limiters are typically attached, for sale in the few states that restrict magazine capacity. But of course punching out a pin is easy to do. Is a magazine with a limiter attached by a pin "designed to be readily converted"? Defendant remains discreetly silent.

Defendant uses epoxy and welding as his obvious examples of what is lawful. He says that such a magazine has been "permanently altered" so that it cannot accept more than 15 rounds.  Resp. at 29, 37.  This is true if "permanently" means "a few hours." Soaking an epoxied item in paint strippers such as acetone and toluene removes the epoxy.  Besides that, as long as the epoxied limiter is left in place, the magazine cannot be disassembled for cleaning and repair. As detailed in Plaintiffs' Motion, the Second Amendment includes the right to clean and repair arms, and magazines are "arms."

As for welding, one of the cases cited by Defendant casts serious doubt on his theory that welding immunizes an arm from the "designed" language. In *United States v. M-K Specialties Model M-14 Machinegun*, 424 F.Supp.2d 862, the issue was statutory language about a gun being "designed to shoot" automatically. The gun in question did not actually shoot automatically, until a federal law enforcement employee went to work, "by drilling out and grinding down the welding that had been placed on the defendant receiver by MK Specialties and utilizing the existing design features of the receiver." *Id.* at 868. The district court thus held that because a gun could be changed from status A (not automatic) to status B (automatic) by machine shop work that involved "grinding down the welding" that had been emplaced by the defendant, the defendant's gun was "designed to shoot" automatically.  Thus, Defendant's notion

20

that welding a limiter onto a magazine is a safe harbor from prosecution is incorrect—at least according to the case cited by Defendant.

Coloradans who currently own or in the future buy magazines with an unattached limiter are now apparently under the obligation to weld or epoxy it in place. Welding is impossible for magazines with plastic components, and the average gun owner possesses neither the tools nor the skills to perform welding of metal magazines. As for epoxy, smearing a bunch of liquid adhesive into a mechanical device stands a good chance of accidentally destroying the device. (For example, if some of the epoxy gets onto the magazine spring.)

Defendant's Response Brief describes two other items:

*Telescoping magazine*

This was patented three decades ago. Defendant is aware of only a single magazine ever commercially sold which can telescope. He admits that there are no such magazines on the market which can telescope from 15 rounds or less to 16 rounds or more. Hypothesizing that such magazines existed, they would be straightforwardly outlawed by the direct language of HB 1224, because they are "capable of accepting" more than 15 rounds.

By analogy, if a statute outlawed cars that can drive more than 15 miles an hour, a car which can drive 10 miles an hour ***and*** can drive 20 miles an hour would be directly outlawed. This is true even if the driver had to push a button or move a lever (e.g., to change gears) in order to make the car drive 20 miles per hour.

*Magazine coupler*

Defendant now says that coupling two legal 10-round magazines together does not turn them into an illegal 20-round magazine. Hence, magazines which can be joined via couplers (or

duct tape) are not prohibited by "designed to be readily converted." Defendant refused weeks ago to make this concession but now offers it to try to defend "designed to be readily converted" from an injunction.

Moreover, Defendant's statement in his Response Brief about couplers is actually an interpretation of the meaning of "capable of accepting" more than fifteen rounds of ammunition. It is **not** an interpretation of the term "designed to be readily converted."

Every substantive statement by Defendant about "designed to be readily converted" (the Technical Guidance, the Motion for Certification, the Brief in Opposition) has offered new interpretations of what Defendant thinks the phrase means. Every one of those new interpretations also remains unconstitutionally vague.

### B.     "Continuous Possession"

As with "designed to be readily converted, Defendant has developed a variety of interpretations about what "continuous possession" means.[6]  The latest interpretation, from the Response Brief, in fact flatly contracts the "Technical Guidance."

---

[6] Defendant's brief supplies a dictionary definition of the individual words in each phrase.  Resp. at 24, 28, 32. Merely quoting the dictionary does not solve a vagueness problem:

> The Government's supplemental briefing raises two additional major arguments in favor of its definition of "compounding": (i) "compounding" is a "term of art," having a clear and uniform meaning understood both by the FDA . . .  and those in the pharmacy industry . . . ; and (ii) that the term "compounding" has a "common and ordinary meaning," ascertainable from dictionaries, and that Congress intended to adopt that common meaning. The Court has carefully considered these arguments, but finds them to be without merit . . . . [I]t is incumbent upon Congress to state its understanding of the terms it uses and improper for a court to speculate as to its intentions, especially where there is none evident in the legislative history and Congress as well as the FDA deferred to the states in regulation of the practice.

According to the "Technical Guidance," a "grandfathered" owner is allowed "temporary transfers" only if both of two conditions are met: the magazine must remain in the "continual physical presence" of the owner, and the owner must have the "expectation that it will be promptly returned."

Defendant's motion for certification offered another meaning of "continuous possession": that is, it is not illegal to allow "another person to temporarily hold, use, or share [a magazine] for lawful purposes."

The Response Brief offers still yet another interpretation. "Under the guidance, if a person remains in the physical presence of the magazine, or ensures that the magazine is secured while the individual is absent, the 'continuous possession' requirement is satisfied." Resp. at 32. This is *not* what the "Technical Guidance" instructs.

The "Technical Guidance" requires "continual physical presence" *and* the "expectation that it will be promptly returned." Neither of those is required by the Response Brief's new standard. Instead, transfers are allowed if either one of two conditions are met: "physical presence" *or* "the magazine is secured while the individual is absent."

Defendant's three different, contradictory interpretations of the meaning of "continuous possession" are conclusive proof that "continuous possession" is unconstitutionally vague.

Plaintiffs in their Motion and Supplemental Brief have presented an extensive list of examples showing clearly unconstitutional restrictions on ownership and use of "grandfathered" magazines arising from the "continual physical presence" mandate in the "Technical Guidance."

---

*United States v. Bader*, 2009 WL 2219258, at *10 (D. Colo. Jul. 23, 2009). The two phrases at issue in the instant case are certainly not terms of art in firearms regulation or the firearms industry. As detailed in the Motion, they are novelties.  Motion at 13, 16-17.

Most importantly, under the "Technical Guidance," it is illegal to loan a magazine to a family
member who does not remain in the owner's "continual physical presence" and does not
"promptly" return the magazine. The same rules of the "Technical Guidance" also outlaw
leaving a magazine for repair with a gunsmith overnight or for several weeks. Defendant tacitly
admits that such prohibitions are unconstitutional; that is why his Response Brief now propounds
a brand-new interpretation of "continuous possession," which might mitigate some of the more
egregious infringements on Second Amendment rights.[7]

That the new interpretation of "continuous possession" in the Response Brief is not
meant to be taken seriously is demonstrated by the brief itself.  Plaintiffs' Supplemental Brief
had detailed the plight of David Strumillo, who is storing magazines for a friend who is currently
serving overseas in the Armed Forces. As of July 1, the owner and Mr. Strumillo will become
criminals, because the owner (who is on another continent) will not be in "continuous
possession." (No physical presence, and no expectation of prompt return, according to the
"Technical Guidance.")  *See* Ex. A (Declaration of David Strumillo).

The Response Brief offers Mr. Strumillo a variety of useless solutions. *E.g.*, Mr.
Strumillo can buy the magazines—which would result in Mr. Strumillo buying magazines for
guns he does not own, and the serviceman losing the magazines for the guns that he does own.

---

[7] Even then, serious problems remain. If an individual's handgun and its 17-round magazine are
stolen and later recovered, the Sheriffs can apparently return the handgun to the crime victim, but
cannot return the magazine. When a thief interrupts the owner's "continuous possession," the
owner does not "ensure[] that the magazine is secured while the individual is absent"—since the
thief never promised to keep the magazine "secured." This problem will be frequent for the
Sheriffs.

If the new standard of the Response Brief actually meant anything, the Response Brief could instead have argued that everything is fine, because the serviceman ensured that "the magazine is secured while the individual is absent." But of course this new interpretation invented for page 32 of the Response Brief is binding on no-one, not even on page 20 of that same brief.

Defendant also proposes the marital property statute as the solution of family members being forbidden to lend each other magazines because of the "continuous possession" requirement. Resp. at 32. Even if Defendant's marital property theory were correct, it does nothing to alleviate HB 1224's ban on a magazine owner lending her magazine to her children, parents, siblings, or a neighbor who is in particular danger. The marital property rule does not change the fact that if a Sheriff's adult daughter arms herself with the Sheriff's duty handgun and its 17-round magazine while the Sheriff is out of town at a conference for a week, the Sheriff and the daughter are criminals, according to the Technical Guidance's interpretation of "continuous possession."

Defendant is correct that a magazine is subject to the ordinary marital property laws of Colorado. If the assets of divorcing spouses included a $50 magazine which the wife had acquired during the course of the marriage, then the husband would be entitled to $25 worth of other marital property, such as cash. Defendant apparently does not realize that gun control statutes and regulations about who can or cannot legally possess an arm do not always mirror marital property laws. For example, according to advisory opinions from the Bureau of Alcohol, Tobacco, Firearms & Explosives, if a husband with a felony conviction is prohibited from owning guns, his wife with whom he lives may still possess firearms, so long as she secures

them in a manner such that he does not have access to them. *See* STEPHEN P. HALBROOK, FIREARMS LAW DESKBOOK 2012-2103 EDITION § 2:19, at 214-15 (2012) (quoting the advisory opinions).

Thus, it is simplistic to assert that general rules of marital property can always by themselves determine the legal rights and duties of persons who own and possess arms.

Regardless, a marital exception to "continuous possession" does not cure the Technical Guidance's unconstitutional prohibition on lending magazines to other family members for lawful purposes, including self-defense in the home.

## CONCLUSION

The Court should grant Plaintiffs' motion for temporary restraining order until the July 10 hearing. The Court, at the hearing, should issue a preliminary injunction as described in the Motion.

Respectfully submitted this 27th day of June, 2013.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com
ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
ATTORNEY FOR SHERIFFS AND DAVID STRUMILLO

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEY FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
ATTORNEY FOR COLORADO STATE SHOOTING
ASSOCIATION AND HAMILTON FAMILY
ENTERPRISES, INC. D/B/A FAMILY SHOOTING
CENTER AT CHERRY CREEK STATE PARK

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2013, I have e-mailed a true and correct copy of the foregoing to the following e-mail addresses:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |

s/Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com