**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado *et. al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

---

For the reasons set forth below, the Court should deny the Governor's effort to dismiss three of Plaintiffs' constitutional challenges to HB-1224.[1]

## <u>INTRODUCTION</u>

Defendant seeks to dismiss Plaintiffs' second, third, and fourth claims based on an unprecedented and peculiar proposition: that the Governor, by instructing his Attorney General to issue non-binding "technical guidance" opining on the meaning of a state statute, can strip this Court of its jurisdiction to rule on the constitutionality of that statute. Put another way, Defendant contends that an Attorney General's non-binding guidance is an acceptable substitute for a federal court ruling on the constitutionality of a state statute. It is not. *Cf. Cooper v. State of Utah*, 684 F. Supp. 1060, 1068 (D. Utah 1987) ("Manifestly, only a court of law by judicial decree, and not the Attorney General by issuance of an opinion, effectively can render a

---

[1] Defendant's Motion to Dismiss also seeks dismissal of the 55 Sheriffs in their official capacities. The 55 Sheriffs are filing a separate response to address that portion of Defendant's motion.

legislative enactment unconstitutional."). Accepting Defendant's proposition would allow States to evade federal constitutional challenges to their statutes by issuing "technical guidance" that is binding on no one and subject to change at any time.

As discussed below, the Attorney General's inconsistent "technical guidance" does not eliminate Plaintiffs' standing to challenge HB 1224 on vagueness grounds. Plaintiffs still face a credible threat of prosecution, and this Court therefore retains jurisdiction to rule upon Plaintiffs' second, third, and fourth claims for relief.

Defendant also asserts that a ruling from this Court will not redress Plaintiffs' injuries, because Plaintiffs have named only the Governor as a defendant. Defendant apparently assumes that when a federal court declares a statute unconstitutional, that ruling is binding only on the named defendant. That has never been the law, and is nonsensical on its face. A statute is either unconstitutional or it is not – it cannot be unconstitutional as to some but not others. Therefore, a ruling by this Court that HB 1224 is unconstitutionally vague on its face would apply to every law enforcement agency in Colorado that might seek to enforce it, and remove forever the uncertainty of its meaning and the attendant uncertainty of prosecution. This, the technical guidance does not, and cannot, do.

Finally, to the extent Defendant's argument is actually premised on mootness rather than standing, that argument fails as well. The technical guidance letter issued on July 10, 2013 ("the Second Technical Guidance Letter") does not even address certain aspects of those claims, and, in any event, the voluntary cessation exception to the mootness doctrine applies where, as here, the defendant remains free to reverse course at any time.

In essence, the Defendant's position is that a ruling by this Court would make no difference because the technical guidance cures the defects in the statute and removes any risk of prosecution. But in conceding that the guidance binds none of the hundreds of local jurisdictions that may enforce it, the Defendant's solution to cure a constitutionally defective statute essentially is to say "trust us, we do not think anybody will actually enforce this." As a fallback, the Defendant asks the citizens to take comfort in knowing that they have an affirmative defense to prosecution. Courts are the place where citizens can go to have their constitutional rights declared with certainty. If a right exists, its exercise cannot depend upon trusting that others will see it the same way, or by resort to an affirmative defense if they do not. That is no right at all. A declaration by this Court will make all the difference.

## **ARGUMENT**

## I. **THE TECHICAL GUIDANCE DOES NOT REMOVE A CREDIBLE THREAT OF PROSECUTION.**

Defendant asserts that Plaintiffs have not demonstrated a "credible threat" of prosecution because, by virtue of the technical guidance letters, Plaintiffs have received "affirmative assurances of non-prosecution." Motion to Dismiss [Doc. No. 64], at p. 7. But the letters say no such thing, even as it relates to the Governor or those within his direct control. Moreover, the letters *cannot* provide any such assurance with respect to local law enforcement. An affirmative defense to a prosecution by definition cannot be an "assurance of non-prosecution." Thus, those letters do not constitute assurances at all, and cannot satisfy Defendant's heavy burden of establishing a lack of credible threat to succeed on his Motion to Dismiss.

"The conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of

Art. III." *Diamond v. Charles*, 476 U.S. 54, 64 (1986). A plaintiff is not required to expose himself to actual arrest or prosecution, and a plaintiff has standing to challenge the constitutionality of a statute so long as the plaintiff's fear of prosecution is not "imaginary or speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-99 (1979). In other words, if a plaintiff alleges that prosecution is even "remotely possible," then a finding of standing is appropriate. *Id.* Moreover, the "evidentiary bar to establish standing is low." *Pacific Frontier, Inc. v. City of St. George*, No. 2:04-CV-780-TC, 2005 WL 3334749 at *4 (D. Utah Dec. 7, 2005).

Indeed, courts assume a credible threat of prosecution in the absence of compelling contrary evidence. *Id.* (citing *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). The lack of enforcement of a particular statute alone does not automatically preclude standing. *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir. 1987). For example, in *Babbitt*, even though the defendants noted that no criminal penalties had ever been levied under the statute at issue and averred that none "might" ever be imposed, the Supreme Court nonetheless found a credible threat of prosecution because the plaintiffs had engaged in the criminalized activities in the past and professed an intent to engage in the same activities going forward. *Babbitt*, 442 U.S. at 301-02. Similarly, in *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), the Court held that plaintiffs had standing to challenge a statute prohibiting the commercial display of sexual materials harmful to juveniles. In so holding, the Court rejected the defendant's argument that there was no credible threat of prosecution because the challenge was filed before the statute became effective. *Id.* at 392. The Court held that the injury-in-fact requirement was met "as the law is aimed directly at plaintiffs,

4

who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution."[2] *Id.*

Here, Plaintiffs have alleged sufficient facts to demonstrate that a credible threat of prosecution exists under HB 1224. *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (for purposes of ruling on a motion to dismiss for want of standing, the trial court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party). Under the text of HB 1224, any manufacture, sale, or purchase of magazines that can conceivably be converted into "large capacity magazines" as that term is defined in the bill will subject Plaintiffs to potential criminal prosecution because of the vague nature of the statute. *See, e.g.*, Second Am. Compl. [Doc. No. 62], ¶¶ 224, 231-34. Moreover, any innocuous transfer of grandfathered magazines for lawful purposes, such as cleaning and repair, will subject Plaintiffs to criminal prosecution based on HB 1224's vague "continuous possession" provisions. *Id.* ¶¶ 237-44. Because of the sweeping breadth of HB 1224's prohibitions, it is inevitable that Plaintiffs, and firearm-owning Coloradans at large, will continue to engage in conduct that is potentially criminalized under HB 1224 and subject to prosecution under the same. *See, e.g., id.* ¶ 226 (vast majority of small-capacity magazines are capable of being readily converted to large-capacity magazines and sale or purchase of the same will potentially be illegal); ¶ 239-40 (any routine transfer of grandfathered magazines is potentially subject to criminal penalties).

Defendant's technical guidance letters cannot wash away the credible threat of prosecution that exists and continues to exist while HB 1224 remains in force because, although

---

[2] The Court further observed that the "alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Id.* at 393. Similarly, here Plaintiffs have alleged that the vagueness of certain provisions in HB 1224 will chill their exercise of Second Amendment rights.

entitled to respect, formal attorney general opinions are **not** binding upon the courts or law enforcement in general. *See, e.g., Colorado Common Cause v. Meyer*, 758 F.2d 153, 159 (Colo. 1988); *Regents of Univ. of Colo. v. Students for Concealed Carry on Campus*, 271 P.3d 496, 502 n.4 (Colo. 2012) (unanimously rejecting a reading of the concealed carry statute contained in Attorney General Opinion).

Further, the technical guidance letters do not contain the sort of affirmative assurances of non-prosecution that courts have relied on to find a lack of credible threat of prosecution. *See, e.g.*, *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (finding no credible threat when the prosecutor affirmatively stated that it would not prosecute the plaintiff or anyone else for the proscribed conduct). The letters are simply the Attorney General's own personal (and different) interpretations of HB 1224 which, as the Plaintiffs have repeatedly alleged, is subject to multiple reasonable interpretations and therefore may be enforced inconsistently. They are not even binding on Defendant as he can change it at any time, as he has already demonstrated. They are not binding on state or local law enforcement and only create an affirmative defense to prosecution, which may or may not be deemed sufficient. They are not binding on the courts. Far from being an "assurance" that no prosecution will happen, the Governor has given no indication that he will intervene on any party's behalf if a prosecution is brought. Finally, they may be repealed or modified at any time by the current Attorney General or a future attorney general.

Absent a ruling from this Court, there is simply no way for Plaintiffs to know whether their routine purchases or sales of firearm magazines or lawful transfers of the same will subject them to criminal liability. Thus, the technical guidance letters do not constitute the sort of

"compelling evidence" necessary to overcome a finding of standing for purposes of motions to dismiss under F.R.C. P. 12(b)(1).

A.      **HB 1224 Is Not Moribund, Which Mitigates in Favor of a Finding of Standing.**

The fact that HB 1224 has only been in effect for approximately seven weeks mitigates in favor of finding a credible threat of prosecution. "Where a statute is recently enacted and is not moribund, its existence alone may create a threat that is credible enough to create standing." *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) (citing *Babbitt*, 442 U.S. at 301-02). In *Brown*, the court determined that Utah's anti-bigamy statute was, in fact, moribund and that the plaintiffs were therefore required to demonstrate that the government took additional threatening activities against them in order to establish the existence of a credible threat. *Id.* at 1249; *cf. New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996) ("[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.").

There is no question that HB 1224 is not moribund, and the sheer uncertainty of present and future interpretations of the statute and prosecutions under the same weighs in favor of finding standing for Plaintiffs' second, third, and fourth claims for relief.

**B.      Defendant's Authorities Are Readily Distinguishable.**

The cases Defendant cites in support of his argument are distinguishable, largely because they involved longstanding laws that, while still valid, were very rarely enforced or otherwise moribund. Moreover, persons charged with enforcing those laws had unequivocally stated that they would not prosecute the plaintiffs for conduct prohibited under the statutes. No such factors are present here.

For example, *Bronson v. Swenson* involved Utah's criminal statute prohibiting bigamy, which had not been enforced in recent memory. 500 F.3d 1099, 1102 (10th Cir. 2007). The Utah Attorney General had also explicitly stated the state would not enforce the statute in cases where the prohibited conduct was between consenting adults. *Id*. Tellingly, nothing in the technical guidance letters states explicitly that HB 1224 will not be enforced against owners of magazines of 15 rounds or less with removable base plates.

Likewise, *D.L.S. v. Utah* involved a long-standing sodomy prohibition, and the Utah County prosecutor provided an affidavit stating that from 1987 to 2004, the county had never prosecuted anyone solely for sodomy under the statute.  374 F.3d 971, 974 (10th Cir. 2004). The prosecutor also unequivocally stated that Utah County had no intention of prosecuting the plaintiff under the statute. *Id.*; *see also Winness*, 433 F.3d at 732 (District Attorney expressly stated that it would not prosecute either the plaintiff or anyone else under the state's flag-abuse statute). Further, the sodomy statute at issue had already been declared unconstitutional by the Supreme Court. *D.L.S.*, 274 F.3d at 974-75. There have been no similar assurances by any government agency in this case, and there has been no ruling on the constitutionality of HB 1224; *D.L.S.* is inapposite.

In *Mink v. Suthers*, prior to filing an answer to the plaintiff's original complaint, the Attorney General expressly admitted that he could not constitutionally prosecute the plaintiff under Colorado's criminal libel statute for the plaintiff's admitted conduct. 482 F.3d 1244, 1255 (10th Cir. 2007). Additionally, both the office of Attorney General and District Attorney changed hands while the case was still pending, further solidifying the conclusion that Colorado had no intention of specifically enforcing the criminal libel statute against the plaintiff. *Id.* Here, neither the Attorney General nor Defendant has admitted that enforcement of HB 1224 as written is unconstitutional.

Similarly, in *Faustin v. City & County of Denver*, the finding of no credible threat was based on the city prosecutor's determination that the plaintiff did not, in fact, violate the city's sign-posting ordinance. 268 F.3d 942, 948 (10th Cir. 2001). There has been no similar determination in this case.

At the preliminary injunction hearing on July 10, 2013, this Court referred the parties to *Dias v. City & County of Denver*, 567 F.3d 1169 (10th Cir. 2009), which Defendant then cited in his Motion to Dismiss. *Dias*, however, is also distinguishable and illustrates the type of situation, not present here, where a party may be deprived of standing. In that case, the plaintiffs challenged Denver's "pit bull ordinance" on vagueness grounds. *Id.* at 1173. The plaintiff dog owners feared their dogs could be seized or destroyed pursuant to the ordinance. *Id.* at 1174. However, the court held that the plaintiffs lacked standing "because they have not alleged a credible threat of future prosecution under the Ordinance." *Id.* at 1176. The court so held because "none of the plaintiffs currently resides in Denver and ***none has alleged an intent to return***." *Id.* (emphasis added). Thus, in *Dias*, in sharp contrast to the situation here, there was no credible

threat of prosecution because prosecution was a factual impossibility. Plaintiffs here are all Colorado residents or maintain their principal places of business in Colorado, and prosecution remains a distinct possibility.

Finally, Plaintiffs are aware of this Court's July 25, 2013 order regarding standing in *Grider v. City & County of Denver*, --- F.Supp.2d ---, 2013 WL 3851046 (D. Colo. July 25, 2013). In part, *Grider* involved an Americans with Disabilities Act ("ADA") claim brought by pit bull owners in Denver who sought an accommodation to have service pit bulls despite Denver's ban on pit bulls. After the plaintiffs in *Grider* brought suit, the City and County of Denver issued a written policy modifying its procedures for enforcing the pit bull ban and formally providing that it would not impound pit bulls that are identified by their handlers as service dogs. *Id.* at *3. This Court stated that "to whatever extent any of the Plaintiffs allege that they cannot go to Denver out of fear that their dog will be impounded, those allegations do not permit an inference that they are under any real and immediate threat of future injury." *Id.* Based on Denver's policy modification, this Court held that "none of the Plaintiffs have standing to seek prospective relief against Denver." *Id.*

*Grider*, again, presents a distinctly different situation than that presented by the Governor's technical guidance. Under the State Administrative Procedures Act, agencies have the authority to promulgate two types of rules: substantive rules, which have the force of law, and interpretative rules, which do not. *Sanchez v. American Standard Insurance Company of Wisconsin*, 89 P.3d 471, 475-76 (Colo. App. 2003). Similarly, the City and County of Denver has its own Administrative Procedures Act that allows promulgation of substantive rules that have the force of law within the City and County. *Denver Colorado Code of Ordinances*, Title II, Ch.

10

24, Art. VIII, Secs. 24-261 – 268. In *Grider*, Denver's policy modification was a substantive rule carrying the force of law which directed the City's law enforcement and prosecuting officials as to how the City's municipal pit bull ordinance was to be applied and enforced. The policy therefore had the force of law and plaintiffs could rely on it to protect them from the credible threat of prosecution. In contrast, the Governor in this case issued "guidance," which at best is an interpretative rule. It therefore lacks the force of law and binds no enforcement official, prosecutorial entities, or courts of law in the enforcement of HB 1224. Thus, Plaintiffs continue to face a credible threat of prosecution.

HB 1224 has only been in effect for roughly seven weeks. There has been no lapse of time and concomitant lack of prosecution that led the Tenth Circuit to find no credible threat in the cases cited by Defendant. More importantly, while the technical guidance letters offer the Attorney General and Defendant's own "interpretation" of what HB 1224 actually prohibits, Plaintiffs have received *no* concrete assurances that they will not be prosecuted for engaging in the conduct outlined in their Complaint – specifically buying and selling magazines which, by virtue of their design, can be converted to hold more than fifteen rounds, or failing to maintain "continuous possession" of grandfathered magazines. In addition, there is absolutely no guarantee that the next Attorney General will follow the current Attorney General's non-binding Technical Guidance or otherwise decline to prosecute the various classes of Plaintiffs for the otherwise constitutional conduct alleged in the Complaint. *See Mink*, 482 F.3d at 1255 (continued non-enforcement of statute after a change in the office of Attorney General solidified lack of credible threat). Thus, Defendant's reliance on the cases cited in his Motion to Dismiss is misplaced and those authorities are inapplicable to this particular case.

**C.      C.R.S.   §   18-1-504(2)(c)   Does   Nothing   to   Eliminate   the   Plaintiffs'
Demonstrated Credible Threat of Prosecution.**

Defendant summarily concludes that the affirmative defense afforded by C.R.S. § 18-1-504(2)(c) eliminates any concerns that threats of prosecution under HB 1224 are "credible."[3] Motion to Dismiss [Doc. No. 64], at p. 10. The Governor cites no authority for this proposition.

Defendant's interpretation of the sort of threatened injuries that can give rise to standing is far too narrow. Defendant essentially argues that if an affirmative defense exists against conviction under an otherwise unconstitutional statute, there is no credible threat of injury. However, the "credible threat" test relates to potential *prosecution*, not conviction. *See Babbitt*, 442 U.S. at 298 (it is not necessary for a plaintiff to subject himself to actual arrest or prosecution to be entitled to challenge a statute as unconstitutional); *Ward*, 321 F.3d at 1267 (plaintiff generally has standing if he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest and there exists a credible threat of prosecution thereunder). Section 18-1-504(2)(c) does nothing to resolve the actual and threatened injuries that Plaintiffs will suffer if prosecuted under HB 1224. *Id.* (plaintiff who challenges statute must only demonstrate a realistic danger of sustaining a *direct injury* as a result of the statute's operation or enforcement).

Even assuming that C.R.S. § 18-1-504(2)(c) provides an ironclad affirmative defense for prosecutions under HB 1224 that deviate from the Technical Guidance letters, the persons

---

[3] "A person is not relieved of criminal liability for conduct because he engages in that conduct under a mistaken belief that it does not, as a matter of law, constitute an offense, unless the conduct is permitted by one or more of the following: . . . An official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law."  C.R.S. § 18-1-504(2)(c).

prosecuted under HB 1224 will still suffer the embarrassment, stress, financial costs, and emotional hardship that go hand in hand with any unjustified criminal prosecution. "No one should have to go through being arrested for a felony, publicly shamed, and pay for a defense only to have a court find that the newly enacted statute is unconstitutional." *Cyberspace Comm'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 745-46 (E.D.Mich. 1999)*, quoted in Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1154-55 (10th Cir. 1999). In addition, the fact of arrest itself constitutes a significant harm. An arrest, regardless of the ultimate disposition, shows up in national criminal databases used in law enforcement. *See* Testimony of Sheriff Hartman on HB-1224, at 115 (Feb. 12, 2013) (attached as Ex. A). The harmful implications are obvious, particularly for anyone employed in the law enforcement community or whose job requires a security clearance. Thus, the potential injuries that will be sustained by the Plaintiffs extend beyond criminal conviction and Defendant's arguments regarding an affirmative defense lack merit.

**D.    In Any Case, Defendant Ignores that Have Satisfied the Injury-in-Fact Requirement Based on Economic Injury.**

Finally, Defendant's argument ignores that there are other ways to show injury-in-fact.[4] Economic injury, for example, is the paradigmatic form of an injury-in-fact. *See e.g., Schrader v. New Mexico*, 361 Fed. Appx. 971, 974 (10th Cir. 2010) ("Pecuniary injury is sufficient to confer standing."). Several Plaintiffs, including the licensed firearms dealers, Family Shooting Center

---

[4] Though it is not pertinent to the specific issues raised in Defendant's motion, information and argument pertaining to each individual Plaintiffs' injuries-in-fact can be found in Plaintiffs' Supplemental Brief Regarding Plaintiffs' Standing and Other Issues Raised by the Court [Doc. No. 37], which was filed on June 20, 2013.

("FSC"), and others, satisfy the injury-in-fact requirement because HB 1224 has already caused them substantial economic injury.

The Plaintiff licensed firearms dealers received orders from customers for magazines and associated firearms in the Fall of 2012. These orders include magazines and firearms which hold 15 rounds or less, but which also have a removable base plate, as well as those with greater magazine capacity. As noted in Plaintiffs' Second Amended Complaint, because of HB 1224, certain manufacturers have refused to fill these purchase orders, thereby rendering the Plaintiff licensed firearms dealers unable to fill the orders and complete the sale of these arms. *See* Second Am. Compl. [Doc. No. 62], ¶ 130-131. Because Plaintiff firearms dealers are unable to fill these purchase orders, HB 1224 has and continues to cause them a real and immediate economic injury.

In addition, Plaintiffs licensed firearms dealers, FSC, and others have already suffered economic injuries caused by HB 1224 because on beginning on July 1, 2013, in order to avoid prosecution for a violation of HB 1224, they refrained from buying, selling, renting, or loaning firearms with magazines of 15 rounds or less and removable base plates. The fact that the Second Technical Guidance Letter, issued on July 10, 2013, has temporarily abated those economic injuries makes them no less actual. These injuries have already been suffered as a result of HB 1224's vagueness. Moreover, Plaintiffs will suffer additional economic injury if the Court does not enter an order declaring HB 1224 unconstitutional. Accordingly, several Plaintiffs have suffered a direct economic injury attributable to the vagueness of HB 1224, and therefore, satisfy the injury-in-fact element of standing.

## II.   A RULING BY THIS COURT WOULD REDRESS PLAINTIFFS' INJURIES.

Defendant asserts that a declaratory judgment or permanent injunction against the Governor "would not redress [Plaintiffs' injuries] as a matter of law [because] Plaintiffs have chosen not to name local law enforcement authorities in their case." Motion to Dismiss [Doc. No. 64], at p. 12. Defendant argues that because "district attorneys are independent from the Governor, they are not 'officers, agents, servants, employees, nor attorneys' for the Governor, and a permanent injunction or declaratory judgment against the Governor would not extend to the district attorneys." *Id.* at pp. 12-13.

Defendant appears to argue, presumably in earnest, that if this Court were to issue a declaratory judgment declaring HB 1224 unconstitutionally vague as a facial matter, that ruling would not apply to anyone beyond the named parties in this lawsuit. That is absurd. A finding of facial unconstitutionality would be binding upon everyone within the limits of this Court's jurisdiction. Otherwise, thousands of Colorado gun owners "would have a cognizable injury until [he or she] filed and won what would become a parade of lawsuits." *Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 619 (6th Cir. 2013) (rejecting argument that because only the governor, and not the Attorney General or local prosecutors, was named in a prior case which enjoined enforcement of an unconstitutional statute, there remained a live issue to be resolved in future cases). Contrary to Defendant's assertion, a plaintiff need not name *all* Colorado District Attorneys as defendants when he or she brings a pre-enforcement challenge to a penal statute.

Defendant's position is also contrary to established Tenth Circuit authority. Defendant cites *American Civil Liberties Union v. Johnson*, 194 F.3d 1149 (10th Cir. 1999), in support of his argument that Plaintiffs were required to name all Colorado District Attorneys as defendants

in this action. Motion to Dismiss [Doc. No. 64], at p. 13. This case, previously cited by Plaintiffs to this Court, supports Plaintiffs' position, not Defendant's.

In *Johnson*, the Tenth Circuit considered the defendants' argument that the district court erred in including New Mexico's district attorneys within the scope of its preliminary injunction order against the governor and attorney general of New Mexico. 194 F.3d at 1163. The court noted that "[t]he district attorney is the law officer of the district and is to prosecute criminal cases on behalf of the state." *Id.* (internal quotations and citations omitted). With this in mind, the court held that "[t]o the extent district attorneys would attempt to enforce [the challenged statute], an injunction against the governor and attorney general prohibiting such enforcement binds those attorneys." *Id.*

Contrary to Defendant's Motion, *Johnson* demonstrates that a declaratory judgment and permanent injunction in this case would redress Plaintiffs' injuries. In the State of Colorado, as in New Mexico, district attorneys are members of the executive branch who are charged with prosecuting cases on behalf of the State. C.R.S. § 20-1-102(1) ("Every district attorney shall appeal on behalf of the state and the several counties of his district."); *see e.g., People v. C.V.*, 64 P.3d 272, 274 (Colo. 2003) ("Colorado requires its district attorneys to prosecute cases on behalf of the state and the counties within his or her district."); *People v. District Court*, 527 P.2d 50, 52 (Colo. 1974) (en banc) (district attorneys are members of the executive branch of government). As the supreme executive power in Colorado, Defendant cannot plausibly argue that subordinate members of the executive branch (including local district attorneys) may continue to execute and enforce statutes declared unconstitutional when he himself cannot do so. *See* COLO. CONST. ART. IV, § 2 (vesting supreme executive power in the governor). Thus, as in *Johnson*, a declaratory

judgment and permanent injunction against Defendant will bind all district attorneys and therefore redress Plaintiffs' alleged injuries.

In *Ainscough v. Owens*, 90 P.3d 851 (Colo. 2004), the Colorado Supreme Court examined the role of the Governor in defending litigation directed against the State of Colorado, statutes passed by the General Assembly, and actions by Colorado's Executive Branch. The Court stated:

> The Governor of Colorado is unique in that he is the "supreme executive," and it is his responsibility to ensure that the laws are faithfully executed. Colo. Const. art IV, § 2 . . . . Therefore, when a party sues to enjoin or mandate enforcement of a statute, regulation, ordinance, or policy, it is not only customary, but entirely appropriate for the plaintiff to name the body ultimately responsible for enforcing that law. Moreover, when that body is an administrative agency, or the executive branch of government, or even the state itself, the Governor, in his official capacity, is a proper defendant because he is the state's chief executive. For litigation purposes, the governor is the embodiment of the state.

*Id.* at 858. The Court further held that "[t]his case and the many others like it clearly demonstrate that when challenging the constitutionality of a statute . . . the governor is an appropriate defendant due to his constitutional responsibility to uphold the laws of the state and to oversee Colorado's executive agencies." *Id.*

Defendant Governor Hickenlooper is the State's chief executive and he is charged with ensuring that Colorado laws are faithfully executed. Accordingly, Plaintiffs' injuries are traceable to him. *See Sportsmen's Wildlife Defense Fund v. U.S. Dept. of the Interior*, 949 F. Supp. 1520, 1514-15 (D. Colo. 1996) (finding that based on the Colorado Constitution, the plaintiff's injury is fairly traceable to the Governor and he is a proper party).

### III.   PLAINTIFFS' SECOND, THIRD, AND FOURTH CLAIMS WERE NOT RENDERED MOOT BY THE SECOND TECHNICAL GUIDANCE LETTER.

Although Defendant couches his argument in terms of standing, the essence of Defendant's argument is that Plaintiffs' second, third, and fourth claims are moot.  "[C]oncepts of mootness and standing are closely related, but not coextensive." *Trudeau v. Bockstein*, No. 05-cv-1019, 2008 WL 541158 at *5 (N.D.N.Y. Feb. 25, 2008); *see also, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 703-04 (2000) ("The Constitution's case-or-controversy limitation on federal judicial authority, Art. III, § 2, underpins both our standing and our mootness jurisprudence, but the two inquiries differ."). Plaintiffs' second, third, and fourth claims were not rendered moot by the Second Technical Guidance Letter.

Moot cases are those in which "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Geraghty*, 445 U.S. at 396. "The crucial question is whether granting a present determination of the issues offered … will have some effect in the real world." *Id.* (internal quotations and citation omitted). Defendant's position appears to be that the Second Technical Guidance Letter eliminated a "live case or controversy" with respect to claims two, three, and four, and that those claims should therefore be dismissed as moot. Those claims, however, are not moot because there remain issues raised by those claims that were not addressed by the Second Technical Guidance Letter, and because the voluntary cessation exception to the mootness doctrine applies.

### A.   The Second Technical Guidance Letter Does Not Address Several Issues Raised by the Second, Third and Fourth Claims.

The Attorney General's first Technical Guidance Letter attempted to address certain shortcomings of HB 1224, but left a significant delta between Defendant's position and

Plaintiffs' second, third, and fourth claims. The Second Technical Guidance Letter was the result of hard-fought briefing on both sides concerning Plaintiffs' motion for preliminary injunctive relief. Defendant, on the eve of the preliminary injunction hearing, offered a Second Technical Guidance Letter which closed the delta enough for Plaintiffs to agree to forego the time and expense of an all-day preliminary injunction hearing. The Second Technical Guidance Letter, however, did not resolve Plaintiffs' claims entirely. There remains a delta, and Plaintiffs' claims are therefore not mooted.

First, the Second Technical Guidance does not make the phrase "designed to be readily converted" any less confusing. The Second Technical Guidance Letter concedes that the mere fact that a box magazine has a removable base plate does not render it "designed to be readily converted." However, as one of Plaintiffs' designated experts has noted, if the determination to be made "is based *not* on whether a detachable box magazine is capable of being . . . converted to accept more than 15 rounds . . . but instead, [on whether] it has objective features that are specifically designed to make it readily convertible, I cannot discern from HB 1224 what those objective features are, if they are not the removable base plate and outside flanges." Expert Report of Michael Shain at 8-9 (attached as Ex. B).[5] Indeed, Mr. Shain further observed that "[w]ith all the experience in the firearms industry and access to reference and research materials that I have, I cannot find a single example of a pistol magazine that has any extraordinary design features that clearly distinguish it as a magazine that is intentionally 'designed to be readily converted' to accept more than 15 rounds of ammunition." *Id.* at 9.

---

[5] "A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (internal citations omitted).

Second, the Second Technical Guidance Letter makes the "designed to be readily converted" provision very difficult to enforce. No law enforcement officer can know, simply by observing a particular magazine, whether it exceeds a 15-round capacity. For example, Colorado citizens who render a standard 20- or 30-round magazine legal by permanently installing a blocking device to limit the magazine to 15 rounds, could still be arrested for violating HB 1224 because the blocking component will not be visible from the outside of the magazine. Shain Report, at 11.

Moreover, without any standards in HB 1224 establishing how such blocking components should be installed and secured, law enforcement officers responsible for enforcing the law have no means of determining whether a particular altered magazine is in compliance. For example, Defendant's contention that welding a blocker to the magazine will immunize a citizen from prosecution is contradicted by the cases that Defendant cites. Defendant does not know, and does not say, whether attaching a blocker with a pin or bolt will or will not make the citizen liable for prosecution. Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction, at 19-21. The Second Technical Guidance Letter does absolutely nothing to solve the vagueness problems involving blocking devices; it addresses base plates, and has nothing to do with blockers.

Third, the Second Technical Guidance Letter does not address an important aspect of Plaintiffs' Second Amended Complaint. As Plaintiffs have pointed out, the phrase "capable of accepting . . . more than 15 rounds of ammunition" is also vague. One reason is that rifle cartridges of a particular diameter vary in length. Second Am. Compl. [Doc. No. 62], ¶ 207. Thus, in some firearms, a tube magazine that will accept 13 rounds of one caliber may also

accept 18 rounds of a compatible shorter caliber. "The ordinary gun owner plaintiffs, as well as plaintiffs involved in the firearms business, cannot tell whether such rifles are legal to sell or transfer after July 1, 20[13]." *Id.*; Shain Report at 11-12.

As applied to box magazines, "capable of accepting" is vague, and may be difficult or impossible for law enforcement officers, including the Sheriffs' deputies, to enforce in the field. Small differences in manufacturing tolerances sometimes make it possible to fit 16 rounds into what is nominally a 15 round magazine. Shain Report at 11-12. The Second Technical Guidance Letter does nothing to address these vagueness problems.

Finally, the Second Technical Guidance Letter concedes that "continuous possession" in HB 1224's grandfather clause cannot mean that Colorado citizens must literally have their magazines in their physical possession, or remain in the physical presence of the magazine, at all times. *See* Exhibit A to Motion to Dismiss [Doc. No. 64-1]. This concession was sufficient for Plaintiffs to forego the need for a preliminary injunction. However, the Second Technical Guidance Letter states that "'[c]ontinuous possession' is only lost by a voluntary relinquishment of dominion or control." *Id.* This does not address the problem, described in the Second Amended Complaint and in other pleadings, of a grandfathered magazine owner who leaves the state and entrusts the magazine to a friend or neighbor for safe storage,[6] or an owner who shares a magazine with another person at a shooting event in which both were participating. *See* Second Am. Compl. [Doc. No. 62], ¶ 239-40. Moreover, the word "dominion" "implies both title ***and***

---

[6] Indeed, Plaintiffs submitted the declaration of Plaintiff David Strumillo, who averred that a friend currently serving overseas in the United States Armed Forces gave Mr. Strumillo much of his personal property for safe-keeping, including magazines of more than 15 rounds. Even under the Second Technical Guidance Letter, it is far from clear that Mr. Strumillo's friend has not "relinquish[ed] dominion or control."

*possession*," Black's Law Dictionary at 486 (6th ed. 1990) (emphasis added), which renders the Second Technical Guidance Letter somewhat circular and fails to address completely the very vagueness concerns described in Plaintiffs' Second Amended Complaint.

In short, the Second Technical Guidance Letter does not render Plaintiffs' second, third, and fourth claims moot because it does not address certain vagueness concerns raised by those claims.

**B.     Even Assuming that the Second Technical Guidance Letter Mooted the Issues Raised by the Second, Third, and Fourth Claims, the Voluntary Cessation Exception Applies.**

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth*, 528 U.S. at 189 (internal quotations and citation omitted). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* (internal quotations and citation omitted). "The rule that voluntary cessation of a challenged practice rarely moots a federal case traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Jordan v. Sosa*, 654 F.3d 1012, 1037 (10th Cir. 2011). "In other words, this exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct." *Id.* "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189.

Here, Defendant revised his interpretation of HB 1224 multiple times and now attempts to use his latest revision as grounds for dismissal.[7] While the Second Technical Guidance Letter did not resolve all of Plaintiffs' concerns, Defendant's offer was sufficient to alleviate enough of them to cause Plaintiffs to agree to avoid the time and expense of a full-day preliminary injunction hearing – particularly in the context of an expedited pre-trial procedure and trial. Notably, in foregoing the preliminary injunction hearing, Plaintiffs never conceded that the Second Technical Guidance Letter resolved the full merits of their claims in any way. Further, as this Court is aware, no injunction or other order was entered memorializing the terms on which the parties agreed to forego a full-day hearing. Accordingly, Defendant is free to alter his interpretation of HB 1224 yet again at any point in the future.[8] Thus, to dismiss Plaintiffs' second, third, and fourth claims for lack of subject matter jurisdiction based on the Second Technical Guidance Letter would be to "leave the Defendant free to return to his old ways." *See Friends of the Earth*, 528 U.S. at 189. As such, this Court has subject matter jurisdiction of Plaintiffs' second, third, and fourth claims pursuant to the voluntary cessation exception.

Defendant may argue that this case does not fall into the voluntary cessation exception because it is analogous to cases in which courts have found that a legislative change to the challenged statute renders the case moot. A statutory change may be sufficient to moot a case even though the legislature possesses the power to reinstate the allegedly invalid law after the

---

[7] In a six week period, Defendant offered three different, contradictory interpretations of "designed to be readily converted" and three different, contradictory, interpretations of "continuous possession." *See* Plaintiffs' Reply Brief in Support of Motion for a Preliminary Injunction, at 19-24.

[8] Plaintiffs in no way question the good faith of the Governor or his counsel. There may be, however, political events that overtake even the most sincere efforts of Defendant.

lawsuit is dismissed. *See, e.g., Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1118 (10th Cir. 2010) ("Even when a legislative body has the power to re-enact an ordinance or statute, ordinarily an amendment or repeal of it moots a case challenging the ordinance or statute.").

This case, however, is not analogous to a statutory change. The Defendant's interpretation of HB 1224 as outlined in the Second Technical Guidance Letter is issued at the complete discretion of Defendant; it is not a legislative change, but rather a unilateral and subjective interpretation issued by Defendant's counsel at the Defendant's request. Neither of the technical guidance letters required a legislative process nor any process whatsoever beyond drafting and publishing[9] Defendant's opinion. The technical guidance letters are not binding, and are little more than an informal assertion that this is the way the Governor interprets the challenged statute. *Compare Rio Grande Silvery Minnow*, 601 F.3d at 1118 ("We are not here presented with a mere informal promise or assurance on the part of the [governmental] defendants that the challenged practice will cease.").

The instant case is similar to *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565 (2d. Cir. 2003). There, a communal boarding house for recovering alcoholics and drug addicts brought an action against the City of West Haven and the West Haven Fire District alleging that the Fire District's enforcement of certain provisions of the Connecticut Fire Safety Code violated the Fair Housing Act and the Americans with Disabilities Act. *Id.* at 570-72. The question of

---

[9] The lack of any significant publication of the Second Technical Guidance Letter undermines the Defendant's attempt to rely upon it as a basis for his "no credible threat of prosecution" argument. It is not even published on the Defendant's website, and can only be found on the Attorney General's website by paging through press release archives. Indeed, the prerequisites for Defendant's argument are wholly lacking in this case.

mootness arose when, subsequent to the commencement of legal proceedings, the Fire District adopted a new interpretation of the Fire Safety Code under which the boarding house could be considered a single-family dwelling, thereby exempting it from the safety requirements applicable to "lodging and rooming" establishments. *Id.* at 572-73. Relying on the principle that the voluntary cessation of unlawful activities does not moot a case, the Second Circuit held that the case was not moot because "the interpretation of the code might change again – for example, upon a change in the State Fire Marshal's administration." *Id.* at 574. Just like in *Tsombanidis*, the Defendant may change his interpretation of HB 1224 anytime at his discretion, or it may change upon the election of a new Governor or a new Attorney General. Accordingly, the voluntary cessation exception applies and claims two, three, and four should not be dismissed for lack of subject matter jurisdiction.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully submit that Defendant's Motion to Dismiss should be denied.

Respectfully submitted this 22d day of August, 2013.

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1445 Market Street, Suite 300
Denver, CO 80202
Phone: (720) 904-6022
Fax: (720) 904-6020
rwestfall@halewestfall.com
ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR
BUDDIES, INC. THE COLORADO OUTFITTERS
ASSOCIATION, COLORADO FARM BUREAU, AND
WOMEN FOR CONCEALED CARRY


s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
ATTORNEYS FOR MAGPUL INDUSTRIES AND THE
NATIONAL SHOOTING SPORTS FOUNDATION


s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
ATTORNEY FOR LICENSED FIREARMS DEALERS

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 22, 2013, I served via email a true and complete copy of the foregoing pleading upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

Jonathan M. Anderson          jmanderson@hollandhart.com

Douglas Abbott                dabbott@hollandhart.com

Marc F. Colin                 mcolin@bcjlpc.com

Anthony J. Fabian             fabianlaw@qwestoffice.net

David B. Kopel                david@i2i.org

Peter J. Krumholz             pkrumholz@halewestfall.com

Richard A. Westfall           rwestfall@halewestfall.com

Matthew Groves                matt.grove@state.co.us

Kathleen Spalding             kit.spalding@state.co.us

Jonathan Fero                 jon.fero@state.co.us

David Blake                   david.blake@state.co.us

Daniel D. Domenico            dan.domenico@state.co.us


s/Peter J. Krumholz