IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

JOHN B. COOKE, Sheriff of Weld County, Colorado; et al.

   Plaintiffs,

vs.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

   Defendant.

---

## FIFTY-FIVE COLORADO SHERIFFS' RESPONSE BRIEF TO DEFENDANT'S MOTION TO DISMISS THEM IN THEIR OFFICIAL CAPACITIES

---

Fifty-five Colorado Sheriffs, by and through their counsel, file this Response Brief to Defendant's motion to dismiss them from the case in their official capacities.[1]

## SUMMARY OF ARGUMENT

Under the Tenth Circuit's precedents on the political subdivision doctrine, the 55 Sheriffs have standing because they have "a personal stake" in the case. As will be described below, the personal stake includes the apprehension of criminals who have murdered a Sheriff. This did happen in 1994, and if HB 1224 had been in effect then, the murderers could have escaped.

---

[1] For the reasons set forth in the separate Response filed by the other Plaintiffs, which the 55 Sheriffs also join, this Court should deny Defendant's motion to dismiss the second, third, and fourth claims for relief.

The Sheriffs also have a personal stake in HB 1229, which makes every Sheriff into a criminal simply for conducting the ordinary operations of his or her Office by temporarily transferring firearms to deputies.

The Sheriffs, in their official capacities, also have a personal stake because HB 1224 has made it difficult or impossible for the Sheriffs and their deputies to obtain standard magazines for their duty firearms. (By "standard," the Sheriffs mean magazines of the standard size supplied by the manufacturer for a firearm. For example, for the Glock 17 pistol, the standard magazine is 17 rounds; for AR-15 type carbines, the standard magazine is 30 rounds.)

Further, the Sheriffs have a personal stake, as well as third-party standing for every armed citizen who comes to the aid of law enforcement. These citizens include the members of the Sheriffs' posses and the members of the Colorado Mounted Rangers, both of whom provide critical, armed assistance to the Sheriffs. These private citizens are not political subdivisions of the state, and so the Sheriffs' third-party standing to defend the Second Amendment rights of those citizens is in no way limited by the political subdivision doctrine.

Sheriffs in their official capacity also have standing to assert the rights of their deputies who are prevented from buying appropriate magazines for their duty arms, because of HB 1224.

An individual Sheriff is not a "political subdivision." Sheriffs are independent of the county government, and not a political subdivision thereof. More fundamentally, the Supreme Court's foundational rule for the political subdivision doctrine asks

whether the political entity was "created by a state." In Colorado, the office of Sheriff was not created by the General Assembly or by the State itself. Rather, the Sheriffs—like the General Assembly and like the State—were created directly by the People, in the State Constitution.

When the other parties in a case have standing to raise all the claims for relief, courts need not decide whether other plaintiffs also have standing. This was precisely the position which the Attorney General himself successfully argued during his participation in the lawsuits against the Affordable Care Act.

## ARGUMENT

### I. The Issue of Sheriffs' Standing is Irrelevant.

Because sufficient plaintiffs clearly have standing to raise all the claims at issue in the motion, this Court need not decide whether the Sheriffs have standing in their official capacity.

In 2010, a large number of Attorneys General, including the Colorado Attorney General, filed a lawsuit challenging the individual mandate in the Affordable Care Act. Defendants argued that the Colorado Attorneys General did not have standing to challenge the individual mandate. The Colorado Attorney General responded with a brief arguing that his standing was irrelevant, since other plaintiffs had standing. Plaintiffs' Mem. in Opp. to Defendants' Mot. to Dismiss, State of Florida, by and through Bill McCollum, Att'y Gen. of the State of Florida et al., *Florida ex*

*rel. Bondi v. U.S. Dept. of Health & Human Servs.*, 780 F.Supp.2d 1256 (N.D. Fla. 2011), 2010 WL 3163990, at *10-16.

The District Court agreed:

> This eliminates the need to discuss the standing issue with respect to the other state plaintiffs, or the other asserted bases for standing. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264 n. 9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); *see also Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996) (if standing is shown for at least one plaintiff with respect to each claim, "we need not consider the standing of the other plaintiffs to raise that claim").

780 F.Supp.2d at 1274.

The District Court granted relief to the Colorado Attorney General on the individual mandate. On appeal, he again urged the Court not to consider standing. Opening/Response Br. of Appellee/Cross-Appellant States, by and through Pam Bondi, Att'y Gen. of the State of Florida et al., *Florida ex rel. Atty. Gen. v. U.S. Dept. of Health & Human Servs.*, 648 F.3d 1235 (11th Cir., 2011) (Nos. 11-11021, 11-11067), 2011 WL 1944107, at *67.

The Eleventh Circuit agreed:

> Although the question of the state plaintiffs' standing to challenge the individual mandate is an interesting and difficult one, in the posture of this case, it is purely academic and one we need not confront today. *The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim—as is the case here—we need not address whether the remaining plaintiffs have standing.* Because it is beyond dispute that at least one plaintiff has standing to raise each claim here—the individual plaintiffs and the NFIB have standing to challenge the individual mandate, and the state plaintiffs undeniably

4

have standing to challenge the Medicaid provisions—this case is justiciable, and we are permitted, indeed we are obliged, to address the merits of each. Accordingly, we turn to the constitutionality of the Act.

648 F.3d at 1243-44 (emphasis added).

In *Ezell v. City of Chicago*, the Seventh Circuit relied on this rule when a variety of plaintiffs challenged the city's prohibition on firing ranges within city limits. There, the court stated: "[t]he district court's emphasis on the organizational plaintiffs' standing is puzzling. As we have noted, it's clear that the individual plaintiffs have standing. Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011) (internal quotations omitted).

A core principle of federal standing is that federal courts do not spend time deciding abstract questions that will not determine the outcome of the case. The Attorney General himself publicly stated, while his motion to dismiss was pending, that the dismissal of the Sheriffs in their official capacities would not affect the case. Charles Ashby, *Top cop: Sheriffs can't sue over guns*, GRAND JUNCTION SENTINEL, Aug. 16, 2013, http://www.gjsentinel.com/news/articles/top-cop-sheriffs-cant-sue-over-guns ("Still, removing the sheriffs won't stop the suit from going forward, Suthers said. 'There's plenty of other (plaintiffs), such as the gun shops, that clearly have standing,' he said.")

In the instant case, the Attorney General has already put the Sheriffs through thousands of hours of work in responding to discovery related solely to their official

duties. One Sheriff had to reprogram his data management system in order to provide complete answers to a particular interrogatory question. Another Sheriff Office devoted literally hundreds of hours to responding to the interrogatories, including by creating and conducting a formal survey of over 200 employees. The smaller Offices worked very hard, with quite limited resources, to dig through a decades' worth of records.

The courts in the Affordable Care Act case were not presented with any new factual information about the individual mandate as a result of the Colorado Attorney General's participation in that case. In contrast, the participation of the 55 Sheriffs in their official capacities will provide important information to this Court about the practical effects on public safety of HB 1224 and 1229.

## II. Political Subdivisions Have Standing When They Have a Personal Stake.

Defendant does not dispute that the 55 Sheriffs have standing, in their official capacity, under the standard tripartite standing rules. *See* Def.'s Mot. to Dismiss 14-15. Instead, Defendant invokes the doctrine that political subdivisions sometimes do not have federal standing for a constitutional challenge to a state statute. *Id.* Defendant recites a collection of generalities about the doctrine, but does not engage the doctrine's particular rules.

A political subdivision has standing when it has a "personal stake." In *Board of Education v. Allen*, two local school boards (certainly political subdivisions) brought a First and Fourteenth Amendment challenge to a New York State statute

requiring the boards to provide free textbooks to private school students. 392 U.S. 236 (1968). The New York State courts were closely divided on the issue of standing, but the U.S. Supreme Court was not. Justice White's majority opinion stated:

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step -- refusal to comply with § 701 -- that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation. *Baker v. Carr*, 369 U.S. 186, 204 (1962).

392 U.S. at 242 n.5. Neither Justice Harlan's concurrence nor the three dissents disagreed with the majority about standing.

The Tenth Circuit of course adheres to the Supreme Court's *Allen* rule. The Tenth Circuit's most recent case on the political subdivision doctrine quoted the above *Allen* text. The Panel then distinguished *Allen*: "This passage makes clear that the situation in *Allen* is very different from the situation here. In *Allen*, standing was based on the individual board members' personal stake in losing their jobs." *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011).

*Allen* pointed to issues involving the School Board members, each of which has relevance for the instant case: adherence to the oath of office; loss of a job; and reduction of funds available to perform the work of the political subdivision. 392 U.S. at 242 n.5.

Defendant relies heavily on a statement from *Hugo*: "[W]e have not found, and the dissent has not cited, a single case where a court of appeals or the Supreme Court has expressly allowed to proceed a claim by a municipality against its parent

7

state premised on a substantive provision of the Constitution." 656 F.3d at 1259. This is true for municipalities, but it is certainly not true for political subdivisions in general. The Supreme Court's *Allen* case itself allowed a claim by a political subdivision based on the Establishment Clause of the First Amendment, as incorporated by the Fourteenth Amendment's Due Process clause.

## A. The Oath of Office is a personal stake, according to the Supreme Court.

The Colorado Constitution mandates that Sheriffs "subscribe an oath or affirmation to support the constitution of the United States." COLO. CONST., art. XII, § 8. In order for a citizen to hold elective office responsibly, the citizen must never deviate from his or her Oath of Office.

For the Rule of Law to exist, constitutional officers must be rigorously scrupulous about their oaths. This is of especially great importance when the oath is sworn by the chief law enforcement officer of a county. *See Frank v. United States*, 78 F.3d 815, 823 (2d Cir. 1996) (standing existed because the Sheriff was forced to enforce a background check statute he believed to be unconstitutional).

Pursuant to *Allen*, fidelity to the oath *always* allows political subdivisions to have standing. As detailed in the Second Amended Complaint, the Sheriffs believe that HB 1224 and 1229 force them to violate their oath of office, because both bills violate the Constitution of the United States. Second Am. Complaint [Doc. No. 62], at ¶¶ 26, 180-82, 190, 194, 199, 206-208.

**B. The existence of an effective *posse comitatus*, and of a well-armed citizenry, is a personal safety stake for Sheriffs, and a personal stake in carrying out their duties.**

### 1. *Posse Comitatus Law*

The *posse comitatus* is the deeply-rooted power of Sheriffs and Federal Courts to call upon the aid of armed citizens in order to enforce the law.[2] For example, United States Magistrate Judges may appoint persons to serve warrants and process, and

> these persons so appointed shall have authority to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged.

42 U.S.C. § 1989.

The Colorado Sheriffs' *posse comitatus* power is reinforced by state statute, which codifies the traditional

> duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots, and unlawful assemblies and insurrections. For that purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they, and every coroner, *may call to their aid such person of their county as they may deem necessary*.

C.R.S. § 30-10-516 (emphasis added); *see also* C.R.S. §§ 16-3-202(1) ("A peace officer making an arrest may command the assistance of any person who is in the vicinity."); 18-8-107 (A class 1 petty offense if one "unreasonably refuses or fails to

---

[2] "Posse comitatus" is Latin for "The power or force of the county. The entire population of the county above the age of fifteen, which a sheriff may summon to his assistance, in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc. Williams v. State, 253 Ark. 973, 490 S.W.2d 117, 121." BLACK'S LAW DICTIONARY 1046 (5th ed. 1979); *see also* BLACK'S LAW DICTIONARY (9th ed. 2009) ("A group of citizens who are called together to help the sheriff keep the peace or conduct rescue operations. — Often shortened to posse.").

aid the peace officer in effecting or securing an arrest or preventing the commission by another of any offense.").

For at least the last millennium in our legal system, Sheriffs have had the authority to summon armed able-bodied citizens to assist law enforcement. *See*, *e.g. Filarsky v. Delia*, 132 S.Ct. 1657, 1664 (2012); *In re Moyer*, 35 Colo. 159, 166-67, 85 P. 190 (Colo. 1904) ("the sheriff of a county, aided by his deputies or posse comitatus in suppressing a riot.").[3]

The *posse comitatus* was well-known to the Founders. *See*, *e.g.*, THE FEDERALIST No. 29 (Alexander Hamilton) (addressing then-current controversy that proposed federal government would have the power to call forth the militia, but not to summon the *posse comitatus*); *Livingston v. Dorgenois*, 11 U.S. (7 Cran.) 577, 579 (1813) (quoting former Secretary of State James Madison's written order that a

---

[3] *See also In re Quarles*, 158 U.S. 532 (1895) ("It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country"); *Cunningham v. Neagle*, 135 U.S. 1, 65 (1890) ("marshals of the United States, with a posse comitatus properly armed and equipped"); 1866 Civil Rights Act § 5, 14 Stat. 28 (Empowering federal civil rights commissioners to appoint "suitable persons... to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty."); Joanne Eldridge, *County Sheriffs In Colorado: Beyond the Myth*, COLO. LAWYER *19 (Feb. 2009); WILLIAM L. MURFEE, A TREATISE ON THE LAW OF SHERIFFS AND OTHER MINISTERIAL OFFICERS 21 (1884) ("For a thousand years the sheriff has been the principal conservator of the peace in his county, with full power to command, whenever necessary, the power of the county.")

At least according to the understanding at the time the Colorado Constitution was adopted, the Sheriff's option to use the *posse comitatus* is indefeasible. *Id.* at 22 ("It is competent for the state legislature to impose upon him new duties growing out of public policy and convenience, but it cannot strip him of his time-honored and common-law functions and devolve them upon the incumbents of other offices created by legislative authority.").

French official "call for the assistance of the good citizens of the district, as the posse comitatus" to enforce the terms of the Louisiana Purchase).

The preservation of civil order is one of the purposes of the right to arms. Colorado's Constitution says so expressly:

> The right of no person to keep and bear arms in defense of his home, person and property, *or in aid of the civil power when thereto legally summoned*, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

COLO. CONST., art II, § 13 (emphasis added).

The two clauses of the Second Amendment similarly intertwine the purposes of personal defense and defense of civil order in a republic. In the Second Amendment, "The phrase 'security of a free state' meant 'security of a free polity,' not security of each of the several States." *District of Columbia v. Heller*, 554 U.S. 570, 598-99 (2008). That is why the Second Amendment applies in the District of Columbia (and other federal areas) and not just in the 50 States. The principle is that *all* of the polities in the United States are supposed to be secure in their freedom. Secure freedom includes a polity's ability to resist invasion or suppress insurrection. *Id.* This includes Sheriffs' ability to carry out their duty to "suppress all affrays, riots, and unlawful assemblies and insurrections." C.R.S. § 30-10-516. As Lord Coke put it, the Sheriff's keeping the peace "is the life of common wealth."[4]

---

[4] The Sheriff is custodian of "*vitae republicae*; he is *principalis conservator pacis* within the countie, which is the life of common wealth, *vitae republicae pax*." COKE UPON LITTLETON 168(a) (Book 3, ch.1, § 248) (Charles Butler ed.) (1st Am. Edition, from the 19th London edition, 1853) (1628). *Coke upon Littleton* is the first volume

11

## 2.  *The Sheriffs and their Posses*

In response to Defendant's interrogatories about use of the *posse comitatus*, Hinsdale County Sheriff Ron Bruce described the events of November 1994, when the Hinsdale County Sheriff requested the assistance of a non-certified deputy, a member of his posse, at what was expected to be a dangerous traffic stop:

> [T]he sheriff was shot and killed. The non-certified deputy fired 17 rounds from his Beretta Model 92 9mm pistol at the suspects when they fled. One of the bullets struck the tire of the vehicle forcing the suspects to retreat on foot. The suspects fled into the mountains and were discovered dead around 30 days later. The male had shot the female and himself with the same .44 magnum that was used to kill the sheriff.
>
> During the manhunt for these two suspects, over 100 local citizens were sworn in to assist the approximately 200 law enforcement officers in conducting the search. Several hundred buildings and the surrounding land mass was searched without a single shot being fired. There is no information on the firearms and magazines since they ran the gamut of nearly anything available at the time.

Hinsdale County Sheriff Ron Bruce, Response to Interrogatories at 4 (Aug. 13, 2013), attached to this brief as Exhibit A.[5]

Seventeen rounds were fired, rather than 15 rounds: If HB 1224 had been the law in 1994, the citizen backing up the Sheriff would have had only 15 rounds. Even

---

of Coke's *Institutes of the Lawes of England*. Prior to Blackstone, it was the foundational text for Anglo-American courts, lawyers, and law students.

[5] "A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (internal citations omitted).

The Sheriffs stand ready to comply with "the trial court's power to allow or require the plaintiff to supply, by amendment to the complaint or by affidavits, further particular allegations of fact deemed supportive of plaintiff's standing," if the Court would consider it to be helpful. *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

for an expert, the magazine change would have taken a second or two, while the murderers' car sped away.

Thwarting the escape of one's own murderer is an enormous "personal stake." The Sheriffs have "a personal stake" in challenging a statute which experience indicates would allow the escape of persons who murder a Sheriff.

Armed citizens come of the aid of law enforcement in other ways. Rio Blanco County Sheriff Si Woodruff recounted that on Sept. 8, 2003, he deputized two armed citizens to search for criminals who had sped away from a traffic stop in a stolen car.

> We had hired a plane to search and we were out of personnel….These men were selected because they were known by me and other staff members as very experienced pistol and rifle shooters. I believe that the men had Glock .40 calibers, AR-15's, shotguns, and perhaps other arms. They patrolled the highway with us, in the vehicle, and operated the Thermal vision.

Rio Blanco County Sheriff Si Woodruff, Response to Interrogatories at 5 (Aug. 12, 2013) (Exhibit B).

The availability of well-armed citizens to assist law enforcement certainly affects the effective operation of a Sheriff's Office. But for the Sheriffs, it is even more personal.

Morgan County Sheriff Jim Crone recalls:

> I was involved in a specific incident in March of 1985 where I was in pursuit of a stolen vehicle from Texas. The vehicle left the roadway and went cross-county into Adams County, and we were unable to pursue due to having no four-wheel drive vehicles. A local rancher offered himself and his pickup so he and I could follow the vehicle's tracks through the snow (in the middle of a blizzard at night). Locating the pickup, the rancher pursued it back into Morgan County.

> We went across country for several minutes and went back into Adams County. After the stolen pickup rammed us and I fired a shot into the front of the pickup, it stopped shortly thereafter. I gave the rancher my shotgun and had him cover me while I arrested both occupants of the pickup. The rancher fired no shots but stood armed, in view of the suspects, as my backup. I made the arrests alone in a remote area in which road signs were covered with snow and my radio could not reach out to the other cars looking for us.

Morgan County Sheriff Jim Crone, Response to Interrogatories at 5 (Aug.14, 2013) (Exhibit C).

Under HB 1224, if Sheriff Crone had given that good Samaritan rancher a patrol rifle, such as an AR-15 type carbine with its standard 30 round magazine, both the Sheriff and the citizen would have been criminals.

Sheriff Crone also noted the more common scenarios in which armed

> citizens, usually local farmers or ranchers, back us up when involved with a combative suspect, a felony stop or a crime in progress. In these instances, the citizens had told us they had ready access to a firearm (inside the house, vehicle, or on their person), if so needed. When searching a private residence or a business where a burglar alarm has gone off, I have had instances where an armed home/business/property owner has accompanied me, while armed with a handgun, when I had no backup close at hand.

*Id.*

So when Sheriff Crone has been the only law enforcement officer at crime scenes, and he had to clear a building, not knowing whether he will encounter violent criminals waiting to ambush him, the Sheriff has been backed up by armed citizens, carrying their personal handguns.

Will the next citizen who is backing up the Sheriff have a standard capacity magazine for his own handgun? Or will the citizen who is protecting the Sheriff

have to do so with a lesser magazine? As the events in Hinsdale County demonstrated, the answer can make a tremendous difference.

In *Allen*, the risk of the loss of one's job was sufficient for standing. The instant case involves the far greater personal stake of the protection of one's life, or the apprehension of the criminals who have taken that life.

As detailed in the answers to interrogatories, the following Sheriffs currently have operational posses consisting of volunteer citizens who are not POST-certified law enforcement officers, and who at least sometimes provide their own arms when assisting the Sheriff in maintaining the peace, performing search and rescue, and so on: Alamosa Sheriff Dave Stong (Exhibit D, at 5); Baca Sheriff Dave Campbell (Exhibit E, at 4-5); Custer Sheriff Fred Jobe (Exhibit F, at 4-5); Hinsdale Sheriff Ron Bruce (Exhibit A, at 4-6) (with posse members sometimes providing their own 30 or 60 round magazines for their carbines); Lincoln Sheriff Tom Nestor (Exhibit G, at 4-5); Logan Sheriff Brett L. Powell (Exhibit H, at 4) (posse program began in approximately 1960); Montezuma Sheriff Dennis Spruell (Exhibit I, at 5-6) (including court security and public event security); Morgan Sheriff Jim Crone (Exhibit C, at 7) (posse program currently being revised so that posse members may bear arms); and Prowers Sheriff Jim Faull (Exhibit J, at 5) (sometimes issues .40 Glock handguns to posse).

In addition: Larimer Sheriff Justin Smith was prepared to call out the *posse comitatus* during High Park Fire in the summer of 2012. The Colorado National Guard was only able to provide limited assistance. "However, the weather changed

quickly and the fire was contained before armed citizens were necessary." (Exhibit K, at 8). Besides have the duty to keep the peace, the Sheriff is also the fire warden of his or her county. C.R.S. § 30-10-512.

Sheriff Smith has heard that the *posse comitatus* was used "to assist in maintaining order and assisting in recovery following the July 31, 1976, Big Thompson River flood." But because none of the Office's current personnel know of this first-hand, and because the then-Sheriff is deceased, the Big Thompson events cannot be stated with certainty. *Id.*

Delta Sheriff Fred McKee considered using the *posse comitatus* for protection of infrastructure in his county after the September 11 terrorist attacks, although he ultimately determined it was not necessary under the circumstances. (Exhibit L, at 5). The Douglas County Sheriff's Office used an armed posse until 1983, but does not presently do so. (Exhibit M, at 5-6). The Las Animas County Sheriff's Office had a posse program until 2007. (Exhibit N, at 5).

**C. The 55 Sheriffs have a personal stake because HB 1229 criminalizes their common activities.**

Because of House Bill 1229, the Sheriffs can function in their jobs only by violating the law. *Allen* holds that the risk of losing one's job is sufficient for a political subdivision to have standing. 392 U.S. at 241 n.5. *A fortiori*, a political subdivision has standing to challenge a statute which criminalizes remaining in one's present job.

HB 1224 (magazines) and HB 1229 (transfer restrictions and registration) both had the same sponsor in their house of origin. House Bill 1224 has three exemptions, including an exemption for employees of law enforcement agencies. C.R.S. § 18-12-302(3)(a), (b), (c).[6] House Bill 1229 has nine exemptions, and has no exemptions for law enforcement. C.R.S § 18-12-112(6).[7]

Sheriffs transfer firearms all the time during the course of their normal duties, and they do so without going down to a gun store with the transferee in order to wait hours or days for approval via a background check initiated by the firearms dealers, as HB 1229 mandates.

Significantly, HB 1229 does not simply mandate a criminal records check, which the Sheriffs have the ability to initiate on their own. Rather, HB 1229 demands that

---

[6] The exemptions are (a) Colorado manufacturers that sell magazines over 15 rounds to certain types of customers; (b) an employee of certain government agencies "who bears a firearm in the course of his or her official duties"; and (c) an agent of a Colorado manufacturer who possess the magazine solely to transport it to an out-of-state entity.

[7] The exemptions are: (a) antiques/curios/relics; (b) among certain family members; (c) inheritance/bequest/operation of law; (d) temporary transfers in the home of the transferee, when in danger of imminent death or serious bodily injury; (e) temporary transfers at target ranges/competitions, or while hunting in the field; (f) for repair or maintenance; (g) temporary transfers where the owner remains in "the continuous presence"; (h) temporary transfers up to 72 hours; (i) to certain family members by armed services members who are being deployed outside the United States.

Exception (c) is for "A transfer that occurs by operation of law or because of the death of a person for whom the prospective transferor is an executor or administrator of an estate or a trustee of a trust created in a will." C.R.S § 18-12-112(6)(c). The "operation of law" language is by its context a reference to judicial and similar judgments, such as those adjudicating a dispute over ownership of a firearm, or ordering the forfeiture of a firearm pursuant to a statute. The vast majority of the Sheriffs' firearms transfers detailed below (e.g., giving an additional gun to a deputy, taking temporary custody of a firearm possessed by the unconscious victim of a traffic accident) are not required by operation of law.

the background check on temporary transfers may only be processed by a licensed firearms dealer, and that the "the licensed gun dealer shall comply with all state and federal laws, including 18 U.S.C. sec. 922, as if he or she were transferring the firearm from his or her inventory to the prospective transferee." C.R.S. § 18-12-112(2)(b). Federal law requires that when a FFL performs a transfer between private parties, both of the private parties (that is, two parties who are not Federal Firearms Licensees) must be physically present in the FFL's business premises. The FFL must take physical custody of the gun, log the firearm into his Acquisition and Disposition record book, record the serial number in the record book, and then log the disposition of the firearm to the transferee. "Record-keeping and background check requirements for facilitation of private party firearms transfers," ATF Proc. 2013-1 (Mar. 15, 2013).

The FFL may not perform this service at a Sheriff's Office. FFLs may only transfer firearms at the single business premises specified on their license, or at a gun show. 18 U.S.C. § 923(d)(E) & (j); 27 CFR § 478.100.

At trial, Larimer County Justin Smith, or another Sheriff, is ready to offer testimony about the following ways in which Larimer County Sheriff's Office and other Offices normally transfer firearms in violation of HB 1229:

1. Deputies assigned a firearm by the agency will be required to undergo an FFL background check prior to issuance. The same is required in reverse when the deputy returns the firearm to the property section.

2. Deputies assigned to the Honor Guard need to check out Office rifles for their Honor Guard missions. If those happen to last more than 72 hours, they will need to undergo an FFL background check and again, the same will need to occur when they are returned.

3. The cars assigned to reserve deputies contain shotguns and rifles for their use. At any given time, a reserve deputy may be given custody of a patrol car and the firearms in it for an undetermined amount of time. If a reserve deputy is possession of the patrol rifle or shotgun for more than 72 hours, the deputy is required to undergo a background check.

4. When deputies take a firearm as evidence of a crime and log it into evidence, the evidence custodian will have possession of the firearm for more than 72 hours. Under HB 1229, this requires a background check of the evidence custodian every time a gun is taken into custody.

5. Sheriffs provide training firearms to deputies for periods exceeding 72 hours. By HB 1229, the deputies will need a background check if the training period exceeds 72 hours.

6. Regional Crime Labs employ firearms experts. When a Sheriff's Office brings in a firearm for forensic examination, the Lab's expert must undergo a background check if he or she will have possession of the firearm for more than 72 hours. Also, when a Sheriff's Office donates a firearm to the expert's firearms library, the expert will need a background check.

7. When a deputy is involved in shooting, the deputy's personally-owned duty firearm(s) must be taken as evidence. The Sheriff's Office will almost always have possession of the firearms for more than 72 hours. HB 1229 requires a background check when the Office takes custody of the firearm, and when the firearm is later returned to the deputy. When the deputy's firearm is in custody for evidence, the Sheriff's Office or another deputy loans the deputy a firearm in the interim. There will have to be a background check for the deputy to receive the loaner firearm, and for the deputy to later return the firearm to its owner.

8. An officer under investigation, placed on leave, is typically required to surrender all Office-issued firearms. Again, an FFL background check is required when those firearms are taken by the Office, and then (after the deputy has been cleared by the investigation) when the firearms are returned to the deputy.

19

9. When the Office takes a weapon into custody, either as potential evidence of a crime or for safekeeping (e.g., when there is a firearm in the automobile of a person who is taken to the hospital after a traffic accident), HB 1229 requires a background check for the deputy who receives the firearm. This is not possible if the accident does not take place near a gun store, or takes place at night when gun stores are closed, or the owner is in the hospital and cannot go to the gun store to play his mandatory role in the transfer. Alternatively, when a firearm is taken from a person who has been arrested, the person will not be willing to accompany the deputy to a gun store to participate in the transfer.

10. In the scenarios in paragraph 9, the deputy who seized the firearm from the vehicle of the accident victim, or from the arrestee, would be unable to transfer the firearm to the Sheriff's Office property custodian, because the deputy is not the lawful owner of the firearm, and thus could not comply with the federal law requiring that for private-to-private transfers conducted by an FFL, the owner must be present at the FFL's business premises.

11. When a Sheriff's Office evidence custodian leaves the office for more than 72 hours (e.g., for vacation), a backup person will takes custody of all the evidence in the Office's possession. HB 1229 requires a background check for the transfer of the custody of the firearms from the custodian to the backup custodian. Because the transfer can *only* be performed at the business premises of the FFL, all the firearms in the property room would have to be transported to the FFL's store.

12. Crime victims whose stolen firearm was recovered by a Sheriff's Office may not have the property returned unless the Sheriff's property custodian and the victim both go to a gun store to process the transfer of the firearm.

It is irrelevant whether the Sheriffs and their deputies face a credible threat of criminal prosecution for violating HB 1229. A Sheriff's Office is, by definition, supposed to be model of law-abiding behavior, an example for the general public. It

is contrary to the Rule of Law for the Sheriffs' Offices (and other law enforcement agencies) to enforce HB 1229 against ordinary citizens when HB 1229 itself has forced the Sheriffs' Offices, like the other agencies, to violate HB 1229 thousands of times a year.

House Bills 1224 and 1229 were rushed from introduction to the Defendant's signature in 41 days. Three-and-half-months later, the Colorado Bureau of Investigation sent an email PDF attachment to Police Chiefs and Sheriffs. The attachment was resent on August 6, and copied to Matt Grove, counsel for Defendant.

The PDF is not on CBI letterhead. The bare page reads as follows:

> The Colorado Bureau of Investigation has received inquiries from Law Enforcement Agencies as to whether such agencies must conduct background checks through CBI when providing firearms to POST Certified Peace Offices employed by the agency for purposes of official use. Extensive background checks are already undertaken upon the hire of all POST Certified Peace Officers. In addition, law enforcement agencies engage in on-going monitoring of POST Certified Peace Officers designed to ensure that they are not prohibited to possess a firearm. Given this context, *CBI believes that it is unnecessary* for a Law Enforcement Agency to conduct an additional NICS[8] background check by an FFL before transferring a firearm to a POST Certified Peace Office employed by the agency for official use. As always, *agencies may wish to seek guidance from their legal advisor.*

(Emphasis added.)

Notably, the news that CBI has purported to invent an ad hoc exemption from HB 1229 has not been published to the public. The CBI website was visited on

---

[8] National Instant Criminal Background Check System. 18 U.S.C. 922(t).

August 16. In the site's section on "2013 Firearms Legislation," there is no mention the CBI has decided to create an important exemption to the law.

The CBI email may or may not have any legal effect. That is an issue for this Court to determine at some future point. In the meantime, the 55 Sheriffs still have a personal stake in challenging a statute whose actual language makes their common activities illegal.

If CBI's non-public *ipse dixit* did have the force of law, the pronouncement only applies to the transfer of Sheriff's Office firearms to POST-certified deputies. The *ipse dixit* does not solve the criminalization of transfers of firearms that have been seized as evidence or taken for safekeeping from unconscious persons, such as victims of auto accidents.

Nor does the CBI's email cover the transfer of firearms to non-certified deputies. Many Sheriffs' Offices hire full-time non-certified deputies as jail and/or transport deputies, and sometimes these deputies are provided with arms from the Office armory.

Law enforcement officers have a personal stake in challenging a statute which criminalizes their ordinary law enforcement activities.

**D. The Sheriffs have a personal stake in the effective performance of their official duties and in the resources therefor.**

*Allen* held that the political subdivision plaintiffs had "a personal stake" because of "a reduction in state funds for their school districts." The Sheriffs have a personal stake, and thus standing under the political subdivision doctrine, because HB 1224

and HB 1229 are presently robbing resources from the Sheriffs' Offices. House Bill 1224 interferes with the *posse comitatus*. *See* Part II.B., above. House Bill 1229 mandates that the Sheriffs spend their financial resources on background check fees, which amount to $20 per firearms transfer, or else become criminals.[9] *See* Part II.C., above. As will be described in Part III, below, HB 1224 also seriously interferes with the volunteer resources—worth literally millions of dollars—which are provided by the Colorado Mounted Rangers.

It is well-established that Sheriffs have standing to challenge a statute that even slightly interferes with the performance of their official duties. The United States Supreme Court decision *Printz v. United States* involved challenges by Sheriffs to a federal statute which ordered the Sheriffs to carry out background checks on handgun buyers. 521 U.S. 898 (1997). The Sheriffs argued that they did not wish to perform the checks, in part, because doing so would distract them from other law enforcement duties which they considered to be more important.

In the Supreme Court, the Sheriffs won 5-4 on the merits, and all nine Justices recognized that the Sheriffs had standing. In the various lower court cases that culminated in *Printz*, the decisions were varied on the merits; but regarding standing, the courts were unanimous. The defendant attacked standing in *every* case and lost in every District Court decision and every Circuit Court of Appeals decision. *See Koog/McGee v. United States*, 79 F.3d 452, 458-459 (5th Cir. 1996),

---

[9] The Colorado Bureau of Investigation is allowed to set its own fees for conducting firearms background checks. C.R.S. § 24-33.5-424(3.5). The fee is currently $10. On top of this, HB 1229 allows the FFL to charge a fee of up to $10 for his or her services in processing each transfer. C.R.S. § 18-12-112(2)(d).

*rev'g Koog v. United States*, 852 F. Supp. 1376, 1380 (W.D. Tex. 1994), and *aff'g*

*McGee v. United States*, 863 F. Supp. 321, 325, earlier proceeding 849 F. Supp. 1147

(S.D. Miss. 1994); *Mack v. United States*, 66 F.3d 1025, 1029-1030 (9th Cir. 1995),

*rev'g* 856 F. Supp. 1372, 1377 (D. Ariz. 1994), and *rev'g Printz v. United States*, 854

F.Supp. 1503, 1508-1509 (D. Mont. 1994); *Romero v. United States*, 883 F.Supp.

1076, 1080 (W.D.La. 1995); *Frank v. United States*, 78 F.3d 815, 823 (2d Cir. 1996),

*rev'g* 860 F.Supp. 1030 (D.Vt. 1994).

The Second Circuit held:

> It is this administrative burden added to the sheriff's regular workload
> that permits plaintiff to maintain his Tenth Amendment challenge.
> Interference with the functions of a local unit of government is an
> injury that may give a litigant standing. For standing purposes, the
> "slender" burden on the Sheriff was "sufficient for constitutional
> purposes." The harm…"need not be monumental."

*Frank v. United States*, 78 F.3d 815, 824 (2d Cir. 1996), *judgment vacated on other*

*grounds*, 521 U.S. 1114 (1997).

The D.C. Circuit adhered to *Printz* in *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir.

2002). There, the Circuit Court pointed out that in *Printz*, "the Court reached the

merits of a Tenth Amendment challenge to the Brady Act in cases brought by

county sheriffs. Neither the majority opinion nor the opinions of the five Justices

who wrote separately questioned the sheriffs' standing to sue." *Id.* Therefore, to

require state authorization for a federal lawsuit by a Chief Law Enforcement Officer

"would be to depart from our decision in the *FOP* case [discussed in Part III, *infra*],

and perhaps the Supreme Court's disposition of *Printz*." *Id.* at 13-14.

As the *Printz* cases demonstrate, there is no requirement that Sheriffs face a credible threat of prosecution in order to challenge statutes which force them to use their limited resources to enforce statutes which they believe to be unconstitutional and to diminish their resources.

The diminution of agency resources was a "personal stake" that conferred standing on a political subdivision in *Allen*. 392 U.S. at 242 n.5. HB 1224 diminishes the resources usable by Sheriffs' Offices by preventing posse members from having standard capacity magazines which can be brought to service. HB 1229 diminishes resources by preventing Sheriffs from temporarily transferring an Office firearm to a posse member for more than 72 hours, unless the Sheriff and the posse member go to a gun store and wait hours or days for the Colorado Bureau of Investigation to conduct a background check. This is highly impractical, especially in rural areas, and during the emergency situations when a firearms transfer might be most necessary. Even though posse members often provide their own arms, depending on the circumstances, a posse member might need a particular type of Office firearm (e.g., a long-distance .308 rifle or a specially colored patrol shotgun pre-loaded with less-than-lethal ammunition).

### III. The Sheriffs Have a Personal Stake, and Third-Party Standing, regarding All Law-abiding Persons who Aid Law Enforcement, including for Sheriffs' Deputies and Posses, and the Colorado Mounted Rangers.

### A. Doctrine of third-party standing

#### 1. *Law enforcement cases*

Law enforcement executives have third-party standing to raise the constitutional rights of other persons. The foundational case is *Fraternal Order of Police v. United States*, 152 F.3d 998, 1001–1002 (D.C. Cir. 1998) (*FOP I*), on rehearing of merits, 173 F.3d 898 (1999) (*FOP II*). The Fraternal Order of Police is a private association whose members include Chief Law Enforcement Officers, as well as rank and file officers. Plaintiffs in *FOP* argued that a 1996 federal statute prohibiting gun possession by anyone convicted of misdemeanor domestic violence was unconstitutional. Essentially, the basis for the plaintiffs' challenge was that the misdemeanor disarmament law also applied to the duty weapons of law enforcement officers, while a federal statute against gun possession by convicted *felons* had an exception for law enforcement officers.

The CLEOs asserted the Equal Protection rights of subordinate officers. On the merits, the argument was not successful, but the D.C. Circuit concluded that the CLEOs had standing for two reasons. First, *FOP I* held that CLEOs had a sufficient relationship with their subordinates such that the CLEOs had third party standing to assert the Equal Protection rights of the subordinates. *FOP I*, 152 F.3d at 1002.

Then, *FOP II* added that the CLEOs were directly injured by being unable to choose the subordinates whom they considered to be well-suited for carrying

26

firearms; so the CLEOs had standing to raise a Tenth Amendment claim. *FOP II*, 173 F.3d at 904-05.

Like the plaintiffs in *Fraternal Order of Police*, the Sheriffs here are complaining about the particular injury of persons whom they wish to be armed; HB 1224 deprives them of the arms that may be the safest ones for them to have.

### 2. *Supreme Court doctrine*

The Sheriffs' third party claim on behalf of armed citizens is a paradigm of the Court's core rules for third-party standing in *Singleton v. Wulff*, 428 U.S. 106 (1976). First, "[i]f the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." Second, whether "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 113-114.

Both elements are present here. The activity the Sheriffs wish to pursue (calling on armed citizens, including non-POST-certified deputies) is inextricably bound up with the public's enjoyment of the Second Amendment right to bear arms. Further, Sheriffs are a particularly "effective … proponent of the right." The Sheriffs are the chief law enforcement officers of their counties. Thus, the Sheriffs are especially suited for third-party standing in support of the law-abiding gun owners of their counties. As detailed in Part II, the better-armed the law-abiding public is, the *personally* safer the Sheriffs are. Likewise, a well-armed public facilitates the operation of the Sheriffs' Office, by deterring or stopping criminal attacks, and by coming to the aid of the Sheriff and his certified deputies.

### 3. *Tenth Circuit doctrine*

The Tenth Circuit requires that there be a "hindrance" or "inability" of the third party to pursue his or her own claims or interests, and requires that the party asserting the right must have a "close" relation to the third party. *Aid for Women v. Foulston*, 441 F.3d 1101, 1111 (10th Cir 2006); *Terrell v. INS*, 157 F.3d 806, 809 (10th Cir 1998).

"The concern behind the 'close relationship' element is whether 'the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal.'" *Foulston* at 1113, quoting *Secretary of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984). The "close" relationship "must allow the third-party plaintiff to operate 'fully, or very nearly, as effective a proponent,' of the potential plaintiff's rights as would the plaintiff himself." *Foulston* at 1113. An example is "professional contexts, where the rights of the potential plaintiff and third-party plaintiff neatly align." *Id*.

The Sheriffs believe that the record of their litigation in this case demonstrates their proper framing of third-party issues, and their adversarial zeal in presenting them. Indeed, the Sheriffs have always considered their participation in this case to be an extension of their primary official duty: "to keep and preserve the peace" by defending and protecting all persons from unlawful invasions of their rights to personal security. In the professional context of the Sheriffs in their official capacities, and the law-abiding armed citizens who aid the Sheriffs, the rights of both are necessarily aligned.

What is the "hindrance" to hundreds of thousands, or millions, of Coloradoans suing in Federal Court to vindicate the right of armed citizens who would come to the aid of the Sheriffs? The hindrance is the difficulty of litigating a class action on behalf of a million or more people.

Is there a "close" relation between the Sheriffs and those citizens? Yes. Each stands ready to come to the armed defense and aid of the other.

When a political subdivision meets the standard tests for third-party standing, the rule against political subdivision standing does not apply. *See E. Liverpool v. Columbiana Cty. Budget Comm.*, 114 Ohio St.3d 133, 870 N.E.2d 705 (Ohio 2007) (City's "direct injury to its own treasury" was "intertwined with the injury" to "the equal protection interest of East Liverpool's citizens." There was "a close relationship" because "The city and its citizens have an interdependent interest in the city's treasury."); *Sanchez v. City of Modesto*, 145 Cal.App.4th 660, 676, 51 Cal.Rptr.3d 821, 834-35 (Cal. App. 5th Dist. 2006) ("Although a local government has no equal protection rights of its own to assert against the state, there is no reason why it cannot act as a mouthpiece for its citizens, who unquestionably have those rights, where the third-party-standing doctrine would allow it."); *Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 21 Cal.Rptr.2d 453 (1993) (water boards' duty to supply water was inextricably bound up with citizens' equal protection rights regarding discharge fees); *Selinger v. City Council*, 216 Cal.App.3d 259, 271, 264 Cal.Rptr. 499, 264 Cal.Rptr. 499, 506

(Cal. App. 4th Dist. 1989) (city's standing interest in reviewing subdivision application was "inextricably bound up" with citizens' due process rights to notice).

B. **Colorado Mounted Rangers**

Some armed citizens have long-running, close relationships with the Sheriffs to provide aid. One such group is the Colorado Mounted Rangers (also known as the Colorado Rangers).

Fremont County Sheriff James L. Beicker writes:

> Since January 1, 2004 I have requested the assistance of the Colorado Mounted Rangers "J Troop." The majority of these individuals are not POST certified peace officers, but my understanding is that a few members of their organization are.
>
> I have used their assistance on four wildfires in my county: Duckett Fire/ Park Fire/ Wetmore Fire/ Royal Gorge Fire. On these incidents they were assigned to road closures, manning road blocks for evacuated areas.
>
> They were allowed, but not required to carry firearms for this duty. I have no documented evidence of who did carry or did not carry during these events.
>
> The Fremont County Sheriff's Office has also utilized the J Troop Rangers for some annual community events…

Fremont County Sheriff James L. Beicker, Answer to Interrogatories, at 6-7 (Aug. 12, 2013) (Exhibit O).

This summer, the Colorado Mounted Rangers provided forest roadblock support for the Douglas and Jefferson County Sheriffs' Offices during the Lime Gulch Fire. (Exhibit M, Sheriff Weaver interrog.,at 8).

The Colorado Mounted Rangers were founded in 1861, and for many decades were the only statewide law enforcement organization. They were recently recognized in state statute. C.R.S. § 24-33.5-222 (specifically authorizing law enforcement agencies to enter into memoranda of understanding with the Colorado Mounted Rangers); Colo. Sen. Bill 12-072.

The Sheriffs are prepared to demonstrate at trial that the Colorado Mounted Rangers provide approximately 50,000 hours of community service during a typical year. This amounts to a contribution of over two million dollars of law enforcement resources, at no cost to the taxpayer. The diminution of these resources which Sheriffs use in support of their official duties is a "personal stake" which confers standing on political subdivisions. *Allen*, 392 U.S. at 242 n.5.

The Sheriffs also have third-party standing on behalf of the Colorado Mounted Rangers. The hindrance to the Colorado Mounted Rangers bringing suit is that they are an unpaid, volunteer organization. Colorado Mounted Rangers, "Organization," available at https://www.coloradoranger.org/index.php/organization. An all-volunteer organization may have difficulty in participating in major constitutional litigation, due to burdens such as the time needed to respond to discovery.

The close relation between some of the Sheriffs and the Colorado Mounted Rangers is that there are Memoranda of Understanding between them, with the Rangers ready to provide armed support to the Sheriffs.

The Colorado Mounted Rangers currently have Memoranda of Understanding to provide support to the following:

Sheriff's Offices:
- Archuleta County SO
- Crowley County SO
- Douglas County SO
- Fremont County SO
- Kiowa County SO
- La Plata County SO
- Weld County SO

Police Departments:
- Ault PD
- Durango PD
- Elizabeth PD
- Fairplay PD
- Fort Lupton PD
- Fowler PD
- Green Mountain Falls Marshal
- Manitou Springs PD
- Rocky Ford PD
- Salida PD
- Windsor PD

County Governments:
- Adams County Office of Emergency Management
- Teller County

Town / City Governments:
- Town of Bayfield
- Town of Monument
- Town of Ordway
- Town of Palmer Lake

Fire Protection / Other:
- Canon City Area Fire Protection District
- Community College of Aurora

Colorado   Mounted   Rangers/Colorado   Rangers,   website   home   page,

https://www.coloradoranger.org/.

HB 1224's magazine prohibition exempts "a law enforcement officer employed by

any department, agency, or political subdivision of the state of Colorado." C.R.S. §

18-12-302(3)(b)(II). The Colorado Mounted Rangers, though, are not "employed" by any law enforcement agency. They are members of a private volunteer organization.

Many of the Colorado Mounted Rangers, and especially the female Rangers, carry the Glock 17 as their service firearm. The 9mm handgun is very controllable for persons with smaller bodies. Most female Rangers strongly prefer the Glock 17. It is has less recoil than larger-caliber handguns, and is thus easier for them to shoot accurately. Because the 9mm cartridge is less powerful than larger calibers, the 17 round magazine is particularly important.

Many certified law enforcement officers, including certified deputies, also carry the Glock 17 9mm pistol. Commonality of arms among the certified and the non-certified makes everyone safer, allowing interchangeability of magazines in a critical incident.

For the same reason that the Glock 17 9mm is popular with many Rangers, so is the Springfield XD 9mm, whose magazine carries 19 rounds. There are no magazines for this firearm that are smaller than 16 rounds. So HB 1224's magazine ban has the effect of banning the gun itself.

As in all 55 Sheriff Offices, the AR-15 type carbine with a magazine larger than 15 is the standard patrol rifle for the Colorado Mounted Rangers.

The Colorado Mounted Rangers regularly use AR-15 carbines with 30 round magazines on search & rescue missions as well as back-country patrol operations when requested by agencies.

The Rangers go deep into Colorado's 24 million acres of forest, where they are subject to bear, mountain lion and coyote attacks and other extremely dangerous conditions. Often, the Rangers are beyond any radio communication, their patrol rifle their only protection. HB 1224 makes being a Ranger more dangerous. During an animal attack, there is rarely time to change magazines; the attack is often complicated by low (or no) light conditions—the conditions common during rescue missions.

During the, House Judiciary Committee hearing on HB 1224, the problem of the Colorado Mounted Rangers was brought to the Committee's attention. Testimony of Lou Reedy, House Judiciary Comm., Feb. 12, 2013, at 157 (Exhibit P).

The prohibition of magazines larger than 15 rounds causes considerable difficulty for the Colorado Mounted Rangers with respect to training[10] and to replacement of worn magazines. The prohibition also harms new Rangers who were not grandfathered by HB 1224.

The Sheriffs have direct standing and they have third-party standing to challenge the prohibition of magazines for the Colorado Mounted Rangers.

### C. Blocking the purchase of magazines by Sheriffs and their deputies

The Sheriffs in their official capacity are proper plaintiffs to raise claims about the disarmament of Sheriffs and of the Sheriffs' POST-certified deputies. HB 1224

---

[10] The Rangers' firearms training is a modified version of the Colorado State Patrol Academy course.

is currently interfering with the armament of certified, sworn law enforcement officers.

HB 1224 bans the sale of magazines over 15 rounds; there are some exceptions, but no exception allows firearms businesses to sell magazines to law enforcement officers, or to possess magazines for potential sale to law enforcement officers.

Nominally, HB 1224 allows the purchase of new standard capacity magazines by the employees of "a department, agency, or political subdivision of the State of Colorado." C.R.S. § 18-12-302(3)(b)(II).

But there is no corresponding exemption for retailers to sell to law enforcement. Rather, HB 1224's only exemption for retailers is: "a firearms retailer for the purpose of firearms sales conducted outside the state." C.R.S. § 18-12-302(3)(a)(III).

HB 1224 comprehensively criminalizes any "person who sells, transfers, or possesses a large-capacity magazine." *Id.* at (1)(a). The bill contains an exemption for *Colorado* manufacturers who sell to certain types of customers. *Id* at (3)(a). There is no exemption under any circumstances for an out-of-state manufacturer who ships standard magazines *to* a Colorado retailer.

As the Plaintiffs will demonstrate at trial, HB 1224 continues to causes massive confusion and fear (including a chilling effect) among retailers, wholesalers, and manufacturers of magazines. Many manufacturers and wholesalers simply will not ship to Colorado, and many retailers will not sell the magazines even to law enforcement. This is quite understandable, since HB 1224's prohibition of possession, sale, and transfer does not exempt retailers who provide magazines to

law enforcement, nor out-of-state manufacturers who sell magazines to such retailers.

Accordingly, many Sheriffs and their deputies are finding their normal sources of magazines cannot or will not sell them standard capacity magazines, as Garfield County Sheriff Lou Vallario and other Sheriffs are prepared to testify. Finding a standard capacity magazine for a duty handgun may now require a day-long trip to one of the rare outlets still selling them, if the magazine can be found at all.

The 55 Sheriffs each have a personal stake in being able to obtain standard capacity magazines for their personal duty arms. The Sheriffs have a personal stake, and third-party standing on behalf of, the acquisition of such magazines by their deputies. The personal stake is the efficient operation of their offices, and the better protection which well-armed law enforcement officers provide to each other.

The hindrance to the deputies bringing a lawsuit is the difficulty of litigating a suit involving thousands of individual plaintiffs. Litigating a suit brought by 55 Sheriffs is much more efficient, and is viable.

The close relation of the Sheriffs and the deputies is that the former have hired them and work with them daily in order keep the peace.

To whatever extent standard capacity magazines can be purchased somewhere in the state, the burden of long-distance travel within Colorado or to another state to purchase the magazine is sufficient for standing. As a practical matter, the travel burden will delay the acquisition of such magazines until the Sheriff or deputy has time to make a long-distance trip. In the interim, the Sheriffs and their deputies

will be at greater personal risk of death or injury because they will not have the appropriate magazines for their firearms.

The Sheriffs also have third-party standing for retired deputies, who are directly prohibited by HB 1224 from possessing standard magazines. The hindrances to a lawsuit by retired deputies are the same logistical problems involving a lawsuit by the active deputies. The close relation is honorable retirement following peace officer service for the Sheriff.

## IV. Individual Sheriffs are Not Political Subdivisions for Purposes of Standing.

### A. The political subdivision doctrine applies only to offices created by the state, not to offices created by the people.

The Tenth Circuit traces the political subdivision standing doctrine to *City of Trenton v. New Jersey*, 262 U.S. 182 (1923). *City of Hugo v. Nichols*, 656 F.3d 1251, 1260 (10th Cir. 2011).

In *Trenton*, the city raised a contract impairment claim about a new state statute which reduced how much water the city could draw from the Delaware River. The Court pointed out that under New Jersey law, Trenton's ability to draw *any* water was purely derivative of the state's power: "The only way the city could acquire the right to take the water of the Delaware river was by grant from the state or by authorized purchase or condemnation from one to whom the right had been granted by the state." 262 U.S. at 185. The Court pointed out that "The city is a political subdivision of the state, created as a convenient agency for the exercise of

such of the governmental powers of the state as may be intrusted to it." *Id.* at 185-86. The Court observed that "Power to own, maintain and operate public utilities, such as waterworks…is frequently conferred by the states upon their cities and other political subdivisions." *Id.* at 186. In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state.

The Court in *Trenton* was careful to lay out the reasons why Trenton, in regards to water rights, was a mere proxy of the state.

The other major early case, according to the Tenth Circuit, was *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933). *Hugo*, at 1255-56. There, Justice Cardozo explained: "A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams*, 289 U.S. at 40. The *Williams* description of the municipal plaintiff was accurate: the Maryland Constitution's article about the City of Baltimore expressly allows the state legislature to over-ride terms of the article, and declares that the municipal corporation is in no way "independent of, or free from the control" of the legislature.[11]

---

[11] MARYLAND CONST., art. XI (imposing various rules for the operations of the Baltimore city government, expressly giving the General Assembly the power to alter those rules, and providing that "this Article shall not be so construed, or taken as to make the political corporation of Baltimore independent of, or free from the control, which the General Assembly of Maryland has over all such Corporations in this State.").

The *ratio decidendi* of the political subdivision doctrine is for federal courts not to adjudicate disputes against the creator (e.g., Maryland) by the created (e.g., the City of Baltimore). The Tenth Circuit so recognizes. *See Hugo*, at 1255, 1256, 1259 (quoted with approval creator/created language from other cases); *Branson Sch. Dist. RE-82 v. Romer*," 161 F.3d 619, 627-30 (10th Cir. 1998) (limited circumstances when a created subdivision may file suit against the creator); Housing *Auth. of Kaw Tribe of Indians v. Ponca City*, 952 F.2d 1183, 1188 (10th Cir. 1991) ("against its creating state").

There are many local government entities in Colorado which have been created by the General Assembly. Any or all of these entities could be abolished tomorrow by the General Assembly. The *Williams* doctrine applies to them. *See City of New Orleans v. New Orleans Water Works Co.*, 142 U.S. 79 (1891) (no standing because city's charter can be "abolished at the will of the legislature"); *Housing Auth. of Kaw Tribe*, 952 F.2d. at 1188-89 (municipal corporations can be destroyed by the state "without the consent of the citizens"). Of course even then, the *Allen* exception for cases with "a personal stake," and the exception for third-party standing would still apply.

In Colorado, school boards (the litigants in *Branson*) are created by the state. The Colorado Constitution requires the General Assembly to provide for the organization of school districts "in each of which shall be established a board of education." COLO. CONST., art. IX, § 15.

Colorado Sheriffs were not "created" by the State. The Sheriffs were created by the same power which created the General Assembly and the State itself: the People of Colorado. The Colorado Constitution proceeds solely and directly from the People. Through the Constitution, the People have created the State of Colorado, the General Assembly, and the Office of Sheriff. *See* COLO. CONST., pmbl. (creating the State of Colorado), art. I (fixing the boundaries of the State), art. V (creating the legislative department), art. XIV, § 8 (creating the Office of Sheriff, mandating that it be popularly elected).[12] Under the Colorado Constitution, the General Assembly's attempt to impose additional qualifications on the Office of Sheriff was voided, until a subsequent constitutional amendment granting that power was enacted. *See Jackson v. State*, 966 P.2d 1046 (Colo. 1998) (also holding that Sheriff in his official capacity had a valid claim under the Fourteenth Amendment).

Since the 1933 *Williams* decision, the case's rule has often been described as the "political subdivision" doctrine. Terms such as "political subdivision" or "firearm"

---

[12] The provision for the popular election of Sheriffs is part of the original Colorado Constitution, which is available on the website of the Colorado State Archives. http://www.colorado.gov/dpa/doit/archives/constitution/1876.pdf

The election of Sheriffs is one of the oldest elements of our tradition of ordered liberty, lauded by Blackstone, and originating in Saxon times. W. BLACKSTONE, 1 COMMENTARIES, ch. 13, para. 3 (1765-69) ("[S]heriffs were elected: following that still old fundamental maxim of the Saxon constitution, that when any officer was entrusted with such power, as if abused might tend to the oppression of the people, that power was delegated to him by the vote of the people them selves.") To Thomas Jefferson, "the office of sheriff" was "the most important of all the executive officers of the county." Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), http://www.let.rug.nl/usa/presidents/thomas-jefferson/letters-of-thomas-jefferson/jefl246.php. An excerpt from the cited letter appears in a panel on the Jefferson Memorial. "Quotations on the Jefferson Memorial," Official Monticello website, http://www.monticello.org/site/jefferson/quotations-jefferson-memorial.

can have different legal meanings depending on the particular legal context.[13] The phrase "political subdivision" is often used in the context of torts and contracts. In the context of the *Trenton/Williams* line of cases for federal court standing, a "political subdivision" is by definition *only* an entity which has been "created" by state. The logic and language of *Trenton* and *Williams* require attention to the identity of the Creator.

### B. Sheriffs are County Officers, but they are not employees of a political subdivision.

Defendant writes that "Sheriffs are Colorado 'county officers.' Colo. Const. Art. XXIV, sec. 8." The cited section of the state constitution does not really support defendant's point, but instead guarantees that the old age pension fund shall remain inviolate.

However, the Colorado Constitution does contain the subhead "County Officers" which introduces sections 6 et seq. of Article XIV.[14] Article XIV, section 8 requires for the popular election of Sheriffs. Sheriffs being Constitutional Officers who are elected by the people of a county, it is tautological that they are "County Officers."

---

[13] Regarding "firearm," there is one meaning in the dictionary. WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (2003) ("a weapon from which shot is discharged by gunpowder – usually used only of small arms"). There is another meaning in the federal Gun Control Act. 18 U.S.C. § 921(a)(3), (16) (applying to any explosive, not just gunpowder). And there is a third meaning in the National Firearms Act. 26 U.S.C. § 5845 (The vast majority of guns are not NFA "firearms." A NFA "firearm" is a machine gun, short shotgun, short rifle, or various other things—such as grenades, which are not really a "firearm" in ordinary usage).

[14] Individual sections of the actual Colorado Constitution do not typically have headings. Some publishers place headings on each section, for the convenience of the reader, but these headings are not part of the actual Constitution.

This does not mean that they work for the county government, which is directed by the County Commissioners.

To the contrary, while the county commissioners have great control over the various departments of the county government, their relationship with Sheriff's Office is strictly circumscribed. The commissioners can approve or reject what the Sheriff has chosen to be the salaries of the Undersheriff and the deputies, but the commissioners cannot themselves propose the salaries. C.R.S. § 30-2-106.

The Sheriff has plenary authority over the hiring, firing, and retention of deputies, and the county commissioners have none. County personnel policies do not apply to the Sheriff's Office. *See* C.R.S. § 30-10-506; *Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002); *Jackson v. Johns*, 714 F. Supp. 1126, 1130 (D. Colo. 1989); *Tunget v. Bd. of County Comm'rs*, 992 P.2d 650, 651-52 (Colo. App. 2000); *Seeley v. Bd. of County Comm'rs*, 771 P.2d 21, 22 (Colo. App. 1989), *aff'd* 791 P.2d 696 (Colo. 1990). Accordingly, the mere fact that a Sheriff is a constitutional County Officer does not prove that the Sheriff himself, in his official capacity, is an employee of the political subdivision which is run by the County Commissioners.

That Sheriffs are elected by the People of a county does not automatically make the Sheriffs into a "political subdivision." *See French v. Village of Walnut, Ill.*, 2012 WL 2175758, at *6 (C.D. Ill. June 14, 2012) ("the Bureau County Sheriff's Department" is not "a political subdivision of the county" because "In Illinois, sheriffs are 'independently elected officials not subject to the control of the

county.’”); *Muth v. Anderson*, 2012 WL 2525574, at *4 n.4 (D. Idaho Jun. 29, 2012) ("The claim against the Ada County Sheriff's Department will also be dismissed. Idaho law permits tort claims against 'political subdivisions' which includes cities and counties, but not sheriff's departments."). In other states, a Sheriff's Office is considered a political subdivision. *E.g.*, *Cozzo v. Tangipahoa Parish Council--President Government*, 279 F.3d 273, 282 (5th Cir. 2002) ("the Louisiana statutes and case law can fairly be read to stand for the proposition that sheriffs are political subdivisions").

In Colorado state law, there is no statute or precedent which declares elected Sheriffs to be political subdivisions. To the extent that Sheriffs and political subdivisions appear in state statute, they are not necessarily the same thing. C.R.S. § 19-2-308(7) ("There shall be cooperation of boards of county commissioners, county sheriffs, and political subdivisions in helping to establish work programs.").

A recent case from the United States District Court of the District of Colorado distinguishes a "political subdivision" from a Sheriff acting in his official capacity. In a case brought by *pro se* plaintiffs complaining that they had been improperly arrested, Magistrate Judge Mix recommended that the case be recaptioned so as to identify the defendants as "DELTA COUNTY BOARD OF COUNTY COMMISSIONERS, a political subdivision of the State of Colorado, UNKNOWN DELTA SHERIFF, in his individual and official capacities,...." *Cabral v. Seventh Judicial District et al.*, 2011 WL 3471237, at *23 (D. Colo. Aug. 8, 2011). The Board

43

of County Commissioners was captioned a "political subdivision" and the Sheriff himself was not.

Precedent does hold that "The Denver Sheriff Department is a political subdivision of the City and County of Denver." *Podboy v. Fraternal Order of Police, Denver Sheriff Lodge 27*, 94 P.3d 1226, 1230 (Colo. App. 2004). The Denver Sheriff Department is headed by a mere appointee of an appointee of the Mayor. The Denver Sheriff is not constitutionally elected by the people, and is not in any way independent of the Mayor. Denver City Charter § 2.6.4 ("Sheriff Department" is a part of the Mayor's Department of Public Safety.) Unlike elected Sheriffs, the Denver Sheriff is not the chief law enforcement officer or fire warden of a county.

## V. Americans with Disabilities Act

While Defendant's brief hardly engages with the particular rules of political subdivision doctrine, defendant does acknowledge that a political subdivision always has standing when a federal statute expressly creates the right to sue. Mot. at 14. In the instant case, that statute is in the Americans with Disabilities Act. 42 U.S.C. § 12133 (enforcement procedures for § 12132 ban on state government discrimination).

Sheriffs and their deputies sometimes become disabled in the line of duty. Some retired employees of the Sheriff's Offices are presently disabled. Some present employees of the Sheriffs' Office, such as clerical employees, are presently disabled. Almost all of the 55 Sheriffs and their current employees will become disabled in the future, for disabilities are common among the elderly. As the Sheriffs and other

plaintiffs will demonstrate at trial, the HB 1224 ban on standard capacity standard magazines is particularly harmful to persons with disabilities. *See* Expert Report of Massad Ayoob, at 2-6 (Aug. 1, 2013) (Exhibit Q).

Third-party standing exists for ADA claims. *See United States v. Chicago of Charlotte*, 904 F. Supp. 482, 486 (W.D.N.C. 1995) (builder of group homes for the disabled had standing assert ADA rights of the persons who would live there).

Regarding the retired or present Office employees who are currently disabled, their hindrance or inability is first of all the complexity of organizing and participating litigation that could have several hundred or more plaintiff, and who have no pre-existing records of each other's name or contract information. For some of the disabled, the disability itself may hinder participation in litigation. A Sheriff in his or her official capacity "has a close relation" with disabled retired and current employees. All the present Sheriffs hope to one day be retired, and Sheriffs have a strong interest in protecting the rights of present and retired employees of the Office. The official capacity of the Sheriff is self-evidently an ideal plaintiff to litigate in support of disabled past and present employees of the Sheriff's Office.

The existence of standing is an issue separate from the final decision on the merits. *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). But at the outset, it may be noted that States have no *per se* Eleventh Amendment immunity from suits under Title II of the ADA. *Tennessee v. Lane*, 541 U.S. 509, 517-18 (2004). This is all the more so when the only relief sought is injunctive and declaratory. *See*

*Miller v. King*, 384 F.3d 1248, 1263-64, 1275-76 (11th Cir. 2004), *vacated on other grounds* 449 F.3d 1149 (11th Cir. 2006) (paraplegic inmate in state prison; ADA suit allowed for injunctive relief but not for damages).

State statutes are covered by the ADA. *See TP v. DuBois*, 843 F. Supp. 775 (D. Mass. 1993) (state statute violates ADA Title II); *TEP & KJC v. Leavitt*, 840 F. Supp. 110, 111 (D. Utah 1993) (permanently enjoining state statute which violated Title II); *State ex rel. McCormick v. Burson*, 894 S.W.2d 739 (Tenn. Ct. App. 1994) (finding that on the merits, the particular state statute did not violate Title II).

The legislative record contains an explanation of how HB 1224 harms the disabled. At the Feb. 12, 2013, hearing of the House Judiciary Committee, the following testimony was presented:

> SAM MYRANT: My name is Sammy Myrant, and I represent myself and my family...
>
> My loss goes on every day. The man who committed 16 felony counts of rape, child abuse on this child gets out of prison this year. So there are times when we're going to need a magazine of high capacity.
>
> He's a member of the Aryan Brotherhood, and he gets out of prison this year. And he has sworn to kidnap her and us, rape her again in front of us, then kill us in front of her.
> ...
> REPRESENTATIVE SALAZAR: I'm so sorry for your loss, and I'm concerned that the gentleman who committed this crime is coming out this year. Just a question for you. How many -- how many rounds do you think that you would need to be able to protect yourself? . . .
>
> SAM MYRANT: Well, first of all, I am disabled, so I can't put a clip in and out very quickly. I drop them, even when I'm practicing at the range. So I want to have as many in my Glock 17 that I can have. And I carry 17 in there all the time. ...

REPRESENTATIVE SALAZAR: Okay. So then that answers my question that, it's not the 10 that you think -- or that's written in the legislation right now, that you feel that the 17 that you might have might get you there, that you'd feel a little better with that.

SAM MYRANT: That's the capacity -- I'm sorry. That's the capacity. Or if I feel like -- if I saw him out -- I have a 30-round clip that I can put into my Glock. If I felt that that's what I needed to carry, I would.

Hearing on HB 1224, Colorado State House Judiciary Committee, at 124-25 (Feb. 12, 2013) (Exhibit P).

State actions which amplify the risk that disabled persons will be victimized by criminals are within the scope of the ADA. *See Ferguson v. City of Phoenix*, 931 F. Supp. 688 (D. Ariz. 1996) (city violated ADA because its TDD/911 emergency communications services failed to respond properly to reports of crimes in progress,); *cf. Civil Ass'n of Deaf of New York City v. Giuliani*, 915 F. Supp. 622, 625 (S.D.N.Y. 1996) (fire alarm call boxes), 970 F. Supp. 352, 359 (S.D.N.Y. 1997) (granting injunction in part).

A statute can violate 42 U.S.C. § 12132 without being facially discriminatory. For example, a statutory prohibition on the sale, transfer, or possession of wheelchairs would (in a numerical sense) affect far more hospital patients (who are not disabled) than it would affect people with disabilities. Almost everyone has used in a wheelchair in a hospital at some time, but most people are not disabled. Persons with mobility-related disabilities would still have the right to bring an ADA claim against the wheelchair ban. "A plaintiff need not show the defendant's action was based on any discriminatory intent." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003).

Defendant may assert that he is entitled to an exemption from the ADA because allowing disabled persons, including Sheriffs' disabled present and retired employees, to possess the standard magazines which are particularly necessary for their self-defense would constitute a "fundamental alteration" of his prohibition statute. *See* 28 C.F.R. § 35.130(b)(7). If this defense is applicable, Defendant bears the burden of demonstration and proof, and it is impossible for him to carry that burden in a motion to dismiss. *See* 28 C.F.R. § 35.150(a)(3) ("a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens.").

The Sheriffs in their official capacities are asserting the ADA right of disabled retired and present employees who have a disability-related need to possess standard capacity magazines, rather than restricted capacity magazines.

## CONCLUSION

For the reasons set forth herein and above, the 55 elected Sheriffs have standing to challenge the constitutionality of HB 1224 and 1229, and to challenge violation of the Americans with Disabilities Act.

Dated this 22d day of August, 2013.

Respectfully submitted,

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR 55 SHERIFFS AND DAVID
STRUMILLO

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2013, I uploaded this brief and all exhibits to this Court's ECF system, which will deliver a copy to all counsel of record listed below.

| | |
|---|---|
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Grove | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org

ATTORNEY FOR 55 SHERIFFS AND DAVID STRUMILLO