IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et. al.*,

    Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

    Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT 1 AND CERTAIN PLAINTIFFS FOR LACK OF STANDING**

---

Plaintiffs, by and through their respective counsel, respectfully submit their response to Defendant's Motion to Dismiss Count 1 of the Plaintiffs' Fourth Amended Complaint (Dkt. No. 116) and Certain Plaintiffs for Lack of Standing.

## INTRODUCTION

At the final pretrial conference, the Court granted Defendant's request to file a standing motion, but had previously denied Defendant's request to file a summary judgment motion. What Defendant filed instead is a motion to dismiss the central claim in the case on the theory that no Plaintiff has standing to bring it, and has interlaced its brief with arguments that turn on the ultimate issue to be decided. Among other things, Defendant argues that Plaintiffs lack "standing" because the magazines at issue are not subject to Second Amendment protection. That is not a standing argument. That is a compressed version of the summary judgment brief Defendant had ready but was precluded from filing. Moreover, Defendant's motion to dismiss

1

Count 1 is directly contrary the Court's ruling that soon-to-retire sheriffs have standing. The Court should decline to entertain Defendant's motion at this late date, but if the Court does address the merits, it will find that motion has none for the reasons set out below.

Similarly, Defendant's argument that firearms retailers have no standing based on proven financial losses caused by the ban is directly contrary to well-established law. Those same retailers likewise have standing to challenge the structure of HB 1229's requirements for FFL processing of all private-party sales and many temporary private-party transfers.

For the reasons set out below, the Court should deny Defendant's motion.

## **ARGUMENT**

### **I.   THE MAGAZINE BAN IS CURRENTLY IN EFFECT, THUS ITS EXISTING INFRINGEMENT OF SECOND AMENDMENT RIGHTS IS NOT SPECULATIVE OR CONTINGENT ON FUTURE EVENTS.**

Defendant moves to dismiss Count 1, which alleges that the ban on the purchase and ownership of magazines with a capacity greater than 15 rounds after July 1, 2013 is an infringement of the Second Amendment right to own and use common arms and accessories for all lawful purposes. Defendant's basic proposition is a simple one: The Second Amendment right is restricted to self-defense, and since the Plaintiffs challenging the magazine ban unsurprisingly already own the same kind of magazines, they have no standing to challenge the ban until such time as all of their current magazines wear out, or are lost, stolen or destroyed. Dkt. 133 at 10. In the meantime, the logic goes, Plaintiffs are free to defend themselves, and thus can exercise their full Second Amendment rights, and have no claim. In other words, a Plaintiff who can currently defend himself does not have a claim until after that ability is lost,

and, once standing is finally achieved, must await the outcome of a lengthy legal process, hoping that the need for defense does not arise in the meantime.

This remarkable proposition is not only legally wrong, but is a transparent attempt to make the current motion parallel to the Court's rationale for the earlier dismissal of Count 3. In dismissing Count 3, the Court found that injury was not sufficiently imminent because the State's "Technical Guidance Letters" removed any threat of prosecution until such unknown future time when a rogue District Attorney might seek to prosecute despite the letters. Dkt. 96 at 12. In other words, the threat was not imminent because it depended on speculative, future events in the Court's view. But no such parallel can be drawn here for several reasons, and the Second Amendment right is not so narrow.

First, Defendant ignores this Court's December 19, 2013, ruling regarding the standing of the eleven individual Plaintiffs who were formerly Plaintiffs in their official capacity as Colorado sheriffs. The Court found that those sheriffs who were soon to retire had standing because they would lose the law-enforcement exemption in C.R.S. § 18-12-302(3)(a)(II) upon retirement. Their injury impending on the date certain of their retirement from office in January, 2015 is "imminent enough" in the words of the Court.[1] The Court did not impose an additional, post-retirement waiting period until their current magazines disintegrated. Those retiring sheriffs in January, 2015 will be in the same position as is today every other Plaintiff who owns a magazine, but cannot buy another. They have equal standing.

Defendant's theory is that if a person currently has functional arms for self-defense, the person has no standing when he or she is prevented from acquiring additional or better arms. An

---

[1] In fact, Defendant's argument is directly contrary to the Courts ruling, as he contends that those same sheriffs lack standing at least until after they retire. Dkt. 133 at 8,11.

3

individual who owns one handgun would have no standing to challenge a handgun ban which prevented her from purchasing a second handgun (as a backup), or an improved handgun. The same points can be made about magazines.

    Second, Defendant's motion depends on repetition of a false construct about the scope of the Second Amendment right. After acknowledging that Plaintiffs' claim is about all lawful uses, including self-defense, Defendant nonetheless thereafter misconstrues the right as only self-defense eleven times, and then bases its entire argument on that false proposition. Dkt. 133 at pp. 3-6, 8-12. Although self-defense is indisputably a core component of the right, it does not define the boundaries. The Second amendment guarantees law-abiding citizens the right to "keep and bear arms" for all lawful purposes. The Supreme Court in *Heller* defined the right to include all firearms that are in common use. *District of Columbia v. Heller*, 554 U.S. 570, 620, 624-25 (2008) ("bearing arms for a lawful purpose"; "arms 'in common use at the time' for lawful purposes like self-defense"; "typically possessed by law-abiding citizens for lawful purposes"). That magazines with a capacity greater than 15 rounds are in common use cannot be seriously disputed, as established both in Defendant's motion and the joint stipulations of the parties that there are tens of millions of such magazines nationally and at least millions in Colorado. Dkt. 133 at 10; Dkt. 119, at 22-23 ¶¶ 25-26. One reason is that they are standard components of many popular firearms.

    Thus, unlike the condition precedent that the Court found was necessary for standing to assert Count 3, there is no such condition here. A commonly-used component necessary for the operation of commonly used firearms has been banned in Colorado since July 1, 2013. The banned magazines are per se illegal to purchase or possess yesterday, today, and tomorrow.

4

That is neither conjectural nor hypothetical, but is the actual injury the law finds sufficient. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  It is far more than the imminent harm that is also sufficient, because it already exists and has for nearly nine months.   The other two elements necessary for standing—that the injury is causally connected to the implementation of the statutory ban, and that a favorable decision striking down the ban will redress the injury—do not appear to be disputed and require no further discussion.

Finally, Defendant strays even further from arguments about standing, and makes what amounts to a summary judgment argument on the ultimate issue—which the Court specifically precluded Defendant from doing.  Defendant argues that Plaintiffs cannot prove an injury because the restriction on ownership of magazines may be constitutional.  Dkt. 133 at 11-12 (Second Amendment does not grant a right to own a specific type of firearm).  Whether the Plaintiffs have a constitutional right to own the banned magazines is the issue that the Court will decide.  It is circular to presume the outcome, and argue the Plaintiffs have no standing because they may not prevail.   Standing has no such requirement.

## II.     THE "BUSINESS PLAINTIFFS" HAVE STANDING TO CHALLENGE HB 1224'S PROHIBITION ON THE SALE OR TRANSFER OF MAGAZINES.

The Defendant contends that the FFLs and the Family Shooting Center at Cherry Creek State Park ("Family Shooting Center")[2] (collectively "the business plaintiffs") lack standing to challenge HB 1224 because they cannot allege a legally-protected interest under the Second Amendment harmed by HB 1224.  These arguments lack merit and defy common sense.

---

[2] While the Family Shooting Center is not an FFL, it nonetheless earns significant revenue from the sale of firearm accessories, including magazines that can hold more than 15 rounds. *See* Dkt. 116 ¶ 94. Accordingly, the arguments in Section II of this response apply just as forcefully to the Family Shooting Center as they do to the other FFL plaintiffs.

5

### A. The Business Plaintiffs Have Alleged Legally Protected Interests Harmed by HB 1224.

The Defendant's primary argument against the standing of the business plaintiffs is that neither the Second Amendment nor the *Heller* decision recognize an individual's right to sell firearms and, therefore, the business plaintiffs do not have a Second Amendment right harmed by HB 1224. Dkt. 133 at 12-13. In other words, according to the Defendant, an FFL could never challenge the validity of a ban against the sale of certain firearms or firearm accessories because the ban only impacts the customer's right to purchase and own such firearms and firearm accessories. However, the authorities cited by the Defendant are wholly distinguishable and contrary to established law that vendors who sell goods or services that implicate fundamental rights under the Constitution have standing to challenge restrictions on the sale of such goods or services.

First, it is absurd to argue that HB 1224 will not logically result in economic harm to the business plaintiffs based on their inability to sell LCMs. In *National Rifle Association of America v. Magaw*, the Court of Appeals for the Sixth Circuit found that an outright ban on certain rifles and magazines unequivocally harmed the plaintiff manufacturers and FFLs and that they had Article III standing to challenge the ban under the Commerce Clause and the Equal Protection Clause. "In sum, the manufacturers and dealers, who must comply with the Act as a condition of functioning in an intensely regulated industry, illustrate that they have suffered economic harm from the impact of passage of the Act, which has restricted the operation of their businesses in various ways—either forcing them to 'stop production,' 'decline work,' and to 'refrain from sales and marketing,' or imposing the need to redesign and relabel products." *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 281 (6th Cir. 1997). The business plaintiffs

6

have alleged exactly this sort of harm resulting from the passage of HB 1224. *See* Dkt. No. 116 ¶¶ 69-101, 161    Therefore, the only question is whether this harm to the business plaintiffs is to a legally protected interest under the Second Amendment.

Despite the Defendant's surprising statements to the contrary, the ruling in *Illinois Association of Firearms Retailers v. City of Chicago* does in fact support the proposition that the sale of firearms is a legally protected interest under the Second Amendment for standing purposes. *See* Dkt. 133 at 15.  In that case, the city imposed a ban on the sale and transfer of firearms within city limits that would even apply to sales by federally licensed firearms dealers. *Illinois Ass'n of Firearms Retailers v. City of Chicago*, -- F. Supp. 2d --, 2014 WL 31339 at *1 (N.D. Ill. 2014).  The plaintiffs included an association of Illinois firearms dealers.  *Id.*  The court immediately noted in its summary that the city's ban "goes too far in outright banning legal buyers ***and legal dealers from engaging in*** lawful acquisitions and ***lawful sales of firearms.***" *Id.* (emphasis added).  The court also noted that since the plaintiff association was composed, in part, of firearms retailers, the association had associational standing to pursue the challenge as a named plaintiff. *Id.* n.3.  It was plainly incorrect for the Defendant to assert that "[t]he opinion did not explicitly address standing at all, and the only injury identified by the court was an infringement on a law-abiding citizen's Second Amendment right to acquire a firearm."  Dkt. 133 at 15.

Implicit in the court's opinion expressly declaring the associational standing of the trade association was the finding that the firearms dealers *themselves* would have had standing to challenge the city's ban.  *Id.* at *16 n.7 (plaintiffs "assuredly have standing to contest" the prohibition of legitimate firearms sales); *see Hunt v. Washington State Apple Advertising Com'n*,

7

432 U.S. 333, 343 (1977) (an association has standing to bring suit on behalf of its members when, among other things, "*its members would otherwise have standing to sue in their own right.*" (emphasis added)).  Thus, *Illinois Association of Firearms Retailers* supports the argument that the business plaintiffs have standing to challenge HB 1224 based on its impact on their legally protected interest under the Second Amendment to sell magazines with capacities greater than 15 rounds, and the Defendant's arguments regarding the same are simply incorrect.

**B.    The Business Plaintiffs Have Standing to Advocate the Rights of Its Customers Whose Second Amendment Rights Are Burdened by HB 1224's Restrictions.**

Even assuming that the Defendant is right in that the Second Amendment does not protect the business plaintiffs' right to sell firearms and firearm accessories, the Defendant cannot reasonably argue that HB 1224 does not expressly place a burden on an ***individual's*** right to purchase and own magazines with a capacity of more than 15 rounds, and that this burden must be evaluated by the Court to see whether it passes constitutional muster. *See District of Columbia v. Heller*, 554 U.S. 570, 626 -27 (2008) (Second Amendment protects the individual right to keep and carry arms in common use at the time); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) ("putting the government through its paces" to prove the constitutionality of a categorical ban on firearm possession for certain persons was necessary); *Koll v. Village of Norridge*, 941 F. Supp. 2d 933, 943 (N.D. Ill. 2013) (laws imposing restrictions on the commercial sale of arms are presumptively lawful, but they must still survive constitutional scrutiny).  Accordingly, the question becomes whether firearms dealers and manufacturers have standing to advocate the Second Amendment rights of those individuals who seek access to their goods and services.

Under established precedent in a variety of Constitutional contexts, the answer is undeniably "yes." Regarding the Second Amendment, in *Ezell v. City of Chicago*, the city attempted to ban all firing ranges within city limits. *Ezell v. City of Chicago*, 651 F.3d 684, 689-90 (7th Cir. 2011). One of the plaintiffs, Action Target, designed, built, and furnished firing ranges. *Id.* at 692. The court noted that the individual plaintiffs' standing was "not in serious doubt" because they were all Chicago residents who wanted to maintain firearm proficiency by practicing at a target range. *Id.* at 695. However, the city argued that Action Target lacked standing because the Second Amendment only protects individual rights, rather than organizational rights. *Id.* at 696. The court expressly disagreed: "Action Target, as a supplier of firing-range facilities, is harmed by the firing range ban and is also permitted to 'act[] as [an] advocate[] of the rights of third parties who seek access to' its services." *Id.* (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)). Thus, like Action Target, the business plaintiffs have standing to advocate both their own rights and the rights of customers whose Second Amendment rights are impacted by the passage of HB 1224. *See also Koll*, 941 F. Supp. 2d at 945 (discussing *Ezell* in-depth and concluding that "even if the Second Amendment does not protect the sale of firearms directly, [FFL Plaintiffs] can still pursue a claim that the Agreement and Revised Ordinance infringe their customers' personal right to keep and bear arms.").

The Tenth Circuit has favorably cited *Ezell* for the very issue of corporate standing of firearms businesses: "Several cases have held, in other contexts, that an inhibition on a person's ability to perform work constitutes an injury-in-fact. *See . . . Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir.2011) (concluding "supplier of firing-range facilities" possessed standing to

9

challenge city's ban on such facilities).” *Kerr v. Hickenlooper*, -- F.3d --, 2014 WL 889445 at *3 (10th Cir. Mar. 7, 2014).

Other cases outside of the Second Amendment context have similarly concluded that vendors and manufacturers have standing to challenge laws that impact the fundamental constitutional rights of their customers. *See Craig v. Boren*, 429 U.S. 190, 195 (1976) (beer vendor had standing to challenge alcohol regulation based on its customers' equal protection rights); *Planned Parenthood v. Danforth*, 428 U.S. 52, 62 (1976) (abortion provider doctors had standing to challenge statute controlling how they provided their services); *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 327 (7th Cir. 1985) (booksellers had standing to challenge ordinance prohibiting them from selling sexually-explicit materials). Thus, the business plaintiffs have standing to challenge the burdens placed on their customers' ability to keep and bear arms under the Second Amendment.

### C. The Remaining Authorities Cited by the Defendant Are Distinguishable.

The other authorities relied on by the Defendant are either distinguishable or inapplicable. *Montana Shooting Sports Association v. Holder* challenged certain applications of federal firearms laws as being beyond the scope of Congress's interstate commerce power. As the Magistrate Judge wrote, "Plaintiffs have not pled a Second Amendment claim in this case." *Montana Shooting Sports Ass'n v. Holder*, 2010 WL 3926029 at *22 (D. Mont. Aug. 31, 2010). The Magistrate Judge did make the statement quoted by Defendant (Dkt. 133 at 13), but dicta from a proposed recommendation is not persuasive authority.

*United States v. Chafin* is an unpublished decision and is therefore not binding precedent. 423 Fed. Appx. 342, 344 (4th Cir. 2011) (citing Fourth Circuit Rule 32.1). Chafin had standing

10

to pursue his Secnod Amendment claim, and lost under the application of the two-part test. *Id.* at 344.  Similarly, in *United States v. Conrad*, the court rejected Conrad's Second Amendment argument, but never asserted that Conrad lacked standing.  923 F. Supp. 2d 843, 852 (W.D. Va. 2013).

The word "standing" does not appear in *Teixeira v. County of Alameda*, 2013 WL 707043 (N.D. Cal. Feb. 26, 2013).  The court held that a zoning ordinance prohibiting gun stores within 500 feet of schools and residences was a presumptively valid restriction under *Heller*'s express creation of a presumption in favor of the validity of conditions and qualifications on the commercial sale of firearms.  The court declined to "decide what level of constitutional scrutiny to apply to the (as yet unarticulated) right to sell or purchase guns because as a threshold matter, there are simply no allegations sufficient to rebut the presumption of validity established in *Heller*."  *Id.* at *6.  The gun store owners lost on the Second Amendment merits, not because they lacked standing.

None of these authorities apply here.  The business plaintiffs are not arguing—as the Defendant seems to suggest—that the Second Amendment precludes any burdens on the sale of firearms or firearm accessories.  The business plaintiffs are simply arguing that the actual burden imposed by HB 1224, when weighed against HB 1224's stated justifications, is unconstitutional under the Second Amendment and that the business plaintiffs have legally protected interests burdened by HB 1224, as more fully outlined in the operative complaint.  Further, under established Supreme Court precedent, the business plaintiffs have standing to advocate the rights of their customers whose Second Amendment rights are unquestionably implicated by HB 1224's restrictions on their right to keep and bear arms.  Thus, the Defendant's arguments

11

regarding the business plaintiffs' lack of standing to challenge HB 1224 as unconstitutional under the Second Amendment lack merit.

### III. THE BUSINESS PLAINTIFFS HAVE STANDING TO CHALLENGE HB 1229, AS ALLEGED IN COUNT 5 OF THE COMPLAINT.

The Defendant now contends, without any authorities, that the business plaintiffs lack standing to challenge HB 1229 because the FFLs are not required to process private firearm sales or loans under HB 1229. Further, the Defendant contends that the business plaintiffs lack standing because section (1)(a) of HB 1229 excludes licensed firearm dealers from its requirements. Both arguments are flawed.

#### A. The Business Plaintiffs Have Standing to Challenge HB 1229 Because HB 1229 Gives Them the Unlawful Choice of Either Refusing to Facilitate Lawful Firearm Transfers or to Lose Business Revenue.

The Defendant's focus on the "voluntary" aspect of FFL background checks to facilitate private firearm transfers misses the point. HB 1229 unequivocally *requires* any private citizen transferring a firearm to another private citizen to have a transfer processed by a licensed gun dealer. C.R.S. § 18-12-112(2)(a) ("A prospective firearm transferor who is not a licensed gun dealer ***shall*** arrange for a ***licensed gun dealer*** to obtain the background check ***required*** by this section." (emphasis added)). This requirement makes FFLs the sole gatekeeper for legal and valid firearm transfers between private parties under HB 1229. If an FFL elects to assist a private citizen with a firearm transfer, it must create and maintain all the same paperwork as is required for a sale from the FFL's inventory, and then conduct and record the background check in accordance with all state and federal laws. The FFL must perform these processes either free of charge or for a maximum of ten dollars. C.R.S. § 18-12-112(2)(b-d).

The Plaintiffs have repeatedly alleged that the ten dollar fee cap is completely impracticable given the obligations and time constraints inherent with fully complying with HB 1229's requirements.  *See* Dkt. No. 116, ¶¶ 20-26, 198-99.  The law, as written now, gives FFLs like the business plaintiffs the choice of either 1) refusing to facilitate the lawful transfer of a firearm from one citizen to another, effectively denying the transferee of his or her right to keep and bear arms under *Heller* and the Second Amendment, or; 2) subsidizing the transfer out of the FFLs' own funds, which they may or may not be able to do from a business standpoint.  The Plaintiffs have already established that vendors and business owners who provide goods and services implicating fundamental rights have the ability to advocate on behalf of their customers whose rights are unconstitutionally burdened.  *See Craig*, 429 U.S. at 195; *Ezell*, 651 F.3d at 696; *Koll*, 941 F. Supp. 2d at 945.  This situation is no different.  The General Assembly, by virtue of HB 1229, has made background checks and other processing requirements via FFLs a mandatory procedural step for any legal transfer of firearms.  If the law regulating this essential step is fundamentally dysfunctional and impracticable, then the business plaintiffs have a vested interest in challenging that dysfunctionality based on their own economic interests and as advocates for the rights of their customers under the Second Amendment.

Moreover, the dilemma faced by the business plaintiffs is analogous to that faced by newspaper publishers in *Grosjean v. American Press Co., Inc*.  In that case, the State of Louisiana imposed a two percent tax on newspaper publishers with circulations of over 20,000 readers who printed advertisements in their publications.  *Grosjean v. American Press Co.*, 297 U.S. 233, 240 (1936).  Failure to pay or report the tax constituted a misdemeanor.  *Id.* at 241.  The Supreme Court found that the effect of the tax gave the publishers the choice of either taking

13

a loss on advertising revenue or restricting circulation of newspapers to the public in order to avoid the 20,000 reader threshold required by the tax. *Id.* at 244-45. Based on these facts, the Court found that the statute was "a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of constitutional guarantees," namely the First Amendment's guarantee of freedom of the press. *Id.* at 250. The Court therefore found the tax unconstitutional under the First Amendment. *Id.* at 250-51.

HB 1229's background check requirements via FFLs and its arbitrary ten dollar cap on background check fees are the sort of invidious and calculated devices intended to prevent the lawful transfers of firearms from one citizen to another, as guaranteed by the Second Amendment. Like in *Grosjean*, HB 1229's practical effect is to freeze such lawful transfers by giving FFLs the unreasonable choice of refusing to facilitate transfers or paying for most of the cost of processing those transfers out of their own pockets. Likewise, it gives private citizens the choice of searching in vain for FFLs who are willing to subsidize their firearm transfers or of transferring the firearms illegally without the required FFL processing. Just as the publishers in *Grosjean* had standing to challenge the State of Louisiana's unconstitutional tax designed to inhibit freedom of the press, the business plaintiffs have standing to challenge HB 1229's transparent attempt to inhibit their Second Amendment rights and the rights of their customers.

**B.  HB 1229's Exclusion of Licensed Gun Dealers as Transferees for Purposes of Mandatory Background Checks is Irrelevant.**

The Defendant then makes the novel argument that since FFLs may receive a firearm from another person or entity without having to be subjected to a background check, the business plaintiffs have no injury in fact and, therefore, no standing. Dkt. No. 133 at *17 ("In other words, Colorado FFL may acquire a firearm from a private seller or other type of transferor

14

without first having to conduct a background check."). The Defendant is essentially arguing that the business plaintiffs have no standing because a person transferring a firearm to an FFL does not need to use a third-party FFL to conduct a background check on the transferee FFL.

This lack of a third-party FFL background check for transferee FFLs is completely beside the point. The unconstitutionality of HB 1229 arises from the fact that transfers between private citizens *must* be done *solely* through FFLs, and the law as-written expressly chills such transfers. Whether an FFL may give or take a firearm from a private citizen without having to have a background check conducted on it under HB 1229 has utterly no relevance to the injuries alleged by the Plaintiffs, as more fully described above. Thus, the Defendant's arguments regarding the business plaintiffs' exclusion from HB 1229's background check requirements are a red herring.

## IV. DAVID BAYNE HAS STANDING TO CHALLENGE HB 1224 AND HB 1229.

Defendant argues that Plaintiff David Bayne should be dismissed as a plaintiff because, as of September of last year, he no longer resides in Colorado. Defendant seems to assume that no out-of-state resident ever has standing to challenge Colorado's laws. That, of course, is nonsense. Even the Tenth Circuit's *Heller* precedent, fledgling as it is, demonstrates that out-of-state residents have standing to challenge Colorado gun laws. *E.g., Peterson v. Martinez*, 707 F.3d 1197, 1207-12 (10th Cir. 2013) (ruling on the merits of Washington resident's Second Amendment challenge to Colorado gun legislation). Mr. Bayne may not reside in Colorado, but he is still an active member of Outdoor Buddies and has every intention of traveling to Colorado on business and for hunting opportunities. Surely, Defendant does not mean to suggest that when Mr. Bayne travels here for the purpose of exercising his Second Amendment rights, he will

not be subject to the requirements of HB 1224 and HB 1229.  Since he assuredly will be subject to those requirements when he travels here, he has standing to challenge them.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.

Dated this 14th day of March, 2014.

        Respectfully submitted,

        s/Richard A. Westfall
        Richard A. Westfall
        Peter J. Krumholz
        HALE WESTFALL LLP
        1600 Stout Street, Suite 500
        Denver, CO 80202
        Phone: (720) 904-6010
        Fax: (720) 904-6020
        rwestfall@halewestfall.com

        **ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY**

        s/David B. Kopel
        INDEPENDENCE INSTITUTE
        727 E. 16th Avenue
        Denver, CO 80203
        Phone: (303) 279-6536
        Fax: (303) 279-4176
        david@i2i.org

        **ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM, JAMES FAULL, LARRY KUNTZ, FRED JOBE, DONALD KRUEGER, STAN HILKEY, DAVE STONG, PETER GONZALEZ; SUE KURTZ, DOUGLAS N. DARR, AND DAVID STRUMILLO**

s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com

**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**

s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com

**ATTORNEY FOR LICENSED FIREARMS DEALERS**

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net

**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK**

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Douglas Abbott | dabbott@hollandhart.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |
| Matthew Groves | matt.grove@state.co.us |
| Kathleen Spalding | kit.spalding@state.co.us |
| Jonathan Fero | jon.fero@state.co.us |
| David Blake | david.blake@state.co.us |
| Daniel D. Domenico | dan.domenico@state.co.us |
| Stephanie Scoville | stephanie.scoville@state.co.us |
| John Lee | jtlee@state.co.us |
| LeeAnn Morrill | leeann.morrill@state.co.us |

                                         s/Peter J. Krumholz
                                         HALE WESTFALL LLP
                                         1600 Stout Street, Suite 500
                                         Denver, CO 80202
                                         Phone: (720) 904-6010
                                         Fax: (720) 904-6020