IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.,*

     Plaintiffs,

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## GOVERNOR'S TRIAL BRIEF

During the 2013 legislative session, in the wake of mass shootings in Aurora, Colorado, Newtown, Connecticut, and countless other episodes of gun violence, the Colorado General Assembly adopted legislation designed to enhance public safety by preventing prohibited individuals from acquiring firearms and by reducing the firepower wielded by mass shooters and other criminals. *See* Colo. Rev. Stat. § 18-12-112 (requiring background checks for most private firearms transfers); § 18-12-301 through -303 (prohibiting transfers and new acquisition of ammunition feeding devices capable of accepting, or designed to be readily converted to accept, more than fifteen rounds of ammunition ("large-capacity magazines," or "LCMs")).

Colorado's enactment of this legislation was not unique either with respect to its own history or to the remainder of the country. In 2000, in the wake of the mass shooting at Columbine High School, the people of the State of Colorado approved a ballot initiative that expanded background check requirements to cover private

1

transfers at gun shows.  *See* Colo. Rev. Stat. § 12-26.1-101.  Section 18-12-112 expanded Colorado's background check requirements further, to cover most other transfers of firearms between private individuals.  Colorado is presently one of sixteen states, along with the District of Columbia, that requires background checks for at least some private transfers.

Limits on magazine capacity have likewise been a feature of the legal landscape for generations.  Prohibition-era laws in at least three jurisdictions placed restrictions on the contemporary equivalent of large-capacity magazines ("LCMs"). The federal assault weapons ban prohibited the manufacture of magazines holding more than ten rounds nationwide from 1994 through 2004.  Presently, Colorado is one of nine states, together with the District of Columbia and a handful of local jurisdictions, with limits on magazine capacity.  With a limit of 15 rounds, rather than 10, and a grandfathering provision that exempts magazines owned before the statute's effective date, Colorado's law is substantially more permissive than both the prior federal law and existing restrictions in most jurisdictions that limit magazine capacity.  Yet every court to consider a challenge to magazine capacity has held that a limit of 10 rounds passes muster under the Second Amendment, even when those laws contain no grandfather clause at all. *See Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) (merits ruling); *Fyock v. City of Sunnyvale,* Case No. C-13-5807-RMW (N.D. Cal. March 5, 2014) (denying motion for preliminary injunction); *San Francisco Veteran Police Officers Ass'n v. City & County of San Francisco,* Case No. 13-cv-05351-WHA, 2014

WL 644395 at *7 (N.D. Cal. Feb. 19, 2014) (denying motion for preliminary injunction); *Shew v. Malloy,* Case No. 13-cv-00739-AVC, 2014 WL 346859 (D. Conn. Jan. 30, 2014) (merits ruling); *NY State Rifle & Pistol Ass'n, Inc. v. Cuomo,* Case No. 13-cv-00291-WMS, 2013 WL 6909955 (W.D.N.Y. Dec. 31, 2013) ("*NYSRPA*") (merits ruling); *Tardy v. O'Malley*, Case. No. CCB-13-2841 (D. Md. Oct. 1, 2013) (denying motion for preliminary injunction).

While the Supreme Court's landmark decisions in *District of Columbia v. Heller,* 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), established that the Second Amendment protects an individual right to keep and bear arms for the purpose of self-defense, they shed scant light on the manner in which lower courts should structure and analyze Second Amendment challenges to regulations on firearms ownership, use, and related matters.  Unlike the restrictions challenged in *Heller* and *McDonald*, the laws at issue here have no effect on who can possess a firearm, what general types of firearms are permissible,[1] the purposes for which a firearm may be used, or where and how it can be carried.  Thus, in contrast to laws that restrict who can possess a firearm

---

[1] Aside from a handful of rather obscure exceptions, (including some firearms with large-capacity internal magazines), the restriction on LCMs has no bearing on the specific model of firearm that can be carried, either.  And even those few exceptions are either grandfathered, and thus remain legal for those who owned them before July 1, 2013, or could be permanently altered or equipped with permanently altered magazines if their owners wished to transfer them. § 18-12-301(2)(b)(I).  This stands in marked contrast to bans on assault weapons, which, in any event, have also consistently been upheld after *Heller. See, e.g., Kampfer v. Cuomo*,  2014 WL 49961 (W.D.N.Y. Jan 7, 2014) (noting that because the New York SAFE Act's assault weapon law "do[es] not create a categorical ban on an entire class of weapons," it "only minimally affect[s]" the Second Amendment right and is therefore not subject to heightened scrutiny).

and where they can carry it, § 18-12-112 and § 18-12-302 are on the "periphery of the Second Amendment right." *Fyock, supra,* at *2.  Building on the emerging framework still under case-by-case development by the federal courts, this brief delineates a workable approach for laws at the margins of the Second Amendment that remains consistent with the mandates established by Supreme Court precedent.

**I.    Analytical framework and standards of review for Counts I, II, and V.**

Plaintiffs raise facial challenges to Colorado's magazine capacity limit and expanded background check requirement.  They cannot prevail on these claims unless they are able show that the statutes are unconstitutional in at least a vast majority of their applications under the appropriate standard of review.

**A.    To prevail on their facial constitutional challenges, Plaintiffs must show that § 18-12-112 and § 18-12-302 are unconstitutional in at least a vast majority of potential applications.**

At the threshold, although Plaintiffs offer various hypothetical scenarios under which either § 18-12-112 or § 18-12-302 could affect their constitutional rights, they have neither alleged, nor are they able to prove, any specific instance in which either statute has been applied in a manner that violates their constitutional rights.  Thus, Counts I, II, and V of the Fourth Amended Complaint raise only facial constitutional challenges to Colorado's magazine capacity limitation and expanded background check requirement.

A facial constitutional challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself, rather than focusing on a particular unconstitutional application of the statute or regulation. *United States v. Frandsen,* 212 F.3d 1231, 1235 (11th Cir. 2000). Because a facial challenge seeks such broad relief, it requires a plaintiff to make a correspondingly broad showing of unconstitutionality in order to succeed. *See Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008) ("a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.,* that the law is unconstitutional in all of its applications‖), *quoting United States v. Salerno,* 481 U.S. 739, 745 (1987).

To date, the Tenth Circuit has followed a somewhat more lenient approach to facial challenges than the standard articulated by the Supreme Court in *Salerno*. *See Hernandez-Carrera v. Carlson,* 547 F.3d 1237, 1255-56 (10th Cir. 2008) ("While we have left undecided whether a plaintiff making a facial challenge must establish that no set of circumstances exists under which the Act would be valid, it is clear a litigant cannot prevail in a facial challenge to a regulation or statute unless he at least can show that it is invalid in the vast majority of its applications.") (internal quotations and citations omitted). This approach appears to be consistent with the Supreme Court's lingering uncertainty about which standard to apply. *See Washington State Grange,* 552 U.S. at 449 ("While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'"), *quoting Washington v. Glucksberg,*

521 U.S. 702, 740 n.7 (1997) (Stevens, J. concurring in the judgment); *United States v. Stevens,* 130 S.Ct. 1577, 1587 (2010) (noting difference between standards articulated in *Salerno* and *Glucksberg,* and stating that "[w]hich standard applies in a typical case is a matter of dispute that we need not and do not address").

Accordingly, for their facial constitutional challenges to succeed, Plaintiffs must at a minimum demonstrate that the § 18-12-112 and § 18-12-302 are "invalid in the vast majority of [their] applications." *Carlson,* 547 F.3d at 1256. In other words, they must show that the challenged provisions violate the Second Amendment in nearly every case to which they could apply.  Absent such a showing, Plaintiffs' Second Amendment challenges must fail.

**B. To prevail, Plaintiffs must show that the challenged statutes burden their Second Amendment rights.  If they do, Plaintiffs must show that the statutes destroy the core Second Amendment right or, alternatively, satisfy means-end scrutiny.**

*Heller* and *McDonald* addressed the constitutionality of outright bans on handgun possession, laws that the Supreme Court held amounted to a "severe restriction" on the core right of self-defense that were comparable to "[f]ew laws in the history of our Nation." *Heller,* 554 U.S. at 627.  The Court held that restrictions of this type – which effectively "destroy" the right to keep and bear arms for the purposes of self-defense, are categorically unconstitutional.  *Id.* at 618; *see also Peruta v. County of San Diego*, __F.3d__, 2014 U.S. App. LEXIS 2786, at *63 (9th Cir. Feb. 13, 2014).  Put another way, laws that effectively prevent lawful self-defense with a handgun cannot survive any level of constitutional scrutiny; the

Supreme Court has declared that such a severe infringement on the core Second Amendment right cannot be justified by any legitimate governmental interest.

Outside of that context, however – where the challenged regulation does not even infringe upon, much less destroy, the core Second Amendment right – *Heller* and *McDonald* provide meager guidance.  The federal circuit courts, including the Tenth Circuit Court of Appeals, have universally adopted a two-step approach under which a reviewing court must first determine whether the law burdens conduct falling within the scope of the Second Amendment's guarantee.  *See Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010).  If it does not, then the "inquiry is complete." *Peterson,* 707 F.3d at 1208, *quoting United States v. Marzzarella,* 614 F.3d 85, 89 (4th Cir. 2010).

If the challenged regulation does burden conduct falling within the scope of the Second Amendment's guarantee, then the court "must proceed to the second part of the analysis and evaluate [it] under some form of means-end scrutiny." *Reese*, 627 F.3d at 801.  Although all the federal circuits are in accord with this general statement, they diverge on the type of means-end scrutiny to apply.  In general, however, the courts have agreed that the second step involves either tiered scrutiny or a sliding-scale approach, under which "the rigor of judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the burden on that right." *Peterson,* 707 F.3d at 1218 (Lucero, J., concurring separately), *quoting Ezell v. City of Chicago,* 651 F.3d 684, 703 (7th Cir.

2011).  Some courts have set a baseline of intermediate scrutiny, concluding that if the challenged regulation places any burden on the Second Amendment right, the burden automatically shifts to the government to demonstrate a substantial relationship between the regulation and its important objective of ensuring public safety.  *See, e.g., NRA of America, Inc. v. BATFE,* 700 F.3d 185, 194 (5th Cir. 2012).  Other courts have hewed more closely to traditional constitutional analysis, requiring the party challenging the law's constitutionality to demonstrate that it substantially burdens the Second Amendment right before applying any type of heightened scrutiny.  *See United States v. DeCastro*, 682 F.3d 160, 166 (2d Cir. 2012); *Heller II,* 670 F.3d at 1253.  No appellate court has applied strict scrutiny, although some courts have come close—applying "not quite strict scrutiny" when evaluating laws that are invidiously designed to prevent the effective exercise of the core rights associated with lawful firearm ownership.  *See, e.g., Ezell*, 651 F.3d at 708 ("[t]he City's firing-range ban is not merely regulatory; it *prohibits* the law-abiding, responsible citizens of Chicago from engaging in target practice").

 *Peterson*, *Reese*, and *United States v. Huitron-Guizar,* 678 F.3d 1164 (10th Cir. 2012), are the most prominent Second Amendment opinions issued by the Tenth Circuit in the post-*Heller* era.  *Peterson* addressed only the first step of the two-part test after concluding that the challenged statute did not burden conduct falling within the scope of the Second Amendment's guarantee.  707 F.3d at 1212.  The remaining cases applied intermediate scrutiny because the burden imposed by the pertinent statutes was substantial.  *See Reese*, 627 F.3d at 802 (prohibition on

firearm possession for those convicted of domestic abuse imposed substantial burden on those disarmed, but survived intermediate scrutiny because prohibition applied to narrow class of persons who posed increased risk of violent behavior); *Huitron-Guizar*, 678 F.3d at 1169 (applying intermediate scrutiny to prohibition on firearm possession by illegal aliens despite the fact that the "law here not only burdens but eliminates the right by placing, on a class of perhaps millions, a total prohibition upon possessing any type of gun for any reason").

To be sure, *Reese* pointed out that the *Heller* majority refused to apply the rational basis test to such a substantial infringement on the Second Amendment right, and based on the *Heller* opinion concluded that it was bound to "apply some level of heightened scrutiny" in that case. 627 F.3d at 801. Thus, had *Reese* addressed a law similar in kind to those challenged here, the opinion would represent binding precedent with respect to the applicable burden of establishing a law's constitutionality. But *Reese,* like *Heller* before it, evaluated a regulation that was completely different in scope, intent, and effect from the laws challenged here— namely, one that resulted in complete disarmament for an entire class of people. While the *Heller* majority dictated that an "interest balancing" approach could not be applied to such a restriction for law-abiding citizens, 554 U.S. at 635, the effect of compelled disarmament on *non*-law-abiding citizens – irrespective of its justifications – places precisely the same burden on those to whom such a restriction applies.

Notwithstanding the *Heller* majority's dismissal of "interest balancing" for restrictions so onerous that they "destroy" the Second Amendment right of law-abiding citizens, lower courts have in fact regularly applied "interest balancing" approaches to less severe restrictions.  For example, intermediate scrutiny involves interest balancing by definition, but was appropriate in *Reese* and *Huitron-Guizar* because the challenged laws did not disarm "law-abiding citizens."  Although the Tenth Circuit held that disarmament was a substantial burden irrespective of an individual's legal status, it held in both cases that prohibitions of this type can be, and were, adequately justified by governmental concerns over public safety.  Thus, heightened scrutiny is appropriate for any law that substantially burdens the right to self-defense, and once such a showing is made, the burden should shift to the government to explain adequately the reasons for imposing it.

A different analysis should apply to regulations that, like § 18-12-112 and § 18-12-302, do not disarm anyone.  Laws of this type have only a "*de minimis* effect,*" Heller II,* 670 F.3d at 1253, or impact only the "periphery of the Second Amendment right," *Fyock, supra,* at *2, and should thus be subject to a lesser degree of scrutiny.  The Supreme Court has certainly taken this approach with other fundamental rights.  In the First Amendment context, for example, the Supreme Court has applied the same type of sliding-scale analysis endorsed by the Tenth Circuit, holding that "election laws trigger strict scrutiny only where the rights to vote and associate are subject to severe restrictions." *Burdick v. Takushi,* 504 U.S 428, 432 (1992).  On the other hand, "reasonable, nondiscriminatory

restrictions" that impose less substantial burdens are generally justified by the state's "important regulatory interests," *id.* at 434, an approach that, like the second half of *Reese*'s two-part test, has been described as a "sliding scale." *Lee v. Keith,* 463 F.3d 763, 768 (7th Cir. 2006); *Citizens for Tax Reform v. Deters,* 518 F.3d 375, 383 (6th Cir. 2008). For example, the Supreme Court has approved regulations that have the "effect of increasing the cost or decreasing the availability" of abortions, *Planned Parenthood v. Casey,* 505 U.S. 833, 873 (1992), applying rational basis review absent an "undue burden" on the right. *Gonzales v. Carhart,* 550 U.S. 124, 146 (2007).

Thus, this Court should apply the following framework to the constitutional claims in this case:

- Plaintiffs must first establish the challenged regulation imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

- If Plaintiffs are able to show that government regulation not only falls within the Second Amendment's scope, but also destroys the core Second Amendment right, the law should be declared unconstitutional.

- If Plaintiffs are unable to make such a showing, then they must establish that the burden on the core right of self-defense imposed by the regulation is a substantial one. If they are unable to make such a showing, Plaintiffs' claim fails.

- If, on the other hand, Plaintiffs are able to establish the existence of a substantial burden, then the burden shifts to the government to satisfy intermediate scrutiny.

## II. Neither statute imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

Plaintiffs' constitutional claims fail at the threshold because they cannot establish that either the magazine capacity limitation or the private background check requirement falls within the scope of the Second Amendment's core guarantee.[2]

### A. Large-capacity magazines are not "arms," and therefore do not fall within the scope of the Second Amendment.

*Heller* struck down a District of Columbia law that imposed a "complete prohibition" on the possession of handguns in the home. 554 U.S. at 629. The Supreme Court focused closely on the text and history of the Second Amendment, concluding that it codified a preexisting, individual right that was not dependent on militia service. *Id.* at 592. *Heller* left the contours of the Second Amendment largely undefined, focusing instead on the individual guarantee of "law-abiding citizens to use arms in defense of hearth and home." *Id.* at 635.

While the *Heller* Court declined to map the boundaries of the right protected by the Second Amendment, it did stress that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

---

[2] The Governor maintains, as he has argued in previous briefing, that no plaintiff has standing to assert Count 1, and that several individual plaintiffs are unable to demonstrate an injury-in-fact to a legally protected interest with respect to either statute. Doc. 133.

purpose." *Id.* at 626.  The Court proceeded to outline a non-exhaustive list of "presumptively reasonable regulatory measures" that fall outside the Second Amendment, specifically identifying laws prohibiting concealed carry, barring certain classes of people from firearm possession, limiting carrying of firearms in sensitive places, and regulating the commercial sales of arms. [3] *Id.* at 626-27 & n.26. Acknowledging "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Id.* at 627 (*quoting* 4 Blackstone, Commentaries on the Laws of England, 148-49 (1769)), the Court explained "that the sorts of weapons protected were those 'in common use at the time.'" *Id., quoting United States v. Miller,* 307 U.S. 174, 179 (1939).

Plaintiffs have suggested that *Heller*'s reference to "common use" is the touchstone for evaluating the constitutionality of modern firearms regulation.  Doc. 116 (Fourth Amended Complaint), ¶ 162 (alleging that a "[p]rohibition on a class of firearms or their accessories that are in common use for self-defense and other lawful purposes is specifically prohibited by the Second Amendment pursuant to *Heller*").  They build on this assertion by claiming that magazines holding more than fifteen rounds are in common use.  Therefore, Plaintiffs claim, *Heller* prohibits a state from regulating them at all.

---

[3] Academic opinion consistently suggests that *Heller*'s categorical exceptions indeed fall outside the scope of the Second Amendment.  As one commentator has written, "it is hard to imagine the Court invalidating [the "presumptively lawful" measures] in a future case.  For all practical purposes, these issues have been decided – and decided in favor of constitutionality."  Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009).

The meaning of "common use" is addressed *infra,* but whatever it may ultimately be taken to mean, Plaintiffs almost certainly overstate its importance. Constitutionality is not now, and never has been, a popularity contest. Rather, the threshold question is whether a large-capacity magazine qualifies as an "arm," and thus whether it falls within the scope of the Second Amendment at all. Plaintiffs incorrectly assume that it does.

The historical meaning of the term "arms" under *Heller* "is no different from the meaning today": "weapons of offence, or armour of defence." 554 U.S. at 581, *quoting* 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978). Another contemporary legal dictionary defined arms as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike at another." *Id., quoting* 1 A New and Complete Law Dictionary. A magazine is not itself a "weapon[] of offence;" that is the firearm receiver. Nor is a magazine a thing worn for defense, like body armor, or a thing used "to cast at or strike another," like ammunition.[4] Instead, a magazine is merely a container used to load a firearm with ammunition. The dictionary definition captures this distinction: a magazine is not a gun, but is instead "a chamber for holding a supply of cartridges to be fed automatically to the breech of a gun." *Oxford English Dictionary* (*available at* oxforddictionaries.com).

---

[4] Note that *Heller*'s reference to common use mentioned "weapons," and not "arms," suggesting that to the extent that common use does dictate constitutionality, such a test would cover somewhat narrower ground than the Second Amendment.

State and federal laws mirror this understanding.  Background checks are not required for magazine purchases, for example, and federal prohibitions on firearm ownership for certain high-risk individuals extend to ammunition but make no mention of magazines.  18 U.S.C. § 922(g).  Likewise, Colorado law prohibits persons subject to protection orders from possessing firearms and ammunition, but does not bar the same individuals from possessing magazines.  § 13-14-102(22)(a)(I)(B); § 18-1-1001(9)(a)(I)(B).

This is not to say that a state could simply regulate functional semi-automatic firearms out of existence by barring ownership of all magazines, rather than just LCMs.  *Heller* made clear that the Second Amendment guarantees that a law-abiding citizen may keep a "firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635.  Laws designed to circumvent that guarantee have received unfavorable treatment from the courts, as well they should.  *See Ezell, supra.*  But § 18-12-302 does not ban ownership of all, or even most, magazines; rather, it merely forbids new acquisitions of only those magazines with a capacity exceeding 15 rounds.  Some Plaintiffs may prefer LCMs, but they do not allege and cannot prove that any category of semi-automatic firearms is incompatible with lower-capacity detachable magazines, or that lower-capacity magazines are inadequate for self-defense.  Colorado law thus does not come anywhere near to an outright ban on firearms that are "operable for the purpose of immediate self-defense."  554 U.S. at 635.

As Plaintiffs in this case have admitted, "After July 1, 2013, thousands of models and variants of firearms with detachable box magazines remain available for lawful purchase and use for home defense in Colorado. With very few exceptions, every gun that was available before July 1, 2013, is compatible with magazines holding 15 or fewer rounds." Doc. 119, p.20, ¶ 11 (Stipulations). At the same time, "[c]omponents such as limiters that can decrease the capacity of magazines are manufactured and are available for purchase in the United States." *Id.*, p.24, ¶ 31. Therefore, even without considering the grandfather clause, Colorado does not prohibit the useful possession of any firearm.

In fact, § 18-12-302 does not limit possession or utility of a firearm in any sense. The law does not limit how many rounds or arms a person can possess. It does not restrict the number of magazines that a person may carry, or how many defensive shots he or she can fire, even in the unlikely event that such shots are required. Because the law creates no categorical ban, Plaintiffs have failed to establish that their challenge raises a cognizable Second Amendment claim. *See Hightower v. City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) (noting that "large capacity weapons" – in that case, those able to carry "more than ten rounds" – are not "of the type characteristically used to protect the home"); *cf. Peterson*, 707 F.3d at 1201 ("[i]n light of our nation's extensive practice of restricting citizens' freedom to carry firearms in a concealed manner, we hold that this activity does not fall within the scope of the Second Amendment's protections"); *Drake v. Filko*, 724 F.3d 426, 440 (3d Cir. 2013) (concluding that the district court "correctly determined

that the requirement that applicants demonstrate a 'justifiable need' to publicly carry a handgun for self-defense does not burden conduct within the scope of the Second Amendment's guarantee").

### B. LCMs may be regulated regardless of how many are in circulation.

Plaintiffs may argue that LCMs are in "common use" – and thus untouchable under *Heller* – simply because there are large numbers of them in circulation. If this theory is correct, then there is no need for a trial on § 18-12-302. There are millions of magazines with capacities exceeding 15 rounds in Colorado, and tens of millions nationwide. Doc. 119, p.25 ¶ 25; p.26, ¶ 26 (Stipulations). But Plaintiffs' position falls short on two counts. They not only misapprehend the meaning of "common use," but they also place too much weight on the numerosity question.

#### 1. Numerosity does not exempt an arm from regulation.

*Heller*'s historical analysis states that "the sorts of weapons protected were those 'in common use at the time,'" 554 U.S. at 627, although the opinion neither identifies the relevant "time," what sort of "use" might be involved, or how "common" that use should be. Nor does it suggest that "common use" somehow exempts a firearm or an accessory such as an LCM from regulation. Rather, *Heller* says the exact opposite—that the Second Amendment extends no protection at all to arms that are not "in common use at the time." *Id.* Accordingly, *Heller*'s reference to "common use" suggests, at the most, that a government's attempt to regulate an arm that is in common use would implicate Second Amendment protections. 554 U.S. at 627, *see also Shew,* 2014 WL 346859 at *16 (finding that assault weapons

and LCMs were in 'common use,' and therefore applying means-end scrutiny to regulations).

Because commercial markets and consumer preferences cannot dictate constitutional norms, "common use" cannot simply be based on the number of LCMs in circulation. Indeed, under the Plaintiffs' approach the constitutionality of regulating a new product would depend largely on how quickly such a regulation was enacted after the product was placed into the stream of commerce. This would create a perverse race to achieve popularity before the government could enact regulations. Manufacturers and distributors of a new product – perhaps a particularly deadly bullet, or an all-polymer firearm undetectable by a magnetometer – would attempt to flood the market to ensure wide circulation, perhaps by lowering prices or giving the product away for free for a period of time after its introduction. Market releases could be timed to coincide the adjournment of state legislatures, some of which convene only biannually. At the same time, regulators would have incentives to prohibit any potentially dangerous new firearms technology as soon as it is developed without waiting to evaluate its true effects, lest it become too widespread to be regulated.

### 2. "Common use" does not simply refer to the number of magazines in circulation.

The number of LCMs in current circulation does not control the analysis for the additional reason that Plaintiffs cannot prove LCMs are in "common use" for self-defense. In elucidating the Second Amendment right "to keep and bear arms," the *Heller* Court determined that the phrase "bear arms" refers "to carrying [arms]

18

for a particular purpose – confrontation." 554 U.S. at 584.  Consistent with that understanding, the Court struck down a District of Columbia law that effectively banned handguns entirely, and required residents to keep their lawfully-owned firearms unloaded and dissembled or bound by a trigger lock or similar device.  *Id.* at 575.  The Court held that banning the possession of immediately operable firearms "makes it impossible for citizens *to use them for the core lawful purpose of self-defense* and is hence unconstitutional."  *Id.* at 630 (emphasis added).

Given the importance of the *Heller* decision, one must assume that the majority selected its language carefully.  For example, the court suggested that "use" and "possession" mean two different things by stating that "the Second Amendment does not protect those weapons not *typically possessed* by law-abiding citizens for lawful purposes[.]"  554 U.S. at 624 (emphasis added).  On the other hand, the opinion also emphasized several times citizens' use of arms for the core lawful purpose of self-defense, which denotes action.  *Id.* at 635 ("whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to *use arms in defense of hearth and home*" (emphasis added); *see also id.* at 636 (concluding that the Second Amendment precludes "the absolute prohibition of handguns *held and used for self-defense* in the home.") (emphases added).

That "use" suggests action is consistent with the dictionary definition: to "take, hold or deploy (something) as a means of accomplishing or achieving a result; employ." *Oxford English Dictionary* (*available at* oxforddictionaries.com).  The noun

form simply incorporates the verb: "the action of using something or the state of being used for some purpose." *Id.*  Accordingly, the Court's emphasis on the "use" of firearms implies more than possession alone.  Plaintiffs' claim that mere numerosity and "common use" are identical concepts must thus be rejected.  To prevail on their theory of "common use," Plaintiffs must prove that large numbers of rounds are commonly employed for self-defense.

> ### C. Assuming *arguendo* that a magazine qualifies as an "arm," the 15-round magazine capacity limit is nonetheless presumptively reasonable because it qualifies as a longstanding regulatory requirement.

A conclusion that magazines are not "arms" would end the inquiry under *Reese*.  However, even if magazines do qualify as "arms," § 18-12-302 does not necessarily implicate conduct within the scope of the Second Amendment's guarantee.  To the contrary, Colorado's statutory limitation on magazine size also passes muster because it is the sort of historical regulation that *Heller* and *McDonald* acknowledged that the Second Amendment will countenance.  *See United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (finding that second step of the constitutional test is only necessary "[i]f the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood").  Limitations like those imposed by § 18-12-302 have a long history in American law and, therefore, are at a minimum "presumptively lawful" under *Heller,* 554 U.S. at 627, n.26. *See also McDonald,* 140 S.Ct. at 3027 ("repeat[ing] those assurances… [that] incorporation does not imperil every law regulating firearms").

For instance, restrictions on access to ammunition, which also would have a direct effect on the number of shots that could be fired in rapid succession, date back to the time of ratification. In the founding era a number of statutes severely restricted access to ammunition, apparently without any meaningful popular objection premised on the right to keep and bear arms. For example, Philadelphia, New York, and Boston, among other cities, regulated "the storage of gunpowder, a necessary component of an operational firearm." *Heller*, 554 U.S. at 684-85 (Breyer, J., dissenting). Although the primary intent of these laws was fire safety, their effect was to restrict the number of rounds that could be fired in defense of one's home or person. *Id*. at 683-87. That restriction, of course, was over and above the already substantial limit on rates of fire imposed by the technology of the day. Although the *Heller* majority found such laws inapposite to the complete handgun ban at issue in that case, *id*. at 631-32, they were far more restrictive than the law at issue here, which does not ban or restrict ammunition or any other mechanism that is necessary to the operation of a firearm. And even as to those laws that actually restricted access to or use of gunpowder—a necessary component for the operation of any founding era firearm— the *Heller* majority held that they did not "remotely burden the right of self-defense as much as an absolute ban on handguns." *Id*. at 632. Given this founding-era context, there is no basis to conclude that § 18-12-302 burdens conduct protected by the Second Amendment as historically understood.

Highly portable handheld semiautomatic firearms featuring detachable box magazines were not popularized until the turn of the twentieth century. The absence of laws specifically addressing magazine capacity during the founding era is thus unsurprising. But this does not mean that this type of regulation is of recent vintage. Concerns over rising gun violence during the Prohibition era led to stricter regulation for short-barreled shotguns and machine guns. *See* National Firearms Act, 26 U.S.C. § 5845 (1934). During the same era, some jurisdictions passed laws that included limitations on magazine size for semi-automatics. In 1932, for example, Congress banned in the District of Columbia "any firearm which shoots…semiautomatically more than twelve shots without reloading." Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (emphasis added). Other states had similar provisions. *See* Mich. Acts 1931, ch. 37 (banning "firearm which can be fired more than sixteen times without reloading"); R.I. Acts 1927, ch. 1052 (defining "machine gun" in part as "any weapon which shoots more than twelve shots semiautomatically without reloading," and establishing enhanced penalty for crime committed with such weapon).

Laws like those adopted in Prohibition-era Michigan, Rhode Island, and the District of Columbia demonstrate that restrictions on magazine capacity are not unprecedented. Indeed, laws tending to limit the number of shots that can be fired by a gun owner have been features of the regulatory landscape for centuries. Consistent with *Heller*, they qualify as "presumptively lawful regulatory measures." 554 U.S. at 570, n.26.

*Heller*, of course, does not say whether a "presumptively lawful" regulation is simply exempt from the Second Amendment or whether the phrase connotes that some altered, less demanding standard of review should apply. At a bare minimum, however, *Heller* suggests that a challenger to a regulation with historical precedent bears the burden of rebutting its presumptive lawfulness.  Plaintiffs will be unable to do so at trial.

### D. Expanded background checks requirements do not burden conduct falling within the scope of the Second Amendment's guarantee.

This Court should reject Plaintiffs' challenge to § 18-12-112 at the threshold because Plaintiffs have not complained that it prevents them from engaging in any conduct that falls within the scope of the Second Amendment's guarantee.  *Heller* and *McDonald* make clear that the Second Amendment protects a law-abiding citizen's right to "possess" handguns for the purposes of self-defense.  *Heller,* 554 U.S. at 592.  Some jurisdictions have concluded that this right is accompanied by at least some ancillary protections such as the right to purchase firearms and ammunition, or the right to keep lawfully possessed firearms in an operable state. *See, e.g. Herrington v. United States,* 6 A.3d 1237 (D.C. App. 2010) (holding that right to keep and bear arms extends to possession of handgun ammunition in the home); *Andrews v. State,* 50 Tenn. 165, 178-79 (1871) (holding under Tennessee constitution that "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair").  More

recently, the Seventh Circuit acknowledged the existence of rights that are corollary to the "central component" of the Second Amendment. *Ezell,* 651 F.3d at 704 ("[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and experience that make it effective").

Whatever the scope of these correlative Second Amendment protections may be, however, nothing in *Heller*, *McDonald*, or any other authority suggests that they confer a right to privately transfer a firearm to an individual without first ensuring that the transferee may legally possess it. Notably, this is the only "infringement" that the Plaintiffs have alleged or for which they have attempted to offer factual support. A review of the Fourth Amended Complaint reveals that none of the Plaintiffs allege that they have attempted to acquire a firearm via a private transfer and have failed due to Colorado's private background check requirements.[5] Instead, they complain only that sellers and businesses will be injured by the law.

Such a complaint simply does not pertain to the self-defense right that formed the core of the *Heller* opinion. However broadly the Second Amendment may protect personal rights, it surely does not guarantee the profitability of a

---

[5] The Governor does not concede that such an allegation, were it advanced or proven in this case, would fall within the scope of the Second Amendment's protections. To the contrary, even an outright ban on private sales would be unlikely to have any practical effect on a lawful purchaser's ability to acquire a firearm for defensive use. Evidence at trial will show that there are more than 1,500 FFLs in Colorado, virtually any one of whom could conduct either a private background check or a commercial sale. This Court need not reach that question here, however, because Plaintiffs have failed to allege or demonstrate that any prospective *transferee* of a firearm offered by a private transferor has been unable to acquire that firearm due to the background check requirement for private sales.

business that relies in whole or in part on firearm sales, nor does it protect the private right to sell a firearm to an individual who may be prohibited by federal or state law from owning one.  Yet these are the only injuries that Plaintiffs allege.

Moreover, even if a core right were at issue here, Plaintiffs would be unable to satisfy the threshold inquiry of the two-step test because Colorado's expanded background check law is an example of a public safety regulatory requirement, which *Heller* explicitly approved.

Federal law has long prohibited private transfers to persons whom the transferor "know[s] or ha[s] reasonable cause to believe…is prohibited from receiving or possessing firearms under Federal law," such as felons, certain individuals with mental illness, and persons subject to a protective order. 18 U.S.C. § 922(d).  Federal statutes likewise prohibit loaning or renting a firearm to a person whom the transferor knows or has reasonable cause to believe is prohibited.  18 U.S.C. § 922(a)(5).  Colorado bars additional types of transfers.  *See* Colo. Rev. Stat. § 18-12-108.7 (generally prohibiting transfers of firearms to juveniles); Colo. Rev. Stat. § 18-12-111 (prohibiting straw purchase on behalf of individual who purchaser knows to be prohibited to possess firearm).  By passing § 18-12-112, Colorado has done nothing more than create a mechanism to ensure that firearm transfers between private parties comply with these longstanding restrictions.

Governmental entities have long overseen large portions of the private firearms market.  Federal law, for example, limits transfers between private individuals who reside in different states.  18 U.S.C. § 922(a)(5); 27 C.F.R. § 478.30.

The Gun Control Act of 1968 and corresponding ATF regulations require private interstate transfers to be processed through an FFL who performs a background check before relinquishing the firearm to the transferee. 27 C.F.R. § 478.30. As noted previously, Colorado statutes have required background checks for private sales at gun shows since 2000. Like background checks under § 18-12-112, background checks for private sales at gun shows must be initiated by an FFL, which may charge a fee "not to exceed ten dollars." Colo. Rev. Stat. § 12-26.1-103.

Plaintiffs may counter by pointing to the fact that the *Heller* opinion stated that "nothing in our opinion should be taken to cast doubt on… laws imposing conditions and qualifications on the *commercial* sale of arms," 554 U.S. at 626 (emphasis added), as proof that *private* transfers fall within the scope of the Second Amendment's protections. But *Heller* painted its list of presumptively lawful regulations with a broad brush – indeed, the opinion explicitly stated that it did "not purport to be exhaustive." *Id.* at 626, n.26; *cf. id.* at 588 (noting that "the fact that the phrase ["bear arms"] was used in a particular context does not show that it is limited to that context"). And expanded background check requirements are certainly the same type of public safety regulation, with precisely the same goals, as those that *Heller* explicitly approved. They are also closely related to, and designed to effectuate, longstanding federal regulations, which have limited who may purchase firearms since the 1930s, *see* Federal Firearms Act of 1938, 52 Stat. 1250 (former 15 U.S.C. § 901(3)), a long enough period to qualify as "longstanding" under *Heller*. *See BATFE*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be

deemed 'longstanding' even if it cannot boast a precise founding-era analogue. . . .
*Heller* considered firearm possession bans on felons and the mentally ill to be
longstanding, yet the current versions of these bans are of mid-20th century
vintage.") (citations omitted); *see also United States v. McCane,* 573 F.3d 1037,
1047-49 (10th Cir. 2009) (Tymkovich, J., concurring).

So long as they are not designed to, and do not in fact, impede an eligible
individual from acquiring firearms for legitimate purposes, regulations designed to
enhance public safety by preventing prohibited individuals from acquiring firearms
do not impinge on the Second Amendment rights of current or prospective law-
abiding gun owners.  Because the expansion of background checks is consonant with
the broad regulatory latitude that *Heller* acknowledged governments possess for the
purpose of public safety, Plaintiffs cannot demonstrate that § 18-12-112 "imposes a
burden on conduct falling within the scope of the Second Amendment's guarantee."
*Reese,* 627 F.3d at 800-01.  Colorado's expansion of the background check
requirement to cover private sales is a prime example of the type of widespread, and
historically grounded, regulatory measure, which *Heller* suggested is presumptively
reasonable.  It therefore falls outside the scope of the protections associated with
the Second Amendment.

### III.   Assuming *arguendo* that Plaintiffs' claims qualify for intermediate scrutiny, this Court should apply a "time, place, and manner" analysis.

As already discussed, Plaintiffs' claims fail at the threshold unless they can
show that the challenged statutes infringe on their Second Amendment rights, and

that they do so substantially.  Conversely, Plaintiffs should prevail if they show that § 18-12-112 or § 18-12-302 destroys the core Second Amendment right to engage in self-defense.  If the evidence at trial, however, shows the existence of a substantial burden that nonetheless falls short of destroying Plaintiffs' core right to self-defense, then intermediate scrutiny should apply.

Intermediate scrutiny as articulated by the Tenth Circuit requires the government to bear the burden "of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective."  *Reese,* 627 F.3d at 802.  Colorado's goal with respect to both statutes is the same: ensuring public safety.  This objective is not simply an important one, it is the central reason that government exists.  *See Huitron-Guizar,* 678 F.3d at 1170 ("[t]he bottom line is that crime control and public safety are indisputably 'important' interests").

Many courts evaluating regulations on the types of firearms that may be carried have looked to the "time, place, and manner" analysis adopted by the Supreme Court's protected speech cases.  *See Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).  The Fourth Circuit's decision in *Marzzarella,* 614 F.3d 85, was one of the first to adopt this approach, and it has been cited favorably more than one hundred times since it was issued, including by all three Tenth Circuit opinions.  As the *Marzzarella* court put it, intermediate scrutiny "is articulated in several different forms," common to which are three requirements: 1) The governmental end must be more than just legitimate, either significant, substantial,

28

or important; 2) there must be a reasonable, not perfect, fit between the challenged

regulation and the asserted objective; and 3) the regulation need not be the least

restrictive means of serving the interest, but may not burden more conduct than is

reasonably necessary. *Id.* at 98.

The key inquiry under the third step of this analysis is whether the

restriction at issue "leave[s] open ample alternative channels" for exercise of the

right. *Heller II*, 670 F.3d at 1262, *quoting* Eugene Volokh, *Implementing the Right

to Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56

UCLA L.Rev. 1443, 1471.  If it does, then the burden is modest and the Court

should apply a "mild form of intermediate scrutiny" under which it gives

"substantial deference to the predictive judgments of the legislature." *Heller II,* 670

F.3d at 1259, 1262, *quoting Turner Broadcasting Systems, Inc. v. FCC*, 520 U.S.

180, 195 (1997).  Applying this approach in *Heller II,* the court concluded that, due

to the availability of a wide variety of firearms that were unaffected by the District

of Columbia's regulations, "the prohibition of semiautomatic rifles and large-

capacity magazines does not effectively disarm individuals or substantially affect

their ability to defend themselves." *Id.*  This approach is consistent with other

courts considering the constitutionality of magazine capacity limitations.  *See

NYSRPA,* 2013 WL 6909955, at *42-44 (SAFE Act "does not totally disarm New

York's citizens; and it does not meaningfully jeopardize their right to self-defense");

*cf. Robertson v. City and County of Denver,* 874 P.2d 325, 335 (Colo. 1995)

(upholding municipal ordinance banning assault weapons and magazines holding

more than 20 rounds because it was not an "onerous restriction on the right to bear arms…[because] there are literally hundreds of alternative ways in which citizens may exercise the right to bear arms in self-defense").

Assuming *arguendo* that either § 18-12-112 and § 18-12-302 burdens Second Amendment rights at all, both statutes leave open ample alternative channels for the exercise of the right to self-defense.  This Court should thus apply, at most, a "mild form of intermediate scrutiny" to Plaintiffs' claims. *Heller II,* 670 F.3d at 1262.

## IV. Assuming that Plaintiffs' facial vagueness challenge can be reviewed on the merits at all, it should still fail because the "continuous possession" requirement is not unconstitutionally vague.

Count III of the Fourth Amended Complaint raises a facial vagueness challenge to the "continuous possession" component of the grandfather clause in § 18-12-302(2)(a).   This Court should not reach the merits of that challenge, but even if it does, Plaintiffs' claim fails on the merits.

### A. Plaintiffs' facial vagueness challenge to the "continuous possession" requirement of § 18-12-302 must fail because facial vagueness cannot be raised outside the First Amendment context.

Count III of the Plaintiffs' Fourth Amended Complaint raises a vagueness challenge to the grandfather clause of § 18-12-302(2)(a), which provides that "a person may possess a large-capacity magazine if he or she: (I) Owns the large-capacity magazine on July 1, 2013; and (II) Maintains continuous possession of the large-capacity magazine."  Plaintiffs confirmed in the final pretrial order that their

challenge is facial in nature.  Doc. 119 at 9-12.  Plaintiffs contend that the ostensibly vague statutory language provides inadequate notice of what constitutes prohibited conduct, thereby raising the possibility of arbitrary and discriminatory enforcement and "chill[ing] individuals' Second Amendment rights by subjecting them to the threat of criminal prosecution[.]"  Doc. 116, ¶ 182; *see also* Doc. 119 at 9-12.

This Court should not reach the merits of this claim because Tenth Circuit precedent makes clear that facial vagueness challenges are not permitted outside of the First Amendment context.  In *United States v. Reed*, for example, the Tenth Circuit affirmed a district court's rejection of a facial vagueness challenge to a statute forbidding drug users from being in possession of a firearm.  114 F.3d 1067, 1069 (10th Cir. 1997).  The appellate court held: "[T]he [vagueness] doctrine is limited when invoked in a context such as this which does not implicate First Amendment values.  A vagueness challenge in this context cannot be aimed at the statute on its face but must be limited to the application of the statute to the particular conduct charged."  *Id.*  This ruling marked a shift from the Tenth Circuit's prior approach, under which facial vagueness challenges outside the First Amendment context were merely disfavored.  *See United States v. Moesser*, 2010 WL 4811945 at *26-27 (D. Utah Nov. 19, 2010) (unpublished) (noting shift).  And the Tenth Circuit has subsequently confirmed that "[w]here a vagueness challenge does not implicate First Amendment freedoms, our review is limited to the

'application of the statute to the particular conduct charged.'" *United States v. Michel,* 446 F.3d 1122, 1135 (10th Cir. 2006), *quoting Reed,* 114 F.3d at 1070.

Accordingly, because Plaintiffs raise only a facial vagueness challenge to the "continuous possession" provision of § 18-12-302(2), and because their challenge falls outside of the First Amendment context, this Court should reject their claim without reaching the merits.

### B. The "continuous possession" requirement is not unconstitutionally vague on its face.

Even if a facial vagueness challenge were permissible here, Plaintiffs' claim fails on the merits. The grandfather clause in general, and the "continuous possession" requirement in particular, plainly prohibits on the one hand, and allows on the other, some of the core conduct in which Plaintiffs wish to engage. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497 (1982). That fact alone should terminate their facial claim, because it demonstrates that the "continuous possession" requirement is not "incapable of valid application." *Dias v. City and County of Denver,* 567 F.3d 1169, 1179-80 (10th Cir. 2009).

"Facial challenges are strong medicine." *Ward v. Utah*, 398 F.3d 1239, 1246 (10th Cir. 2005). As the Supreme Court has explained, "[a]lthough passing on the validity of a law wholesale may be efficient in the abstract, any gain is often offset by losing the lessons taught by the particular, to which common law method normally looks." *Sabri v. United States*, 541 U.S. 600, 608–09 (2004). Accordingly, "a statute with some arguably vague elements is not automatically vague on its face in violation of the Fourteenth Amendment." *Dias,* 567 F.3d at

32

1180; *see also Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1367 (10th Cir. 1981). Rather, to fail a facial vagueness challenge, the statute must be "utterly devoid of a standard of conduct so that it 'simply has no core' and cannot be validly applied to any conduct." *High Ol' Times v. Busbee,* 673 F.2d 1225, 1228 (11th Cir. 1982), *quoting United States v. Powell,* 423 U.S. 87, 92 (1975); *see also United States v. Gaudreau,* 860 F.2d 357, 364 (10th Cir. 1988).

When construing a statute under Colorado law, as Plaintiffs' challenge requires, "the duty of the reviewing court is to construe the statute so as to uphold its constitutionality whenever a reasonable and practical construction may be applied to the statute." *See People v. Longoria*, 862 P.2d 266, 270 (Colo. 1993); *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1121 (10th Cir. 2008). When evaluating a Colorado statute that is subject to several interpretations, Colorado's rules of statutory construction require selection of the interpretation that best harmonizes both legislative intent and constitutional requirements. *See People v. R.M.D.,* 829 P.2d 852, 853 (Colo. 1992). While a court cannot rewrite a statute, it may read in a *mens rea* requirement if one is consistent with statutory intent. *See* § 18-1-503(2) ("Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such a culpable mental state"); *see also People v. Moore,* 674 P.2d 354 (Colo. 1984) (requisite mental state may be implied from the statute).

The public debate surrounding the passage of § 18-12-302 was particularly intense, and resulted in widespread misconception about the intent and scope of the bill.  In response to concerns that the statute was a backdoor attempt to ban all magazines and that the grandfather clause was laden with traps for the unwary, the Governor's signing statement rejected an expansive interpretation of the bill, instead stating "that the large capacity magazine ban should be construed narrowly to ensure compliance with the requirements of the Second Amendment and the Due Process Clause of the 14th Amendment." *See* Doc. 40-1.  The Governor went on to request that the Colorado Department of Public Safety, in consultation with the Attorney General, issue "Technical Guidance on how the law should be interpreted and enforced in Colorado." *Id.*

The Attorney General subsequently issued two Technical Guidance letters, the second of which was negotiated with the Plaintiffs just prior to the preliminary injunction hearing in this case.  *See* Doc. 29-2, Doc. 59-1.  Both were signed by the Attorney General and issued at the Governor's request.  *See* Colo. Rev. Stat. § 24-31-101(b).  Under Colorado law they are "entitled to respectful consideration as a contemporaneous interpretation of the law by a governmental official charged with the responsibility of such interpretation." *Colorado Common Cause v. Meyer*, 758 P.2d 153, 159 (Colo. 1988); *see also Phelps v. Hamilton*, 59 F.3d 1058, 1070 (10th Cir. 1995) ("Among the statutory construction tools available to us are…to some degree…the interpretation of the statute given by those charged with enforcing it").

The first letter stated in pertinent part that the bill could not be reasonably construed as "barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual physical presence of the temporary transferee." Doc. 29-2. Further, "an owner should not be considered to have 'transferred' a large-capacity magazine or lost 'continuous possession' of it simply by handing it to a gunsmith, hunting partner, or an acquaintance at a shooting range with the expectation that it will be promptly returned." *Id*. The second letter provided additional detail, stating that:

> The phrase 'continuous possession' in HB 1224 shall be afforded its reasonable, every-day interpretation, which is the fact of having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent. "Continuous possession" does not require a large-capacity magazine owner to maintain literally continuous physical possession of a magazine. "Continuous possession" is only lost by a voluntary relinquishment of dominion and control."

Doc. 59-1.

Colorado law protects an individual from criminal liability for prohibited conduct if such conduct is permitted by "[a]n official written interpretation of the statute or law relating to the offense, made or issued by a public servant, agency, or body legally charged or empowered with the responsibility of administering, enforcing, or interpreting a statute, ordinance, regulation, order, or law." § 18-1-504(2)(c). The Governor is the only defendant in this case, and the two Technical Guidance letters, along with the signing statement, are his official written interpretation of § 18-12-302. This Court's review of Plaintiffs' facial challenge

35

should account for this binding effect under Colorado law.[6]  *See* Colo. Rev. Stat.

§ 18-1-504(2)(c).

The analysis in the Technical Guidance parallels criminal cases that have

analyzed and applied similar concepts in the double jeopardy context.  For example,

in *United States v. Jones,* 533 F.2d 1387 (6th Cir. 1976), the defendant was charged

with five counts of unlawful possession of a firearm, based on his possession of the

same firearm on five separate occasions.  On appeal, he argued that he had

"committed only one offense because of his continuous and uninterrupted possession

of the same weapon."  *Id.* at 1390.  The Sixth Circuit agreed, holding that

"[p]ossession is a course of conduct, not an act; by prohibiting possession Congress

intended to punish as one offense all of the acts of dominion which demonstrate a

continuing possessory interest in the firearm."  *Id.* at 1391.

More recent cases, including one unpublished decision from the Tenth

Circuit, have followed this approach.  *See United States v. Martin*, 2000 U.S. App.

LEXIS 616, 2000 WL 33526 (10th Cir. Jan. 18, 2000).  *Martin* adopted the "course of

conduct" analysis, and favorably cited *United States v. Horodner,* 993 F.2d 191 (9th

Cir. 1993), in which the court vacated one of two separate convictions for being a

---

[6] The extent to which Plaintiffs still maintain that the "designed to be readily
converted" language in § 18-12-301(2)(a)(I) is unconstitutionally vague or somehow
effectively bans all magazines that are equipped with a removable baseplate is
unclear.  The two Technical Guidance letters reject this interpretation.  As the
second letter states: "Magazines with a capacity of 15 or fewer rounds are not large
capacity magazines as defined in HB 13-1224 whether or not they have removable
base plates."  Doc. 59-1.  As with the "continuous possession" requirement, this
interpretation is binding on the Governor and should guide this Court's
interpretation of the law.

felon in possession of a single firearm over the course of several months.  Evidence at trial in *Horodner* established at least one break in physical custody, a ten-day period in which the defendant left his shotgun with a gunsmith for repair.  *Id.* at 193.  The Ninth Circuit vacated the second conviction because during this period the defendant "retained the right to possess and control" the shotgun.  *Id.*  "In short," the court held, "he retained constructive possession" and his "possession was one uninterrupted course of conduct."  *Id.*

The Attorney General's Technical Guidance letters employ similar reasoning, and indicate that the "continuous possession" requirement of the grandfather clause connotes a course of conduct, rather than actual, physical possession at all times. This interpretation demonstrates that the statute has an easily discernible core, under which the course of conduct associated with "continuous possession" can be interrupted by "voluntary relinquishment of dominion and control." Doc. 59-1. Thus, "continuous possession" would be unequivocally interrupted if the owner sold, gifted, or indefinitely leased an LCM to someone else. But the owner would not voluntarily give up dominion and control by leaving a magazine with a gunsmith, or by storing it at his home, in a locker at the gun range, or in his neighbor's safe.

This is not to say that the language of the grandfather clause would be simple to apply under every hypothetical circumstance.  But facial vagueness does not follow from the possibility that there may be difficult cases at the margins. "A statute challenged for vagueness does not depend on whether the challengers can posit some obscure and difficult application of the legislation which causes

confusion.  It is doubtful whether any criminal statute could survive such scrutiny."
*Coalition of N.J. Sportsmen v. Whitman*, 44 F.Supp.2d 666, 682 (D.N.J. 1999).

Moreover, although the lack of an express scienter requirement does not, on its own, demonstrate vagueness, this Court may read a mental state into a statute under Colorado law in order to preserve its constitutionality.  *See* § 18-1-503(2); *see also Gorman v. People*, 19 P.3d 662, 665 (Colo. 2000) ("legislative silence on the element of intent in a criminal statute is not to be construed as an indication that no culpable mental state is required.  Rather, the requisite mental state may be implied from the statute.").  A "course of conduct" analysis, especially when considered together with the Technical Guidance's reference to "voluntary relinquishment of dominion and control," suggests that loss of "continuous possession" would require, at a minimum, knowing conduct.[7]  Nonetheless, with or without this requirement, Plaintiffs are unable to satisfy the demanding standard of proof associated with a claim of facial vagueness.  This Court should rule in the Governor's favor on Count III as a matter of law.

----

[7] To the extent that Plaintiffs continue to allege vagueness as to other aspects of § 18-12-302, implying a scienter requirement remains an option where necessary to preserve the statute's constitutionality.  *See Gorman,* 19 P.3d at 665.  Plaintiffs have asserted, for example, that due to differing spring tolerances, it is sometimes possible to force a sixteenth round into a fifteen-round magazine, thereby making the magazine a large-capacity magazine by virtue of the fact that it is "capable of accepting" more than fifteen rounds.  *See* Doc. 116, ¶ 41.  Consistent with the Governor's signing statement and the Attorney General's Technical Guidance, holding the new purchaser of a magazine strictly liable for the purchase would represent exactly the type of trap for the unwary that the Governor's signing statement sought to avoid.  Rather than casting doubt on the constitutionality of the statute as a whole, however, these hypothetical scenarios suggest that a culpable mental state of "knowing" should be implied in order to discount this possibility.

V.     **Plaintiffs' ADA claims fail as a matter of law.**

Finally, Plaintiffs' novel claims under the Americans with Disabilities Act ("ADA") should fail as a matter of law because they are not cognizable under Title II of the ADA.

Plaintiffs claim that "[d]isabled individuals, including the Disabled Plaintiffs, are subject to discrimination by the prohibition on magazines in HB 1224 because they have far less ability to defend themselves than do able-bodied persons."  Doc. 116, ¶ 187.  Plaintiffs also assert that "[p]ersons with disabilities also routinely transfer firearms to one another and to and from persons who aid them in participation in shooting sports and self-defense," and that "HB 1229's restrictions of such temporary transfers restrain persons with disabilities from engaging in conduct that is essential to the exercise of their Second Amendment rights."  *Id.* ¶¶ 189, 190.  Thus, Plaintiffs claim that § 18-12-112 and § 18-12-302 violate Title II of the ADA.

A claim for relief under Title II of the ADA requires a plaintiff to establish that: 1) he is a qualified individual with a disability; 2) due to the disability, he was denied the benefits of government operations; 3) there is a reasonable accommodation that could have been made by the governmental entity that would permit him to enjoy such benefits; and 4) that he has sought that accommodation from the governmental entity and has been denied.  *Grider v. City of Aurora,* 2013 WL 3927661 (D. Colo. July 20, 2013) at *2, *citing Tsombanidis v. West Haven Fire Dept.,* 352 F.3d 565, 578-79 (2d Cir. 2003).

Title II of the ADA provides that "no disabled person shall, by reason of his disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA does not define "service, program, or activity." While a few courts have construed this phrase broadly – as "anything a public entity does," *see, e.g., Barden v. City of Sacramento,* 292 F.3d 1073, 1077 (9th Cir. 2002) – the Tenth Circuit is not one of them. Indeed, in *Elwell v. Okla. Ex rel. Bd. of Regents of the University of Okla.*, 693 F.3d 1303, 1306 (10th Cir. 2012), the Tenth Circuit explicitly rejected the broad approach, holding instead that "an agency's services, programs and activities refer to the 'outputs' it provides some public constituency." *Id.* The *Elwell* panel relied on the dictionary and standard rules of statutory interpretation to develop more precise definitions for each category, concluding that: 1) "services" are acts done for the benefit of another; 2) "'programs of a government entity' refers to its 'projects or schemes'"; and 3) "the placement of the term 'activity' suggests an effort to capture all the *outputs* the public entity provides to the public it serves." *Id.* at 1306-07 (emphasis added). The court took care to emphasize that, although the term "activities" could be read very broadly in isolation, a better reading would account for context and thereby ensure that it does not "rope in everything the public entity does." *Id.* at 1307.

The opinion in *Elwell* focused on whether Title II of the ADA covers employment, but its reasoning is consistent with that of other courts, which have placed limits on what constitutes a "public service, program, or activity" under the

Act. *Aswegan v. Bruhl,* 113 F.3d 109 (8th Cir. 1997), analyzed a prison inmate's complaint that his cell's lack of cable television reception violated the ADA. Reversing a district court's ruling in the inmate's favor, the Eighth Circuit Court of Appeals held that "the cable television sought by Aswegan is not a public service, program, or activity within the contemplation of the ADA," and that the relief he sought was thus "not covered by [42 U.S.C.] § 12132." *Id.* at 110.  Courts in other circuits have reached similar conclusions in a variety of different settings. *See, e.g. Rosen v. Montgomery County,* 121 F.3d 154, 157 (4th Cir. 1997) (rejecting claim that the act of arrest is a governmental "service, program, or activity"); *Filusk v. Town of Weston*, 266 F.Supp.2d 322, 328 (D. Conn. 2003) (finding that personnel and equipment engaged by municipality to provide services such as public education, public transportation, or law enforcement are not services or programs within meaning of Title II of the ADA, rather they are conduits used by public entity to provide services, programs, and activities); *S.G. v. Barbour County Dept. of Human Resources*, __So.3d__, 2013 WL 5861500 (Ala. Civ. App. 2013) (proceeding to terminate parental rights is not a governmental service, program, or activity).

Nor does the second phrase of § 12132 – "or be subjected to discrimination by any such entity" – operate as a "catch-all" that stretches the ADA's coverage beyond governmental outputs. *Elwell*, 693 F.3d at 1308.  Rather, a contextual review of the ADA as a whole "unambiguously demonstrates that Congress intended Title II to be confined to the context of public services." *Canfield v. Isaacs*, 523 F.Supp.2d 885, 890 (N.D. Ind. 2007).  The ADA applies to "qualified individual[s] with a disability."

42 U.S.C. § 12131.  To bring an actionable claim under Title II, an individual "*must meet the essential requirements for the receipt of services or the participation in programs or activities provided by a public entity.*"  42 U.S.C. § 12131 (2) (emphasis added).  The statute assumes a relationship between a public entity, on the one hand, and a member of the public, on the other.  *Zimmerman v. Oregon DOJ*, 170 F.3d 1169, 1176 (9th Cir. 1999).  The former *provides* an output that the latter *participates in or receives.  Id.*  The phrase "qualified individual with a disability" makes clear that Title II applies only "to people who receive the services of, or participate in the programs or activities of, a public entity[.]"  *Canfield*, 523 F.Supp.2d at 890.  Thus, "the first clause precludes an agency from discriminatorily 'exclud[ing]' or 'den[ying] benefits' to disabled persons who are eligible for the services, programs or activities the agency provides to the public.  The second does distinctly additional work by prohibiting the agency from engaging in other forms of discrimination against those same individuals."  *Elwell,* 693 F.3d at 1308.

Under *Elwell*, neither § 18-12-112 nor § 18-12-302 implicates Title II of the ADA.  Plaintiffs have not alleged that either statute provides or relates to a governmental service, program, or activity.  For good reason: they do not.  Rather, § 18-12-302 simply limits the capacity of ammunition magazines.  As a public safety regulation, the statute is not itself a governmental service, program or activity.

Similar reasoning applies to Colorado's background check requirements. Section 18-12-112 does, indirectly, involve government activity – the state's management of background checks.  But Plaintiffs make no claim and have offered

no evidence to support a conclusion that any disabled individual would have extra difficulty initiating a background check for a private sale due to a disability.  And even if they had made that claim, any such problem would arise from the pre-existing background check system itself, rather than its expansion to cover private sales.  Nor do Plaintiffs allege or offer any evidence suggesting that the various exceptions to § 18-12-112 affect them in some way that differs from able-bodied individuals.[8]  Accordingly, Plaintiffs' ADA claims fail as a matter of law.

## CONCLUSION

The Court should rule in favor of the Defendant, uphold the constitutionality of § 18-12-112, § 18-12-302, and reject Plaintiffs' ADA claim

Respectfully submitted this 14th day of March, 2014.

JOHN W. SUTHERS
Attorney General

s/ *Matthew D. Grove*

KATHLEEN SPALDING*
Senior Assistant Attorney General
MATTHEW D. GROVE *
Assistant Attorney General
STEPHANIE SCOVILLE*
Senior Assistant Attorney General
LEEANN MORRILL*
First Assistant Attorney General
Attorneys for Governor John W. Hickenlooper

---

[8] In any event, in interpreting language similar to Title II found in the Rehabilitation Act, the Supreme Court has held that a facially neutral governmental restriction does not deny "meaningful access" to the disabled simply because disabled persons are more likely to be affected by it.  *Alexander v. Choate,* 469 U.S. 287, 303–04 (1985) (ceiling on number of inpatient hospital days paid for by Medicaid program did not deny meaningful access to Medicaid services).

*Counsel of Record
1300 Broadway, 10th Floor
Denver, Colorado  80203
Telephone:  720-508-6000

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014 I served a true and complete copy of the foregoing TRIAL BRIEF upon all counsel of record listed below via the CM/ECF system for the United States District Court for the District of Colorado:

| | |
|---|---|
| David B. Kopel | david@i2i.org |
| Jonathan M. Anderson | jmanderson@hollandhart.com |
| Richard A. Westfall | rwestfall@halewestfall.com |
| Peter J. Krumholz | pkrumholz@halewestfall.com |
| Marc F. Colin | mcolin@bcjlpc.com |
| Anthony J. Fabian | fabianlaw@qwestoffice.net |

_s/  Matthew D. Grove_