IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION, *et al.*,

     Plaintiffs

v.

JOHN W. HICKENLOOPER, Governor of the State of Colorado,

     Defendant.

---

## PLAINTIFFS' TRIAL BRIEF

---

## I.    INTRODUCTION

The Tenth Circuit follows the two-step analysis most circuits have adopted for Second Amendment challenges to state and local regulations of firearms in the wake of *Heller* and *McDonald*. The Court first should consider whether the regulation burdens Second Amendment rights. If it does, then the burden shifts to the government to justify the restriction based upon a sliding scale.

If the burden is severe (such as the handgun ban in *Heller*) then strict scrutiny applies. As the Supreme Court noted, the handgun ban at issue there failed any level of scrutiny applicable to enumerated rights, including strict scrutiny. If the burden is significant and the persons affected are law-abiding citizens, then heightened scrutiny is in order such as that used in *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011) ("The City must establish a close fit between the range ban and the actual public interest it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights."). If the Second Amendment burden is on persons other than law-abiding citizens, or if the burden is not substantial, then, generally, intermediate scrutiny is applied. *See United States v. Reese*, 627

F.3d 792, 802-03 (10th Cir. 2010) (upholding firearms restrictions on persons adjudicated as domestic abusers; restrictions imposed must be "substantially related to an important government objective"). This methodology for analyzing Second Amendment claims was recently reaffirmed by the Ninth Circuit in *Peruta v. County of San Diego*, -- F.3d --, 2014 WL 555862 (9th Cir. Feb. 13, 2014), in an opinion that categorically rejects the approach urged by the Defendant here to essentially defer to the rationale adopted by the Colorado General Assembly in adopting the challenged legislation.

HB 1229 and HB 1224 substantially burden Second Amendment rights. HB 1229 burdens far more than private sales. It requires in-person background checks between the transferor and the transferee for the most routine temporary loaning of firearms for day-to-day gun ownership and use. Any loan of more than 72 hours is covered. Even loans within the 72-hour timeframe impose additional liability by making the transferor jointly and severally liable for damages "proximately caused by the transferee's unlawful use." For the vast number of Coloradans living in rural areas, in-person background checks are prohibitively difficult to obtain. Many Federal Firearm Licensees ("FFLs") are an hour or more drive-time away from rural Coloradans, including the farmers and ranchers who are members of plaintiff Colorado Farm Bureau. Even if someone wanted to make the drive, many, if not most, rural FFLs are refusing to perform the checks (which impose potential liability on the FFL) for the $10 maximum fee allowed under the statute. The Defendant cannot meet his burden to justify these restrictions. Defendant can offer no evidence that *any* public benefit is derived from such an onerous scheme, and indeed the State's own data indicate that the number of background checks has actually *decreased* since HB 1229 became effective.

HB 1224 represents a categorical ban dissimilar from *Heller* only in degree. Common firearms used by law-abiding citizens for self-defense are protected under the Second Amendment. Rifles using 20- and 30-round magazines and the magazines themselves number in the millions. Handguns using 17-round magazines are equally as common. The 15-round cut-off adopted by the Colorado General Assembly is wholly arbitrary and outlaws common firearms based upon little more than speculation.

This Trial Brief is broken down as follows. First, Plaintiffs will address the appropriate legal standards for Second Amendment cases in this Circuit. Next, they will discuss why the Defendant should be precluded from introducing after the fact novel arguments, justifications, expert opinions and data not considered by the General Assembly in an attempt to justify the measures after the fact. Following that, Plaintiffs will address HB 1229, discuss its harm on Second Amendment rights and why the Defendant cannot meet his burden to justify 1229's restrictions, especially on the routine loaning of firearms. Next, Plaintiffs will discuss why HB 1224 violates the Second Amendment. Plaintiffs will finish with sections on the Americans with Disabilities Act and their vagueness challenge.

## II.   THE LEGAL STANDARD FOR ASSESSING SECOND AMENDMENT CLAIMS IN THE TENTH CIRCUIT

The Tenth Circuit uses a two-step test to analyze Second Amendment issues. *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) ("In *United States v. Reese* . . . this court adopted a 'two pronged approach' to Second Amendment claims.").

### A.   The First Step: Identify Burdens on Second Amendment Rights

The first step is for the reviewing court to ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does, the

court must then evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid. *Reese*, 627 F.3d at 800-01.

"[T]o determine whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee, we first ask whether the Second Amendment provides a right to [do the prohibited conduct]." *Peterson*, 707 F.3d at 1209. The Tenth Circuit "agree[s] with the Fifth Circuit that in applying the two-step approach to Second Amendment claims, we consider at the first step 'whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee.'" *Id.* at 1211 (quoting *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)). As the Ninth Circuit forcefully reiterated in *Peruta*, an historical assessment is very important to understanding the scope of the Second Amendment rights at issue. As the Ninth Circuit noted: "In short, the meaning of the Second Amendment is a matter not merely of abstract dictionary definitions but also of historical practice." *Peruta*, 2014 WL 555862, at *4.

Application of the two-step process in this Circuit follows *Heller*. In *Peterson*, an out-of-state plaintiff who could not obtain a Colorado concealed carry permit, and who was not prohibited by state law from carrying a handgun openly, failed "step one of [the] two-step analysis [because] the Second Amendment does not confer a right to carry concealed weapons." *Peterson*, 707 F.3d at 1209.[1] (The *Heller* court repeatedly and favorably cited state court cases which had upheld the right to carry, while allowing the legislature to prohibit the mode of **concealed** carry. *Heller*, 554 U.S. at 629.)

---

[1] For whatever reason, Mr. Peterson did not challenge Denver's ban on open carry, which was actually the cause of Mr. Peterson's problem. *Peterson*, 707 F.3d at 1208. It should be noted that the *Heller* court repeatedly and favorably cited state court cases which had upheld the right to carry, while allowing the legislature to prohibit the mode of **concealed** carry. *Heller*, 554 U.S. at 629.

In contrast, the statute at issue in *Reese* prohibited certain people (domestic violence misdemeanants) from possessing arms. The Second Amendment burden on adjudicated domestic abusers, nevertheless, easily passed step one: "there is little doubt that the challenged law . . . imposes a burden on conduct, i.e. [plaintiff's] possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment." *Reese*, 627 F.3d at 801. Similarly, the federal statute banning gun possession by illegal aliens also passed step one. *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168-69 (10th Cir. 2012).

### B.      Step Two: Apply the Appropriate Means/Ends Test

"The Supreme Court did not specify in *Heller* precisely what level of scrutiny a reviewing court must apply to the challenged law." *Reese*, 627 F.3d at 801. "Instead, the Court indicated only that the rational basis test is not appropriate for assessing Second Amendment challenges to federal laws." *Id.* (citing *Heller*, 554 U.S. at 628 n.27).[2]

In step two, the court must apply "some level of heightened scrutiny and, in so doing, must look to analogous cases for guidance in precisely what level to apply." 627 F.3d at 801; *see also Ezell*, 651 F.3d at 706-08. In *Reese*, the Court cited with approval a Third Circuit case for the proposition that "the Second Amendment can trigger more than one particular standard of scrutiny, depending, at least in part, upon the type of law challenged and the type of Second

---

[2] Despite the Supreme Court's admonition in *Heller* that heightened scrutiny applies to Second Amendment challenges, the Second Circuit has refused to adopt this approach, arguing that "where the burden imposed by a regulation on firearms is a marginal, incremental ***or even appreciable restraint*** on the right to keep and bear arms, it will not be subject to heightened scrutiny." *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013) (internal quotations and citations omitted; emphasis added).

Amendment restriction at issue." 627 F.3d at 801 (quoting *U.S. v. Marzzarella*, 614 F.3d 85, 97 (3rd Cir. 2010) (internal quotations omitted)).[3]

*Reese* and *Huitron-Guizar* did not involve *Heller*'s paradigmatic "law-abiding citizens." To the contrary, *Reese* was about "people who have been judicially determined to pose a credible threat to the physical safety of a family member, or who have been ordered not to use, attempt to use, or threaten to use physical force against an intimate partner or child that would reasonably be expected to cause bodily injury." *Reese*, 627 F.3d at 802 (internal quotations omitted). After recounting data related to the recidivism rate of domestic violence offenders, the court stated that "[n]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners." *Id.* at 803. Accordingly, the Tenth Circuit in *Reese* applied intermediate scrutiny.

Using intermediate scrutiny, the Tenth Circuit found that the challenged statute is substantially related to its stated objective in plaintiff's case and is consistent with the government's intended purpose in implementing the statute and thus satisfied intermediate scrutiny. *Id.* at 803-04. Similarly, the Tenth Circuit held that the prohibition on gun possession by illegal aliens also satisfied intermediate scrutiny; by definition, an illegal alien is neither "law-abiding" nor a "citizen." *Huitron-Guizar*, 678 F.3d at 1170 (citing *Reese*, 627 F.3d at 802)).

More is required when the regulation at issue encumbers the Second Amendment rights of law-abiding citizens. The Tenth Circuit in *Reese* relied upon, inter alia, the Seventh Circuit's decision in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), which dealt with an analogous

---

[3] The Tenth Circuit has also observed that the Supreme Court methodology is "to consider the rarity of state enactments in determining whether they are constitutionally permissible." *Kerr v. Hickenlooper*, slip op. at 40 (10th Cir. Mar. 7, 2014) (citing and quoting *Heller*, 554 U.S. at 629). As will be detailed infra, state enactments such as HB 1224 and 1229 are rare. Even for the small minority of states which have enactments on the same subject, HB 1224 and 1229 are more severe than most of them.

statutory prohibition on firearms possession. *See Reese*, 627 F.3d at 802 (discussing *Skoien* and noting statutes at issue in two cases "prohibit the possession of firearms by narrow classes of persons who, based on their past behavior, are more likely to engage in domestic violence"). The Seventh Circuit subsequently expounded further on step two of the Second Amendment's analysis where the prohibitions at issue affect "law-abiding, responsible citizens." *Ezell*, 651 F.3d at 708. In this context, "a more rigorous showing than that applied in *Skoien* should be required." *Id.* Per the Seventh Circuit: "The City must establish a close fit between the [challenged law] and the actual public interest it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Id.* In light of the impacts HB 1229 and HB 1224 have on the Second Amendment rights of law-abiding citizens, if the Court does not believe that strict scrutiny is called for, at a minimum, the Court should apply *Ezell's* "close-fit" test.

As set forth in the Final Pretrial Order, the Defendant is urging this Court to adopt an intermediate scrutiny test that in actual application is demonstrably flawed. To the extent there are decisions from other circuits that offer some support for this view, the recently decided *Peruta* decision explains why such an approach is erroneous:

> First, the analysis in the Second, Third, and Fourth Circuit decisions is near-identical to the freestanding "interest-balancing inquiry" that Justice Breyer proposed – and the majority explicitly rejected – in *Heller. See Heller*, 554 U.S. at 689-90 (Bryer, J. dissenting) (proposing that in Second Amendment cases the court should "ask[] whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important government interests"); *see also id.* at 634-35 (majority opinion) (rejecting a "judge-empowering 'interest-balancing inquiry'" as a test for the constitutionality of Second Amendment regulations because "no other enumerated right [had its] core protection . . . subjected to [such] a freestanding" inquiry).

*Peruta*, 2014 WL 555862, at *27. Also, as the Ninth Circuit pointed out, the circuits purporting to apply intermediate scrutiny along the lines suggested by the Defendant erred because of the

"high degree of deference they afforded the state legislatures' assessments of the fit between the challenged regulations and the asserted government interest they served." *Id.* at \*28.

The Ninth Circuit in *Peruta* required the government to engage in "sufficient narrow tailoring" that involved requiring the government to demonstrate that the regulatory measures at issue in fact would advance the stated public benefit. *Id.* at \*28-29 (citing cases). Under this test, the government is required "to prove that the statute [does] not burden the right 'substantially more . . . than is necessary to further [the government's legitimate] interests.'" *Id.* at \*28 (quoting *Turner Broadcasting Systems, Inc. v. FCC (Turner II)*, 520 U.S. 180, 214 (1997)). The Ninth Circuit's analysis tracks the test adopted in *Ezell*. The Court should follow these cases and not resort to either what in fact is an interest-balancing standard, or defer to the conclusory reasoning of the Colorado General Assembly, discussed below.

## III.  THE DEFENDANT IS BOUND BY THE DATA AND TESTIMONY BEFORE THE GENERAL ASSEMBLY AT THE TIME THE BILLS WERE ENACTED

No matter the level of scrutiny deemed appropriate, in order to uphold these measures the Court must find a nexus between the new limitations on firearms ownership and use, and the stated purpose of increasing public safety. Over the course of seven days of hearings on HB 1224 and eleven days of hearings on HB 1229, which fill more than 2,000 combined pages, the House and Senate heard many references to well-known mass shootings, and some less frequent references to studies or data cited for the proposition that previous limits or bans had reduced crime, or that background checks keep guns out of the hands of criminals. But the minimal data cited was disputed, and left many legislators asking whether the bills would save lives, or were only to give the appearance of action in the face of tragedy: "Show me somewhere where we have data that says that a magazine with 10 or 12, or for that matter the amendment, the 15, will

have an impact on lives saved . . . ***Because it makes a difference whether we legislate on facts or legislate just to legislate.***" LH, 2/15/13 at 87-88 (1224) (emphasis added).

The Defendant's plan at trial is to dwarf what the General Assembly actually considered with new information the General Assembly never saw. After the measures were challenged, the Defendant went out in search of data that could justify them after the fact. That is not permissible. The General Assembly enacted the bills, and the question is whether the General Assembly found a sufficient nexus based on what it considered. The opinion of defense experts in a litigation context based on newly-developed analysis or information the legislature never considered cannot answer that question. The Court should not permit the Defendant to shift the focus away from what the General Assembly did to what Defendant's experts have done since. Under either strict or intermediate scrutiny, the reasonableness of HB 1224 and HB 1229 and the General Assembly's enactment of the same must be evaluated in the context of the facts and record before the General Assembly at the time the laws were enacted.

### A.      Strict Scrutiny

Plaintiffs contend the correct analysis is strict scrutiny. The Federal Circuit's opinion in *Rothe Development Corporation v. Department of Defense* provides the framework for disallowing new history in that context. In that case, plaintiff Rothe challenged an Air Force contract award to a competing company. *Rothe Dev't Corp. v. Department of Defense*, 413 F.3d 1327, 1330 (Fed. Cir. 2005). Rothe contended that a federal statute, 10 U.S.C. § 2323, which was designed to make socially and economically disadvantaged businesses more competitive, was a violation of its right to equal protection. *Id.* Rothe argued that because the law presumed businesses run by certain racial and ethnic minorities to be part of the protected class, the law

was facially discriminatory and there was insufficient evidence to support its discriminatory provisions. *Id.*

Rothe contended that evidence that was not presented to Congress should either be stricken from the record or given no weight. Agreeing with Rothe, the Federal Circuit expressed clearly the evidentiary standard in this regard:

> Thus, to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification. Although these statistical studies predate the present reauthorization of section 1207 in 2002, their relevance is unclear because it is uncertain that they were ever before Congress in relation to section 1207. ***Without a finding that these studies were put before Congress prior to the date of the present reauthorization in relation to section 1207 and to ground its enactment, it was error for the district court to rely on the studies***.

413 F.3d at 1338 (emphasis added).

Other decisions have agreed with the *Rothe* court's analysis in holding that the strict scrutiny standard must be applied to the knowledge and facts before legislatures at the time the legislatures pass the challenged laws at issue. *See Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) (any institution that makes a racial distinction must have a strong basis in evidence to conclude that remedial action is necessary before implementing the distinction); *Miller v. Johnson*, 515 U.S. 900, 921 (1995) (under a strict scrutiny analysis, a state must have "convincing evidence" that remedial action is necessary *before* implementing affirmative action statutes).

### B.    Heightened or Intermediate Scrutiny

Even if the Court determines that heightened or intermediate scrutiny is warranted in this case, the evidence considered to justify HB 1224 and HB 1229 should be limited to that which was before the General Assembly at the time of their enactment. *See, e.g., Turner Broadcasting System v. F.C.C. (Turner I)*, 512 U.S. 622, 662 (1994) (applying intermediate scrutiny in First Amendment case). A court must "assure that, in formulating its judgments, [the legislature] has

10

drawn reasonable inferences *based on substantial evidence*." *Id.* at 666 (emphasis added). The Colorado General Assembly drew no inferences whatsoever from the bulk of the Defendant's proposed evidence because it never considered it.

This aspect of *Turner I* has been relied on by both circuit and district courts when analyzing Second Amendment issues. *See Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) ("Thus, our role is only 'to assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence.'"); *Shew v. Malloy*, -- F. Supp. 2d --, 2014 WL 346859 at *8 (D. Conn. Jan. 30, 2014) ("Accordingly, the court must only 'assure that, in formulating its judgments, [Connecticut] has drawn reasonable inferences based on substantial evidence.'"). Implicit in the concept of drawing reasonable inferences based on substantial evidence is that the evidence is actually presented to the legislature for its consideration prior to the enactment of the statute at issue.[4]

Other courts have held that under an intermediate scrutiny standard (and even under a lower standard), the reasonableness of a legislature's conduct must be evaluated based on the evidence before it at the time the challenged law is enacted. *See Hughes v. Oklahoma*, 441 U.S. 322, 338 n.20 (1979) (under intermediate scrutiny, the State cannot rely on its lawyers to sift through the legislative record and provide post-hoc rationalizations for statutory restrictions on fundamental rights); *United States v. Carolene Products Co.*, 304 U.S. 144, 154 (1938) ("such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it"); *Hutchins v. D.C.*, 188 F.3d 531, 567 (D.C. Cir. 1999) (under intermediate scrutiny, a

---

[4] The Second Amendment analysis employed by *Kachalsky* and *Shew* was flawed for the reasons explained in *Peruta*, 2014 WL 555862, at *27, but even these courts correctly considered only the evidence that was before the legislatures at the time of enactment.

court must independently examine "the evidence before the legislature to determine whether an adequate foundation justified the challenged burdens").

Defendant is also precluded from alleging that certain public policies justify infringements of fundamental rights when those policies were never considered by the legislature in the first place. In *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150, 169 (2002) (Breyer, J., concurring) (invalidating on First Amendment grounds ordinance prohibiting canvassing activities without a permit), Justice Breyer noted in his concurrence that the city's "crime prevention" justification for the ordinance was "not a strong one" because there was no indication that the city considered this justification when passing the ordinance. "In the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given." *Id.* at 170. Per Justice Breyer, if the city actually thought that preventing burglaries or violent crimes was an important justification for the ordinance at issue, "it would have said so." *Id.* Similarly, any additional public policy considerations raised by Defendant *after* the passage of HB 1224 and HB 1229 should not be given any weight.

Thus, Defendant should be precluded from introducing new evidence, testimony, or novel public policy considerations beyond the legislative record at the time HB 1224 and HB 1229 were enacted by the General Assembly to meet his burden to justify encumbrances on the Second Amendment rights at issue here.

## IV.   HB 1229 VIOLATES THE SECOND AMENDMENT

### A.   HB 1229 Substantially Burdens Core Second Amendment Rights

It is important to clarify what Plaintiffs are ***not*** challenging regarding HB 1229. Colorado's law requiring background checks for the commercial, retail sale of firearms is "presumptively" constitutional because it "impos[es] conditions and qualifications on the

*commercial* sale of firearms." *Heller*, 554 U.S. at 626 (emphasis added). Further, its serves the constitutionally legitimate purpose of preventing possession of firearms by felons and the mentally ill. *Id.* Nor do Plaintiffs base their claim on a theory that background checks on ***private*** firearm sales are necessarily unconstitutional.

Plaintiffs' claim involves the non-commercial sale and loans of firearms, by persons who are not engaged in the firearms business, which is outside *Heller*'s comment about commercial sales. Plaintiffs challenge imposing background checks on private sales to the extent the means chosen by the General Assembly are arbitrary, dysfunctional, and fail to satisfy the appropriate least restrictive alternative standard.[5]

HB 1229 substantially harms important Second Amendment rights. Acquiring firearms is essential to the core right to use firearms in lawful self-defense, as is the right to acquire the items necessary to exercise the right. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687-89 (1977); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Loaning of firearms, like private sale of firearms, is an essential aspect of firearm acquisition and is long established as a typical activity for which Americans do not need to seek prior government permission.

Consistent with *Ezell*, which involved access to firing ranges for target practice, routine loaning of firearms is a necessary part of the right to keep and bear arms. For Colorado Youth Outdoors, routine loaning is essential for teaching young persons the basics of firearm use and safety, so HB 1229 imposes substantial burdens on CYO. Similarly, farmers and ranchers routinely loan firearms to hands and to one another, and HB 1229 substantially encumbers their

---

[5] HB 1229 does not ban firearms purchases, with one exception: its *de facto* prohibition on 18- to 20-year-olds purchasing handguns, which is described below.

normal, everyday use of firearms to protect themselves, their livestock and their property. Finally, Plaintiffs routinely transfer firearms to friends, fellow shooters, fellow members of shooting organizations, etc., as part of routine keeping and bearing of arms. The "exceptions" do not come close to entailing all of the common loan situations and the 72-hour restriction is especially harmful.

### B.   Defendant Cannot Justify 1229's Encumbrances on Plaintiffs' Second Amendment Rights

In *Ezell*, the standard of review was "not quite 'strict scrutiny,'" and the defendant did "not come close to satisfying this standard" because the defendant "presented no data or expert opinion." *Id.* at 709. In the instant case, Defendant will offer data and expert opinion in support of background checks on private *sales*.[6] Defendant has, however, presented no data and expert opinion about *loans*, and certainly no data on constricting such loans to only 72 hours.

HB 1229 plainly fails whatever means test this Court chooses to apply, for several reasons.

*First*: HB 1229 is ineffective. HB 1229 resulted in a *decrease* in background checks on private sales.

*Second*: HB 1229 makes background checks difficult to obtain. To illustrate, one may contrast C.R.S. § 24-33.5-424 (background check system for retail sales) against HB 1229 (private loans or sales). The background check system for retail sales requires no additional travel by any party. As with any retail storefront, the customer must come to the store. The background check will take place at the store at the time of purchase, and so does not burden the customer with extra travel.

---

[6] As discussed above, Defendant should not be permitted to present data that was not presented the General Assembly.

In contrast, the loans and transfers covered by HB 1229 involve people who are not at a store. When a rancher wants to loan a gun to her neighbor, both of them can meet can be close to home. Under HB 1229 they would have to travel to consummate the loan, often an hour or more each way. No Coloradan should have to spend the better part of a day to obtain a background check to loan a firearm to a neighbor or a friend for a few days or weeks.

**Third:** HB 1229's FFL fee cap wholly debilitates 1229's regulatory scheme. The cap of $10 for private sales is far below an FFL's practical cost of processing the paperwork, and risks felonies for paperwork errors. Accordingly, the fee cap greatly reduces the number of FFLs who are willing to process private sales. Fewer than 365 of 1,698 FFLs in Colorado processed even a single private sale or loan in Colorado in July-September, according to CBI data.[7] Contrast HB 1229's fee cap with the situation in a retail sale from the FFL's own inventory in which the FFL charges whatever price he or she wishes, to cover all the costs associated with the sale.

The situation is the same for private sales at a gun show, in effect since 2000. C.R.S. § 12-26.1-101. There is no extra travel burden on either party because they are both at the gun show. There also is no "burden" on the FFL who processes the background check. Pursuant to C.R.S. § 12-26.1-101(2), a gun show operator must hire a FFL to process private sales. The gun show background check statute sets no restrictions on the terms of the contract between the gun show operator and the FFL who will provide the service, so the FFLs performing the checks can insure that they are appropriately compensated.

For non-1229 background checks, FFLs can set the price for the service of guiding a buyer through filling out the Federal Form 4473, and then contacting CBI for a background

---

[7] Total Colorado FFL figure from Defendant's "0113-ffl-list-Colorado.xlsx" spreadsheet, produced during discovery. Numbers of private transactions processed by individual FFLs from CBI document production, nos. CBI 00002-00009.

check. The evidence will show this is usually between $30 to $50. When the FFL is selling from his own inventory, the price is implicitly taken into account in the mark-up of the firearm. When the FFL is *not* selling out of his or her own inventory (for example, processing mail-order sale of a handgun from a private seller in Illinois to a private buyer in Colorado), then the $30-50 fee is charged directly to the Colorado buyer.

Defendant's own exhibits demonstrate that the large majority of Colorado FFLs are *not* performing background checks for private sales, let alone private temporary loans.[8] Of the minority of FFLs which are doing private background checks, the vast majority have processed only a handful – suggesting that they are performing a money-losing favor for long-time customers.

The legislative record contains numerous claims that 40% of gun sales are private sales. If 60% of gun sales are FFL inventory sales, and 40% are private sales, then the number of background checks should increase by about two-thirds (since 40% private is about two-thirds of the 60% of sales which are FFL inventory sales). Accordingly, the number of background checks should have increased by much more than two-thirds, especially when one considers that HB 1229 applies not only to sales, but also to loans exceeding 72 hours. But instead, *checks on private sales have declined*.[9] HB 1229 wholly fails the "means" prong of any form of heightened scrutiny. If the means is empirically counterproductive, extreme, and a major burden on day-to-day usage of firearms in this State, then the means cannot pass any form of heightened scrutiny.

---

[8] The CBI chose not to keep separate data on background checks for private sales vs. private transfers, so the data is necessarily limited in determining the efficacy of HB 1229. Setting this aside, this data is not relevant, for the reasons identified in Section III, above.

[9] From July through December 2012, CBI performed 3,854 checks on private transfers that did not take place at gun shows. For July through December 2013, CBI performed 3,838 such checks. CBI Instacheck Unit (Feb. 28, 2014), CBI document production, no. 00200. To be sure, the decline of 16 checks is a small number, but there should have been a very large increase, if HB 1229's means were not counterproductive to its ends.

### C.     The Means of HB 1229 Are Extreme

Forty-three states do not require government permission before the private sale or temporary transfer of firearms. Of those that do, sweep far less broadly than HB 1229: they apply only to certain types of guns (handguns, and sometimes also to a subset of long guns), or they have broad exemptions (e.g., transferees who have a concealed carry permit; loan periods much longer than Colorado's 72 hours).

Requiring government permission for the private sale of all long guns has not been part of the historic tradition of gun ownership in America. Only five states in addition to Colorado (New York, Connecticut, Delaware, California, and Rhode Island) have enacted such requirements, three of which did so only last year. 2013 NY ALS 1; 2013 Ct. ALS 3; 2013 Del. Laws Ch. 20 (H.B. 35). Accordingly, HB 1229 in its application to long guns is a novelty.

Two other states require permission for private sales only for some types of firearms. MD Code, Public Safety, §§ 5-101(p), (r), (t), 5-124 (only handguns and "assault weapons"); 18 Pa. Cons. Stat. Ann. §§ 6102, 6111(f)(2) (handguns and certain short rifles and shotguns).

In addition, in other states, the burden of the requirement for government permission for private individual sales is substantially mitigated by various exemptions, which are absent or very constricted in HB 1229. For example, in California, loans of up to 30 days are allowed "between persons who are personally known to each other." Cal. Pen. Code § 27880. HB 1229 only allows loans for 72 hours. In California, a long gun may be loaned to a licensed hunter for the entire "duration of the hunting season for which the firearm is to be used." Cal. Pen. Code § 27950. HB 1229 only allows hunting loans to take place while both parties are actually out in the field hunting, not even at a hunting camp. C.R.S. § 18-12-112(6)(e)(III). Californians can loan their guns indefinitely to target ranges or gun clubs as long as the gun is used on the

premises and stored there. Cal. Pen. Code § 27910. Similarly, Delaware allows loans for up to 14 days "by the owner of said firearm to a person known personally to him or her," DEL. CODE ANN tit. 11 § 1448B(b)(2)a, and Pennsylvania allows loans of an indefinite period in one's dwelling or place of business, as long as the firearm stays there, and indefinite loans to a person with a concealed carry permit. 18 Pa. Cons. Stat. Ann. § 6115(b)(1)(i) & (b)(3).

###### D.    HB 1229 Violates the Second Amendment Rights of 18- to 20-Year-Olds by Prohibiting Them from Acquiring Handguns

Subsection (2)(b) of HB 1229 requires that when an FFL conducts a background check on a private transfer, the FFL "shall comply with all state and federal laws, including 18 U.S.C. § 922, as if he or she were transferring the firearm from his or her inventory to the prospective transferee." The effect of this requirement is to prohibit Coloradans aged 18 to 20 from acquiring handguns. This prohibition violates the Second Amendment.

###### 1.    Subsection (2)(b) prohibits FFLs from conducting background checks for private transfers of handguns to 18- to 20-year-olds

Subsection (2)(b) incorporates by reference the requirements of 18 U.S.C. § 922, and directs FFLs to abide by those requirements. The express terms of section 922 prohibit FFLs from selling or delivering a handgun to anyone under the age of 21. Subsection 922(b)(1) states that it is unlawful for any FFL to "sell or deliver" any firearm, other than a shotgun or rifle, "to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age." Subsection 922(c)(1) further provides that if an FFL sells a handgun to a person who does not appear in person (e.g., by mail order, internet, etc.), the transferee must submit a sworn statement to the FFL that he or she is 21 or more years of age.

Because subsection (2)(b) of HB 1229 requires FFLs to handle background checks for private transfers subject to the requirements of subsections 922(b)(1) and 922(c)(1), and further

requires FFLs to conduct such checks "as if he or she were transferring the firearm from his or her inventory," the effect of HB 1229 is to prohibit FFLs from conducting background checks for the transfer of a handgun to any adult between the ages of 18 and 20.

Thus, the interplay of state and federal law prohibits 18- to 20-year-olds from purchasing handguns FFLs at retail, and further prohibits them from acquiring handguns via private sales or loans. HB 1229, therefore, prohibits any 18- to 20-year-old from legally obtaining a handgun from anyone other than as a gift from an immediate family member.

**2.    The prohibition on transfers of handguns to 18- to 20-year-olds burdens conduct falling with the scope of the Second Amendment**

The Tenth Circuit's decision in *Reese* illustrates that any prohibition on gun possession by a certain category of citizens passes step one of the *Heller* analysis.[10] *Reese*, 627 F.3d at 801; *Huitron-Guizar*, 678 F.3d at 1169.

**3.    Regardless of the level of scrutiny applicable at the second step, Defendant cannot carry his burden because the legislative record is devoid of any justification for prohibiting 18- to 20-year-olds from acquiring handguns**

Even assuming, as the Fifth Circuit has suggested,[11] that a lower level of heightened scrutiny applies to the prohibition on acquisition of handguns by 18- to 20-year-olds, Defendant still cannot carry his burden. This is because "[i]n the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given." *Watchtower Bible*, 536

---

[10] The Fifth Circuit has addressed this question and suggested that the historical evidence indicates that laws prohibiting 18- to 20-year-olds from purchasing handguns does not implicate the Second Amendment. *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012). The court nonetheless acknowledged the "institutional challenges in conducting a definitive review of the relevant historical record," and proceeded to step two of the analysis. *Id.* at 204.

[11] *National Rifle Ass'n*, 700 F.3d at 205. The Fifth Circuit's decision upholding the federal laws prohibiting **retail** sales of handguns to 18- to 20-year-olds has no application in this case, where the effect of section 18-12-112 is to eliminate virtually **all** means of acquisition.

U.S. at 170 (Breyer, J., concurring). "The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

Here, the legislative record is devoid of any justification whatsoever for prohibiting 18- to 20-year-olds from acquiring handguns. The issue is not even mentioned, much less justified. Thus, any reasons supplied by Defendant for the prohibition are necessarily *post hoc* and unworthy of consideration. Defendant cannot carry his burden on step two of the analysis, and the prohibition therefore constitutes a violation of the Second Amendment.

## V.   HB 1224 VIOLATES THE SECOND AMENDMENT

Because of the length of this section, a brief introductory comment is in order. As the Ninth Circuit just noted in *Peruta*, "the meaning of the Second Amendment is a matter not merely of abstract dictionary definitions but also of historical practice." 2014 WL 555862 at *4. The ban at issue in this case relates to a type of arm: handguns and rifles with magazines that hold 16 or more rounds. Under *Heller*, the arms that law-abiding citizens have a Second Amendment right to "keep and bear" are those "in common use at the time." 554 U.S. at 627. In our time, tens of millions of magazines banned by HB 1224 are "[t]ypically possessed by law-abiding citizens for lawful purposes." *Id*. at 625. "At the time" of adoption of the Second Amendment, such magazines were the finest arms. At the time of the Fourteenth Amendment, such magazines were common. The original understanding of the Second and Fourteenth Amendments carries forward to our time, forbidding prohibition of the arms that are chosen by the American people "in defense of hearth and home" today. *See Heller*, 554 U.S. at 635; *Peruta*, 2014 WL 555862 at *7-18; *Ezell*, 651 F.3d at 705 ("As we have noted, the most relevant historical period for questions about the scope of the Second Amendment as applied to the States is the period leading up to and surrounding the ratification of the Fourteenth Amendment.").

Firearms that were in "common use at the time," as explained by the Supreme Court in *Heller*, are the flipside of "dangerous and unusual weapons." 554 U.S. at 627. The former are protected by the Second Amendment. The latter can be heavily regulated.

This section of the Trial Brief will start with the American history and tradition of arms and show that magazines which can accept at least 16 rounds are more than 400 years old, and they are venerable in the history and tradition of how Americans exercise their right to keep and bear arms. For a broad array of arms in common use, magazines holding at least 16 rounds have also been in common use as part of Americans exercising their Second Amendment rights. Turning to the second part of the *Reese* test, Plaintiffs will demonstrate why the ban at issue here should be struck down under any form of scrutiny. HB 1224 substantially burdens the Second Amendment rights of typical law-abiding citizens, and Defendant cannot meet his correspondingly great burden to legitimate it.

**A.     HB 1224 Substantially Burdens Core Second Amendment Rights**

**1.     The History of Magazines Reflects That They Have Been "In Common Use" Since the Adoption of the Second Amendment to Today**

Guns with magazines holding more than 15 rounds are older than the Second Amendment. As early as 1580 to 1590 a single barrel firearm was developed that would fire sixteen shots without reloading.[12]

At the time that the Second Amendment was being ratified, the state-of-the-art for guns with magazines of at least 16 rounds was the Girandoni air rifle, with a 20- or 22-shot magazine

---

[12] This was accomplished through superposed loads (each load stacked on top of previous loads in the same barrel), and was fired through the use of two wheel locks and one matchlock mounted on the gun. LEWIS WINANT, FIREARMS CURIOSA 168-70 (2009)(1st pub. 1954). For a survey of some early multishot guns, Clayton E. Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716-18 (2008) (noting that such guns were first issued to the British army in 1658).

capacity. Merriweather Lewis carried one on the Lewis & Clark expedition. At the time, air guns were ballistically equal to powder guns, firing large bullets at a velocity similar to powder guns. The .46 and .49 caliber Girandoni rifles had been invented around 1779 for use in European armies, and was employed by elite units. One shot could penetrate a one-inch wood plank, or take an elk.[13]

"It is clear that the goal of multi-shot firearms was on the mind of gunsmiths, inventors, and shooters in 1791. Rudimentary repeating firearms existed, as did magazine-fed firearms. Faster, more secure and weather-resistant ignition technology was being pursued at the time of the drafting of the federal Bill of Rights. . . . Guns were in hand and getting better with every generation."[14]

The most popular multi-shot firearms of the Early Republic were "pepperbox" handguns. These handguns had several barrels, each of which could be preloaded with a round. Most pepperboxes held eight or fewer rounds,[15] but some more European pepperbox guns held 16 or more rounds.[16]

Leading up to the adoption of the Fourteenth Amendment, from 1836 to 1873, there were 120 patents issued for magazine-based guns.[17] Some of the inventors of rifles with more than 15

---

[13] JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 91-103 (2012); JOHN PLASTER, THE HISTORY OF SNIPING & SHARPSHOOTING 69-70 (2008); Girandoni Air Rifle, http://en.wikipedia.org/wiki/Girandoni_Air_Rifle; JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[14] Cramer & Olson, 44 WILLAMETTE L. REV. at 721.

[15] *See generally* LEWIS WINANT, PEPPERBOX FIREARMS (2001 reprint ed.).

[16] SUPICA, TREASURES at 33, 250 (Marietta 18 shot model); JACK DUNLAP, AMERICAN, BRITISH AND CONTINENTAL PEPPERBOX FIREARMS 148-49, 167 (1964) (three European 18 shot models, and one 24 shot model); WINANT, FIREARMS CURIOSA 250 (24 shot pepperbox).

[17] HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST at 6 (1952) (citing V.D. STOCKBRIDGE, DIGEST OF PATENTS RELATING TO BREECH-LOADING SMALL ARMS (EXCEPT REVOLVERS) GRANTED IN THE UNITED STATES FROM 1836 TO 1873 INCLUSIVE 173-76 (1963)).

rounds achieved much more commercial success during the latter part of the 19th century than did their counterparts who were designing handguns of similar capacities.

In 1851, the Turret Rifle was introduced, with a 30-round ammunition magazine (a canister) mounted above the action.[18] A more commercially successful innovation from the 1850s was from a spin-off of Smith & Wesson: the Volcanic Repeating Arms Company's production of lever-action rifles with 20, 25, and 30 round magazines.[19] An 1859 advertisement bragged that the guns could be loaded and fire 30 shots is less than a minute.[20]

In 1862, the Volcanic evolved into the 15-round Henry lever action rifle.[21] The Henry then was improved to become the Winchester Model 1866. The Winchester M1866 lever action rifles came in .38 or .44 caliber, with a standard magazine tube of 17 rounds for the full-length rifle, or 12 for the shorter carbine version.[22] A Winchester advertisement touted the Model 1866 for defense against "sudden attack, either from robbers or Indians."[23] According to advertising, the M1866 "can be fired thirty times a minute."[24] Or with 17 in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds."[25] The gun was a particularly

---

[18] NORM FLAYDERMAN, FLAYDERMAN'S GUIDES TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 716 (9th ed. 2007) (about 1,250 made). According to James S. Hutchins, Historian Emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman is a "revered expert in antique American arms and a vast range of other Americana for half a century." James S. Hutchins, Foreword, in NORM FLAYDERMAN, THE BOWIE KNIFE 7 (2004).

[19] WILLIAMSON, WINCHESTER at 13, 25; FLAYDERMAN at 304. Oliver Winchester had an ownership interest in Volcanic, and acquired the company in 1857. FLAYDERMAN at 300.

[20] WILLIAMSON at 25.

[21] FLAYDERMAN at 304-06.

[22] ARTHUR PIRKLE, 1 WINCHESTER LEVER ACTION REPEATING ARMS: THE MODELS OF 1866, 1873 & 1876, at 44 (1994); LOUIS A. GARAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 124 (1985). The Winchester Model 1866 was produced until 1898. GFLAYDERMAN at 306.

[23] R.L. WILSON, THE WINCHESTER: AN AMERICAN LEGEND 11, 32 (1991).

[24] WILLIAMSON, WINCHSTER, at 49.

[25] GARAGLIA & WORMAN, at 128-29.

big seller in the American West, including in Denver.[26] There were over 170,000 Model 1866s produced.[27]

Next came the Winchester M1873, "The gun that won the West." There were many configurations in its long production run, including with magazines of more than 15 rounds.[28] Modern versions of the Winchester 1873 are produced today by the Italian company Uberti, which specializes in high-quality reproductions of Western firearms.[29]

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873. The innovative rotary helical magazine in the buttstock held 34 rounds.[30] It was commercially successful for a while, although not at Winchester's levels. Over 12,000 copies were produced.[31]

One of iconic rifles of the latter 19th century was the pump action Colt Lightning rifle. Modern reproductions of this rifle (from Uberti and Taurus) are now illegal in Colorado under HB 1224, depending on the particular model.[32]

---

[26] WILSON at 34.

[27] FLAYDERMAN at 306.

[28] *Id.* at 307-09. The Model 1873 was Pa Cartwright's gun on the 1959-1973 television series *Bonanza*. SUPICA, TREASURES at 108. The calibers for which magazine capacity was greater than 15 were two versions of .22. About 19,500 of these particular models were manufactured. FLAYDERMAN at 307.

[29] 2014 STANDARD CATALOGUE OF FIREARMS, at 1237, 1240-41 (Jerry Lee ed. 2013). This annually-published guide was relied on by *Kirkland v. District of Columbia*, 70 F.3d 629, 636 n.3 (D.C. Cir. 1995) (citing the 1995 5th edition).

[30] DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS 294-95 (rev. ed) (Friends of the Maine State Museum, 1997). A later iteration of the rifle held 25 or 28 rounds in the buttstock. *Id.* at 331; FLAYDERMAN at 694. The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns. DEMERITT at vi.

[31] FLAYDERMAN at 694; DEMERITT at 332.

[32] The Uberti is a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1887 and 1904. The original Colt held up to 15 rounds, in calibers of .32-20, .38-40, and .44-40. FLAYDERMAN at 122-23. The Uberti replica uses the modern caliber which is the closest equivalent, namely .357/.38 Special. A gun which is chambered for .357 can also fire .38 Special. A gun which can use .38 Special (1.55 inches long) can also

HB 1224 exempts lever action guns with tubular magazines, but does not exempt pump action, slide action, or bolt action guns with tubular magazines. The distinction is wholly irrational.

During the second half of the 19th century, efforts were also underway to improve multi-shot handguns, although nothing from that period achieved the popularity of rifles with standard magazines of 16 or greater.

Pin-fire revolvers with capacities of more than 15 entered the market in the 1850s; they were produced for the next half century, but were significantly more popular in Europe than in America.[33] For revolvers with other firing mechanisms, there were some models with more than 16 rounds.[34] The 20-round Josselyn belt-fed chain pistol introduced in 1866, and various other chain pistols had even greater capacity.[35] Chain pistols did not win much market share, perhaps because the large dangling chain was such an impediment to carrying the gun.

---

use .38 Long Colt (1.26 inches long). FRANK BARNES, CARTRIDGES OF THE WORLD 275, 499 (9th ed. 2000) ("The 38 Long Colt cartridge can be fired in a 38 Special revolver, but not vice versa…Any 357 Magnum revolver will also shoot the 38 Special."). The Uberti replicas have a magazine capacity of 13 rounds in .357/.38 Special. See Uberti, *1873 Winchester Rifle and Carbine*, models 342720 & 342750, http://www.uberti.com/1873-rifle-and-carbine. Simple math shows that a magazine which can accept 13 rounds of .38 Special (1.55 inches each) will accept 16 rounds of .38 Long Colt (1.26 inches each).

Another, less popular, modern rifle with the same problem is the Taurus Thunderbolt. It is a reproduction of the Colt Lightning large frame, which was much less popular than the medium frame. FLAYDERMAN at 122-23. The Thunderbolt is also available in .357/.38. 2014 STANDARD CATALOGUE OF FIREARMS 1210. The Taurus Thunderbolt in .38 has a capacity of 14 rounds of .38 Special. *Taurus Owner's Manual* 22 (2006), http://www.taurususa.com/pdf/thunderbolt-manual.pdf. Thus, the gun can accept 17 rounds of .38 Long Colt.

[33] WINANT, FIREARMS CURIOUSA at 60-61, 63, 67-71 (16, 18, and 20 shot European revolvers are on pages 67-71); SUPICA, TREASURES, at 48-49 (21-shot Belgian).

[34] WINANT, FIREARMS CURIOSA 62, 64-65 (.22 cal.; 18 shots from one cylinder); 207-08 (Enouy "Ferris Wheel" revolver; 42 shots from 7 cylinders). *Cf. id.* at 250 (Beals prototype 24 shot revolver).

[35] WINANT, FIREARMS CURIOUSA at 204-08 (Guycot 25 shot chain pistol and 100 shot chain rifle).

The first handgun to use a detachable box magazine was the 10-round Jarre harmonica pistol, patented in 1862.[36] It would take until the 1890s before box magazines for handguns became a significant commercial success.

### a.       Semi-automatic handguns

The semi-automatic firearm and its detachable box magazine were invented before the turn of the century. It was the latest success in the centuries-old effort to improve the reliability and capacity of multi-shot guns.

In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s, with nearly a million sold to civilians worldwide. The most common configuration was in 10-round capacity, but there were a variety of models with capacities as low as six, or as high as 20. The latter was the Cone Hammer pistol, with 20-round box magazine.[37]

The Luger semi-automatic pistol was brought to the market in 1899 (although it is commonly known as the 1900). Through many variants, it was very popular for both civilians

---

[36] WINANT, FIREARMS CURIOUSA at 244-45; SUPICA, TREASURES at 33. The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never caught on.

[37] 2014 STANDARD CATALOGUE OF FIREARMS at 708-09; JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 23, 30-31, 38-39, 54-55, 272 (1967). At least during 1896-1905, Mauser's direct sales to the U.S. were small. *Id.* at 266-67. Spain's Astra brought out its own versions of the Mauser, with several models having 20 round magazines starting in 1928. But these do not appear to have had much distribution in the U.S. BREATHED at 208, 211-12; Astra Model 900, Wikipedia, http://en.wikipedia.org/wiki/Astra_Model_900.

and the military markets, and remained in production for nearly a century.[38] The most common

magazines were 7 or 8 rounds, but there was also a 32 round drum magazine available.[39]

The Spanish Gabilondo 20-round "Plus Ultra" was introduced in 1925.[40] Spain's

Arostegui, Eulogio brought out the Azul—a semi-automatic with standard magazines of 10, 20

and 30—in 1935.[41] The Spanish developments illustrate the progress of firearms design, but few

were sold in the United States.

Handguns with 16 or more rounds had been around for a long time, but 1964 was the year

that one become a notable success in the American market. The Plainfield Machine Company's

"Enforcer" was a pistol version of the M1 carbine (discussed below), with a 30-round

magazine.[42]

A tremendous commercial success was the Beretta model 92, a 9mm pistol with a 16-

round magazine, which entered the market in 1976.[43] In various configurations (currently the

Beretta 92F), the Beretta is one of the most popular of all modern handguns.[44] In the early years

in the American market, Beretta faced, and beat, high-quality European competitors with similar

guns: Austria's L.E.S. P-18 (18 rounds), and Germany's Heckler & Koch VP 70Z (also 18).[45]

---

[38] Among the many models was the 1906 American Eagle. 2014 STANDARD CATALOGUE at 464-66. George Luger's invention was licensed to many companies, including Mauser (Germany) and Vickers (England). The gun was never manufactured under Luger's own name. *Id.* at 464.

[39] JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126-27 (1993); SUPICA, TREASURES at 86.

[40] 2014 STANDARD CATALOGUE at 464-66 (manufactured 1925-33).

[41] 2014 STANDARD CATALOGUE at 72-73 (manufactured 1935-40); BREATHED, at 216-17.

[42] GUN DIGEST 1965, 19TH ANNIVERSARY DELUXE EDITION 229 (John T. Amber ed. 1964).

[43] 2014 STANDARD CATALOGUE at 121.

[44] 2014 STANDARD CATALOGUE at 121-26. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm.

[45] GUN DIGEST 34TH ANNIVERSARY 1980 DELUXE EDITION, at 297-98 (Ken Warner ed., 1979). L.E.S. was the American partner of Austria's Steyr. The following courts have relied on one of the annual issues of *Gun Digest*: *A. Uberti and C. v. Leonardo*, 892 P.2d 1354, 1364 (Ariz. 1995) (when certain guns were available for sale to Arizona residents); *Citizens for a Safer Community*

Today, the variety of handguns with standard magazines of at least 16 rounds is enormous, from companies such as Beretta, Glock, Ruger, Smith & Wesson, and many others.[46]

### b. Tubular magazine rifles

Since the late 1890s, the Savage Repeating Arms Company has been one of the classic American firearms manufacturers. In 1911, the company introduced their bolt action Model 1911, a 20-shot repeater with a tubular magazine in .22 Short. The rifle was popular for boys, and for shooting galleries.[47]

By the 1930s, the classic American manufacturers were producing a slew of tubular magazine rifles in .22 caliber. The following rifles could all use any of the three most popular .22 caliber cartridges: .22 short, .22 long, and .22 long rifle. These firearms are classic rifles for "plinking" (casual target shooting), especially for young people. Based on firearms catalogues

---

*v. City of Rochester*, 627 N.Y.S.2d 193, 203 n.5 (N.Y.Sup., 1994); *Sturm, Ruger & Co. Inc. v. Arcadia Mach. & Tool Inc*., 1988 WL 391514 *2 (C.D. Cal. 1988) (influence of a particular model on Ruger's recognition by consumers); *Couplin v. State*, 378 A.2d 197 205 n.2 (Md. App. 1977) (examples of a particular type of gun).

[46] The 2014 *Gun Diges*t lists the following models current available: Armscor/ Rock Island Armory, 1911A2 - .22 TCM (17 round capacity) , MAP1 & MAPP1 (16 round capacity); Auto-Ordnance TA5 (30 round); Baer H.C. 40 (18); Beretta, PX4 Storm (17), Bersa Thunder 9 Ultra Compact/40 Series (optional 17); Bushmaster Carbon 15 .223 (30); CZ 75 B (16), P-07 (16), P-09 Duty (19), 75 Tactical Sport (16 or 20), SP-01 (19), SP-01 Phantom (19), 75 TS Czechmate (20), 75 Tactical Sports (17-20), 85 Combat (16); Dan Wesson, Havoc (21), Mayhem (18), Titan (21); EAA, Witness Full Size (18), Witness Elite Gold Team (18); FN, FNS Series (17), FNX Series (17); Glock, 17/17C (17/19/33), 19/19C (15/17/19/33), 22/22C (15 or 17), 23/23C (13/15/17), 26 (10/12/15/17/19/33), 27 (9/11/13/15/17), 31/31C (15 or 17), 32/32C (13/15/17 round capacities), 33 (9/11/13/15/17), 34 (17/19/33), 35 (15 or 17); KEL-TEC, PLR-22 (26), PMR-30 (30); Ruger, SR9 (17), SR9C Compact (10 or 17); Sig Sauer, 250 Compact (16); Smith & Wesson, M&P (12/15/17), Pro Series Model M&P9 (17), Model SD9 (10/14/16), Enhanced Sigma Series DAO (10 or 16); Taurus, Model 800 Series (17), Model 92 (10 or 17), Model 90 (10/12/17); Walther, PPX (14 or 16). GUN DIGEST 2014, 68TH EDITION 383-84, 387-88, 390-91, 393, 395-97, 403, 412, 414, 418-19, 422-23, 426, 428-29 (Jerry Lee ed. 2013).

[47] JIM PERKINS, AMERICAN BOYS' RIFLES 1890-1945, at 191-92 (1976). Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended magazine that held twenty-five .22 shorts. ROY MARCOT, REMINGTON, AMERICA'S OLDEST GUN MAKER 149 (1998) (official company history).

from 1936-1971, there are over 20 such firearms models from major American manufacturers with magazines of 16-30 rounds in one of more of the calibers.[48]

### c.  Semiautomatic rifles to 1979

The Remington Model Eight (introduced in 1906) offered an optional 20-round magazine, but that magazine did not become common.[49] The first centerfire semi-automatics with magazines above 15 rounds to enjoy some commercial success were the Auto-Ordnance 1927 rifles, which are still in production, and used 30-round or larger magazines.[50]

---

[48] *Shooter's Bible 1936*: Remington Model 34 bolt action, Remington Model 121 slide action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens Model 76 semi auto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, Winchester Model 61 slide action. STOEGER SHOOTER'S BIBLE TREASURY REPRODUCTION OF 1936 CATALOG 108-09, 112, 123, 124, 126, 127, 140 (1960).

Some additional models appearing in a 1948 hunting magazine: A 1949 catalog from the gunsmithing supplier Brownell's lists some additional models: Stevens Model 87 bolt action, Remington 550 semi-auto, Mossberg Model 46B bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semi-automatic, Marlin 39 A lever action, Marlin Model 81 DL bolt action. BROWNELL INDUSTRIES INC. THE GUNSMITH MART NO. 2 1949-1950, at 212, 214, 216, 218, 221 (reprinting article from *Hunting & Fishing*, Oct. 1948).

The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list. THE "SHOOTER'S BIBLE" NO. 50, 1959, at 103 (1959). *See id.* at 80, 87, 91, 101 for some of the models previously mentioned.

Histories of Savage and Stevens firearms includes the following not listed above: Stevens No. 66 bolt action, Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G slide action. JAY KIMMEL, SAVAGE AND STEVENS ARMS 49, 53, 79, 102, 165, 167-68, 177 (5th ed. 1990); BILL WEST, SAVAGE AND STEVENS ARMS 11-12, 13-8, 14-44, 15-10, 16-10 (1971) (page numbering recommences in each chapter). Savage purchased Stevens in 1920.

For use of *The Shooter's Bible* by the courts, *see United States v. Olson*, 1995 WL 746177 at * 1 (9th Cir. Dec. 15, 1995) (book was properly used as a source for ATF agent's expert opinion); *United States v. Precise Import Corp.*, 458 F.2d 1376, 1377 (Cust. & Pat. App., 1972) (record reflects district court's admission of pages from the 1967 edition as an exhibit); *United States v. Fisher*, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (noting that experts had relied on the book); *Potter v. United States* 167 Ct. Cl. 28, 80 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms).

[49] Sixty thousand were produced from 1906-36. STANDARD CATALOGUE 2014 at 869-70.

[50] 2014 STANDARD CATALOGUE at 84.

The M-1 carbine was invented for the citizen solider of World War II. The M-1 carbine has been a popular rifle in America for over half a century. The United States government's Civilian Marksmanship Program put nearly a quarter-million of these guns into the hands of law-abiding American citizens, starting in 1963, at steeply discounted prices. The Plainfield Machine Company and Iver Johnson cumulatively manufactured over two hundred thousand for the civilian market, and about a dozen other companies also made M1 carbines for civilians, starting in the late 1950s. The standard magazines are 15 and 30 rounds.[51]

Today, the most popular rifle in the United States is the AR-15 platform, a semi-automatic rifle with standard magazines of 20 or 30 rounds. See Stipulation 12 ("Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. In 2011, AR-15 platform rifles accounted for approximately 18% of all rifles made in the United States for the domestic market. Many of these are used by law enforcement officers in the line of duty and many are used by private citizens . . . .").

The AR-15 was brought to the market in 1963, with a then-standard magazine of 20; the 30-round standard magazine was developed a few years later.[52] By 1969 there was also the

---

[51] BRUCE N. CANFIELD, COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163, 165, 167, 206-08, 279 (2d ed. 2010); M1 Carbines Incorporated website, http://www.m1carbinesinc.com/ (on company-specific pages, the largest producers were Plainfield's 112,000 from 1962-78; and Iver Johnson's 96,700 from 1978-92). The U.S. government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. Thereafter, the program (then known as "DCM"—Director of Civilian Marksmanship), sold M1s to Americans from the supply of WWII M1 carbines that had been exported to allied nations, and subsequently returned to the U.S. when the allied nation switched to a newer type of rifle. As of 2014, the CMP's supply of carbines for sale has been exhausted. See Civilian Marksmanship Program, Carbine Sales, http://www.thecmp.org/Sales/carbine.htm.

[52] PATRICK SWEENEY, GUN DIGEST BOOK OF THE AR-15 104 (2005). About this time, the Cetme-Sport semi-auto rifle with optional 20-round detachable box mag magazine came on the market. GUN DIGEST 22ND ANNIVERSARY 1968 DELUXE EDITION, at 335 (John T. Amber ed. 1967); H.B. Young, The CETME—Military to Sporter, GUNS (Nov. 1967): 26-27, 57-58

Armalite-180 (20-round optional magazine), the J&R 68 carbine (30 rounds), the Eagle Apache carbine (30 rounds).[53]

Springfield Armory brought out the M1A semi-automatic rifle in 1974, with a 20-round detachable box magazine.[54] The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard 5-, 10-, or 20-round detachable magazines.[55] Both the M1A and the Mini-14 are very popular to this day.[56]

By 1979, all of the above guns faced competition in the American market from high quality European imports such as the Belgian FN-FAL Competition rifle (optional 20-round magazine), the German Heckler & Koch HK-91 & HK 93 rifles (20 rounds), the Swiss SIG AMT rifle (20 rounds), and the Finnish Valmet M-71S rifle (30 rounds).[57]

As with handguns, the variety of modern rifles which come with standard manufacturer magazines of at least 16 rounds is tremendous. Manufacturers are venerable companies such as Colt, Marlin, Ruger, and Smith & Wesson., as well as many new ones.[58]

---

[53] GUN DIGEST 24TH ANNIVERSARY 1970 DELUXE EDITION 294 (John T. Amber ed. 1969).

[54]  2014 STANDARD CATALOG at 1102; "M1A," Wikipedia, http://en.wikipedia.org/wiki/ M1A_rifle (year of introduction).

[55] 2104 STANDARD CATALOGUE at 1173.

[56] Another gun introduced in 1975 also used magazines larger than 15. The Bingham company (from Norcross, Georgia) brought out the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of 50 or 29 rounds. 2104 STANDARD CATALOG at 164. The PPS-50 is currently manufactured by Mitchell's Mausers. http://www.mauser.org/pps-50-22/. That the gun is still in production four decades later is impressive, but the PPS-50 never entered the pantheon of American rifles, as did the M1A and the Mini-14.

[57] GUN DIGEST 1980, at 319-21 (1979). Also on the market were the Commando Arms carbine (5, 15, 30 or 90 rounds), and the Wilkinson Terry carbine (31 rounds). *Id.* at 319, 322.

[58] From *Gun Digest 2014*: Bushmaster, ACR (30 round standard magazine), 6.8 SPC (26), 11.5" barrel carbine (30), Modular Carbine (30), Carbon 15 Flat-Top (30), Gas Piston (30), Target (30), M4A3 (30), Pit Viper 3-Gun Competition (20), A2/A3 Target (30); Century International, AES-10 (30), GP WASR (30), WASR-2 (30), M70AB2 (30); Colt, Carbine (9/10/20/30); DMPS, Prairie (30), Panther REPR 19); Excel X-5.7R (10 or 20); Les Baer LR 300S (30); Marlin, 39A Golden Lever-Action (19/21/26 depending on caliber); Olympic Arms, K3B series (30), Plinker

Today tens of millions on magazines which hold 16 or more rounds are in the hands of typical law-abiding American citizens. See Stipulation 10 ("the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions"). Americans today continue the practice of owning such magazines, a practice which has always been part of the American tradition of gun ownership.

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791. The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[59] But even if *Heller* had created such a rule, magazines of more than 15 rounds are older than the Second Amendment. By the era of the Fourteenth Amendment, the exercise of Second Amendment rights by owning magazines of more than 15 rounds was widespread.

The quality, reliability, and durability of guns and magazines have improved significantly since 1791 or 1868. Yet today's firearms do essentially the same thing that their Winchester, Girandoni, and other ancestors did: allow the user to fire 16-30 times without having to reload. Firearms with the capacity to fire more than 16 rounds without reloading have been "in common

---

Plus (30), SM Servicematch (30), UM Ultramatch (30), Multimatch (30), Targetmatch 7 or 30); Ruger SR-556 (10 or 30); Remington, Model 552 (15/17/20 depending on caliber); Ruger Mini-14 Ranch (5 or 20); Ruger Mini-Thirty (optional 30); SIG, 556 (30); SIG-SAUER SIG516 (30); Smith & Wesson, M&P 15 (30), M&P VTAC (30), M&P15-22 (10 or 25); Stag Arms, Model 1 (30); Taurus, G2 carbine (34, in 9mm); Umarex, Colt Tactical M4 OPS (10 or 30), M4 (10 or 30), M16 (10 or 30), M16 SPR (10 or 30), 416-22 (10 or 20), Mp5 A5 (10 or 25); Wilson Combat, Tactical (20). GUN DIGEST 2014, at 456-62, 490-95, 497. There are many more rifles in *Gun Digest 2014* whose picture clearly indicates a magazine of more than 15. But we have listed only models for which the text expressly states the magazine size. The first pages listed are for centerfire rifles, and the second set is for rimfire.

[59] *Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

use at the time," whether that time is measured at the adoption of the Second Amendment, or the adoption of the Fourteenth Amendment, or today.

### 2.   Magazine Prohibitions Are Not Presumptively Constitutional

The Supreme Court in *Heller* identified certain firearm regulations that are presumptively constitutional under the Second Amendment, for example, regulation of the commercial sale of firearms, proscription of bearing arms in "sensitive places," and keeping arms from dangerous persons such as convicted felons or the insane. 554 U.S. at 626-27. Magazine restrictions enjoy no such presumption. To the contrary, all federal circuit courts which have reviewed magazine bans agree that a challenge to a ban passes their circuit's equivalent of this Circuit's *Reese* step one: all of these courts recognize that magazine bans encumber Second Amendment rights. *See, e.g., Heller II* 670 F.3d at 1260 (we "are not aware of evidence that prohibitions in either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity").

Magazine bans exist in only a few States, and before New Jersey's 1990 statute, no state restricted magazines.[60] The only national restrictions on magazine size were from 1994-2004. 18

---

[60] N.J. Stat. Ann. § 2C:39-1 (only applies to semi-automatics). All other state laws which clearly violate the Second Amendment are even more recent. Haw. Laws 1992, ch. 286 (only applies to handguns); Md. Criminal Law Code § 4-305 (enacted 1994; bans only sale and manufacture; no ban on possession or loans); Cal. Sen. Bill 23 (enacted 1999, effective 2000); 2000 Sess. Laws of N.Y. Ch. 189 (S. 8234, A. 11535).

An Ohio statute defines "dangerous ordnance" in such a way as to encompass a semiautomatic firearm into which a magazine holding 32 or more rounds has been inserted. Ohio Rev. Code Ann. §§ 2923.11, 2923.17. The statute is apparently interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *See*, *e.g.*, Bud's Gun Shop, Ohio Restrictions, http://www.Budsgunshop.com/catalog/feeds/state_reg/ohio_restrictions.pdf.; *see also* Gander Mountain Website, http://www.gandermountain.com/ (allowing on-line customers to arrange for pick-up of a "SureFire 60-Round High-Capacity Magazine MAG5-60 Item #447625" at any of 9 Ohio stores). Plaintiffs have carefully limited their Complaint on Second Amendment issues to cover

U.S.C. § 921(a)(31)(A), 922(w)(2) (pre-ban magazines were freely transferable) (expired). Notably, when Congress passed the ban in 1994, Congress included a 10-year sunset, and required the Department of Justice (DOJ) to conduct a study of the effects of the ban. Attorney General Reno's DOJ chose the researchers, who provided interim reports, and then a final report in 2004. The DOJ report, which will be discussed in detail below, found there was no evidence that the restrictions had saved lives, reduced the number of shots fired in shoot-outs, or led to any other actual benefit. Christopher S. Koper, America's Experience with the Federal Assault

---

only magazines which indisputably pass *Heller*'s "common use" test, and they do not argue that the Ohio law is unconstitutional.

During Prohibition, Rhode Island and Michigan enacted statutes similar to the Ohio statute, although with lower numbers. Mich. Acts 1931, ch. 37 ("more than sixteen times without reloading"); R.I. Acts 1927, ch. 1052 (more than 12 shots semi-automatically). These statutes have long since been repealed. Notably, like the Ohio statute, they apparently did not actually ban any magazines. These isolated acts do not establish an American history and tradition of magazine bans. They are better evidence of legislatures acting in during a period notable for unsuccessful repression, and later restoring civil liberty. When the D.C. Circuit looked through American history for the record of basic handgun registration, it found a half-dozen states with laws from 1881-1927. *Heller v. District of Columbia*, 670 F.3d 1244 (*Heller II*) (D.C. Cir. 2011). Notably, those laws were still in effect a century later.

The one enduring magazine restriction in American history is in the District of Columbia, which is not exactly a role model of respect for the Second Amendment. The D.C. ordinance also dates to Prohibition, having been enacted by Congress in 1932. (Notably, Congress did not choose to use the National Firearms Act of 1934 to extend the restriction nationally.)

When D.C. achieved home rule in 1975, it did not choose to repeal the law, but instead promptly enacted the unconstitutional bans on handguns and on self-defense with any gun in the home which were later ruled unconstitutional by the Supreme Court in *Heller*.

D.C. also did interpreted the law so that it outlawed all magazines and all semi-automatic handguns. (In contrast to the state approach, discussed above.) *See* Vivian Chu, Cong. Res. Svc., *DC Gun Laws and Proposed Amendments* (2011) ("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot ... semiautomatically, more than 12 shots without manual reloading.' [citing DC Code § 7-2501.01(10)(B) (2008)]. By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun, and prohibited from being registered. It appears under the District's old definition, registration of a pistol was largely limited to revolvers.")

The definition of "machine gun" was later amended to conform to the federal definition. The current D.C. Code provision on magazines outlaws all magazines which can accept more than 10 rounds of ammunition (except for .22 tubular magazines). D.C. Code, § 7-2506.01(b).

Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003, Report for the National Institute of Justice, June 2004. This was undoubtedly one reason why Congress chose to let the ban sunset.

Thus, in the 223 years since the Second Amendment was ratified, free availability of magazines of every size has been the norm of national law for 213 of those years.

### 3.    HB 1224 Wholly Outlaws a Number of Popular Firearms

Another reason that the challenge to HB 1224 passes *Reese* step one is because the magazine ban also bans several firearms that use tubular magazines. These include modern replicas of the 19th-century Colt Lightning (discussed above) as well as modern Springfield Amory and Kel-Tec handguns. Defendant's Responses to Plaintiff 55 Sheriffs and David Strumillo Discovery Requests to Defendant, at 9-10.

### 4.    The Ban at Issue Regulates an Essential Part of the Firearm

Magazines are an integral part of firearms. They are not just "accessories" as suggested by Defendant. Regulating magazines is regulating the firearms themselves. HB 1224 defines "magazine" to include a "fixed or detachable magazine, box, drum, feed strip, or similar device." C.R.S. § 18-12-301(2)(A)(I). This covers an integral component of every gun ever made, with the exception of single-shot guns. Magazines (including fixed or detachable; box, tubular, cylinder, or other) are part of Second Amendment "arms" for the same reason that ink fountains are part of a First Amendment "press." Banning magazines is thus no different than banning a broad class of firearms.

### B.    Defendant Cannot Justify the Burden on Second Amendment Rights

### 1.    The ban at issue here is not dissimilar to the handgun ban at issue in *Heller* and fails under any form of scrutiny

The Supreme Court in *Heller* did not engage in a balancing test.[61] In *Heller*, the only fact that was necessary for plaintiff to win was mass possession of the firearms at issue (handguns) commonly used for self-defense in the home. What mattered in *Heller* was that handguns are "chosen by American society." 554 U.S. at 628. When tens of millions of arms are kept for lawful purposes by law-abiding citizens, such arms reside at the core of the Second Amendment and their prohibition fails any form of scrutiny.

In *Heller*, the Court seemingly took judicial notice of the social fact of the commonness of handguns, without needing to cite social science data. In the instant case, judicial notice is not required. The parties have stipulated to the requisite facts:

> 10.     . . . Although the total number is not known, the number of lawfully owned semi-automatic firearms that utilize a detachable box magazine with a capacity greater than 15 rounds is in the tens of millions.

> 12.     Several million AR-15 platform rifles have been lawfully purchased in the United States and are used for lawful purposes. In 2011, AR-15 platform rifles accounted for approximately 18% of all rifles made in the United States for the domestic market. Many of these are used by law enforcement officers in the line of duty and many are used by private citizens. . . .

> 15.     In states without laws regulating magazine capacity, AR-15 platform rifles are usually sold at retail with a detachable box magazine capable of holding up to 30 rounds. In states without laws regulating magazine capacity, the majority of owners of AR-15 platform rifles use magazines with a capacity of 20 and/or 30 rounds.

> 19.     Semi-automatic firearms equipped with detachable box magazines with a capacity greater than 15 rounds are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home.

---

[61] *See* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. REV. 375, 380 (2009) (''Rather than adopting one of the First Amendment's many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage.''); *id.* at 405 (*Heller* ''neither requires nor permits any balancing beyond that accomplished by the Framers themselves.'').

20.     Semi-automatic pistols and rifles cannot function as designed without a magazine. Semi-automatic firearms are designed to discharge a bullet for each pull of the trigger, automatically extract and eject the spent cartridge case from the firing chamber, re-cock the firing mechanism, and load a new cartridge into the firing chamber so it can be fired again with another pull of the trigger.

22.     Many full-sized 9mm semi-automatic pistols are sold at retail with magazines with capacities of greater than 15, for example the Glock 17, which is one of the most popular handguns sold in the United States. . . .

Under *Heller*, HB 1224 should fail any form of scrutiny. HB 1224 imposes a similar absolute prohibition of firearms and magazines which are commonly possessed by the tens of millions. They are approximately as numerous as handguns, and they are a vastly smaller part of the violent crime problem than are handguns. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family . . . would fail constitutional muster." 554 U.S. at 628-29 (quotations and citations omitted). Even if strict scrutiny were to be applied, nothing uncovered in discovery or suggested in the Final Pretrial Order even hints that Defendant can establish a compelling state interest to justify the ban.

Defendant wishes this Court to consider his speculative predictions about the benefits of HB 1224. Indulging in sociological speculation is beyond the judicial function. As the Seventh Circuit observed: "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts. *Moore*, 702 F.3d at 939.

The *Heller* Court was certainly aware of the frequent and lethal use of handguns in violent crime. Amicus briefs in favor of the District of Columbia ban marshaled a large array of social science data which described the very widespread misuse of handguns. *See*, *e.g.*, Brief of the American Academy of Pediatrics et al. as Amici Curiae in Support of Petitioners, 2008 WL 157189 (Jan. 11, 2008); Brief for American Public Health Association et al. as Amici Curiae in

Support of Petitioners 2008 WL 157191 (Jan. 11, 2008). Given that handguns are "typical" and "common" for home defense, the Supreme Court determined that prohibition was impermissible.

The Seventh Circuit held a state statute which banned the defensive carrying of handguns in public was categorically unconstitutional. *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("[O]ur analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states."). The Ninth Circuit made a similar holding assessing a local government's interpretation of the "good cause" requirement in the state handgun carry licensing statute, when a local official's interpretation made it impossible for typical law-abiding citizens to obtain a carry permit. *Peruta*, 2014 WL 555862; *Ezell*, 651 F.3d 684 (Supreme Court rejected the notion that prohibition on common arms could satisfy any form of scrutiny).[62]

The *Heller* Court repeatedly emphasized how often law-abiding American citizens choose to ***possess*** handguns for self-defense. 554 U.S. at 629. The Court did not address whether citizens actually shoot handguns for self-defense. When a citizen keeps a firearm that is ready for self-defense, or lawfully bears the firearm at home or in public, the citizen is using the firearm. Law enforcement officers very rarely ***shoot*** their duty arms, except during target practice, but they ***use*** their guns every day. They use their firearms by possessing them in a manner so that they can be fired in the unlikely event of an emergency is a use of the firearm. Indeed, by using

---

[62] As Judge Kavanaugh noted:

> The Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered. Cf. Tr. of Oral Arg. at 44, Heller, 554 U.S. 570 (No. 07-290) (Chief Justice Roberts: ''Well, these various phrases under the different standards that are proposed, 'compelling interest,' 'significant interest,' 'narrowly tailored,' none of them appear in the Constitution. . . . I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up.'').

*Heller II*, 670 F.3d at 1273 n.5 (Kavanaugh, J., dissenting).

firearms as an available deterrent, law enforcements officers reduce the need to fire their guns. The same is true for ordinary citizens. People use the firearms which they possess in many ways for self-defense, and most of these uses do not involve pulling a trigger against a violent attacker.

Nowhere in the Court's opinion does the Court even consider whether handguns are empirically superior for self-defense. Similarly, the Court does not inquire as to the social science about the benefits and harms of handgun prohibition. What mattered to the *Heller* majority was the choice of the American people about what guns to own. The Supreme Court in *Heller* did not second-guess the American people about the people's choices. Handguns were the most popular choice of arm for self-defense in the home. Accordingly, and by definition, handgun prohibition was unconstitutional.

Here, magazines of 16-30 rounds are owned by the tens of millions, by law-abiding American citizens for lawful purposes. That should be the end of the case if *Heller* is followed.

**2.      Even if this Court adopts *Ezell's* "close fit" test or even intermediate scrutiny, appropriately applied, Defendant cannot meet his burden**

Under heightened scrutiny, "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." Nor can a government rely upon "overbroad generalizations." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

As a general matter, protecting the public from violent crime is a compelling state interest. *See e.g., United States v. Salerno*, 481 U.S. 739, 745 (1987) (federal government has "compelling interests in public safety"); *Schall v. Martin*, 467 U.S. 253, 264 (1984). Defendant is eager to present his arguments about the general use of magazines in self-defense and violent crime. Such justifications, however, are not part of the legislative history and should not be considered by this Court.

The legislative history has three bases: First, frequent reference to the mass murders in Newtown, Aurora, and Tucson. Proponents asserted that the perpetrators there were impeded because their magazines ran out of ammunition and had to be changed. None of these examples are true, as the evidence at trial will show.

Second, proponents asserted that magazines over 15 rounds are not needed for hunting. This is true for some types of hunting (e.g., waterfowl) but not for others.[63] If this were a genuine reason rather than a pretext, it could have been accomplished simply by changing the hunting regulations, or by a statutory enactment limited to hunting.

Third, HB 1224 is in fact, an expression of animus and prejudice against firearms and their owners, as many statements by proponents indicate. The lead sponsors in each house, and other supporters, announced that the only reason that someone would want a magazine of more than 15 rounds (or of 10 rounds, when the bill was introduced) was to kill a lot of people quickly.[64] This was the opposite of a legitimate rationale for legislative action. [65] The

---

[63] The State hunting regulations are as follows: Rifles or handguns of any type for small game, no limit; centerfire semi-automatic rifles for big game, six rounds; centerfire rifles of other types (e.g., bolt action, pump action, lever action) for big game, no limit; handguns for big game, no limit; shotguns for migratory bird hunting, three rounds. Colo. Hunting Regulations W-2 #203 (big game: semiautomatic rifle may have no more than six rounds in magazine and chamber combined; shotguns, may fire only a single slug; handguns or other rifle action types, no limit); W-3 #303 (furbearers and small game, except for migratory birds: for shotguns, three rounds; no limit on rifle or handguns); W-5 #502 (migratory birds: three rounds for shotguns; other firearms not permitted).

[64] *See, e.g.*, LH Feb. 12, 2013 at 5:22-24, 6:5-8, 21:10-12, 36:7-10, 36:16-21, 37:3-4; Feb. 15, 2013 at 32:19-23, 62:14-18, 64:1-25; Mar. 4, 2013 at 7:13-16, 51:14-21, 57:14-19, 59:2-5, 59:19 – 60:5. The preceding list covers the committee hearings in the House and Senate, plus Second Reading in the House. If we added Third Reading, in the House, Second and Third Readings in the Senate, plus the Conference Committee and House and Senate floor debates related to the Conference, the list would be significantly longer.

[65]   Even if the law is written in a manner which is facially neutral, courts should inquire into legislative motive based on prejudice or animus. For example, in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), a city council enacted an ordinance which banned some particular killings of animals. Although the ordinance was facially neutral, the

stipulations acknowledge that the banned magazines "are used for multiple lawful purposes, including recreational target shooting, competition shooting, collecting, hunting, and are kept for home defense and defense outside the home." Stipulations para. 19.

Another argument for HB 1224 was a feeling that passage of bill would be an emotionally positive response to the Aurora and Newtown murders. Emotions are not a legitimate basis for infringing First Amendment or other constitutional rights.[66]

While not appropriate in this case, even if the Court were to employ intermediate scrutiny, Defendant would still fail to meet his burden if the standard is appropriately applied. "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective *is advanced* by means substantially related to that objective." *Reese*, 627 F.3d at 802 (emphasis added). The standard is not "might be advanced." Under intermediate scrutiny, a government defendant must demonstrate "a substantial government interest that *would be achieved* less effectively absent the regulation, and the means chosen are not substantially broader than *necessary* to achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989) (emphasis added). Under the "means" prong for even the weakest form of intermediate scrutiny (commercial speech), the government's burden is not satisfied by "mere speculation or conjecture. The government must demonstrate that the harms it recites are real and that *its restriction will in fact alleviate them to a material degree*." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (emphasis added).

---

Supreme Court struck it down as a violation of the Free Exercise Clause, because the legislative history plainly showed that the purpose of the ordinance was to suppress the practice of the Santeria religion. *Id.* at 534-35.

[66] *See*, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

Under this lowest (and, in this case, inappropriate) standard, Defendant fails. First, Defendant himself has publicly admitted that HB 1224 is "very difficult or impossible to enforce."[67]

Second, Defendant's expert witness Jeffery Zax will speculate about what a state-only magazine ban *might accomplish*. These speculations are outweighed by the evidence of what a national ban *did accomplish*, which was nothing. As noted above, Congress in 1994 enacted a 10-year restriction on new magazines, and required that Attorney General chose researchers to conduct a study and issue a report. The final report, with researchers selected by General Reno's DOJ, found no evidence of any benefits to public safety. Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Report for the National Institute of Justice, June 2004. The statistical evidence did not show any meaningful effect on murders perpetrated with firearms. There was no evidence of a reduction in the number of shots-per-incident fired by criminals. There was no evidence of a reduction in multiple-victim gun homicides. There was no evidence that whether or not a criminal had a magazine of 10 or fewer rounds (the 1994 limit), the fatality or injury rates for victims were affected.

Third, while Jeffrey Zax and other experts will attempt to opine on how, statistically, no one, including Plaintiffs and the persons represented by Plaintiff organizations, actually *needs* a

_____

[67] In response to a question about the "continuous possession" clause, Governor Hickenlooper answered, "Right...I...I think that would be very hard to enforce. I'm not going to argue that. It would be close to impossible to enforce....and this was certainly not my favorite bill...uh...in any session...uh...you know, there is...uh...an issue...uh...for a lot of people, especially in urban and suburban areas about...uh...these large capacity magazines and even though it may be very difficult or impossible to enforce, setting a law does put some constraints on things." The Mike Rosen Show, Apr. 4, 2013, 10 a.m. segment, available at http://www.850koa.com/media/podcast-mike-rosen-podcast-shows_rosen/rosen-replay-04042013-10am11am-23058975/. The quoted discussion begins at 21:57.

firearm with a capacity of 16 rounds or more, the same statistical evidence can be used to eviscerate the bases for the prohibition in the first place. As noted above, the incidences of handguns used in violent crimes completely dwarfs any examples of violent crimes being committed by so-called "large capacity magazines." Yet, handguns are categorically legal to possess under *Heller*.

From 1999 through 2010, there were 1,765 deaths from firearms in the District of Columbia.[68] Violent crime and homicides with handguns are frequent. Multiple homicides are certainly a serious problem, but they are extremely rare compared to handgun homicides. Compare the 1,765 gun deaths in a single city in 12 years, versus the 547 deaths from multi-person shootings in the entire United States from 1983 to 2012. Congressional Research Service, Jerome P. Bjelopera et al., *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy* (7-5700, R43004, Mar. 18, 2013), http://www.fas.org/sgp/crs/misc/R43004.pdf.

Homicides in which three or more people are killed are fewer than 1% of homicide deaths. *See* Pew Research Center, *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, at 4 (May 2013) http://www.pewsocialtrends.org/2013/05/07/gun-homicide-rate-down-49-since-1993-peak-public-unaware/. (This report and its appendices provide two decades of detailed data on guns and crime, based on federal government statistics.) *See also* J. Reid Meloy, et al., *A Comparative Analysis of North American Adolescent and Adult Mass Murders*, 22 BEHAVIORAL SCI. & THE L. 291, 307 (2004) ("very low-frequency and high intensity events").

---

[68] The data can be obtained from the CDC Wonder site. "About Underlying Cause of Death, 1999-2010." http://wonder.cdc.gov/ucd-icd10.html. In the data request form, for choice "6." Select cause of death," choose "Injury Intent and Mechanism." Then on the submenus that will appear, for "Injury Intent," select "All Causes of Death." For "Injury Mechanism," select "Firearm."

Under *Heller*, social science cannot trump the rule against the prohibition of the common arms chosen by typical law-abiding citizens. Social science, however, demonstrates one unassailable fact that is devastating to Defendant in meeting his burden, even if the Court were to consider social science here: handguns cause exponentially more illegal deaths than firearms using magazines with 16 rounds or more. Defendant's evidence attempting to link mass shootings to magazine size has major shortcomings.[69] However, even if such evidence were true, prohibiting an entire class of firearms based upon a few dozen incidents over ***decades*** is patently unconstitutional when, under *Heller*, handguns are used in homicides involving ***thousands*** of deaths ***each year***.

In sum, Defendant cannot meet his burden to justify the encumbrances on Second Amendment rights caused by HB 1224.

### 3.    This Court should not follow *Heller II*

All opinions in federal courts upholding magazine bans rely on the D.C. Circuit's opinion in *Heller v. District of Columbia*, 670 F.3d 1244 (*Heller II*) (D.C. Cir. 2011). As dissenting Judge Kavanaugh pointed out, the majority seemed to have lost sight of the fact that Justice Breyer's opinion in *Heller* was for the dissent: "It is ironic . . . that Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*; that the Heller majority flatly rejected that *Turner Broadcasting*-based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on *Turner Broadcasting*." *Id.* at 1280 (Kavanaugh, J., dissenting). Because Justice Breyer's argument was expressly rejected by the *Heller* majority, *Turner Broadcasting* is by definition not a legitimate precedent on which to

---

[69] For example, Defendants will attempt to refer to a number of mass shootings and note that the need to change magazines reduced the "lethality" of these shootings due to the need to change magazines. This "evidence" is wholly unreliable and inadmissible, even setting aside it is inherently irrelevant under *Heller*, as well as demonstrably false in at least some instances.

build a decision upholding a prohibition on Second Amendment arms. *See also Peruta*, 2014 WL 555862 at *27.

The *Heller II* decision, and its progeny in some district courts, rely heavily on analogy to the First Amendment's "alternative channels of communication" doctrine. The reliance is defective for several reasons. First, alternative channels is a theory about the medium used in communication in ***public***. *See Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 648 (1981). The alternative channels doctrine can allow leafleting to be limited at a state fair on public property, *see id.* at 650; it is not a doctrine allowing the criminalization of the possession of leaflets within one's own home.

Second, the First Amendment's alternative channels doctrine mandates a serious inquiry into the adequacy of those alternative channels, and strong evidence that the alternative channels are (at least) nearly as effective as whatever channel is being restricted. A government cannot ban political advertising on the radio merely by pointing out that a candidate's supporters can try to engage random strangers in conversation at public parks. Or that television and Internet ads can reach almost all the same people who would be reached by radio.

The D.C. Circuit failed to engage in the serious analysis required by the alternative channels doctrine. Instead, the *Heller II* opinion merely cited to the opinion of the D.C. police chief, and to the legislative testimony of a gun prohibition lobbyist, as evidence that self-defense with other firearms and smaller magazines would be just as effective. *Heller II*, 670 F.3d at 1259. To say the least, it was clearly erroneous for the D.C. Circuit to treat such highly contested assertions as conclusive at the summary judgment stage.

More fundamentally, the casual invocation of alternative-channels-type arguments is contrary to how *Heller* itself addresses such argument. The last time a Second Amendment case

from the D.C. Circuit was affirmed by the Supreme Court was the *Heller* case. Judge Silberman rejected the District's argument that "since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).

At the Supreme Court, the same argument was raised by the District, and by some of the District's amici, who presented evidence about why long guns were considered by some to be superior for home defense. *See Heller*, 554 U.S. at 710 (Breyer, J., dissenting). The Supreme Court responded: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." The Court then listed some common sense reasons why "a citizen may prefer a handgun for home defense." The key point was that "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. Again, the American people's choice of their common arms is protected by the Second Amendment, notwithstanding a government's insistence that the government can take away the people's choices for their own good.

Notably, the common sense reasons which *Heller* listed as among the reasons why Americans so often choose handguns for defense also apply to magazines of 16 or more rounds:

- "It is easier to store in a location that is readily accessible in an emergency." 554 U.S. at 629. It is easier to store and keep track of one magazine than several, and to keep it away from small children or other unauthorized persons. It is much easier to access one

magazine in an emergency than to access several. "Access" includes having the magazine on one's person, ready for use in an emergency. "Access" also includes not having to change magazines while under criminal attack.

- "[I]t cannot easily be redirected or wrestled away by an attacker." *Id.* The magazine that is already in the gun is easier to control than the magazine that might be dropped or snatched during an exchange.

- "[I]t is easier to use for those without the upper-body strength to lift and aim a long gun." *Id.* Likewise, a standard magazine is easier for persons with limited upper body strength to use than is manipulating several smaller magazines. As will be adduced at trial, standard capacity magazines have many advantages for persons who suffer from various physical limitations, including persons whose limitations do not legally constitute a disability.

- "[I]t can be pointed at a burglar with one hand while the other hand dials the police." *Id.* If the defender has several rounds left in the magazine, even after shots have been fired, it is easier to keep the assailant(s) under control while waiting for help to come.

The *Heller II* majority's analysis is subject to numerous flaws as pointed out by the dissent. It should not be followed.

### 4.      There are less restrictive and more effective means

In *Peruta*, the Ninth Circuit employed the less restrictive means test in striking down the public carry ban at issue there. *See* 2014 WL 555862 at *28 (noting test and criticizing sister circuits for not recognizing that in those other cases upholding regulations in the face of Second Amendment challenges "the government failed to show that the gun regulations did not burden

'substantially more' of the Second Amendment right than was necessary to advance its aim of public safety"); *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (strict scrutiny case; "least restrictive means among available, ***effective*** alternatives" (emphasis added)); *Madsen v. Women's Health Center*, 512 U.S. 753, 765 (1994) (intermediate scrutiny; "burden no more speech than necessary to serve a significant government interest"); *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (inquiring whether statute "burden[s] substantially more speech that is necessary" to advance the government interest).

In Colorado, the doctrine has been applied to the right to arms in the 1972 Colorado Supreme Court decision in *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972). The Lakewood city council was concerned about gun crime, and responded by enacting a broad ban on many forms of carrying or transporting firearms. The Colorado Supreme Court unanimously struck down the ban. Citing First Amendment precedent, the Court explained:

> A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

*Id.* at 745. The above quote closely tracks *Shelton v. Tucker*, 364 US 479, 488 (1960). *Pillow* has been followed by courts in several other states.[70]

---

[70] *See* Benjamin v. Bailey, 662 A.2d 1226, 1234 (Conn. 1995); *Winters v. Concentra Health Services, Inc.*, 2008 WL 803134, at *3 (Conn. Super. Ct. Mar. 5, 2008) (refusing to strike plaintiff's claim that he was illegally discharged for lawful carry of a firearm at work, when the company had no policy against firearms in the workplace, and the state constitution protected the right to carry handguns); *Junction City v. Mevis*, 601 P.2d 1145, 1150 (Kan. 1979) (relying on *Pillow* to void a city ordinance against handgun carrying); *Bowers v. State*, 389 A.2d 341, 347 (Md. 1978) (citing *Pillow* for the proposition that "more rigorous standard of vagueness review is triggered whenever an ill-defined penal statute is alleged to infringe upon any of the fundamental freedoms protected under the Bill of Rights," but upholding the child abuse law

HB 1224 is far more burdensome than necessary. HB 1224 applies to all types of firearms, except for lever action rifles. (That is, it applies to semi-automatic action, pump action, slide action, and bolt action firearms.) New Jersey's statute is only for semi-automatics. N.J. Stat. § 2C:39-1y. Hawaii's statute is only for handguns. Haw. Rev. Stats. § 134-8(c). Ohio's law is only for semi-automatics of 32 or more rounds. Ohio Rev. Code Ann. 2923.11(E). Ohio also exempts all .22 caliber. Massachusetts has no ban, but rather requires a "Class A" license, for which "any person" may apply. Mass. Gen. Laws 140 §§ 121, 131. About five out six firearms licenses in Massachusetts are Class A, allowing possession of a magazine of any size.[71]

Another alternative which is much less burdensome and restrictive to "typical law-abiding citizens," and which is far ***more*** effective than HB 1224, is to develop a crisis services program for identification and treatment of mental illness.

For the Aurora shooting that was a stated major reason for HB 1224 and HB 1229, the cumulative effect of those statutes, assuming that they worked perfectly, would be that the next James Holmes could buy two handguns—since Holmes repeatedly passed background checks.

---

because it would pass strict scrutiny); *People v. Swint*, 572 N.W.2d 666, 673 n.8 (Mich. Ct. App. 1997) (upholding felon-in-possession law, and noting Colorado courts had done the same because *Pillow* involved a non-felon); *Arnold v. Cleveland*, 616 N.E.2d 163, 176 (Ohio 1993) (Hoffman, J., concurring and dissenting) (stating that because "[e]xercise of the police power may not be achieved by a means which sweeps unnecessarily broadly," the Cleveland "assault weapon" ban should be declared unconstitutional); *City of Seattle v. Riggins*, 818 P.2d 1100, 1104 (Wash. Ct. App. 1991) (stating that *Pillow* is not applicable because carrying a dangerous knife within city limits is not an innocent activity); *Perito v. County of Brooke*, 597 S.E.2d 311, 316 (W. Va. 2004) (stating that *Pillow* is consistent with ban on firearms possession by convicted felons); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 143 (W. Va. 1988) (finding that discretionary statute licensing for concealed handguns is unconstitutional); *State v. Hamdan*, 665 N.W.2d 785, 817 (Wis. 2003) (Crooks, J., concurring and dissenting) (stating that because the concealed carry law was "unnecessarily broad" it should be declared unconstitutional, rather than, as the majority held, only declared unconstitutional in certain applications).

[71] Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, BOSTON GLOBE, Jan. 24, 2013, http://www.boston.com/yourtown/specials/snapshot/massachusetts_snapshot_gun_licenses_2012

And the next Holmes could purchase numerous 15-round and smaller magazines. That would be all the equipment necessary to perpetrate the worst firearms murder in U.S. history.

At Virginia Tech in 2007, the perpetrator used 10-round magazines and 15-round magazines. With his pair of handguns, no one was able to tackle him during a magazine exchange. No one was able to escape during a magazine exchange. He murdered 33 unarmed victims, finally killing himself when he heard the sounds of armed responders approaching.[72] HB 1224 will let the next Holmes into the next theater or school with the same equipment as used by the Virginia Tech killer.

There is a better, enforceable alternative to HB 1224. Dr. Lynn Fenton, the treating psychologist for James Holmes, apparently broke patient confidentiality in order to warn the University of Colorado about Holmes.[73] Such a violation of patient confidentiality is permissible only when the patient manifests a serious danger to commit violent harm.

Shortly thereafter, Holmes withdrew from the University, and University officials apparently failed to warn anyone else. Had law enforcement been informed, Holmes could have been involuntarily committed for observation. If there was any legal obstacle to longer-term commitment for Holmes, it was only in the Colorado statute requiring that in a civil commitment for dangerousness, the danger must be "imminent." C.R.S. § 27-65-105(1)(a)(I). Holmes expressed his murderous desires in May, but did not murder anyone until late July. It would have

---

[72] The official law enforcement report on incident stated that "10-round magazines…would not have made a difference." *Report of the Virginia Tech Review Panel* 74 (Apr. 16, 2007) https://web.archive.org/web/20130423135032/http://www.governor.virginia.gov/TempContent/t echPanelReport-docs/FullReport.pdf. According to the review panel, even revolvers with speed loaders could have been equally deadly in the circumstances. *Id.*

[73] Arthur Kane, Tak Landrock & John Ferrugia, *Did CU Officials Consider James Holmes 'High Risk' For Violence?*, 7 NEWS DENVER, Aug. 16, 2012, http://www.thedenverchannel.com/news/31363132/detail.html,

been simple for the legislature to clarify the meaning of "imminent," or simply to remove that word from the statute.

Even a 72-hour observation commitment would have prevented Holmes from legally purchasing firearms, since records of such commitment are transmitted by Colorado to the FBI's National Instant Check System, and function as disqualifiers for firearms purchase for a period of three years from the date of the 72-hour commitment. Defendant can speculate about the effect of magazine sizes, but the certainty is that if Holmes had been prevented from acquiring firearms, he would not have been able to shoot anyone.

After the Virginia Tech murders, the Virginia legislature revised state law to allow the involuntary hospitalization of individuals, such as the perpetrator, who have when there is a "substantial likelihood" of serious physical harm to self or others. The new standard does not require "imminent" danger, but also applies to danger "in the near future," when there is evidence of recent behavior attempting or threatening harm. Va. Code, § 37.2-808A. Instead of enacting sweeping legislation against gun owners, or against the mentally ill, the Virginia legislature focused on the small subset of the seriously mentally ill who are dangerous. Such a simple change in the law is not only the less restrictive alternative, more importantly, it is the more effective alternative.

### 5.    In sum

The ban at issue here should fail any form of scrutiny. If the Court does apply some level of heightened scrutiny, Defendant will fail it. The legislative history does not come close to providing concrete evidence that HB 1224 will have *any* positive affect on public safety. The speculations that Defendant will attempt to introduce should be rejected. Even if it is considered, they offers no proof that HB 1224 will enhance public safety.

## VI.   HB 1224 VIOLATES THE ADA

The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The remedies include the injunctive and declaratory relief.[74] 42 U.S.C. § 12133.

Associations (such as Outdoor Buddies) have standing to bring ADA claims if one of their members (such as Board of Directors member Dylan Harrell or member David Bayne) suffers injury in fact. *Raver v. Capital Area Transit*, 887 F. Supp. 96, 97-98 (M.D. Pa. 1995); *Medical Soc'y v. Jacobs*, 1993 WL 413016, at *3 (D.N.J. Oct. 5, 1993). Plaintiffs must prove: (1) they are qualified individuals with a disability; (2) they have been discriminated against by reason of such disabilities; and (3) by a public entity.

### A.   Plaintiffs are qualified individuals with a disability

A disability is a "physical or mental impairment that substantially limits one or more of the major life activities" of an individual. 42 U.S.C. § 12102(1)(A). A physical impairment is "[a]ny physiological disorder or condition . . . or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal . . . ." 28 C.F.R. § 35.104. "Major life activities" include "performing manual tasks, [such as] walking." 28 C.F.R. § 35.104. "Substantially limits" includes loss of the ability to stand or walk. 56 Fed. Reg. 35,696, 35,699 (July 26, 1991) (preamble to DOJ regulations for Title II, for § 35.104) ("a person who is a paraplegic is substantially limited in the major life activity of walking").

---

[74] This section incorporates by reference the injunction authority of section 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). That in turn incorporates by reference the remedies of the Civil Rights Act of 1964.

Many members of Outdoor Buddies, including Plaintiffs David Bayne and Dylan Harrell, are paraplegics, or have other ADA-covered physical disabilities. Plaintiffs are also "qualified individuals" because they "meet the essential eligibility requirements." 42 U.S.C. § 12131(2). They are competent, responsible, law-abiding, qualified firearms users who would use and possess magazines of greater than 15 rounds, but for HB 1224.

**B.      Plaintiffs Have Been Discriminated Against by Reason of Such Disabilities**

**1.      Disparate impact**

Disparate impact is sufficient for an ADA Title II claim. *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 859-860 (10th Cir. 2003) ("Congress sought with § 504 – and consequently with Title II of the ADA – to remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination."), *overruled on other grounds by Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012); *Barber ex rel. Barber v. Colorado Dep't of Revenue*, 2005 WL 2657885 at *3 (D. Colo. Oct. 17, 2005) (disparate impact is a viable claim under Title II).

It is not necessary to prove discriminatory intent; what matters is the effect. *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012) ("Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination. . . . To prove a case of disparate impact discrimination, the plaintiff must show that 'a specific policy caused a significant disparate effect on a protected group.'") (quoting *Reinhart v. Lincoln Cnty.*, 482 F.3d 1225, 1229 (10th Cir. 2007)); *see also Grider v. City & Cnty. of Denver*, 2011 WL 721279 at *4 (D. Colo. Feb. 23, 2011).

Plaintiffs must offer more than a "simple, anecdotal showing" that they were affected by the policy. *Id.* at *4. They must provide the "analytical mechanism to determine disproportionate impact." *Id.* (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576 (2d Cir. 2003)).

According to Bureau of Justice Statistics:

- In 2011, the average annual age-adjusted rate of serious violent victimization for persons with disabilities (22 per 1,000) was more than three times higher than that for persons without disabilities (6 per 1,000).

- The rate of violent victimization (serious and lesser) for males with disabilities was 42 per 1,000 in 2011, compared to 22 per 1,000 for males without disabilities.

- For females with disabilities, the rate of violent victimization (serious and lesser) was 53 per 1,000 in 2011, compared to 17 per 1,000 for females without disabilities.[75]

Plaintiffs will provide additional evidence of disparate impact at trial.

After Plaintiffs meet this burden, the burden shifts to Defendant "to show that the practice furthered a legitimate governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* (citing *Tsombanidis*, 352 F.3d at 575).

## 2.    In addition, the legislative record shows discriminatory intent

In the Tenth Circuit, actual discriminatory intent is present when there is a showing of "deliberate indifference." *Barber ex rel. Barber v. Colorado Dept. of Rev.*, 562 F.3d 1222, 1228-29 (10th Cir. 2009) ("[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."). The legislative record shows deliberate indifference. At the Feb. 12, 2013, hearing of the House Judiciary Committee, Sammy Myrant testified:

---

[75] United States Department of Justice, Bureau of Justice Statistics, *Crime Against Persons with Disabilities, 2009-2011* at 3, 5 (NCJ 240299 Dec. 2012).

> I am disabled, so I can't put a clip in and out very quickly. I drop them, even when I'm practicing at the range. . . . [t]he man who committed 16 felony counts of rape, child abuse on this child gets out of prison this year. So there are times when we're going to need a magazine of high capacity. He's a member of the Aryan Brotherhood, and he gets out of prison this year. And he has sworn to kidnap her and us, rape her again in front of us, then kill us in front of her.

LH, 2/12/13 at 124-25 (1224). Asked how many rounds he would want for self-defense, he responded "30." *Id.* at 125. More such stories likely would have been presented if the legislative leadership had not limited public testimony.

Some of Defendant's witnesses have stated that they do not believe that disabled people should defend themselves with AR-15 rifles or with guns that use detachable box magazines. ADA Title II is intended to outlaw discrimination based on "patronizing attitudes, fears, and stereotypes about individuals with disabilities." *See* 56 Fed. Reg. 35,694, 35,703 (July 26, 1991) (regarding 28 C.F.R. § 35.130). "Qualified individuals" who are disabled have the right to make personal decisions about their own safety.

## C.      The Discrimination was by a Public Entity

Defendant's asserts the affirmative defense that "Plaintiffs have not been excluded from participation in the benefits and programs of a public entity." However, ADA Title II is not just about the "services, programs, or activities of a public entity." Title II additionally protects any covered person "subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Title II applies "to anything a public entity does," including "activities of the legislative" branch of State and local government. It covers "all actions of State and local governments." 56 Fed.Reg. 35,694, 35,696, (July 26, 1991) (preamble to DOJ regulations for Title II, for §§ 35.102 & .103). Hence, Title II applies to state statutes. *See Thompson v. Cooke*, 2007 WL 891364 at *5 (D. Colo. Mar. 22, 2007) (state statute on fees for handicapped parking permits violated ADA Title II regulation in 28 C.F.R. § 35.130(f)); *T.E.P.& K.J.C. v. Leavitt*, 840 F. Supp. 110, 111 (D.

Utah 1993) (permanently enjoining state statute against marriage by HIV-positive persons as a violation of Title II); *T.P. v. DuBois*, 843 F. Supp. 775, 776 (D. Mass. 1993) (state statute violates ADA Title II).

Any contrary rule would be absurd; otherwise, a state could enact a statute forbidding the physically disabled to leave their homes after dark. The public safety purpose of the statute might arguably pass the rational basis test, but the statute would certainly violate Title II.

### D.    Reasonable Accommodation

"Courts have recognized that a claim implicating the public entity's failure to make reasonable accommodation of disabled people is a freestanding claim which does not require a showing of either the discriminatory state of mind of the disparate treatment claim or the class-based evidence of disparate impact." *Grider*, 2011 WL 721279 at *5 (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 276–77 (2d Cir. 2003)).

Governments have an obligation to make reasonable accommodation for the disabled. *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007) ("To effectuate Title II's mandate, the regulations require public entities to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.'") (quoting 28 C.F.R. § 35.130(b)(7)). That a generally applicable government policy might have to be modified to comply with the ADA is the point of the ADA, which "contemplates that different or separate benefits or services be provided if they are 'necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others.'" *Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach*, 846 F. Supp. 986, 991 (S.D. Fla. 1994) (quoting 28 C.F.R. §35.130(b)(1)(iv)).

Although the burden to identify a reasonable accommodation "is 'not a heavy one,' the plaintiff must nevertheless identify a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' If the plaintiffs carry their burden, the public entity bears the burden of showing that the requested accommodation is unreasonable in some way – e.g., that it would 'fundamentally alter the nature of the activity' in question, or that it would 'impose an undue hardship.'" *Grider*, 2011 WL 721279 at *5 (quoting *Henrietta D.*, 331 F.3d at 280-81).

A reasonable modification to the magazine ban would be to allow an exemption for persons who have been formally diagnosed as having a covered ADA disability which impairs their ability to defend themselves: physical disabilities which eliminate or significantly reduce an individual's mobility to retreat or the dexterity to change a magazine quickly.

The legislature could have enacted a reasonable modification that the disabled person undergo a background check before purchasing a magazine. This would not violate the ADA, as long as the person was not charged a fee. 28 C.F.R. § 35.130(f). Given that the CBI did not charge any firearms buyer a fee until 2013, the necessary spending for magazine background checks for disabled persons would be reasonable, and could be paid from general revenues, as § 35.130(f) requires.[76]

Even if this Court were to uphold the constitutionality of HB 1224, a reasonable accommodation under the ADA can include limited exemptions from a generally applicable law of unquestionable constitutionality, and which was enacted with no discriminatory intent. For example, the Ninth Circuit ruled that Hawaii's requirement of a 120-day quarantine for dogs had

---

[76] Unlike the instant case, in *Grider*, the plaintiffs wanted to repeal the entire ordinance. Their accommodation would require that the local government create a process for "case-by-case analysis" of individual dogs. That might be an "undue burden." *Grider*, 2011 WL 721279 at *5 n.5. Here, a case-by-case system already exists – the background check systems for firearms.

to be modified for the benefit of vision-impaired people who use guide dogs. *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).

### E.     Defenses

#### 1.     Fundamental alteration or undue burden

"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Fundamental alteration, however, is an affirmative defense. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 606 (1999) (Stevens, J., concurring) (describing fundamental alteration as an affirmative defense); *see also Kerr v. Heather Gardens Ass'n*, 2010 WL 3791484 at *2 (D. Colo. Sept. 22, 2010) (same).

Defendant has raised various defenses, but not fundamental alteration/undue burden. Accordingly, Defendant has waived the affirmative defense. F.R.C.P. 8(c); *Stafne v. Unicare Homes*, 266 F.3d 771, 779 (8th Cir. 2001).

#### 2.     Sovereign immunity

Defendant has not raised sovereign immunity, but the defense has not been waived, because he has not shown "unequivocal intent to do so." *Guttman v. Khalsa*, 669 F.3d 1101, 1110 (10th Cir. 2012).

It does not matter. The Tenth Circuit is very explicit that ADA plaintiffs may seek claims for injunctive relief against a state official:

> An individual can bring an *Ex parte Young* claim against a state official in federal court for an ADA or § 1983 violation. In *Garrett*, 531 U.S. at 374 n.9, the Supreme Court reaffirmed that an *Ex parte Young* ADA claim can proceed even if the state defendants are protected by sovereign immunity. Although *Garrett* involved a suit brought under Title I of the ADA, there is no relevant difference

between Title I and Title II as far as the availability of prospective injunctive relief is concerned.

*Guttman*, 669 F.3d at 1127 (internal citations omitted).[77]

## VII.  HB 1224'S "CONTINUOUS POSSESSION" PROVISIONS ARE VOID FOR VAGUENESS

The void-for-vagueness doctrine is a subset of the Due Process clause. Criminal laws must give a person of ordinary intelligence fair notice that his or her contemplated conduct is forbidden. *U.S. v. Lovern*, 590 F.3d 1095, 1003 (10th Cir. 2009). Similarly, a penal statute must specify what is prohibited in a way that does not encourage arbitrary and discriminatory enforcement. *Dias v. City & County of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009). While the Supreme Court has opined that the second concern is more important, it continues to analyze each element separately. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).

There are two preliminary inquiries for vagueness challenges in the Tenth Circuit. First, a court must determine if the challenge is appropriate under the circumstances. *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988). Then, the court must consider the strictness of the test to be applied to the challenge. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). If the Court finds that a challenge is appropriate and determines the strictness to be applied, then it considers whether the challenged law provides sufficient notice and whether it encourages arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Kolender*, 461 U.S. at 357.

### A.    A Facial Vagueness Challenge Is Appropriate

---

[77] Several other circuits are in accord. *See Koslow v. Pennsylvania*, 302 F.3d 161, 179 (3d Cir. 2002); *McCarthy ex rel. Travis v. Hawkings*, 381 F.3d 407, 413-414 (5th Cir. 2004); *Klinger v. Director, Dept. of Rev.*, 281 F.3d 776, 777 (8th Cir. 2002); *Carten v. Kent State Univ.*, 282 F.3d 391, 396.

Facial challenges are proper in two circumstances. First, a statute may be challenged when it threatens to chill constitutionally protected conduct. *Gaudreau*, 860 F.2d at 360. Second, a facial challenge to the constitutionality of a statute may be appropriate on pre-enforcement review. *Id.*

Plaintiffs' challenge here is appropriate under both preliminary tests. HB 1224's continuous possession clause threatens to chill the constitutionally protected conduct of loaning firearms with a capacity of 16 or more rounds (or the magazines themselves) to family members and friends for lawful purposes. Also, under the second consideration, a vagueness challenge is appropriate in this circumstance because the challenge is pre-enforcement. *See* Fourth Amended Complaint for Declaratory and Injunctive Relief (Doc. 46).

### B.     A high degree of specificity is required for HB 1224 to overcome Plaintiffs' Fourteenth Amendment facial vagueness claim

The degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement – depend in part on the nature of the enactment. *Murphy v. Matheson*, 742 F.2d 564, 570 (10th Cir. 1984). Courts consider four factors when determining the degree of specificity required to overcome the vagueness challenge. *See Gaudreau*, 860 F.2d at 360; *Flipside*, 455 U.S. at 498. First, criminal statutes must be more precise because the consequences of vagueness are more severe. *Gaudreau*, 860 F.2d at 360. Further, a scienter requirement may mitigate a criminal law's vagueness by ensuring that it punishes only those who are aware their conduct is unlawful. *Id.* Also, regulatory statutes governing business activities may be less precise because the conduct prescribed is usually in a narrow category and the business may be able to obtain clarification from an administrative agency. *Id.* Finally, the Constitution demands more clarity of laws that threaten to inhibit constitutionally protected conduct, especially conduct protected by the First Amendment. *Id.*

Here, all four factors counsel in favor of requiring a high degree of specificity. First, HB 1224 is a penal statute and the consequence of its vagueness is criminal prosecution and loss of the right to possess an arm. Next, HB 1224 has no scienter requirement. Indeed, HB 1224 has no mens rea requirement whatsoever and will subject citizens to criminal punishment even if they violate the statute inadvertently. Third, HB 1224 does not involve the regulation of business activities but the exercise of a fundamental right. Finally, HB 1224 inhibits the constitutionally protected conduct of loaning firearms and magazines for lawful purposes. Consequently, a high degree of specificity is required for HB 1224 to overcome Plaintiffs' Fourteenth Amendment pre-enforcement facial vagueness challenge.

### C.      HB 1224 does not provide fair notice as to what acts are unlawful

HB 1224 does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited. "Continuous possession" is not defined anywhere. Thus, no one knows with any certainty what "continuous possession" means. Nor can even a lawyer opine with certainty what would constitute a "voluntary relinquishment of dominion and control" as set out in the July 10, 2013, Technical Guidance. The vagueness and lack of notice in HB 1224's phrase "continuous possession" is further amplified by the fact that HB 1224 does not contain a scienter or mens rea requirement, exposing citizens to criminal penalties for unknowingly violating HB 1224.

### D.      Adequacy of HB 1224's enforcement standards

A statute also cannot authorize or encourage arbitrary and discriminatory enforcement by establishing a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections. *Kolender*, 461 U.S. at 357-58; *Gaudreau*, 860 F.2d at 363-64. A vague

law is one in which the enforcement is "completely subjective" and enforceable "at the whim of any officer." *Firth v. Shoemaker*, 2010 WL 882505 at *10 (D. Colo. Mar. 8, 2010).

Here, HB 1224 contains no enforcement standards. For example, HB 1224 is silent on how law enforcement officers are to determine if a magazine was purchased prior to or after July 1, 2013. Magazines purchased before or after are identical, with the exception of the few that are date-stamped. With no way to determine whether particular magazines were acquired prior to July 1, 2013, HB 1224 permits arbitrary and discriminatory enforcement.

Moreover, HB 1224's phrase "continuous possession" is undefined and open to interpretation by individual law enforcement officers, prosecutors, judges, and juries. The Technical Guidances relied upon by Defendant are not widely distributed, nor is there evidence that law enforcement has been trained on what "continuous possession" means, leaving each department or officer are free to interpret it as they see fit. HB 1224 is unconstitutionally vague under the Fourteenth Amendment.

### E.     The "No Set of Circumstances" Test

Plaintiffs expect that Defendant will advocate for the "no set of circumstances" test derived from *United States v. Salerno*, 481 U.S. 739, 745 (1987). That test generally requires that the challenger establish that "no set of circumstances exist under which the Act would be valid." *Salerno*, 481 U.S. at 745. Although some courts have adopted this test, the Tenth Circuit has specifically rejected the notion that the test applies in pre-enforcement facial vagueness challenges. *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012), considered the defendant city's argument (based on *Salerno*) that "in a facial vagueness challenge a court . . . must simply determine whether it can imagine hypothetical situations in which the ban could possibly be constitutionally applied. 667 F.3d at 1123. The court found that, "[c]ontrary to the

City's position, it has not been established that the 'no set of circumstances' test applies to facial vagueness challenges ***not based on overbreadth***." *Id.* (emphasis in original). Moreover, the court stated that "[t]he idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority." *Id.* at 1124 (collecting cases). Instead, the court stated that "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Id.* at 1123.

**CONCLUSION**

HB 1224 and HB 1229 are contrary to the supreme Law of the Land: the Second and Fourteenth Amendments to the United States Constitution, and the Americans with Disabilities Act, which was enacted in pursuance thereof. This court should so declare, and enjoin these enactments, as defined in this trial brief and as Plaintiffs have outlined in the Final Pretrial Order.

Dated this 14th day of March, 2014.

Respectfully submitted,

s/Richard A. Westfall
Richard A. Westfall
Peter J. Krumholz
HALE WESTFALL LLP
1600 Stout Street, Suite 500
Denver, CO 80202
Phone: (720) 904-6010
Fax: (720) 904-6020
rwestfall@halewestfall.com

**ATTORNEYS FOR DISABLED CITIZENS, OUTDOOR BUDDIES, INC. THE COLORADO OUTFITTERS ASSOCIATION, COLORADO FARM BUREAU, AND WOMEN FOR CONCEALED CARRY**

s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org
**ATTORNEY FOR JOHN B. COOKE, KEN PUTNAM, JAMES FAULL, LARRY KUNTZ, FRED JOBE, DONALD KRUEGER, STAN HILKEY, DAVE STONG, PETER GONZALEZ; SUE KURTZ, DOUGLAS N. DARR, AND DAVID STRUMILLO**


s/Douglas Abbott
Jonathan M. Anderson
Douglas Abbott
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO 80201-8749
Phone: (303) 295-8566
Fax: (303) 672-6508
jmanderson@hollandhart.com
**ATTORNEYS FOR MAGPUL INDUSTRIES AND THE NATIONAL SHOOTING SPORTS FOUNDATION**


s/Marc F. Colin
BRUNO COLIN JEWELL & LOWE PC
1999 Broadway, Suite 3100
Denver, CO 80202-5731
Phone: (303) 831-1099
Fax: (303) 831-1088
mcolin@bcjlpc.com
**ATTORNEY FOR LICENSED FIREARMS DEALERS**

s/Anthony J. Fabian
LAW OFFICES OF ANTHONY J. FABIAN PC
510 Wilcox Street, Suite C
Castle Rock, CO 80104
Phone: (303) 663-9339
Fax: (303) 713-0785
fabianlaw@qwestoffice.net
**ATTORNEY FOR COLORADO STATE SHOOTING ASSOCIATION AND HAMILTON FAMILY**

ENTERPRISES, INC. D/B/A FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2014, I have served the foregoing pleading via the CM/ECF system for the United States District Court for the District of Colorado:

David B. Kopel                  david@i2i.org

Jonathan M. Anderson            jmanderson@hollandhart.com

Douglas Abbott                  dabbott@hollandhart.com

Marc F. Colin                   mcolin@bcjlpc.com

Anthony J. Fabian               fabianlaw@qwestoffice.net

Matthew Grove                   matt.grove@state.co.us

Kathleen Spalding               kit.spalding@state.co.us

Jonathan Fero                   jon.fero@state.co.us

David Blake                     david.blake@state.co.us

Daniel D. Domenico              dan.domenico@state.co.us

Stephanie Scoville              stephanie.scoville@state.co.us

John Lee                        jtlee@state.co.us

LeeAnn Morrill                  leeann.morrill@state.co.us


s/David B. Kopel
INDEPENDENCE INSTITUTE
727 E. 16th Avenue
Denver, CO 80203
Phone: (303) 279-6536
Fax: (303) 279-4176
david@i2i.org