**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 13-cv-01300-MSK-MJW**

**COLORADO OUTFITTERS ASSOCIATION;
COLORADO FARM BUREAU;
NATIONAL SHOOTING SPORTS FOUNDATION;
MAGPUL INDUSTRIES;
COLORADO YOUTH OUTDOORS;
USA LIBERTY ARMS;
OUTDOOR BUDDIES, INC.;
WOMEN FOR CONCEALED CARRY;
COLORADO STATE SHOOTING ASSOCIATION;
HAMILTON FAMILY ENTERPRISES, INC., d/b/a FAMILY SHOOTING CENTER AT
CHERRY CREEK COLORADO PARK;
DAVID STRUMILLO;
DAVID BAYNE;
DYLAN HARRELL;
ROCKY MOUNTAIN SHOOTERS SUPPLY;
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC;
BURRUD ARMS INC. D/B/A JENSEN ARMS;
GREEN MOUNTAIN GUNS;
JERRY'S OUTDOOR SPORTS;
SPECIALTY SPORTS & SUPPLY;
GOODS FOR THE WOODS;
JOHN B. COOKE;
KEN PUTNAM;
JAMES FAULL;
LARRY KUNTZ;
FRED JOBE;
DONALD KRUEGER;
DAVE STRONG;
PETER GONZALEZ;
SUE KURTZ; and
DOUGLAS N. DARR,**

     **Plaintiffs,**

**v.**

**JOHN W. HICKENLOOPER, Governor of the State of Colorado,**

     **Defendant.**

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

**THIS MATTER** comes before the Court following a bench trial on the Plaintiffs' claims under the Second and Fourteenth Amendments to the United States Constitution, and under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et seq.* Having considered the evidence presented and the parties' arguments, the Court finds and concludes as follows.

## I. Factual Background

In 2013, in the wake of a mass shooting at a movie theater in Aurora, Colorado, the Colorado General Assembly enacted gun control legislation that included two new criminal statutes: (1) C.R.S. § 18-12-302, banning the sale, possession, and transfer of "large-capacity magazines," as that term is statutorily-defined; and (2) C.R.S. § 18-12-112, expanding mandatory background checks to recipients of firearms in some private transfers.

This action was initiated before the statutes became effective. The Plaintiffs — individuals who own guns, associations and organizations of gun owners and advocates, and businesses that manufacture or sell magazines and/or firearms — challenge these statutes and seek to permanently enjoin their enforcement. Many of the Plaintiffs opposed the legislation before the General Assembly, and iterate the arguments they made during the legislative process here. The named Defendant is the Governor of the State of Colorado, sued in his official capacity.[1] Thus, all future references to the Defendant will be to Colorado.[2]

---

[1]     *See Kentucky v. Graham*, 473 U.S. 166 (1985).

[2]     Generally, the Eleventh Amendment to the United States Constitution shelters a state from private suits brought without its consent under the doctrine of sovereign immunity. *Ellis v. Univ. of Kansas Medical Center*, 163 F.3d 1186, 1195 (10th Cir. 1998). However, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a narrow "exception" to states' sovereign immunity to allow private litigants to seek an injunction in federal court against a state

A number of claims were dismissed prior to trial.  The issues at trial were: (1) whether §

18-12-302 and § 18-12-112 violate the Second Amendment[3] of the United States Constitution,

which guarantees the people's right to "keep and bear arms;" (2) whether the phrase "continuous

possession" in the grandfather clause of § 18-12-302 is so vague as to violate the people's right

to Due Process under the Fourteenth Amendment of the United States Constitution; and (3)

whether the statutes violate Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §

12132.[4]

## II.  The Scope of this Decision

The issue of gun control is controversial.  It is the subject of vigorous and passionate

debate in legislatures, the media, and innumerable public and private discussions across the

---

official, in order to prohibit the official from enforcing a state statute claimed to violate federal law.  *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011).  The doctrine rests on the premise — or rather, legal fiction — that when a federal court commands a state official to do nothing more than refrain from violating federal law, the official is not the state for sovereign-immunity purposes.  *Virginia Office for Protection and Advocacy v. Stewart*, 131 S.Ct. 1632, 1638 (2011).  In other words, such a suit is not technically against the state, but rather against an individual who has been "stripped of his official or representative character" because of his unlawful conduct.  *Ex parte Young*, 209 U.S. at 159-60.  For such exception to apply, the named state official must have a duty to "enforce" the statute in question and have demonstrated a willingness to exercise that duty.  *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007).  Given the duties of the Governor of Colorado to ensure that the laws of Colorado are enforced, Colo. Const. art IV, § 2, the Court finds that the *Ex parte Young* exception applies here.

[3]      By inference, the Plaintiffs also invoke the Fourteenth Amendment, which makes the Second Amendment applicable to the states.

[4]      Also pending before the Court are the parties' Joint Motion to Strike Expert Opinions Per Fed. R. Evid. 702 (**#118**) and the Defendant's second Motion to Dismiss (**#133**).  The Court's findings of fact and conclusions of law set forth herein implicitly adjudicate the Rule 702 motion, and the Court will not otherwise address it separately.  The Court's ruling on the Motion to Dismiss is incorporated into this opinion.

country.  The subject triggers both fear[5] and deeply-held societal values that conflict in varying degrees: the desire for physical safety, concerns about government intrusion into matters of individual liberty, the availability of mental health treatment for those disposed to violence, the effectiveness of existing law enforcement protection, and so on.  In crafting gun control laws, it is the role of the legislature to carefully examine each of these concerns, to weigh them against each other, and to create social policy in the form of legislation (or, indeed, to elect not to do so).

When the constitutionality of a state law is challenged, however, a court does not engage in the same process.  Judicial review of laws for constitutional compliance focuses on only a small sliver of the issues that the legislature considers.  A court does not act as a super-legislature to determine the wisdom or workability of legislation.  Instead, it determines only whether legislation is constitutionally permissible.  A law may be constitutional, but nevertheless foolish, ineffective, or cumbersome to enforce.

The limited role of the court grows out of the separation of powers among the executive, legislative, and judicial branches of government.  A legislature, being a body directly elected by the citizenry, is granted the broadest power to act for and by the people.  The judiciary acts only as a check on the exercise of that collective power, not by substitution of the personal opinion of a judge as to what he or she believes public policy should be.  The judge must only compare the public policy adopted by the legislature against the constitutional minimums that protect individual rights.

Constitutionality is a binary determination: either a law is constitutional, or it is not.  This Court will not express a qualitative opinion as to whether a law is "good" or "bad," "wise" or

---

[5]      Mass shootings are particularly frightening because they are unpredictable, occur in places one ordinarily expects to be safe, are horrendously violent, and there is no general consensus as to how to prevent them.

"unwise," "sound policy" or a "hastily-considered overreaction."  Similarly, this Court will not assess what alternatives the legislature could have chosen, nor determine whether the enacted laws were the best alternative.  Such decisions belong to the people acting through their legislature.  Put another way, in determining whether a law is constitutional, this decision does not determine whether either law is "good," only whether it is constitutionally permissible.

### III.  The Laws at Issue

#### A.  Prohibition of Large-Capacity Magazines

Colorado Revised Statute § 18-12-302(1) makes it a crime for a person to possess or transfer a large-capacity magazine after July 1, 2013.  The statute defines a "large-capacity magazine" as including, "a fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition."  C.R.S. § 18-12-301(2)(a)(I).  Persons who possessed such magazines on July 1, 2013 may be protected by a so-called "grandfather clause," which states that a person can possess large-capacity magazines if: (1) the magazines were acquired before July 1, 2013, and (2) if the person has maintained (and continues to maintain) "continuous possession" of the magazines.  C.R.S. § 18-12-302(2)(a).  The statute also contains a handful of specifically-defined exceptions permitting the possession of large-capacity magazines by, among others, certain narrow classes of firearm manufacturers, firearm dealers, and government officials who carry weapons as part of their official duties.

#### B.  Mandatory Background Checks for Private Firearm Transfers

Colorado has long required background checks for those acquiring firearms at gun shows or from firearm dealers.[6]  Such background checks must be performed by a licensed gun dealer

---

[6]   *See* C.R.S. § 24-33.5-424 (firearm sales), and C.R.S. § 12-26.1-101 (gun shows).

as defined in C.R.S. § 12-26.1-106(6).  Prior to transfer of the firearm, a search must be performed by, and approval obtained from, the Colorado Bureau of Investigation in accordance with C.R.S. § 24-33.5-424.

The 2013 law, Colorado Revised Statute § 18-12-112, expands the background check requirement to certain private transfers of firearms.  It makes it a crime for both the person transferring possession (the transferor) and person taking possession of a firearm (the transferee) to transfer possession of the firearm in a private transfer without first obtaining a background check for the transferee.  In addition, the statute makes the transferor liable for any injury caused by the transferee's use of the firearm if no background check was obtained.  C.R.S. § 18-12-112(5).  The process for obtaining the background check is the same as that required for retail sales, but the fee that can be charged by the gun dealer performing the check is limited to ten dollars.  C.R.S. § 18-12-112(2)(d).  If the firearm is transferred to an entity rather than a living person, then a background check is required for each living person who will possess it.  C.R.S. § 18-12-112(1)(b).

The statute specifies certain types of private transfers for which no background check is required, including, among others: (1) gifts or loans between certain specifically-identified family members; (2) temporary transfers, made in the transferee's home, when the transferee reasonably believes that possession is necessary to prevent his or her imminent death or serious bodily injury; (3) temporary transfers of possession at shooting ranges, during target firearm shooting competitions, or while legally hunting, fishing, target shooting, or trapping; and (4) temporary transfers for no longer than seventy-two hours.  C.R.S. § 18-12-112(6).

### IV.  Jurisdiction

The Plaintiffs invoke the Court's jurisdiction under 28 U.S.C. § 1331.  Colorado, however, contends that the Court lacks jurisdiction to determine the constitutionality of either statute because no Plaintiff has shown standing to assert such claim.

The Plaintiffs' standing has been a persistent and problematic issue in this case. Colorado filed two motions seeking to dismiss claims on that basis.  In ruling on Colorado's first Motion to Dismiss (**#96**), the Court set out the legal standards that guided its analysis.[7]  The Court adopts that explication as if fully set out herein, but expands its reasoning in this ruling, as necessary.

Summarized briefly, for a federal Article III court to have jurisdiction to determine a matter, there must be a "claim or controversy" that is "justiciable."  For a claim or controversy to be justiciable, at least one plaintiff must have standing to assert the claim.  To have standing, a plaintiff must show that he, she, or it has been or is being injured, that the challenged law causes the injury, and that the lawsuit will provide relief for the injury.  *See Lujan v. Defenders of*

---

[7]      Colorado's Second Motion to Dismiss (**#133**), was filed shortly before trial.  It seeks dismissal of the challenge to the constitutionality of C.R.S. § 18-12-302 arguing that no Plaintiff has shown standing.  Alternatively, it seeks dismissal of claims by certain Plaintiffs.  As to § 18-12-112, it addresses standing in a footnote, "maintaining that [the claims] are not justiciable," but not expressly "re-raising arguments" it previously made in its first Motion to Dismiss.  Both this Motion and the Plaintiffs' Response at (**#134**) rely on discovery responses and other documents prepared before trial.  The Court has an independent duty to assure that jurisdiction is secure, and therefore this opinion will not necessarily follow the arguments of the parties.  *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996); *PeTA v. Rasmussen*, 298 F3d 1198, 1202 (10th Cir. 2002); *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).  In addition, because standing is determined in conjunction with the trial in this matter, the Court limits its consideration to the evidence presented at trial, rather than using the standard for pre-trial consideration of standing issues that indulges "well-pled" allegations and affidavits with the presumption that the facts contained therein will ultimately be proven.  *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).

*Wildlife*, 504 U.S. 555, 560-61 (1992).  The injury must be actual and concrete, rather than anticipated, hypothetical, or speculative.

When a plaintiff seeks to enjoin the enforcement of a criminal statute on grounds that it abridges a constitutional right, it is not necessary for the plaintiff to violate the statute in order to show an injury.  Instead, the law recognizes that the mere existence of a criminal statute can prevent or chill a plaintiff's desire to exercise conflicting constitutional rights.  *See Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997).  Thus, the law deems a plaintiff to suffer a continuing injury sufficient for standing if it can be shown that: (1) the plaintiff genuinely intends to engage in a course of conduct that is constitutionally protected but is proscribed by the challenged statute, and (2) if the plaintiff engaged in such conduct, there exists "a credible threat" that the plaintiff would be prosecuted under the statute.  *See Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298-299 (1979); *Dias v. City and County of Denver*, 567 F.3d 1169, 1176-77 (10th Cir. 2009) (citing *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)).  To be "credible," the threat of prosecution must be more than imaginary or speculative.  *Younger v. Harris*, 401 U.S. 37, 42 (1971); *Golden v. Zwickler*, 394 U.S. 103 (1969).

Both § 18-12-302 and § 18-12-112 are criminal statutes.  No Plaintiff has been charged with violating either statute nor specifically threatened with prosecution.  Thus, no Plaintiff has suffered an actual past injury.  Instead, the Plaintiffs bring facial challenges to these statutes[8] and seek prospective injunctive relief.  For these claims to be justiciable, the evidence at trial must show that at least one Plaintiff intends to engage in a course of constitutionally protected conduct

---

[8]     Challenges to the constitutionality of statutes can take two forms.  There can be a challenge as to how the law has actually been applied to a plaintiff (an "as-applied" challenge) or, there can be a challenge based solely on its language and anticipated applications (a "facial" challenge).  Here, because the statutes have not been enforced against any Plaintiff, only facial challenges have been asserted.

that would violate the statute and that there is a "credible threat" of prosecution should the Plaintiff do so.  *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1166 (10th Cir. 1996).

## A.  Standing for Challenges to § 18-12-302

The Plaintiffs challenge this statute on two grounds: (1) that it violates rights protected by the Second (and by inference, the Fourteenth) Amendment to the United States Constitution; and (2) that the "grandfather clause" is so vague that it denies due process under the Fourteenth Amendment to the United States Constitution.  For these claims to be justiciable, the evidence must show that at least one Plaintiff[9] either: (1) possesses a large-capacity magazine that he or she acquired after July 1, 2013, in violation of the statute (in other words, not subject to any of the statutory exceptions); (2) intends to acquire a new large-capacity magazine in violation of the statute; or (3) intends to transfer or sell a large-capacity magazine, owned as of July 1, 2013, in violation of the statute.  In addition, such Plaintiff must show that there is a "credible threat of prosecution" for such violations.

### 1.  Individual Plaintiffs

The Court turns first to the individual Plaintiffs.  At trial, evidence was presented only as to three individual Plaintiffs — David Bayne, Dylan Harrell, and John Cooke.  No evidence shows that any of these Plaintiffs meet the requirements of standing discussed above.

Mr. Bayne lived in Thornton, Colorado when this action was initiated, but has since moved to Georgia.  He did not testify that he intends to return to Colorado, much less that he

---

[9]      No evidence was presented to demonstrate the standing of the following Plaintiffs: National Shooting Sports Foundation; USA Liberty Arms; 2nd Amendment Gunsmith & Shooter Supply, LLC; Green Mountain Guns; Jerry's Outdoor Sports; specialty Sports & Supply; Goods for the Woods; David Strumillo; Ken Putnam; James Faull; Larry Kuntz; Fred Jobe; Donald Krueger; Dave Strong; Peter Gonzalez; Sue Kurtz; and Douglas N. Darr.

would return with his large-capacity magazines.  Thus, there is no evidence that he is likely to be subject to the statute in the future.

Mr. Harrell owns large-capacity magazines that were purchased before July 1, 2013. There is no evidence that suggests that Mr. Harrell's continued possession would not be protected by the grandfather clause, thus he is not currently in violation of the statute or subject to a risk of prosecution.  Mr. Harrell did not testify about any intention to acquire additional large-capacity magazines in the future, nor did he express an intention to transfer the large-capacity magazines currently in his possession, nor otherwise testify about future conduct that would place him at risk of prosecution.  Accordingly, Mr. Harrell lacks standing to challenge the statute.

Mr. Cooke currently serves as the Sheriff of Weld County and will be retiring in 2015. There was no evidence as to whether he currently possesses large-capacity magazines.  His testimony strictly related to a "survey" he conducted of his employees (none of whom are Plaintiffs).  Even assuming that Mr. Cooke does possess large-capacity magazines, his current possession is exempted from the prohibition (due to his status as a law enforcement employee), and there was no testimony that, upon his retirement, he intends to transfer such magazines or intends to acquire more in violation of the statute.  Thus, on this record, the Court finds that no individual Plaintiff has shown standing to challenge § 18-12-302.

### 2. Plaintiffs that are Entities

The Court then turns to the Plaintiffs that are entities.  They fall roughly into two groups: associations of gun enthusiasts/advocates and firearm businesses.  The associations are Colorado Youth Outdoors, Women for Concealed Carry, Outdoor Buddies, Colorado State Shooting Association, Colorado Farm Bureau, and Colorado Outfitters Association.  The firearm

businesses are Rocky Mountain Shooter Supply and Burrud Arms, Inc. (both licensed firearm dealers), Hamilton Family Enterprises, Inc. (a shooting range operator), and Magpul Industries (a manufactures of magazines).

As to the associational entities, the Court begins by examining whether these entities can assert associational standing on behalf of their members.  "Associational standing" is recognized if an organization can establish that: (1) its members would otherwise have standing to sue in their own right; (2) the members' interests that the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.  *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756 (10th Cir. 2010).  With regard to the first element, the entity Plaintiffs must show, through specific facts, that at least one of its members would be directly affected by the statute.  *See Lujan*, 504 U.S. at 563 (citing *Sierra Club v. Morton*, 405 U.S. 727, 735, 739 (1972), and *Hunt v. Washington Colorado Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

At trial, Elisa Dahlberg, a member of Women for Concealed Carry, testified that Women for Concealed Carry is a nonprofit organization committed to providing information to women who choose to carry a concealed weapon as a form of self-defense.  She further testified that she owns two semiautomatic carbine-style rifles and a 9mm semiautomatic handgun, each of which are equipped with a large-capacity magazine.  She testified that she uses these firearms for home defense and target shooting, among other things.  It appears to be undisputed that Ms. Dahlberg's current possession of large-capacity magazines is permitted by the statute's grandfather clause, and the parties agree that all large-capacity magazines will wear out or become unusable at some

point in time.  Considering this, Ms. Dahlberg stated that, due to § 18-12-302, she will be unable to replace her large-capacity magazines once they no longer function.

The question of whether Ms. Dahlberg is suffering a continuing injury is a close one, because it is not clear when Ms. Dahlberg's magazines are likely to need replacement and whether, at that indeterminate point in future, she will desire to replace them with magazines of similar type.  Notwithstanding her current interests, with the passage of time, Ms. Dahlberg's desire to carry large-capacity magazines may change.[10]  If that happened, this statute would not affect her.

Nevertheless, in an attempt to find standing for some Plaintiff, the Court will assume that, in the absence of evidence as to the age of Ms. Dahlberg's existing large-capacity magazines and the functioning life of those magazines, Ms. Dahlberg may need to replace a large-capacity magazine in the very near future and that she will desire to replace it with another large-capacity magazine.  If that were the case, the restrictions of § 18-12-302 would nevertheless prevent her from acquiring and possessing the replacement large-capacity magazine.  Thus, the first element necessary for associational standing for Women for Concealed Carry is, arguably, satisfied.

The second element is also satisfied because the interests that Women for Concealed Carry ostensibly seek to protect — providing information to and engaging in advocacy on behalf of women who are interested in carrying concealed weapons for self-defense purposes — are "germane" to the interests that Ms. Dahlberg could assert on her own behalf.

Finally, because this claim is a facial challenge and the relief requested is prospective, it does not require the personal participation of the individual members of Women for Concealed

---

[10]     The inability to predict *when* Ms. Dahlberg may need to replace magazines and *what* her desires might be at that time is illustrative of how speculative a pre-enforcement, facial challenge to a criminal statute can be.

Carry in the lawsuit. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975). Whether the statute violates constitutional standards turns on the statute's plain language and its general operation, not on the particular circumstances for which Ms. Dahlberg or a specific member of Women for Concealed Carry possesses large-capacity magazines. Thus, the personal participation of Women for Concealed Carry's members is not essential.

Accordingly, with the benefit of some generous assumptions, the Court finds that Women for Concealed Carry has associational standing to assert the Second Amendment challenge to § 18-12-302.[11] Accordingly, the Court has jurisdiction to determine these challenges to the statute on their merits. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *Colorado of Utah v. Babbitt*, 137 F.3d 1193, 1215 n.36 (10th Cir. 1998).

### B.  Standing for the Challenge to § 18-12-112

The Plaintiffs assert a single challenge to § 18-12-112: that it violates the Second (and by inference, the Fourteenth) Amendment to the United States Constitution. Following the same analytical pattern used with regard to § 18-12-302, in order for the Court to consider this claim, at least one Plaintiff must establish a continuing injury by showing that he or she intends to engage in conduct protected by the Second Amendment but which violates § 18-12-112, and that if the Plaintiff engaged in such conduct, there is a credible threat that he or she would be prosecuted.

---

[11] The status of Women For Concealed Carry's standing to assert a vagueness challenge with regard to the "grandfather clause" of § 18-12-302 is a bit more murky, as it is not clear that Ms. Dahlberg's current possession of her grandfathered large-capacity magazines subjects her to a risk of future prosecution, nor that other members of Women For Concealed Carry similarly face such a risk. Nevertheless, for purposes of completeness of the Court's decision, the Court will assume that Women for Concealed Carry has associational standing to pursue this claim as well.

As noted above, § 18-12-112 requires that a background check be performed on the individual transferee(s) who take possession of a firearm through certain private transfers. The statute requires a licensed gun dealer to perform certain actions, retain certain records, and charge no more than ten dollars for the background check. The failure to obtain such a background check exposes both the transferor and transferee to criminal liability.

To establish a continuing injury sufficient to challenge § 18-12-112, the evidence must show either: (1) a Plaintiff intends to transfer or acquire a firearm, through a private sale not otherwise exempt under the statute, without first conducting a background check on the transferee; or (2) a Plaintiff who is a licensed gun dealer intends not to comply with the requirements for conducting the background check or other specified responsibilities. Further, either types of Plaintiff must also show that there is a "credible threat of prosecution" for this conduct.

### 1. Individual Plaintiffs

The Court begins its analysis of standing with the same three individual Plaintiffs discussed above, finding that none have demonstrated a continuing injury.

Mr. Bayne is not subject to prosecution under § 18-12-112 because he no longer lives in Colorado and does not intend to return.

Mr. Cooke did not provide any testimony with regard to his personal firearms, much less his intention to transfer them to others or to acquire new ones via private transfer, with or without a background check.

Mr. Harrell's circumstances are bit more complicated. He testified that, in the past, he has installed scopes on, or "sighted," firearms for friends and neighbors. On occasion, he kept the firearm for longer than 72 hours. Initially, the Court has some doubt that a person's taking

temporary possession of another person's firearm for the purpose of installing a scope or

"sighting" it is within the Second Amendment's protection of an individual right to "keep and

bear arms" for the purpose of self-defense.  But, assuming (without deciding), that it is, there is

no evidence that the transfer to Mr. Harrell is a private transfer requiring a background check.

Temporary transfers for up to 72 hours are exempt from the background check requirement, and

although there was testimony that Mr. Harrell sometimes retained the firearm for more than 72

hours, it was not clear that he did so out of necessity rather than convenience.  Assuming Mr.

Harrell could regularly perform the scoping or sighting of the firearm within the 72-hour period

and return the weapon, he would suffer no injury from the operation of the statute.  In addition,

assuming that he kept a firearm for longer than 72 hours with the owner's permission while

performing maintenance duties on it, he has not shown any credible threat that he would be

prosecuted for not first obtaining a background check.  Accordingly, the evidence does not

establish Mr. Harrell's standing.

### 2.  Plaintiffs that are Entities

As noted earlier, there are two groups of entity Plaintiffs.  With regard to this statute, the

Court begins with the firearm businesses — Rocky Mountain Shooter Supply, Burrud Arms,

Hamilton Family Enterprises, Inc., and Magpul Industries.

The Court has some doubt that these entities can have standing to bring a Second

Amendment challenge.  As discussed in greater detail below, rights granted under the Second

Amendment are *individual* rights premised upon an inherent natural right of self-defense.

Although businesses such as these might have standing to challenge a statute under some other constitutional theory, it does not appear that they are protected by the Second Amendment.[12]

Assuming, however, that a business entity *could* assert a Second Amendment challenge, the trial record does not show evidence of continuing injury to any of the Plaintiff business entities.  Rocky Mountain Shooter Supply and Burrud Arms are licensed firearm dealers.  Transfers by these Plaintiffs are not governed by § 18-12-112, and neither of these parties perform private background checks subject to the statute.  Hamilton Family Enterprises, Inc. operates a shooting range and lends firearms to those who use the range.  It sells firearm accessories including magazines, but does not sell firearms themselves, nor is it a licensed firearm dealer.  It appears that the only transfers made by Hamilton Family Enterprises are in the nature of loans that do not exceed 72 hours and are for the purpose of target shooting.  Such transfers are expressly exempt from the statute's requirements. According to the parties' stipulated facts, Magpul Industries designs and manufactures high-quality magazines and magazine accessories.  There is no evidence that it intends to be a transferor or transferee of a firearm in private sales, nor a licensed firearm dealer subject to § 18-12-112.

Next, the Court looks to the Plaintiff associations: Outdoor Buddies, Colorado Farm Bureau, Colorado Outfitters Association, Women for Concealed Carry, Colorado Youth Outdoors, and Colorado State Shooting Association.  Based on the evidence presented, it does not appear that any of these entities can bring a Second Amendment claim based on associational standing.

---

[12]     *Cf. United States v. Chafin*, 423 Fed.Appx. 342, 344 (4th Cir. 2011) (finding no authority to suggest that the Second Amendment protects a right to sell a firearm); *Mont. Shooting Sports Ass'n v. Holder*, 2010 WL 3926029, *21 (D.Mont. 2010) (recognizing that *Heller* did not extend Second Amendment protection to manufacturers and dealers seeking to sell firearms); *Teixeira v. Cnty. of Alameda*, 2013 WL 4804756, *6 (N.D.Cal. 2013) (same).

Outdoor Buddies is a non-profit organization with over 800 members, a third of whom are disabled.  Its mission is to "get disabled individuals active in the outdoors."  It lends highly specialized firearms to members for 3-day hunts.  Because these transfers are temporary and incident to legal hunting activities, they are exempt under § 18-12-112.  The evidence reflects that, sometimes, transferees keep a firearm for a period before or after the hunt, which time might exceed 72 hours.  But the record does not clearly establish that this is necessary (as opposed to convenient), or that any member would decline to participate if he or she could not retain the firearm for more than 72 hours beyond the time of a hunt.  As a consequence, the record does not reflect that either Outdoor Buddies or its members are at risk of prosecution under § 18-12-112.

The Colorado Farm Bureau (CFB) is a federation with 24,000 members, 5,800 of whom are active farmers and ranchers.  Its mission is to promote agriculture and protect agricultural values.  Nicholas Colgazier testified as its Director of Public Policy, and Michele Eichler testified as a member.  Mr. Colgazier works as an in-house lobbyist who brings pending legislation to the attention of the "board" for development of policy positions.  He did so with regard to § 18-12-112, then lobbied against it based on the requests of some members who opposed the background check requirement due to inconvenience and expense.  He did not offer testimony as to whether or how many of the CFB members would be transferors (or, arguably, transferees) in transfers subject to the statute, whether any would forego such transfers or intended to ignore the background check requirement, or otherwise testify as to facts demonstrating any "credible threat of prosecution."  Ms. Eichler testified that it would be inconvenient to have to obtain a background check in order to transfer a firearm to a ranch or farm hand.  She particularly worried that the gun kept in her farm truck (for predator control)

would inadvertently be in the possession of a ranch hand if the family left town for longer than 72 hours.  However, she acknowledged that there had never been an occasion when her ranch hand had possession of the gun for longer than 72 hours.  The Court finds that the evidence as to potential violations of the statute by CFB members to be speculative.  Moreover, even assuming that CFB's members would themselves have standing to challenge the statute, it is not clear that challenging firearms laws is within the scope of CFB's mission of promoting "agricultural values."  Finally, the Court finds that CFB has not shown that there is a "credible threat of prosecution" of its members for the conduct described at trial.

Ms. Eichler also testified as a member of Colorado Outfitters, but offered no evidence as to that association's organization, membership, or mission.  She testified that she and her husband run an outfitting business that takes between 100-150 clients on hunts each year.  In the past, if a client did not have a firearm, the Eichlers would loan the client one of their personal firearms for use during the hunt.  Hunts are usually five days, but may last longer if successful. It would appear that the type of transfers described by Ms. Eichler would be exempt under C.R.S. § 18-12-112(6)(e)(III).  But in any event, the lack of evidence about Colorado Outfitter's membership or mission requires a conclusion that it has not shown the requirements for associational standing.

Three associations — Women for Concealed Carry, Colorado Youth Outdoors, and Colorado State Shooting Association — each testified (through representatives) that they regularly "loan" firearms to their members for various purposes, sometimes for longer than 72 hours, without conducting background checks.  If these associations were individuals, with

clearly established Second Amendment rights,[13] they might have standing to assert a Second Amendment challenge to the statute.[14]   However, because they are entities rather than human beings, the question of whether they are protected by the Second Amendment is less than clear. As noted, the Second Amendment protects a fundamental *individual* right, and it is not clear that entities have any rights protected by the Second Amendment.  Such questions stretch the outer boundaries of current Second Amendment jurisprudence, and the parties have not specifically addressed these issues.

Thus, although the Court has profound reservations as to whether any Plaintiff has standing to challenge § 18-12-112, in the interests of providing a complete ruling, both for the guidance of the parties and the inevitable review by the Court of Appeals, the Court will assume that Women for Concealed Carry, Colorado Youth Outdoors, or the Colorado State Shooting Association have standing, in their own right, to challenge § 18-12-112 under the Second Amendment.

## V.  Analysis

### A.  History and Analytical Framework for Second Amendment Challenges

The Second Amendment to the United States Constitution provides**:**

> A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

---

[13]      It is not necessarily evident that that the Second Amendment's guarantee of a "right to keep and bear arms" extends to also guarantee the right of an owner of a firearm to lend that weapon to another (or to guarantee the right of a non-owner to borrow a firearm).  The parties have not addressed this question, and the Court does not consider it.

[14]      The Court rejects the notion that these associations have associational standing to bring claims on behalf of their members who might wish to engage in private transfers without conducting background checks.  The testimony by the representatives of these associations focused on the transfer of weapons ostensibly belonging to the associations themselves, not on private transfers that individual members intended to make involving their own, personally-owned weapons.

Until 2008, most courts did not construe the Second Amendment to protect an individual's right to possess and use firearms.  Courts were guided by the Supreme Court's decision in *United States v. Miller*, 307 U.S. 174, 179 (1939), which held that a right protected by the Second Amendment required "some reasonable relationship to the preservation or efficiency of a well regulated militia."  *See, e.g., United States v. Haney*, 264 F.3d 1161, 1164-66 (10th Cir. 2001); *Gillespie v. Indianapolis*, 185 F.3d 693, 710-11 (7th Cir. 1999); *Stevens v. United States*, 440 F.2d 144, 149 (6th Cir. 1971); *but see United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

In 2008, the legal landscape with regard to the Second Amendment shifted.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court considered a District of Columbia ban on the possession of usable handguns.  The Court concluded that the Second Amendment "confer[s] an individual right to keep and bear arms."  554 U.S. at 595.  To reach that conclusion, it de-linked the Second Amendment's prefatory clause — "a well regulated militia, being necessary to the security of a free state" — from its operative clause — "the right of the people to keep and bear Arms, shall not be infringed" — and explained that although the prefatory clause states the purpose for the right, it does not limit the right to own or use firearms to circumstances of militia service.[15]  *Id.* at 577.  Instead, the Court identified the core Second Amendment right as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," and defined the right to "keep and bear arms" as the ability to acquire, use, possess, or carry lawful firearms for *the purpose of self-defense*.  *See, e.g., id.* at 599 ("self-

---

[15]      This reasoning was extended to state statutes by virtue of the Fourteenth Amendment in *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

defense . . . was the *central component* of the right itself") (emphasis in original), at 628 ("the inherent right of self-defense has been central to the Second Amendment right").

As profound as *Heller* is, it does not stand for the proposition that there can be no permissible regulation of firearms or their use.  To the contrary, the Court explained that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose."  *Id.* at 626.  And the Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," among others.  *Id.* at 626-27 & n.26.

The Supreme Court did not specify in *Heller* what analytical framework should be used in testing laws challenged under the Second Amendment.  This was, in part, because it found that that the ban it was considering (a law effectively prohibiting the possession of functional handguns inside or outside of the home) would fail all recognized tests for constitutionality.  *Id.* at 628.  Since *Heller*, Second Amendment jurisprudence has continued to evolve, particularly with regard to the analytical standards to be applied.  Many Circuit Courts of Appeal, including the Tenth Circuit, have adopted a two-step approach.  *See United States v. Reese*, 627 F.3d 792 (10th Cir. 2010);[16] *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013);

---

[16]    The two-step process was also applied in *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012), and in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013).

*Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

In the two-step approach, a court must make a threshold determination of whether the challenged law burdens conduct falling within the Second Amendment's protection.  As part of this determination, the Court may consider whether the challenged law impacts firearms or firearm use, whether the affected firearms are currently in "common use," whether the affected firearms are used for self-defense inside or outside of the home, and whether the restriction is akin to restrictions that were historically imposed and customarily accepted.[17]  If the challenged law does not burden a right or conduct protected by the Second Amendment, then the inquiry is over.

If the challenged law burdens conduct protected by the Second Amendment, then a court must determine what level of constitutional scrutiny to apply.  Generally, constitutional scrutiny takes one of three forms.  *See United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938).  The least rigorous and most deferential standard is the "rational basis" test, which is used when a local, commercial, or economic right, rather than a fundamental individual constitutional right, is infringed.  *See Armour v. City of Indianapolis, Ind.*, 132 S.Ct. 2073, 2080 (2012).  More rigorous

---

[17]     Although this is a threshold determination, some circumstances may require a comparison of the burden imposed to "longstanding prohibitions" that have been generally accepted.  These include, but are not limited to: the possession of firearms by felons and the mentally ill; laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings; or laws imposing conditions and qualifications on the commercial sale of arms.  *Heller*, 554 U.S. at 625 & 627 n.26; *see also Jackson v. City and Cnty. of San Francisco*, 2014 WL 1193434, *4 (9th Cir. 2014).  In *Peterson*, the Tenth Circuit held that the Second Amendment did not confer a right to carry concealed weapons because such bans were long-standing.  *Peterson*, 707 F.3d at 1197.  In *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009), Judge Tymkovich presaged the possibility that reliance on the long-standing restriction exception to categorically exclude certain conduct from protection under the Second Amendment might circumvent constitutional scrutiny of current restrictions.

is "intermediate scrutiny" review, which applies to laws that infringe upon, but do not substantially burden, fundamental individual rights, such as content-neutral restrictions on speech. For a challenged law to satisfy intermediate scrutiny, it must be substantially related to an important governmental interest. *Reese*, 678 F.3d at 802 (citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012). Laws that substantially burden fundamental individual rights (*e.g.*, laws embodying racial discrimination or content-based restrictions on speech) are subject to "strict scrutiny." To satisfy strict scrutiny, a law must be narrowly-tailored to further a compelling government interest. *See Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002).

Recognizing that the Second Amendment protects fundamental individual rights, *Heller* instructed that the rational basis test should not be applied,[18] but it gave no instruction as what heightened level of scrutiny — intermediate, strict, or something in between — should apply. In subsequent cases, courts have analogized conduct protected under the Second Amendment to other fundamental individual rights such as those protected by the First Amendment (speech, religion, assembly, and petition).[19] Most courts have concluded that no single standard is applicable to all challenges under the Second Amendment. Rather, the level of scrutiny to be

---

[18]        *See* 554 U.S. at 628 n.27.

[19]        In free-speech cases, the standard of judicial review depends on the nature and degree of governmental burden on the First Amendment Right. For example, content-based regulations and laws that burden political speech are subject to strict scrutiny, whereas "time, place, and manner" regulations need only be "reasonable" and "justified without reference to the content of the regulated speech." *See Ezell*, 651 F.3d at 706-08 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), and *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)); *Chovan*, 735 F.3d at 1138. Firearm regulations that leave open alternative channels for self-defense are less likely to severely burden the Second Amendment right than those that do not. *See Jackson*, WL 1193434 at *4; *see also Marzzarella*, 614 F.3d at 97.

applied depends, in part, on the type of restriction being challenged and the severity of its burden

on the "core" Second Amendment right. *See, e.g., Marzzarella*, 614 F.3d at 96-97; *Reese*, 627

F.3d at 802; *Ezell*, 651 F.3d at 703; *Chovan*, 735 F.3d at 1138. The Tenth Circuit has joined

many other courts in applying intermediate scrutiny to Second Amendment challenges. *See, e.g.*,

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *United States v. Huitron-Guizar*, 678 F.3d

1164 (10th Cir. 2012).[20]

### B.  Application to § 18-12-302

Under the two-step test, the first question is whether § 18-12-302 impacts a right or

conduct protected by the Second Amendment. The Plaintiffs argue that by limiting magazines to

15 rounds or less, this statute impairs an individual's Second Amendment "right of self-defense."

Colorado reflexively responds that because people can still defend themselves, no Second

Amendment right is impaired.

Both positions are slightly off-base. They reflect a common confusion between the right

that is protected by the Second Amendment — that is, "to keep and bear arms" — and the

---

[20]     In *Reese* and *Huitron-Guizar*, the court applied the standard intermediate scrutiny test, and *Reese* expressly declined to impose a strict scrutiny standard. *See Reese*, 627 F.3d at 804 n.4. It appears that the Tenth Circuit relied heavily on a Seventh Circuit line of cases, beginning with *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010). In *Skoien*, the Seventh Circuit determined that another federal gun restriction, 18 U.S.C. § 922(g)(9), was constitutional based upon a "strong showing" that the statute was substantially related to an important government interest. *Id.* at 641. In selecting that test, the Seventh Circuit cited both to a First Amendment case, *Buckley v. American Constitutional Law Found., Inc.*, 525 U.S. 182, 202-04 (1999), and to a gender-classification equal protection case, *Heckler v. Mathews*, 465 U.S. 728, 744-51 (1984).
    Interestingly, some courts that analogize Second Amendment rights to First Amendment rights apply a more rigorous test than that adopted in *Skoien*, *Reese*, and *Huitron-Guizar*. Some have required a showing of a "tight fit" between the means and the ends, meaning that the statute is "narrowly tailored" to achieve the desired objective. *See, e.g., Heller II*, 670 F.3d at 1258 (citing *Bd. of Trustees v. Fox*, 492 U.S. 469 (1989), and *Ward v. Rock Against Racism*, 491 U.S. 781(1989)); *see also Marzzarella*, 614 F.3d at 97-98. Because it falls between the standard intermediate scrutiny and strict scrutiny, one might call it "intermediate scrutiny plus."

purpose of that right — "for defense of self and home."  Although *Heller* sometimes uses

shorthand phrases such as "a natural right of self-defense," 554 U.S. at 612, or the "inherent right

of self- defense," 554 U.S. at 612, it is clear that *Heller* does not extend the boundaries of the

Second Amendment to guarantee "self-defense" as a right in and of itself.  Nothing in *Heller* can

be read to guarantee an individual right to possess whatever firearm he or she subjectively

perceives to be necessary or useful for self-defense, nor any firearm for a purpose other than self-

defense.  To the contrary, the Supreme Court expressly stated that the rights embodied by the

Second Amendment have not historically been understood to be "a right to keep and carry any

weapon whatsoever." *Id.* at 626.  And the Supreme Court conceded that its interpretation of the

Second Amendment could authorize the prohibition of civilian possession of certain weapons

commonly used in military service, such as "M-16 rifles[21] and the like." *Id.* at 628.  *Heller* also

acknowledged the historical validity of "prohibitions on carrying concealed weapons." *Id.* at

626.  Such comments illustrate that the Supreme Court does not equate the Second Amendment

"right to keep and bear arms" to guarantee an individual the "right to use any firearm one

chooses for self-defense."

Instead, *Heller* describes the Second Amendment "right to keep and bear arms" rather

narrowly: the right to possess those weapons that are "in common use" for "self-defense"

purposes. *See id.* at 624-25 ("the Second Amendment's operative clause furthers the purpose

announced in its preface" by guaranteeing access to the type of arms "in common use at the time

for lawful purposes like self-defense"), at 627 ("the sorts of weapons protected were those in

---

[21]     The M-16 rifle mentioned by the Court is a military version of the AR-15 rifle, a rifle that
several witnesses in this case testified that they possess for their own self-defense purposes.  If,
as *Heller* implies, the M-16 rifle can legally be prohibited without violating the Second
Amendment, it seems to follow that other weapons such as the AR-15 may also be prohibited,
notwithstanding the fact that some individuals believe that such weapon is important, or even
essential, to their self-defense.

common use at the time"). *Heller* concluded that handguns were in common use because they are a "class of arms that is overwhelmingly chosen by American society for that lawful purpose [of self-defense]" and they are "the quintessential self-defense weapon." *Id.* at 628-29. Thus, the Court's first inquiry is whether § 18-12-302 burdens the right of individuals to possess commonly-used weapons, such as handguns, for self-defense.

Section 18-12-302 is interesting in that it does not directly regulate firearms at all; it regulates only the size of a magazine. Simply put, a "magazine" is nothing more than a container that holds multiple rounds of ammunition. Magazines are designed to feed a bullet into the firing chamber of a firearm with each cycle of the action, allowing multiple shots to be fired rapidly, either semi-automatically (that is, with a single shot fired each time the trigger is pulled) or automatically (with shots being fired continually so long as the trigger is held).[22] Here, the Plaintiffs are concerned primarily with semiautomatic firearms. Such firearms can operate without a magazine, but each round must be individually loaded.

The capacity of the magazine determines how frequently a firearm must be reloaded if the shooter wishes to keep firing. For example, a handgun or rifle using a 15-round magazine must be reloaded twice as frequently as one using a 30-round magazine. Because § 18-12-302 regulates only the number of rounds in a magazine, it does not affect whether the semiautomatic

---

[22]     Certain firearms are not designed to use magazines at all. Single-shot firearms, including bolt-action and muzzle-loading rifles, shotguns, and some handguns, require the user to manually load each new round. Other firearms, such as revolvers, use a cylinder, rather than a magazine, to load each round.
        Magazines may be integral to a weapon or, more commonly in modern weapons, detachable. Detachable magazines allow a user to pre-load and carry multiple magazines, making it possible for the user to quickly swap out an empty magazine from the weapon and replace it with a full one. For all practical purposes, the discussion of "magazines" in this case refers to detachable magazines.

firearm can be used, or even whether it can be used in a semiautomatic mode.  It only affects how often it must be reloaded.

The parties agree that semiautomatic firearms are numerous and widespread.  They stipulate that lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions, although the exact number subject to regulation in Colorado is unknown.  They also agree that semiautomatic firearms are commonly used for multiple lawful purposes, including self-defense.  Because § 18-12-302 affects the use of firearms that are both widespread and commonly used for self-defense, the Court concludes that, at the first step of the analysis, the statute burdens the core right protected by the Second Amendment.

The second analytical step requires that the Court to determine the level of constitutional scrutiny to apply.  Similar to their prior arguments, the Plaintiffs argue that the Court should apply strict scrutiny because the statute severely restricts a person's "right to self-defense," which the Court understands to be the ability to successfully defend him or herself.  Colorado contends that the impact is not severe because, despite the magazine size limitation, people can adequately defend themselves.

As noted, § 18-12-302 bans possession of all magazines capable of holding more than 15 rounds (except for magazines subject to the grandfather clause).  Other than those specifically excepted in the statute, this ban applies to every person in Colorado, in every venue, and for every use, including self-defense inside and outside of the home.  It impacts a large number of semiautomatic firearms, both handguns and rifles.  Viewed in this light, the *scope* of the statute is broad, and it touches the *core* of an individual right guaranteed by Second Amendment — the right to keep and bear (use) firearms for the purpose of self and home defense.

Despite such broad scope, however, the statute's impact on a person's ability to keep and bear (use) firearms for the *purpose* of self-defense is not severe.  Unlike the restriction considered in *Heller*, this statute does not ban any firearm nor does it render any firearm useless.  Semiautomatic weapons can be used for self-defense in and outside of the home. The parties agree that semiautomatic weapons that use large-capacity magazines will also accept compliant magazines (*i.e.*, 15 rounds or fewer), and that compliant magazines can be obtained from manufacturers of large-capacity magazines.  Thus, this statute does not prevent the people of Colorado from possessing semiautomatic weapons for self-defense, or from using those weapons as they are designed to function.  The only limitation imposed is how frequently they must reload their weapons.

By requiring users to reload every 15 rounds, the statute impacts both the "offensive" and "defensive" use of semiautomatic weapons.  Most of the time when a weapon is used "offensively," it is for unlawful purposes — *i.e.* the mass shooting scenario.  (The significance of the statute with regard to offensive firearm use is discussed below.  Needless to say, no party here is complaining of the effects of the challenged statute on the offensive use of large-capacity magazines.)  The Plaintiffs' primary concern here focuses on the "defensive" use of a firearm — that is, to protect the user or others against an attacker.  The effect of magazine size limitations on defensive use of a weapon is important in assessing whether and to what degree a citizen's lawful ability to defend him or herself is compromised.

No evidence presented here suggests that the general ability of a person to defend him or herself is seriously diminished if magazines are limited to 15 rounds.  Despite more than 40 years instructing individuals and law enforcement in defensive firearm use, the Plaintiffs' expert witness, Massad Ayoob, identified only three anecdotal instances in which individuals engaging

in defensive use of firearms fired more than 15 rounds, and not all of these successful defensive

actions involved semiautomatic weapons.[23]  Of the many law enforcement officials called to

testify, none were able to identify a single instance in which they were involved where a single

civilian fired more than 15 shots in self-defense.[24]  (Indeed, the record reflects that many law

enforcement agencies, including the Colorado State Patrol, the Federal Bureau of Investigation,

and the New York City Police Department equip their officers with 15-round or smaller

---

[23]      The first incident involved a gun shop owner who lived next door to the shop.  One night, carloads of people drove through his storefront to steal guns.  In defending his property, the shop owner used a fully automatic M-16 and a fully automatic 9mm submachine gun to fire over 100 rounds.  One perpetrator was killed, others were injured, and all were captured and convicted.  The second incident involved a man who owned a watch shop in Los Angeles and who had been involved in a series of "gun fights."  (Presumably, he had been robbed repeatedly.)  The shop owner began keeping multiple pistols hidden in his shop.  Mr. Ayoob recalled that at least one of the gun fights "went beyond" 17 or 19 shots before the last of the multiple perpetrators was down or had fled.  The third incident involved a Virginia jewelry store that was robbed by "two old gangster type guys."  The two brothers who owned the store successfully defended themselves and their property using multiple revolvers (not semiautomatic weapons) that were kept behind the counter.  Mr. Ayoob did not specify how many rounds were fired in that incident.

[24]      These witnesses include John Cerar, Douglas Fuchs, Lorne Kramer, and Daniel Montgomery.  Mr. Cerar spent 26 years with the New York City Police Department, beginning in 1973.  Over the course of his career, he was responsible for training NYC police officers in firearms and tactics, and also oversaw the evaluation and testing of firearms, ammunition, armor, and police equipment in order to determine appropriateness of use for the department.  He also served on the firearms discharge review board, which reviews all police involved shootings in New York.  Mr. Cerar currently serves as a consultant to various police agencies where high profile shootings have taken place.
       Mr. Fuchs currently serves as the Chief of Police in Redding, Connecticut.  He has served in that role for the past 12 years, following lengthy periods in other police agencies.  Throughout his career, Mr. Fuchs has received thousands of hours of training in law, defensive tactics, firearms, and practical skills, such as magazine reloading and tactical reloading.
       Mr. Kramer joined the Los Angeles Police Department in 1963 and served there for nearly 28 years.  In 1991, he became the Chief of Police in Colorado Springs, Colorado, where he served for 11 years.
       Mr. Montgomery began his law enforcement career in 1962 in California.  In 1971, he was recruited to the police department in Lakewood, Colorado, where he served for 12 years and attained the rank of captain.  In 1982, he became the Chief of Police in Westminster, Colorado, a role in which he served until his retirement in 2007.

magazines.)  Anecdotal testimony from the Plaintiff's lay witnesses was corroborative.
Although they possessed large-capacity magazines, none had ever had the occasion to fire more
than 15 rounds in an instance of self-defense.

There are myriad reasons for this phenomenon.  First, the defensive purpose of firearms
is often achieved without shots being fired whatsoever.  Mr. Avoob testified that, often, merely
the defensive display of a firearm is sufficient to defuse the threat.  Similarly, when shots are
fired in self-defense, the deterrent purpose is often achieved simply by the firing of a round or
two, regardless of whether those shots find their target (in other words, a "warning shot,"
intentional or otherwise, is often sufficient to deter the attacker).  In these types of circumstances,
a restriction on magazine size in no way diminishes the ability of the firearm user to defend him
or herself.

Circumstances in which an attack is halted by a defensively-shooting civilian disabling
the attacker are comparatively rare.  Even then, the purpose is not to fire as many shots as
possible, only as many shots as necessary.  The detrimental effect of a limitation on magazine
capacity in such situations is very difficult to measure because it is affected by a wide array of
external variables: the nature and characteristics of the attacker(s), the competence of the
defensive user, environmental circumstances, the timeliness of intervention by others or by law
enforcement, etc.  For example, a highly-trained firearm user might be able to disable an attacker
by firing only a relatively small number of rounds.  For these users, the statute poses no
impediment to effective self-defense.[25]  Adverse environmental circumstances that may be

---

[25]     There is a curious paradox here: the more competent the defensive firearm user, the more
likely he or she is to hit her target with fewer shots, and thus, the less likely that user is to need a
large-capacity magazine for defensive purposes.  By contrast, the less competent or confident the
user, the greater the number of rounds the user perceives he or she needs.  One wonders how

common in mass shootings — large numbers of bystanders, poor lines of sight, or darkness, for example — or circumstances where a law enforcement response is imminent, may make the firing of large numbers of defensive rounds by a civilian ill-advised.  In these instances, the restriction on magazine size again poses no discrete impairment to the ability of effective self-defense.

Even in the relatively rare scenario where the conditions are "ideal" for defensive firing, there is no showing of a severe effect on the defensive shooter.  As previously stated, the limitation on the size of magazines merely affects how many rounds can be fired before a reload is necessary.  Assuming that the defensive firearm user has fired all 15 rounds in his or her initial magazine, and yet failed to neutralize the threat, the user need simply replace his or her magazine or firearm to resume firing.  Admittedly, the defensive user cannot fire during the time it takes to complete a reload or access another weapon, but the length of that period, again, varies greatly with the circumstances, such as the defensive user's preparation and skills.  The testimony at trial was that persons skilled in firearms use can replace a magazine in a matter of a few seconds, whereas less skilled users may take longer periods of time.  At most, then, the statute's burden on the exercise of self-defense is this: in the relatively rare circumstances in which sustained defensive fire is appropriate, the statute forces a brief pause to reload or access another weapon. The evidence presented does not establish that such circumstances occur frequently, affect very many, or that the pause to reload adversely affects one's success in self-defense.[26]  On the record

these perceptions are affected by exposure to military grade weaponry in news and entertainment.

[26]     The Plaintiffs make a secondary argument that magazines with no more than 15 rounds are generally less reliable than large capacity magazines.  Although some witnesses testified about their dislike of certain compliant magazines, there was no evidence as to general unreliability of such magazines, particular as compared to large-capacity magazines.  Indeed, the

presented, the Court finds that although § 18-12-302 burdens the operation of semiautomatic weapons, the burden is not severe because it does not materially reduce the ability of a person to use a semiautomatic firearm for self-defense, nor does it reduce the effectiveness of self-defensive efforts.  As a result, the Court will examine the statute under the intermediate scrutiny test.

For § 18-12-302 to survive intermediate scrutiny, Colorado must prove that its objective in enacting § 18-12-302 was "important" — that is, that that the statute was based on "reasoned analysis," *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003) — and that the provisions of § 18-12-302 are "substantially related" to its stated objective.[27]

According to Colorado, the General Assembly's objective in passing § 18-12-302 was to reduce the number and magnitude of injuries caused by gun violence, specifically in mass shootings.  The legislative record reflects that members of the General Assembly were acutely aware of the Aurora Theater shooting in 2012, as well as other mass shootings inside and outside Colorado.  The General Assembly considered evidence that mass shootings occur with alarming frequency and often involve use of large-capacity magazines.  It considered testimony that when a shooter using a large-capacity magazine intends to kill, the shooter usually fires continuously until he runs out of ammunition, which leads to greater numbers of injuries and deaths.  With regard to general gun violence, the General Assembly also considered statistics drawn from several cities that large-capacity magazines were used in 14-26% of all gun crimes and in 31-

---

parties stipulated that 10-round magazines produced by Plaintiff Magpul are just as functional and reliable as Magpul's higher-capacity magazines.

[27]     The Plaintiffs urge the Court to limit its consideration of the evidence to the legislative history for § 18-12-302.  As to a determination of the General Assembly's objective and whether it is important, the Court has done so.

41% of fatal police shootings.  This legislative history demonstrates that the General Assembly considered relevant evidence in determining that the use of large-capacity magazines in gun violence poses a serious threat to public safety.  To prevent the effects caused by the use of large-capacity magazines is undoubtedly an important governmental purpose.

Even with an important purpose, however, Colorado must prove that the 15-round limitation in § 18-12-302 is substantially related to an anticipated reduction in the number and magnitude of injuries caused by the use of large-capacity magazines.  *See Peterson v. Martinez*, 707 F.3d 1197, 1222 (10th Cir. 2013) (Lucero, J., concurring) (citing *Michael M. v. Superior Court*, 450 U.S. 464, 473 (1981) (plurality opinion)).  The Court finds that Colorado has demonstrated this relationship.

The evidence[28] shows that large-capacity magazines are frequently used in gun violence and mass shootings, and that often a shooter will shoot continuously until a weapon jams or the shooter runs out of ammunition.  Interestingly, most experts agree that the size of a magazine correlates to the number of rounds that are fired in both an offensive and defensive capacity.  Dr. Jeffery Zax testified that there is a direct positive correlation between the firearm ammunition capacity and the average number of shots fired during criminal aggression.  Mr. Ayoob agreed that this is true in defense, as well.  He testified that when training individuals to use high-capacity semiautomatic weapons, his students frequently feel the need to "spray and pray," meaning that they believe that they should fire all of their rounds in the hope that at least one shot will hit the intended target.  Mr. Ayoob sees his job as training them not to empty their

---

[28]     In determining whether there is a substantial relation between the statute and the Colorado's asserted purpose, the Court does not limit itself to the legislative history.  *See Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994) (citing *Contractors Ass'n v. Philadelphia*, 6 F.3d 990, 1003-04 (3d Cir. 1993)).

magazines, and instead to shoot as if they were using a magazine with fewer rounds.  Mr. Cerar testified to having a similar experience in training New York City Police Department Officers.

There is no dispute that when a shooter pauses to reload a weapon or shift to another weapon, there is pause.  Mr. Cerar and Mr. Fuchs call this the "critical pause" because it gives potential victims an opportunity to hide, escape, or attack the shooter.  This pause also gives law enforcement or other armed individuals an opportunity to act.  They point to several shooting incidents, including those that took place at the Aurora theater, at a Safeway in Tucson, Arizona, and at an elementary school in Sandy Hook, Connecticut, when a pause allowed a shooter to be overcome, law enforcement to intercede, or potential victims to flee.  In each incident, the pause was created either by the shooter reloading their weapon, or there being a malfunction of their firearm.

Plaintiffs accurately observe that a weapon malfunction or jam can be as effective as mandatory reloading in creating a critical pause.  However, one cannot predict whether or when a firearm will malfunction.  The limitation on magazine size makes the critical pause mandatory because continued use of the gun requires reloading or switching to another gun.

Plaintiffs also accurately observe that skilled shooters can reload more quickly than can unskilled shooters, which would reduce the duration of the critical pause.  That is undoubtedly true, but also largely irrelevant.  A pause, of any duration, imposed on the offensive shooter can only be beneficial, allowing some period of time for victims to escape, victims to attack, or law enforcement to intervene.  The pause compelled by the limitation on magazines also could temporarily impair a defensive shooter, but beyond acknowledging that fact, there are too many external variables to permit a conclusion that pauses effectively compelled on both sides are necessarily better or worse than having no such pauses on either side.  In cases involving skilled

defensive shooters and inexperienced offensive shooters, the pause is necessarily favorable. Where the situation is reversed, it may be that the offensive shooter gains an advantage, or it may be that the asymmetry of the offensive shooter and defensive shooter's goals nevertheless negate some or all of that advantage.  The mere fact that the legislature's decision might raise the risk of harm to the public in some circumstances, while clearly diminishing it in others does not defeat the conclusion that the legislature's decision was substantially related to an important governmental interest.

Finally, the Plaintiffs argue that criminals who are intent on committing gun violence will not obey the magazine restriction and will nevertheless unlawfully obtain large-capacity magazines.  Hypothetically, this may be true, but the Court declines to speculate about the subjective intentions and means of unspecified criminals involved in unspecified gun violence. The Court accepts the unrebutted opinion of Dr. Zax, who testified that the magazine size restriction will reduce the overall number of large-capacity magazines available in Colorado and his testimony about the effects of federal firearms regulation in Virginia.  Thus, although it may be impossible to completely eliminate access to large-capacity magazines, it is reasonable to infer that the restriction will, at a minimum, reduce the ready availability of large-capacity magazines to both criminals and law-abiding citizens.

It is clear from the legislative history that the General Assembly adopted the 15-round restriction in the effort to balance the ability of individuals to lawfully use semiautomatic weapons in self-defense, while limiting the capability of unlawful shooters to fire repeatedly.  It considered a more restrictive limit of 12 rounds, but rejected that at the request of citizens and law enforcement officials.  Instead, it chose the 15-round limit based on evidence that officers of

the numerous state and federal law enforcement agencies all successfully use magazines with 15 or fewer rounds.

Whether adoption of a fifteen-round magazine limit is a sound public policy or a perfect fit with the General Assembly's objective to improve public safety is not the question before this Court. The fit may not be perfect, but the evidence establishes both an important governmental policy and a substantial relationship between that policy and the restriction of § 18-12-302. The provisions of § 18-12-302 are permissible under the Second Amendment.

### C. Application to § 18-12-112

Subject to multiple exceptions, § 18-12-112 extends the mandatory background check required in gun sales by dealers and at gun shows to transferees who take possession of a firearm in a private transfer. Plaintiffs do not argue that requiring background checks for the private sale of firearms is unconstitutional. Rather, they focus their challenge on the effect of the statute on *temporary* transfers, when ownership of the firearm does not change. Essentially, they argue that the Second Amendment protects an individual's right to borrow a firearm for lawful purposes, including for self-defense, and that such right is infringed by the statute's requirements.

First, the Court must determine whether § 18-12-112 impacts conduct protected by the Second Amendment. As repeatedly noted, the Second Amendment guarantees an individual's right to keep and bear arms for the core purpose of defense of self and home. However, it is not at all clear that the Second Amendment prevents the government from restricting the ability of persons to acquire firearms via temporary loans from others. Notably, *Heller* acknowledged the historical permissibility of "laws imposing conditions and qualifications on the commercial sale of arms." 544 U.S. at 626-27. Logically, if the government can lawfully regulate the ability of persons to obtain firearms from commercial dealers, that same power to regulate should extend

36

to non-commercial transactions, lest the loophole swallow the regulatory purpose.  Thus, the

Court has grave doubt that a law regulating (as opposed to prohibiting) temporary private

transfers of firearms implicates the Second Amendment's guarantee at all.

Nevertheless, the Court will assume that, arguably, the right to "keep and bear" firearms

implies some protection of the right to acquire firearms in the first place.  *Cf. Ezell*, 651 F.3d at

704.  And the Court will assume that, if the acquisition of firearms is protected to some extent,

that protection will include acquisition via loan.  Thus, if the Court were to conclude that the

Second Amendment protects an individual's right to acquire firearms for the purpose of self-

defense by temporarily borrowing them, the Court would find that § 18-12-112 impacts that right

by requiring a background check before such transfer can occur.[29]

Contrary to the Plaintiffs' position, however, the burden imposed on the right is no more

severe than the law already provides with regard to firearm sales.  Colorado already requires a

background check to be conducted on the buyer in a commercial firearm sale, and thus, the

operation of § 18-12-112 does nothing more than impose the same restrictions on acquisition by

loan.  It does not prevent a person otherwise permitted to obtain a firearm from acquiring one,

nor subject that person to any greater burdens than he or she would face if acquiring the weapon

commercially.  Nothing in the Second Amendment can be read to suggest that a permissible

burden on commercial sales of firearms cannot similarly be extended to apply to those acquiring

firearms by loan.

---

[29]     Arguably, however, a Second Amendment right focused on acquisition of a firearm would extend only to the transferee of the firearm.  It is difficult to imagine how a firearm owner's Second Amendment rights are impaired by prohibiting him or her from loaning a firearm to another.  However, as the preceding discussion concerning standing observes, the Plaintiffs here are the parties intending to *lend* the weapons, not the parties borrowing them. This further highlights the dubious issue of standing in this case.

The Plaintiffs argue that the burden is severe because it will be difficult for individuals to actually obtain the background checks from a federally licensed firearms dealer. They argue that firearm dealers may be unavailable in areas where individuals need background checks, that the checks could take a long time, or that the dealers may be unwilling to perform the checks due to the limit on fees they can charge.

The evidence presented does not entirely support the Plaintiffs' argument. Plaintiffs' witnesses provided anecdotal evidence of experiences they have had where a dealer refused to perform a background check for one reason or another. They also testified as to how it would be inconvenient for them to locate a dealer and obtain a check before the need to execute a transfer. However, there is no evidence that all, or even most, firearms dealers refuse to perform private background checks, or that it would be impossible for many, or most, who would receive a weapon to obtain a background check. Rather, the evidence shows that there are more than 600 firearms dealers in Colorado that are actively performing private checks, and that, currently, it takes an average of less than fifteen minutes for a check to be processed by the Colorado Bureau of Investigation. Although the statute may result in logistical difficulties or inconveniences for some individuals who want to privately borrow a firearm for more than 72 hours, it does not facially infringe their Second Amendment right to do so.[30] In the context of the facial challenge presented here, the Court finds that § 18-12-112 does not severely impact the Second Amendment right. Accordingly, intermediate scrutiny is appropriate.

The Court first looks to Colorado's asserted objective in passing § 18-12-112. Colorado asserts that the objective in passing the statute was to ensure public safety and aid in crime

---

[30] This is not to say that there may be instances where individuals do not comply with the requirement for a background check and are prosecuted for their noncompliance. Such circumstances can be addressed through an as-applied challenge.

prevention by closing a loophole in the background check statutes applicable to gun sales by dealers and at gun shows.  The General Assembly considered evidence that almost 40% of gun purchases are made through private sales, in person or over the internet; 62% of private sellers on the internet agree to sell to buyers who are known not to be able to pass a background check; and 80% of criminals who use guns in crime acquired one through a private sale.  The General Assembly also considered evidence that a high percentage of gun crimes are committed by individuals with prior arrests or convictions, which would trigger a denial in a background check, and that closure of the loophole would reduce the number of firearms that are easily passed into the trafficking market and made more accessible for use in crime.  The Court finds that the General Assembly used reasoned analysis in concluding that it was necessary and beneficial to require background checks for private transfers of firearms to help prevent crime and improve public safety, both important governmental interests.

The next question is whether the provisions of § 18-12-112 are substantially related to these objectives.  Colorado presented evidence showing that private background checks will make it more difficult for prohibited individuals to acquire firearms, reduce the rate of diversion of firearms from legal commerce into the trafficking market, and reduce the firearm homicide rate.  Dr. Daniel Webster testified that most firearms used in crime are obtained from a dishonest licensed dealer or from a trusted friend or family member.  Ronald Sloan, the Director of the Colorado Bureau of Investigation, testified that background checks on private transfers are denied at a rate as high as, if not higher than, the denial rate of sales at retail or gun shows.  Further, Dr. Webster opined that imposition of accountability on law-abiding citizens who are tempted to transfer a firearm to a prohibited individual deters diversion of firearms into the trafficking market.  Decreasing diversion ultimately impacts the availability of firearms to

criminals.  Dr. Webster also testified that, based on his research and studies, when measures of accountability for private transfers are taken away, the rates of firearm homicide grow substantially.  Thus, by imposing such measures, the General Assembly could reasonably expect the rates of criminal gun trafficking and use to decrease.

Plaintiffs argue that the evidence shows that private background checks are not happening at the frequency expected, and thus the public interest is not actually being served.  However, for purposes of determining constitutionality — particularly via facial challenge — arguments about whether the statute has been successful are not relevant.  Colorado is not required to show that the statute has already achieved success if its rationale for imposing the law is substantially related to an important purpose.

In addition, Plaintiffs argue that the 72-hour exemption to the background check requirement is unreasonable.  They contend that there was no basis for limiting the exemption to 72 hours, and that more reasonable options include extending the exemption to thirty days, allowing an exemption for individuals with concealed carry permits, or implementing a system that would not require parties to a transfer to physically go to a firearms dealer.

The Court perceives this argument to be one of preferred policy.  The Court's role in this case is to determine whether § 18-12-112 impermissibly burdens protected Second Amendment rights.  What the legislature chooses to *exempt* from the statute's requirements is a determination that is left solely to the legislature.  The legislature was free to conclude, as it did, that 72 hours would be an adequate period of time to permit transfers without background checks while ensuring that sham loans would not occur beyond that timeframe.  Whether or not the legislature's policy decision was wise or warranted is not a question properly presented to this Court.

Accordingly, the Court concludes that § 18-12-112 is constitutionally permissible under the Second Amendment.

## VI.  Vagueness Challenge

Returning to § 18-12-302, the Court considers the Plaintiffs' challenge to the statute's grandfather clause as being unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.  Section 18-12-302(2)(a) provides that a person may possess a large-capacity magazine if he or she: (1) owned the large-capacity magazine on July 1, 2013, and (2) has maintained "continuous possession" of the magazine since that date.  The Plaintiffs seek to invalidate the second requirement, arguing that because the phrase "continuous possession" is undefined in the statute, it fails to put the public on notice of prohibited conduct or provide any enforcement standards.

A law runs afoul of the Due Process Clause if it is "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits."  *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (citation omitted).  The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.  *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  This means that a statute can be impermissibly vague for either of two independent reasons: (1) if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or (2) if it authorizes or even encourages arbitrary and discriminatory enforcement.  *Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  In this case, the Plaintiffs challenge the statute on both grounds.

In assessing the sufficiency of statutory language, the court is guided by venerated authority that "we can never expect mathematical certainty from our language" and that a statute's terms may be "marked by flexibility and reasonable breadth, rather than meticulous specificity." *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Thus, a statute is not vague if it is clear what the statute as a whole prohibits. *Id.*

As a preliminary matter, Colorado contends that the Court should not reach the merits of this claim. Relying on *United States v. Reed*, 114 F.3d 1067 (10th Cir. 1997), and *United States v. Michel*, 446 F.3d 1122 (10th Cir. 2006), Colorado argues that facial vagueness claims are permitted only when the challenged statute prohibits protected First Amendment activity. The Court rejects that argument, as these cases are not analogous. Both actions sought post-enforcement review of the statute under which the individuals were prosecuted. *See Reed*, 114 F.3d at 1070; *Michel*, 446 F.3d at 1135.

The Tenth Circuit has held that facial vagueness challenges are proper in two circumstances. First, when an individual has been prosecuted under an arguably vague statute, he or she is permitted to facially attack the statute, in addition to bringing an as-applied challenge, if the statute threatens to "chill" constitutionally protected conduct, especially that protected by the First Amendment. *See Dias*, 567 F.3d at 1179-80; *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988). The reasoning for permitting a facial challenge in this circumstance is that when a statute is arguably so vague that it can reasonably be interpreted to prohibit constitutionally protected speech, individuals may refrain from speaking rather than risk criminal prosecution. Thus, when an individual *is* prosecuted under the statute, he or she is permitted to bring a facial challenge in order to vindicate the rights of others who may be chilled from speaking at all.

The second circumstance where a facial challenge is appropriate is upon pre-enforcement review of a statute.  In a declaratory judgment action where no one has been charged under the challenged statute, the court cannot evaluate the statute as applied.  Thus, the only claim to be brought is a facial challenge.  In these circumstances, the challenger may facially attack the statute as "vague in all of its applications."  *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982); *see also Ward v. Utah*, 398 F.3d 1239, 1251 (10th Cir. 2005).  If the statute is vague in all of its applications, then it will necessarily be vague as applied in every case, and the statute is therefore void on its face.  *Gaudreau*, 860 F.2d at 361.

As noted, § 18-12-112 has not been enforced against any Plaintiff.  This is a declaratory judgment action in which the Plaintiffs seek pre-enforcement review of the statute.  Thus, a facial challenge that asserts that the statute is necessarily vague in all of its applications is appropriate.  The Supreme Court has cautioned that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

First, the Plaintiffs argue that a person of ordinary intelligence could not understand whether his or her conduct fell within § 18-12-302(2)(a) because "continuous possession" is not defined.  Pointing to hypothetical situations where § 18-12-302(2)(a) may or may not apply, the Plaintiffs argue that "no one knows with any certainty what 'continuous possession' means." The Plaintiffs further argue that the lack of notice is amplified due to the fact that the statute does not contain a scienter requirement.

The Court is unpersuaded.  Because the statute fails to provide an explicit definition for "continuous possession," it is possible that the "continuous possession" requirement may not be

43

clear in every application.  However, the existence of close cases does not render the statute unconstitutionally vague.  Indeed, "[c]lose cases can be imagined under virtually any statute." *United States v. Williams*, 553 U.S. 285, 306 (2008).  What renders a statute vague is the inability to determine what the necessary facts *are* under wholly subjective standards.  *Id.*  For example, the Supreme Court has struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent."  *See, e.g.*, *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971); *Reno v. ACLU*, 521 U.S. 844, 870-71 & n.35 (1997).

Such is not the case here.  The grandfather clause actually is an exception to the law.  It does not describe criminal conduct, but instead describes conduct that is not criminal.  The two operative words, "possession" and "continuous" are in common usage and have readily defined meanings.  *See, e.g.*, Merriam-Webster's Collegiate Dictionary, 10th Ed. at 250 (defining "continuous" as "marked by uninterrupted extension in space, time, or sequence"), at 906 (defining "possession" as "the act of having or taking into control").  Indeed, it is not difficult to conceive of many situations where the statute's application would be clear: an owner who loaned out his or her magazine to another after July 1, 2013 would clearly not have maintained "possession" of it; a person who pawned a magazine after July 1, 2013, only to redeem and reacquire it later might currently have possession of the magazine, but that possession has not been "continuous" since July 1, 2013.  Accordingly, the Court finds that despite the lack of a precise statutory definition for "continuous possession," it is clear what conduct the statute as a whole prohibits and permits.

The Plaintiffs also contend that the grandfather clause is unduly vague because it lacks an express scienter requirement.  The Tenth Circuit has explained that the presence of a scienter requirement can save an otherwise vague statute by mitigating a law's vagueness and thus

making the law constitutional.  *Ward v. Utah*, 398 f.3d 1239, 1252 (10th Cir. 2005).  This principle does not imply, however, that every statute lacking a scienter requirement is necessarily vague.  *Id.*  Because the Court finds that § 18-12-302(2)(a) is not otherwise vague, its lack of an express scienter requirement does not render the statute unconstitutional.

Plaintiffs also argue that the statute does not contain any enforcement standards and therefore permits arbitrary and discriminatory enforcement.  Again, the Plaintiffs point out that "continuous possession" is undefined.  They argue that, as a result, it will be left open to interpretation by "individual law enforcement officers, prosecutors, judges, and juries."  The Court disagrees.  "As always, enforcement requires the exercise of some degree of police judgment."  *Grayned*, 408 U.S. at 114.  The Court finds that the degree of judgment required in enforcing § 18-12-302(2)(a) is not unacceptably delegated to the whim of individual prosecutors.  Although there may be edge cases where the application of the clause is debatable, the "continuous possession" requirement as a whole is sufficiently clear that reasonable people can understand what general types of conduct are authorized.

Further, when evaluating a facial challenge to a Colorado law, a federal court must "consider any limiting construction that a Colorado court or enforcement agency has proffered."  *Hoffman Estates*, 455 U.S. at 494 n.5; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 795 (1989).  Here, the Attorney General has issued two "technical guidance letters" to the Colorado Department of Public Safety regarding how § 18-12-302(2)(a) should be interpreted and enforced.  The letters provide that "continuous possession" shall be interpreted as "having or holding property in one's power or the exercise of dominion over property, that is uninterrupted in time, sequence, substance, or extent."  Further, "continuous possession" does not require "literally continuous physical possession" — instead, "continuous possession" is only lost by a

45

"voluntary relinquishment of dominion and control."  The technical guidance acknowledges that "[r]esponsible maintenance, handling, and gun safety practices . . . dictate that [§ 18-12-302(2)(a)] cannot be reasonably construed as barring the temporary transfer of a large-capacity magazine by an individual who remains in the continual presence of the temporary transferee, unless that temporary transfer is otherwise prohibited by law."  The Plaintiffs have not provided any evidence demonstrating a reason to believe that § 18-12-302(2)(a) will not be enforced in accordance with the interpretation provided by the Attorney General.  The guidance therefore serves to further limit the discretion of law enforcement officers when applying the grandfather clause.  In light of the forgoing, the Court finds that the statute does not authorize or encourage arbitrary or discriminatory enforcement.  Because the Plaintiffs have failed to sustain their burden of establishing that § 18-12-302(2)(a) is unconstitutionally vague in all applications, the Court finds the statute permissible under the  Fourteenth Amendment to the United States Constitution.

## VII.  Claims under Title II of the ADA

Finally, certain disabled Plaintiffs contend that § 18-12-302 and § 18-12-112 violate 42 U.S.C. § 12132 of the ADA under a disparate impact theory. [31]  The Plaintiffs argue that the statutes disproportionately burden disabled individuals in their ability to defend themselves as compared to able-bodied individuals and they are therefore at a greater risk of harm.[32]

---

[31]    In closing argument, the Plaintiffs' counsel appeared to argue that they were also asserting an ADA claim for denial of a request for reasonable accommodation.  However, no claim of reasonable accommodation was presented in the final pretrial order (Docket #119).  The Court therefore deems such claim to be waived.

[32]    The Court notes that some of the evidence presented with regard to the constitutionality of § 18-12-302 could be construed to suggest that some disabled persons may have greater need for large-capacity magazines for self-defense than more able-bodied persons.  Whether there are

Title II of the ADA provides that "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA seeks to "remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination." *Chaffin v. Kansas Colorado Fair Bd.*, 348 F.3d 850, 859-60 (10th Cir. 2003) (overruled on other grounds as recognized by *Muscogee (Creek) Nation v. Pruit*, 669 F.3d 1159, 1167 n.4 (10th Cir. 2012)). To prove a case of disparate impact discrimination, a plaintiff must show that "a specific policy caused a significant disparate effect on a protected group." *Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012). This is generally shown by statistical evidence identifying relevant comparators to the plaintiff group, examining the relative outcomes of the two groups, and establishing a reasonable inference that any disparate effect identified was caused by the challenged policy and not other causal factors. *Id.* (citation omitted).

Colorado argues that the Plaintiffs' claims under the ADA fail as a matter of law because the Plaintiffs have failed to prove how § 18-12-112 and § 18-12-302 deprive disabled individuals of the "services, programs, or activities of a public entity." The Plaintiffs respond that Title II is not limited to a denial of government services, programs, or activities. They argue that the second clause of § 12132, which provides that a qualified individual shall not "be subjected to discrimination by any [public entity]," extends to any and all actions taken by a public entity. Thus, they argue, by simply enacting statutes that disparately impact disabled individuals, Colorado committed discrimination against disabled individuals in violation of Title II.

---

more viable claims than those brought here to address that concern is a matter upon which the Court does not speculate.

This issue was addressed by the Tenth Circuit in *Elwell v. Oklahoma*, 693 F.3d 1303

(10th Cir. 2012).  In *Elwell*, the issue before the Tenth Circuit was whether a governmental

employee could bring a claim of employment discrimination against his public employer under

Title II of the ADA (rather than under Title I of the ADA, which specifically addresses

employment discrimination).  In its analysis, the court acknowledged that § 12132 of Title II has

two primary clauses.  The first clause prevents a qualified individual from being "excluded from

participation in or be[ing] denied the benefits of the services, programs, or activities of a public

entity."  Thus, the question was whether "employment" could be fairly described as a "service,

program, or activity" of a public entity.  The court held that it could not, explaining that "an

agency's services, programs, and activities refer to the 'outputs' it provides some public

constituency." 693 F.3d at 1306.  Employment, on the other hand, is an "input" required to make

an agency's services, programs, and activities possible.  *Id.*

The second clause prevents a qualified individual from being "subjected to discrimination

by any [public entity]."  The plaintiff in *Elwell* argued that this clause is a "catch-all" that

prohibits all discrimination by a public entity, regardless of whether it occurs in a service,

program, or activity the entity provides or in some other way or function.  The Tenth Circuit

disagreed, holding that the second clause also refers to discrimination in the context of

government-provided services, programs, and activities.  *Id.* at 1308-09.  The Tenth Circuit

explained that § 12132 must be read in concert with the definition of "qualified individual with a

disability," 42 U.S.C. § 12131(2), which states that a "qualified individual with a disability" is an

"individual with a disability who . . . meets the essential eligibility requirements for the receipt of

services or the participation in programs or activities provided by a public entity."  Thus, the first

clause of §12132 precludes an agency from baldly "exclud[ing]" or "deny[ing] benefits" to

qualified individuals, while the second clause does additional work by addressing more subtle (though equally inequitable) acts of discrimination, such as by making it disproportionately more difficult for qualified individuals to participate in programs or activities, unfairly disadvantaging them compared to others, or "otherwise discriminating against them in the manner the agency provides its services, programs, and activities." *Id.* at 1308.

The Tenth Circuit in *Elwell* went onto explain what the terms "services," "programs," and "activities" are understood to mean.  "Services" are ordinarily understood as acts done by the government for the benefit of another, whereas the term "program" refers to a government's projects or schemes, such as social security or a foreign exchange program. *Id.* at 1306.  The term "activity" has a broader meaning, encompassing all outputs the public entity provides to the public it serves.  However, the term does "not necessarily rope in everything the entity does." *Id.* at 1307.

Applying the principles of *Elwell* here, the Court finds that the Plaintiffs have failed to prove that § 18-12-112 and § 18-12-302 disproportionately impact disabled individuals with respect to a Colorado "service, program, or activity."  The statutes at issue do not create any governmental "output" which disabled persons are less able to access.  Rather, the statutes merely embody a criminal prohibition on conduct generally applicable to all persons.  Thus, the Plaintiffs' claims fail to establish a violation of Title II of the ADA.

Assuming, however, that the statutes *did* constitute a government service, program, or activity, the Court would nevertheless find that the evidence is insufficient to establish a disparate impact.  The Plaintiffs presented significant evidence tending to show that *some* disabled individuals: (1) feel that large-capacity magazines are necessary for their self-defense because they have decreased mobility and/or ability to reload quickly during confrontation, and

(2) wish to borrow firearms, some of which are specifically equipped to aid their disabilities, from various organizations without having to undergo a background check.  Such anecdotal evidence, in the absence of meaningful statistical analysis comparing the effect of the statute on the Plaintiffs and able-bodied comparators is insufficient to carry the Plaintiffs' burden of demonstrating that the statutes cause any disparate effect.  Accordingly, the Court finds that the Colorado is entitled to judgment in its favor on the Plaintiffs' claims under the ADA.

## VIII.  Conclusion

For the forgoing reasons, the Court **ORDERS** as follows:

- Colorado's Motion to Dismiss (**#133**) is **DENIED**;

- The parties' Joint Motion to Strike Expert Opinions Per FRE 702 (**#118**) is **GRANTED, in part, and DENIED, in part** consistent with the findings contained herein;

- Colorado Revised Statutes § 18-12-112 and § 18-12-302 are compliant with the provisions of the Second and Fourteenth Amendments to the United States Constitution.

- The Clerk of the Court is directed to enter **JUDGMENT IN FAVOR OF THE DEFENDANT** on all claims and to close this case.

Dated this 26th day of June, 2014.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge