THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION,
COLORADO FARM BUREAU,
NATIONAL SHOOTING SPORTS FOUNDATION,
MAGPUL INDUSTRIES,
COLORADO YOUTH OUTDOORS,
USA LIBERTY ARMS,
OUTDOOR BUDDIES, INC.,
WOMEN FOR CONCEALED CARRY,
COLORADO STATE SHOOTING ASSOCIATION,
HAMILTON FAMILY ENTERPRISES, INC.,
d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
DAVID STRUMILLO,
DAVID BAYNE,
DYLAN HARRELL,
ROCKY MOUNTAIN SHOOTERS SUPPLY,
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
BURRUD ARMS INC. D/B/A JENSEN ARMS,
GREEN MOUNTAIN GUNS,
JERRY'S OUTDOOR SPORTS,
SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS,
JOHN B. COOKE,
KEN PUTNAM,
JAMES FAULL,
LARRY KUNTZ,
FRED JOBE,
DONALD KRUEGER,
STAN HILKEY,
DAVE STONG,
PETER GONZALEZ,
SUE KURTZ,
DOUGLAS N. DARR,

    Plaintiffs,

vs.

JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

    Defendant.

---

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT - DAY TWO

---

1       Proceedings before the HONORABLE MARCIA S. KRIEGER,

2   Judge, United States District Court for the District of

3   Colorado, continuing at 8:37 a.m., on the 1st day of April,

4   2014, in Courtroom A901, United States Courthouse, Denver,

5   Colorado.

6

7                          **APPEARANCES**

8       RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
    at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9   Denver, Colorado, 80202, appearing for the Plaintiffs.

10      DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
    555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11  for the Plaintiffs.

12      MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
    P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13  appearing for the Plaintiffs.

14      ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
    Street, Castle Rock, Colorado, 80104, appearing for the
15  Plaintiffs.

16      DAVID BENJAMIN KOPEL, Attorney at Law, Independence
    Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17  appearing for the Plaintiffs.

18      MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
    SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19  General, Colorado Attorney General's Office, Ralph L. Carr
    Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20  80203, appearing for the Defendant.

21

22

23

24                 THERESE LINDBLOM, Official Reporter
               901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

**P R O C E E D I N G S**

THE COURT:  We are reconvened in Case No. 13-cv-1300.
This is the second day of trial.

Could I have entries of appearance, please.

MR. WESTFALL:  Good morning, Your Honor.  Richard
Westfall, Peter Krumholz on behalf of the disabled shooters,
the nonprofit plaintiffs in the case.

THE COURT:  Good morning.

MR. KOPEL:  Good morning, Your Honor.  David Kopel on
behalf of David Strumillo, John Cooke, Ken Putnam, James Faull,
Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey, Dave
Stong, Peter Gonzalez, Sue Kurtz, and Douglas Darr.  Thank you.

THE COURT:  Good morning.  Thank you.

MR. ABBOTT:  Good morning, Your Honor.  I am Doug
Abbott on behalf of plaintiffs Magpul and National Shooting
Sports Foundation.

And I just want to note that Mr. Colin expects to
arrive at about the morning break this morning.

THE COURT:  Good morning.  Thank you.

MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian
on behalf of Colorado State Shooting Association and Hamilton
Family Enterprises.

THE COURT:  Good morning.

MR. GROVE:  Matthew Grove, along with Kit Spalding,
LeeAnn Morrill, and Stephanie Scoville on behalf of the

1    defendants.

2              *THE COURT:*  Good morning.

3              Are you all ready to proceed?

4              *MR. WESTFALL:*  Yes.

5              *MR. GROVE:*  Yes, Your Honor.

6              *THE COURT:*  Thank you.

7              Mr. Keech, I'm not sure if our microphones are on.

8    Can you double-check that.

9              *COURTROOM DEPUTY:*  My apologies, Your Honor.

10             *MR. WESTFALL:*  Ours at our table is working, Your

11   Honor.

12             *COURTROOM DEPUTY:*  They are.

13             *THE COURT:*  Great, thank you.

14             Please call your first witness.

15             *MR. KOPEL:*  Your Honor, the plaintiffs would like to

16   call Mr. Terry Maketa.  And he's in the witness room.

17             *THE COURT:*  Please step up and be sworn.

18               (**TERRY MAKETA, PLAINTIFFS' WITNESS, SWORN**)

19             *COURTROOM DEPUTY:*  Please be seated.

20             Please state your name and spell your first and last

21   name for the record.

22             *THE WITNESS:*  First name is Terrance -- that's my

23   legal name -- T-E-R-R-A-N-C-E, last name, Maketa, M-A-K-E-T-A,

24   and I go by Terry.

25             *THE COURT:*  You may proceed.

Terry Maketa – Direct

1                    **DIRECT EXAMINATION**

2    *BY MR. KOPEL:*

3    *Q.*  Mr. Maketa, do you have a job?

4    *A.*  Yes, I do.

5    *Q.*  What is that?

6    *A.*  I'm the Sheriff of El Paso County, Colorado.

7    *Q.*  When did you take that job?

8    *A.*  Began in October of 1987.

9    *Q.*  As sheriff, or working for El Paso County?

10   *A.*  Working for El Paso County Sheriff's Office.  I've spent my

11   entire career with the sheriff's office there.

12   *Q.*  How many years is that?

13   *A.*  A little over 26, almost 26 1/2.

14   *Q.*  Okay.  Do you have plans to retire?

15   *A.*  Yes, I do.

16   *Q.*  And when will you retire from the sheriff's office?

17   *A.*  As an elected official, I'm under term limits, approaching

18   the end of my third term, so that will be January 13 of 2015.

19   *Q.*  Okay.  What guns do you personally own and use for –– that

20   you use for self-defense?

21   *A.*  Obviously, I have handguns, a revolver, several

22   semiautomatics, ranging in magazine capacity from, I believe,

23   nine rounds on up to seventeen rounds.

24   *Q.*  Any rifles?

25   *A.*  Yes, I guess I would call them carbine style.  Two in an AR

Terry Maketa - Direct

1    configuration, one in a .223 caliber, one in a .308 caliber, I

2    have an SKS, and a 7.62, as well as a -- I think it's a MAC-9

3    or -10 in a 7.62 as well.

4    Q.   Any shotguns for self-defense?

5    A.   I do own one shotgun.

6    Q.   Okay --

7    A.   Actually, in Colorado, I have one.

8    Q.   Okay.  Do any of these firearms have magazines with more

9    than 16 rounds -- 16 or more rounds?

10   A.   Yes.  The AR configuration, the SKS model, MAC-10, have

11   magazines ranging from 20 rounds on up to 30 rounds.  And I do

12   have one handgun, it's a Smith & Wesson Sigma, that has a

13   capacity that exceeds 15 rounds.

14   Q.   Okay.  After you retire, do you wish to buy magazines that

15   have 16 or more rounds?

16   A.   Well, I would certainly like to keep my existing inventory

17   functional and operational.

18   Q.   Okay.  Would you like to buy any replacements for those if

19   those wear out?

20   A.   Absolutely.  I mean, I know from experience of 26 years in

21   law enforcement, magazines, the components within, do wear out,

22   they do malfunction and require replacement.

23   Q.   How do you use your firearms for self-defense at home?

24   A.   I'm sorry?

25   Q.   How do you use your firearms for self-defense at home?

Terry Maketa – Direct

1  A.  Well, I typically keep -- I live in a two-level house with

2  a basement.  And I typically keep one readily available in my

3  bedroom, as well as one in the main living area, main level of

4  my home, which would consist of the family room, dining room,

5  kitchen area.  Those are handguns.  There are occasions, due to

6  threats made against me -- there have been times where I keep

7  my AR-15 with a .223, 30-round magazine available in my room.

8  And I've gone as for as -- my issued weapon in my position is

9  an M-16, which is fully automatic .223 with 30-round magazine.

10  I've had that sitting by my bedside, just depending on the

11  circumstances and the validity of different threats.

12  Q.  Why do you choose magazines of more 16 or more rounds for

13  some of your personal defense firearms?

14  A.  I think it boils down to me, personally, it's a level of

15  comfort, psychological effect of what I feel comfortable and

16  what I believe provides me the best opportunity to protect

17  myself, whether it be one threat or multiple threats.

18  Obviously, being in law enforcement, when I began, you carried

19  a revolver with six rounds in it.  And through the evolution

20  and because of circumstances that have happened around the

21  country, you've seen that desire to carry an increased magazine

22  capacity.  And law enforcement has gravitated in that direction

23  dramatically.

24  Q.  Does it have anything to do with threats that you face now

25  or in the future?

247

Terry Maketa - Direct

1   A.   Absolutely.  I mean, being an elected official, you're

2   going to create enemies, whether that's your intent or not.

3   But also through the official capacity of your duties, you're

4   going to make enemies with individuals, as well as organized

5   groups.  And I know there has been a lot of publicity in this

6   state in the last year concerning the murder of Director

7   Clements, director of the Department of Corrections, and the

8   association of the 211 gang, prison gang, which has members

9   both in prison, as well as outside the prison system, which

10  have continuously been making threats toward elected officials

11  or public figures.

12  Q.   Well, once you're retired, will those threats go away?

13  A.   You know, I don't believe they'll go away.  You know, once

14  your name is out there and you're a public figure, I don't

15  think they necessarily track when you retire or where you go

16  when you're -- I mean, they just don't drop off and end.  And I

17  know that even individuals that have had differing opinions on

18  my decisions, my opinions, my interpretations, as well as

19  enforcement of the laws my agency enforces, I guess you could

20  say I have people that -- not through any direct action, but I

21  would view as potential threats, either directly or indirectly.

22  Q.   Okay.  Do you own any magazines which you bought because

23  you wanted a 15-round magazine?

24  A.   I'm sorry?

25  Q.   Have you ever bought any 15-round magazines, 1-5?

Terry Maketa - Direct

1    *A.*  I have several firearms that have 15-round magazines.  The

2    Glock, for instance, the 22 model is a 15-round magazine.

3    *Q.*  That Glock 22, do you use that very often?

4    *A.*  That is what I carry on duty as an issued weapon.  I also

5    have a personal Glock 22 that I keep available in my home.

6    *Q.*  What caliber is that?

7    *A.*  It's a .40 caliber.

8    *Q.*  Do any of those 15-round magazines that you have for the

9    Glock, do any of them hold a different number of rounds?

10   *A.*  You know, it seems the last -- the previous generation of

11   Glock and the current generation, every once in a while -- I

12   mean, they were designed to hold 15 rounds, but I've been able

13   to inadvertently stick a 16th round in it.  We qualify four

14   times a year.  During that qualification, you'll load up your

15   magazine, shoot different scenarios, whether it be tactical or

16   static shooting.  And there has been several occasions where

17   I've had an additional round left.  And in discussions with my

18   range master, he has informed me --

19          *MS. SPALDING:*  Objection, Your Honor.

20          *THE WITNESS:*  -- that that is somewhat common.

21          *THE COURT:*  What just a minute.  When there is an

22   objection, you need to stop talking.

23          What's the objection?

24          *MS. SPALDING:*  Move to strike the answer.  It's

25   hearsay.

249

Terry Maketa – Direct

 1            THE COURT:  I'm sorry.  I can't hear you.

 2            MS. SPALDING:  Move to strike the answer.  It's

 3   hearsay.

 4            MR. KOPEL:  Insofar as the range master --

 5            THE COURT:  Just a minute.  Do you want to respond to

 6   the objection?

 7            MR. KOPEL:  We will strike at the point where he began

 8   talking about the range master.

 9            THE COURT:  All right.  Well, I'm going to overrule

10   the objection because there hasn't been any hearsay that's been

11   offered yet, and there hasn't been any hearsay that has been

12   requested yet, no out-of-court statement offered for the truth

13   of the matter asserted.  So if you can phrase a new question,

14   maybe we can avoid the hearsay altogether.

15            MR. KOPEL:  Thank you, Your Honor.

16   BY MR. KOPEL:

17   Q.  If we could just -- tell us about your personal experiences

18   with those 15-round magazines that sometimes hold a different

19   amount.

20   A.  Inadvertently, I have been able to get one additional round

21   in there and not even realize it.

22   Q.  Do you know which magazines of those -- of your 15-round

23   magazines, which one does that?

24   A.  No, I -- I don't recall it being just one particular one.

25   Q.  Okay.  Do you have any children?

Terry Maketa – Direct

1    A.   Yes, I do.

2    Q.   Adult children?

3    A.   Yes, both my children are adults.

4    Q.   Do either of your children own firearms in their home?  Let

5    me back up.  Do your children live with you?

6    A.   No, they do not live with me.

7    Q.   Does either of your children own any firearms in that

8    child's own home?

9    A.   Yes.  Actually, both of them do.

10   Q.   Do you have a son?

11   A.   Yes, I do.

12   Q.   Does your son live with anyone else?

13   A.   Yes, he lives with his girlfriend.

14   Q.   Does your son own a firearm of his own?

15   A.   Yes, he has a few firearms.

16   Q.   Does -- do you ever store your son's firearms?

17   A.   Yes.

18   Q.   In your own home?

19   A.   Yes.

20   Q.   What are the circumstances of that?

21   A.   My son works out of state typically on a seven-week

22   out-of-state tour, and then he's home for three weeks.  And he

23   doesn't live in the best neighborhood, so there are times when

24   it wouldn't be unusual for him to bring his firearms to my

25   house and store them there while he's gone.

Terry Maketa - Direct

251

1 *Q.* When your son gives you those firearms for safekeeping, do

2 you go to a gun store to get a background check done on

3 yourself before you take custody of those firearms for more

4 than 72 hours?

5 *A.* No, I do not.

6 *Q.* Do you plan to keep up this course of behavior, of storing

7 firearms for him for weeks or more after you retire?

8 *A.* Well, I think that's going to be a predicament I'll have to

9 evaluate once I do retire, since right now I am actively in law

10 enforcement.

11 *Q.* Okay.  Does your son own any magazines in his home?

12 *A.* Yes, I know -- I know he does have magazines at his home.

13 He also has several magazines at my home.

14 *Q.* For the magazines that he has in his home -- are these

15 magazines that contain more than 15 -- more than 15 rounds?

16 *A.* Yes.  I know at least two of them are 30-round magazines

17 for an AR-15 and a .223 caliber.

18 *Q.* So he -- you're saying, he leaves home, what does he do

19 with those magazines that -- those 30-round magazines he had in

20 his home?

21 *A.* Sometimes he'll leave them in his home, other times he will

22 bring them to my house.  But we also have mixed magazines, I

23 guess is the best way to put it, where he has additional

24 magazines stored at my house that are mixed in with my

25 magazines.

Terry Maketa - Direct

1    *Q.*  Sure.  Let's talk about those in just a second.  I just

2    want to finish of those magazines he has in his own home.  You

3    said he leaves them in his home, and I guess his girlfriend

4    then has custody of those magazines.  Is that what you're

5    saying?

6    *A.*  Yes.

7    *Q.*  How long a period would that be for?

8    *A.*  His trips range from four to seven weeks.

9    *Q.*  Okay.  And then -- thank you.  You had mentioned that your

10   son also has other magazines which he owns which are kept at

11   your home?

12   *A.*  Yes.

13   *Q.*  What are -- are those magazines of 16 or more rounds?

14   *A.*  Yes.

15   *Q.*  How long -- about how many are there, of your son's at your

16   house?

17   *A.*  I want to say six or seven of them.

18   *Q.*  And how long have they been there at your house?

19   *A.*  I believe it's been two to three years.

20   *Q.*  And do you all -- I believe you also testified, you have

21   magazines that you personally own of that exact same type?

22   *A.*  Yes.

23   *Q.*  These are the 30-round magazines for an AR-15?

24   *A.*  That is correct.

25   *Q.*  Do you keep those -- his magazines and your magazines in

253

1   separate locations so you know which is which?

2   A.   No.   They've always been stored together.

3   Q.   Could you actually identify today in that joint storage

4   area who owned which magazine?

5   A.   No, I could not.

6   Q.   Do you plan on traveling after you retire?

7   A.   Yes, I do.

8   Q.   Long-term trips, perhaps?

9   A.   I -- we see ourselves traveling both short term, a week at

10  a time, as well as, you know, three to five, six weeks at a

11  time.

12  Q.   When you travel in your retirement, would you like to store

13  your firearms and magazines at your son's house?

14  A.   Well, you know, whether I store them at his home or there

15  is an opportunity where he can stay at our house if we're out

16  of town to take care of the animals, I mean, it would be nice

17  to have that flexibility.

18  Q.   Have you read House Bill 1224?   That's, I know, what we've

19  been talking about in our discussions, but that's the statute

20  that is now codified at Colorado Revised Statutes 18-12-301 and

21  the following sections.   Have you had a chance to read that

22  bill?

23  A.   Yes, I have.

24  Q.   Have you read the Attorney General's technical guidance

25  memo from May?

254

Terry Maketa – Direct

1   *A.*   From May, yes, I have.

2   *Q.*   Have you read the Attorney General's technical guidance

3   memo from July?

4   *A.*   Yes, I have.

5   *Q.*   Have you read all of these documents several times

6   carefully?

7   *A.*   Yes.

8   *Q.*   Have you sought any legal advice about the meaning of the

9   documents?

10  *A.*   Yes, I have.

11  *Q.*   From whom?

12  *A.*   The sheriff's office has its own in-house legal

13  representative.

14  *Q.*   Have you sought advice from anyone else?

15  *A.*   You know --

16  *Q.*   Prosecutor, perhaps?

17  *A.*   No.

18  *Q.*   Do you know whether the magazine storage arrangements that

19  you have with your son right now are legal or not?

20  *A.*   You know, I think if I look at the wording of 1224, then

21  one could raise the question that it's not.  I mean, both

22  magazines were purchased and owned legally prior to July 1

23  under 1224.  They had always been stored together, but there is

24  no identifying markings as to which ones specifically belong to

25  one or the other.

255

Terry Maketa - Direct

1    *Q.*   Okay.  Have there been any wildfires or floods in El Paso

2    County in the last year?

3    *A.*   Yes, there has been.

4    *Q.*   Have you personally observed whether House Bill 1224, the

5    magazine bill, or the firearms transfer bill law, House Bill

6    1229, did or did not impact the fire or flood victims?

7    *A.*   Yes, it has -- I've had numerous citizens share their

8    stories with me and talk to me directly about their situations.

9    *Q.*   What situations?  Could you elaborate on that.

10   *A.*   Yes, individuals seeking clarity on the new laws,

11   especially following July 1, as to the circumstances they were

12   placed in when they evacuated their homes, had to store their

13   firearms with magazines and so forth with friends.  You know,

14   many people were displaced.  A lot of them went to hotels

15   initially until they could get permanent homes, especially if

16   they were people who lost their homes.  And even months later

17   were still storing their firearms, as well as magazines

18   exceeding 15 rounds, with friends that would take them, you

19   know, secure them in their personal safes or residences.

20   *Q.*   Had these people gone through a background check to give

21   the firearms to the people they were storing them with?

22          *MS. SPALDING:*  Objection, Your Honor.  Foundation.

23          *THE COURT:*  I'm sorry, I can't hear you.

24          *MS. SPALDING:*  Objection, Your Honor.  Foundation.

25          *THE COURT:*  Sustained.

256

Terry Maketa - Direct

1    *BY MR. KOPEL:*

2    *Q.*  Do these -- have you learned about what people did with

3    their firearms after they were forced out of their house

4    because of the floods or fires?

5          *MS. SPALDING:*  Objection, Your Honor.  Calls for

6    hearsay.

7          *THE COURT:*  Sustained.

8          *MR. KOPEL:*  Your Honor, if I could -- might suggest

9    that this is a declaration against interest, in that people are

10   coming to Mr. Maketa in his role as sheriff, a high-ranking law

11   enforcement official, and essentially confessing to him that

12   they are committing crimes.  And I believe the test that the

13   Tenth Circuit has set out for when a penal declaration against

14   interest may be admitted is precisely his kind of situation.

15         If I might, I have a brief memo on that.  I'm

16   wondering if I could offer to the Court.

17         *THE COURT:*  First of all, you're going to need to make

18   a proffer.  And, secondly, any kind of legal authority you need

19   to submit should be filed, not submitted in writing during the

20   course of the hearing.

21         If you'd like to reserve this issue so that you can

22   file that memorandum at a recess, we can resume this particular

23   place in the examination after you've had an opportunity to

24   tender it.

25         *MR. KOPEL:*  Certainly, Your Honor.  So I file it on

257

Terry Maketa - Cross

1  the -- via the ECF system in the ordinary process?

2      THE COURT:  Correct.  That way the opposing party has

3  an opportunity to read what it is that you submit, and I have

4  an opportunity to study it as well.

5      MR. KOPEL:  Certainly.  I have copies for opposing

6  counsel right now.  Would -- could we take a recess while I

7  file that?  Or could we -- would you like me to move on to

8  another topic?

9      THE COURT:  Why don't you move on to another topic.

10  We'll take a recess probably in the next hour or so, and then

11  you can file it.

12      MR. KOPEL:  Certainly, Your Honor.

13      In fact, we're finished with Mr. Maketa's examination.

14      So, thank you very much, Mr. Maketa.

15      THE COURT:  You'd like to reserve the right to recall

16  this witness?

17      MR. KOPEL:  Yes, I would like to reserve the right to

18  recall him.

19      THE COURT:  All right.  Thank you.

20      MR. KOPEL:  Thank you, Your Honor.

21      THE COURT:  Cross-examination.

22      MS. SPALDING:  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24  BY MS. SPALDING:

25  Q.  Good morning, Sheriff.

258

Terry Maketa - Cross

 1    *A.*  Good morning.

 2    *Q.*  You have indicated that you have a number of weapons, and I

 3    wanted to make sure I understood exactly what you had.  You

 4    indicated that you had a number of handguns, revolvers,

 5    semiautomatic -- handguns, is that?

 6    *A.*  That is correct.

 7    *Q.*  Rifles, which I am assuming included the two AR-style

 8    weapons that you mentioned; is that right?

 9    *A.*  That is correct.

10    *Q.*  And SKS; is that correct?

11    *A.*  Yes.

12    *Q.*  Is that a rifle?

13    *A.*  It's a carbine style.

14    *Q.*  A shotgun, correct?

15    *A.*  That is correct.

16    *Q.*  And I didn't catch one.  I thought you said MAC, and I'm

17    not sure I got that correctly.

18    *A.*  Yes, MAC -- I don't remember if it's a 9 or a 10.

19    *Q.*  Okay.  And that's a rifle as well?

20    *A.*  Yes.

21    *Q.*  And you regard all of these weapons as self-defense

22    weapons; is that correct?

23    *A.*  Yes.

24    *Q.*  How many weapons do you have, sir, that you regard as

25    self-defense weapons?

259

Terry Maketa - Cross

1   *A.* I guess, depending on the circumstances, I would have to

2   say, all of them would fit some form of self-defense, whether

3   it's against a two-legged threat or a four-legged threat.

4   *Q.* Fair enough. How many in total are we talking about here?

5   *A.* I'm going to have to say 20 to 30.

6   *Q.* Are there other weapons that you have that you do not

7   regard as self-defense weapons?

8   *A.* Well, as I said, I think depending on the circumstances,

9   they all could be. But there are weapons I do have that I

10  didn't discuss here, yes.

11  *Q.* Okay. And what are those weapons that --

12  *A.* Primarily lever-action rifles, as well as bolt-action

13  large-caliber rifles, typically used for hunting.

14  *Q.* All right. And you've never used those weapons for

15  self-defense; is that correct?

16  *A.* Well, actually, yes, I have.

17  *Q.* Okay. How many of those weapons do you have that we didn't

18  talk about previously, that is used primarily for hunting?

19  *A.* I'm going to say around eight, eight or ten.

20  *Q.* And are these all rifles?

21  *A.* Yes.

22  *Q.* Okay. Now, as I understand your testimony of the -- of all

23  the weapons that you've -- of all the 30 or so weapons that you

24  have, you only -- you have two or three, if I'm getting this

25  right, that take magazines as a standard matter with a capacity

Terry Maketa - Cross

1    of more than 16 rounds; is that correct?

2         Well, let me backtrack.  You indicated that you have

3    two AR-style weapons, right?

4    A.  Yes, that is correct.

5    Q.  And I think you said that one carries as a standard

6    magazine, a magazine with a capacity of 20 rounds, correct?

7    A.  That is correct.

8    Q.  And the other carries, as a standard magazine, a magazine

9    with a capacity of 30 rounds, correct?

10   A.  Yes.

11   Q.  Okay.  You had -- you also said that you had a handgun, a

12   Smith & Wesson, that had as a standard magazine, a magazine

13   that carried more than 15 rounds, correct?

14   A.  Yes.

15   Q.  And how many rounds does that magazine carry, just as a

16   standard magazine?

17   A.  Seventeen rounds.

18   Q.  Is a lower capacity magazine available for that weapon?

19   A.  I don't believe so.  It's one of the first generations of

20   the Smith & Wesson Sigma model.  As a matter of fact,

21   replacement parts for that firearm are a little challenging to

22   locate.

23   Q.  Have you done any investigation to determine whether in

24   fact lower capacity magazines are available for that weapon?

25   A.  I did look to see, not necessarily if lower capacities were

Terry Maketa - Cross

1    available, but before the magazine restriction took effect, to

2    see if I could actually get additional spare magazines.

3    Q.  Additional spare magazines that had a capacity of 17

4    rounds?

5    A.  That is correct.

6    Q.  Okay.  So you haven't checked to see if in fact that -- for

7    that weapon, lower capacity magazines that would comply with

8    Colorado law are in fact available?

9    A.  No, I have not.

10   Q.  Okay.  How about with the ARs, have you done any

11   investigation to determine whether the AR that you have that

12   takes as a standard magazine, a magazine with the capacity of

13   20 rounds, can in fact take a lower capacity magazine?

14   A.  No, I haven't researched that.

15   Q.  Okay.  And with respect to the other AR, the same thing.

16   You indicated you have an AR that takes as a standard magazine,

17   a magazine with a capacity of 30 rounds.

18   A.  That is correct.

19   Q.  Okay.  And you haven't done any investigation to determine

20   whether or not there is in fact a Colorado-compliant, if you

21   will, magazine for that weapon, correct?

22   A.  No, I haven't had a need to.

23   Q.  All right.  And the reason you haven't had a need to is

24   because you're currently exempt from the magazine restrictions

25   in Colorado law because you're a sheriff, right?

Terry Maketa - Cross

1    *A.*  No, because I do have a pretty comfortable inventory of

2    magazines both in 20 or 30 round for both ARs.

3    *Q.*  Let's go there.  How many magazines do you have for each of

4    the ARs?

5    *A.*  I don't know off the top of my head.  I could take just a

6    guess.  I know, as I stated earlier, some of my son's are mixed

7    in with mine.

8    *Q.*  Uh-huh.

9    *A.*  But I would say somewhere around 18 to 25.

10   *Q.*  Okay.  And those are yours, personally, correct?

11   *A.*  Yes, those are my personal ones.

12   *Q.*  And is that for each of those weapons, or both combined?

13   *A.*  No, in the 20-round configuration, I think I have around

14   maybe 15, give or take.

15   *Q.*  All right.  And so the 30, you have how many, would you

16   say?

17   *A.*  The 30 round?

18   *Q.*  Yes, I'm sorry, for the 30 round.

19   *A.*  For the AR, I think it's the number I previously gave.  I

20   also have other model weapons that have a different -- totally

21   different magazine for them in a 30-round capacity.

22   *Q.*  Okay.  So how many 30-round magazines do you have that

23   would operate with the AR that takes that as a standard

24   capacity magazine?

25   *A.*  I think that's the 18 to 25.

263

Terry Maketa - Cross

1  *Q.*  All right.  And I'm sorry if I asked this before.  How many

2  magazines of 17 rounds do you have to fit your -- I think it

3  was a Glock, you said?

4  *A.*  No, Sigma.

5  *Q.*  Sigma, I'm sorry.

6  *A.*  Yeah.  I believe I have three.

7  *Q.*  All right.  Do you have any other weapons that you regard

8  as self-defense weapons that as a standard magazine have

9  capacities of greater than 15 rounds, aside from the weapons

10  you've already mentioned?

11  *A.*  Yes.  I think -- oh, other than the ones I've mentioned?

12  *Q.*  Yes.

13  *A.*  No, I don't believe so.

14  *Q.*  All right.  For all of the weapons that you currently

15  possess that take as a standard matter, magazines with

16  capacities of greater than 15 rounds, you have magazines for

17  all of those weapons, correct?

18  *A.*  Yes, currently, I do.

19  *Q.*  And when you -- let me step back.  How do you use those

20  weapons?  I'm talking now about the two ARs that you referred

21  to and the Glock.  Target shooting, hunting?  I mean, actually

22  discharged.

23  *A.*  Yes.

24  *Q.*  In what way have you used those weapons?

25  *A.*  Well, primarily -- obviously, the Glock, I carry on duty.

Terry Maketa - Cross

 1    The M-16, I keep in my vehicle.  So that would be considered

 2    carrying it on duty.  That's an office-issued weapon.  Outside

 3    of that, I would describe the shooting activity as primarily

 4    training or maintaining the skill level I have.

 5    Q.  Okay.  So target shooting, that kind of thing --

 6    A.  Yes.

 7    Q.   -- primarily?  All right.  When you discharge those

 8    weapons for target shooting or the kind of training that you

 9    do, have you always used the large-capacity magazines that you

10    have mentioned?

11    A.  Well, yes, since that's what was standard with the weapon

12    and what it was designed to -- I assume, designed to fire.

13    Q.  Okay.  Sheriff, when you're off duty, do you carry a

14    concealed weapon?

15    A.  Yes, I do.

16    Q.  And what weapon do you carry concealed?

17    A.  It depends on what is happening, what the circumstances

18    are, how I personally feel.  But I could carry a Glock .380,

19    which has, I believe, nine rounds.  I carry my Glock 27, which

20    is ten or eleven rounds.  I carry a Glock 22.

21    Q.  And the Glock 22 comes standard with a 15-round magazine,

22    correct?

23    A.  That is correct.

24    Q.  Do you commonly carry concealed when you're off duty, or is

25    it more occasional?

Terry Maketa - Cross

1    *A.*  It depends.  I mean, I do carry concealed, and there is

2    times I don't carry at all.

3    *Q.*  All right.  And is the -- are the weapons that you

4    mentioned that you do carry, when you carry concealed, are

5    those the only weapons you would carry, or would you carry

6    additional weapons as well?

7    *A.*  Well, there is times I carry -- yeah, other weapons, other

8    than those.  Those would be the three primary ones.

9    *Q.*  Okay.  And I'm talking about when you're off duty.

10   *A.*  I'm sorry?

11   *Q.*  I'm just talking about times when you're off duty now, not

12   when you're on duty.

13   *A.*  Okay.  Off duty as well, I would have to include, I have

14   another Glock, I forget the model number.  It's a .45 caliber.

15   I have a Ruger .45 caliber that I also carry off duty,

16   completely off duty.  And a .44 magnum when I'm in Alaska.

17   *Q.*  You go to Alaska to hunt, don't you?

18   *A.*  I do.  Also to go just to visit.

19   *Q.*  Tell me about the Glock .45 caliber.  When you're off duty,

20   do you carry that as a concealed weapon?

21   *A.*  Yes.

22   *Q.*  Okay.  And does that firearm operate with a magazine?

23   *A.*  Yes, it does.

24   *Q.*  What's the capacity of the magazine on that firearm?

25   *A.*  I believe it's nine.

266

Terry Maketa - Cross

1   *Q.*   How about the Ruger .45, when you are off duty, you've

2   indicated you carry that weapon concealed sometimes; is that

3   correct?

4   *A.*   Yes, both concealed and open carry.

5   *Q.*   And open, okay.  And does that firearm operate with a

6   magazine?

7   *A.*   Yes, it does.

8   *Q.*   And what's the capacity of the standard magazine for that

9   weapon?

10   *A.*   I think it's ten rounds.

11   *Q.*   All right.  And the .44 magnum.  That's a pretty big gun,

12   isn't it?

13   *A.*   Yes.

14   *Q.*   I'm assuming that's kind of hard to carry concealed.

15   *A.*   I do pretty good with it.

16   *Q.*   Okay.  Do you carry that here in Colorado, or is that

17   strictly a going to Alaska kind of a weapon?

18   *A.*   That's primarily up in Alaska.

19   *Q.*   All right.  Is that a weapon that uses a magazine?

20   *A.*   No.

21   *Q.*   All right.  Now, you testified that on one of the weapons

22   that you have, one with the 15-round magazine in it, you have

23   had occasion to load a 15-round magazine with 16 rounds.

24   *A.*   Yes.

25   *Q.*   Correct?  Okay.  How did you discover that you had

Terry Maketa - Cross

1   overloaded your magazine?

2   A.  It's happened several times, where now I'm more dialed into

3   it.  But, basically, I would complete a course of qualifying

4   fire and have one additional round left, count the rounds that

5   were in the box that the magazines were loaded from, and

6   realize that I had inadvertently stuck 16 rounds in a 15-round

7   magazine.

8   Q.  Okay.  And you said this has happened several times.  Three

9   times, twice?

10  A.  I would say three to five times.

11  Q.  Okay.  And have -- has it only happened while you were

12  qualifying?

13  A.  Yes.

14  Q.  All right.

15  A.  That I'm aware of, yes.

16  Q.  Okay.  How often do you qualify, sir?

17  A.  I'm only required to qualify two times a year, first --

18  once in the first half of the year, once in the second half of

19  the year.  There are times where I do it three times, because

20  one of those has to be a night fire, and I don't get it done in

21  time, so there will be a third qualification.

22  Q.  All right.  And have you had to qualify two times a year

23  since you began with the sheriff's way back in the '80s?

24  A.  Yes, at a minimum.

25  Q.  All right.  Have you always used a firearm with 15-round

Terry Maketa – Cross

1  capacity in those qualifying sessions that you are required to

2  engage in?

3  A.  I'm -- I mean, when I began my career, the standard weapon

4  that -- which we had to purchase our own was a revolver.  We

5  transitioned -- I don't recall the year of that transition.

6  I'm going to say the early '90s, since then -- well, there was

7  a time period where I did carry a Smith & Wesson 645, that I

8  believe had ten rounds, until we went to a standardized weapon.

9  I'm going to say that was in the mid '90s.  Since then, it has

10  always been a 15-round magazine.  For my primary duty weapon,

11  though, not my off duty.

12  Q.  Okay.  But in terms of the times when you have noticed that

13  you have overloaded your magazine, you've indicated that that

14  occurred during these times when you were qualifying, right?

15  A.  Yes.

16  Q.  In the last 20 or years or so, you've had to qualify at

17  least twice a year, right?

18  A.  Yes.

19  Q.  Okay.  And those are the occasions in which you would use a

20  15-round magazine to qualify, correct?

21  A.  That is correct.

22  Q.  Okay.  I assume when you -- is it fair to assume that when

23  you overloaded your magazine, this was not intentional on your

24  part?

25  A.  No, it was not intentional.

269

Terry Maketa - Cross

1    Q.  Okay.  You knew that the manufacturer of the magazine

2    recommended that a 15-round magazine be loaded with only 15

3    rounds, right?

4    A.  You know, I know the magazine has little windows

5    periodically.  And based on which primer shows up through that

6    window, gives you an indication of how many rounds are in

7    there.  It was quite easy to stick a 16th round in.  I didn't

8    notice any difference in the tension, as compared to when there

9    is 15, which kind of surprised me.

10   Q.  Okay.  But my question was, sir, you were aware, weren't

11   you, that the manufacturer that manufactured your 15-round

12   magazine recommended that just 15 rounds be put in there, not

13   more, right?

14   A.  Yes.

15   Q.  Okay.  And you didn't mistake a 15-round magazine with a

16   magazine that actually was intended to carry more than 15

17   rounds, did you, on those occasions when you overloaded your

18   magazine?

19   A.  No.

20   Q.  Now, you've been with the sheriff's office a long time, I

21   know.  As I understand it, you started as a detention deputy,

22   right?

23   A.  That is correct.

24   Q.  All right.  And just tell me the positions that you've held

25   within the sheriff's office, briefly.

Terry Maketa – Cross

1   *A.*  Detentions deputy; intake/release deputy; intake/release

2   sergeant; detentions shift sergeant; internal affairs sergeant;

3   lieutenant of internal affairs; patrol commander, which

4   included position of SWAT commander; commander in admin; bureau

5   chief in support services; undersheriff; and then elected

6   sheriff in 2002, and took office in 2003.

7   *Q.*  In all the positions that -- well, off duty, in your

8   civilian life, have you ever had to fire a weapon in

9   self-defense?

10  *A.*  No, I have not.

11  *Q.*  Not a single round, correct?

12  *A.*  Not at a person.

13  *Q.*  Okay.  I think you stated in your deposition that you have

14  had occasions to put down wildlife, I think, is that --

15  *A.*  Yes.

16  *Q.*  Aside from those occasions, you've never fired a single

17  round in self-defense, correct?

18  *A.*  That is correct.

19  *Q.*  Have you ever had occasions to display your weapon in

20  self-defense?  By that I mean, show it, but not use it, in your

21  private capacity, not in your law enforcement capacity.

22  *A.*  I have gone to my door with my firearm at my side.  I don't

23  know that the person necessarily saw it or not, or how that

24  would fit into the definition of "display."  In my personal,

25  private capacity, I don't recall a time where I directly aimed

Terry Maketa – Cross

 1   it at somebody that overtly.

 2   Q.  All right.  Let's talk a little bit about your personal

 3   safety.  You've talked about, as sheriff, receiving threats,

 4   correct?

 5   A.  Yes.

 6   Q.  Have you ever been sufficiently concerned about the kind of

 7   threats you received from somebody that you initiated some kind

 8   of investigation or reported it in any way?

 9   A.  I'm not sure I understood the question.

10   Q.  Did you -- did you ever initiate any kind of criminal

11   investigation over a threat you received?

12   A.  Several times.

13   Q.  Okay.  Tell me about those.

14   A.  Well, typically, when you use the term "criminal

15   investigation," you initially do a threat assessment to see if

16   it's even valid.  If there is any validity to it, then you

17   would begin the criminal portion of it.

18          There is one that specifically resulted in criminal

19   charges.  I'm not sure what the outcome of that -- that one was

20   fairly recent, I believe, back in December.

21   Q.  Okay.  Aside from that one, had you ever in your threat

22   assessments made a determination that the threats were valid,

23   as you say?

24   A.  You know, I don't know that I've ever been able to say

25   whether they were not valid.  It's just that there was not

Terry Maketa - Cross

272

1    enough there to establish probable cause to initiate criminal

2    charges, especially as an elected official.

3    Q.  Okay.  Have you ever had anybody come to your home in a

4    threatening manner, threatening you or your family?

5    A.  You know, I've had my family members followed, I've had

6    cars -- strange cars sitting outside my house.  When I walk out

7    to confront or to see who it is, they drive off.  I think it's

8    a matter of perception as to what you take as a threat.  It's

9    not normal activity.  So, yes, I would say --

10   Q.  Let me put it this way:  Have you ever -- you've never

11   confronted anybody at your home who was threatening -- who you

12   felt was threatening you or your family, correct?

13   A.  Directly, no.

14   Q.  Sir, you're not aware, are you, of any threats against you

15   by the 211 crew?

16   A.  Not directly.

17   Q.  All right.  And you mentioned the murder of Mr. Clements.

18   Are you aware how Evan Ebel, the shooter, got his gun?

19   A.  Yes, I am.

20   Q.  You did not -- he did not get that gun legally, did he?

21   A.  No, he did not.

22   Q.  In that -- and if he had attempted to get a gun legally, he

23   would have been denied, because he wouldn't pass the background

24   check, would he?

25   A.  That is correct.

Terry Maketa - Cross

1    Q.   You mentioned that your -- your son works out of state,

2    right?

3    A.   That is correct.

4    Q.   Is that correct?  And you said he was -- he wants to store

5    his weapons with you when he leaves the state; is that right?

6    A.   I'm sorry, could you repeat that?

7    Q.   I'm sorry, I think I dropped off there.  He wants to store

8    his weapons with you when he leaves the state, correct?

9    A.   There is times, yes, he has.

10   Q.   Okay.  How -- does he have other options available to him?

11   A.   I wouldn't think so.

12   Q.   He could buy his own gun safe, couldn't he?

13   A.   Yeah, he probably could if he had the financial means to

14   buy a good safe.

15   Q.   Okay.  You generally believe that people ought to be

16   responsible for their own firearms, don't you?

17   A.   Absolutely.

18   Q.   And that applies to your son as well?

19   A.   Absolutely.

20   Q.   Under the law, if your son makes a gift or loan to you, you

21   are not required to go through the background check processes,

22   are you?

23   A.   As a law enforcement official, I could hold his firearms

24   for him, if that's what you're asking.

25   Q.   Well, no.  Actually, under the statute, are you -- are you

Terry Maketa - Cross                                                274

1   aware under the statute --

2   A.  I understand what you're saying now, yes.

3   Q.  Okay.  That is, if -- between family members, a person can

4   make a gift or a loan, correct?

5   A.  That is correct.

6   Q.  And that doesn't require background check, whether you're

7   law enforcement or not, right?

8   A.  No, that is correct.

9   Q.  All right.  Sheriff, to your knowledge, has there been any

10  enforcement to date of the background check law?

11  A.  Could you clarify what -- your question?

12  Q.  Sure.  Have there been any prosecutions to date that you're

13  aware of for anyone that has violated the background check law?

14  A.  Not that I'm aware of.

15  Q.  Okay.  Now, you -- you would agree, wouldn't you, that as a

16  sheriff, you have a certain degree of discretion in the

17  enforcement of laws, depending on circumstances, correct?

18  A.  To some extent.

19  Q.  For instance, you don't always arrest someone for

20  jaywalking.  It's discretionary, right?

21  A.  Jaywalking is not an arrestable offense.

22  Q.  Okay.  Issue a ticket, correct?

23  A.  That is correct.

24  Q.  And if someone was speeding with a sick child to the

25  hospital, you might forgo that speeding ticket because, under

Terry Maketa - Cross

1    the circumstances, enforcement of that law wouldn't be just; is

2    that fair?

3    *A.*   That is correct.

4    *Q.*   Okay.  Don't emergencies present the same kind of situation

5    for you to exercise your discretion in the enforcement of law?

6    *A.*   I think within some laws, there is some officer discretion

7    that can be exercised.

8    *Q.*   So, for instance, when you're talking about the fires that

9    occurred in the area, that would be an emergency situation in

10   which you might exercise your discretion to enforce laws or how

11   you enforce laws, correct?

12   *A.*   That is correct.

13   *Q.*   That would include the background check law, correct?

14   *A.*   Yes.

15   *Q.*   Okay.  And that would also include the law concerning --

16   the restriction on magazine capacity and transfer, correct?

17   *A.*   Yes, I believe so.

18   *Q.*   All right.  And during the -- as a result of the fires in

19   your area, you're not aware of any prosecutions that occurred

20   of individuals who were affected by the fire and had to

21   transfer their guns to other folks for safekeeping?

22   *A.*   The last I spoke to the District Attorney's Office, there

23   were none.

24   *Q.*   Okay.  You've lived in El Paso County for a lot of years

25   now, correct?

Terry Maketa – Redirect

1   *A.*   That is correct.

2   *Q.*   Okay.  Even before you became sheriff?

3   *A.*   Yes.

4   *Q.*   All right.  You're not personally aware, are you, of any

5   person, a civilian, who has fired more than 15 rounds in

6   self-defense, are you?

7   *A.*   Not that I recall.

8   *Q.*   Ten rounds?

9   *A.*   I'm sure there has been circumstances, but --

10   *Q.*   Do you recall any --

11   *A.*   Nothing comes to mind.

12   *Q.*   Okay.  Just one moment, sir.

13   *A.*   Okay.

14          *MS. SPALDING:*  Thank you very much, Sheriff Maketa.  I

15   appreciate your time.

16          *THE WITNESS:*  Thank you.

17          *THE COURT:*  Thank you.

18          Would you like to take our morning recess at this

19   time?

20          *MR. KOPEL:*  You know, Your Honor, I think we might be

21   able to finish up very quickly and save everyone lots of time

22   if we go for just a couple of minutes.

23          *THE COURT:*  Okay.

24

25

Terry Maketa – Redirect

1           **REDIRECT EXAMINATION**

2      *BY MR. KOPEL:*

3      *Q.*  Mr. Maketa, I just wanted to clarify the situation about

4      your son when he leaves the state and what happens to his --

5      the firearms.  Does he sometimes leave firearms at his home

6      with his girlfriend, to whom he is not married?

7      *A.*  Yes.

8      *Q.*  And that's for a period of many weeks?

9      *A.*  Four to seven.  Typically, four to seven weeks.

10     *Q.*  And in those -- during those weeks, does the girlfriend

11     have control, ability to use those firearms, or are they locked

12     up?

13          *MS. SPALDING:*  Objection, Your Honor.  I -- I object

14     to foundation.

15          *THE COURT:*  Sustained.

16     *BY MR. KOPEL:*

17     *Q.*  Does anyone have access to those firearms when your son is

18     out of town and they're at his house?

19          *MS. SPALDING:*  Same objection, Your Honor.

20          *THE COURT:*  Sustained.

21     *BY MR. KOPEL:*

22     *Q.*  In the emergency situations that Ms. Spalding was asking

23     you about, the people having to deal with the consequences of

24     the fire, how many people came to you and told you about that

25     situation, involving their firearms and the compliance?

278

Terry Maketa – Redirect

1    A.  I'm going to say 20 to 30 specific people.  Hundreds came

2    to me asking for, really, what I would deem interpretations of

3    the law and how it would relate to them and their

4    circumstances.

5    Q.  But only 20 or 30 told you of personal situations?

6    A.  Yes.

7    Q.  Potential violations?

8    A.  That is correct.

9            MR. KOPEL:  Great.  Thank you very much, Mr. Maketa.

10           THE COURT:  Does that conclude your examination?

11           MR. KOPEL:  Concludes my -- yes, Your Honor, it does.

12           THE COURT:  All right.  And can this witness step down

13   and be excused?

14           MR. KOPEL:  Yes.  Thank you.

15           THE COURT:  Any objection?

16           MS. SPALDING:  No, Your Honor.

17           THE COURT:  Thank you, sir.  You may step down.  You

18   are excused.

19           THE WITNESS:  Thank you.

20           You may call your next witness.

21           MR. WESTFALL:  Thank you, Your Honor.  The plaintiffs

22   call Ms. Elisa Dahlberg to the stand.

23

24

25

1       (**ELISA DAHLBERG, PLAINTIFFS' WITNESS, SWORN**)

2          *COURTROOM DEPUTY:*  Please be seated.

3          Please state your full name and spell your first and

4    last name for the record.

5          *THE WITNESS:*  Elisa Ann Dahlberg, E-L-I S-A,

6    D-A-H-L-B-E-R-G.

7          *THE COURT:*  You may proceed.

8                        **DIRECT EXAMINATION**

9    *BY MR. WESTFALL:*

10   *Q.*  Ms. Dahlberg, where do you live?

11   *A.*  In Aurora, Colorado.

12   *Q.*  Are you affiliated with the plaintiff Women for Concealed

13   Carry?

14   *A.*  I am.

15   *Q.*  Would you describe briefly Women for Concealed Carry, what

16   its mission is, what it is.

17   *A.*  Women for Concealed Carry is a nonprofit organization that

18   is committed to providing information to women who conceal

19   carry --

20          *THE COURT:*  I'm going to get you to slow down.  Our

21   court reporter will not be able to transcribe if you speak too

22   quickly.  Would you take a deep breath and slow down.

23          *THE WITNESS:*  Sorry, yes.

24          *THE COURT:*  Thank you.

25          *THE WITNESS:*  Women for Concealed Carry is a nonprofit

280
Elisa Dahlberg - Direct

1   organization.  We provide information to women who conceal

2   carry -- who are looking to conceal carry as a means of

3   self-defense.  And we also provide -- we also work with

4   legislatures to protect bills that may take that right away.

5   *BY MR. WESTFALL:*

6   Q.  If I could ask you, Ms. Dahlberg, because I have old person

7   ears -- my wife keeps reminding me I should get hearing aids --

8   if you would speak into the microphone and speak louder so I

9   can hear you.  I'd appreciate it.

10  A.  Yes.  Thank you.

11  Q.  How are you employed now?

12  A.  I am a full-time graduate student at the University of

13  Colorado Boulder.

14  Q.  What is your education background?

15  A.  I started work on my bachelor's degree at Red Rocks

16  Community College.  I transferred up to the University of

17  Colorado Boulder, where I completed a dual bachelor's degree in

18  geology and ecology and evolutionary biology.  And I graduated

19  that May of last year -- May of this year, sorry.  And then I

20  started my graduate work this current year.

21  Q.  Would you describe to the Court your work history.

22  A.  After I graduated high school, I enlisted in the Air Force

23  for six years.  I was security forces, or military police.

24  After my six years in the military, I separated, and I was

25  hired by the Aurora Police Department, where I worked for

Elisa Dahlberg – Direct

1    roughly a year.  And then I decided that that wasn't exactly

2    where I wanted to be, so I resigned from the police department

3    and then started my education.  While I was working on my

4    bachelor's degree, I worked part-time at the Buckley Air Force

5    Base fitness center as a recreation aide.

6    Q.  Are you proficient with firearms?

7    A.  I am.

8    Q.  How did you become proficient?

9    A.  I became proficient in firearms through my training in the

10   military and through my training with the Aurora Police

11   Department.

12   Q.  Describe the training you received in the military.

13   A.  I was certified on a handful of weapons, the M9 handgun,

14   the M16 rifle, the M203 grenade launcher, the M249 automatic

15   rifle, the M60 machine gun, and also had experience with

16   grenades and rocket launcher.

17   Q.  Did you receive training as part of being hired by the

18   Aurora Police Department?

19   A.  I did.  It was mostly handgun and shotgun.

20   Q.  Describe the training you received from the Aurora Police

21   Department.

22   A.  We went through the POST certification -- the

23   certifications that are required for the POST certification

24   test.  It was broken up over the six-month training period of

25   the academy, so we would spend several days a week at the

282

Elisa Dahlberg - Direct

1    range.

2    Q.  What firearms do you own?

3    A.  I own two 12-gauge shotguns, two M&P15s, two .22 long

4    rifles, four handguns, and a 30-30 lever action rifle.

5    Q.  Do you have a concealed carry permit?

6    A.  I do.

7    Q.  Which firearms do you carry concealed?

8    A.  I carry my Smith & Wesson Bodyguard and my Smith & Wesson

9    M&P 9 millimeter concealed.

10   Q.  Do any of the firearms that you own use magazines with a

11   capacity of more than 15 rounds?

12   A.  Yes.  Both of my M&P15s do, and my M&P 9 millimeter does as

13   well.

14   Q.  What is the M&P15?

15   A.  The M&P15 is a semiautomatic carbine style rifle.

16   Q.  What is its capacity -- you said you had two of them?

17   A.  Yes.

18   Q.  What are their capacities?

19   A.  They have a standard 30-round magazine.

20   Q.  What do you use the -- what do you use your M&P15 firearms

21   for?

22   A.  Use them for home defense and target shooting.

23   Q.  Please describe your use of the M&P15s for home defense.

24   A.  I would use the M&P15 for home defense in the event that

25   multiple assailants were trying to break into our home or in

Elisa Dahlberg - Direct

283

 1   the event of an emergency or civil disorder.

 2   Q.   Where do you keep the two M&P15s?

 3   A.   They're both kept in a safe in our basement.

 4   Q.   Now, the other firearm that you mentioned that has -- that

 5   you use magazines of a capacity exceeding 15 rounds was the

 6   M&P9, correct?

 7   A.   Correct.

 8   Q.   Please describe the M&P9 for the Court.

 9   A.   The M&P9 is a full-sized semiautomatic handgun.

10   Q.   What are -- what is the capacity of the M&P9?

11   A.   Standard 17-round magazine.

12   Q.   How many of them do you have?

13   A.   I have three.

14   Q.   How do you use the M&P9?

15   A.   I use the M&P9 for home defense, for target shooting, and

16   for concealed carry.

17   Q.   Please describe your use of the M&P9 for home defense.

18   A.   I keep my M&P9 in a safe in my bedroom, close to my bed.

19   It's -- it was my duty weapon when I was with the Aurora Police

20   Department, so I'm very proficient with it.  And it's my go-to

21   weapon in the event that something would happen to my home or

22   somebody would try to break into my house.

23   Q.   Describe the M&P9 for your use for personal protection.

24   A.   I use the M&P9 for personal protection by means of

25   concealed carry.  I have a -- generally, I have a specialized

Elisa Dahlberg - Direct

1  backpack that has a special pouch for a concealed carry weapon.

2  It's a larger handgun, so it's harder for me to actually

3  conceal on my body, so this one I actually keep in a bag.  I

4  use it for personal protection when out hiking in remote areas

5  or when I'm out doing field work and research.

6  Q.  How many magazines, again, do you have for the M&P9?

7  A.  Three.

8  Q.  How did you acquire them?

9  A.  They came with the purchase of a handgun.

10  Q.  How did you end up selecting the M&P9?

11  A.  When I was in the Aurora police academy, I had first

12  started out with a 1911 style handgun, which has a seven-round

13  capacity magazine.  As much as I really liked that handgun, I

14  found myself reloading twice as many times as individuals that

15  had Glocks or Smith & Wessons.  I had to carry around five

16  magazines, versus the three -- one in the handgun, two in the

17  pouch, versus my colleagues that had the Glocks and Smith &

18  Wessons.  And I also had a lower capacity of rounds all

19  together because the magazines only had seven-round

20  capabilities.  So to save my time on the range reloading and to

21  save myself having to reload in the event that I was faced with

22  an imminent threat, I decided to switch to the Smith & Wesson

23  M&P9 simply because of its capacity.

24  Q.  Are the three 17-round magazines that came with the M&P9

25  important to you?

Elisa Dahlberg - Direct                            285

1    *A.*  Yes, they are.

2    *Q.*  Why?

3    *A.*  Because they came with the handgun, they have always been

4    the magazines that I've used with the handgun.  I've put

5    thousands of rounds through them, and I've never had a

6    malfunction.  And I -- I know that they're there and they're

7    going to be there when I need them.

8    *Q.*  Ms. Dahlberg, you described your experience in the

9    police -- at the police academy and the reasons for selecting

10   the M&P9, and you've testified about it -- why you selected it.

11   Did what you learned at the academy have any applicability to

12   home defense?

13   *A.*  It did, for the same reasons.  If somebody were to attempt

14   to force their way into my home, I want to have the best chance

15   in defending myself against them.  Not having to worry about

16   reloading as frequently, in the event of that threat would

17   decrease my stress level at that point and increase my

18   competency in facing that threat.

19   *Q.*  How about anything you learned regarding personal

20   protection?

21   *A.*  I would say all along the same lines.

22   *Q.*  Based upon your training, what is the effect of having to

23   reload in an armed confrontation situation?

24   *A.*  Having to reload in an armed confrontation, it wastes

25   precious seconds.  And in those precious seconds, bad things

Elisa Dahlberg - Direct

1    can happen.  It only takes a couple of seconds to have the

2    ability to have the threat move upon you and cause you harm or

3    death.

4    Q.  Are there magazines that are legal under the enacted Bill,

5    1224, for your M&P9 and your M&P15?

6    A.  There are for the M&P9.

7    Q.  How about the M&P15?

8    A.  I believe there are 20 and 30-round magazines available for

9    that, and neither of those are legal under the bill.

10   Q.  Let's go to the M&P9.  Are the 1224 compliant M&P9

11   magazines suitable substitutes for you?

12   A.  No.

13   Q.  Why not?

14   A.  Because they were not the original designed magazines that

15   came with the weapon.  And the importance of having the 17

16   rounds is why I initially chose that weapon.

17   Q.  Are they available?

18   A.  Not to my knowledge.  I have searched -- as of Sunday, last

19   I checked, I believe, on the Smith & Wesson website, they're

20   still out of stock.  I've checked at multiple stores and online

21   outlets, and they're just simply not available.

22   Q.  Ms. Dahlberg, under 1224, your three 17-round magazines are

23   still legal for you to own, are they not?

24   A.  They are.

25   Q.  Do you understand why they are -- they are -- they continue

Elisa Dahlberg - Direct

1    to be legal for you to own?

2    A.  Yes, because they were -- they were purchased before the

3    1 July 2013 and under the continuous possession portion.

4    Q.  So what must you do to maintain the legal status of those

5    three 17-round magazines?

6    A.  Maintain continuous possession.

7    Q.  Will -- does 1224 still impact you?

8    A.  It does.

9    Q.  How?

10   A.  Eventually, these magazines will wear out, and I won't be

11   able to replace them.  So this will, basically, render my

12   firearm useless.  And being it's my go-to weapon for home

13   defense, I won't have that weapon available to me in the event

14   that I need it.

15   Q.  Would it be possible to lose them?

16   A.  It could be.

17   Q.  Would it be possible to lose continuous possession?

18   A.  Yes.

19   Q.  Ms. Dahlberg, I believe we need notebook 3, that has

20   Exhibit 6 in it.  And I'd like to have that presented to the

21   witness.

22        And I'd like -- Ms. Dahlberg, if you would, you should

23   have notebook 3 that has Exhibit 6 in it.  Do you have that in

24   front of you?

25   A.  Yes, the technical guidance from July.

288

Elisa Dahlberg - Direct

1   Q.  Have you read the Attorney General's technical guidance as

2   it relates to continuous possession as contained in Exhibit 6

3   before you?

4   A.  I have.

5   Q.  Does Exhibit 6 answer your questions on what you need to do

6   to maintain continuous possession?

7   A.  No, it does not, because it is still relatively vague as of

8   what is meant of continuous possession and what is meant by

9   actually keeping dominion and control over your magazines.

10  Q.  Do you understand what dominion and control means?

11  A.  My definition of dominion and control is keeping direct

12  control over the physical proximity of your magazines.  But it

13  is not clear in the technical guidance if that is what is meant

14  in there.

15  Q.  Have you ever not maintained continuous possession of your

16  M&P9 and the magazines that go with it, as you understand those

17  terms?

18  A.  Yes, I have lost continuous possession.

19  Q.  Please describe the situation or situations.

20  A.  When I originally -- when I originally started with the --

21  when I originally transitioned to that handgun in the police

22  department, we had to have it inspected by the armorer and --

23  to make sure it was department compliant.  So the armorer took

24  the handgun and the magazines that went with it and inspected

25  it, and at that point in time I lost continuous possession over

Elisa Dahlberg - Direct

1    the magazines and the handgun.

2    Q.   Are there circumstances that you can envision in which you

     would not maintain continuous possession?

4    A.   Yes.  One example I can think of is with my -- is doing

5    field work.  Like I said earlier, I keep that handgun in my

6    field bag.  If we were to have some kind of emergency

7    situation, somebody got hurt or what not, that they had -- that

8    we had to leave the site, and somebody just grabbed all the

9    bags and threw them into one of our vehicles, where I was then

10   separated from that bag, I would lose continuous possession

11   over it.

12   Q.   What would happen if you lost continuous possession of the

13   three magazines for the M&P9 that you just testified about?

14   A.   The magazines would be illegal, and my handgun would be

15   useless.

16   Q.   Did Women for Concealed Carry take a position on House Bill

17   1229?

18   A.   Yes, we did.

19   Q.   What position?

20   A.   The position that we took on it was that the 72-hour loan

21   portion of the bill is extremely vague and does not cover

22   situations that may have -- that may -- that may affect women

23   for concealed carry reasons.

24   Q.   As related to your mission for concealed carry, what are

25   some of the situations that Women for Concealed Carry were

290
Elisa Dahlberg – Cross

1    concerned about?

2    *A.*  Some of the things that we were concerned about was our

3    having women –– having –– being able to loan women handguns or

4    other firearms when they are in danger from spouses or

5    significant others or things like that.  It's very easy for

6    those loans to go over 72 hours, whether it be because of

7    distance, if somebody was out on the eastern plains, and there

8    is a couple of hours drive between the person who is

9    transferring and the person who is ––

10            *MS. SPALDING:*  Objection, foundation.

11            *THE COURT:*  I'm going to overrule the objection.  The

12   witness can continue her answer.

13            *MR. WESTFALL:*  Ms. Dahlberg, I have no further

14   questions on direct.  Thank you.

15            *THE WITNESS:*  Thank you.

16            *THE COURT:*  Cross-examination.

17                      **CROSS–EXAMINATION**

18   *BY MS. SPALDING:*

19   *Q.*  Good morning, Ms. Dahlberg.

20   *A.*  Good morning.

21   *Q.*  Tell me a little bit if you can about Women for Concealed

22   Carry.  How many members are there?

23   *A.*  We have four board members.

24   *Q.*  And are there any other members of the organization aside

25   from the four board members?

Elisa Dahlberg - Cross                                    291

 1   *A.*   No.   We don't have a strict membership, like, structure.

 2   Like, there is no official form or anything that you fill out.

 3   We didn't want to have a financial burden placed on women that

 4   were seeking information about concealed carry, so we want that

 5   information to be available to everybody.

 6   *Q.*   Okay.   I appreciate that.   But I'm not asking about who has

 7   made inquiries.   How many members do you have?

 8   *A.*   Just the four.

 9   *Q.*   Okay.   And you've indicated that you live in Aurora,

10   correct?

11   *A.*   I do.

12   *Q.*   And since there are only three more, do they live in the

13   metro area?

14   *A.*   Along the Front Range, and one lives in Nevada.

15   *Q.*   Okay.   Is it fair to say that you don't have any members

16   who live in rural areas of Colorado?

17   *A.*   If you consider Greeley rural, we have one that lives in

18   Greeley.

19   *Q.*   Okay.   You don't know, do you, how many FFLs are available

20   in rural areas to conduct background checks, do you?

21   *A.*   No.

22   *Q.*   Now, let's talk about what you mentioned last, first,

23   loaning firearms.

24          Have you -- you've not had -- strike that.   Hold on

25   just a minute.   Are you aware of circumstances under the

Elisa Dahlberg – Cross

1    background check bill in which you could loan a weapon to a

2    woman who you thought needed it?

3    A.   That are actually -- that's in the bill?  That's not --

4    Q.   Yes.

5    A.   If it were a family member.

6    Q.   Okay.  And you can also loan a weapon without a background

7    check for a period of 72 hours, correct?

8    A.   Correct.

9    Q.   Are there other circumstances?

10   A.   I'd have to refer to refresh my memory.

11   Q.   All right.  Excuse me just a minute.

12        The bill doesn't in any way restrict the ability of

13   women to purchase firearms, does it?

14   A.   No.

15   Q.   And have -- is it fair to say that you haven't had occasion

16   to have to loan a weapon to a woman who required it for more

17   than 72 hours?

18   A.   I personally?

19   Q.   Yes.

20   A.   No, I have not.

21   Q.   Can you identify any woman who was unable to defend herself

22   because she could not obtain a weapon that she wanted to

23   borrow?

24   A.   Not personally, no.

25   Q.   Okay.  So you're not aware that the background check has

Elisa Dahlberg – Cross                                         293

1   had any effect on any woman in that sense, correct?

2   A.  Correct.

3   Q.  Now, as I understand it, ma'am, you're the only member of

4   Women for Concealed Carry who carries concealed, at least, at

5   times, as I understand it, a weapon that has as a standard

6   magazine a magazine with a capacity of greater than 15 rounds;

7   is that correct?

8   A.  Correct.

9   Q.  I know that's kind of a mouthful.  The other three members

10  of Women for Concealed Carry do not carry a concealed weapon

11  with a standard magazine of more than 15 rounds, correct?  To

12  your knowledge.

13  A.  To my knowledge.

14  Q.  You own shotguns, correct?

15  A.  Correct.

16  Q.  And are shotguns a good self-defense weapon?

17  A.  Under certain circumstances, yes.

18  Q.  Would you say they're a good home self-defense weapon?

19  A.  Under certain circumstances.

20  Q.  What makes a shotgun a good home self-defense weapon?

21  A.  They're good in close quarters.  They have a larger spread

22  with their round, so you have a better chance of hitting your

23  target if you were in a low visibility situation.

24  Q.  All right.  And when you were with the Aurora Police

25  Department, was that something that was mentioned in your

Elisa Dahlberg – Cross

1   training, that is, that shotguns were good home self-defense

2   weapon?

3   A.  Not that they were a home self-defense weapon that I

4   recall.

5   Q.  Okay.  Was there anything in particular that you were

6   instructed with respect to uses for shotguns in self-defense

7   situations?

8   A.  Not that I recall.

9   Q.  All right.  Now, you most often, as I understand it, carry

10  concealed a smaller handgun, correct?

11  A.  Correct.

12  Q.  And I think you described it as a Smith & Wesson Bodyguard;

13  is that right?

14  A.  Yes.

15  Q.  Okay.  And that comes equipped with a standard six-round

16  magazine, correct?

17  A.  Yes.

18  Q.  When you carry concealed, do you carry extra magazines

19  along with that weapon?

20  A.  Generally, yes.

21  Q.  How many?

22  A.  Three.

23  Q.  And do you feel that carrying that weapon concealed with

24  the extra magazines provides you with adequate self-protection?

25  A.  I feel that there are compromises that need to be made when

Elisa Dahlberg - Cross                                    295

1   you carry a weapon that is smaller with a lower capacity.  I

2   carry that weapon because it's easier for me to conceal on my

3   body versus the 9 millimeter, which is quite a bit larger.

4   Q.  Okay.  Now, the 9 millimeter that you sometimes carry

5   concealed, you've indicated that you use that when you go to

6   more remote areas of the state, correct?

7   A.  Correct.

8   Q.  Okay.  And you have three 17-round magazines for that

9   weapon, correct?

10  A.  Yes.

11  Q.  And I may have missed some of your testimony.  Did you --

12  is that weapon -- are there Colorado-compliant magazines for

13  that weapon?

14  A.  There are.  Smith & Wesson makes ten-round magazines for

15  it.

16  Q.  All right.  And you've indicated that you prefer, I think

17  is the way you put it -- you prefer to use the magazine that

18  comes standard with weapons, including that one, right?

19  A.  Correct.

20  Q.  Do you have any reason to believe that a lower capacity

21  magazine is any less reliable than the magazines that you have

22  that come standard with that weapon?

23  A.  I would have to say, if it was made by the manufacturer

24  specifically for that model handgun --

25  Q.  Uh-huh.

Elisa Dahlberg – Cross

 1   A.   -- it would have the probability of being as reliable.

 2   However, I would not attest to that if I hadn't used it and put

 3   many rounds through it first.

 4   Q.   Okay.  But as we sit here today, you have no reason to

 5   believe that a lower capacity magazine that would fit into that

 6   weapon would be any less reliable than the ones that you've

 7   been using, correct?

 8   A.   Correct.

 9   Q.   The -- you've indicated that you have searched for lower

10   capacity magazines for that weapon; is that correct?

11   A.   I have.  I have looked for the ten-round ones.

12   Q.   Okay.  And are you just looking at magazines that are

13   manufactured by Smith & Wesson?

14   A.   I am.

15   Q.   You're not considering lower capacity magazines that are

16   made by other manufacturers, right?

17   A.   No.  And my reason for that is, I've used other brand

18   magazines, and I've had issues with them.  They're not as

19   reliable.  I've had a couple break on me at the range after

20   only putting a handful of rounds through them.  So in my mind,

21   made by the manufacturer for that handgun is the way to go.

22   Q.   Okay.  And are you specifically just referring to Smith &

23   Wesson, the magazines that you're looking at, then?

24   A.   Yes, because that's the brand of the two handguns I have.

25   Q.   Okay.  And have you researched whether -- well, put it this

297

Elisa Dahlberg – Cross

1   way:  I assume that there are a number of manufacturers who

2   manufacture magazines that are compliant with Colorado law and

3   can be used in that weapon; is that fair?

4   A.  I would assume so, yes.  I have not really looked at those

5   other options.

6   Q.  Okay.  And you've not done any research to determine

7   whether the manufacturers of the magazines that have failed you

8   in the past are the only ones that are available to manufacture

9   a lower capacity magazine for that weapon, correct?

10  A.  I have not.

11  Q.  Now, you said you also had two M&P15s; is that a correct

12  description?

13  A.  Correct.

14  Q.  All right.  And you have large-capacity magazines for those

15  weapons, correct?

16  A.  I do.

17  Q.  I think you said three; is that right?

18  A.  For that M&P15?

19  Q.  Yes.

20  A.  Thirty.

21  Q.  Okay.  You have two --

22  A.  I'm sorry, two rifles, yes.  Thirty magazines, yes.

23  Q.  And you've had occasion to fire those weapons, correct?

24  A.  Yes.

25  Q.  Are those magazines that you've used when you fired that

Elisa Dahlberg – Cross

1  weapon?

2  A.  Yes.

3  Q.  Have you only fired the weapon at the range?

4  A.  Yes.

5  Q.  Okay.  You've not had any occasion to either display or

6  fire that weapon -- those weapons in self-defense, correct?

7  A.  Correct.

8  Q.  And are you -- isn't it true that there are

9  Colorado-compliant magazines available for the M&P15s?

10  A.  I believe so.  I'm not really aware of the 20 and 30

11  rounds, neither of which are -- there may be ten rounds, I'm

12  not 100 percent sure.

13  Q.  Okay.  You've not tried to buy any Colorado-compliant

14  magazines for those weapons, correct?

15  A.  No, because we purchased all of our high-capacity ones

16  before the deadline, so they were all grandfathered in.

17  Q.  All right.  And I'm sorry if I'm repeating, for the M&P9,

18  you have a number of large-capacity magazines, and I'm speaking

19  of magazines that have a capacity of in excess of 15 rounds.

20  You have large-capacity magazines for that weapon as well?

21  A.  Right, the M&P9 has three with it.

22  Q.  Three, okay.  Thank you.  And when you've fired that

23  weapon, are those the magazines that you've used?

24  A.  Yes.

25  Q.  And you've had occasion to discharge that weapon target

Elisa Dahlberg - Cross

 1   shooting; is that correct?

 2   *A.*   Yes.

 3   *Q.*   For any other purpose?

 4   *A.*   No.

 5   *Q.*   All right.  Because you have large-capacity magazines for

 6   the weapons that use those types of magazines, you've not been

 7   restricted in your ability to use either the M&P15s or the

 8   M&P9, correct?

 9   *A.*   Correct.

10   *Q.*   Since you left the Air Force and the Aurora PD, have you

11   ever had an occasion where you've had to fire more than 15

12   rounds in self-defense?

13   *A.*   No.

14   *Q.*   Have you ever had occasion where you've even had to fire

15   one round in self-defense?

16   *A.*   No.

17   *Q.*   As a civilian, have you ever had to display a weapon, that

18   is, show someone that you had a gun as part of your

19   self-defense?

20   *A.*   No.

21   *Q.*   And you talked a little bit about your experience in the

22   Air Force and the Aurora PD.  You were with the Aurora PD for a

23   year, I think; is that correct?

24   *A.*   Roughly, yes.

25   *Q.*   Thereabouts.  Okay.  What were your duties with the Aurora

300

Elisa Dahlberg – Cross

1    PD?

2    *A.*  I went through the academy for the first six months, and

3    then I was put on patrol after that.

4    *Q.*  Okay.  Were there -- how long were you on patrol?

5    *A.*  About four months.

6    *Q.*  Were there any occasions when you were on patrol where you

7    discharged your weapon?

8    *A.*  No.

9    *Q.*  There were some occasions, I believe, when you were on

10   patrol when you displayed your weapon; would that be fair?

11   *A.*  Yes.

12   *Q.*  And I think you've testified that at least one occasion

13   that you recalled was a traffic stop, when you and your partner

14   held people in the car at gunpoint while you waited for backup

15   to arrive?

16   *A.*  Yes.  It was a high-risk traffic stop on a stolen vehicle.

17   *Q.*  Okay.  And there was another time that you recalled when

18   you and I think a partner were chasing a suspect, it sounded

19   like, through backyards of Aurora?

20   *A.*  Correct.

21   *Q.*  Okay.  And you pinned the suspect in the backyard?

22   *A.*  Yes.

23   *Q.*  Okay.  And, again, you waited for backup to arrive,

24   correct?

25   *A.*  Yes.

301
Elisa Dahlberg – Cross

1    *Q.* In both those occasions, you displayed your gun in order to

2    subdue a suspect, correct?

3    *A.* Correct.

4    *Q.* All right.  Since you left the Aurora PD, fair to say that

5    you've not had to engage in any high-risk traffic stops?

6    *A.* Correct.

7    *Q.* And you're fortunate enough now not to have to run through

8    backyards to chase suspects and pin them down, correct?

9    *A.* Correct.

10   *Q.* Would you agree, ma'am, that as a police officer or a

11   security officer with the Air Force, there are more situations

12   where you put yourself at risk than the civilian does?

13   *A.* I would agree to that, yes.

14   *Q.* You were speaking earlier, and we spoke earlier about

15   loaning firearms.  There is nothing in the bills that you're

16   here to talk about today that restrict you in any way from

17   loaning or giving a lower capacity magazine than one that

18   carries greater than 15 rounds, correct?

19   *A.* Magazines?

20   *Q.* Yeah, magazines.

21   *A.* Not magazines.

22   *Q.* Okay.  Have you ever had occasion to loan or give a

23   magazine to someone who you felt was in danger?

24   *A.* No.

25          *THE COURT:* We're a few minutes past 10 o'clock.  When

302

Elisa Dahlberg – Cross

1  you reach a convenient stopping point, would you let me know,

2  and we'll take our morning recess.

3       *MS. SPALDING:*  This is fine, Your Honor.

4       *THE COURT:*  All right.  The court clock is showing six

5  minutes after 10:00.  We'll stand in recess until 10:20, then

6  we will reconvene.

7       (Recess at 10:07 a.m.)

8       (In open court at 10:24 a.m.)

9       *THE COURT:*  Please proceed.

10      *MS. SPALDING:*  Thank you, Your Honor.

11  *BY MS. SPAULDING:*

12  *Q.*  I just have a few more questions, Ms. Dahlberg.

13       You mentioned that while you were training with Aurora

14  PD, you had occasion to change the weapon that you carry,

15  correct?

16  *A.*  Correct.

17  *Q.*  And I think you indicated that you -- that prior to the

18  change, you commonly carried a weapon that had a magazine with

19  a capacity of 15 rounds or fewer, correct?

20  *A.*  Correct.  It was a 1911 style.  It was a Kimber.  It had

21  seven-round capacity.

22  *Q.*  Right.  And you talked about changing because you wanted to

23  save time in loading, right?

24  *A.*  Correct.

25  *Q.*  At least that was part of the reason, right?

303

Elisa Dahlberg – Cross

1  *A.*  Correct.

2  *Q.*  The reloading you were talking about, that was all done

3  during training, correct?

4  *A.*  Correct.

5  *Q.*  That is, you didn't have occasion while you were on duty or

6  since you've been a civilian to have to reload in a stressful

7  situation, correct?

8  *A.*  No -- correct.

9  *Q.*  Now, you talked about a lot of training that you received

10  in the Air Force, as well as your training with the Aurora PD.

11  Before you entered the military, did you have any weapons

12  experience?

13  *A.*  No, I did not.

14  *Q.*  Okay.  So, in the military, did you receive training with a

15  weapon that would require you to reload a magazine?

16  *A.*  Yes.

17  *Q.*  Did -- do you recall, when you first started learning how

18  to do that, how long it took you to reload a magazine?

19  *A.*  When I first started learning, a couple of seconds is

20  probably my best estimate.

21  *Q.*  Okay.  And you've had a lot of training since, correct?

22  *A.*  Yes.

23  *Q.*  How long would you say it takes you now to reload a

24  magazine?

25  *A.*  What kind of reload?

304

Elisa Dahlberg – Cross

1    Q.  Okay.  Well, tell me the various situations that you

2    encounter with the weapons that you have in terms of reload

3    being?

4    A.  With a handgun, you can do a standard reload, where the

5    slide is forward.  You can do tactical reloads.  You can do

6    one-handed reloads.  Just depends.

7    Q.  Let's talk about a standard reload, then.  When you first

8    started your training with firearms some years ago, how long

9    did it take you to do a standard reload with a handgun,

10   approximately?

11   A.  I would say a couple of seconds, maybe three.

12   Q.  Okay.  And how about now?

13   A.  Maybe two.

14   Q.  Okay.  And how about tactical reload, when you first

15   started your training, how long did it take you to conduct a

16   tactical reload?

17   A.  Well, in the military, that wasn't -- because that was

18   back -- the military has since changed some of the weapons

19   training, even since I got out, so that wasn't really a focus

20   back then.  I don't recall doing that in basic training or the

21   last time I qualified with the -- the 9-millimeter Beretta.

22   Q.  M&P --

23   A.  Yes.

24   Q.  While we're on the topic, can you explain what a tactical

25   reload is.

Elisa Dahlberg – Cross

1   *A.*  You've expended a full magazine of rounds, the slide is

2   locked to the rear, you hit the magazine release, the magazine

3   drops out, you insert another magazine, the slide automatically

4   goes forward.

5   *Q.*  All right.  And what is a standard reload?

6   *A.*  When the magazine slide -- the slide of the handgun is

7   already forward, you insert a magazine, you have to rack the

8   slide to chamber a round.

9   *Q.*  Okay.  With respect to a tactical reload, has your time

10  improved as you've had more training?

11  *A.*  Yes.

12  *Q.*  And as a civilian, it's my understanding, you've never had

13  to reload in a threatening situation, correct?

14  *A.*  Correct.

15       *MS. SPALDING:*  That's all I have.  Thank you very

16  much.

17       *THE COURT:*  Thank you.

18       Redirect.

19       *MR. WESTFALL:*  Your Honor, we have no redirect, and we

20  would request that the witness be excused.

21       *THE COURT:*  Thank you.

22       *MS. SPALDING:*  We have no objection.

23       *THE COURT:*  Thank you, ma'am.  You may step down.  You

24  are excused.

25       *THE WITNESS:*  Thank you, Your Honor.

Dylan Harrell - Direct

1          *THE COURT:*  Please call your next witness.

2          *MR. WESTFALL:*  Thank you, Your Honor.

3          The plaintiffs' next witness, we'd call Mr. Dylan

4    Harrell to the stand.

5          *THE COURT:*  Please come forward and be sworn.

6          (**DYLAN HARRELL, PLAINTIFFS' WITNESS, SWORN**)

7          *COURTROOM DEPUTY:*  Please state your name and spell

8    your first and last name for the record.

9          *THE WITNESS:*  My name is Dylan Harrell, and it's

10   spelled D-Y-L-A-N, and the last name is Harrell, H-A-R-R-E-L-L.

11                       **DIRECT EXAMINATION**

12   BY MR. WESTFALL:

13   *Q.*  Thank you, Mr. Harrell.  If I can ask again what I asked

14   Ms. Dahlberg, I don't hear very well.  To the extent to which

15   you can speak slowly and into the microphone, I would really

16   appreciate it.

17   *A.*  Okay.

18   *Q.*  Where do you live, Mr. Harrell?

19   *A.*  I live up in Frederick, Colorado.

20   *Q.*  How are you employed?

21   *A.*  I am an account executive for a marketing services firm

22   here in Colorado.

23   *Q.*  What is your educational background?

24   *A.*  Year 2000, I graduated as valedictorian from Horizon High

25   School, and then I went to Colorado State to do my

Dylan Harrell – Direct

1    undergraduate.  I got a bachelor's in mathematics.

2    Q.  Are you proficient with firearms?

3    A.  I consider myself to be, yes.

4    Q.  Do you have a concealed carry permit?

5    A.  I do, yes.

6    Q.  Are you a named plaintiff?

7    A.  I am.

8    Q.  Are you affiliated with the organization Outdoor Buddies?

9    A.  I am, yes.

10   Q.  What is your role in that organization?

11   A.  I am on the board of directors, and I'm also the secretary

12   of the organization.

13   Q.  Describe Outdoor Buddies.

14   A.  Outdoor Buddies is a nonprofit organization.  We have over

15   800 members, a third of which are disabled.  The organization

16   was co-founded by representatives from Craig Hospital and

17   Colorado Parks and Wildlife.  And their mission, essentially,

18   is to get people who were either born with disabilities or

19   maybe had a life-changing experience, to get them back in the

20   outdoors, to, basically, realize they can still do a lot of the

21   things they did before, that they want to do.

22   Q.  Why did Outdoor Buddies join this lawsuit?

23   A.  Outdoor Buddies has some major concerns over the firearm

24   transfer stuff in 1229.  We have a number of firearms that are

25   outfitted with highly customized equipment that stays on those

Dylan Harrell - Direct

1   particular firearms.

2   *Q.*  I'd like to explore, if we can, just what these firearms

3   are, what the special equipment is, and the types of

4   disabilities the firearms and the equipment are designed to

5   assist in hunting.

6   *A.*  Sure.  One of the pieces -- one of the pieces of equipment

7   that we have is called the trophy shot.  And what that is, is

8   it's a system, essentially, to help blind hunters still be able

9   to hunt.  What it does -- what the equipment does, essentially,

10  a little camera will mount behind the eye piece on the scope

11  and then output the video to a monitor, to where a disabled

12  hunter could still be aiming the firearm and -- but an

13  assistant would be able to see on the monitor what is visible

14  through the scope, to help that person aim.  So that person

15  would still be the one to do the aiming and actually pull the

16  triggers.

17        We also have one of those pieces of equipment set up

18  on a .22 rifle that we will loan out to people who are doing a

19  hunter safety education course.  Colorado Parks and Wildlife

20  will contact us if they know they have a blind hunter coming

21  out to do their hunter safety education, and we'll provide that

22  rifle to them to complete the shooting part of that

23  certification.

24        And then we also have another piece of equipment

25  mounted to a rifle that is to help with people who don't have

Dylan Harrell – Direct

1    full use of their arms, whether they're -- like, whether they

2    would be a double amputee, a quadriplegic, maybe someone with

3    some kind of muscle atrophy, where they can't use the firearm

4    with their arms.  So what that equipment does is sets up with a

5    joystick and a straw, essentially, to where the person could

6    aim the firearm with the joystick, with their jaw.  And then

7    also, the little straw is something they can blow into to

8    actuate the trigger, to fire the firearm.

9    Q.  Thank you.  Now, are these specialized firearms that you

10   just described used in hunting?

11   A.  Both hunting and then the hunter education certification.

12   Q.  Describe the hunts that Outdoor Buddies works with, with

13   using these specialized firearms?

14   A.  Sure.  So, every year at the beginning of the year, people

15   are asked to submit their hunt requests.  And the hunt

16   committee through the organization will put together all the

17   hunts, you know, based on people's ability levels and knowing

18   what is needed for those trips.  Each hunt is scheduled for

19   three days.  Sometimes they take the full three days, sometimes

20   not.  And these hunts are located all throughout the state,

21   could be Western Slope, you know, southeastern Colorado, could

22   be anywhere throughout the state.

23   Q.  Does 1229 pose difficulties for Outdoor Buddies and its

24   participants regarding the transfers of these specialized

25   firearms?

Dylan Harrell - Direct

1   *A.*   Yes, it does.

2   *Q.*   Please describe.

3   *A.*   Sure.  So, if the hunts are, let's say, three days long,

4   the person would most likely need to acquire the firearm, like,

5   the night before the hunt begins to be able to get that firearm

6   to the location of the hunt.  And then they could potentially,

7   after the three days still have it, you know, into the next

8   day, where they would be returning from the hunt to give the

9   firearm back.

10  *Q.*   Could obtaining background checks be a difficult situation?

11  *A.*   It could, yeah.  A lot of times these hunts are in rural

12  locations, and we don't know everyone through the state --

13  like, have -- every FFL in the state to know whether there is

14  ones in the areas that we would be transferring the rifle to.

15  *Q.*   Do you personally have concerns with enacted bill 1229?

16  *A.*   I do, yes.

17  *Q.*   What?

18  *A.*   I consider myself to be a pretty avid firearms enthusiast.

19  And that, in turn, for any of the firearms enthusiasts out

20  there, oftentimes leads to discussions with other firearms

21  enthusiasts.  And I've come across friends or co-workers who

22  have, you know, told me that they're having trouble with a

23  firearm, whether it's the way it's functioning, or in other

24  cases, I've had friends say, hey --

25          *MS. MORRILL:*  Objection, Your Honor, to the extent the

Dylan Harrell - Direct

1    witness is testifying about hearsay, what other people have

2    told him.

3            THE COURT:  Is this being offered for the truth of the

4    matter asserted?

5            MR. WESTFALL:  I asked the -- the question I asked

6    was, did he have concerns?  And he's describing his concerns.

7    I don't recall any statement that was made that was actually

8    designed to elicit testimony concerning -- that would be

9    testimony saying House Bill 1229 is good or House Bill 1229 is

10   bad.  The testimony is merely describing the circumstances that

11   gave rise to his concerns.  And the circumstances, as I

12   understood his testimony, were situations where firearms would

13   be loaned to him.  And he's merely describing the circumstances

14   of those loans to him.

15           And to the extent to which Mr. Harrell may have

16   actually uttered some statement about what somebody asked him

17   to do, it would not in that context be offered to prove the --

18   the -- be offered to prove the truth of the matter asserted in

19   this case, but would be merely a statement providing context of

20   his concerns.

21           THE COURT:  Thank you.  The question called for

22   "what," referring to his personal concerns.  And he's

23   explaining his personal concerns.  I understand the testimony

24   in that context.  I do not understand it to offer any

25   out-of-court statement for the truth of the matter asserted.

Dylan Harrell – Direct

1      You may continue with your answer.  Do you need to

2  have it read back to you so you know where you were?

3           THE WITNESS:  I think I'm okay.

4           THE COURT:  Okay.

5           THE WITNESS:  Thank you.

6           So, I've talked to people whose firearms were not

7  functioning properly.  And I've also spoken to people who have

8  gotten a new scope, let's say, to where they've asked for my

9  assistance to sight in the rifle with the new scope.  I belong

10  to a gun club, so this is more convenient for me a lot of times

11  than them.  In which cases, I would take possession of the

12  firearms.

13  BY MR. WESTFALL:

14  Q.  Mr. Harrell, are you familiar with 1229?

15  A.  I am, yes.

16  Q.  Are you -- are you aware of the exception in 1229 under

17  (6)(f) that contains a repair and maintenance exception?

18  A.  I am familiar with that, yes.

19  Q.  Does that address your concerns that you've just described?

20  A.  It does not, no.

21  Q.  Please explain why.

22  A.  As far as putting a new rifle on a scope and getting it

23  sighted in, I'm not really sure that falls under repair and

24  maintenance.  That would be sort of like a modification or

25  accessory type thing.  And as far as the repair and maintenance

Dylan Harrell - Direct

1    is concerned, I'm a gun enthusiast.  I'm not an accredited

2    gunsmith, and I don't know how well I feel to defend myself,

3    should I need to, to be able to prove that's what I was doing

4    with the firearm.

5    Q.  I understand.  Thank you, Mr. Harrell.

6         Do you have experience with private sales?

7    A.  I do have one, yes.

8    Q.  Please describe it, if you would.

9    A.  I was looking to replace one of my rifles.  And before

10   buying the new one, I had to sell the one I had currently.  So

11   to do that, I had to find a buyer, which eventually I did.  It

12   ended up being a neighbor that wanted a rifle.  At which point

13   we had to start looking for someone to perform the background

14   check for us.  I went to talk to two FFLs that I had worked

15   with before, neither of which was willing to do the background

16   check for us.

17   Q.  Were you able to eventually find someone, then, to do the

18   background check?

19   A.  We did find someone later on, yes.

20   Q.  How long did it take you?

21   A.  It took about three weeks.  The search started mid to late

22   October, and the background check was completed on November 9.

23   Q.  And did some -- were some folks unable to provide -- were

24   some FFLs unwilling or unable to provide background checks for

25   you?

Dylan Harrell - Direct

1   *A.*   Yes.  The first two that I checked with that I had used

2   before were unwilling to do it.  The person who ended up

3   performing the check in the end turned out to be a friend of

4   the person I was selling the firearm to, who did this as a

5   courtesy to us.

6   *Q.*  Now I'd like to turn our attention to 1224.  What firearms

7   do you use for home defense, Mr. Harrell?

8   *A.*  I have an M&P15, I have various pistols, and also a shotgun

9   that I have set up for home defense.

10  *Q.*  Do any of the firearms that you use for home defense have

11  magazines -- use magazines with a capacity of more than 15

12  rounds?

13  *A.*  Yes.  The M&P15 does, and I also have an M&P9 pistol that

14  does.

15  *Q.*  So you mentioned the M&P15 and M&P9.

16  *A.*   Right.

17  *Q.*  Let's start with the M&P15.  Where do you keep  the M&P15?

18  *A.*  The M&P15 I keep in a safe near the front door of my home.

19  *Q.*  Is the M&P15 readily accessible from the front of your

20  house?

21  *A.*  I'd say, yes.  If I'm near the front door, the safe would

22  be right there, and I'd be able to access it at that location.

23  *Q.*  Now, let's talk -- where do you store the M&P9?  Where do

24  you keep the M&P9?

25  *A.*  The M&P9 is in a smaller safe next to the bed in my

315

Dylan Harrell - Direct

1   bedroom.

2   Q.   Is the M&P15 the firearm that you would use if you were

3   dealing with a threat in the front of your home?

4   A.   It is, yes.

5   Q.   What is the capacity of the M&P15?

6   A.   I use a 40-round Magpul PMAG.

7   Q.   So we're clear, Magpul P, the letter P, mag, one word?

8   A.   Magpul is the brand, and PMAG, one word, is the model, if

9   you will.

10  Q.   So, again, what is -- what do you use with the M&P15, just

11  so we're clear on the record?

12  A.   I use a 40-round magazine with my M&P15.

13  Q.   Is the 40-round magazine that you use for the M&P15

14  important to you?

15  A.   Yes, I -- when it comes to defending my home and my

16  family -- I've got a wife and two small children -- I want as

17  many rounds that I can, that I feel is both reliable and

18  practical for me.

19  Q.   What do you mean by "reliable"?

20  A.   In all the times shooting, I have used different magazines

21  over time.  And any of my Magpul magazines, specifically the

22  40-round one, I've never had a failure of any kind.  I feel

23  that it's a reliable magazine for me.

24  Q.   Describe what you mean by "practical."

25  A.   The 40-round magazine is also similar in size to any of the

Dylan Harrell – Direct

1    other magazines, is still lightweight enough for me to carry

2    practically, and if I need to lay a rifle in my lap, it is flat

3    with the rifle, and I can do so without worrying about the

4    rifle falling off my lap.

5    Q.  If you were in your bed at night and all of a sudden you

6    had to encounter an intruder situation or some sort of threat

7    in the middle of the night, what is the firearm that you would

8    use in that situation?

9            MS. MORRILL:  Objection, calls for speculation.

10           THE COURT:  Sustained.

11   BY MR. WESTFALL:

12   Q.  Where do you keep the M&P9, again?

13   A.  I keep the M&P9 in a safe next to my bed.

14   Q.  If you were in your bed, and you had to deal with a

15   situation at that time, is the M&P9 the firearm that you would

16   turn to in that situation?

17           MS. MORRILL:  Same objection.

18           THE COURT:  Sustained.

19   BY MR. WESTFALL:

20   Q.  What other firearm would you have available to you other

21   than the M&P9 if you were in your bed and a threat arose?

22   A.  I would not have any other firearms next to me.

23   Q.  Pardon me, I'm sorry?

24   A.  You asked if I could not access the M&P9, what other

25   firearm would you use?

317

Dylan Harrell – Direct

1   Q.  I'm trying to get around the objection here and see if we

2   can nail down what firearm you would use if you were in your

3   bed and you were confronted with a threat situation.

4        MS. MORRILL:  And the question as phrased calls for

5   speculation.

6        THE COURT:  Sustained.

7        You may inquire of this witness what his plan is, what

8   strategy he has developed, along those lines.  You cannot ask

9   what he might do in the future.

10       MR. WESTFALL:  Thank you, Your Honor.

11  BY MR. WESTFALL:

12  Q.  Mr. Harrell, have you given some thought about dealing with

13  a threat situation if you were in your bed in the middle of the

14  night?

15  A.  I have, yes.  I have a small pistol safe next to the bed in

16  my room, and I put the M&P9 in there.  Because of the pistols

17  that I own, that one -- that one has the magazines that carry

18  the most rounds.  And that firearm is also, basically, the

19  largest firearm that I can put in the safe next to my bed.  So

20  if I were in my bedroom, I would reach for that M&P9 in the

21  safe.

22  Q.  Mr. Harrell, describe your disability and how it affects

23  your ability to defend yourself in your home.

24  A.  Yeah.  About twelve years ago, I was in an accident that

25  left me paralyzed from about the chest level down.  So I don't

Dylan Harrell - Direct

 1   have any use of, like, my stomach muscles, my back muscles, my

 2   legs, anything like that.  If I'm reaching over to pick

 3   something up, I have to use one of my arms to stabilize myself

 4   in the chair, the other arm to pick something up.  I'm not able

 5   to reach out with both arms without falling over because I

 6   can't hold myself up.

 7          So in terms of a self-defense situation in my home, I

 8   would either need to attempt to flee, which I'm not very fast

 9   at, or I would need to be able to sit there and fight back, via

10   firearm, more likely.  But I would not be able to do both, flee

11   and fight back, at the same time.

12   Q.  In a home defense situation, would you have issues with

13   having to change a magazine?

14   A.  I would, yes.

15          MS. MORRILL:  Objection to the extent that it calls

16   for speculation.

17          THE COURT:  Sustained.

18   BY MR. WESTFALL:

19   Q.  Mr. Harrell, describe, if you will, what you need to do to

20   change a magazine, given your disabilities.

21   A.  Sure.  Since I mentioned before that I don't have use of my

22   stomach muscles for balance, any time that I'm shooting a

23   firearm of any kind and I need to reload the magazine or what

24   not, I have to lay that firearm down on my leg so I can support

25   myself with my hands and still use my other hand to, basically,

319

Dylan Harrell - Direct

1  eject the empty mag and be able to grab a new mag to put into

2  the firearm.  During that time, I'm lowering the firearm down

3  to my lap, which would take a matter of seconds.

4  *Q.*  In your -- you say you had a concealed carry permit.

5  *A.*  Right.

6  *Q.*  Did you receive training in your concealed carry class that

7  is relevant to dealing with a home defense situation involving

8  a magazine change?

9  *A.*  Yes, I have.  It would both apply to a magazine change and

10  drawing a firearm in any situation.  What I'm talking about is

11  the Tueller drill.  And I don't know how many people are

12  familiar with that, but it was a study performed and proven

13  that an assailant within 7 yards of you can get to you and

14  attack you prior to you being able to draw a firearm and get a

15  shot on target, or, in my case, reload a magazine, before an

16  attacker could get to me.

17        Why that's relevant in my home is because there are no

18  real points in my home that are more than 7 yards.  So at that

19  point lowering a firearm would render me defenseless.

20        *MS. MORRILL:*  Your Honor, I would move to exclude the

21  part of the testimony that is reliant on the Tueller study, I

22  believe it's called.

23        *THE COURT:*  Noted.

24  *BY MR. WESTFALL:*

25  *Q.*  During a magazine change, are you in a defenseless

Dylan Harrell – Direct

1    situation?

2    *A.*   I am.  As soon as I run out of ammunition and have to load

3    a firearm onto my lap, I would be defenseless.

4    *Q.*   Have you assessed, Mr. Harrell, what you need to do with

5    the firearms you have to protect yourself in a home defense

6    situation?

7    *A.*   I'm not sure I understand the question.

8    *Q.*   Have you -- have you given thought and made a plan with

9    regards to whether one magazine is preferable or having a

10   second or third magazine is feasible in a home defense

11   situation?

12   *A.*   Yes, I have thought about that, which is why I opt for the

13   larger magazines, specifically, the 40-round magazine.  For me,

14   not only accessing the firearm to start with takes a little

15   time, but the added time it would take to grab a second or

16   third magazine and find a way to place it on my person.  A lot

17   of times when I'm carrying something, I might put it under my

18   leg or on my lap; but in those cases I've still had issues of

19   dropping the item.  So I would think, not only if I have to

20   change the magazine, I also run the risk of potentially

21   dropping any extra magazines I might have.

22   *Q.*   Again, if you would, just briefly explain a little bit more

23   and demonstrate the issues you have with changing what -- using

24   a second or third magazine, sitting there in the wheelchair.

25           *MS. MORRILL:*  Objection, asked and answered.

Dylan Harrell – Direct

1          *THE COURT:*  Sustained.

2     *BY MR. WESTFALL:*

3     Q.  Do you believe that you are more of a target in a

4     wheelchair than someone who is not disabled?

5          *MS. MORRILL:*  Objection, foundation.

6          *THE COURT:*  Sustained.

7     *BY MR. WESTFALL:*

8     Q.  Do you have any personal knowledge, based upon any

9     experience that you have confronted, that would indicate to you

10    that you're more of a target?

11    A.  Yes.

12    Q.  Than a person who is not disabled?

13    A.  Right.  Yes, my wife and I were leaving a Rockies game one

14    night, had started being followed, and we recognized the

15    threat, and actually turned around and confronted the person

16    before they got too close, which at that time they fled in the

17    opposite direction.  I feel we were picked out due to me being

18    in a chair and my wife potentially not being able to fight

19    back.

20         *MS. MORRILL:*  Motion to exclude the portion of the

21    testimony that lacks foundation for what the possible

22    attacker's motives were.

23         *THE COURT:*  I overrule the objection.  The problem is

24    not foundation, it's relevance.

25    *BY MR. WESTFALL:*

Dylan Harrell - Direct

1    *Q.*  Mr. Harrell, are you familiar with 1224's requirement that

2    you maintain continuous possession of your magazines exceeding

3    16 rounds?

4    *A.*  I am, yes.

5    *Q.*  Are you familiar with the technical guidances that were

6    issued in this case?

7    *A.*  I have read them, yes.

8    *Q.*  If I may ask that the witness be given Volume 3 of the

9    exhibits, and specifically, would like to call the witness's

10   attention to Tab 6, Exhibit 6, of that notebook.

11           Have you seen Exhibit 6, Mr. Harrell?

12   *A.*  I have, yes.

13   *Q.*  Have you read it?

14   *A.*  Yep.

15   *Q.*  Does Exhibit 6 answer your questions on what you need to do

16   to maintain continuous possession of your firearms -- I mean,

17   excuse me, of your magazines with a capacity of 16 rounds or

18   more?

19   *A.*  No, it's not clear to me.

20   *Q.*  Explain why.

21   *A.*  In terms of exercising dominion over property, I'm not

22   really sure what the difference is between me being present

23   with someone and shooting one of these magazines through --

24   like, using one of these magazines in a firearm versus loaning

25   it out for any extended period of time, as long as that

Dylan Harrell – Cross

 1  magazine is technically still mine and I am due to get it back.

 2         MR. WESTFALL:  Your Honor, I have no further questions

 3  of this witness on direct.

 4         THE COURT:  Thank you.

 5         Cross-examination.

 6         MS. MORRILL:  Yes, Your Honor.

 7                         **CROSS-EXAMINATION**

 8  BY MS. MORRILL:

 9  Q.  I want to go back to the beginning of your direct exam

10  where you spoke about your involvement with Outdoor Buddies.

11  A.  Sure.

12  Q.  You testified about hunts that have a duration of more than

13  three days; was that correct?

14  A.  Right.  The hunts are scheduled for three days.

15  Q.  For three days, I'm sorry.  But the temporary transfer of

16  the firearm for the purpose of the hunt might take longer than

17  a 72-hour period?

18  A.  Yes.

19  Q.  Or might last longer, is really the better question.

20  A.  Right.  The person would likely take possession of the

21  firearm prior to the hunt.

22  Q.  I see.  And these hunts are organized by Outdoor Buddies?

23  A.  Right.

24  Q.  And the hunts occur on property at locations where it is

25  legal to engage in hunting?

Dylan Harrell - Cross

1   *A.*   It is, yes.

2   *Q.*   Okay.  And they -- and any individual who is on one of

3   Outdoor Buddies' hunts has the required permit or license

4   necessary to engage in hunting?

5   *A.*   Right.

6   *Q.*   I'd like to talk to you now a little bit about the weapons

7   that you own in your individual personal capacity that accept

8   large-capacity magazines.  And by that term, when I use that

9   term in my questions, I'm referring to magazines that hold 16

10   or more rounds and are subject to Colorado statute.

11          So I understand that for home defense, you have both

12   the M&P15 and the M&P9; is that correct?

13   *A.*   Right, yes.

14   *Q.*   And I know that you identified that the M&P15, you use that

15   with a 40-round magazine?

16   *A.*   For home defense, yes.

17   *Q.*   Correct.  And I didn't catch what the capacity was of your

18   M&P9.

19   *A.*   M&P9 holds 17 rounds.

20   *Q.*   Okay.  And you currently own multiple magazines for each of

21   those weapons; is that correct?

22   *A.*   I do, yes.

23   *Q.*   And the number of 40-round magazines that you own for the

24   M&P15 is what?

25   *A.*   I have two of those.

Dylan Harrell - Cross

1   Q.   Okay.  And the number of magazines you own for the M&P9?

2   A.   I have two of those.

3   Q.   Okay.  And all four of those large-capacity magazines were

4   acquired by you prior to July 1, 2013?

5   A.   Yes, they were.

6   Q.   And they have remained in your home since that time?

7   A.   No, I've taken them out to shoot.

8   Q.   But I -- what I'm just trying to say is, they've been yours

9   the whole time?

10  A.   Yes.

11  Q.   Okay.  You haven't loaned them to anyone since July 1,

12  2013?

13  A.   No, I have not.

14  Q.   You also testified on direct exam, sir, that you have a

15  concealed carry permit?

16  A.   Yes.

17  Q.   And you do in fact carry concealed where it is permitted?

18  A.   Yes.

19  Q.   And the -- let's say -- I just want to clarify, you also

20  had a concealed carry permit before July 1, 2013; is that

21  accurate?

22  A.   I did, yes.  I've had it since 2007.

23  Q.   And prior to Colorado's magazine capacity restriction going

24  into place, you carried concealed weapons that had a capacity

25  of less than 15 rounds; is that -- 15 or less rounds?

326

Dylan Harrell - Cross

1  A.  Yes.

2  Q.  And at the time of your deposition, you testified that you

3  carried concealed with weapons that hold 15 or less rounds at

4  that time too?

5  A.  Yes.

6  Q.  And that was in the fall of 2013?

7  A.  Yes, I think October.

8  Q.  Okay.  And so -- and do you still conceal carry today?

9  A.  Yes.

10  Q.  I mean, not today --

11  A.  Not today, yes.  Right.

12  Q.  But when you're not in federal courthouses, you do conceal

13  carry still?

14  A.  Yes.  Anywhere that's legal.

15  Q.  And are the weapons that you conceal carry where it's legal

16  today weapons that hold 15 rounds or less?

17  A.  Yes, they are.

18  Q.  And speaking with respect to acts of self-defense that

19  might occur in a public setting, where you would be -- you

20  would have your concealed weapon, you have never had to fire

21  any of your concealed weapons in personal self-defense; is that

22  right?

23  A.  Right.

24  Q.  And you've also never had to display any of your concealed

25  weapons while in public for the purpose of self-defense?

Dylan Harrell - Cross

1   A.   I drew -- I guess we would have to clarify, probably.  I

2   did draw once a revolver on a bear that was threatening me, but

3   not on a person.

4   Q.   Right.  Not against any two-legged attackers?

5   A.   Right.

6   Q.   Okay.  You also use your -- not your self-defense or your

7   home weapons -- I'm sorry, not your concealed carry or your

8   self-defense -- let me pause and start from the beginning.

9        In addition to the weapons you own for home and

10  concealed carry, self-defense, you also own weapons for

11  hunting?

12  A.   Yes, I have other firearms.

13  Q.   Okay.  And those weapons you use recreationally for target

14  shooting and hunting?

15  A.   Yes.

16  Q.   Okay.  And you have weapons that have detachable magazines

17  for those purposes that hold in excess of 15 rounds?

18  A.   For the hunting rifles?  Only when I'm using, like, the

19  M&P15 for small game.

20  Q.   So sometimes you might take one of your home self-defense

21  weapons out and use it for small game hunting?

22  A.   Yes.

23  Q.   But, again, you have the magazines necessary to use that

24  weapon?

25  A.   Yes.

328

Dylan Harrell - Cross

 1   *Q.* I want to turn now to your testimony about the effect of

 2   C.R.S. -- I'm sorry C.R.S. 18-12-301, which is Colorado's

 3   background check requirement.  You testified that you -- I'm

 4   sorry, I have that citation wrong.  C.R.S. 18-12-112 is the

 5   statute, but it is the background check statute.  You testified

 6   on direct that you sight in scopes for rifles for friends?

 7   *A.* Yes.

 8   *Q.* And doing so involves you borrowing their weapon with the

 9   scope in order to sight the weapon correctly?

10   *A.* Yes.

11   *Q.* Okay.  And that in -- on occasion, it takes you more than

12   72 hours to perform the sighting of the weapon?

13   *A.* Yes, it could take multiple trips to the range.

14   *Q.* And so you might be in possession of that weapon for more

15   than 72 hours?

16   *A.* I could, yeah.

17   *Q.* In some instances, though, you are able to sight the weapon

18   in less than 72 hours; is that true?

19   *A.* The amount of time it takes to sight in could be less than

20   72.  As far as seeing that person again, you know, it could be

21   weekend to weekend.

22   *Q.* So you described one incident, then, where you did

23   obtain -- you attempted to obtain a background check for a

24   private transfer, not for the purpose of sighting the weapon;

25   is that right?

Dylan Harrell - Cross

1   *A.*  Yes.

2   *Q.*  And you testified that you contacted two FFLs, both of whom

3   refused to perform the background check for you; is that

4   correct?

5   *A.*  Yes.

6   *Q.*  What were those -- who were those two FFLs?

7   *A.*  There was an FFL that I used in Thornton, Colorado, through

8   Becker Tactical, and then the other one was my gun club.

9   *Q.*  And what's the name of your gun club?

10  *A.*  Trigger Time Gun Club.

11  *Q.*  I believe that you testified that you were ultimately able

12  to obtain the required background check in order to transfer

13  privately your weapon.

14  *A.*  Right.  My neighbor found a friend of his that was an FFL

15  holder.

16  *Q.*  And do you know whether that friend owns an actual brick

17  and mortar store in Colorado?

18  *A.*  I don't know.

19          *MS. MORRILL:*  Your Honor, may I have one moment,

20  please?

21          *THE COURT:*  You may.

22          *MS. MORRILL:*  Thank you.

23  *BY MS. MORRILL:*

24  *Q.*  Just briefly, back to the weapons that you maintain at home

25  for self-defense.  You've never had to either display or

Dylan Harrell - Cross

1   discharge any of your home self-defense weapons, have you?

2   A.  I've shot them, not -- not in a defense situation.

3   Q.  For the purpose of self-defense in your home, you've never

4   had to discharge any of the weapons that you keep for that

5   purpose?

6   A.  Yeah, I've not fired any of them in my home.

7          MS. MORRILL:  Thank you.

8          I have nothing further, Your Honor.

9          THE COURT:  Thank you.

10         Redirect.

11         MR. WESTFALL:  Your Honor, we have no redirect for

12  this witness, and we respectfully request that he be excused.

13         THE COURT:  Thank you.

14         MS. MORRILL:  No objection, Your Honor.

15         THE COURT:  Thank you, sir.  Your testimony is

16  complete, and you're free to go.

17         THE WITNESS:  Thank you.

18         THE COURT:  Please call your next witness.

19         MR. WESTFALL:  Your Honor, I believe Mr. Colin has a

20  housekeeping matter.

21         MR. COLIN:  Not much housekeeping.  My witness just

22  ran down the hall.  He'll be right back.

23         THE COURT:  Okay.  Thank you.

24         Mr. Keech, would you go see if you can find the

25  witness.

Massad Ayoob - Direct

1          (**MASSAD AYOOB, PLAINTIFFS' WITNESS, SWORN**)

2          *COURTROOM DEPUTY:*  Please be seated.

3          Please state your name and spell your first and last

4    name for the record.

5          *THE WITNESS:*  Certainly.  My name is Massad Ayoob,

6    first name is spelled M-A-S-S A-D, last name spelled,

7    A-Y-O-O-B.

8          *MR. COLIN:*  Thank you.

9                         **DIRECT EXAMINATION**

10   *BY MR. COLIN:*

11   *Q.*  Good morning, Mr. Ayoob.

12   *A.*  Good morning, Mr. Colin.

13   *Q.*  Mr. Ayoob, you are a retained expert in this case; is that

14   accurate?

15   *A.*  I am.

16   *Q.*  And you charge for your services?

17   *A.*  I do.

18   *Q.*  Can you advise the Court as to the cost of your services.

19   *A.*  The same as I charge to teach, $2,500 a day and expenses.

20   *Q.*  Is that what you're charging the plaintiffs in this case?

21   *A.*  It is.

22   *Q.*  All right.  Can you describe for the Court your background,

23   training, and experience, please.

24   *A.*  Certainly.  As relates to this case, I've been a firearms

25   instructor since 1972 for police and since 1981 for private

Massad Ayoob - Direct

1   citizens.

2   Q.  And can you describe what you instruct police and private

3   citizens in with regard to firearms, please.

4   A.  We begin with safety, the responsibility that comes with

5   the weapon; the operation of the gun; the efficient use of the

6   gun, in terms of accuracy, speed, sustainability of gunfire;

7   the tactics that accompany it, since the emphasis is on

8   self-defense.  So that will include movement, that will include

9   finding cover, that is, something that could stop opposing

10  gunfire.

11  Q.  And you mentioned that at least some of the training I

12  think you just described is in the context of self-defense; is

13  that accurate?

14  A.  That is virtually all in the context of self-defense.

15  Q.  Can you expand on that and explain what you mean, this

16  training is in the context of self-defense.

17  A.  Sure.  We don't teach how to win a bull's-eye target pistol

18  match.  We're teaching the police officer who is carrying the

19  gun as a tool of protection.  And the private citizen who is

20  carrying a very similar gun for a similar function,

21  essentially, the -- we teach the private citizen to think of

22  himself as a first responder and that his gun should be an

23  analog to a fire extinguisher.

24      The gun, like a fire extinguisher, is a symbol of a

25  public safety professional.  We remind them that possession of

Massad Ayoob – Direct

1    that symbol does not make them a public safety professional,

2    does not mean that they don't need public safety professionals.

3    We make it clear that the gun, like the fire extinguisher, is

4    an emergency rescue tool to cut a lane of safety for you and

5    others until the designated professionals can get there to deal

6    with the crisis.

7    Q.  Overall, does the self-defense training that you're

8    describing involve the dynamics of violent encounters?

9    A.  Oh, it absolutely does.  And the techniques that we teach

10   are built from extensive research and study of dynamics of

11   violent encounters, things such as flight-or-fight response,

12   human action/reaction paradigms, things of that nature.

13   Q.  I'd like to explore your teaching experience for a moment,

14   if I could.  How long have you been engaged specifically in the

15   instruction of self-defense with firearms and dynamics of

16   violent encounters?

17   A.  Forty-two years, sir.

18   Q.  Can you describe your teaching experience.  What is the

19   context in which you have instructed individuals in those

20   areas?

21   A.  Certainly.  I began teaching a local police department in

22   1972, Hooksett, New Hampshire, H-O-O-K-S E-T-T.  Shortly

23   thereafter, I was retained to teach weapons and chemical agents

24   for the advanced police training program of New Hampshire in

25   Nashua, New Hampshire.  Began teaching civilians in 1981 after

Massad Ayoob – Direct

1   a pilot program at the Chapman Academy of Practical Shooting in

2   Columbia, Missouri.  And in October of that year, founded

3   Lethal Force Institute.  That organization was geared to

4   provide training to private citizens on a law enforcement level

5   in terms of safety, competence, and responsibility in

6   self-defense with firearms.  Within a year, that became pretty

7   much my full-time occupation, and has been ever since.

8   Q.  Are you still involved in the Lethal Force Institute?

9   A.  No, sir.  I left there in 2009 and now teach through Massad

10  Ayoob Group.

11  Q.  Can you explain briefly the nature of that change.

12  A.  Strictly a business decision.

13  Q.  Are you a member of any committees, training councils, and

14  the like, either nationally or international?

15  A.  Yes, sir.  I've spent -- I've been a member for many years

16  of the International Association of Law Enforcement Firearms

17  Instructors.  I've taught for them at local, regional,

18  national, and two international seminars.  For 19 years, I was

19  chair of the firearms committee for the American Society of Law

20  Enforcement Trainers.  For the last eleven years, I've been on

21  the advisory board for the International Law Enforcement

22  Educators and Trainers Association.  That's where I came from

23  this week, in fact, having taught there last week.

24  Q.  Do you participate in the National Law Enforcement Training

25  Center in any way?

335

Massad Ayoob – Direct

1   *A.*   Yes, sir.   The National Law Enforcement Training Center is

2   headquartered in Kansas City, Missouri.   It's an institution

3   that focuses on teaching –– well, my side of it, at least, was

4   teaching gun retention and disarming, teaching how to take the

5   gun away from another person, from an offender.   And gun

6   retention is the corollary science to that, how to defeat the

7   man who is trying to take your gun away from you with felonious

8   purpose.

9          I began as an instructor –– certified by them as an

10  instructor in 1980 and as a –– what they called a national

11  instructor, meaning I trained and certified other instructors.

12  I was certified for that in 1990, and I've done a great deal of

13  that over the years.

14  *Q.*   So you've been teaching other instructors how to teach for

15  20 years or more?

16  *A.*   Yes, sir.   Well, for at least that.   I've also done that in

17  the baton training discipline with the PR24 baton, but I didn't

18  think that was relevant to the case at bar.

19  *Q.*   Specifically, you've been engaged in instructing law

20  enforcement and civilians in defensive tactics involving

21  firearms use for the last 40 years; is that fair to say?

22  *A.*   Forty-two, I think.

23  *Q.*   Okay.   You touched upon the training that you have given.

24  Can you touch upon the training that you have received,

25  specific to the areas that you've just been speaking to.

Massad Ayoob – Direct

1  *A.* Certainly. At Chapman Academy, I took the advanced pistol

2  course, became involved with them, did our pilot project for

3  armed citizens in 1981. And until the late 1980s, their head

4  instructor, Ray Chapman, the world pistol champion, he and I

5  taught for the Police Marksman Association, going around the

6  country doing what they called an advanced officer survival

7  program for various police agencies.

8       Let's see. My own training, six or seven times

9  through Smith & Wesson academy and various instructor or

10  instructor enhancement programs.

11       In the 19 years with American Society of Law

12  Enforcement Trainers, I attended all but two of the five or six

13  day-long annual seminars, and have attended all 11 of the

14  IOEETA seminars, many of the seminars at the International

15  Association of Law Enforcement Firearms Instructors. 1980 or

16  so, I went through the officer safety and survival program at

17  the Federal Law Enforcement Training Center in Brunswick,

18  Georgia. Numerous other seminars over the years around the

19  country.

20       On the homicide investigation side, the basic and

21  advanced officer-involved investigation school, taught by the

22  commanders and members of the LAPD officer-involved shooting

23  investigation unit. The advanced homicide school -- advanced

24  homicide investigative school taught by Vernon Geperth,

25  G-E-P-E-R-T-H, the author of the authoritative text in the

Massad Ayoob – Direct

1   field.  And the medical, legal investigation of death course

2   taught at what was then the Metro Dade Medical Examiner's

3   Office.  Twice attended and twice taught at the International

4   Homicide Investigators seminar as well.

5   *Q.*  Have you been published in the area specific to the

6   expertise that we're discussing now, the areas of self-defense

7   and use of firearms, defensive gun uses, dynamics of gun

8   encounters?

9   *A.*  Yes, I am.

10  *Q.*  Can you advise the Court of the nature of those

11  publications, please.

12  *A.*  Certainly.  The first article in a gun magazine was 1971.

13  Became more extensively involved in writing after that for

14  various law enforcement professional journals, martial arts

15  journals, and gun magazines.  For 30 some years now I've been

16  the law enforcement editor for *American Handgunn*er magazine.

17  My duties there include occasional feature articles, in every

18  issue, the Cop Talk column, which is basically focused on law

19  enforcement handgun trends and training issues.  Also each

20  issue I do a series called Ayoob Files, where we dissect an

21  actual gunfight and determine what lessons were learned from

22  that that could prevent tragedy in the future.

23          I've been handgun editor for *Guns Magazine* for, again,

24  30 some years.  Many of those articles focus on self-defense,

25  though the occasional one will focus on sport or gun

338
Massad Ayoob – Direct

1    collecting.

2              I've been firearms editor for *Backwoods Home Magazine*

3    since about 1996.  My column there is sometimes self-defense,

4    sometimes recreation or hunting or gun safety.

5              I write in every issue of *Guns & Weapons for Law*

6    *Enforcement* the first responder column, which is geared to the

7    first officer who arrives at the scene, who is often the only

8    one who is there long enough to contain a fast-breaking scene.

9              For many years I've also done the self-defense and the

10   law column for *Combat Handguns Magazine*.  And my work has

11   appeared in various other periodicals over the years.

12             There have also been several books, a dozen or

13   fifteen -- I'd have to count them up -- all of them related in

14   some way to weapons or self-defense.

15   *Q.*  Can you identify a few of these dozen or so books that

16   you've written that focus specifically on the area of defensive

17   use of firearms and the dynamics of violent encounters?

18   *A.*  Certainly.  One would be *In the Gravest Extreme*, subtitled

19   *The Role of the Firearm in Personal Protection*.  That came out

20   in 1980 and has probably been my best seller.  Some were kind

21   enough to call it an authoritative text.

22             Others that would -- there was two in the Stressfire

23   series.  Stressfire is what I named the shooting system we

24   teach, because -- we found most training had been based on the

25   instructors going to the shooting range, timing each other, and

Massad Ayoob – Direct

1   scoring their targets, and figuring whatever worked best is the

2   most accurate on the range, we would teach to the officers.

3   And we had found that would break down in the field because it

4   had not taken into account human factors of stress, shaking

5   hands, tunnel vision, and all of that.  So what we attempted to

6   do there was to study what happened to the human being in a

7   near-death experience and backspace developing techniques

8   around that.

9        That led to the *Stressfire Pistol Book* in early 1980s,

10  *Stressfire Shotgun* in the late 1980s.  Other books out today,

11  two editions of the *Gun Digest Book of Combat Handgunnery*,

12  *Ayoob on Combat Shooting*, two editions now of *Gun Digest Book*

13  *of Concealed Carry*, and most recently a book dedicated to

14  firearm safety.

15  *Q.*  Let's move on to training films.  Do you produce or are you

16  involved in the production of training films associated with

17  training civilians and law enforcement how to engage in

18  defensive gun uses in violent encounters?

19  *A.*  Yes, sir.

20  *Q.*  And can you describe for the Court the nature of those

21  training films, please.

22  *A.*  One is titled *Physio-Psychological Aspects of Violent*

23  *Encounters*.  And it explains phenomena such as tunnel vision,

24  auditory exclusion, or tunnel hearing, tachypsychia --

25  T-A-C-H-Y-P-S-Y-C-H-I-A -- the sense of things going into slow

340
Massad Ayoob – Direct

1  motion.  We explain also what some of the physiological effects

2  are as heart rate increases, vasoconstriction occurs, physical

3  strength increases, but dexterity decreases.

4         Other films in the Stressfire series, we had

5  *Stressfire I*, for the handgun; *Stressfire II*, for the shotgun;

6  and *Stressfire III*, for the semiautomatic rifle and fully

7  automatic weapon.  More recently, Panteao Productions,

8  P-A-N-T-E-A-O, has released my film on home protection and

9  self-defense and a training film on concealed carry.  There are

10  others out there.  For eight seasons I was on Personal Defense

11  TV, touching on self-defense topics of various kinds.

12  *Q.*  How long were you on Personal Defense TV?

13  *A.*  That was eight years.  The series ended early this year.  I

14  don't believe it's going to be renewed for the late 2014

15  season.

16  *Q.*  With regard to the publications that you listed, have you

17  written any articles that deal specifically with the use of

18  firearms by disabled or otherwise infirm, handicapped

19  individuals?

20  *A.*  Yes, I've written a few that touch on that and -- a few

21  that were devoted to that and many that touched on that.

22  *Q.*  Are you familiar with the Wounded Warrior Project?

23  *A.*  Yes, I am.

24  *Q.*  And what is your involvement, if any, in publishing for the

25  Wounded Warrior Project?

Massad Ayoob - Direct

1    *A.*  I don't publish for Wounded Warrior.  I have written about

2    the programs they have as it relates to firearms.

3         While Wounded Warrior does not advertise it, there are

4    several gun clubs that have, essentially, done benefit shoots

5    for soldiers and Marines who come back from the current

6    conflict seriously injured or as amputees.  It gives them a

7    chance to shoot firearms, something that, you know, most of

8    them identified with based on their careers.  Let them know,

9    yeah, you can get back into hunting, you can get back into

10   target shooting, and here is how to adapt.

11   *Q.*  Does the training also include how to adapt for defensive

12   gun use purposes?

13   *A.*  Mine does.  I'm not sure Wounded Warrior goes that far into

14   the tactics.

15   *Q.*  All right.  Have you ever been retained previous to today

16   to provide expert testimony in any court proceedings?

17   *A.*  Yes.  I've been an expert witness in weapon-related and

18   deadly force related cases since 1979.

19   *Q.*  Can you estimate how many cases that involved?

20   *A.*  It's in the dozens.  I don't know the exact number.

21   *Q.*  When you say "in the dozens," a couple dozen, more than

22   that?

23   *A.*  It would be 40 or 50 where I've given sworn testimony; a

24   great many more that I've consulted on and did not take the

25   case; and many were, we would do a report, and it ended in

Massad Ayoob - Direct

1    settlement or dismissal.

2    Q.   Thanks for the clarification.   Did any of those cases in

3    which you have rendered expert testimony involve persons with

4    injuries, disabilities, infirmities of some kind that were

5    relevant to the litigation?

6    A.   There were none exactly like this case that resulted in

7    legislation that became the focus of the legislation.   Some --

8    there were more than one disparate impact case of female law

9    enforcement officers who have been fired for failure to

10   qualify.   And there were physiological aspects involved,

11   typically, hands that were too small for the male-oriented guns

12   that they had been issued.

13        There have been self-defense cases where injury

14   inflicted on the individual who shot in self-defense had

15   created a disparity of force element that needed to be

16   explained to the juries.   There were -- I can think of at least

17   one case where the victim was a 63-year-old handicapped female,

18   violently attacked by a 1.8 percent blood alcohol 240-pound

19   male and was charged with either murder two or manslaughter

20   because she fired three bullets into an unarmed man, and that

21   needed to be explained.

22   Q.   What were you originally asked to evaluate in connection

23   with this case?

24   A.   Primarily, the disparate impact of a magazine limit on

25   handicapped individuals in terms of firearms kept for

Massad Ayoob – Direct

1   self-defense and home defense, whether carried on the street or

2   whether with a gun permit or whether kept in the home and

3   deployed in the home.

4   *Q.*   You've given us an overall general description of much of

5   your training and experience in the area of firearms defensive

6   gun uses and the dynamics of violent encounters.  Can you tell

7   us what specific training and experience you have that

8   qualifies you to render opinions regarding the impact of

9   magazine limitations on both able and disabled bodied

10  individuals?

11  *A.*   Sure.  From the beginning when I started teaching cops in

12  1972, while they were all able-bodied, except for the

13  occasional case, we'd have the injured officer on light duty

14  who still had to qualify on the range, one of the things that

15  we had to look at was, the very fact that the officer needed to

16  shoot meant he was likely in a gunfight.  He might well be

17  seriously  wounded and might often have been wounded at the

18  very beginning of the fight if he was ambushed.  So we have to

19  look at what I called wounded officer response techniques.

20  What do you do if one hand, one arm has been rendered

21  inoperable?  What do you do if the effect of the first couple

22  of shots have put you on your back, or you started in the

23  patrol car, can't get out of the patrol car because a bullet

24  has broken your hip?  Those techniques served very well in the

25  '80s, when I started teaching civilians, and started getting

Massad Ayoob - Direct

344

1   students who were physically handicapped to various degrees.

2          There was a great deal of crossover.  There was some

3   things that did not cross over, and we simply analyzed their

4   situation and reached out to others who had dealt with

5   handicapped shooters and worked on finding the most efficient

6   ways to deal with them, both in terms of techniques and in

7   terms of mechanics, in terms of guns that in one way or another

8   might make up for their physical disability.

9   Q.  Did the training that you provided to these able-bodied and

10  disabled individuals, whether they were law enforcement or

11  civilians, include defensive tactics in the use of --

12  apologize, poorly phrased.  Did it include the use of firearms

13  in defensive gun use situations, both inside the home and

14  outside the home?

15  A.  Yes.  The -- virtually all of the training I've done has

16  been focused on the firearm as a defensive instrument, as

17  opposed to a recreational tool or an instrument of sport.

18  Q.  Is there any difference to the training that you provide to

19  civilians, whether able-bodied or disabled, as to defensive

20  tactics inside the home versus outside the home?

21  A.  Yes, there would be.  Situationally, if you're outside the

22  home, by definition, if you're resorting to a firearm, that

23  means you're licensed to carry a gun, and you have one either

24  on your person or immediately within reach.  So we'll work with

25  them on drawing the gun from discreet concealment and being

Massad Ayoob - Direct

 1  able to reload.  We strongly emphasize that we feel anyone

 2  carrying a gun without spare ammunition is carrying a temporary

 3  gun.  So we teach them how to carry a spare magazine or a spare

 4  speed loader, if they're carrying a revolver.  But in the home,

 5  there are relatively few people who keep their gun on all the

 6  time when they're in their own domicile.

 7  Q.  You mean on their person when you say "keep the gun on"?

 8  A.  No.  What I'm saying is, most people do not keep their gun

 9  on when they're at home.  They will typically when they're in

10  their domicile have it stored in one or another fixed, static

11  location.  Perhaps a quick-release gun safe; perhaps a home

12  where you don't have to worry about children running around,

13  simply in the nightstand.

14          For them it's not a matter, when danger comes on them

15  suddenly to simply reach under their coat.  They may have to go

16  into another room to get at where the gun is, they may have to

17  go down the hall to get at where the gun is.  So now their

18  mobility becomes a much more critical factor in their ability

19  to defend themselves.  If when the alarm goes off, or the door

20  kicks off, or the window breaks, every second that they're

21  trying to get the wheelchair down the hall to where the gun is,

22  is going to be more vulnerability.  So we tell them, once they

23  have been able to get their hand on the gun, things are going

24  to be happening fast.  They're going to have to be -- hopefully

25  with a Bluetooth if they have one on already -- communicating

Massad Ayoob - Direct

1    with the police.  But mostly, one hand is going to be occupied

2    with some sort of telephone communication device.

3            They're not going to have time to strap on a gun belt

4    with an ammunition pouch, and they're not going to have time to

5    grab a spare magazine or speed loader.  Essentially, what they

6    have in that gun is going to be probably all they're going to

7    have from the beginning to the end of fight that occurs.  So we

8    tell them, for the home defense gun in particular, it makes

9    sense to have higher cartridge capacity than some other

10   applications.

11   Q.  And the comparison, then, to defensive gun use outside the

12   home, how is your training or -- how is the advice that you

13   give to able-bodied and disabled shooters different, if it is?

14   A.  Well, again, in terms of the magazines and such, we would

15   be advising the person in the wheelchair, for example, to have

16   a higher-capacity gun.  The reason is, the ambulatory person --

17           If I may stand for a moment to demonstrate.

18   Q.  Sure.

19   A.  The ambulatory person can be almost like a uniformed police

20   officer.  If you look at the next cop you see on the street,

21   the duty belt is going to have gear all the way around it, all

22   the stuff they have to carry.  You'll see a lot of people -- a

23   lot of ordinary folks will carry their pager behind their belt

24   or something else behind their belt.  Your guy in a wheelchair

25   is very restricted on that, particularly if he's paralyzed from

347

Massad Ayoob - Direct

1   the waist down, and most particularly if he's paralyzed from

2   the chest up.

3           If I lean back now against some hard object that is

4   behind my hip --

5   Q.  Mr. Ayoob, I'm really not getting into wheelchair-bound

6   individuals right now.  I'd like you to respond to the question

7   about any difference in the training that you give to students

8   for defensive gun uses outside the home versus inside the home.

9   You had spoken to larger firearms magazines, availability and

10  those kinds of things.  Is that any different in terms of

11  outside the home?

12  A.  Well, outside the home, yes, because he's probably going

13  to -- if they're in the wheelchair, again, they're going to

14  have limitations.  There is only so much you can get in that

15  very small space that you're taking around with you.  And as I

16  was saying, you can't put any of it behind your backs.  You've

17  got to put all of it in the front.

18          If you found room for the gun -- that's not that tough

19  to do.  Finding room for the gun and spare ammunition is much

20  more difficult in the more limited waist space.  What I was

21  trying to get at is, that would be one more reason for them,

22  we'd be suggesting they get a higher-capacity gun.  They will

23  have much more difficulty reloading in the wheelchair than

24  would an ambulatory person, as well.

25  Q.  Thank you.  Do students bring their own firearms to your

348

Massad Ayoob – Direct

1     classes?

2     *A.* The students normally will bring their own firearms,

3     correct.

4     *Q.* And do you give them direction on what firearms to bring to

5     class, or do they select those on their own?

6     *A.* Unless they ask, we simply tell them to bring the guns they

7     use for personal protection.

8     *Q.* Have the -- has the equipment or the firearms that have

9     been most popular with your students changed over the years?

10     *A.* Yes, they have.

11     *Q.* Can you describe that, please.

12     *A.* Over the last ten, twenty years, we've seen a much stronger

13     trend towards semiautomatic pistols and, particularly, the

14     pistols with relatively higher magazine capacity.

15     *Q.* When did that take place?

16     *A.* We started seeing it in the 1980s, and it was actually kind

17     of concurrent with the law enforcement switch from the old

18     service revolver to the semiautomatic service pistol.  And we

19     saw it more still in the '90s.  And today, the polymer-framed

20     pistol, usually 9 millimeter, occasionally larger calibers, is

21     by far the most popular type that we'll see in a civilian

22     course.

23     *Q.* Can you estimate the percentage of students annually that

24     bring semiautomatic pistols to your class these days, in the

25     last ten years?

349

Massad Ayoob - Direct

1    *A.* If we cover all semiautomatics, it would be in the high

2    90th percentile. We do see the occasional revolver, but in

3    many classes there's not a revolver on the firing range.

4    *Q.* Does the shift that you just described, the change in

5    popularity of handguns from revolvers to semiautomatics, affect

6    your training?

7    *A.* We have to put more emphasis on avoiding what is called

8    colloquially spray and pray. When someone suddenly goes from a

9    six-shot gun to an eighteen-shot gun, it's -- particularly if

10   fire power was the reason for the decision, it's real easy to

11   get the idea that the fire power was the *raison d'être*. And

12   that means, if I ever have to pull this thing out, I better

13   hose all 18 rounds and hope something sticks; hence, spray and

14   pray.

15        And we told them, no, shoot it as if you had the

16   old-fashioned six shooter and you just have a greater reservoir

17   of ammunition. The reservoir of ammo is not to hose the area;

18   it's to allow you to stay in the fight longer if the fight gets

19   particularly complicated and ugly.

20   *Q.* Can you provide examples of the most commonly used firearms

21   brought by civilians and law enforcement officers to your

22   training classes in the last ten years.

23   *A.* Yeah. Some of the most popular brands will be the Glock,

24   the Smith & Wesson military and police semiautomatic, and to a

25   slightly lesser extent, but I'm seeing it increase, the

Massad Ayoob - Direct

1   Springfield Armory XD series.

2   *Q.*  As to the Glock series, can you identify the most popular

3   Glock model that you see in your classes.

4   *A.*  The most popular I see in the class is the Glock 17.  It's

5   their service-sized 9-millimeter pistol with 17-round magazine.

6   *Q.*  You also mentioned the M&P, the military and police?

7   *A.*  Yes, sir.

8   *Q.*  How many rounds is that?

9   *A.*  Again, 9 millimeter, that would be a 17-round magazine.

10  *Q.*  And then you also mentioned the Springfield XD series.

11  *A.*  Yes, the original XD, full-sized service pistol with the 15

12  or 16 -- I'd have to go back and look.  What we're seeing more

13  is the updated version of that gun, the XDM, which in full size

14  is a 19-shot magazine, in the 9 millimeter.  Of course, all of

15  them would have one more cartridge in the firing chamber when

16  kept loaded.

17  *Q.*  What percentage of students these days, in the past ten

18  years, bring revolvers to self-defense class?

19  *A.*  It's tiny percent.  As I've said, I see classes where there

20  is not a revolver in sight.  I think in the last year, the most

21  revolvers I ever saw in a class was three or four, in classes

22  of 20 to 40 people.

23  *Q.*  I want to move into some mechanical discussions regarding

24  the differences between a semiautomatic firearm or handgun and

25  a revolver.  All right.

Massad Ayoob - Direct

1        Your Honor, we have brought some dummy firearms into

2   the courtroom.  I'd like the clerk to provide those to the

3   witness at this time for this demonstration.

4        THE COURT:  Have they been marked as demonstrative

5   exhibits?

6        MR. COLIN:  They have not at this time, Your Honor.

7   We brought them in this morning, didn't --

8        THE COURT:  Well, let's get them marked.

9        MR. COLIN:  We'll do that.  I think we're at 93.

10        There is a semiautomatic you want to use?

11        THE WITNESS:  The blue one.

12        MS. MORRILL:  Your Honor, we have not seen this

13   demonstrative.  We'd ask to see it before it is handed to the

14   witness.

15        THE COURT:  I'm sorry?

16        MS. MORRILL:  We have not seen this demonstrative

17   exhibit before.  We would like to see it before it is handed to

18   the witness.

19        MR. COLIN:  Sure.

20        THE COURT:  Fine, you can see it.

21        MR. COLIN:  The blue revolver and the blue

22   semiautomatic.

23        THE WITNESS:  Yes, I think there is only one revolver,

24   should be blue, as I recall, blue semiautomatic.

25        THE COURT:  Mr. Keech, would you present those to

Massad Ayoob – Direct

1    defense counsel, please, so that they can see them.

2            *COURTROOM DEPUTY:*  Yes, Your Honor.

3    *BY MR. COLIN:*

4    *Q.*  Okay.  Can you describe how semiautomatic firearms,

5    semiautomatic handguns in specific, are similar to or different

6    from a revolver, mechanically.

7    *A.*  Certainly.  The dummy here in my left hand is apparently

8    produced by Odin Press, O-D-I-N.  But they're designed

9    originally for handgun retention and disarming instruction, for

10   obvious safety reasons.

11           This is a cast dummy of the gun in battery.  When I

12   say "in battery," the parts are in alignment for firing.

13   Because it's cast, there are, obviously, no moving parts.  So

14   bear with me, because that compounds the difficulty of the

15   demonstration.

16           Once the gun is loaded, the part I'm indicating here

17   is the cylinder.  Essentially, a rotary drum that rotates on an

18   axis.  The pulling of the trigger straight back over a long

19   pull that would go from the at-rest position I'm indicating

20   here to the back of the trigger guard will inside the gun cause

21   a part called the cylinder hand to engage a ratchet inside the

22   gun at the back of the cylinder.  That will turn the cylinder,

23   rotating it.  As the mechanism brings the hammer back, the

24   hammer -- which I'm indicating here -- will rise before it

25   falls.  The next cartridge in the cylinder, which in this sized

Massad Ayoob - Direct

1    gun there would be six chambers with six cartridges, will

2    rotate under that hammer.  When the trigger pull is completed,

3    the hammer falls, the firing pin strikes the primer and the

4    cartridge, and the bullet is propelled through -- out of the

5    chamber through the barrel and toward the target.

6           To unload the gun, the part I'm indicating here, the

7    cylinder release latch, would have to be pressed in a certain

8    direction.  This is a dummy copy of a Smith & Wesson combat

9    magnum, and that brand is pressed forward.

10          Simultaneously, the other hand or some force has to

11   push the cylinder to the left to bring it out of the frame.

12   The cylinder assembly will now swing out and will be located

13   where I'm indicating here to the Court with my hand.  The

14   ejector rod of -- the stick-like projection in front of the

15   frame that I'm indicating here, is a part of the cylinder

16   assembly and will swing out with it.

17          To eject the spent -- the six spent empty casings that

18   will be in the chamber located at the back of the cylinder,

19   that rod has to be pressed or struck toward the cylinder.  The

20   ejector star, which is part of the ratchet, now comes back out

21   of the cylinder and drives those cartridges out, and they'll

22   fall to the ground.

23          So get it reloaded, visualize the cylinder was still

24   outside the frame.  If we had just loose ammunition in a pouch,

25   most people would have to reload one cartridge at a time,

354

Massad Ayoob - Direct

1   chamber per chamber, so six separate complicated motions of

2   getting the -- a small, narrow cartridge into the chamber.  A

3   dexterous, experienced shooter can load them two at a time.

4        There is a device called a speed loader, which holds

5   all six cartridges in a circle, that allows them to be loaded

6   at once.  Because it's the diameter of the cylinder, it's very

7   bulky and relatively few people find they can comfortably,

8   discreetly carry them concealed.

9        Once those are in, if it's a speed loader, the loader

10  has to be released, and it will then be allowed to fall away.

11  The firing hand will come back to the grip, and the other hand

12  will close the cylinder of the revolver.  And as we've noted,

13  it's a fairly complicated procedure.

14        The semiautomatic pistol, demonstrated here with a

15  Ring's brand, R-I-N-G apostrophe S, blue gun.  This one is cast

16  with polymer.  The primary parts will be the frame -- which I'm

17  indicating here -- in which the magazine -- which I'm

18  indicating here -- would be housed.  The barrel would be inside

19  the slide -- which I'm indicating here -- riding on a spring

20  guide rod with a recoil spring inside the gun.  The trigger --

21  which I'm indicating here -- is pulled, the pistol fires.  The

22  recoil force of that shot going off will drive this whole slide

23  assembly back on the frame.  The extractor -- which I'm

24  indicating here -- is a hook that will catch the inside edge of

25  the cartridge, the spent casing, and drag it back until it is

355

Massad Ayoob - Direct

1    punched out through the eject port -- which I'm indicating

2    here -- by the ejector, which is a little stub that is inside

3    the gun.   In other words, the cartridge is dragged back by this

4    by the extractor hook and is then bumped by the fixed ejector

5    to kick it out.

6           At that point, the slide will have reached its

7    rearward point of movement.  It will no longer be blocking the

8    spring-loaded magazine in which the remaining cartridges are

9    stacked, and the spring will now drive the next cartridge up in

10   front of the slide.  As the recoil spring does its reciprocal

11   movement, brings the slide back forward, it will carry that

12   cartridge back into the firing chamber.  It happens in an

13   instant, and the gun is ready to fire.  If you watch it happen,

14   most people can't actually see the slide moving; they just see

15   the spent casing sticking out of the gun.

16          To unload -- to reload once it's run empty, most

17   pistols will usually lock their slides to the rear when they're

18   empty to signal to the shooter that it's time to reload.

19          To -- may I stand?

20          THE COURT:  Sure.

21          THE WITNESS:  Okay.  To get the -- we have to do what

22   we did with the revolver, get the old empty stuff out and the

23   new fresh stuff in.  With the semiautomatic, we now have an

24   empty magazine that will be released by pressing the magazine

25   release button.  This, as in most guns, it's in the form of a

356
Massad Ayoob – Direct

1    button behind the left side of the trigger guard.  The magazine

2    will now fall away, or if it's stuck, the shooter will flip it

3    out.  The shooter will grasp a fresh magazine, insert it in one

4    motion.  The difference is, here, we were inserting six tiny --

5    six exact size objects into six exact size holes, and with a

6    speed loader, trying to do it all simultaneously.  Here, it's

7    more of a gross motor skill than a fine motor skill.  We have

8    one relatively larger object going into one relatively larger

9    area.

10        The magazine is inserted until it clicks and seats.

11   If the slide is locked to the rear, either tugging back on it

12   will release it forward, or just coming up with the thumb and

13   touching the part I'm indicating here, the slide release lever,

14   will allow the slide to close, chamber the round, and complete

15   the reloading cycle.

16        The difference would be, reloading the revolver would

17   look in sequence like this.  Reloading the semiautomatic would

18   be a much simpler sequence that would look like this.

19   BY MR. COLIN:

20   Q.  During the course of your comparative testimony, you

21   mentioned trigger pull and trigger distance with regard to the

22   revolver, but not the semiautomatic.  Are they the same between

23   the two?

24   A.  No.  There are two different issues, and they do tend to be

25   different between the two types of guns.

Massad Ayoob - Direct

1    Q.  What are the differences on those?

2    A.  On the revolver, we have a long, heavy pull.  The reason

3    is, mechanically, the index finger, the trigger finger,

4    bringing the trigger back is performing multiple functions.

5    It's driving the cylinder hand upward to rotate the cylinder

6    against resistance; it's bringing the hammer back against the

7    resistance of a very strong main string that will be located

8    inside the grip frame.  And, typically, your double-action

9    service revolver will have a trigger pull weight of 9 to

10   12 pounds.  I've seen some that ran 14 pounds.  It's also a

11   longer stroke, because to get all of that mechanical work done,

12   basically, we need some distance for the lever-shaped trigger

13   to move.

14           With the semiautomatic, it -- you can get -- most

15   designs will have a lighter, easier trigger pull, at least for

16   most shots.  In this pistol, the M&P, it's striker fired, so

17   there is no hammer that needs to be raised and lowered.  It's a

18   much shorter trigger stroke that tends to be lighter.  The

19   factory spec for trigger pull weight on this gun for a duty or

20   defense pistol is 6.5 pounds.

21   Q.  You've done a demonstration for us, you've given us a

22   mechanical description of the differences between a revolver

23   and firearm, have you performed any tests to determine which

24   is -- which can be reloaded more quickly and efficiently?

25   A.  Yes.

358

Massad Ayoob - Direct

1  *Q.*  And can you describe those for the Court, please.

2  *A.*  Yeah, over the years, I've lost count of how many thousands

3  of people I've observed reloading both revolvers and

4  semiautomatics in 40 some years of shooting competition and

5  shooting training.  It is inarguable that the same individual

6  is going to be able to reload the semiautomatic faster than he

7  is the revolver.  It's simply a less complicated task with

8  fewer movements involved.

9  *Q.*  Why does the amount of time required for reload matter?

10  *A.*  Because it -- assuming real world and not sport, every

11  second the defender cannot fire is a second of absolute

12  helplessness.  The longer the reload process takes, the longer

13  they are helpless against an armed opponent.

14       That becomes magnified in a situation where the hands

15  are trembling, fine motor skill is being lost.  The revolver is

16  more dependent on fine motor skill than is the semiautomatic.

17  And, overall, when you're reloading, you're vulnerable.

18       I think the easiest way to explain it is, if it was a

19  boxing match, if someone said for X numbers of seconds you have

20  to lower your arms and not punch or block while your opponent

21  is allowed to punch, you would have just turned into a punching

22  bag, and for that period of seconds would take blow after blow

23  until they finally got the knockout blow, and you are going to

24  be unconscious on the mat.

25       That same -- that same dynamic occurs in the reloading

Massad Ayoob – Direct

1   process.  While you're unable to fire the gun, since it's not

2   been reloaded yet, you are the equivalent of the boxer with his

3   hands at the side.  The opponent does now have you turned into

4   a target instead of a threat to flee.  And with impunity, he

5   can be sending his blows with a gun or knife at you until he

6   gets the knockout blow that leaves you dead.

7          MR. COLIN:  Thank you.  Your Honor, this would be a

8   good time for the noon break.

9          THE COURT:  All right.  Then we'll stand in recess,

10  and we'll stand in recess until 1:30 this afternoon.

11         Is there anything we need to take up before our noon

12  break?

13         MR. COLIN:  No.  Not from the plaintiff.

14         THE COURT:  Okay.  All right.  Then we'll stand in

15  recess until 1:30.

16         (Recess at 11:56 a.m.)

17         (Hearing continued at 1:33 p.m.)

18         THE COURT:  Please resume.

19         MR. COLIN:  Thank you, Your Honor.

20  BY MR. COLIN:

21  Q.  Mr. Ayoob, we've gone through your knowledge of the

22  mechanical functioning of both revolver and semiautomatic

23  pistol.  I'd like to move now on to how that's applied.

24         Do you teach civilian shooters and law enforcement

25  officers, both able-bodied and not, how to perform magazine

Massad Ayoob - Direct

1   exchanges swiftly, efficiently?

2   A.  We do.

3   Q.  For how long have you been providing that kind of

4   instruction?

5   A.  For 42 years.

6   Q.  Can you estimate how many students you've taught how to do

7   tactical, standard, or any other kind of magazine exchanges

8   involving semiautomatic firearms?

9   A.  Countless thousands.

10  Q.  And did you say law enforcement since 1970 something, and

11  civilians after that?

12  A.  Law enforcement since '72; private citizens since '81.

13  Q.  Based upon that experience, can you tell us how long it

14  take an average shooter, able-bodied, to perform a magazine

15  exchange?

16  A.  With some proper training fresh in their mind, they'll

17  probably average around four to six seconds.  Of the more

18  dexterous, the more expert, the naturals, if you will, the ones

19  with more experience, will probably go two to three seconds.

20  Q.  Can you provide an average time for disabled shooters?

21  A.  We cannot.  The reason is the range of disabilities is

22  simply too far to figure out an average.

23  Q.  Describe what kind of considerations you have to take into

24  account when dealing with developing a training program for a

25  disabled shooter to effect a magazine exchange swiftly and

361
Massad Ayoob - Direct

1  effectively.

2  A.  Sure.  The first thing that we have to do is analyze what

3  the shooter's disabilities are, and just as important, what

4  abilities he or she still has.  The disabilities may range from

5  the guy who is palsied due to age or neurological problems or

6  nerve damage.  The very rapid insertion of the magazine that

7  would be easy for an able-bodied person sitting in here becomes

8  a nightmare for him, because both the feeding hand and the

9  receiving hand are shaking.  It's going to take him much

10  longer, and proportionately longer still with the revolver,

11  with smaller cartridges going into smaller receptacles.

12       Overall, we look at, where is the disability?  The

13  upper body disabilities, the upper limbs, whether it's hands,

14  arms, upper body strength issues, I see that when I'm

15  teaching the shooting of the gun, use of the guns, as a

16  profound disability in that respect.

17       The other element we have to look at is the lower

18  body, disabled knees, ankles, perhaps someone who has no

19  feeling at all in their legs.  That becomes an issue of

20  tactical mobility.  We can --

21  Q.  Before we get to that, I want to -- I certainly want to

22  speak to that issue.  I want to get there by laying foundation

23  before we can talk about it.

24       I'd like you to explain why -- if we're only talking

25  about two to three seconds for an expert or four to six seconds

362

Massad Ayoob - Direct

1   for a typical civilian, an average civilian shooter -- if we're

2   only talking about two to six seconds, what is the big deal?

3   Why does it make a difference?

4   A.   Remember, we're teaching them on the range to operate

5   life-saving emergency rescue equipment.  When they actually

6   need the skill, it will be during an ongoing attack.  Every

7   second that they are unable to respond is a second of absolute

8   total helplessness.  We often -- when we're looking at time on

9   one side, we always have to look at time on the other.  The

10  opponent is up and running.  It has been well established in

11  firearms training literature for decades now that the average

12  person can pick up one of these guns -- here, I'm holding the

13  dummy revolver.  And even with its long trigger stroke back and

14  its long stroke forward to reset, if you start timing from the

15  first shot, the average person can fire four shots in about --

16  four shots in about one second.

17          The semiautomatic pistol, the majority of models which

18  have the shorter trigger stroke, like this M&P I'm now

19  demonstrating with, shorter back, shorter forward, less

20  distance equals less time and more output.  The average

21  person -- not the expert, not the master, the average person,

22  will get off five shots in the first second.  Some people if

23  they're fast will get off six.  That means the other person has

24  six chances to kill you or six chances to kill the people

25  you're protecting if you are unable to stop them.

Massad Ayoob - Direct

1          If, instead of having to take that -- that, whether

2    it's two-second, four-second, or ten-second reload, if you had

3    enough cartridges in the gun that it had not run dry, that you

4    could simply keep shooting, average break time -- that is, the

5    elapsed time between shots -- is going to be a fourth to a

6    fifth of a second.  So we're balancing several seconds,

7    multiple whole seconds of vulnerability for you and those

8    within the mantle of your protection against the ability to

9    return a shot and hopefully end the danger in a quarter of a

10   second.

11   Q.  Now I want to get to the area you were about to speak to

12   with regard to upper and lower body disabilities if we could.

13   You have instructed, have you not, over the last 40 years,

14   individuals with both kinds of disabilities, meaning upper body

15   disabilities and lower?

16   A.  I have.

17   Q.  Can you tell us how many physically challenged, disabled,

18   infirm shooters that you have instructed over the last 40

19   years?

20   A.  It will go maybe one out of twenty with what I would

21   consider a profound disability in terms of shooting, the really

22   severe tremors in the hands, an arm that does not work, missing

23   digits from the hands, missing whole fingers from the hands,

24   and the occasional missing hand or missing arm.

25   Q.  Is --

Massad Ayoob - Direct

1   A.  It's at least twice that for the lower body disabilities.

2   A few times a year, every year, in civilian classes, we'll have

3   someone who is in a wheelchair.  There are many more whose

4   lower body disabilities don't show up until I ask them to shoot

5   from a cover position.  And most of the cover positions are

6   low, such as a kneeling position or a deep-cover crouch.  The

7   guy who you don't notice any disability when he's just walking

8   around casually, now in his bad knee, his replacement hip, his

9   fused ankle, whatever come into play, he can't do it.  He can't

10  get down behind that cover.  He doesn't have that protective

11  place, that safe harbor, that safe haven where he's going to

12  have the few seconds to reload the gun.  He may be caught in

13  the open, and the only thing he can stop the opposing fire with

14  is his own return fire.

15  Q.  So it sounded to me like you have two categories of

16  disabilities, at least in your mind.  You used the term

17  "profoundly disabled."

18  A.  From my perspective as a firearms instructor, yeah.  I'm

19  not looking at what a doctor would call profoundly disabled;

20  I'm looking at what me teaching the student this particular

21  skill is a profound handicap to overcome.

22  Q.  And you said, roughly 5 percent of your students over the

23  last 40 years have fallen into that category?

24  A.  Roughly 5 percent, yeah.

25  Q.  And then you said there is another category.  Can you give

Massad Ayoob - Direct

 1   us an estimate of how many students fall into this other

 2   disability category.

 3   A.  What I would call the tactically disabled.  The people who

 4   move very slowly, the people who may not be able to move at all

 5   if they're in a manually operated wheelchair, or the people

 6   with lower limb injuries or disabilities that are in positions

 7   where they cannot take cover behind something like an engine

 8   block or a heavy stove during a home invasion or something like

 9   that.  And that would be about twice as many.

10   Q.  So another 5 to 10 percent?

11   A.  Probably, yeah.

12   Q.  Okay.  Do you provide separate training classes for

13   disabled shooters, infirm shooters?

14   A.  I do not.  The reason is, there is such a wide range of

15   disabilities, there is no one curriculum that will fit them

16   all.  So we integrate them often with special needs assistance

17   into our regular programs.

18   Q.  In the regular programs in which you allow disabled

19   shooters to participate, is there training to able-bodied

20   students in those classes that is similar to the training that

21   is received by these disabled folks?

22   A.  Yes.  In the first level in police training and the second

23   level in our civilian training, we'll get into the wounded

24   defender techniques.  The situation where you walked into the

25   thing able-bodied, a gunshot went off, now one of your arms no

Massad Ayoob - Direct

1   longer works, now your leg has crumpled under you and no longer

2   works.  How do you transition from this hand to that hand,

3   let's say, for the police officer?  How do you shoot from the

4   ground and stabilize the shot, whether you're on your butt, on

5   your back, on your side, whatever?  If you only have one hand

6   to shoot back with, how do you maximize your ability to deliver

7   accurate rapid fire when 50 percent of your upper shooting

8   platform has just been shot away?

9   Q.  Am I accurately hearing that your training, then, for the

10  disabled shooter is pretty much the same as the training that

11  you give to able-bodied citizens on how to deal with injuries

12  during a gunfight?

13  A.  There is a lot of crossover, but it's not identical.  For

14  example, shooting from a seated position.  If we had a police

15  officer who's ambushed from the front, and he's seat-belted

16  into his cruiser, the car is in park, there is no time to

17  escape, he's literally got to shoot through the windshield.

18  From his seated position -- I will be visible from your

19  perspective -- he could jackknife his upper body forward, get

20  his upper body weight under the gun, and deliver very accurate

21  rapid fire, recovering from the recoil almost as quickly as he

22  can reset the trigger.

23       The person in the wheelchair very often will not be

24  able to do that.  The reason is, if you jackknife forward from

25  the hips, your legs become V springs that are holding your

367

Massad Ayoob - Direct

1    upper body upright as your upper body weight goes forward.   The

2    paraplegic, particularly the paraplegic who is paralyzed from

3    the chest down -- I've seen some who have to be strapped into

4    the wheelchairs.   If they try to lean their upper bodies

5    forward, it's going to overbalance, and they fall out of the

6    chair.   So we teach them different techniques.

7         For example, I teach them, since they're going to have

8    to lean back to stay in the chair, to shoot with what is called

9    the Weaver stance.   It's an isometric position in which both

10   elbows are bent, the gun hand pushes, the support hand pulls.

11   That allows recoil to -- it, essentially, turns the arms into

12   tense skeletomuscular shock absorbers.   The recoil is forced

13   between the gun and torso.   If they had tried to shoot in the

14   more modern technique that the officer could do jackknifed

15   forward, the locked arms will become levers.   The first shot

16   may go through the windshield.   The second shot will go into

17   the roof, unless they consciously take time to bring the gun

18   back down, which would greatly slow their rate of return.   So

19   in areas like that, there might be some difference.

20        In many of the others, we teach them exactly the same,

21   because so many wheelchair victims, when they're mugged, the

22   attacker's first thing is to tip them out of the wheelchair on

23   the ground, thinking they're going to be helpless like an

24   upside down turtle.   We emphasize with the wheelchair students

25   how to shoot from the ground a little more than we would with

Massad Ayoob – Direct

1    the average civilian student.

2    Q.  Okay.  I'd like you to describe for the Court the process

3    that you use when a disabled individual comes to you, somebody

4    with an infirmity, a handicap of some kind.  Describe the

5    process that you use to develop training that will allow them

6    to overcome that disability.

7    A.  Sure.  Well, we'll start with, at the risk of repeating

8    from the last question, assessing, what is their disability?

9    What are their abilities?  We know now what they can't do;

10   let's see what they can do.  It may be more important for them

11   than for a perfectly able-bodied shooter to have a gun that

12   perfectly fits their hand.  And lets them apply maximum

13   mechanical damage to compensate for any upper body weakness

14   they might have.  We may have to place the gun differently.

15   Most people, police or civilian, who carry concealed handguns

16   will carry on or just behind the strong side hip.

17            If I may stand for one more moment.

18            It's a natural, easy place for the dominant hand to

19   simply come back to and access the gun.  If we have someone in

20   a wheelchair, it's going to be much more difficult.  The gun

21   tends to be pinned between the arm of the wheelchair and the

22   torso of the patient.  And as they reach down here, they've

23   about run out of range of movement, so they're going to have to

24   rock significantly to the side.  So people like that, we'll

25   suggest, you know, may be a little slower for the standing guy,

369

Massad Ayoob - Direct

 1   but we'll have you place your gun cross body.  That would be

 2   the opposite hip, but forward.  Gives them much better range of

 3   movement across the body, and we just show them how to safely

 4   do it on the firing range in a way not to cross any other

 5   shooter so they can practice and build their skills.

 6          We will try to adapt the gun.  The person who is going

 7   to have particular difficulty reloading for whatever reason is

 8   obviously that much more a candidate for a gun that has a

 9   higher reservoir of ammunition.

10   Q.  All right.  So you analyze the disability, you address how

11   they might carry it, where they might carry it, where they

12   might carry ammunition, drawing and aiming the weapon?

13   A.  Right.

14   Q.  Is there any identification -- and maybe that's what you

15   were getting to a moment ago with regard to mechanical changes

16   that might be made to the firearm itself.  So, do you study the

17   mechanical operation of the firearm in conjunction with the

18   disability to try to figure out how the mechanical function of

19   the firearm might be modified or how the shooter might modify a

20   more typical approach in firing?

21   A.  We do.  A classic example of that would be the person with

22   very short fingers.  We have a lot of people, particularly in

23   foreign countries, that have had industrial farming accidents,

24   so they're missing a fingertip or something.  I had one student

25   who was a Thalidomide baby in adulthood, and all of his fingers

Massad Ayoob - Direct

1   were about as long as the median joints are of mine here.  One

2   of the things you want is going to be a pistol with shorter

3   trigger reach.  The trigger reach dimension on the gun is

4   measured from the back strap under the grip tag, of the part

5   that I'm indicating here, to the center of the face of the

6   trigger, which I'm indicating here.

7           On the hand, it would be measured from the center, the

8   web of the hand, in line with the long bones of the forearm,

9   from this point I'm indicating here, to the contact point on

10  the trigger finger.

11          Someone with one digit shorter than what my finger is

12  here is barely going to be able to touch the trigger, but will

13  not have the left leverage to pull it.  My finger only went to

14  here on a longer trigger gun.  If you've got something with a

15  shorter trigger reach, as you can see here, they'll be able to

16  get at least -- where the joint -- with the distal joint of my

17  finger sits here, is where their fingertip will sit, and they

18  will be able to operate the gun effectively.

19  Q.  You've gotten into -- a little ahead of us in terms of the

20  missing shortened finger issue.

21  A.  I'm sorry.

22  Q.  I want to walk through the methodology you apply when

23  attempting to develop what I'm going to call the work-around or

24  a method by virtue of which someone with a disability can

25  overcome that disability.  And what I understood you to say,

Massad Ayoob - Direct

1  you start out by figuring out what the disability is, figuring

2  out what aspects of carrying, firing, reloading a firearm those

3  disabilities are going to affect; is that a fair beginning?

4  A.  Correct.

5  Q.  And then what's the next step in the process?

6  A.  The next step in the process is get the student out

7  actually shooting, and, basically, diagnose, how is he hitting?

8  How is his hand interfacing with the firearm?  What's his speed

9  of recoil control, et cetera?  And we adapt accordingly in

10  terms of technique and equipment.

11  Q.  So you develop ways for the disabled, injured, or infirm

12  shooter, whether able-bodied or not, to overcome whatever the

13  disability or injury presents?

14  A.  Correct.

15  Q.  Is that fair?

16  A.  Yes.

17  Q.  All right.

18  A.  Whether by technique or equipment or combination of both.

19  Q.  Can you advise the Court regarding the impact of upper body

20  disabilities on a shooter's ability to reload.  And whether

21  it's a disability or injury, let us know if there is a

22  difference.  Otherwise, if the same is true for able-bodied

23  injured shooters as it might be to a disabled person with a --

24  an extremity that is either missing or rendered useless,

25  paralyzed?

Massad Ayoob – Direct

1    *A.*  Sure.  You have to take each of them, basically, as they

2    come.  For every student who is going to have the super short

3    fingers or the hand injury or partial or complete amputation,

4    you're going to have several who are my age.  The age is

5    getting along, you're seeing arthritis manifestations in the

6    hand, and they don't have the range of movement that they might

7    have had when they were 20 or 30 or 40.

8         I'm kind of losing track here -- repeat the question.

9    *Q.*  Sure.  I'm asking you to explain how the ability to reload

10   is adversely affected by a disability.

11   *A.*  Thank you.  Let's say that I had a shortened thumb, and we

12   are reloading the semiautomatic pistol.  With an average length

13   thumb, it's no problem for me, being right-handed, to simply

14   press this button inward and dump the magazine.  If my thumb

15   only came to where my median joint is, I would have to turn my

16   hand on the gun, bring the proximal joint of my index finger

17   under the grip tag, which would somewhat weaken my grasp of the

18   pistol, to get that part of the thumb -- where my median joint

19   is would be the tip of his stump, basically -- to make that

20   press.

21        Or we could simply have him do it with the other hand,

22   but that's going to slow him down too.  Because the

23   conventional reload, the shooting hand is dumping the magazine

24   simultaneously with the support hand grabbing a fresh magazine

25   to reload.  Now, with the left hand, in my case, doing the

373

Massad Ayoob - Direct

1   right hand's job, that support hand is going to get much later

2   to the spare magazine and will slow down the reload and

3   lengthen that window of absolute helplessness.

4   Q.  You anticipated my next question.  I was going to ask why

5   time was a problem.  Thank you.  How can that be overcome, the

6   time element that you just described?

7   A.  The simplest and most logical way is to have that person

8   carry a gun, or have access to a gun if it's home defense, that

9   has that many more cartridges in it.  The more cartridges there

10  are, the less often he will have to reload.  The more

11  cartridges there are, the longer he can stay in the fight

12  before he has to reload.

13  Q.  How, then -- taking everything you just testified to into

14  account, how, then, did you arrive at your opinion that the

15  ability of a disabled, infirm, or injured person to protect

16  themselves will be adversely protected by a magazine capacity

17  limitation?

18  A.  Well, certainly, through a lifetime of study, through

19  observation.  When you look at the lower-capacity gun versus

20  the higher-capacity gun in fully skilled hands, it becomes

21  pretty stark.  There is an organization that conducts what you

22  might call simulated gunfighting, called IDPA, International

23  Defensive Pistol Association.

24       At their national championships last year, the top

25  revolver shooter in the world, a guy named Jerry Miculek,

374

Massad Ayoob - Direct

1    M-I-C-U-L-E-K, was shooting against the top semiautomatic

2    pistol shooter in the world, Rob Vogel.  They're shooting the

3    exact same course of fire, the exact same number of hits

4    required.  The rules limit Miculek with the revolver to six

5    shots, then he has to reload again, six shots, then he has to

6    reload again, et cetera.  Their rules, to keep a level playing

7    field for semiautomatics in states that have ten-round magazine

8    limits, is ten in the magazine, one in the chamber.  So the

9    semiautomatic shooter in that case had eleven rounds to six the

10   other man had.

11          When you figure the time it takes to reload and the

12   number of times you have to reload, at the end, Vogel's score

13   was 28 percent faster than the revolver shooter.  So,

14   essentially, comparing like with like, the greatest world

15   champions in the sports at this time, it was a 28 percent

16   deficit to have the gun with less capacity.

17   Q.  We've already done this to a certain degree, so I want to

18   skip over anything that you have already covered in your

19   testimony.  Now is about the time I wanted to get into

20   particular disabilities that present specific problems for

21   handicapped or injured able-bodied shooters which adversely

22   affect their ability to address a threat due to a magazine

23   limitation.  And you had started to talk about shortened or

24   missing fingers, and you actually effected the demonstration of

25   some of the issues for the Court.

Massad Ayoob - Direct

1          Are there any other points that you'd like the Court

2     to consider with regard to how individuals with missing or

3     shortened fingers are impacted by capacity limit on detachable

4     box magazines?

5     A.  Well, the missing or shortened fingers, if it reduces their

6     ability to shoot fast and straight, means that a shot that had

7     they had perfect hands and had lined up, might have struck

8     center and ended the fight, might hit off center, leave the

9     opponent up and running and trying to kill them and others and

10    require them to shoot again.  If you don't have any ammunition

11    left with which to shoot again, you're back in that window of

12    utter helplessness.

13    Q.  You mentioned possible design -- mechanical design

14    modifications to a firearm to address a problem associated with

15    missing or shortened fingers.

16    A.  One that has been suggested in some of the plaintiffs' --

17    I'm sorry, the defendant's reports and depositions that I've

18    read has been simply putting an extended magazine release on

19    the semiautomatic pistol.  That would work to some degree,

20    certainly, on the range.  Your problem with it is if the gun is

21    going to be carried.  The magazine button tends to extend --

22    it's going to be generally the same diameter, a bit larger, but

23    it will extend out away from the pistol.  That means we have a

24    protuberance that in a right-handed person's holster, coming

25    from the left side of the gun, is going to be pressing against

Massad Ayoob – Direct

1    the left side.

2         Apart from discomfort, any time that person bumps into

3    a door or simply leans to the right side in a wheelchair when

4    the armchair hits it, the weight of the gun will now drive the

5    button against the body, it will press the release, and the

6    magazine will pop out.  This means the gun is no longer

7    functional.  On some guns, if they need to draw and fire in

8    self-defense, they will get one shot before the gun ceases to

9    fire.  Some others have a feature called a magazine

10   disconnector safety, which means that when a magazine drops out

11   of place, even the live round in the chamber cannot be fired.

12   In that situation, they'd be totally helpless.

13        Carrying on the left side, since most of the pistols

14   have the button protruding to the left, that would allow any

15   time the edge of the chair -- the wheelchair strikes the hip,

16   once again, the magazine is going to be released, and it will

17   turn the whatever-many-shot pistol into a one-shot pistol, or

18   if it has the disconnector safety, a nonfunctional,

19   nonshootable pistol.

20   Q.  All right.  I want to move on, if we've covered everything

21   dealing with adverse effects of missing or shortened fingers on

22   the mechanical operation of the firearm, and talk about either

23   a completely paralyzed arm or missing arm or hand and whether

24   or not, first of all, you've trained people with those

25   disabilities.

Massad Ayoob - Direct

1   *A.*  I have.

2   *Q.*  Secondly, when you're training those folks, is that similar

3   to teaching an able-bodied person how to shoot one-handed, for

4   example?

5   *A.*  It is.  It is very much the same, I'd say high 90th

6   percentile commonality.  What you've got there -- with only one

7   hand on the gun, you've literally lost 50 percent of the flesh

8   and bone that your opponent might have to control his gun.

9   You've got to remember with even a 6 1/2 pound trigger pull,

10  this is going to be only about a -- about a 2-pound gun once

11  it's loaded, give or take a few ounces.  Putting 6 1/2 pounds

12  pressure suddenly on something that weighs only 2 pounds,

13  something a third of its weight, it's very easy for that to be

14  tripped off target.  If you have a two-handed grasp, it's much

15  easier to keep it stable on target and make those shots.  So

16  if --

17  *Q.*  So just so I understand, what you're saying, it potentially

18  affects accuracy?

19  *A.*  Potentially affects accuracy.  It will also dramatically

20  affect recoil recovery.  That is, the speed -- the time it's

21  going to take from one accurate self-defense shot to the next

22  accurate self-defense shot.  Two hands could control the

23  recoil, which takes the form of what is colloquially called

24  kick, the gun coming back into your hand, and includes also

25  muscle rise or muscle jumps, as the muscle levers up against

378

Massad Ayoob - Direct

1    the axis of the wrist.

2    Q.  So one-handed shooting affects accuracy in two ways that

3    you just described?

4    A.  It affects accuracy, and it affects speed.

5    Q.  Let's talk about the speed component.  When you're talking

6    about speed, are you talking about the speed to reload or

7    replace a magazine?

8    A.  No, that would be the speed to get multiple hits.

9    Q.  All right.  Let's talk about that, and then we'll talk

10   about the other issue.  Tell me about the speed to get multiple

11   hits.

12   A.  Okay.  The speed of shooting is going to be the same one or

13   two hands, because the same index finger is controlling the

14   trigger.  The delivery of accurate hits is what changes.  Given

15   the fact that, again, we only have half the flesh and bone to

16   stabilize against the trigger pull weight against the

17   trigger's -- excuse me, to stabilize the gun against the weight

18   of the trigger pull, and we're going to have more muscle rise

19   between shots, it's going to take longer between shots to

20   align, hold and squeeze, bring the muscle back down from the

21   recoil of shot one to align it for shot two.

22          You could put -- one-handed, I could shoot as fast as

23   I can shoot two-handed.  One-handed, none of us are going to be

24   able to hit accurately as fast as we could two-handed.

25   Q.  So what's a work-around?  What -- what are ways that you

Massad Ayoob - Direct

1    have developed to overcome the problem with hit potential here

2    that you've just described, or accuracy?

3    *A.*  We teach very hard grasp, very aggressive stances.

4          May I stand?

5          *THE COURT:*  You may.

6          *THE WITNESS:*  It's like throwing a punch.  If you're

7    standing upright, like, on the target range, and the pistol

8    recoil is one-handed, the gun comes up and toward your weak

9    hand side like a lever.  It's following the line of least

10   resistance.  It goes upward because the axis of the barrel is

11   above the wrist, and it goes inward because that's where the

12   hand is open and, therefore, the weakest.  That would be

13   happening much less if that side was closed.

14          By getting the upper body forward, we're getting body

15   weight into it, and we can recover faster.  These are fixes,

16   but they're not perfect fixes.

17          I referred a minute ago to IDPA, International

18   Defensive Pistol Association.  In their current rules, the

19   matches cannot put the target more than 7 yards away from the

20   shooter when he's firing non-dominant hand or weak hand only.

21   They cannot put the targets more than 10 yards away in a stage

22   that requires strong hand only shooting.  And the stages where

23   two-handed shooting is allowed, the distances go to three or

24   more times that distance.  That gives you an idea of how much

25   the one-handed versus two-handed shooting affects accuracy and

Massad Ayoob - Direct

1    speed.

2    BY MR. COLIN:

3    Q.  What is the most effective way to address diminished

4    accuracy?

5    A.  Diminished accuracy means you're going to need more makeup

6    shots.  If you get clumsy in the golf game, you're going to

7    need more strokes.  If something has kept you from getting the

8    bullet exactly where it needs to go, you're going to need a

9    Mulligan, a do-over.  Given that that is highly predictable,

10   particularly for the physically handicapped individual, that

11   means you're going to need more cartridges in the firearm.

12   Q.  And then I had referenced time to reload.  Is there an

13   adverse effect on an individual who has been injured in a hand

14   or an arm or if the arm is disabled, the hand is disabled, is

15   there an adverse effect on their ability to reload?

16   A.  Yes.  The one-handed reload can be done; but it takes so

17   much longer.  It's not just increasing the time, it's literally

18   multiplying the time.

19          It would probably be best if I demonstrated the

20   mechanics really quick.

21          MR. COLIN:  Your Honor, may he demonstrate from the

22   witness stand?

23          THE COURT:  He may.

24          MR. COLIN:  Thank you.

25          THE WITNESS:  Okay.  We discussed before two-handed

Massad Ayoob - Direct

1    with the revolver, simply open the cylinder, support hand slaps

2    out and grabs, loads go in, other hand closing cylinder, we're

3    back in business.

4            But now if, let's say, all I have is my left hand only

5    on this revolver, last shot has been fired.  I can't flip it

6    around like this without dropping it, so I've got to bring it

7    back to my chest and let the back of the butt touch here to

8    stabilize.  Now my left hand can go under the trigger guard,

9    and that's the only way this thumb can reach the cylinder.  The

10   fingers of this hand simultaneously have to push the cylinder

11   out of the frame.  At this point my fingers would go through

12   the now open frame, and the thumb would hit the ejector rod to

13   clear the shells.

14           I don't have another hand to hold it with, so I have

15   to put it somewhere.  If I had a holster on the left-hand side,

16   I'd stick it in the holster with the cylinder up.  If not, I'd

17   shove it in the waistband.  But either way, I would have to

18   remember to hold my thumb on that ejector star we talked about,

19   because when the ejector rod touched the clothing where the end

20   of the holster would come up, it blocks the insertion of any

21   fresh cartridges.

22           Once that's there, now this hand has to go to the

23   ammunition, one cartridge at a time, if we have a pouch or

24   maybe the speed loader.  If it's the most popular type of speed

25   loader, with a release knob that turns clockwise, as I turn

Massad Ayoob - Direct

1    clockwise, the cylinder will turn with it.  So now I've got to

2    remember to hold the finger to stabilize the cylinder.  And

3    that's a whole lot of fine motor dexterity and a whole lot of

4    dancing going on.

5           Finally, the rounds are in the chamber, I've got to

6    draw the gun again, use the trigger finger now to close the

7    cylinder and come back.  It takes multiple times longer than

8    the two-hand reload.

9    *BY MR. COLIN:*

10   *Q.*  What is the most effective way to address that problem?

11   *A.*  The most effective way is not to have to reload because you

12   had enough cartridges in your pistol to end the fight.

13   *Q.*  Are you aware of any statistical data regarding the number

14   of rounds in which a defensive shooter has had to fire more

15   than 15 rounds under those circumstances?

16   *A.*  No.  To the best of my knowledge -- believe me, I've looked

17   for it -- no such data exists.  The reason being, there is no

18   central repository where that kind of empirical data is

19   gathered.  We don't even have it for police nationwide.  What

20   we do have is FBI's officers killed, several every year, but

21   that's only the officers who are murdered in the line of duty.

22   It's not at all applicable to all gunfights, which would

23   encompass the victory by the good guys that we hope we're

24   looking for.

25           What we do have on the police side is, there are a

1    couple of large departments that every year analyze and detail

2    every shooting involving their officers.  Now, if one accepts

3    the extrapolation, the private citizens are going to be

4    shooting in self-defense at the exact same people the police

5    are going to be shooting in self-defense, I think it's a

6    reasonable extrapolation.

7           Insofar as high round counts, the last year I can find

8    for the New York City Police Department, the largest in the

9    country, 3 percent of the shootings that year went over 16

10   shots fired by police.  On the West Coast, Los Angeles Police

11   Department, the third largest, it was 5 percent.

12   *Q.*  So if we're only talking about 3 to 5 percent, help me

13   understand why that's significant.

14   *A.*  It is significant because in a life-or-death issue,

15   Mr. Colin, it's not about the odds, it's about the stakes.  I

16   think the best analogy I could give is, probably everyone in

17   this room has fire insurance on their home.  If the judge would

18   ask for a show of hands, okay, how many of you have ever had

19   your house burn down, you probably wouldn't see more than one

20   or two hands go up.  Those people would be awfully glad they

21   have the fire insurance.  Would the rest of us look at each

22   other and say, darn, we've been cheated by the insurance

23   company and all of those premiums because our house didn't burn

24   down?

25          What we have for every premium, the value we got was

Massad Ayoob - Direct

1    the peace of mind.  And that is, in essence, exactly what we're

2    looking at when police or civilians select the firearm they're

3    going to carry.  The odds say, none of us, even the police, are

4    ever going to need to shoot anyone during our career.  The odds

5    say, the cops should be able to be Andy of Mayberry and go out

6    and do their duty without a gun at all.  But in those moments

7    when you become the 3 percent, the 5 percent, it's like the

8    fire extinguisher -- it's like the fire insurance, the cost of

9    not being prepared for it is so absolutely catastrophic, it is

10   simply unacceptable.

11   Q.  Thank you.

12        I'd like to move on to your training of individuals

13   who, either due to age or some other infirmity, have

14   experienced, perhaps not the level of disabilities to which you

15   previously -- those profound disabilities, but nonetheless fall

16   into that other 5 to 10 percent of your category of your

17   students who you've had to develop work-arounds similar to the

18   work-around for an injured shooter.  Can you describe the

19   nature of the infirmities, if you will, caused by age or

20   illness that you've had to address in your instruction.

21   A.  I'm not sure if they're caused by age or just come with it,

22   but I'm at an age experiencing it.  Essentially, there, we see

23   more the tactical disability elements, the -- they can't move

24   to cover or get in behind cover as effectively.  The current

25   protocol that's being put forth by the authorities for active

Massad Ayoob - Direct

1   murder attempt responses is run, hide, fight.  First try to run

2   and get away, get out of range.  Second, if you can't do that,

3   hide someplace and hope they can't see you or hope you're

4   hiding behind something so solid they can't shoot through it

5   and kill you.  And fight only as a last resort.  The person who

6   cannot move quickly, the run part and the hide part are off the

7   table from when the killer's first shot goes off.  Their only

8   chance is to fight.

9   Q.  Stop there.  So these folks with these lower-body problems

10  that you've just described, are those similar to folks with

11  lower-body disabilities that you've talked about, folks in

12  wheelchairs, missing legs?

13  A.  Correct.  It's a matter of degree.

14  Q.  Well, then, to save a little bit of time, let's combine

15  those discussions, if we could.  You talked about infirmities

16  that affect this run, hide, fight situation.  Same true of

17  lower-body disabilities?

18  A.  Yes.

19  Q.  All right.  And so can you describe to the Court the

20  adverse effect of being unable to run and hide and the methods

21  that you've developed to try to address those adverse effects.

22  A.  Basically, there, you become a sitting duck, once again,

23  that window of helplessness that we've been speaking of.  I can

24  teach them to shoot while they're moving.  One of the few

25  advantages of the slow-moving guy is he'll be able to hit

Massad Ayoob - Direct

1  better than the fast-running guy when he shoots while he's

2  moving.  But, in essence, if you cannot escape the line of fire

3  with the opponent, if you cannot outrun the guy coming at you

4  with a knife, the only chance you have left is to use your

5  weapon to neutralize his threat.  And that means you need

6  enough punches to be able to throw to finish the knockout blow

7  to end the fight.

8  Q.  I've heard the word in a different context in law

9  enforcement called cover fire; is that what you're talking

10  about?

11  A.  No.  If you shoot -- the object you're shooting is to hit,

12  particularly in a crowd situation.  Again, we want -- don't

13  want to jump into that spray and pray.  The whole purpose of

14  the gun is to deliver accurate fire, perhaps rapid fire, if

15  necessary, that will stop the threat.  Shooting while you're

16  moving, you will have to slow down your rate of fire to get

17  accurate hits.

18  Q.  So the -- your ability to return cover fire -- or to

19  provide the kind of defensive fire that you're talking about,

20  is that impacted by the number of rounds that you have

21  available to you before you reload?

22  A.  Certainly, the more punches you have to throw, the more

23  likely you are to land the punch that ends the fight.  The

24  opponent very often is behind heavy cover.  You look at

25  situations like the Trolley Square Mall mass shooting in Salt

387

Massad Ayoob - Direct

1  Lake City, Utah.  The killer was shooting people in the Von

2  Maur mall -- I'm sorry, I'm not sure if it was Von Maur or not

3  -- the Trolley Square Mall.  The first responder was an

4  off-duty police officer who only had a seven-shot pistol.

5       He sees the shooter, fires the shot at him.  The

6  shooter ducks in behind the cover of a store that everybody has

7  run out of.  And every time he ducks his head out, the officer

8  takes another shot.  Doesn't hit him, but comes close, and pins

9  him down.  Everyone is stampeding to the exits.  But during

10  those moments, the killer has been diverted.  He claims no more

11  victims from then on.

12       As the young officer is -- he either ran out of

13  ammunition or had one cartridge left, the accounts of that

14  vary.  At that moment, the second responding officer arrived,

15  joined in the fight, pinned the guy down until the SWAT team

16  arrived.  And it took the SWAT team 14 rounds of submachine

17  gunfire and M16 rifle fire to finally kill the killer.  But it

18  wasn't about posing, it was about sustaining fire that kept him

19  in position.  And I gather that's what you were talking about

20  when you spoke of cover fire.

21       We saw it earlier in the classic 20th century mass

22  murder, back in '66, the Texas tower.  Charles Whitman had

23  climbed that tower with literally a footlocker full of guns and

24  ammunition that he rolled up on a dolly on the elevator.  He

25  opens fire from the top of the tower, more than 330 feet up.

Massad Ayoob - Direct

1    The police with .38 caliber revolvers, short-range buckshot,

2    were helpless to stop him.  Once the people down on the streets

3    figured out what was going on and saw people falling around

4    them, hunting rifles started coming out of pickup trucks.

5            One of the guys who returned fire was a civilian rifle

6    competitor who had been issued a national match at 14.  And if

7    you look at the news cam footage of what happened then at the

8    tower, you see puffs of dust coming off the parapets behind

9    which Whitman was shooting.  At that point, the last civilian

10   victim had been killed, once he came under return fire.  The

11   ability of those multiple people from the ground to pin him

12   down stopped the killing until another citizen with a rifle

13   could lead two policemen to the roof and end the whole thing.

14           Those are examples of the appropriate use of cover

15   fire, not spray and pray, nothing that endangers the public,

16   but something that can hold -- if it can't neutralize the

17   threat, can at least contain the threat in one spot until

18   society's forces can be marshaled to close in on it and deal

19   with it.

20   Q.  Well, we heard at the outset of this case a list of four or

21   five indents in which I think -- we're calling the mass

22   shootings where multiple individuals were shot.  I'd like to

23   ask the reverse question, in the context that you've just been

24   talking about.  Are you aware of incidents where law

25   enforcement officers, as you've previously described, fired

Massad Ayoob - Direct

1   more than 15 rounds?  Did those involve multiple assailants, is

2   that usually the case when law enforcement officer is firing

3   more than 15 rounds?

4   *A.*  Not necessarily.  There are any number of things that could

5   make a law enforcement officer or, for that matter, the private

6   citizen have to go to a high round count.

7        Let's say the opponent is firing at you from a

8   vehicle.  A solidly built automobile is pretty solid cover.

9   Most pistol bullets are going to have difficulty getting

10  through a car door, particularly on an angle.  Heavy window

11  safety glass has the same effect.  So it's going to take a lot

12  of shots to chew into that car, make the killer inside stop

13  shooting from there.  He's not in a tank, it's only an

14  automobile, but we don't have bazookas or antitank rockets

15  either, so it kind of balances with small arms.

16       We see today probably more criminals wearing soft body

17  armor during their crimes than during the time of John

18  Dillinger in the 1930s.  It's very standard among the cocaine

19  cowboys.  You saw it here in Colorado at the Aurora theater

20  with Holmes.  The actual videotape exists from 1997 of the

21  North Hollywood bank robbery at the Bank of America.  The

22  suspects, Phillips and Matasareanu -- M-A-T-T-S-E-A-R-A-N-U, I

23  think -- had got old military surplus flak vests.  They had

24  disassembled them prior to their robberies with tape strips and

25  wrapped the bullet-resistant Kevlar around each other's upper

Massad Ayoob - Direct

1    arms, forearms, leaving the joints uncovered so they could flex

2    their limbs, thighs and calves, and heavy armor around the

3    torsos.  They put on these big coveralls.

4         And if you look at the action news cam footage of the

5    44 minutes of that shooting, they look like the Michelin tire

6    men.

7         Police, once again, were limited to medium-caliber

8    pistols, 9 millimeter and .38 and shotguns with buckshot.  You

9    can see these guys jerking and flinching as the bullets hit

10   them, but they have absolutely no effect.  They are using

11   totally illegal machine guns, for which they have a four-figure

12   round count of ammunition with them.  They lay 13 good people,

13   cops and civilians, down on the street before the SWAT team

14   gets there and it's over.  I do not recall what the round count

15   was, but the round count was huge.

16        The running opponents or running and shooting, it's a

17   more difficult marksmanship problem.  It will take more shots

18   to hit them.  The guy who knows how to take cover, that is

19   going to take more shots to keep him there or maybe shoot

20   through the cover.

21        Multiple opponents.  We look at the typical hit ratio

22   on the street.  New York City Police tends to run in the mid

23   30th percentile.  That is about 34, 35 percent of the shots

24   they fire in actual combat will hit the suspect.  Let's, for

25   the sake of argument, assume the private citizen has the same

Massad Ayoob - Direct

1    hit potential, hits with the same ratio.  We have three home

2    invaders kick down the door.  You're going to need three shots

3    apiece to get one bullet into each of them.  And you ask

4    yourself, how many rounds do I have?  How many rounds will it

5    take to stop them?

6          We have cases, one out of Cook County, Illinois.  A

7    heroin addict doing a liquor store robbery.  Took 33 rounds, 33

8    hits from 9 millimeter pistols.  Stayed on his feet until

9    finally one or two shotgun blasts put him down.  We have case

10   after case where these guys just turn into bullet sponges.

11         The medical examiners tell us that since they are

12   going through the same fight-or-flight response as the

13   defenders, the -- the adrenaline release will leave no artifact

14   in the body.  There is no postmortem artifact to test for

15   adrenaline like you can test for cocaine or heroin.  If there

16   was, we could never tell how much that particular person was

17   affected by that particular internally generated substance.

18         Then you start looking at the drug use.  If your

19   assailant is on cocaine -- let's say, crack cocaine, which is

20   an intensified form of flake cocaine -- one of the ways cocaine

21   gives its rush is adrenaline release in the body.  So he is,

22   essentially, that much more supercharged, that much stronger,

23   that much more capable of absorbing pain and trauma before you

24   put him down.

25         So when you read about these situations where many,

Massad Ayoob - Direct

1   many shots were fired at the criminal before the criminal goes

2   down, you have to remember, that's not necessarily spray and

3   pray.  It may well be any number of any combination of

4   circumstances that kept him up and running.  Real life is not

5   like TV, where one shot is fired, and the bad guy goes flying

6   through a plate glass window like he's scooped up by an

7   invisible giant.

8   Q.  Which he may have been on TV.

9           You've talked about a number of events where multiple

10  rounds were fired.  I'd like you to focus just for a minute on

11  events of which you are aware in which multiple rounds, more

12  than 15 rounds, were necessary for a civilian defensive gun

13  use.  And I'd like you to tell us whether or not you are aware

14  of any such incidents.

15  A.  The largest one I'm aware of was a man I became friends

16  with, Harry Beckwith, in Micanopy, Florida, M-I-C-A-N-O-P-Y.

17          Harry ran a gun shop in Alachua County.  There had

18  been robberies, so he had a lot of security in place, and he

19  lived next door to the gun shop.  One night the alarm -- he

20  hears a crash, and, of course, the alarms are going off.  And

21  he looks out, and multiple carloads of perpetrators have driven

22  through the door and window to run in and scoop all the guns

23  and stuff.

24          Harry is not about to put up with that, and he figures

25  he will interject, yell at them, "stop or I'll shoot,"

Massad Ayoob – Direct

 1   something like that.  Harry has on a pistol.  He is a licensed

 2   machine gun dealer, and he grabs a fully automatic M16 and a

 3   fully automatic 9 millimeter submachine gun.  He also after the

 4   stop sees a gun in their hand coming up toward him, and he

 5   starts shooting.  By the time that was over, Harry had fired

 6   more than 100 rounds.  One of the perpetrators was killed, one

 7   or more wounded, all of them captured and convicted, and he was

 8   cleared by the grand jury.

 9        Others I'm aware of, there was a string of I think

10   five gunfights involving a man named Lance Thomas.  He owned a

11   watch shop and Rolex repair center in Los Angeles.  After the

12   first gunfight, he started staging multiple handguns.  He had a

13   very small workplace, not a heck of a lot bigger than this

14   witness stand, and he had barred doors.  And he would buzz in

15   people after he looked through the window and was comfortable

16   with their look.  And a few of them got through anyway.  He had

17   a pistol staged probably every 3 or 4 feet behind the counter.

18   It was safe in there because it was a secured workplace, and

19   there was no chance of little kids getting at them or anything.

20        In the course of five gunfights, at least one of his

21   went beyond 16.  It was either 17 or 19 shots before the last

22   of the multiple perpetrators was either down or had fled.

23        There was another where I debriefed the survivors.

24   Two brothers owned a jewelry store.  They called it the Beverly

25   Hills Jewelry Store, but it was located in Richmond, Virginia.

Massad Ayoob - Direct

1   They had done something very similar.  They had bought a large

2   number of five-shot .38 revolvers and staged them behind the

3   counter, so if there was a robbery at any point, the person

4   behind the counter would be within a few steps of a gun to

5   fight back with.

6           Their shootout was with two old gangster type guys,

7   both members of the Dixie Mafia.  They walked in, one with a

8   sawed-off shotgun, one with a .45.  And in the course of the

9   firefight, I actually lost count of how many guns one brother

10  emptied, pinning one of them down.  The other brother shot and

11  killed the perpetrator with the .45, then went to the shotgun.

12  And between the two, they were able to finally put both of them

13  down.

14  Q.  So these multiple staged firearms seem to be a fairly --

15  even low-capacity firearms, seem to be a fairly effective

16  method of home defense, then, would it not?

17  A.  No, not at all.  What you had, particularly in the Lance

18  Thomas case, and to a significant degree in the Beverly Hills

19  Jewelers case, is these were in secured areas.  Lance Thomas

20  worked alone.  He did not have employees, to my knowledge.  The

21  jewelry store, only trusted employees were allowed behind

22  there.

23          In the home, I think it would be madness staging a

24  loaded gun in instant reach every few feet.  Because what are

25  you going to do when the neighbors or the relatives come by

Massad Ayoob - Direct

1    unexpectedly with their little kids?  What are you going to do

2    when -- you know, when the burglar walks into the house while

3    you're gone and finds, there is ten guns laying around waiting

4    for, you know, quick draw?  I would consider it not only

5    totally impractical, but a little bit reckless to have that

6    many loaded guns staged in plain sight and easy reach in

7    anyone's home.

8    Q.  Does the law enforcement exemption in 18-12-302 provide law

9    enforcement officers with an advantage over armed criminals?

10   A.  Only if the armed criminals obey that law.

11   Q.  What about civilians, meaning, do --

12   A.  I'm not sure I understand --

13   Q.  Do criminals have an advantage over civilians with regard

14   to the capacity limitations of the magazine?

15          MS. MORRILL:  Objection, Your Honor.  Foundation.

16          THE COURT:  Sustained.

17   BY MR. COLIN:

18   Q.  Have you reviewed report of a Dr. Jeffrey Zax?

19   A.  I have.

20   Q.  And in his report, Dr. Zax opines, "The use" -- and I'm

21   quoting, "The use of firearms for purposes of assault seems to

22   far exceed the use for the purposes of self-defense."

23          Do you agree with that proposition?

24   A.  I do not.

25   Q.  Why not?

Massad Ayoob - Direct

1    *A.*  As I read Dr. Zax's report, he is comparing all criminal

2    assaults with firearms to only justifiable homicides committed

3    by private citizens.  What is called in the trade DGUs,

4    defensive gun usages, by private citizens are very much like

5    the police.  Overwhelmingly, the great majority of the time,

6    when the gun comes out, the fight is over.  The criminals

7    submit to the officer, may even submit to a homeowner,

8    citizen's arrest, or runs away.

9         There are a number of cases where the victim shoots

10   the attacker, the attacker does not die, he either runs away

11   and is arrested later or collapses at the scene.  Of course,

12   when he stops attacking, the citizen stops shooting.  And none

13   of those figure into the report that I read by Dr. Zax.

14   *Q.*  Dr. Zax also opines that "mass shootings are more

15   lethal" -- more lethal -- "Mass shootings are more lethal when

16   executed using large-capacity magazines.  If these magazines

17   become less widely available, there is some chance that mass

18   shootings will become somewhat less horrific."

19        Do you agree with that proposition?

20        *MS. MORRILL:*  Objection, Your Honor.  Foundation.

21        *THE COURT:*  Response.

22        *MR. COLIN:*  Your Honor, the foundation for his

23   response to Dr. Zax's opinions has been, we believe, adequately

24   established throughout his testimony here.  He is an expert

25   in -- well, let me withdraw that.  Let me build a foundation.

Massad Ayoob – Direct

1          THE COURT:  Thank you.

2    BY MR. COLIN:

3    Q.  Do you know the basis upon which Dr. Zax rendered that

4    opinion?

5    A.  I would have to go back and review his report.  I do not

6    recall as I sit here.

7    Q.  Then let me move on to a different topic area.  Defendant

8    suggested that the delay associated with a suspect's need to

9    reload gives potential victims an opportunity to intervene.

10         My understanding is that you actually instruct

11   individuals on disarming suspects; is that right?

12   A.  I do.

13   Q.  Do you believe that intervention is an appropriate method

14   by virtue of which to deal with an armed suspect who has a

15   lower magazine capacity firearm.

16   A.  Well, first, let's clarify for the record, attempting to

17   disarm is something we would only recommend if the -- if it's

18   obvious the guy is going to kill somebody.  He's just said, I'm

19   going to kill this person, I'm going to do a countdown, or the

20   killing has already begun.  At that point, the -- any officer,

21   any armed citizen with a gun, their best recourse would be to

22   go to their own gun.

23         For the many who do not, it would be at that point

24   that it would make sense to attempt to intervene.  But to wait

25   until he has expended -- okay.  Let's say he's only got a

Massad Ayoob - Direct

1   15-shot magazine -- heck, let's say he's only got a ten-shot

2   magazine.  I'm standing behind him, I've heard a shot, I turn

3   around, here is this guy behind me shooting into the crowd.  Am

4   I supposed to wait and let him shoot nine more, let him shoot

5   fourteen more?  If you're going to disarm him, disarm him now.

6        The whole concept of disarming with a firearm, why

7   it's actually easier than with a knife, is the firearm only

8   directs its force in one very specific direction.  If you can

9   get in behind the muzzle of the gun and you know how to apply

10  leverage, you have a very good fighting chance of disarming him

11  now.  The recoiling slide of the pistol as he pulls the trigger

12  might give you minor cuts on your hands.  You could fix that

13  with a bandaid.  The very hot barrel of, let's say, a machine

14  gun, there is going to be a burn on your hand that is going to

15  heal.

16       The rationale of waiting until he runs dry allows him

17  to kill numerous victims.  And what's to say during that

18  period, he won't kill you.  If you're close enough to grab him

19  and disarm him, you're close enough to be one of the primary

20  targets.

21  Q.  Are you aware of circumstances where that's occurred?

22  A.  Yes.

23  Q.  Can you describe that, please.

24  A.  Let's look at one of the most recent.  Sparks, Nevada,

25  last year.  A 12-year-old kid brings a gun to school, starts

399
Massad Ayoob - Direct

1   shooting.  The math teacher attempts to get the gun away from

2   him.  He didn't -- my reading of it is, he didn't jump him.  He

3   was approaching him and trying to talk to him down.  He never

4   got there.  The kid shot him in the chest and killed him, then

5   committed suicide.

6        Your classic sample, Sandy Hook.  You look at the

7   first victim, Dawn Hochsprung.  She's about 5 feet 2 inches

8   tall.  Lanza literally shoots his way through that front door.

9   She charged him.  She charged him, clearly going for an attempt

10  to disarm.  Going from the front on a guy who has got the gun

11  up is hopeless.  She was the first to die, and the dominoes

12  fall from there.

13       Where you'll see the successful disarm will be the

14  very physically strong person who is in a position.  The -- I

15  want to say it was the Barry Loukaitis mass shooting,

16  L-O-U-K-A-T-I-S.  Loukaitis was a 14-year-old boy who went to

17  school and opened fire.  A large male gym teacher jumps him,

18  diverts the muzzle of the gun, and wrestles him down and gets

19  the gun away.  If you can get onto the gun without being shot,

20  you're a large male gym teacher against an average-sized kid,

21  God bless that man for doing that.  But most people will not

22  have that physical advantage.

23       In New Hampshire, 1997, the Carl Drega murder spree.

24  Drega had murdered two state troopers.  He had hunted down the

25  local judge that he hated, Judge Vickie Bunnell, and shot her

Massad Ayoob – Direct

 1    in the back.  A man named Dennis Joos, J-O-O-S, a physically

 2    small man, a newspaper publisher whose office was next door to

 3    Judge Bunnell's, jumped him and tried to get the gun away from

 4    him.  Drega, who was 6-foot 3, 240 pounds, and rock solid, just

 5    knocked him to the ground, said, Mind your own F-ing business,

 6    and shot him dead.

 7          What that tells us is, there are the occasional

 8    successful disarms.  If we tell the public, hey, we're going to

 9    try to give you a little opening here so it will be safe for

10    you to jump the guy and get the gun away, that means nobody is

11    going to try to disarm him until all of those rounds have been

12    fired and X number of those victims have been claimed.  So in

13    the end, I don't think there is going to be a whole lot of

14    change in the victim count based on round count, particularly

15    because the great majority of these things have involved guns

16    that were not the so-called high-capacity magazines under

17    discussion today.

18    Q.  Thank you.

19          I have no further questions of this witness.

20          THE COURT:  I think this might be a good time to take

21    our afternoon recess.  The court clock is showing about 2:40,

22    and we'll reconvene at 2:55.  We'll stand in recess until then.

23          (Recess at 2:39 p.m.)

24          (In open court at 3:04 p.m.)

25          THE COURT:  Are we ready for cross-examination?

Massad Ayoob – Direct

 1          MS. MORRILL:  Thank you, Your Honor.  We have no

 2   cross-examination for this witness.

 3          THE COURT:  Thank you.

 4          Can this witness step down and be excused?

 5          MR. COLIN:  He may.  I would ask to withdraw Exhibits

 6   93 and 94, please.

 7          THE COURT:  Any objection?

 8          MS. MORRILL:  No objection.

 9          THE COURT:  All right.  Then, thank you very much,

10   sir.  You may step down.  You are excused.

11          And Exhibits 93 and 94 are withdrawn.  I think that

12   means they go back into the briefcase.

13          MR. COLIN:  I'm hoping.  The person who brought them

14   is here to take them.

15          THE COURT:  Would you call your next witness, please.

16          MR. COLIN:  Sorry?

17          THE COURT:  Next witness.

18          MR. FABIAN:  Thank you, Your Honor.  Plaintiff would

19   call Dave Gill.

20          THE COURT:  Thank you.

21              (**DAVE GILL, PLAINTIFFS' WITNESS, SWORN**)

22          COURTROOM DEPUTY:  Please be seated.

23          Please state your name and spell your first and last

24   name for the record.

25          THE WITNESS:  Dave Gill, D-A-V-E, Gill, G-I-L-L.

Dave Gill – Direct                                        402

1          THE COURT:  Ready to proceed?

2          MR. FABIAN:  Yes, Your Honor.  Thank you.

3          THE COURT:  Please do so.

4                    **DIRECT EXAMINATION**

5     *BY MR. FABIAN:*

6     *Q.*  Mr. Gill, are you a Colorado resident?

7     *A.*  Yes, I am.

8     *Q.*  How long have you been a Colorado resident?

9     *A.*  Since 1983.

10    *Q.*  Where do you live?

11    *A.*  I live in unincorporated Douglas County.

12    *Q.*  Are you a member of the Colorado State Shooting

13    Association?

14    *A.*  I am.

15    *Q.*  For how long?

16    *A.*  Been a member since 2000.

17    *Q.*  What is the Colorado State Shooting Association, what does

18    it do?

19    *A.*  Well, its primary function is to provide shooting

20    opportunities to law-abiding Colorado citizens.

21    *Q.*  And is that the stated mission or purpose of the

22    association?

23    *A.*  Yes, it is.  We also do bring people together to provide a

24    uniform voice in governmental issues.

25    *Q.*  As a member of CSSA -- do you mind if I refer to the

Dave Gill – Direct

 1  shooting association as CSSA?

 2  *A.*  Please do.

 3  *Q.*  Is it safe to say you're a shooter and gun owner?

 4  *A.*  Yes, I am.

 5  *Q.*  Are you also a hunter?

 6  *A.*  I am.

 7  *Q.*  How long have you been shooting?

 8  *A.*  Since 1959.

 9  *Q.*  What types of shooting have you engaged in or currently

10  engage in?

11  *A.*  Trapshooting, sporting clay shooting, target shooting,

12  variety, both with shotguns and rifles and handguns.

13  *Q.*  And what type of hunting have you participated in?

14  *A.*  In the past, I have participated in bow hunting, which I no

15  longer do because of an injury.  But big game hunting for elk

16  and deer.

17  *Q.*  And does that big game hunting involve use of firearms?

18  *A.*  Yes, it does.

19  *Q.*  Is it fair to say you're well acquainted with firearms in

20  general and a wide variety of firearms?

21  *A.*  Yes, I have.

22  *Q.*  Have you ever used firearms that accept detachable

23  magazines with a capacity of more than 15 rounds?

24  *A.*  I have.

25  *Q.*  Have you ever owned any of these types of firearms?

Dave Gill - Direct

1    A.  I have, several.

2    Q.  Without getting into every single type of firearm you own

3    and how many, do you own an AR-15 style rifle?

4    A.  Yes, I do.

5    Q.  What type or make model is it?

6    A.  Well, there are three.  One is made by Colt, another is a

7    Bushmaster target rifle that I received through the Civilian

8    Marksmanship Program, and the other is a tactical AR.

9    Q.  But they're all built on the AR-15 style platform; is that

10   correct?

11   A.  Yes, they are.

12   Q.  What type of magazines do you use in those rifles?

13   A.  The standard-capacity magazines.

14   Q.  Okay.  What is standard-capacity magazines?

15   A.  Twenty and thirty rounds.

16   Q.  And what do you use these rifles for?

17   A.  Different things.  Mostly for either varmint control, home

18   defense, and target shooting.

19   Q.  Are -- you mentioned varmint control.  What specifically

20   are you talking about?

21   A.  Cutting down the population of prairie dogs.

22   Q.  And have you seen other hunters or varmint controllers use

23   AR style rifles?

24   A.  They're very popular for that, yes.

25   Q.  Have you ever used a handgun while hunting?

Dave Gill - Direct

 1    *A.*  I've carried a handgun with me while hunting.

 2    *Q.*  So was -- were you carrying the handgun to hunt with or for

 3    another purpose?

 4    *A.*  For self-defense.

 5    *Q.*  Okay.  And defense against what?

 6    *A.*  Two-legged and four-legged critters.

 7    *Q.*  To be a little more specific for the record, are you

 8    talking about both animals and people?

 9    *A.*  Yes.  And when hunting in the East Coast, it is often

10    considered necessary.

11    *Q.*  So is there a time when you actually had to use or were

12    glad that you had a handgun for self-defense while you were

13    hunting?

14    *A.*  Personally, no.  I've never needed it.

15    *Q.*  Now, do you hold any leadership position in Colorado State

16    Shooting Association?

17    *A.*  I'm the vice president.

18    *Q.*  How long have you been vice president?

19    *A.*  Since 2001.

20    *Q.*  And what do you do as vice president of the association?

21    *A.*  Primary duties are to assist the president and to fill in

22    for him when he is not present.

23    *Q.*  So, essentially, you occupy the second highest position of

24    the association?

25    *A.*  Yes, I do.

Dave Gill - Direct

1   *Q.*  And is it fair to say, then, you are familiar with CSSA and

2   its operation, at least in a general way?

3   *A.*  Yes, I am.

4   *Q.*  Is CSSA associated in any way with the National Rifle

5   Association of America?

6   *A.*  Yes, we are the official state association for NRA.

7   *Q.*  And is one of the functions that CSSA performs under the

8   auspices of the NRA the sanctioning of firearm competitions?

9   *A.*  Yes, it is.

10  *Q.*  Do some of those shooting competitions involve the use

11  firearms that use or accept magazines with the capacity of

12  greater than 15 rounds?

13  *A.*  Yes, they do.

14  *Q.*  Do shooting competitions involving the use of firearms that

15  use magazines of greater than 15 rounds have specific

16  limitations on magazine capacities?

17  *A.*  No, they don't.

18  *Q.*  Do any of these competitions, though, require that shooters

19  load more than 15 rounds at any single time?

20  *A.*  No.

21  *Q.*  That being -- that being established, do shooters in these

22  competitions still use magazines that have capacities of

23  greater than 15 rounds?

24  *A.*  Yes, they do.  The normal capacity magazines are the ones

25  that are commonly used.

Dave Gill – Direct

1    *Q.* And why is that?

2    *A.* They're more reliable.

3         *MS. SCOVILLE:* Objection. I don't think that this

4    witness has established the personal knowledge on a non-hearsay

5    basis for this information.

6         *THE COURT:* Your objection is to foundation?

7         *MS. SCOVILLE:* Yes.

8         *THE COURT:* Response.

9         *MR. FABIAN:* Your Honor, I think he's already said

10   he's familiar with CSSA sanctioning. If the Court is not

11   satisfied, I can lay further foundation.

12        *THE COURT:* I think the foundation is adequate.

13   *BY MR. FABIAN:*

14   *Q.* You can answer the question, Mr. Gill. Do I need to reask

15   the question?

16   *A.* Would you please.

17   *Q.* You mentioned that shooters in competition still use

18   magazines of a capacity of greater than 15 rounds. Why is

19   that?

20   *A.* Because they're more reliable in their function.

21   *Q.* Now, are you familiar with Colorado Revised Statute

22   18-12-301, *et sequentes*, commonly known as House Bill 1224?

23   *A.* Yes, I am.

24   *Q.* Even though the competitions you discussed don't require

25   loading more than 15 rounds at any specific time, does the

Dave Gill - Direct                                                          408

1   restriction of Colorado Revised Statute 18-12-301, 302, and 303

2   have any adverse effect on shooters competing in those matches

3   or competitions?

4   A.  Yes, I think it will.

5   Q.  What is that?

6   A.  Well, it will give older shooters, current shooters, a

7   tactical and significant advantage over new shooters that are

8   coming in to the sport because the new shooters won't be able

9   to have the normal-capacity magazines that those of us who have

10  been around a few years have in adequate supply.  If they --

11  Q.  I'm sorry.

12  A.  Go ahead.

13  Q.  If I understand you correctly, you're saying, shooters who

14  aren't in the sport now but who may enter the sport down the

15  road are not going to have the opportunity to obtain and use

16  the magazines that are the preferred type of magazine in the

17  competition?

18  A.  Yes, they'll be barred from ownership of them legally.

19  Q.  Have you, yourself, ever used a magazine that was modified

20  to accept fewer than its original full complement of rounds?

21  A.  I have used a ten-round magazine that came with a Colt

22  rifle, yes.

23  Q.  How did you find its reliability compared to

24  standard-capacity magazines?

25  A.  Substandard, and I discontinued using it rather quickly

Dave Gill - Direct

1   because of the lack of reliability.

2   Q.  Specifically, when you say "lack of reliability," what was

3   the specific problem that you encountered?

4   A.  Frequent failure to feed and occasional severe jams.

5   Q.  Is magazine reliability important to competitive shooters?

6   A.  It's critical.

7   Q.  Why?

8   A.  Well, they're timed events.  So that if you are fighting

9   with your rifle because it didn't feed properly or jammed,

10  you're losing time.  The jams can be so severe that, basically,

11  you're out of the competition if you don't have another rifle

12  with you and the match will not allow you to substitute.

13  Q.  Is CSSA affiliated in any way with the Civilian

14  Marksmanship Program?

15  A.  We're the official state organization in Colorado.

16  Q.  What is the Civilian Marksmanship Program?

17  A.  It's a program established by Congress to encourage safe

18  and accurate use of firearms, specifically, of military type

19  firearms.

20  Q.  And I'm going to refer to the Civilian Marksmanship Program

21  as CMP.  Is that all right?

22  A.  Please do.

23  Q.  Okay.  Does CMP sell magazines -- I'm sorry, does CMP sell

24  firearms that accept magazines with greater than 15-round

25  capacity?

Dave Gill - Direct

1   *A.*  Yes, they do.

2   *Q.*  What type of firearms would those be?

3   *A.*  The ones that come to mind immediately are the M1 carbine

4   and the AR.

5   *Q.*  The AR-15 type model that you previously discussed that

6   your -- the type of firearm that you own?

7   *A.*  Yes.

8   *Q.*  Has CSSA ever purchased any firearms from CMP?

9   *A.*  Yes, we have.  We've purchased both the AR target rifles

10  and M1.

11  *Q.*  For what purpose were those purchased?

12  *A.*  To facilitate our lending of firearms to new shooters,

13  people who are looking at the sport and trying to see if

14  they're interested in pursuing it, if so, what type of target

15  rifle they may be interested in purchasing.

16  *Q.*  So does CSSA make both the M1 Garands and the AR-15 type

17  rifles available for loan for individuals who wanted to use

18  them in shooting competitions?

19  *A.*  Yes, we have.

20  *Q.*  And do these loans frequently exceed 72 hours in length?

21  *A.*  Yes, they do.

22  *Q.*  What might -- what might be the longest period of time they

23  may be loaned for?

24  *A.*  The longest I am aware of is two years.  Generally, it's

25  one year; sometimes for a specific match.

411

Dave Gill – Direct

1  Q. As we previously discussed, AR–15 type rifles accept

2  magazines with capacity of, standard, 20 and 30 rounds,

3  correct?

4  A. Yes, they do.

5  Q. Did CSSA provide these sized magazines with the AR–15

6  rifles that they loaned?

7  A. We did.

8  Q. Now, are you familiar with the Colorado Revised Statute

9  18–12–112, we've commonly referred to this in this lawsuit as

10  House Bill 1229?

11  A. I am.

12  Q. And what effect did this law have on the CSSA rifle loaner

13  program?

14  A. It forced us to suspend it.

15  Q. Why was the program suspended?

16  A. The amount of time and work required to try to understand

17  and comply with the requirements of what I'm going to refer to

18  as 1229, if I may, were excessive and exceed our ability.

19  Q. Okay. Could you be a little more specific about -- with

20  respect to 1229, let me just ask the question this way:  Did

21  CSSA find it easy to conduct background checks every time these

22  rifles were transferred for possession?

23  A. No, we did not.

24  Q. Also, I think you've already testified that magazines of

25  greater than 15 rounds -- greater than 15-round capacity were

412

Dave Gill - Direct

1   also usually provided with these rifles, correct?

2   A.  Yes, they were.

3   Q.  You previously testified that you were familiar with the

4   Colorado statute pertaining to magazine limitations, 18-12-301,

5   302, and 303, correct?

6   A.  Yes.

7   Q.  Does that have any effect on the CSSA loaner program?

8   A.  It would have required that we either lend the rifles

9   without a magazine, which wouldn't have been particularly

10  useful for the individual borrowing it, or acquire magazines

11  that were compliant with that.

12  Q.  With respect to the concerns with respect to these laws

13  affecting the CSSA loaner program, did you warrant this program

14  when you testified last year in opposition to these laws?

15  A.  Excuse me I missed part of your statement.

16  Q.  Did you testify in opposition to either of these statutes

17  that we've referred to in your testimony?

18  A.  Yes, I did.

19  Q.  Okay.  And in the course of that testimony, did you in fact

20  make it known to the legislators involved that these -- this

21  legislation would adversely affect the CSSA loaner program?

22  A.  I did.

23       MS. SCOVILLE:  Objection, Your Honor.  The legislative

24  history has been stipulated and admitted as an exhibit, so this

25  is cumulative testimony.

Dave Gill - Direct

1          THE COURT:  Response.

2          MR. FABIAN:  I'm just asking Mr. Gill to verify that

3    this information was made available to the legislature.

4          THE COURT:  It's cumulative.

5          MR. FABIAN:  I understand, Your Honor.

6    BY MR. FABIAN:

7    Q.  Mr. Gill, did CSSA ever provide background checks on

8    individuals who checked out these loaner rifles?

9    A.  No, they did not.

10   Q.  If the 14 years you've been a member, 13 years as vice

11   president, has there been any incident or episode involving the

12   criminal use, possession of one of the CSSA loaner rifles?

13   A.  No, there was not.

14   Q.  Was the purpose of the loaner rifle program, as you

15   previously explained, made clear to those who used the rifles?

16   A.  Yes, it was.

17   Q.  In other words, were the rifles offered for any other

18   purpose, such as hunting?

19   A.  No.

20         MR. FABIAN:  If I may have a moment, Your Honor?

21         THE COURT:  You may.

22         MR. FABIAN:  I have no further questions at this time,

23   Your Honor.

24         THE COURT:  Thank you.

25         Cross-examination.

Dave Gill – Cross

1                         **CROSS-EXAMINATION**

2    *BY MS. SCOVILLE:*

3    *Q.*  Good afternoon, Mr. Gill.

4    *A.*  Good afternoon.

5    *Q.*  You spoke this afternoon about the loans of CSSA rifles for

6    competition, correct?

7    *A.*  Correct.

8    *Q.*  And you don't know exactly how many rifles CSSA has for

9    loans, right?

10   *A.*  Not specifically at this moment, no.

11   *Q.*  CSSA lends M1 Garands, you mentioned?

12   *A.*  Yes.

13   *Q.*  And an M1 Garand has a capacity of eight rounds, correct?

14   *A.*  Correct.

15   *Q.*  So those rifles are not affected by 18-12-302 or House Bill

16   1224?

17   *A.*  No, they have not been.

18   *Q.*  The AR-15 style rifles that are available for loaning have

19   a detachable box magazine, you testified, correct?

20   *A.*  Yes, they do.

21   *Q.*  And the AR style platform rifles were made with

22   lower-capacity magazines during the federal assault weapons

23   ban, correct?

24   *A.*  Yes, they were.

25   *Q.*  And lower-capacity magazines are available for those rifles

Dave Gill - Cross

1    at this time, right?

2    A.   I assume they are.

3    Q.   And it would be possible for CSSA to loan AR style rifles

4    with smaller magazines, right?

5          MR. FABIAN:   Objection, asked and answered on direct.

6          THE COURT:   Overruled.

7    BY MS. SCOVILLE:

8    Q.   You can go ahead and answer.

9    A.   I suspect it would be possible that we could do it, but it

10   would put those people at a competitive disadvantage.

11   Q.   It would also be possible to loan the AR style rifles

12   without any box magazine attached and permit competitors to

13   supply their own, correct?

14   A.   As far as 1224 goes, yes.   As far as 1229, I don't believe

15   that would be possible for us.

16   Q.   Well, certainly would be possible if the competitor went

17   through a background check, wouldn't it?

18   A.   Yes.

19         THE COURT:   Counsel, would you speak up a little bit,

20   please.   It's hard to hear you.

21         MS. SCOVILLE:   Certainly.   I think with these high

22   heels on, I'm taller than the microphone today.

23         THE COURT:   Well, feel free to take them off if you'd

24   like.

25   BY MS. SCOVILLE:

Dave Gill - Cross

1    *Q.* You mentioned that CSSA has made loans of the rifles for up

2    to a period of two years, correct?

3    *A.* Correct.

4    *Q.* I believe you just testified that CSSA has not done

5    background checks on any of the competitors who borrowed the

6    rifles?

7    *A.* Correct.

8    *Q.* So CSSA was not aware of whether any of these people had

9    outstanding warrants, right?

10   *A.* I suppose anything is possible, but we've never had a

11   problem.

12   *Q.* It's not something you would know because you never did a

13   background check, right?

14          *MR. COLIN:* Objection, argumentative.

15          *THE COURT:* Overruled.

16   *BY MS. SCOVILLE:*

17   *Q.* You can go ahead and answer.

18   *A.* It's our experience that the people who are involved in the

19   shooting sports do not have these problems.  We've never had a

20   problem with it.

21   *Q.* My question was, I believe, you are not aware of whether

22   any of these people who borrowed the guns for competition had

23   outstanding warrants, right?

24   *A.* No, we're not aware of that.

25   *Q.* And you're not aware of whether any of the people who

Dave Gill - Cross

1    borrowed the firearm for competition had outstanding domestic

2    violence restraining orders?

3    *A.*  I suppose inasmuch as anything could be possible, I suppose

4    that could occur.  But, once again, there was never a problem

5    in all the years.

6    *Q.*  My question was, you are not aware of any instances of

7    people having domestic violence retraining orders, because you

8    didn't check, correct?

9    *A.*  No, we did not.

10    *Q.*  And you didn't check to see whether any of the people to

11    whom you had loaned guns for competition were felons?

12    *A.*  Excuse me.  I couldn't hear you.

13    *Q.*  Were felons?

14    *A.*  Well, once again, anything being possible, I suppose, yes,

15    it could be.  But we're not aware --

16    *Q.*  But you did not know?

17    *A.*  No.

18    *Q.*  You have read Section 18-12-122, or House Bill 1229,

19    haven't you?

20    *A.*  Yes, I have.

21    *Q.*  All right.  And you are aware that there is an exception to

22    the background check requirement in that bill for competition

23    that takes place at a shooting range, correct?

24    *A.*  Yes, if that shooting range is being operated by an

25    incorporated entity.

418
Dave Gill - Cross

1    Q.  And CSSA-sanctioned events do take place at incorporated

2    rifle clubs, right?

3    A.  I believe they're all incorporated.  I've never checked.

4    Q.  And the legislation also includes an exception from the

5    background check requirement for competition -- for shooting

6    competitions, right?

7    A.  Under certain circumstances.  But to qualify for that, we

8    would have to deliver the firearms to the range at the

9    competition and then return with them.  Part of our program has

10   been that the people have to learn also not only to handle and

11   fire the firearm safely, but also to maintain and care for it.

12   And that would not be possible if we had to do all of the

13   cleaning, maintenance, and care of the rifles.

14   Q.  The Section 18-12-112 also includes an exception for

15   temporary transfers of up to 72 hours, correct?

16   A.  Yes.

17   Q.  And CSSA competitions are all under 72 hours, right?

18   A.  Frequently, the guns are not returned within 72 hours

19   because of the need to take them home, clean them, lubricate

20   them, et cetera.

21   Q.  Yes, but that wasn't my question.  My question was, you are

22   not aware of any CSSA-sanctioned shooting competitions that

23   last longer than 72 hours, correct?

24   A.  No, that's correct.

25   Q.  Now, there are no CSSA-sanctioned events that require a

419

Dave Gill - Cross

1   competitor to use a magazine or a firearm that has a capacity

2   of greater than 15 rounds, right?

3   A.   True.

4   Q.   In any of the CSSA sanctioned pistol events, the maximum

5   number of rounds that could be fired at any time -- strike

6   that.   Any of the CSSA sanctioned pistol events, the maximum

7   number of rounds that would be permitted to be loaded at any

8   time is ten, right?

9   A.   Yes.

10   Q.   And in any of the CSSA sanctioned rifle events, the maximum

11   number of rounds that would be permitted to be loaded at any

12   time is eight, correct?

13   A.   Yes.

14   Q.   You mentioned that competitors prefer large-capacity

15   magazines.   And when I use the term "large-capacity magazines,"

16   I mean those that are of 16 rounds or greater.   You have

17   testified that competitors prefer large-capacity magazines

18   because they're more dependable, right?

19   A.   I've testified that normal-capacity magazines are

20   preferred.

21   Q.   All right.   And "normal" in your definition is, for an AR

22   style rifle, 20 or 30 rounds, right?

23   A.   Yes, it is.

24   Q.   Okay.   And you have experienced problems with the Colt

25   ten-round magazine that you used on a Colt AR style rifle,

420

Dave Gill - Cross

1   correct?

2   A.   Yes.

3   Q.   And you had problems with one magazine, right?

4   A.   Yes.

5   Q.   And that happened in the late 1990s, correct?

6   A.   Correct.

7   Q.   You are not aware of any data or studies showing that

8   lower-capacity magazines for AR style rifles are less reliable?

9        MR. FABIAN:   Objection, beyond the scope.

10       THE COURT:   Overrule.

11       THE WITNESS:   I'm not aware of any studies, but it is

12  generally believed and accepted by shooters who are

13  knowledgeable that they are less reliable.

14  BY MS. SCOVILLE:

15  Q.   And you know that only from your discussions with various

16  competitors, correct?

17  A.   Yes.

18       MS. SCOVILLE:   And, Your Honor, I would move to strike

19  his response as based on hearsay.

20       THE COURT:   Overruled.

21  BY MS. SCOVILLE:

22  Q.   And CSSA has not collected any data from its members about

23  the decreased reliability of lower-capacity magazines, correct?

24  A.   Correct.

25  Q.   CSSA is not aware of any competitive shooters who have yet

421

Dave Gill - Cross

1 | been impacted by House Bill 1224, Section 18-12-302, right?

2 | A.   Correct.

3 | Q.   That's because current competitors with high-powered rifles

4 | already own high-capacity magazines, right?

5 | A.   Yes, they do.

6 | Q.   Now, you testified that you owned several high-capacity

7 | magazines, didn't you?

8 | A.   I have quite a few.

9 | Q.   I think you've told me in the past that you've been blessed

10 | with a very large supply, right?

11 | A.   Yes.  I have a lifetime supply.

12 | Q.   You mentioned earlier that CSSA has suspended its loan

13 | program as a result of the legislation that was passed, right?

14 | A.   Yes, we have.

15 | Q.   That's something that has happened since your deposition

16 | was taken on November 1, 2013?

17 | A.   I'm not sure of the exact date of when we suspended.

18 | Q.   And part of the reason for that suspension, as I understand

19 | your testimony, is that it is too difficult to conduct the

20 | background checks that would be required to loan these firearms

21 | to competitors?

22 | A.   It would be difficult or impossible.

23 | Q.   All right.  CSSA is not aware of any members who have had

24 | difficulty finding a federally licensed firearms dealer to

25 | perform a background check for private transfers since July 1,

Dave Gill - Cross

1    2013, right?

2    A.  We're aware of many dealers who are refusing to do it.

3    Q.  That wasn't my question.

4    A.  I've not had a member specifically tell me they have been

5    unable.

6    Q.  You mentioned the firearms that you own and the way that

7    you use them.  You also carry firearms for self-defense,

8    correct?

9    A.  I do.

10   Q.  And you've had, in fact, several experiences in which you

11   have at least displayed a weapon in self-defense, correct?

12   A.  There have been a couple, yes.

13   Q.  And in the two situations of which I'm a -- let me back up.

14   First of all, how many situations have you had where you had to

15   display a weapon?

16   A.  Two.

17   Q.  All right.  In each of those two situations, you had

18   weapons with you that had a capacity of 15 or less, correct?

19   A.  That is correct.

20   Q.  And in neither instance were you required to discharge your

21   firearm, right?

22   A.  That is true.

23   Q.  And you have never had to fire a weapon in self-defense?

24   A.  Correct.

25              MS. SCOVILLE:  If you would permit just a moment, Your

423

Dave Gill - Redirect

1    Honor.

2           I have no further questions, thank you.

3           THE COURT:  Redirect?

4           MR. FABIAN:  Briefly, Your Honor.

5                        **REDIRECT EXAMINATION**

6    BY MR. FABIAN:

7    Q.  Mr. Gill, counsel just asked you regarding incidents in

8    which you had to use your firearm in self-defense, I'd like to

9    turn your attention to one of those incidents.  I believe it

10   was the incident where you and your wife were both involved.

11   Do you recall that?

12   A.  Yes, I do.

13   Q.  Okay.  Would you briefly describe for the Court what that

14   incident involved.

15   A.  We were leaving our home, going for a hike in the national

16   forest.  We were both carrying.  Ann had her firearm concealed

17   in a fanny pack; mine was on my belt and was visible.  We saw

18   eight young men who were on a neighbor's property and drinking.

19   And we tend to look after each other's property.  We live on

20   acreage in rural Douglas County.  And we stopped and just

21   politely asked that they please move on, they don't have

22   permission to be there, they were on private property.  If they

23   were to go up the road a few miles, they'd be in the national

24   forest and could do whatever they chose there without a

25   problem.  Their response was to refuse to reply to us and come

Dave Gill - Redirect

1    out at us and attempt to encircle us.

2    *Q.*  And in addition to the multiple threats that you perceived,

3    was there anything that concerned you about the adequacy of the

4    firearm that you and your wife carry?

5    *A.*  Yes.  I had fifteen plus one rounds, and there were eight

6    of them.  This was obviously a high-stress situation.  One of

7    the unfortunate things that I've experienced was an accident

8    that left me 27 percent partially permanently disabled.  I

9    can't run.  So I was one of the people that Mr. Ayoob was

10   describing who does not have the alternative of running or

11   hiding effectively.  I'm going to stay pretty close to where I

12   am.

13          And I was not at all certain that the 16 rounds that I

14   had would have been adequate without reloading.  There were

15   eight of them, and they were coming at us fairly quickly.

16          *MR. FABIAN:*  I have nothing further, Your Honor.

17          *THE COURT:*  Thank you.

18          I have some questions for this witness.

19          Sir, if I understood your testimony correctly, you

20   defined reliability as being, essentially, no misfires and no

21   feeding jams, right?

22          *THE WITNESS:*  Correct.

23          *THE COURT:*  Why is it in your view that a

24   high-capacity magazine would have fewer misfires or feeding

25   jams than a lower-capacity magazine?

Dave Gill - Redirect

1          *THE WITNESS:*  Those were the magazines that the

2    firearm was originally designed for.  They're mil spec,

3    military specification, magazines.  And they seem to work

4    better with the rifle.  They were designed to function with

5    each other.  The reduced-capacity magazines tend to have

6    different length springs, and I suspect it's the spring that is

7    the primary cause of the problem.

8          *THE COURT:*  Now, the ten-round magazine for the Colt

9    that you had was manufactured by Colt to fit that particular

10   firearm, wasn't it?

11         *THE WITNESS:*  Yes, it was.

12         *THE COURT:*  But that was the one you had the problem

13   with, right?

14         *THE WITNESS:*  Yes, it was.

15         *THE COURT:*  So how is it that you conclude that is a

16   function of whether the magazines were manufactured for the

17   particular firearm or not?

18         *THE WITNESS:*  Well, when the firearm was designed, it

19   was designed to function with the 20- or 30-round magazine.

20   And I suspect maybe our manufacturers don't put the same care

21   in the manufacture of those that are designed to meet a law

22   governing the civilians.

23         *THE COURT:*  Or perhaps manufacturing standards have

24   declined over time and, therefore, this might be a problem with

25   future magazines?

Dave Gill – Examination

1        THE WITNESS:  Well, possibly.  But the current 20- or

2   30-round magazines being produced, for instance by Magpul, are

3   fine quality and fine performing magazines.  People are not

4   encountering the problem with them that we did with the

5   diminished-capacity magazines in past years.

6        THE COURT:  This problem that you've encountered with

7   diminished-capacity magazines, you've encountered with all

8   diminished-capacity magazines?

9        THE WITNESS:  I only had the one.

10       THE COURT:  Okay.  Thank you very much.

11       Does that prompt any more questions?

12       MR. FABIAN:  Yes, Your Honor.

13       THE COURT:  Okay.

14                        **EXAMINATION**

15   BY MR. FABIAN:

16   Q.  Mr. Gill, do you recall the 1994 federal legislation that

17   placed the limitation on magazine capacity?

18   A.  Yes.

19   Q.  Prior to 1994, were -- are you familiar with Colt AR-15

20   style rifles that were offered for sale?

21   A.  Yes, I was.

22   Q.  And what size -- were those rifles normally offered for

23   sale with any magazine size other than 20 rounds?

24   A.  No.

25   Q.  And when did the ten-round magazines become available for

Dave Gill – Examination

1    sale?

2    *A.*  They only became available, to the best of my knowledge,

3    with the passage of that 1994 restrictive law.

4    *Q.*  And that limited magazine capacity to ten rounds, correct?

5    *A.*  Yes, it did.

6    *Q.*  So is it your understanding that the ten-round magazines

7    became available as a result of the legislative action, not as

8    a result of any kind of shooter preference or choice?

9    *A.*  Absolutely.

10          *MR. FABIAN:*  No further questions.

11          *THE COURT:*  Thank you.

12          Any further questions by the defense?

13                              **EXAMINATION**

14   *BY MS. SCOVILLE:*

15   *Q.*  One, Your Honor, please.

16          Mr. Gill, you're aware –– Mr.  Gill, you're familiar

17   with the manufacturer of magazines, Magpul?

18   *A.*  Yes.

19   *Q.*  Are you aware that in this action, the parties have

20   stipulated –– and this is stipulation 45 in the parties'

21   pretrial order.  The parties have stipulated in this case that

22   Magpul ten-round magazines that are being manufactured and

23   available are made to be just as functional and reliable as

24   Magpul magazines of higher capacity?

25          *MR. FABIAN:*  Objection.  Beyond the scope of the

Douglas Hamilton – Direct

1    Court's questions.

2              THE COURT:  I don't agree.  The witness can answer.

3              THE WITNESS:  I'm not familiar with that, no.

4              MS. SCOVILLE:  No further questions, thank you.

5              THE COURT:  Thank you.

6              Can this witness step down and be excused?

7              MR. FABIAN:  Ask that the witness be excused, Your

8    Honor.

9              THE COURT:  Thank you, sir.  You may step down, and

10   you are excused.

11             THE WITNESS:  Thank you.

12             THE COURT:  Next witness.

13             MR. FABIAN:  Plaintiff would call Doug Hamilton.  He's

14   also in the courtroom.

15             THE COURT:  Please step up and be sworn.

16             (**DOUGLAS HAMILTON, PLAINTIFFS' WITNESS, SWORN**)

17             COURTROOM DEPUTY:  Please be seated.

18             Please state your name and spell your first and last

19   name for the record.

20             THE WITNESS:  My name is Douglas Hamilton,

21   D-O-U-G-L-A-S, Hamilton, H-A-M-I-L-T-O-N.

22                        **DIRECT EXAMINATION**

23   BY MR. FABIAN:

24   Q.  Mr. Hamilton, are you a Colorado resident?

25   A.  I am.

Douglas Hamilton - Direct

1   *Q.*  Where do you reside?

2   *A.*  Northern Douglas County, unincorporated.

3   *Q.*  What is your occupation?

4   *A.*  I currently am CFO of a corporation called Hamilton Family

5   Enterprises.

6   *Q.*  What does Hamilton Family Enterprises do?

7   *A.*  We own and operate the concession facility at Cherry Creek

8   State Park called Family Shooting Center.

9   *Q.*  Okay.  And is Hamilton Family Enterprises a for-profit

10  Colorado corporation?

11  *A.*  Yes, it is, it's a C Corp.

12  *Q.*  What does your job entail?

13  *A.*  A little bit of everything.  I run the company.  We formed

14  the company back in 2002.  I take care of all financials, I

15  take care of the direction of employees, procedures, the

16  buying, just about anything that goes on there I have a heavy

17  hand in, I would say.

18  *Q.*  Is it -- so is it fair to say you're responsible for the

19  overall day-to-day operations of Family Shooting Center?

20  *A.*  I am.

21  *Q.*  You don't mind -- I know it's Family Shooting Center Cherry

22  Creek State Park, in the interest of brevity referring to it as

23  Family Shooting Center, shooting center?

24  *A.*  That's fine.

25  *Q.*  Would you describe the facility of the Family Shooting

Douglas Hamilton - Direct

1    Center.

2    A.  We are an outdoor range.  We have a rifle range, a pistol

3    range, a police practice range, shotgun ranges, multiple.

4    There is three different shotgun ranges, an archery range, and

5    a couple of other smaller practice areas for air gun, knife

6    throwing, and patterning.

7    Q.  Is the Family Shooting Center, is that a public shooting

8    facility?

9    A.  We are a fully public shooting facility, yes.

10   Q.  And about how many shooters use your facility?

11   A.  We have in the neighborhood of 60,000 shooter visits per

12   year.  2012 is about 64,000.

13   Q.  Do you host any events or tournaments that attract a large

14   number of shooters?

15   A.  We have a few, yes.

16   Q.  Are your facilities used by firearms instructors?

17   A.  Yes.

18   Q.  And law enforcement?

19   A.  Yes.

20   Q.  Do law enforcement officers shoot at Family Shooting Center

21   when they're off duty for recreation?

22   A.  Yes, they do.

23   Q.  Would you explain to the Court as briefly as possible your

24   background in firearms and shooting.

25   A.  I guess I fired my first shots at about age 7.  In the

431

Douglas Hamilton - Direct

1   early '90s, I became highly interested, was a member at Skyline

2   Hunting and Fishing Club.  My -- I used to work for Lockheed

3   Martin, that was their club.  We built ranges, built programs

4   out there.  And I started shooting clubs, became an NRA

5   instructor, also have coach credentials through the National

6   Rifle Association, and I have gotten highly involved in quite a

7   number of the shooting activities in the metro area.

8           I am a former competitor.  I have shot high-powered at

9   Camp Perry National Matches, for instance.

10  Q.  And do you participate in the training of any types of

11  shooters?

12  A.  I'm sorry, I didn't catch that.

13  Q.  Do you participate in the training of any shooters?

14  A.  Quite a few.  One of the things that we promote at the

15  range is the instruction of new shooters.  We have excellent

16  firearms training classes, which are currently taught

17  predominantly by people whom I have put in a position of

18  instructors, through training counselors of the National Rifle

19  Association.  They work for me.

20  Q.  So is it fair to say you have a detailed knowledge of the

21  type of firearms commonly in use and the types of magazines

22  that they also utilize?

23  A.  Oh, yes.

24  Q.  Okay.  Is it also fair to say you know a great deal about

25  firearms and shooting, but most of your knowledge came through

Douglas Hamilton - Direct

1   training and personal experience?

2   *A.*   That's correct.

3   *Q.*   Now, you operate Family Shooting Centers as a for-profit

4   enterprise, correct?

5   *A.*   That is correct.

6   *Q.*   How do you make your money?

7   *A.*   Well, predominantly, we make our money on range fees.  We

8   sell some merchandise.  Merchandise is a large percentage, not

9   a majority.  We have a lot of training that I either -- by

10  either class or personal instruction that adds to the -- to the

11  financial base.  I guess predominantly, the -- I think I hit

12  them all, majority.

13  *Q.*   Well, like most businesses, do you depend on customers to

14  patronize your business?

15  *A.*   Our shooter accounts are each very important.  Each shooter

16  that comes to the facility does pay a range fee or purchases

17  something there to shoot.  It's not just a walk-on-and-go-shoot

18  type of facility.

19  *Q.*   I'm sorry, were you finished?

20  *A.*   Yes, like a club.

21  *Q.*   Prior to July 1, 2013, did you offer for sale magazines of

22  a capacity greater than 15 rounds?

23  *A.*   Yes.

24      *MS. SCOVILLE:*   Objection, Your Honor.  The State would

25  like to lodge a relevance objection at this point.  I know the

433

Douglas Hamilton – Direct

1   Court has not ruled on the State's standing motion, but the

2   State's standing motion did make the argument that the

3   financial losses of the parties are not relevant.  And I just

4   wanted to reiterate that objection for the record at this

5   point.

6           *THE COURT:*  Noted.  Thank you.

7           *MR. FABIAN:*  May the witness answer, Your Honor?

8           *THE COURT:*  He may.

9           *THE WITNESS:*  Ask the question again, please.

10  *BY MR. FABIAN:*

11  *Q.*  Yeah.  Prior to July 1, 2013, did you offer for sale

12  magazines of a capacity greater than 15 rounds?

13  *A.*  Yes.

14  *Q.*  Did you offer for rent firearms that used magazines of

15  greater than 15 rounds?

16  *A.*  Yes, we did.

17  *Q.*  In the ten months prior to the magazine restriction going

18  into effect, what was your revenues from magazine sales?

19  *A.*  Approximately $26,000 in net revenue.

20  *Q.*  And is there a reason that you offer these magazines for

21  sale, other than just profit?

22  *A.*  Absolutely.  Most of the merchandise we offer for sale at

23  the range is -- I would equate it as shooter convenience,

24  customer convenience.  We're down in the middle of a state

25  park.  It's not easy for them to get replacements if they were

434

Douglas Hamilton - Direct

1   to break something or forget something at home.  We have

2   ammunition, we have some accessories for shooting, which

3   include some of the more popular magazines, for their

4   convenience.

5   Q.  Do you still offer these magazines of capacity greater than

6   15 rounds for sale?

7   A.  Nope.

8   Q.  Why not?

9   A.  They're illegal by the terms of the new laws.

10  Q.  Do you still offer the firearms for rent that use these

11  types of magazines?

12  A.  Yes, we do.

13  Q.  Do you still rent them with the magazines of capacity of

14  greater than 15 rounds?

15  A.  Yes, we do.

16  Q.  And why is that?

17  A.  They are the standard-capacity magazines that came with the

18  guns.  We believe we -- well, first of all, customers look to

19  what they see to rent.  They have an interest in the common

20  guns that are on the market today.  They also have an interest

21  in militaria, so we have old guns from World War II era to

22  rent.  We have new guns.  The current ARs are one of the most

23  popular guns for us to rent.

24  Q.  The magazines that you use in the rental of these firearms,

25  these are magazines that were owned by Family Shooting Center

435

Douglas Hamilton - Direct

1   prior to July 1 of 2013?

2   A.  That is correct.

3   Q.  After July 1, 2013, were you left with an inventory of

4   magazines of capacity of greater than 15 rounds that were

5   illegal for you to sell?

6   A.  That's correct.

7   Q.  Approximately how many of these magazines did you have in

8   inventory as of July 1, 2013?

9   A.  The last inventory had 430.

10  Q.  Since Family Centers owned the magazines prior to July 1,

11  2013, can't you just use these extra firearms for your rental

12  firearms?

13  A.  Yes, we could, and do.

14  Q.  Okay.  Would you be able to utilize your entire inventory

15  of 430 magazines?

16  A.  The -- what has been termed standard-capacity magazines are

17  the most reliable that we can put into the gun.  They rarely go

18  down.  I would say maybe we would use one or two magazines per

19  year, maybe four, if I recollect here correctly.  We would go

20  for many, many years before we'd expend 430 magazines at that

21  rate.

22  Q.  Why don't you sell the magazines to out-of-state

23  purchasers?

24  A.  Basically it's not practical, nor would it be financially

25  beneficial.

Douglas Hamilton – Direct

 1   *Q.*  And could you kind of amplify as to why that is the case.

 2   *A.*  The selling of something out of state would be a mail

 3   order.  A couple of elements of that are, first of all, we do

 4   know there are places where you cannot sell these types of

 5   magazines out there.  We'd have to research that.  We'd have to

 6   figure out where we could not send legally these magazines to.

 7   We want to do things within the law.

 8             Additionally, the magazine markup, if you wish, you

 9   cannot compete -- I cannot compete with other sources of

10   magazines outside of state and still make any sort of profit.

11   I would have to sell them at a loss.  It's not rational for me

12   to do that as a business.

13   *Q.*  And although you're a business, you are not a licensed

14   firearms dealer, correct?

15   *A.*  I am not.

16   *Q.*  You don't sell firearms?

17   *A.*  We do not sell firearms.

18   *Q.*  Now, do shooters at your facility regularly use magazines

19   of greater than 15 rounds?

20   *A.*  Oh, yes.

21   *Q.*  What types of firearms do they use?

22   *A.*  With respect to those firearms that are utilizing magazines

23   of greater than 15 rounds, both pistol and rifle.

24   *Q.*  Okay.  And if you had to give a -- an estimate of how many

25   were -- what percentage of your clientele used these types of

Douglas Hamilton – Direct

1   magazines, what would that be?

2   *A.* It's a tough estimate. Based on observations, I would say

3   that we have something just under, maybe, 45, 55 percent --

4   probably half the people come out shooting rifle will bring an

5   AR with standard-capacity magazines. For pistol, it's somewhat

6   less. Many of the pistols are small pocket pistols with

7   smaller-capacity magazines anyway. However, maybe 25 percent

8   of the pistol shooters have higher standard-capacity magazines.

9   *Q.* I think you touched on it before, but I just want to be

10  clear. The magazines that you sold prior to July 13, 2013,

11  were of capacity greater than 15 rounds, correct?

12  *A.* That is correct. They were -- we had a few 20s, mostly

13  30-round magazines, I believe.

14  *Q.* Okay. And why did you sell those type -- that type of

15  magazine?

16  *A.* That was the demand of magazine. That's -- when we started

17  selling magazines, or any of our products, since we have such

18  limited display space, we choose the product with significant

19  emphasis on how fast can we move the product, how much in

20  demand is it. These particular magazines were most in demand.

21  *Q.* Since July 1, 2013, has there been a decrease in the

22  commonality of shooters using magazines of capacity greater

23  than 15 rounds?

24  *A.* I believe we have seen a noticeable number less, yes.

25  *Q.* Have you or your employees seen shooters regularly

Douglas Hamilton - Direct

1    exchanging magazines or firearms on the firing line?

2    *A.*  Yes, they do.

3    *Q.*  And, likewise, firearms that accept these types of

4    magazines?

5    *A.*  Yes, they do.  It's -- groups come out, family groups,

6    friend groups, two, three, four, as many as ten, perhaps, and

7    they will interchange a quantity of guns that one or more of

8    the people have brought out to shoot.

9    *Q.*  And I need to clarify.  I wasn't complete in my question

10   when I just referred to magazines in general.  Specifically,

11   I'm speaking about magazines of capacity greater than 15

12   rounds.

13   *A.*  Yes, greater than 15, correct.

14   *Q.*  Now, Mr. Hamilton, are you familiar with the provisions of

15   Colorado Revised Statute 18-12-301, 302, 303, commonly referred

16   to as House Bill 1224?

17   *A.*  Yes.

18   *Q.*  Okay.  Particularly, the provision I'm talking about

19   pertaining to continuous possession of magazines of capacity

20   greater than 15 rounds owned prior to July 1 of 2013.

21   *A.*  Yes.

22   *Q.*  Has this provision been a cause of concern for Family

23   Shooting Center?

24   *A.*  It's been a significant topic around the range, both by the

25   customers and by my personnel.  The bill's clause "continuous

Douglas Hamilton - Direct

 1    possession," my people have asked me for direction.  Can I take

 2    a firearm from an individual who is having problems with it,

 3    where it has a 30-round -- 20-round or 30-round magazine in it,

 4    because I am then taking possession of the firearm?  I can only

 5    say that I -- technically, it is in violation of law by the way

 6    the law is worded.

 7         Customers call us regularly and ask, can I bring my

 8    firearm out?  I have a 30-round magazine.  We have calls

 9    literally every week, I don't know how many.  I've taken quite

10    a few; my people have taken quite a few.  But it's ongoing.

11    They are new shooters to our range, and they ask, can we do

12    this?

13    Q.  Now, you've been made aware of the technical guidance

14    letter from July of last year from the Attorney General,

15    correct?

16    A.  Correct.  I actually have copies of two letters, a May and

17    a July.

18    Q.  Right.  I'm asking you specifically about July.  You're

19    familiar with that letter?

20    A.  Yes.

21    Q.  Did that letter resolve any concerns or issues that you had

22    with that term "continuous possession"?

23    A.  There is an attempt to clarify what continuous possession

24    is.  I'm not sure how to say this exactly, but my -- when I

25    looked at the wording of that, we're taking the definition of

440

Douglas Hamilton – Direct

1    continuous possession, and now we have to go interpret the

2    meaning of two other words in the final sentences of that

3    letter, and you can interpret that differently as well.  So I'm

4    still not sure.

5    Q.  Now, Mr. Hamilton, do you keep track of the number of

6    shooters who shoot at Family Shooting Center?

7    A.  We do.

8    Q.  And do you regularly report this information?

9    A.  Each month we are required to report to Colorado state --

10   it's now Colorado Division of Parks and Wildlife -- our total

11   numbers, about 30 categories, I believe, of numbers which

12   include shooter count.

13   Q.  I'd ask that the witness be given the notebook 4 of the

14   exhibits, and invite his attention to Exhibit 39.

15           Just a take moment, Mr. Hamilton.  I'll let you get

16   your glasses on.  Just take a moment and review that exhibit.

17   You don't need to read it in detail, every line.  Just review

18   it and see if you recognize the contents of that exhibit.

19   A.  Yes, these are, effectively, our single page monthly

20   summary that we turn in to the state park for the year it looks

21   like January 2013 and it goes back to July 2012.  There is a

22   significant number.

23   Q.  Okay.  Are these records of regularly conducted activities

24   and transactions in the course of business of Family Shooting

25   Center?

Douglas Hamilton – Direct

1   *A.*  Yes, they do.

2          *MR. FABIAN:*  Your Honor, at this time we would tender

3   for the Court to receive Exhibit 39.

4          *THE COURT:*  *Voir dire* or objection?

5          *MS. SCOVILLE:*  No objection, Your Honor.

6          *THE COURT:*  It's received.

7          (Exhibit 39 admitted.)

8   *BY MR. FABIAN:*

9   *Q.*  Mr. Hamilton, has there been any general trend in Family

10  Shooting Center participation, in other words, the number of

11  shooters using the facility, over the past year?

12  *A.*  Yes, there has been a significant change.

13  *Q.*  And what has that trend been?

14  *A.*  Since March of 2013, the last 12 months, including January

15  and February of this year, we have seen an 11.7 percent drop in

16  our shooter count.

17  *Q.*  And that's in comparison to the previous year, 2012?

18  *A.*  I'm sorry.  That's correct, the previous 12 months.

19  *Q.*  Okay.  Now, just so we're clear, and for the record, was --

20  there has been an overall decrease.  Has that decrease been

21  every single month during that period of time?

22  *A.*  No.  Traditionally -- and we've kept these monthly records

23  since our first concession date, which is May of 2004.

24  Reviewing the records shows that we have a few months -- and I

25  will say this, the last four years, a few months that have

Douglas Hamilton - Direct

1    turned negative.  Mostly, each month, from the prior year's

2    month comparison -- in other words, January to January or July

3    to July -- we have seen predominant increase in shooter count.

4    Business has been growing every year, literally, for the last

5    ten years, last nine years.

6           Up until March of 2013, the prior 32 months of our

7    records show only four months in which the numbers have dropped

8    from the prior year.  Pretty good odds, I think.  However,

9    after March of 2013, which is the month that Governor

10   Hickenlooper signed the laws into place, the prior twelve

11   months, we have had ten months of downturn, one even, and only

12   one month that has increased, I believe, it was 3 percent.  So

13   we've had a general severe downturn in the last twelve months.

14   Q.  And what was that total number of shooter reduction?  In

15   other words, what is -- what was that drop in total yearly

16   shooter attendance between 2012 and 2013?

17   A.  These last twelve months -- and they're skewed in the year

18   a little bit because I go from March to February -- 7,500 total

19   shooters is the reduction, out of the total of -- for the year

20   in 2013, we had 57,000 shooters.

21   Q.  And I take it, as you previously testified, you rely on

22   shooter attendance for your business, correct?

23   A.  Predominantly, it's the range fees that pay the bills.

24   Q.  Now, during this drop in attendance at Family Shooting

25   Center, were there any substantive or significant changes in

Douglas Hamilton – Direct

1    your facilities?

2    *A.*  None.

3    *Q.*  Any reduction in range availability?

4    *A.*  Actually, to the contrary; we probably increased some

5    availability.  We increased our hours slightly, and we've

6    offered more programs.

7    *Q.*  So were there any changes made that the -- could be

8    attributed to that drop in shooter attendance?

9    *A.*  No, not at all.

10   *Q.*  Now, you said previously that you have experience as a

11   competitive shooter; is that correct?

12   *A.*  That is correct.

13   *Q.*  And that includes the competition of high-power rifle

14   matches in Colorado?

15   *A.*  In Colorado, I have shot at a half a dozen of the

16   high-powered ranges, and I have shot at Camp Perry, which is

17   the National Matches, for three years.

18   *Q.*  Okay.  Do shooters in those competitions frequently use

19   rifles with magazines of greater than 15-round capacity?

20   *A.*  Yes.

21   *Q.*  What type of rifles do they that accept those magazines?

22   *A.*  The ones I am familiar with in those matches that I have

23   shot are the service rifle type guns, the M14, or the civilian

24   version, M1A, and the AR-15, civilian version of the M16.

25   *Q.*  And the M1A, the civilian version of the M14, the standard

Douglas Hamilton - Direct

1    magazine for that rifle is 20 rounds, correct?

2    A.   That's correct.

3    Q.   For the AR-15, semiautomatic, the civilian version of the

4    M16, that uses both 20- and 30-round magazines; is that

5    correct?

6    A.   The standard issue for the military is 30 rounds for that.

7    And when you do -- there are two levels of tournament, I should

8    clarify.  The what is called board games are conducted by

9    Civilian Marksmanship Program.  A specific competition there is

10   something called rattle battle, and it is actually a scenario

11   where the intent is to score as many hits onto your target as

12   you can in a -- call it, battle scenario time frame.  So you

13   will use the most -- as many 30-round magazines as you could

14   muster in that particular competition.

15          There are other competitions, as was stated by

16   Mr. Gill, that the limitation on shots is at eight.

17   Q.   But the rattle battle competition that you just described,

18   it's actually to the shooter's advantage to have a

19   higher-capacity magazine, correct?

20   A.   If you don't have a higher-capacity magazine, you will lose

21   the match.  You have no competitive advantage at all.

22   Q.   Now, to be clear, these -- there are no rules that said you

23   must use a specific capacity magazine with respect to these

24   competitions, correct?

25   A.   That is correct.  There are no specific rules that say you

Douglas Hamilton - Direct

 1   must.  But the practical element of the competition, whether

 2   it's handgun or the high-powered rifle that I shot, a

 3   higher-capacity magazine gives you that edge that you need for

 4   the competition.

 5   Q.  Well, now, moving away from just the rattle battle

 6   competition, where magazine capacity is critical, to the

 7   competitions that Mr. Gill testified to, the standard

 8   high-powered competition, so we're clear, that competition

 9   doesn't require shooters to load any more than eight rounds at

10   any one time; is that correct?

11   A.  That's correct.

12   Q.  What type of magazines did you use as a competitor in those

13   types of matches?

14   A.  In those types of matches, we used a 20-round magazine.

15   Q.  Why did you use that type of magazine?

16   A.  The configuration of the magazine -- well, there is two

17   reasons, actually.  The 20- and 30-round magazines still have

18   the highest reliability rate of anything that we've used.

19   20-round magazine, the configuration fits -- specifically fits

20   the offhand or standing position in how you hold the gun -- or,

21   I should say, how most competitors hold the gun.  They actually

22   hold it by that magazine.  A ten rounder does not have --

23   anything that is smaller to the gun does not fit.  You are

24   placed in an awkward position in how you have to hold the gun

25   with that type magazine.

446

Douglas Hamilton – Direct

1          The 30 rounder, I would say is probably the same way,

2   so we settled -- we settled on a 20-round magazine.

3   Q.  Let's use your example of the 20-round magazine, because

4   you said not only is it preferable for its reliability, but

5   also for its length.

6   A.  Uh-huh.

7   Q.  Could a shooter, if they desired, insert a plug or a block

8   of some kind so that magazines -- so that 20-round magazine

9   would only accept 10 rounds?  Could they do that?

10  A.  Yes, they could.  In fact, I heard mention the 1990s ban --

11  I forget the number of the bill, but we had this ban put in

12  place.  In those later years, as I was preparing to compete for

13  competition -- Bushmaster is a very common gun.  They could no

14  longer manufacture the high-capacity, standard-capacity

15  magazines that we had.  So they took their standard-capacity

16  magazines and modified them so that the foreplate would hold no

17  more than the ten rounds required by law, and we started using

18  those in competition.  It didn't take but a few tries, and we

19  literally tossed those magazines.  They were not reliable at

20  all.

21  Q.  Okay.  Specifically, when you say not reliable, what were

22  the problems that you were having?

23  A.  They were feeding problems, predominantly.  On occasion

24  we'd have a problem with the gun -- with the magazine not

25  staying in the gun.  Not totally sure why.  But, predominantly,

Douglas Hamilton – Direct

1    what we saw was the magazine feed into the gun, the rounds

2    would jam.  They would come up at an angle and so forth, and

3    all we could do was -- when we would look at what the problem

4    is and how we could fix it, there is really no way to do it

5    except to throw that magazine away.  So we eventually found

6    other manufacturers and such that -- that we could use, or we

7    had to go back to the old magazines that -- that were still

8    available.

9          It didn't ban the magazines -- the law did not ban, it

10   banned the manufacture of the magazines.  So rather than use

11   the new Bushmaster magazines, we went and found old

12   manufacturer magazines of 20-round capacity that we began

13   using, that they were reliable.

14   Q.  Is reliability of a magazine important to competitive

15   shooters?

16   A.  Oh, absolutely.  You are timed in virtually all of your

17   competitions.  And if you have to deal with a reliability

18   problem, a jam or a misfeed or something like that, that costs

19   you time.  It gets you flustered.  If you cannot concentrate on

20   your shots as well, you lose the competition.

21   Q.  As a competitive shooter, what would be your preference if

22   you had the choice between a full-capacity 20-round magazine

23   and a reduced-capacity 10-round magazine for competition?

24   A.  There is no contest.  You'd use the 20 rounder.

25          MR. FABIAN:  If I can have a moment, Your Honor.

Douglas Hamilton – Cross

1          THE COURT:  You may.

2          MR. FABIAN:  I have no further questions at this time,

3    Your Honor.

4          THE COURT:  Thank you.

5          Cross-examination.

6                        **CROSS-EXAMINATION**

7    BY MS. SCOVILLE:

8    Q.  Good afternoon, Mr. Hamilton.

9    A.  Good afternoon.

10   Q.  We spoke earlier this afternoon about the magazine sales at

11   Family Shooting Center.  And since July 1, Family Shooting

12   Center has offered ten-round magazines for sale, correct?

13   A.  We have offered a few.  Frankly, we have not been able to

14   get many in stock, nor do we have a demand for them.

15   Q.  But they are offered for sale?

16   A.  I believe we have some on the shelf right now.

17   Q.  You had mentioned this afternoon that patrons who visit the

18   Family Shooting Center can bring their own pistols and rifles

19   with large-capacity magazines, right?

20   A.  That is correct.

21   Q.  And Section 18-12-302, or House Bill 1224, has not impacted

22   that at all, right?

23   A.  When you say "has it impacted," in what respect?

24   Q.  Well, since the passage of that bill, customers have

25   continued to bring their large-capacity magazines and use them

449

Douglas Hamilton - Cross

1    at the Family Shooting Center, right?

2    A.  They have continued to do that, yes.

3    Q.  And Family Shooting Center has continued to rent firearms

4    with large-capacity magazines to patrons since July 1, 2013,

5    right?

6    A.  That is correct.

7    Q.  And approximately 50 percent of the rifles you rent have

8    large-capacity magazines, right?

9    A.  The 50 percent number was the number of patrons who came

10   into the range we believe with standard-capacity magazines.

11   Q.  About 50 percent of the rifles you rent to customers also

12   have large-capacity magazines, right?

13   A.  No, it was a lesser number.

14   Q.  And what is that number?

15   A.  If I would hazard a guess, maybe 30 percent of the rifles

16   we rent.

17   Q.  You also rent pistols with large-capacity magazines after

18   July 1, 2013, right?

19   A.  That's correct.

20   Q.  Now, you mentioned when you were asked by your counsel that

21   Section 18-12-302, or House Bill 1224, does not technically

22   permit you to do that, right?

23        MR. FABIAN:  Objection.  Mischaracterizes the

24   testimony.

25        THE COURT:  Noted for the record.

450

Douglas Hamilton - Cross

1          MS. SCOVILLE:  I'm sorry, Your Honor.  Could you

2    repeat your ruling for me.

3          THE COURT:  There was no ruling.  It was noted.

4          MS. SCOVILLE:  Thank you.

5          THE WITNESS:  On the content of the law itself, and as

6    it's written, there is too much ambiguity and too much

7    confusion to the definitions and the intents of the law.

8          I think the reality of what we do at the range, most

9    all -- since most of the guns that are shot there by patrons

10   coming in, as well as much of what we do there, involves

11   magazines that exceed the 15-round capacity.  And, therefore,

12   their handling, their possession, in fact -- House Bill 12 --

13   1229 provisions I believe also would apply, that there is so

14   much confusion, we've had a lot of people call us and say, can

15   I do this?

16   BY MS. SCOVILLE:

17   Q.  Okay.  I'm going to stop you right there.  That wasn't my

18   question.  My question for you is, solely related to Section

19   18-12-302, House Bill 302 -- sorry, House Bill 1224 -- I'm

20   sorry.  And you've said before that transferring a firearm with

21   a large-capacity magazine is not technically allowed under that

22   law, right?

23   A.  By the terms of the law as passed, that is correct.

24   Q.  And you've obtained guidance from legal counsel indicating

25   that you can continue to rent firearms with large-capacity

Douglas Hamilton - Cross

1    magazines after July 1, 2013, right?

2    A.  We believe that what we are doing is -- I guess the best

3    way to look at it, at least within the purview of the letters

4    written by the Attorney General's -- Attorney General's Office,

5    yes.

6    Q.  So Section 18-12-302, or House Bill 1224, is flexible

7    enough to permit you to continue to rent large-capacity

8    magazines after July 1, 2013?

9    A.  I would say it's ambiguous and unclear enough that you can

10   interpret it so many ways that we choose to interpret it in a

11   manner that we can at least continue our business.

12   Q.  And you intend to continue to do that in the future, right?

13   A.  Yes, we do, at least as long as the rules are as they are.

14   Q.  And you mentioned that your staff have asked you if they

15   can take possession of a large-capacity magazine when a patron

16   has trouble with it, right?

17   A.  That's correct.

18   Q.  Since July 1, 2013, your staff has continued to assist

19   patrons in handling large-capacity magazines, right?

20   A.  We must do that.  And I will cite an example precisely --

21   Q.  Actually, I don't think we need an example.  Thank you.

22   A.  Okay.

23   Q.  And House Bill 1224, or Section 18-12-302, is flexible

24   enough to permit your staff to handle large-capacity magazines

25   when necessary, right?

452

Douglas Hamilton - Cross

1   A.  Not the bill.

2   Q.  The way you've interpreted the bill is flexible enough,

3   right?

4   A.  The interpretation or the ambiguity of the bill, we choose

5   to interpret it in a manner that we can continue running our

6   business safely.

7   Q.  And when a staff member handles a firearm with a

8   large-capacity magazine for a patron, there is generally an

9   expectation that the staff member is going to hand it back to

10  the patron, correct?

11  A.  Yes, it's an exchange back and forth.

12  Q.  And when you rent a large-capacity magazine to an FSC

13  patron, you intend for that patron to return it to you at the

14  end of the day, right?

15  A.  Yes, they -- we absolutely do.

16  Q.  You mentioned that as your high-capacity magazines wear

17  out, they will have to be replaced with lower-capacity

18  magazines, right?

19  A.  When the current standard-capacity magazines we have

20  deteriorate or become unusable, we will replace them with the

21  current magazines we have in stock, that are under our

22  ownership.

23  Q.  And one of the problems that you see with HB 1224, Section

24  18-12-302, is that lower-capacity magazines are less

25  interesting to your Colorado customers, right?

Douglas Hamilton - Cross

1   *A.*   What you just said is a true statement.   These people do

2   want to rent and handle the guns as they were manufactured and

3   sold.

4   *Q.*   The exhibit in front of you, would be the -- rather, the

5   notebook that is in front of you, would you please turn to

6   Exhibit No. 40.

7   *A.*   Okay.

8   *Q.*   Do you recognize Exhibit No. 40?

9   *A.*   Yes.

10  *Q.*   This is an exhibit that has been stipulated to and

11  admitted.

12        You wrote the text that appears in the middle of

13  Exhibit 40, didn't you?

14  *A.*   Yes.

15  *Q.*   And the text right in the middle of that exhibit says,

16  "Family Shooting Center.   July 1, 2013.   Impact of new Colorado

17  restrictive gun laws.   The Family Shooting Center at Cherry

18  Creek State Park wants you to know that the new firearms laws

19  going into effect on July 1 do not impact our range operations.

20  You may bring any of your firearms to the range to shoot

21  following our normal range rules.   As well, you may rent any of

22  our rifles, pistols, and shotguns as you have always been able

23  to do."

24        Did I read that correctly?

25  *A.*   You did.

Douglas Hamilton – Cross

1   *Q.*  And one of the things that the Family -- sorry, let me

2   start that over.  One of the things that you have told FSC

3   customers when they have called in, it is your understanding

4   that the Colorado sheriffs will not be enforcing this law,

5   right?

6   *A.*  I have heard that statement made in several venues, that

7   the sheriffs will not be enforcing it.  For one reason, they

8   don't know quite how to enforce it.

9   *Q.*  Well, that's something that you tell FSC patrons, correct?

10  *A.*  We tell them our opinion and interpretation of the law,

11  that as it stands, we will continue operations.

12  *Q.*  Well, you also tell a few patrons, don't you, that it is

13  your understanding that the sheriffs will not enforce the law?

14  *A.*  I don't believe I have specifically said that to somebody

15  on the phone.  I do not recall.  It is said in shoptalk, in the

16  office, for sure.

17  *Q.*  Do you recall having your deposition taken in this matter,

18  sir?

19  *A.*  Yes.

20        *COURTROOM DEPUTY:*  Would you like me to hand the

21  witness his deposition?

22        *MS. SCOVILLE:*  Yes, please.  Thank you.

23        *COURTROOM DEPUTY:*  I hand the witness his deposition

24  taken November 4, 2013.

25        *THE COURT:*  Thank you.

455

Douglas Hamilton - Cross

1   *BY MS. SCOVILLE:*

2   Q.  Mr. Hamilton, do you recall having your deposition taken on

3   November 4, 2013?

4   A.  Yes, I do.  It was a long day.

5   Q.  And at that time you were given an oath, correct?

6   A.  That's correct.

7   Q.  And you testified at your deposition to tell the truth,

8   right?

9   A.  To the best of my ability, absolutely.

10  Q.  And you did tell the truth to the best of your ability at

11  that deposition, right?

12  A.  I did.

13  Q.  All right.  If you would please turn to page 106.

14          I'm sorry, 107, please.

15  A.  10 --

16  Q.  107.

17  A.   -- 7.

18  Q.  And at line 6, you were asked the following questions:

19  "So, are there any injuries to FSC as a result of House Bill

20  1224 that we have not covered already today?"

21          Did I read that correctly?

22  A.  You did.

23  Q.  And the answer goes on for about four pages.  But I would

24  like to ask you about the portion of your answer that appears

25  at page 108, line 21.  You gave this answer:

456

Douglas Hamilton - Cross

1           "When people call us and ask us what they can do, we

2    give them the honest answer that we don't enforce the law out

3    here.  We don't know any situation where somebody was busted

4    because somehow it was proven that what they had in their

5    possession was illegal.  That hasn't happened yet.  We haven't

6    had enough time to do that.  We can also state our

7    understanding -- we can also state that it is our understanding

8    that county sheriffs will not enforce this, that they have

9    refused to, in the notion that, you know, it's still up in the

10   air as to whether they should be, number one, and they don't

11   know how because of how the law is written."

12           Did I read that correctly?

13   A.   Yes, you did.

14   Q.   You mentioned this afternoon that large-capacity magazines

15   that have been modified are unreliable.  Do you recall that

16   testimony?

17   A.   Yes.

18   Q.   You have only personally used a firearm with a modified

19   magazine three to five times, correct?

20   A.   Repeat the question, please.

21   Q.   You have only used, personally, a firearm with a modified

22   magazine three to five times in your lifetime, correct?

23   A.   That was the Bushmaster example I quoted earlier, yes.

24   Q.   So that's a true statement?

25   A.   Yes.

457

Douglas Hamilton - Cross

1  *Q.*  You've personally helped customers with magazine problems

2  that they have encountered while at the range, correct?

3  *A.*  What kind of problems?  Magazine problems?  Is that what

4  you -- I'm having a little trouble with the words.  Your

5  decibel level is just --

6          *MS. SCOVILLE:*  Certainly.  I apologize.

7          *THE COURT:*  Would you like a headset to help in the

8  hearing?

9          *THE WITNESS:*  No.  I can pretty much hear her, but the

10  voice level, the tone of her voice is -- I have tone deafness

11  at certain frequencies, and I think that is what is happening.

12          *THE COURT:*  All right.  Thank you.

13          *THE WITNESS:*  I think we're okay.

14  *BY MS. SCOVILLE:*

15  *Q.*  I'll try and stay close to the microphone.

16  *A.*  There you go.

17  *Q.*  In your experience at the Family Shooting Center, you have

18  had opportunities to assist patrons when they have had trouble

19  with their firearm or magazine, right?

20  *A.*  Oh, yes.

21  *Q.*  And you've in fact helped people when they had trouble with

22  a modified magazine, right?

23  *A.*  There are a -- have been a few instances, yes.

24  *Q.*  And, in fact, you've had trouble -- you've experienced

25  instances where you have helped people with trouble with

Douglas Hamilton - Cross

1  modified magazines at the Family Shooting Center no more than a

2  dozen times over a period of nine years, right?

3  *A.*  I would say, personally, that's true, yes.

4  *Q.*  Could you please turn to Exhibit 39 in the notebook in

5  front of you.

6         Mr. Hamilton, your counsel asked you some questions

7  about Exhibit No. 39, and I'd like to follow up on those.  You

8  mentioned that your -- the number of shooters who have visited

9  your facility has been down since the law has passed, correct?

10 *A.*  That's correct.

11 *Q.*  But, in fact, your shooter visits were down before this law

12 was passed as well, correct?

13 *A.*  On a couple of months, yes.

14 *Q.*  All right.  Well, January 2013 was lower than January of

15 2012, right?

16 *A.*  I would have to look that up.  I believe there were -- I

17 believe my statement was that there was four months since July

18 of 2010 in which the shooter counts went down from one month,

19 one year to the next year.  All the rest went up.  I didn't

20 specify what months.  I'd have to look.

21 *Q.*  Well, January 2013 was lower than January 2012, right?

22 *A.*  Yes, it was.

23 *Q.*  And February 2000 --

24 *A.*  Um --

25 *Q.*  You should feel free to --

459

Douglas Hamilton - Cross

1   A.  March -- you've got to understand, I compile my numbers

2   into a table, as opposed to looking at the individual sheets.

3   Q.  Well, the sheets in front of you would contain the same

4   information, right?

5   A.  Right, same information.

6   Q.  I'd like to ask you a couple of questions about that.  And

7   if you need to refer to Exhibit 39, that's fine.

8   A.  Okay.

9   Q.  January 2013 was lower than January 2012, correct?

10  A.  I could check the numbers.  I don't know offhand.  Some of

11  these are upside down.

12          January of 2013, we had 4,100.  For some reason, a

13  month is missing in the descriptor here.  I don't know which

14  months these are.

15  Q.  You know, it will help you if you take a look at the

16  printed date that -- at the bottom right-hand corner of these

17  pages.

18  A.  Here it is.  January 2012 is shooter count is 42.  So it

19  went down in January of 2013 versus January of 2012, yes.

20  Q.  And March 2013 was significantly down from March 2012,

21  right?

22  A.  That is my recollection.

23  Q.  And April 2013 was down from April 2012?

24  A.  I believe that is correct.

25  Q.  And May 2013 was slightly down from May 2012?

Douglas Hamilton - Cross

1    A.   I believe that is correct.  One of those months was even,

2    one shooter count different.  And I believe it was October of

3    2013 that was actually up.  All the other months were down.

4    Q.   That's correct.  October 2013 was higher than October of

5    2012, right?

6    A.   That is correct.

7    Q.   Okay.

8    A.   By about 3 percent, I believe.

9    Q.   And October 2013 was after these laws were passed?

10   A.   That's correct.  It is the only month after the law was

11   passed that we have increased shooter count.

12   Q.   Now, a huge number of factors affect your shooter numbers,

13   right?

14   A.   I'm sorry?  Say again.

15   Q.   A huge number of factors affect your shooter numbers,

16   right?

17   A.   There is quite a few, yes.

18   Q.   All right.  Weather plays a role?

19   A.   Weather plays a role.

20   Q.   The economy plays a role?

21   A.   Not necessarily in the way you believe.

22   Q.   Well, it does play a role, doesn't it?

23   A.   It certainly plays a role, yes.

24   Q.   And current events play a role, right?

25   A.   Certainly.

Douglas Hamilton - Cross

1   Q.   In fact, it is difficult for you to say specifically what

2   accounts for the decrease in your shooter numbers, right?

3   A.   There is no absolute in our determination of what affects

4   the shooter count.   However, we take the situation as it

5   exists.   All right.

6   Q.   Well, you can't honestly say that the dip in your shooter

7   numbers is attributable to the Colorado legislation, right?

8   A.   Oh, there is no rational way to say that, no.   It's not one

9   factor that causes shooter count drop.

10  Q.   And you can't honestly say, though, that it is attributable

11  to the Colorado legislation, right?

12  A.   That's wrong, I can.   I don't know how much.

13  Q.   Family Shooting Center is not a licensed FFL, correct?

14  A.   That is correct.

15  Q.   And you're familiar with the term FFL?

16  A.   That is federal firearms license, yes.   Anybody who wants

17  to sell a firearm commercially must have an FFL license.

18  Q.   And although you are not an FFL, you do have an FFL that

19  you refer FSC patrons to when they need FFL services, right?

20  A.   That is correct.

21  Q.   And the FFL to whom you refer FSC patrons is performing

22  background checks for private transfers after July 1, 2013?

23  A.   I do not know that.

24  Q.   All right.   Do you still have your deposition in front of

25  you, sir?

Douglas Hamilton - Cross

1    A.   Yes.

2    Q.   I'd like you to turn to page 128.

3    A.   128?

4    Q.   At line 18, were you asked the following questions:

5              Question:  "And do you know whether this gentleman who

6    is an FFL is performing background checks for private transfers

7    since July 1, 2013?"

8              Answer:  "Do I know if he is?"

9              Question:  "Yes."

10             Answer:  "Yes, he is."

11             Did I read that correctly?

12   A.   That is correct -- I answered that question --

13   Q.   I don't have a question pending, sir.

14             You mentioned some shooting competitions this

15   afternoon.  And you are not aware of any CSSA-sanctioned

16   competitions that require competitors to use a large-capacity

17   magazine, correct?

18   A.   I don't believe there are any.

19   Q.   You have not competed in any shooting competitions in more

20   than five years, right?

21   A.   No high-powered and no pistol, but I believe I had one

22   competition of shotgun.

23             MS. SCOVILLE:  I have no further questions.  Thank

24   you.

25             THE COURT:  Thank you.

463

John Cooke – Direct

1               Redirect?

2               *MR. FABIAN:*  No redirect, Your Honor.

3               *THE COURT:*  Thank you.  Can this witness step down and

4    be excused?

5               *MR. FABIAN:*  Ask that the witness be excused, Your

6    Honor.

7               *THE COURT:*  Any objection?

8               *MS. SCOVILLE:*  No, Your Honor.  Thank you.

9               *THE COURT:*  Thank you, sir.  You may step down.  You

10   are excused.

11              Ready to call your next witness?

12              *MR. KOPEL:*  Yes, Your Honor.

13              Your Honor, the plaintiffs would like to call Mr. John

14   Cooke.

15              *THE COURT:*  Please step up and be sworn.

16                 (**JOHN COOKE, PLAINTIFFS' WITNESS, SWORN**)

17              *COURTROOM DEPUTY:*  Please be seated.

18              Please state your name and spell your first and last

19   name for the record.

20              *THE WITNESS:*  John Cooke, J-O-H-N, Cooke is C-O-O-K-E.

21                          **DIRECT EXAMINATION**

22   *BY MR. KOPEL:*

23   *Q.*  Good afternoon, Mr. Cooke.  Do you have a job?

24   *A.*  I do.

25   *Q.*  What is that job?

John Cooke – Direct

1   A.   I am the Weld County Sheriff.

2   Q.   Do you have plans to retire from that job?

3   A.   Yes.

4   Q.   And when will you retire?

5   A.   January.  I'm term limited, and my last day will be

6   January 2, I believe.

7   Q.   How long have you been the sheriff?

8   A.   Twelve years -- in my twelfth year.

9   Q.   Okay.  In the course of your official duties, have you ever

10  studied the off-duty use of firearms by your employees and

11  their families?

12  A.   Yes.

13  Q.   Could you describe the circumstances under which you've

14  conducted that study.

15  A.   Absolutely.  We were answering interrogatories from the

16  Attorney General's Office for this case.

17  Q.   You felt you were legally required to conduct this study as

18  part of your official duties?

19  A.   Yes.

20  Q.   Who did you request to answer that survey?

21  A.   We asked all of our POST certified patrol deputies and our

22  commissioned corrections officers.

23  Q.   What time period did that survey cover?

24  A.   From 2004 to 2013, August of 2013, I believe.

25  Q.   Now, were the respondents told to answer for that entire

John Cooke – Direct

1    period in their life, or for only that portion of the ten-year

2    period in which they were employed by the Weld County Sheriff's

3    Office?

4    A.   For the time that we were employed there.

5    Q.   Did the survey cover the personal firearms -- off-duty

6    firearms use of the respondents only, or did it also cover that

7    of their families?

8    A.   It covered both, themselves and their families.

9    Q.   How many people answered the survey?

10   A.   I think the highest number was 230.

11   Q.   What percent of the employees in that class you just

12   mentioned answered the survey?

13   A.   Approximately 80 percent.

14   Q.   Was this a multiple choice survey?

15   A.   No, not multiple choice.  They were asked to give a certain

16   number.

17   Q.   So if -- they were asked if they had done something and how

18   many times?

19   A.   Correct.

20   Q.   So they could answer zero or three or ten or whatever the

21   applicable number was for them?

22   A.   Yes, whatever the applicable number was.

23   Q.   Did the respondents also have the option of, besides

24   supplying the number -- in addition to supplying the number, of

25   adding free-form explanations or details?

466

John Cooke – Direct

1   *A.*  Yes.  They were allowed to fill in the blanks, so to speak.

2   *Q.*  Okay.

3        If I could, I'd like to hand to Mr. Cooke a copy of

4   the survey.

5        *THE COURT:*  For what purpose?

6        *MR. KOPEL:*  So he can read the -- provide us with the

7   answers to the questions.

8        *THE COURT:*  Well, usually a witness does not testify

9   from a document.  Are you seeking to refresh his recollection

10  or --

11       *MR. KOPEL:*  Yes.

12       *THE COURT:*  Would you like to admit the exhibit?

13       *MR. KOPEL:*  Actually, both, Your Honor.

14       *THE COURT:*  Well, okay.  Why don't we start with the

15  laying of foundation in order to admit the exhibit.  And would

16  you please mark this exhibit, but with the next sequential

17  number.

18       *MR. KOPEL:*  Yes.  Your Honor, this exhibit is in the

19  exhibit book, it's No. 9.  So that would be in book No. 3.

20       *THE COURT:*  Oh, well, then he can turn directly to the

21  exhibit.

22       *MR. KOPEL:*  Okay.

23  *BY MR. KOPEL:*

24  *Q.*  Mr. Cooke, would you please read question 1.

25  *A.*  Certainly.  "Since 2004, if employed at the Weld County

467

John Cooke – Direct

1   Sheriff's Office during the incident, how many times have you

2   used a firearm in defense of your home, yourself, or another,"

3   and then in parentheses "armed yourself."

4        *MS. SPALDING:*  Objection, Your Honor.  This is

5   hearsay.

6        *THE COURT:*  Could you speak into the microphone,

7   please.

8        *MS. SPALDING:*  Objection, hearsay, Your Honor.

9        *THE COURT:*  Thank you.  I overrule the hearsay

10  objection.

11  *BY MR. KOPEL:*

12  *Q.*  Mr. Cooke, for question 1, how many answered that?

13  *A.*  200 --

14        *MS. SPALDING:*  Objection, hearsay.

15        *THE COURT:*  Overruled.

16        *THE WITNESS:*  230.

17  *BY MR. KOPEL:*

18  *Q.*  And how many of those indicated an affirmative answer to

19  that first question?

20  *A.*  95.

21  *Q.*  Could you please read question No. 2.

22  *A.*  "Since 2004, if employed at the Weld County Sheriff's

23  Office during the incident, how many times have you displayed a

24  firearm in defense of your home, yourself, or another?"  And

25  then in parentheses, "this includes having your weapon on your

468

John Cooke – Direct

1   belt."

2   *Q.*  And how many people answered that question?

3   *A.*  I think around 230.

4          *THE COURT:*  Mr. Kopel, has this exhibit been admitted?

5          *MR. KOPEL:*  No, it has not.

6          *THE COURT:*  Well, then, we don't read from exhibits

7   into the record.  You need to lay the foundation for exhibit,

8   and then offer it, and then there will be an opportunity for

9   *voir dire* or objection.

10         *MR. KOPEL:*  Okay.

11  *BY MR. KOPEL:*

12  *Q.*  Mr. Cooke, do you recognize Exhibit No. 9 as the survey we

13  discussed earlier?

14  *A.*  Yes.

15  *Q.*  And does it contain an accurate summary of the results, in

16  the first two pages?

17  *A.*  Yes.

18  *Q.*  And does the rest of that exhibit contain the

19  straightforward printout of the answers that were provided by

20  your employees?

21  *A.*  It appears so, yes.

22  *Q.*  Does that exhibit include the alteration from the way it

23  was produced in the interrogatories, in that the affirmative

24  answers, the numbers italicized for a particular response that

25  count as an affirmative answer?

469

John Cooke – Direct

1     *A.*  Yes.

2              *MR. KOPEL:*  Your Honor, we would like to move Exhibit

3     9 into evidence.

4              *THE COURT:*  *Voir dire* or objection?

5              *MS. SPALDING:*  A little bit of *voir dire*, Your Honor.

6              *THE COURT:*  All right.

7              *MS. SPALDING:*  Good morning -- afternoon, Sheriff.

8              *THE WITNESS:*  Good afternoon.

9              *MS. SPALDING:*  You didn't prepare that survey, did

10    you?

11             *THE WITNESS:*  No, I did not.

12             *MS. SPALDING:*  And do you know who did?

13             *THE WITNESS:*  Yes, I do.

14             *MS. SPALDING:*  It was your counsel; isn't that

15    correct.

16             *THE WITNESS:*  I'm sorry?

17             *MS. SPALDING:*  Was it your counsel who compiled that

18    survey?

19             *THE WITNESS:*  No, it was not.

20             *MS. SPALDING:*  Okay.  Who did prepare the survey, sir?

21             *THE WITNESS:*  Sergeant Gerald Porter with my office.

22    He is our training sergeant.

23             *MS. SPALDING:*  Okay.  And you didn't have any hand in

24    that yourself?

25             *THE WITNESS:*  Not in preparing it.  I did answer it.

John Cooke - Direct

1        *MS. SPALDING:*  Okay.

2        Your Honor, we have a hearsay objection.  Also,

3    Sheriff Cooke has no knowledge.

4        *THE COURT:*  I'm having a problem with these hearsay

5    objections.  Hearsay is an out-of-court statement offered for

6    the truth of the matter asserted.  What is the fact here that

7    is being offered for the truth of the matter asserted?

8        *MS. SPALDING:*  This document is a compilation of

9    responses from officers or employees of the Weld County

10   Sheriff's Office and the -- all of these statements made by

11   employees of the Weld County Sheriff's Office are being offered

12   for their truth, and the 10106 exhibit is a compilation of

13   these statements.

14       *THE COURT:*  Okay.  So you believe this is being

15   offered for the truth of how many officers, for instance, in

16   response to question No. 1, have used a firearm in defense of

17   your home, yourself, or another?

18       *MS. SPALDING:*  I believe this is being offered for --

19   out of 230 -- the question 1, for instance, out of 230 answers,

20   95 indicated the respondent had used a firearm defensively at

21   least one.  It's a compilation of the responses from employees

22   of the Weld County Sheriff's Office.

23       *THE COURT:*  All right.  Response.

24       *MS. SPALDING:*  Also, Your Honor -- I'm sorry.  Sheriff

25   Cooke doesn't have any personal knowledge, and there is no

471

John Cooke - Direct

1    foundation for his testimony.

2           THE COURT:  All right.  Response.

3           MR. KOPEL:  Well, the foundation is that this was

4    compiled under Mr. Cooke's supervision, and he was the one who

5    was responsible for putting it together and delivering it to me

6    pursuant to his discovery obligations.  So certainly is quite

7    familiar with it.

8           The -- the survey in a technical sense can be

9    considered hearsay.  But the Tenth Circuit has three precedents

10   where they have accepted hearsay -- have accepted properly

11   conducted surveys under the residual exception to the hearsay

12   rule.  The *Brunswick Corp. v. Spinit Reel* in 1987, *Harolds*

13   *Stores v. Dillard Department Stores* in 1996, and going back all

14   to the way back to *Randy's Studebaker Sales* in 1976.  So, in

15   general, certainly in the Tenth Circuit, surveys are well

16   established as a -- under the residual exception to the hearsay

17   rule.

18           THE COURT:  Reply.

19           MS. SPALDING:  I believe the residual exception that

20   Mr. Kopel is referring to, if I have -- if I have the right

21   section, indicates that these statements are admissible only

22   if, before trial or hearing the proponent gives adverse party

23   reasonable notice of the intent to offer the statement as

24   particular, including the declarant's name and address, so that

25   the parties have a fair opportunity to meet it.  I think we can

John Cooke - Direct

1    agree that was not gone here.

2           MR. KOPEL:  Your Honor, I'd suggest we can disagree on

3    that.  It's in Exhibit 9.  On the notebook, we have been

4    sending them, they have had copies of this for the past week,

5    including multiple copies as we refined and made sure the

6    numbers were correct.  And the proponent of the evidence,

7    Mr. Cooke, his name and address have been known to the -- it

8    was identified in the exhibit book, that he would be the

9    proponent of it.  And his name and address have been known to

10   the defendant ever since this case was filed and we did our

11   initial disclosures, which included the name and address of

12   Mr. Cooke.

13           MS. SPALDING:  If I could, Your Honor.

14           THE COURT:  You may.

15           MS. SPALDING:  Sheriff Cooke is not the declarant.  He

16   may be the proponent, but he's not the declarant.  There are a

17   lot of declarants, over 200, it would appear.  So I don't

18   believe that the survey here that plaintiffs seek to admit is

19   admissible under this exception to the hearsay rule.

20           THE COURT:  All right.  Thank you.

21           The parties apparently agree that this is hearsay.

22   I'm not so sure it is, because I'm not really so sure that it

23   says what they think it says.  But assuming that it's not

24   hearsay, this witness is not competent to lay the foundation

25   for the admission of this exhibit.  This witness has not

473

John Cooke – Direct

1    testified as to the regularity with which this particular

2    survey was conducted, nor is it apparent that he has that

3    knowledge.

4            In order for the residual exception to the hearsay

5    rule to apply, there must be other indicia of reliability, and

6    there is none shown here.

7            I sustain the objection.

8            MR. KOPEL:  Thank you, Mr. Cooke.  No further

9    questions.

10           THE COURT:  Cross-examination?

11           MS. SPALDING:  I have no questions, Your Honor.

12           THE COURT:  Can this witness step down and be excused?

13           MR. KOPEL:  May the witness be excused?

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16           All right.  We're close to 5 o'clock, so this might be

17   a convenient time for us to recess for the day.

18           Yes, sir.

19           MR. GROVE:  I just had one housekeeping question that

20   I wanted to ask.

21           THE COURT:  Okay.

22           MR. GROVE:  Tomorrow morning, Dr. Kleck, one of the

23   plaintiffs' experts, is going to be testifying.  And as part of

24   the 702 portion of my cross-examination of him, since, as Your

25   Honor knows, those have been combined into this proceeding, I

John Cooke - Direct

1   have a number of documents I'm going to need solely for the

2   purpose of impeaching the first and second -- the second and

3   third prong of the 702 test, the methodology and the amount of

4   facts and data that he relied upon.

5          Would you like those marked -- I don't want them

6   admitted.  They're solely for the purpose of impeaching.  Would

7   you like those marked as exhibits ahead of time, or can we use

8   them without being marked?

9          THE COURT:  Well, the question is whether or not

10  you're going to ask me to consider those for purposes of

11  evaluating the expert's qualifications or other grounds on

12  which you object.  If you want me to consider the contents of

13  those documents, then this really is not impeachment.  What it

14  is, is the 702 determination, and we probably should admit

15  them.

16         If you're not concerned about the contents of those

17  documents, you're not using an out-of-court document for some

18  purpose here, then we probably don't have to admit them.

19         What's your pleasure?

20         MR. GROVE:  No -- I mean, the question for me is

21  whether they were considered, not what they say.  We will read

22  into the record what they say, and so --

23         THE COURT:  Well, we've got a little problem in

24  reading documents into the record.

25         MR. GROVE:  Okay.

475

John Cooke - Direct

1          THE COURT:  You either admit the documents or we don't

2   admit the documents.

3          MR. GROVE:  Okay.

4          THE COURT:  So, again, I would be real mindful of how

5   you want to use these particular documents.

6          MR. GROVE:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Anything else we need to address before we recess for

9   the afternoon?

10          MR. WESTFALL:  No.

11          THE COURT:  Okay.  I'll look forward to seeing you all

12   at 8:30 tomorrow morning.  We'll stand in recess until then.

13          (Recess at 4:51 p.m.)

14                    REPORTER'S CERTIFICATE

15


16       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

17

18       Dated at Denver, Colorado, this 22nd day of May, 2014.

19                              s/Therese Lindblom

20          _____

21                    Therese Lindblom,CSR,RMR,CRR

22

23

24

25

John Cooke – Direct

1                            **INDEX**

2      **Item**                                              **Page**

3

       TERRY MAKETA
4           Direct Examination By Mr. Kopel             245
            Cross-examination By Ms. Spaulding          259
5           Redirect Examination By Mr. Kopel           278
       ELISA DAHLBERG
6           Direct Examination By Mr. Westfall          280
            Cross-examination By Ms. Spalding           291
7      DYLAN HARRELL
            Direct Examination By Mr. Westfall          307
8           Cross-examination By Ms. Morrill            324
       MASSAD AYOOB
9           Direct Examination By Mr. Colin             332
       DAVE GILL
10          Direct Examination By Mr. Fabian            403
            Cross-examination By Ms. Scoville           415
11          Redirect Examination By Mr. Fabian          424
            Examination By Mr. Fabian                   427
12          Examination By Ms. Scoville                 428
       DOUGLAS HAMILTON
13          Direct Examination By Mr. Fabian            429
            Cross-examination By Ms. Scoville           449
14     JOHN COOKE
            Direct Examination By Mr. Kopel             464

15

16

17

18

19

20

21

22

23

24

25