THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION,
COLORADO FARM BUREAU,
NATIONAL SHOOTING SPORTS FOUNDATION,
MAGPUL INDUSTRIES,
COLORADO YOUTH OUTDOORS,
USA LIBERTY ARMS,
OUTDOOR BUDDIES, INC.,
WOMEN FOR CONCEALED CARRY,
COLORADO STATE SHOOTING ASSOCIATION,
HAMILTON FAMILY ENTERPRISES, INC.,
d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
DAVID STRUMILLO,
DAVID BAYNE,
DYLAN HARRELL,
ROCKY MOUNTAIN SHOOTERS SUPPLY,
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
BURRUD ARMS INC. D/B/A JENSEN ARMS,
GREEN MOUNTAIN GUNS,
JERRY'S OUTDOOR SPORTS,
SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS,
JOHN B. COOKE,
KEN PUTNAM,
JAMES FAULL,
LARRY KUNTZ,
FRED JOBE,
DONALD KRUEGER,
STAN HILKEY,
DAVE STONG,
PETER GONZALEZ,
SUE KURTZ,
DOUGLAS N. DARR,

    Plaintiffs,

vs.

JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT - DAY FIVE

_____

1    Proceedings before the HONORABLE MARCIA S. KRIEGER,

2  Judge, United States District Court for the District of

3  Colorado, continuing at 8:38 a.m., on the 4th day of April,

4  2014, in Courtroom A901, United States Courthouse, Denver,

5  Colorado.

6

7                    **APPEARANCES**

8     RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
   at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9  Denver, Colorado, 80202, appearing for the Plaintiffs.

10    DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
   555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11 for the Plaintiffs.

12    MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
   P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13 appearing for the Plaintiffs.

14    ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
   Street, Castle Rock, Colorado, 80104, appearing for the
15 Plaintiffs.

16    DAVID BENJAMIN KOPEL, Attorney at Law, Independence
   Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17 appearing for the Plaintiffs.

18    MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
   SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19 General, Colorado Attorney General's Office, Ralph L. Carr
   Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20 80203, appearing for the Defendant.

21

22

23

24           THERESE LINDBLOM, Official Reporter
          901 19th Street, Denver, Colorado 80294
25      Proceedings Reported by Mechanical Stenography
            Transcription Produced via Computer

**P R O C E E D I N G S**

1    THE COURT:  We are reconvened today in Case No.

2    13-cv-1300.  This is the fifth day of trial.

3    For today's proceedings, could I have your entries of

4    appearance.

5    MR. WESTFALL:  Good morning, Your Honor.  Richard

6    Westfall and Mr. Peter Krumholz on behalf of David Bayne, Dylan

7    Harrell, Outdoor Buddies, Inc., Colorado Farm Bureau, Women for

8    Concealed Carry, and Colorado Youth Outdoors.

9    THE COURT:  Good morning, welcome.

10   MR. KOPEL:  Good morning, Your Honor.  David B. Kopel

11   on behalf of David Strumillo, John B. Cooke, Ken Putnam, James

12   Faull, Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey,

13   Dave Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

14   And I'm happy to inform you that my wife of 27 years,

15   Jennifer, is visiting us in the courtroom today.

16   THE COURT:  Good morning, welcome.

17   MR. COLIN:  Good morning, Your Honor.  Mark Colin

18   appearing on behalf of the licensed firearms dealers.

19   THE COURT:  Good morning, welcome.

20   MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian

21   appearing on behalf of Hamilton Family Enterprises and Colorado

22   State Shooting Association.

23   THE COURT:  Good morning, welcome.

24   MR. GROVE:  Matthew Grove, Your Honor, on behalf of

1    the defendant.  With me at counsel table is Stephanie Scoville,

2    LeeAnn Morrill, Kathleen Spalding, and our advisory witness,

3    Jeffrey Zax.

4         *THE COURT:*  Good morning, welcome.  Are you all ready

5    to proceed?

6         *MR. COLIN:*  Plaintiffs are ready, Your Honor.

7         *MR. GROVE:*  When we left off, Dr. Kleck was in his

8    cross-examination.  We'd ask that he be recalled to the stand.

9         *THE COURT:*  Thank you.

10        Dr. Kleck, would you please return to the stand.  You

11   remain under oath.

12        (**GARY KLECK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**)

13                    **CROSS-EXAMINATION CONTINUED**

14   *BY MR. GROVE:*

15   *Q.*  Good morning.

16   *A.*  Good morning.

17   *Q.*  When we left off on Wednesday, we were discussing a study

18   by Dr. Koper published in 2003, that looked at a comparison

19   between gun assaults with revolvers and gun assaults with

20   semiautomatics.  Do you recall that?

21   *A.*  Yes.  I do.

22   *Q.*  And Dr. Koper found that assaults that were committed with

23   semiautomatic pistols resulted in 15 percent more injured

24   persons than assaults that were committed with revolvers,

25   right?

1  *A.*  Yes.

2  *Q.*  But it's your opinion that this finding has no bearing on

3  Colorado's law because criminals only rarely fire anywhere

4  close to 15 rounds; is that right?

5  *A.*  Right.  It only affects the number of surplus rounds, by --

6  I mean, unused -- by that I mean, unused.

7  *Q.*  Let's talk about the flip side of this issue, self-defense.

8  You've opined that limits on magazine capacity will impair the

9  ability of law-abiding citizens to engage in self-defense,

10  right?

11  *A.*  Yes.

12  *Q.*  And that's because, in your view, it may sometimes be

13  necessary for someone engaging in self-defense to discharge

14  large numbers of rounds?

15  *A.*  Could you say that again, please.

16  *Q.*  Sure.  That's because, in your view, it may occasionally be

17  necessary for someone engaging in self-defense to discharge

18  large numbers of rounds?

19  *A.*  Yes.

20  *Q.*  And by "large numbers of rounds" here, you would mean more

21  than 16?

22  *A.*  Sixteen or more.

23  *Q.*  Well, just so we're on the same page here, Colorado's

24  magazine limit is 15, correct?

25  *A.*  You could have one in the chamber.  I see where you're

1  going.  Yes, more than 16.

2  Q.  And you conducted research on defensive gun use, right?

3  A.  Yes.

4  Q.  And you're also familiar with the literature on the topic

5  of defensive gun use?

6  A.  Yes.

7  Q.  The vast majority of defensive gun uses don't involve the

8  gun actually being fired at all, correct?

9  A.  Well, I don't know vast majority; but certainly majority.

10  Q.  Do you have a percentage?

11  A.  That don't involve gun being fired?  Yeah, it's something

12  like two-thirds, something like that.

13  Q.  Well, you testified on direct, didn't you, in your

14  defensive gun use study in 1995, approximately 17 percent of

15  the individuals who were -- who discharged firearms fired at

16  somebody; is that right?

17  A.  No.  The -- it's 17 percent of all defensive gun uses

18  involved the gun being fired at trying to shoot somebody.

19  Q.  Then another --

20  A.  The base is the total number of defensive gun uses.

21  Q.  And, then, another about 8 1/2 percent involved warning

22  shots?

23  A.  Yes.  More like a quarter, I guess.

24  Q.  Okay.  So about 75 percent of defensive gun uses don't --

25  A.  Sure, yeah.

1  *Q.*  Just so the record is clear.  About 75 percent of defensive

2  gun uses do not involve shots being fired at all?

3  *A.*  That's correct.

4  *Q.*  And, in addition, defensive gun uses almost never involve

5  gunfights or shootouts with both parties shooting at each

6  other.

7  *A.*  Correct.

8  *Q.*  And you're not aware of any empirical studies that attempt

9  to track the number of rounds fired by individuals defending

10 themselves, are you?

11 *A.*  Yes.  I'm not aware of any such studies.

12 *Q.*  As a criminologist, you generally keep track of the crime

13 news, right?

14 *A.*  Of the crime what?

15 *Q.*  Of the crime news?

16 *A.*  News?  Not really, no.  I don't pay much attention to the

17 news.

18 *Q.*  You did a review of news articles for the purpose of this

19 case, right?

20 *A.*  Yes, I did.

21 *Q.*  And you probably had to sift through a large amount of news

22 articles in order to get to the results of that study, right?

23 *A.*  Yes.

24 *Q.*  And your -- as you sit here today, are you able to identify

25 a single incident in which a civilian crime victim was required

1  to expend more than 16 rounds to defend themselves?

2  *A.*  In connection with this case, or ever?

3  *Q.*  Ever.

4  *A.*  I have vague recollections.  I didn't gather that data for

5  the purposes of this case, but I have vague recollections of

6  people firing large numbers of rounds in connection with riots,

7  you know, where people were shooting at would-be looters, and

8  civil rights cases where people shot at large numbers of

9  rioting racist whites who were threatening blacks.  But I

10  wouldn't be able to recite the exact dates or names or

11  anything, and it certainly is not a basis for my conclusions in

12  this case.

13  *Q.*  So you're not able to identify a single case as you sit

14  here today?

15  *A.*  No.  I couldn't provide you that kind of detail.

16  *Q.*  Are you able to identify a single incident in which a

17  civilian crime victim fired more than ten rounds in

18  self-defense?

19  *A.*  No.  Because there is no data on it one way or another.  No

20  matter how many of that type of incident there were, there is

21  just no research on it, so we can't say one way or another.

22  *Q.*  Surely there is data somewhere, right?

23  *A.*  No, probably not.  You'd have to go out and get it.

24  Somebody would have to make an affirmative effort to gather the

25  data, rather than it just be sitting around.  In fact,

1  normally, the only thing you'd have is police data on that sort

2  of incident.  But they probably wouldn't be all that interested

3  in recording what the victim did; they're more interested in

4  making a case against the suspect.

5  Q.  It might appear in police data, though, right?

6  A.  I suppose it's remotely possible that every once in a while

7  they might record that, sure.  But it doesn't really go to the

8  issue of, you know, can we make a case against this guy?  Can

9  we provide the state's attorney with evidence to get him

10  convicted?  The suspect, I mean.

11  Q.  Well, sometimes, for example, if you have a gunfight, you

12  need to figure out who shot what, right?  You need to know if

13  the attacker fired the round or if the defendant fired the

14  round?

15  A.  Yes.

16  Q.  And so in that sort of situation, you would want to figure

17  out exactly who fired what?

18  A.  Possibly, but it's really outside the area of my expertise.

19  Q.  In your opinion, guns are used by civilians to defend

20  themselves in America more than 1 million times every year?

21  A.  Not every year, but I'd guess the average in recent years

22  would be in the vicinity of 1.2 million.

23  Q.  About 25 percent of those involve people actually firing a

24  gun in self-defense?

25  A.  Yes -- well, yeah, yes.

Gary Kleck - Cross

1    *Q.* That's about -- off the top of my head, about 300,000 times

2    per year --

3    *A.* Yes.

4    *Q.* -- a civilian fires a gun in self-defense?

5    *A.* Yes.

6    *Q.* And a person who uses a gun in self-defense is less likely

7    to be injured than someone who uses a lesser weapon, correct?

8    *A.* Yes.

9    *Q.* Or no weapon at all?

10   *A.* Yes.

11   *Q.* But you're not aware of any studies that discuss whether

12   the victim must fire his gun in self-defense at all, how many

13   shots are necessary in order for that to be effective?

14   *A.* That's correct.

15   *Q.* I'd like to talk about what mass shooters need in order to

16   injure or kill their victims.  Your opinion is that

17   large-capacity magazines don't make a difference in most mass

18   shootings, correct?

19   *A.* Well, I make a stronger assertion than that.  It wouldn't

20   be just a majority; it would be almost all.

21   *Q.* And there are several reasons for that, right?

22   *A.* Yes.

23   *Q.* One of them is that mass shooters usually bring multiple

24   guns?

25   *A.* Yes.

1   *Q.*  And if multiple guns are used, then, in your view, magazine

2   size matters less, right?

3   *A.*  Yes.

4   *Q.*  And even if a mass shooter doesn't bring multiple guns,

5   putting in a new magazine doesn't take all that long?

6   *A.*  That's correct.

7   *Q.*  And to reach this opinion, you analyzed newspaper reports

8   of mass shootings, correct?

9   *A.*  Yes.

10  *Q.*  Those articles reported on incidents from the beginning of

11  1994 through the middle of 2013?

12  *A.*  Correct.

13  *Q.*  And you had some research assistance in locating those

14  articles?

15  *A.*  Yes.

16  *Q.*  The assistant was here in Colorado, right?

17  *A.*  Yes.

18  *Q.*  And you passed instructions to that research assistant

19  through the plaintiffs' attorneys?

20  *A.*  I think so.  Yes, probably.  I think through Mr. Kopel.

21  *Q.*  And those instructions were to locate media accounts of

22  mass shootings, correct?

23  *A.*  Yes.

24  *Q.*  We'll discuss how you define mass shootings in a moment.

25  But, first, you find that media reports are sufficiently

Gary Kleck - Cross

1  accurate for this purpose, right?

2  A.  Yes -- well, I don't know about sufficiently.  I mean, more

3  information is always better.  So it would be better if you had

4  even more information than is contained in media reports.  But,

5  yeah, it's sufficient to establish a minimum number of mass

6  shootings that involved multiple guns or a minimum number that

7  involved multiple magazines and a minimum in number in which

8  the shooter reloaded, and so forth.  So, it's not as good as

9  you would like to have, in that you have definitive information

10  on all of those variables for all the cases; but it is

11  sufficient to establish a minimum.  So it's a baseline, and the

12  true figure would be that or something above.

13  Q.  Well, you found them to be sufficiently detailed to support

14  your expert conclusions in this case?

15  A.  Yes.

16  Q.  And if the media reported that a large-capacity magazine

17  was used, you would have indicated that in your study, right?

18  A.  Yes.

19  Q.  Now, very few of these incidents actually had official

20  reports available, correct?

21  A.  Correct.

22  Q.  There were about three; is that right?

23  A.  Probably something like that, sure.

24  Q.  And if there wasn't some sort of official report, you just

25  relied on what the media said, correct?

1    *A.*   Yes.

2    *Q.*   And that's because media articles are usually based on

3    police reports?

4    *A.*   I'd say almost entirely, yeah.

5    *Q.*   And that's the reason that you didn't independently seek

6    out police reports, right?

7    *A.*   Well, it really isn't a reason.  It would be, maybe, an

8    additional reason.  But the real reason was, the reports

9    wouldn't usually be accessible.

10   *Q.*   You didn't visit the scene of any of these incidents?

11   *A.*   No.

12   *Q.*   You didn't review maps of the layout of the area?

13   *A.*   In one or two cases, where they happened to be available;

14   but it didn't have any bearing on my conclusions either.

15   *Q.*   You didn't interview any of the victims?

16   *A.*   No, certainly not.

17   *Q.*   Any of the witnesses?

18   *A.*   No.

19   *Q.*   You didn't read transcripts of statements that weren't

20   contained in media accounts?

21   *A.*   Well, I can say, if I did, it didn't have any basis -- it

22   was not a basis for my opinions.

23   *Q.*   You didn't speak to any of the law enforcement

24   investigators?

25   *A.*   No.

1  Q.  You didn't interview any of the shooters?

2  A.  No.

3  Q.  No one dissuaded you from doing any of those things, did

4  they?

5  A.  No one dissuaded me from doing it?  No, no one dissuaded me

6  from doing that.

7  Q.  And for the purposes of this study, you established a

8  definition for what qualifies as a mass shooting?

9  A.  Yes.

10  Q.  You just said one criteria, and, actually, it's pretty

11  easy, more than six persons killed or wounded.

12  A.  Well, another -- I don't know if you want to call it a

13  criterion.  It's not my criterion, particularly.  It's a

14  distinction between a mass shooting versus a spree shooting.

15  And that's just -- it's standard criminological distinction.

16  So it had to be more than six victims killed or injured in one

17  location, in one incident, rather than cumulatively more than

18  six over two or three or four locations, which would be a spree

19  killing.

20  Q.  Okay.

21  A.  Although, again, let me caution.  In the initial report I

22  did six months ago, I did erroneously include some spree

23  killings, but didn't mean to.  So I would have -- you know,

24  I've since excluded them.

25  Q.  And the one that you issued six months ago is the one that

1  you submitted in this case?

2  A.  That's correct.

3  Q.  In any event, you didn't exclude incidents that involved

4  more than one shooter, right?

5  A.  No.

6  Q.  You didn't exclude gang violence?

7  A.  No, that could -- I think there was only one like that, so

8  it wouldn't have made any difference.  But, no.

9  Q.  You didn't exclude robberies?

10  A.  No.  Again, that was really rare; but, no, huh-uh.

11  Q.  You didn't exclude incidents in which seven or more people

12  were wounded but no one was killed?

13  A.  No, definitely not.

14  Q.  You were attempting to capture all incidents in which there

15  were seven or more injured or killed?

16  A.  That was my goal.

17  Q.  And there were none that satisfied this test but that you

18  disregarded?

19  A.  I don't understand the question.

20  Q.  If they met all the criteria that we have discussed

21  already, there were none that you said, well, that has some

22  factors that you and I haven't discussed in the last couple of

23  minutes that makes it not qualified for my study?

24  A.  No.  I would never knowingly exclude a case based on the

25  information I had.  Only when I had additional information,

1  would I do that.

2  Q.  And you chose that figure of more than six killed or

3  wounded because a typical revolver holds six shots?

4  A.  Yes.  So the implication is, you could shoot six people

5  without reloading with a very old-style conventional weapon.

6  Q.  The hit rate for mass shootings isn't typically

7  100 percent, is it?

8  A.  No.

9  Q.  In fact, it's a lot less than 100 percent, isn't it?

10  A.  Yes.

11  Q.  You're not the only person to have conducted a study of

12  mass shootings, are you?

13  A.  I am not.

14  Q.  Others select different criteria, right?

15  A.  Yes.  They -- they usually have a criterion based on number

16  of deaths rather than number shot.

17  Q.  So, for example, they might say three killed is something

18  that we would classify as a mass shooting, right?

19  A.  They might.  I don't recall any specific one doing that.

20  That would be an unusual one.  It's most commonly four or more.

21  Q.  Or some --

22  A.  I'm sorry, four or more dead.

23  Q.  Some others might try to take the shooter's intentions into

24  account?

25  A.  In defining it as a mass shooting?

1   *Q.* Well, for example, they might say that it has to be in a
2   public place.

3   *A.* Oh, I see what you mean. Yes, some decided they wanted to
4   only study subsets of mass shootings. It's not that they
5   defined non-public incidents as not mass shootings; they just
6   said, we're only interested in public shootings.

7   *Q.* There are some people who would like to shoot a lot of
8   people, but they don't manage to wound or kill seven or more,
9   right?

10   *A.* Very likely, but we really don't know the true intentions
11   or desires of these shooters. We really can only firmly know
12   what they actually did.

13   *Q.* Well, it seems likely, wouldn't you agree, that if someone
14   were trying to reload the weapon, and they were unable to for
15   some reason, that it would be reasonable to infer that they
16   were intending to shoot more people with it?

17   *A.* Yes, if you knew they really were trying to reload.

18   *Q.* And someone who wants to shoot a lot of people but doesn't
19   manage to get to your threshold of seven or more could fail to
20   get there for a number of reasons, right?

21   *A.* That's correct.

22   *Q.* So he might have bad aim?

23   *A.* Correct.

24   *Q.* Or he might have second thoughts?

25   *A.* Correct.

1  *Q.*  His gun might jam?

2  *A.*  Yes, it might.

3  *Q.*  He might run out of ammunition?

4  *A.*  He might.  Although, I don't know of any incidents where

5  that actually happened.

6  *Q.*  Potential victims might run away?

7  *A.*  Would that affect how many he could shoot?  I don't know of

8  any incidents in which we can be confident that affected the

9  number he could shoot.

10  *Q.*  It's possible, though, right?

11  *A.*  Yes, certainly it's possible.

12  *Q.*  Potential victims might shoot back?

13  *A.*  Certainly, that's a possibility, although I don't recall

14  any incidents like that either.

15  *Q.*  Potential victims might tackle him?

16  *A.*  Yes, definitely.

17  *Q.*  And they might do so after he's emptied his gun and

18  reloading, right?

19  *A.*  They could.

20  *Q.*  In your view, that last scenario is unlikely, right?

21  *A.*  I don't know about unlikely; but certainly in the past 20

22  years, it's been extremely rare.

23  *Q.*  In fact --

24  *A.*  It's happened, maybe, one time -- probably one time, and

25  maybe as many as three times in 20 years.

Gary Kleck – Cross

1  *Q.* And the one time that you cited in your study was in Oregon

2  in 1998, correct?

3  *A.* Yes, that was the most definite one.

4  *Q.* And you reported finding 58 incidents that met your

5  criteria, right?

6  *A.* It's 58 or 59. My confusion is because there was a

7  constantly evolving number, depending on whether I added or

8  subtracted cases that were or were not eligible. So, yes, it's

9  certainly either that –– either 58 or 59.

10  *Q.* Let's turn to Exhibit 44.

11       *COURTROOM DEPUTY:* I'm sorry, you said 44?

12  *BY MR. GROVE:*

13  *Q.* Do you recognize this document?

14  *A.* Yes.

15  *Q.* What is that?

16  *A.* That's an appendix to my expert report.

17  *Q.* And this is the data that you relied on to form the basis

18  for your conclusion about –– conclusions about large-capacity

19  magazine use in mass shootings, correct?

20  *A.* Yes.

21  *Q.* Let's just make sure we all understand how these incidents

22  are reported in this document. And, actually, don't answer

23  that yet.

24       Your Honor, I'd move to have 44 admitted.

25       *THE COURT: Voir dire* or objection?

1        *MR. KOPEL:*  No objection, Your Honor.

2        *THE COURT:*  44 is received.

3        (Exhibit 44 admitted.)

4    *BY MR. GROVE:*

5    *Q.*  Let me ask that question again.  Let's just look at --

6    through Exhibit 44 to make sure we all understand how these

7    incidents were reported.

8        Looking at the first page, under the heading "mass

9    shootings in 1994" -- are you with me?

10   *A.*  Yes.

11   *Q.*  So you start with an article in which the shooting was

12   reported, right?

13   *A.*  Yes.

14   *Q.*  That's identified by the publication?

15   *A.*  Yes.

16   *Q.*  Did you exclude any publications because you're concerned

17   about unreliability?

18   *A.*  I don't recall that ever being necessary.

19   *Q.*  So you didn't get anything from the *National Enquirer* or

20   anything like that?

21   *A.*  No.  I would rarely rely on a single source; and when I

22   did, it was usually some well-respected source like the *New*

23   *York Times* or the *Washington Post*.

24   *Q.*  Something like the Associated Press, would that be

25   reasonable too?

1    *A.*  Yes.

2    *Q.*  Or UPI?

3    *A.*  I don't recall anything using UPI.  I'm not sure it was in

4    existence anymore; but, yeah, that would be an example.

5    *Q.*  Or Reuters, that kind of thing?

6    *A.*  Yes, that would be a respected source.

7    *Q.*  And then moving down this, you then reported the date of

8    the incident?

9    *A.*  Yes.

10   *Q.*  So we see for this first one under mass shootings in 1994,

11   five arrested in shooting at market.  That's the article that

12   you used.  Then the date of the article, which is April 11,

13   1994; then the date of the incident, which is March 31, 1994,

14   correct?

15   *A.*  Correct.

16   *Q.*  Then the number of shooters?

17   *A.*  Yes.

18   *Q.*  And in that case, it was unknown, but up to four.  The

19   number of guns used, correct?

20   *A.*  Yes.

21   *Q.*  And that was unknown in this particular case, right?

22   *A.*  That's correct.

23   *Q.*  Then the types of guns?

24   *A.*  Correct.

25   *Q.*  And the number of magazines?

1    A.   Yes.

2    Q.   If you knew it, of course.  Right?

3    A.   Yes.

4    Q.   And then the magazine capacity?

5    A.   Yes.

6    Q.   The number of shots fired?

7    A.   Yes.

8    Q.   And then you asked, did the offender reload?  Is that

9    right?

10   A.   Yes.

11   Q.   And the source of that still would have been from the

12   article that's identified at the header of each entry?

13   A.   Probably.  Occasionally, I'd have additional sources on

14   maybe one piece of information.  But in this case, I think that

15   was the only source I had, so, yeah.

16   Q.   And then time from start to end.  What does that mean?

17   A.   It means from the start of the shooting to the end of the

18   shooting.

19   Q.   So that means from the first shot to the last shot?

20   A.   That's correct.

21   Q.   And that, again, was reported in the newspaper article?

22   A.   Could you ask that again, please.

23   Q.   The source of that was the article itself?

24   A.   Oh, yes, yes.

25   Q.   So it would say something like, the shooter began firing at

1    9:02 a.m., and his last shot was fired at 9:10 a.m.?

2    *A.* They might.  Although it's more likely they say something

3    like, eyewitnesses reported that the shooting went on for ten

4    minutes, or something like that.

5    *Q.* And then the next entry was, how gun was acquired.  For the

6    purposes of this study, how the gun was acquired, that doesn't

7    really have any bearing on large-capacity magazine use, does

8    it?

9    *A.* I don't think so.  Nothing -- no relevance occurs to me

10   right now.

11   *Q.* And then number killed and number wounded, right?

12   *A.* Yes.

13   *Q.* And so there were 58 incidents that you identified in

14   Exhibit 44, correct?

15   *A.* Okay.  Sure.  It's either 58 or 59.  As I say, it's

16   confusing, depending on whether or not you had a September or

17   August version versus some later version.  The problem is, I

18   really don't pay that much attention to the earlier unrevised

19   versions, I guess you could say.

20   *Q.* Let say 58.  Will you take my word for it?

21   *A.* Sure, I'll take your word for it.

22   *Q.* Turn to page 18, please.  These start at page 13, so the

23   number's at the top right of the page.

24   *A.* Got it.

25   *Q.* Do you see at the very bottom of that page where it says

1  "CNN:  Mental breakdown defense hinted in Georgia school

2  shooting"?

3  *A.*  Yes.

4  *Q.*  The second page -- go through the data we just went

5  through, I see, number wounded, six, number killed, zero.

6  *A.*  Could you say that again.

7  *Q.*  So I'm on page 19.

8  *A.*  Yes.

9  *Q.*  And at the top of that page, carrying over from the

10  previous page, is this, "Mental breakdown hinted in Georgia

11  school shooting."  I'm just asking, does this shooting actually

12  meet your criteria?

13  *A.*  Oh, I see what you mean.  No, it does not.  It doesn't

14  quite meet it because there is six total injured rather than

15  seven.

16  *Q.*  Okay.  So we're at 57, then?

17  *A.*  Sure.

18  *Q.*  And looking through here, just in general, it appears that

19  in many of these shootings, you were unable to determine from

20  the sources that you looked at the capacity of the magazines or

21  the number of magazines used, correct?

22  *A.*  That's correct.  That was probably one of the most lightly

23  reported details.

24  *Q.*  In fact, you reported that magazine size is unknown in 41

25  of the 57 qualifying incidents that you reported?

1    *A.*   Sure.

2    *Q.*   So that means that there is --

3           *MR. KOPEL:*   Objection.   This mischaracterizes his

4    testimony.   I don't think that's what he said at all on direct

5    examination.

6           *THE COURT:*   Noted.

7    *BY MR. GROVE:*

8    *Q.*   Dr. Kleck, would you like a moment to look at your report

9    to count them up?

10   *A.*   Sure.   Can I?

11   *Q.*   Sure.

12   *A.*   Okay.   The number unknown, is that what you're asking?

13   *Q.*   Yes.   Make sure you skip the one that we just discussed.

14   *A.*   All right.   Yeah, I'd accept your count.   You said 41?

15   *Q.*   So that means that there were 16 in which we did know the

16   magazine capacity?

17   *A.*   That would be 17, I guess.

18   *Q.*   57 minus 41 is --

19   *A.*   I thought we were at 58 total.

20   *Q.*   Right.

21   *A.*   Oh, I'm sorry, but we excluded the one with six rounds.   I

22   see, yes.   My answer is yes, then.

23   *Q.*   So based on your report, 75 percent of the mass shootings

24   in which we know the magazine capacity involved a

25   large-capacity magazine, correct?

1    *A.*  Large capacity defined as over 15 rounds?

2    *Q.*  Correct.

3    *A.*  I'm not prepared to answer that question.  I really didn't

4    figure it that way.

5    *Q.*  Well, it's in your report, right?

6    *A.*  I don't recall it being in the report, no.  Could I see the

7    page where it was, to refresh my recollection?

8    *Q.*  Sure.  You can take a look, or we can go through if you'd

9    like.

10   *A.*  Yeah, let's go through it.

11   *Q.*  Okay.  So let's look first at page 15.  Are you there?

12          *COURTROOM DEPUTY:*  Volume I of his deposition?

13          *MR. GROVE:*  No, we're still on Exhibit 44.  I'm sorry.

14          *THE WITNESS:*  In here?

15   *BY MR. GROVE:*

16   *Q.*  Yeah, page 15, Exhibit 44.  This is the -- not the 15th

17   page, but the page with "15" on top of it.

18   *A.*  That's just part of the appendix.

19   *Q.*  Correct.

20   *A.*  Is that all you're asking about?

21   *Q.*  Yes.

22   *A.*  In the appendix, page 15.  That's not going to have

23   anything on what you just asked about.

24   *Q.*  My question was how many -- maybe I just asked a bad

25   question.  If I did, I apologize.  My question is this:  In the

1   appendix, you identified 16 shootings for which you said the

2   magazine capacity was known, correct?

3   *A.*   I take your word for that.  Sure, I'll accept that.

4   *Q.*   And in those 16 incidents, you reported the magazine

5   capacity in -- well, in all 16 of them.  And for 12 of them,

6   the shooter used a magazine that was 16 rounds or larger,

7   correct?

8   *A.*   Again, see, that's not in any one page.  I would either

9   have to count that up, or I would have to consult the main text

10   of the expert report, assuming it had it in it.  I didn't

11   calculate the numbers that way.  You're, basically, asking me

12   for a new topic.

13   *Q.*   That's because you didn't think that magazine capacity was

14   important to whether a mass shooter was successful or not?

15   *A.*   No.  I just thought of it in a different way than you're

16   framing the issue.  I thought of it in terms of the various

17   sources I used, not just the news media sources, were well

18   motivated to identify it when a large-capacity magazine was

19   involved.  And then I was interested in the ones that were

20   known to be large-capacity magazines, what characteristics did

21   they have?  Because those were the incidents where we could be

22   confident there might have been an influence on the number

23   casualties on the use of these larger-capacity magazines.

24   *Q.*   Let's get --

25   *A.*   But at no point would I have been interested in what you

1  were asking me about.

2  *Q.* We'll get back to the numbers in a moment. I'm just

3  curious about something you just said. You said the news

4  sources were well motivated. Why would the *Washington Post* be

5  motivated to report the magazine capacity involved in that

6  shooting?

7  *A.* I didn't say just the news sources would be well motivated,

8  because I didn't rely on the news sources. I also relied on

9  five other sources, most of which were, basically, entities

10 that had a position on this issue, they favored bans or

11 limitations on magazine capacities. And so those are the ones

12 that are well motivated to report if it had a larger capacity

13 magazine involved. They would include, like, a liberal

14 political magazine like *Mother Jones*; the Violence Policy

15 Center, which is -- advocates limits on magazine capacity;

16 Mayors Against Illegal Guns, which also advocates the same

17 thing.

18        So my assumption -- and I suppose it could be

19 challenged -- is, these organizations made a great deal of

20 effort to locate all the mass shootings they could in which a

21 large-capacity magazine. And then I was interested in the

22 known cases, what are they like? Do people use multiple guns,

23 multiple magazines, and so on? That's why I really didn't see

24 it in the terms you're asking about.

25 *Q.* Well, you submitted -- you're an expert in several other

1    cases.  I think we established that on Wednesday, correct?

2    *A.*  Yes.

3    *Q.*  And in the Sunnyvale case in the Northern District of

4    California, you submitted a declaration -- two declarations, in

5    fact, in support of the motion for summary judgment in that

6    case, correct?

7    *A.*  Yes.

8    *Q.*  And in that declaration, you said as follows -- tell me if

9    I'm wrong.  For your study, you assumed that, quote, if an LCM

10   had in fact been used in a mass shooting, that at least one

11   available news account would have reported that fact,

12   especially in light of the editorial policies of so many news

13   outlets favoring bans on LCMs.

14   *A.*  Yes.  That would be an additional reason why we would be

15   likely to know about if they had, in fact, used a

16   large-capacity magazine.

17          You mentioned the *Washington Post* in particular.  And

18   the *Washington Post* has a very strong editorial policy on gun

19   control in general and, certainly, in favor of limits on

20   magazine capacity.  But that's not true of all the news

21   outlets.  I mean, you know, wire services, for example, that

22   would be irrelevant for them.  They wouldn't have an editorial

23   policy.

24   *Q.*  And is that true for the *New York Times* as well?

25   *A.*  Yes, but I don't think it's going to influence their news

1    reporting as much.  I have a lot of respect for their news

2    reporting.  And I don't think it's influenced by the editorial

3    policy to the same degree that, let's say, a less reputable

4    outlet would.

5    *Q.*  In any event, you assumed if a large-capacity magazine was

6    used, the media would have reported it, correct?

7    *A.*  If they knew about it, yes.  And they would be very well

8    motivated, partly because it's a detail that they think is

9    important.

10   *Q.*  Let's go back to the numbers.  It sounded like you were not

11   prepared to agree with my calculation that 12 of the 16

12   incidents in which we knew the large capacity -- sorry -- in

13   which we knew the magazine capacity based on your report

14   involved a large-capacity magazine.  Correct?

15   *A.*  You're going to have to repeat that again.  That's a

16   complicated sentence.

17   *Q.*  We've already established that the magazine capacity was

18   reported as unknown in 41 of the 57 incidents.

19   *A.*  Okay.

20   *Q.*  That means that we have 16 in which we know the magazine

21   capacity, correct?

22   *A.*  Correct.

23   *Q.*  And in 12 of those, the magazine capacity reported in your

24   report exceeded 15 rounds.

25   *A.*  Again, I -- my -- I'd be willing to accept your assertion,

1 but I don't recall testifying to that in prior testimony or

2 mentioning it in my expert report.  So . . .

3 *Q.*  Okay.  Let's go through it.

4         So, let's start with page 15, here, on Exhibit 44.  So

5 in the middle of page 15, we see, "Man to be executed Friday

6 for plant shootings."  Do you see that?

7 *A.*  Yes.

8 *Q.*  That says, capacity of magazines, eight rounds.  Right?

9 *A.*  Yes.

10 *Q.*  That's one in which large-capacity magazines were not used.

11 *A.*  Correct.

12 *Q.*  Please turn to page 17.  Top of the page, the *New York*

13 *Times* article, starts with, "From wild talk and friendship."

14 Do you see that?

15 *A.*  Yes.

16 *Q.*  Capacity of magazines, 30 rounds, correct?

17 *A.*  Correct.

18 *Q.*  Page 22, halfway down the page, "A deadly turn to a normal

19 workday."  Do you see that?

20 *A.*  Yes.

21 *Q.*  Capacity of magazines, 30, correct?

22 *A.*  Correct.

23 *Q.*  Page 24, under the heading "Mass Shooting in 2004, suspect

24 says hunter shot at him first."  Do you see that?

25 *A.*  Yes.

Gary Kleck - Cross

1    *Q.*   Capacity of magazine, ten rounds?

2    *A.*   Yes.

3    *Q.*   So that's two each so far, correct?

4    *A.*   Correct.

5    *Q.*   Page 28.  This is the Virginia Tech shooting.  Top of the

6    page, it says 10 or 15 rounds, correct?

7    *A.*   Correct.

8    *Q.*   So that's three non-large-capacity magazines and two

9    large-capacity magazines.

10         Next one down, "Computers may yield clues about mall

11   shooter."  Capacity of magazines 30 rounds, correct?

12   *A.*   Correct.

13   *Q.*   Three-three.  Page 30.  I'm just curious about this one,

14   because this is in your unknown category.  I'm --

15   *A.*   Yeah, the "unknown" shouldn't be there.  The parenthetical

16   information is what I would go on.

17   *Q.*   Okay.  So that one would be --

18   *A.*   That would be large capacity, yes.

19   *Q.*   Yeah.  So page 32.  The last entry on that page, shooting

20   in Binghamton, New York.  Capacity of magazine, 30, correct?

21   *A.*   Right.

22   *Q.*   The next page, 33.  It's the Fort Hood shooting.  Capacity

23   of magazines, 20 to 30, correct?

24   *A.*   That's correct.

25   *Q.*   That's five LCMs, three not LCMs, so we're all keeping

1    track -- six, I'm sorry.

2          Page 34, Associated Press, "Police report no racism

3    for Connecticut shootings."  Capacity of magazines, 17 rounds,

4    right?

5    *A.*  Right.

6    *Q.*  So that's seven.  Next page, 35, Tucson shooting.  That's

7    capacity of magazines, two by 33 and two by 15, correct?

8    *A.*  Correct.

9    *Q.*  That's eight.  Next page, 36, capacity of magazines is one

10   by 12 rounds.  So that's not a large-capacity magazine, right?

11   *A.*  Right.

12   *Q.*  So that's four.  And then next entry, "Gunman kills three,

13   wounds others at Nevada IHOP," and that is two 30-round

14   magazines, correct?

15   *A.*  Right.

16   *Q.*  Nine.  Page 38, *Denver Post*, this is the Aurora theater

17   shooting, one 100-round drum.  So that qualifies as an LCM,

18   right?

19   *A.*  Right.

20   *Q.*  Next entry, *Los Angeles Times*, Sikh temple shooting.

21   Capacity of magazines, 19, correct?

22   *A.*  Correct.

23   *Q.*  That's 11.

24   *A.*  How many did you say?

25   *Q.*  We're at 11.  And then *New York Times*, "Children all shot

1  multiple times with semiautomatic."  I'm on page 39.  This is

2  the Newtown shooting.  And capacity of magazines is ten by 30

3  round.  So that's 12, correct?

4  *A.*  Correct.

5  *Q.*  So 16 total shootings, 12 of them involved large-capacity

6  magazines, 4 did not?

7  *A.*  Yeah, I'll accept that.  I don't recall report -- reporting

8  it in my expert report, because I had no interest in that.

9  *Q.*  Sure.  You don't deem that important.  I understand that.

10  *A.*  Pardon?

11  *Q.*  You don't deem that important.  I understand that.

12  *A.*  Right.  Right.  I mean, it's irrelevant to any of my

13  opinions, as far as I know, unless you can suggest some other

14  relevance.  But my assumption is, it's precisely because it's a

15  large-capacity magazine that it becomes newsworthy.  So, of

16  course, the majority of what gets reported will be

17  large-capacity magazines.  But it's an indication of what is

18  newsworthy versus what is not.

19  *Q.*  Well, let's look and see if there are any other sources

20  that might report magazine size.

21      I mean, I think that we should talk about whether your

22  methodology, looking at newspaper articles, was appropriate.

23  Although, before I do that, I'd like to go back, just to page

24  13 of this exhibit, which is the very first page.

25      This is another one I'm confused about.  Because in

1  the notes, it says -- it mentions on the very last line a

2  70-round magazine; but in the body, it says that the capacity

3  of the magazines was unknown.  Which one is it here?

4  *A.*  Well, it would be unknown, because the 70-round magazine

5  was simply something that was acquired.  What I was counting is

6  magazines that have something to do with the shooting.  And the

7  way we defined that was, if it was in the immediate possession

8  of the shooter.  So . . .

9        *MR. GROVE:*  Your Honor, I mentioned the other day that

10  we had a series of impeachment exhibits that we'd like to put

11  in front of this witness.  I put them in notebooks for the ease

12  of everyone's reference.

13        *THE COURT:*  And what would you like to do at this

14  point?

15        *MR. GROVE:*  I'd like to provide them to counsel, the

16  Court, and the witness.

17        *THE COURT:*  Fine.  You can provide them to counsel,

18  and you can provide them to Mr. Keech.  Whether the witness

19  needs them at this time is not clear.

20  *BY MR. GROVE:*

21  *Q.*  If you could turn to the first page of this notebook that

22  has just been handed to you, sir.

23        *THE COURT:*  It hasn't yet been handed to him.  Why

24  don't you let me know what it is you intend to do with these.

25  Admit them as exhibits?

1    MR. GROVE:  For the purpose -- so, this portion of

2  what I'm going to do goes to the 702 challenge.

3    THE COURT:  Okay.

4    MR. GROVE:  And so we're going to go through a series

5  of documents that I'm going to use to challenge Dr. Kleck's

6  methodology and the amount of data that he considered in

7  reaching his conclusions in this report.

8    THE COURT:  All right.  In most 702 hearings, they're

9  conducted under Rule 104 of the Federal Rules of Evidence; and

10  as a consequence, the rules of evidence do not apply in 104

11  hearings.

12    For purposes of this discrete examination involving

13  these exhibits, does the -- do the plaintiffs have any

14  objection to suspension of the rules of evidence?

15    MR. KOPEL:  We don't support the suspension of the

16  rules of evidence in this case.

17    THE COURT:  I understand you don't support it.  The

18  question is, do you oppose it?

19    MR. KOPEL:  Yes.

20    THE COURT:  All right.  Would you please make your

21  argument.

22    MR. KOPEL:  That this -- these --

23    THE COURT:  Would you speak into the microphone,

24  Mr. Kopel.

25    MR. KOPEL:  Certainly, Your Honor.

1    Based on having 30 seconds to review what plaintiff

2  has, these duplicate something that plaintiff -- these are

3  selected from something which plaintiff disclosed back in

4  January and purported to be something that Mr. Fuchs, their

5  expert, would testify about.  They're a series of newspaper

6  articles.  And when Mr. Fuchs was redeposed on that, it turned

7  out that a lot of the information was incorrect, and you had

8  situations where there was, perhaps, one newspaper article that

9  said something, but then when you read the other newspaper

10  articles about the event, you find that the plaintiffs -- the

11  defendant's preferred newspaper article was incorrect,

12  incomplete, and significantly wrong for the kinds of facts

13  we're interested in this case.

14    So if the -- in fact, we've done research on this and

15  found a great deal of those articles were wrong or misleading

16  or incomplete.

17    What he's prepared to do now is show Dr. Kleck some of

18  those wrong articles without Dr. Kleck having the opportunity

19  to do what he does in his scholarship, which is to say, okay,

20  here is one article that identifies a situation; now I'm going

21  to go and read more articles and get the broader universe of

22  what is going on here and do other research.

23    *MR. GROVE:*  Your Honor, if I may.  These are not the

24  same set of articles.

25    *MR. KOPEL:*  In any case, it's -- the methodology of

1   what Dr. Kleck has done is, when you find one article, you look

2   for more, and you try to get the complete story.  And, here,

3   you have the one claim with no opportunity to further

4   investigate it.

5         *MR. GROVE:*  Your Honor, if I could *voir dire* the

6   witness for just a second.

7         *THE COURT:*  You may.

8   *BY MR. GROVE:*

9   *Q.*  Please turn to Exhibit 44, sir.

10        In Exhibit 44, how many of the incidents that you

11   identified did you identify multiple articles for in this

12   exhibit?

13   *A.*  The ones that I listed in the exhibit, I -- let me answer

14   as best I can.  You tell me if I've satisfied your question.

15        When I cite an article here, it establishes a source

16   that will tell you all of the information that was available,

17   and that's recorded below that source.  It doesn't necessarily

18   mean I didn't consult other sources.  It's just superfluous to

19   cite them, because they didn't add anything to that one source.

20   *Q.*  So you're saying that you relied on other data that you did

21   not supply to defendant in this case?

22   *A.*  I'm not sure you could say "relied upon," because it would

23   only be relied upon if it added something new.  But if it just

24   duplicated what was already in this article, as would be often

25   the case where newspapers just reprinted what a wire service

1 │ had presented, so it's the identical information, so it would

2 │ be duplicative.  So I guess you could say I relied on it, in

3 │ that it confirmed what the original article said.  But I didn't

4 │ rely on it in the sense of relying on additional information

5 │ that is recorded here beyond what is in the one source that is

6 │ cited.

7 │ Q.  Nonetheless, you didn't disclose those additional sources

8 │ to the defendants in this case?

9 │ A.  Right.  Because I didn't rely on them.

10 │ Q.  So, in fact, you just relied on the one article that is

11 │ identified for the vast majority of these incidents?

12 │ A.  Yes.  If there was no additional information provided by

13 │ the other article I looked at, it was redundant to cite those

14 │ other articles.

15 │      MR. GROVE:  Your Honor, we'd ask that Rule 104 apply

16 │ and that the rules of evidence be suspended for this portion of

17 │ the examination.

18 │      THE COURT:  I've not heard a good justification for

19 │ not doing that.  This is a trial to the bench, and I will

20 │ circumscribe my consideration of this portion of the testimony

21 │ with regard to these documents to the same issues that I would

22 │ consider with regard to a 702 hearing.

23 │      MR. GROVE:  Again, our only purpose for these -- just

24 │ to be clear -- is to challenge Dr. Kleck's opinions, the

25 │ methodology, and the amounts of facts and data he relied upon.

1    We're not offering them for the truth of the matter asserted or

2    anything in those.

3           *THE COURT:*  I understand.  And thanks for the

4    representation.

5    *BY MR. GROVE:*

6    *Q.*  Let's look at Exhibit 95.  You mentioned that this

7    shooting, which is identified on Exhibit 44 at page 13, under

8    the article titled "Gunman kills two and hurts nineteen on Air

9    Force base," that the capacity of the magazine used in this

10   incident was unknown, correct?

11   *A.*  I'm trying to catch up.  I just was handed Exhibit 95.

12          Could you repeat the question, please.

13   *Q.*  You said that the capacity of the magazines used in this

14   incident was unknown.

15   *A.*  That's correct.

16   *Q.*  If you could turn to the second page of this report, which

17   is actually marked as page 1 at the bottom.

18   *A.*  Yes, I see it.

19   *Q.*  Do you see here, about ten lines from the bottom on the

20   right side, it says, "He entered a local sporting goods store

21   in Spokane with a rifle and a 75-round drum magazine which he

22   is believed to have purchased the day before from a local

23   surplus store."  Correct?

24   *A.*  Correct.

25   *Q.*  And if you could turn to page 3, second full paragraph,

1    middle of the paragraph says, "A subsequent check of subject's

2    rifle and the drum magazine disclosed 19 rounds still remained.

3    If the drum magazine was fully loaded when subject began his

4    shooting rampage, 56 rounds would have been fired."  Would you

5    agree that appears that the shooter in this case used a

6    large-capacity magazine?

7    A.  This report certainly indicates that.

8    Q.  And -- so that puts us at 13 out of 17 incidents in which

9    we know, correct?

10   A.  I don't think it -- oh, yes, it does, 13 out of 17, yes.

11   Q.  You testified on direct that the Columbine shooter, one of

12   them, used a TEC-9 with I think it was 28-, 32-, and 52-round

13   magazines, right?

14   A.  Yes.

15   Q.  In your report, you also listed that as unknown, right?

16   A.  Yes.  At that point, yeah, I didn't know.  And in later

17   versions, I corrected it.

18   Q.  That's, what, 14 out of 18 now?

19   A.  Right.

20   Q.  Please turn to page 28 of Exhibit 44.  And at the bottom

21   you see there, "Ammo shipped to PO box with Murray on police

22   radar."

23   A.  Yeah.

24   Q.  This is the New Life church shooting in Colorado Springs,

25   correct?

Gary Kleck - Cross

1   *A.*  Yes.

2   *Q.*  If you could turn to Exhibit 97, please, which is in the

3   other notebook.

4   *A.*  This one?

5   *Q.*  Yes, the thin notebook I just handed you.  Exhibit numbers

6   are at the bottom.

7   *A.*  I see.  Got it.

8   *Q.*  I'll represent to you, sir, that this is the police report

9   from the New Life church shooting.  As you can see, it's -- the

10  page numbers are at the bottom right-hand of the page.  And

11  I've omitted pages 2 through 20.  I'd like you to look at the

12  page that has page 21 of 25 at the bottom, which is the second

13  page of this exhibit.  Do you see that?

14  *A.*  Yes.

15  *Q.*  Starts with "evidence recovered."  And then turn to the

16  next page.  You'll see there a picture of the handgun with the

17  bullets next to it.  Can you count the number of bullets that

18  fit in that magazine?

19  *A.*  Sixteen.

20  *Q.*  Sixteen?

21  *A.*  Sixteen.

22  *Q.*  If you'll turn to the next page, which is page 23 of 25.

23  *A.*  Got it.

24  *Q.*  This is not the best picture in the world, but if you can

25  see that photo, there is what appears to be an AR-15 platform

1   rifle, correct?

2   *A.* I can't tell that. I -- I accept it. I mean, I --

3   *Q.* Okay. We don't need to look at the picture.

4   *A.* Yeah.

5   *Q.* Look just above it, on the third bullet point of four,

6   where it says "one 6.8 magazine with 25 rounds of ammunition."

7   Do you see that?

8   *A.* Yes.

9   *Q.* And this is not a source that you considered here, correct?

10  *A.* No. As I say, I rarely considered official reports,

11  probably only three or four incidents.

12  *Q.* So you would agree that large-capacity magazines were in

13  fact used in this incident as well?

14  *A.* Yes.

15  *Q.* So that's --

16  *A.* Well, let me back up. As far as it indicates here. I

17  don't know whether it was used or just possessed, so -- I

18  couldn't say -- testify to that.

19  *Q.* So, then, you don't agree that this incident used a

20  large-capacity magazine?

21  *A.* I'd say I don't know one way or another.

22  *Q.* And this police report isn't enough to convince you

23  otherwise?

24  *A.* No. I'm saying the part you've shown me, or I've been

25  allowed to see, doesn't indicate whether it was used or not.

1   We know for a fact, many mass shooters have guns and magazines

2   they don't use, and so I can't tell if this is one of them.

3   Q.  Okay.  Let's turn to page 31 of Exhibit 44.  At the top of

4   the page, says, "Santa gunman had lost job, wife before gory

5   attack."  Do you see that?

6   A.  Yes.

7   Q.  And here you listed the capacity of the magazines as

8   unknown, right?

9   A.  Right.

10  Q.  If you could turn to page 98 -- I'm sorry, Exhibit 98 in

11  the thin notebook.

12  A.  What page?

13  Q.  It is Exhibit 98 in the lower right-hand corner.  It's just

14  past what you looked at.

15  A.  So which of the pages in that exhibit?

16  Q.  There is only one page, sir.

17  A.  Oh, I'm sorry.  I was at the wrong one.  Okay.

18  Q.  This is a letter from the police department of Covina,

19  California that was sent to our office.  If you could look at

20  the second bullet point -- actually, the first bullet point,

21  types of weapons used during the incident.  Total of five

22  9-millimeter semiautomatic handguns.  Second bullet point,

23  magazine capacity, 17 with an extension to total the capacity

24  to 19.  Would you agree that a large-capacity magazine was used

25  in this incident?

1    *A.* Yes, assuming the information is accurate.

2    *Q.* Do you have any reason to disbelieve it?

3    *A.* Again, as in the last one, there was a confusion between

4    whether or not it's merely possessed or used in the incident.

5    And it depends on whether this individual was aware of that

6    distinction and reported the use, rather than the possession.

7    *Q.* Nothing in this would raise any red flags for you, would

8    it, given that there were no other magazines reported?

9    *A.* Just the ambiguity in general.  It's not this particular

10   incident; it's just that it is an ambiguous thing.  There is a

11   distinction between possessing and using.

12   *Q.* Let's turn to the last page of Exhibit 44.  This says,

13   "Santa Monica shooting suspect, possible motive identified."

14   Actually, that is on the second to the last page.  Here, on the

15   last page, which is the page 40, you say, capacity of magazines

16   unknown, correct?

17   *A.* Yes.

18   *Q.* And then if you could turn to the next page in the thin

19   notebook, which is Exhibit 99.

20   *A.* I've got it.

21   *Q.* And this -- title of this article is, "Rifle in Santa

22   Monica shooting was pieced together."  About halfway down that

23   article there is a sentence that starts with, "Zawahri's rifle

24   appeared to be modified so that it could fire more rounds, the

25   sources said.  Police said he had 40 magazines capable of

1  holding 30 rounds each during the rampage."  So do you agree

2  that this incident, the capacity of the magazine was unknown?

3  *A.*  No, it's not unknown now.  It was at the time I compiled

4  that report.

5  *Q.*  Okay.  When did you compile the report?

6  *A.*  August to September -- well, July to September of 2013.

7  *Q.*  What's the date on the article in Exhibit 99?

8  *A.*  June 12, 2013.

9  *Q.*  So that was available before you compiled your report,

10  correct?

11  *A.*  Right.  It's possible it's the kind of thing I missed

12  because of the search terms used, or the -- the assistant did.

13  *Q.*  So by my count, that puts us at 21 incidents in which we

14  know that the shooter was equipped with a large-capacity

15  magazine, correct?

16  *A.*  Correct.

17  *Q.*  And I'm sorry -- that gives us 21 total incidents in which

18  we know the capacity of the magazine with which the shooter was

19  equipped.

20  *A.*  Yeah, that's what I understood you to mean.

21  *Q.*  And 17 of those involved a large-capacity magazine?

22  *A.*  Yes, of the known ones, yes.

23  *Q.*  So that's 81 percent?

24  *A.*  I'll accept your computation.

25  *Q.*  That's probably enough discussion of the methodology.

1    Let's talk about whether you considered sufficient facts or

2    data.

3            You testified earlier that you considered all mass

4    shooting incidents that met your criteria of seven or more

5    killed or wounded, correct?

6    *A.*  Yes.

7    *Q.*  And now that we notice there was one incorrectly included,

8    that was a total of 57?

9    *A.*  At least one.  There is others as well.

10   *Q.*  Well, yes, it's possible that you missed a couple, right?

11   *A.*  I'm talking about the ones that I didn't include.

12   *Q.*  So we know there is one you didn't include --

13   *A.*  There is both some I didn't include and some that included

14   but didn't belong there.  And you were initially asking about

15   the latter.

16   *Q.*  Let's talk about the ones that should have been in there

17   but were not.  We discussed earlier on Wednesday that you had

18   realized there were a few through the course of depositions in

19   other cases that slipped through your radar; is that correct?

20   *A.*  Yes.  There were three.

21   *Q.*  Three.  And missing three isn't a major problem for your

22   conclusions?

23   *A.*  Absolutely not, because they -- the cases I discovered

24   confirmed my conclusions.  They supported them.

25   *Q.*  And --

1    *A.*   They strengthened them, let's put it that way.

2    *Q.*   And that's because, as you said on your direct, you

3    wouldn't quibble with an error rate of a couple of percent?

4    *A.*   I don't recall saying that in this connection.  But it

5    wouldn't be a matter of percentages; it would be a matter of

6    whether the additional cases that we added in changed the

7    conclusions.  As I say, it didn't.  It strengthened them.

8         Like, in the incidents you're pointing out, in every

9    single case where it turns out there was information on

10   magazine capacity, it confirms my statements and the expert --

11   the expert report, which is that they always involve either a

12   person who had multiple guns or multiple magazines, and so this

13   strengthens the case.

14   *Q.*   That's despite the fact that, as we just established,

15   newspaper articles often don't contain what police reports and

16   other research will turn up?

17   *A.*   That's correct.  It's not publicly available at the time

18   the newspaper reports come out.

19   *Q.*   Well, let's see how many that you missed.  Since your

20   analysis is chronological, let's do this chronologically.

21        Please turn to page 23 of Exhibit 44.

22   *A.*   Got it.

23   *Q.*   And this is mass shootings in 2001, correct?

24   *A.*   Correct.

25   *Q.*   And then if you could turn to Exhibit 101 in the thin

1  notebook.

2  A.  Got it.

3  Q.  Please take a moment to read Exhibit 101.

4  A.  Okay.

5  Q.  This article is entitled, "Tech worker charged in seven

6  deaths at Massachusetts firm."  Correct?

7  A.  That's correct.

8  Q.  And in the second paragraph it says, "Prosecutors accuse

9  McDermott of acting with premeditation and without mercy when

10  colleagues were shot repeatedly with a 12-gauge shotgun and an

11  assault rifle fed with a 60-round magazine," correct?

12  A.  Yes.

13  Q.  And the next paragraph says, "The seven Edgewater

14  Technology employees were shot a combined 30 times," correct?

15  A.  Correct.

16  Q.  This meets your criteria for inclusion in your report,

17  correct?

18  A.  It does.

19  Q.  And it was not included in Exhibit 44, right?

20  A.  Correct.  But it's another case that strengthens my

21  arguments.  This, too, involves multiple guns.

22  Q.  Nonetheless, you didn't consider it, did you?

23  A.  No, I did not.

24  Q.  Let's turn to Exhibit 102.

25  A.  Got it.

1  Q.  Title of this is, "Factory feud is cited in shooting in

2  Indiana."  Do you need a moment to read this?

3  A.  Yes, please.  Okay.

4  Q.  So the very first sentence of this says, "The factory

5  worker who killed a co-owner of the factory and wounded six

6  others before fatally shooting himself was apparently angered

7  over a dispute."  So that's one dead, six wounded, correct?

8  A.  That's correct.

9  Q.  That meets your criteria?

10  A.  Yes, it does.

11  Q.  And you didn't include this in your report, did you?

12  A.  No.

13  Q.  Turn to Exhibit 103.  Would you like a minute to read this?

14  A.  Yes, please.  All right.

15  Q.  Second paragraph, "Luther Casteel has been charged in the

16  shooting in which two people were killed and sixteen wounded.

17  Five others were injured as they sought cover."  Does this meet

18  your criteria?

19  A.  Yes, it does.

20  Q.  And if you could look at the next paragraph.  It says, "The

21  report written by Officer Robert Engelke adds new detail to

22  witness accounts of the rampage" --

23  A.  Pardon me.  Where are you now?

24  Q.  Next paragraph, third paragraph.

25  A.  Okay, thank you.

1  *Q.* -- "which ended when patrons tackled Casteel as he paused

2  to reload."  Did I read this correctly?

3  *A.*  You did.

4  *Q.*  Is this an incident which you considered in your report?

5  *A.*  It's not included as a mass shooting, no.

6  *Q.*  So you would agree that two killed and sixteen wounded

7  would meet your criteria?

8  *A.*  Definitely, yes.  But it's another case that strengthens my

9  argument.

10  *Q.*  And that's despite the fact that this individual had

11  multiple weapons?

12  *A.*  No.  It's because he had multiple weapons that it

13  strengthens my case.

14  *Q.*  So he had multiple weapons, and he was tackled when he

15  paused to reload, correct?

16  *A.*  That's correct.

17  *Q.*  How does that strengthen your case?

18  *A.*  It strengthens my case because he was capable of shooting

19  without pause because he had multiple guns.

20  *Q.*  How did he pause?  This -- I'm sorry, I don't want to argue

21  with --

22  *A.*  No, I said he didn't have to pause, did not, because he had

23  multiple guns.

24  *Q.*  Let me read this to you again, sir.  "The report written by

25  Officer Robert Engelke adds new detail to witness accounts of

1   the rampage, which ended when patrons tackled Casteel as he

2   paused to reload."  Did I read that correctly?

3   *A.*  You did read that correctly, yes.

4   *Q.*  This is one, again, that you didn't consider, correct?

5   *A.*  That's correct, I did not.

6   *Q.*  Let's move on to Exhibit 104.  Please read that and let me

7   know when you're done.

8         *THE COURT:*  Is this a good time to take a morning

9   recess?

10        *MR. GROVE:*  Sure.

11        *THE COURT:*  I'm thinking if we're reviewing things, it

12  might be an appropriate time.

13        *MR. GROVE:*  It's going to be a while.  Maybe we can

14  discuss a stipulation to what Dr. Kleck included and didn't

15  include to cut this short.

16        *THE COURT:*  All right.  Then we'll take our morning

17  recess at this time.  The court clock is showing just a few

18  minutes before 10 o'clock, about five minutes.  We'll try and

19  reconvene at 10 minutes after the hour.  We'll stand in recess

20  until then.

21        (Recess at 9:54 a.m.)

22        (In open court at 10:15 a.m.)

23        *THE COURT:*  You may resume.

24        *MR. GROVE:*  Your Honor, I made an effort to cut this

25  short.  I apologize, it's going to be a bit painful.  We

1    offered to stipulate.  We have 28 of these, and we're through

2    three.  We offered to stipulate, and it was declined.

3            *THE COURT:*  All right.  Thank you.

4    *BY MR. GROVE:*

5    *Q.*  Please turn to Exhibit 104.

6    *A.*  Got it.

7    *Q.*  Take a moment to read it.

8    *A.*  Okay.

9    *Q.*  First sentence of that says, "A man suspected of gunning

10   down seven family members in their home here surrendered to the

11   authorities on Saturday."  Do you agree this matched your

12   criteria?

13   *A.*  Yes.

14   *Q.*  And it wasn't submitted in your report?

15   *A.*  That's correct.

16   *Q.*  Exhibit 105, please.  Please take a moment to read it.  Let

17   me know when you're done.

18   *A.*  Okay.

19   *Q.*  About halfway down this article, fifth full paragraph, it

20   says, "He said Mr. Peterson left the gathering, but returned

21   with an automatic rifle similar to one used by the sheriff's

22   department.  About 30 rounds were fired, killing six and

23   wounding one."  Would you agree that this meets your criteria?

24   *A.*  Yes, it does.

25   *Q.*  Was it included in your report?

1    *A.*  I don't think so, although it's very familiar.  May I pause

2    to look at my report, please?

3    *Q.*  Absolutely.  Mass shootings in 2007 begins on page 27 of

4    Exhibit 44.

5    *A.*  No, it's not included.

6    *Q.*  Exhibit 106, please.

7    *A.*  Okay.

8    *Q.*  "Denver shooter pleads guilty."  Do you see that article?

9    *A.*  Yes, I do.

10   *Q.*  And please take a moment to read it.

11   *A.*  Okay.

12   *Q.*  It says, "The man accused of killing one person and

13   injuring six others outside a Lower Downtown nightclub in

14   November of 2007 pleaded guilty to Second Degree Murder today."

15   Would you agree that this meets your criteria?

16   *A.*  Yes.

17   *Q.*  And it's not included in your report?

18   *A.*  That's correct.

19   *Q.*  Exhibit 106, please.  Please let me know when you have a

20   chance to read it.

21   *A.*  Okay.

22   *Q.*  At the very top of this article it says, "An out-of-work

23   truck driver smiled Monday as he pleaded guilty to killing two

24   people and wounding six others at a Tennessee church last

25   summer because he hated its liberal politics."  Does this meet

1  your criteria, sir?

2  *A.*  Yes, it does.

3  *Q.*  I'd also like to draw your attention to about halfway down

4  the first page, with the paragraph that starts, "evidence would

5  show."  Do you see that?

6  *A.*  Yes, I do.

7  *Q.*  "Evidence would show that Adkisson bought the shotgun a

8  month before the attack, sawed off the barrel at his home, and

9  carried the weapon into the church in a guitar case that he

10  bought two days before the shooting.  He had more than 70

11  shotgun shells with him and planned to keep firing until

12  officers killed him, police have said, but church members

13  intervened and wrestled him to the ground."  Did I read that

14  correctly, sir?

15  *A.*  Yes, you did.

16  *Q.*  Did you include this incident in your analysis?

17  *A.*  Not in the report I submitted to you.  It's been added

18  since, but, no.

19  *Q.*  Let's turn to 108.  Let me know when you've had a chance to

20  read that.

21  *A.*  Okay.

22  *Q.*  Very top of the article, "The man who killed two teenage

23  girls and wounded seven other people in a weekend shooting

24  rampage outside a youth nightclub died Tuesday of a

25  self-inflicted gunshot, police said."  Does this incident meet

1  your criteria?

2  *A.*  Yes, it does.

3  *Q.*  Did you include it in your analysis?

4  *A.*  No.

5  *Q.*  Exhibit 109, please.  Let me know when you've had a chance

6  to read that.

7  *A.*  Okay.

8  *Q.*  Title of this article is "Jose Bonilla-Ortiz convicted of

9  murder and shooting that killed one, injured six others in

10  Reading."  Does this appear to meet your criteria?

11  *A.*  Yes.

12  *Q.*  Did you include it in your analysis?

13  *A.*  No.

14  *Q.*  Exhibit 110, please.  Let me know when you've had a chance

15  to read it.

16  *A.*  Okay.

17  *Q.*  First line of the article, "Prince George's County police

18  say they were investigating a shooting that killed one person

19  and injured six others."  This meets your criteria, correct?

20  *A.*  Yes, it does.

21  *Q.*  It's not included in your analysis?

22  *A.*  That's right.

23  *Q.*  111, please.  Let me know when you've read it.

24  *A.*  Okay.

25  *Q.*  First line, "Jacksonville authorities are looking for the

1    gunman who opened fire during a block party, killing one person

2    and wounding eight others."  Does this appear to meet your

3    criteria?

4    *A.*  Yes, it does.

5    *Q.*  Was it included in your report?

6    *A.*  No.

7    *Q.*  112, please.  Let me know when you're ready.

8    *A.*  Okay.

9    *Q.*  First line, "Police say gunfire in a packed North

10   Philadelphia bar has killed one person and injured six others."

11   Does this appear to meet your criteria?

12   *A.*  It does.

13   *Q.*  Did you include it in your report?

14   *A.*  No.

15   *Q.*  113, please.  Let me know when you've read it.

16   *A.*  Okay.

17   *Q.*  First line of this, "The day before gunfire turned this

18   Overtown birthday party into a blood bath, killing two and

19   wounding ten, Lawrence Smith shot at a group of Liberty City

20   drug dealers to deliver a warning."  Does this event fit into

21   your criteria, sir?

22   *A.*  Yes, it does.

23   *Q.*  Was it included in your analysis?

24   *A.*  No.

25   *Q.*  114, please.  Let me know when you've read it.

1   A.  Okay.

2   Q.  First paragraph, "LA Fitness in Collier resumed normal

3   operations this morning, reopening to the public and holding

4   workout classes for the first time since a gunman killed three

5   women and injured nine others there."  That meets your

6   criteria, correct?

7   A.  Yes, it does.

8   Q.  You didn't include it in your analysis?

9   A.  Let me check on that one.  I have added that to my database

10  since -- possibly since that report, so let me check on that

11  one.  No, it's not in this analysis.

12  Q.  Exhibit 115.  Please let me know when you've had a chance

13  to read it.

14  A.  Okay.

15  Q.  First paragraph, "A day after a 51-year-old factory

16  employee went on a horrific shooting spree at a St. Louis

17  company, killing three co-workers and injuring five others,

18  before taking his own life with a single shot to the chin, St.

19  Louis officials were still trying to determine why he did it."

20  This meets your criteria, correct?

21  A.  Yes, it does.

22  Q.  It's not included in your analysis?

23  A.  That's another one I added to the database.  Let me check

24  to see if I had it in there.

25          No, I added it after this report.

Gary Kleck - Cross

1  Q.  So you didn't rely on that in reaching your conclusions in

2  this case?

3  A.  That's correct.

4  Q.  116, please.

5  A.  Okay.

6  Q.  First paragraph, "Police said three of the nine people shot

7  at a high school graduation party, including the 17-year-old

8  who died, were friends of the man accused of the shootings."

9  Does this incident appear to fall within your criteria?

10  A.  Yes, definitely.

11  Q.  And did you include it in your report?

12  A.  No.

13  Q.  117, please.

14  A.  Okay.

15  Q.  Second paragraph, "It was a year ago October 5 that three

16  quarry employees" -- I'll skip the names -- "were shot and

17  killed by Shareef Allman, a disgruntled fellow employee, who

18  went on a 4:00 a.m. shooting rampage that also wounded six

19  others."  That's three killed, six wounded.  That meets your

20  criteria, correct?

21  A.  Yes, it does.

22  Q.  You didn't consider that, correct?

23  A.  Correct.

24  Q.  118, please.

25  A.  Okay.

1  *Q.* First paragraph, "Eight people were shot after rival gangs

2  confronted each other during a rap competition in Dallas early

3  Saturday, and at least one person was critically injured,

4  police said."  Does this meet your criteria?

5  *A.* Yes, it does.

6  *Q.* Did you include it in your report?

7  *A.* No.

8  *Q.* 119, please.

9  *A.* Okay.

10  *Q.* First paragraph, "Charges have been filed against a man

11  accused of killing two and wounding five others Tuesday evening

12  at a packed Englewood fast-food restaurant."  This meets your

13  criteria, correct?

14  *A.* Yes, it does.

15  *Q.* Didn't include it in your report?

16  *A.* That's right.

17  *Q.* 120, please.

18  *A.* Okay.

19  *Q.* Second paragraph, "The Saturday night shootings lasted just

20  moments, said Walt Hedrick, Forum Roller World owner.  Six were

21  killed, including a gunman who shot himself."  So that's five.

22  Right?

23  *A.* Right.

24  *Q.* And then if you skip down two paragraphs -- three

25  paragraphs, sorry, "No children were killed, but four people

1  were wounded in addition to the adults who died, he said."  So

2  that's five killed, four wounded, correct?

3  *A.*  Correct.

4  *Q.*  This meets your criteria?

5  *A.*  Yes, it does.

6  *Q.*  You didn't rely on this in reaching your expert

7  conclusions?

8  *A.*  No, I did not.

9  *Q.*  121, please.

10  *A.*  Okay.

11  *Q.*  First paragraph, "An Ohio woman says she tried to hide an

12  11-year-old boy from a gunman who fatally shot him and six

13  other people before being killed by police."  This meets your

14  criteria, correct?

15  *A.*  Yes, it does.

16  *Q.*  You did not analyze this as part of your report?

17  *A.*  No, I did not.

18  *Q.*  122.

19  *A.*  All right.

20  *Q.*  Second paragraph here, "Ten people were wounded and an

21  unborn child died in a hail of bullets in a neighborhood

22  shooting near Riverside just before 9 p.m."  Does this incident

23  fit within your criteria?

24  *A.*  Yes, it does.

25  *Q.*  Did you consider it?

Gary Kleck - Cross

1    A.  No, I did not.

2    Q.  123, please.

3    A.  Okay.

4    Q.  First paragraph, "No arrests have been made in a Broward

5    County nightclub shooting that left two people dead and ten

6    others injured."  Does this meet your criteria?

7    A.  Yes, it does.

8    Q.  And did you consider it?

9    A.  No.

10   Q.  124, please.

11   A.  Okay.

12   Q.  First paragraph, "Two people were shot to death and another

13   twenty-two were wounded by gunfire Saturday when gunmen opened

14   fire outside of a Palmetto nightclub, authorities in Manatee

15   County said."  Does this meet your criteria?

16   A.  It does.

17   Q.  And did you include it in your analysis?

18   A.  No.

19   Q.  Is that a no?

20   A.  No.

21   Q.  125, please.

22   A.  Okay.

23   Q.  First paragraph, "One person is dead and six others injured

24   after gunfire erupted at a Miami nightclub."  Does this meet

25   your criteria?

Gary Kleck – Cross

1  *A.* Yes.

2  *Q.* Did you consider it?

3  *A.* No.

4  *Q.* 126, please.

5  *A.* Okay.

6  *Q.* First paragraph, "Zina Haughton, who had been involved in

7  an ongoing case of domestic violence that ended Sunday when her

8  estranged husband killed her, two others, and injured four at a

9  Brookfield spa, died of multiple gunshot wounds."  Does this

10  incident meet your criteria?

11  *A.* Yes.

12  *Q.* Is it in your analysis?

13  *A.* No.

14  *Q.* 127, please.

15  *A.* Okay.

16  *Q.* First paragraph, "A jury has found Travis Steed guilty of

17  charges including Second Degree Murder in a February 2012

18  shooting at Karma Lounge that killed Lecarlos Todd and wounded

19  19 others."  Does this meet your criteria?

20  *A.* Yes.

21  *Q.* Did you include it in your analysis?

22  *A.* No.

23  *Q.* 128, please.

24  *A.* Okay.

25  *Q.* First paragraph, "A drive-by shooting left two dead and

Gary Kleck - Cross

1  twelve injured when gunmen opened fire on mourners outside of a

2  Miami funeral home."  Does this meet your criteria?

3  *A.*  Yes.

4  *Q.*  Did you include it in your analysis?

5  *A.*  No.

6  *Q.*  129.

7  *A.*  Okay.

8  *Q.*  Second paragraph, "Bruce Bankhead was shot once in the

9  spree that wounded 17 more people at a nearby bar early Tuesday

10  morning."  Does this incident meet your criteria?

11  *A.*  Yes.

12  *Q.*  Did you include it in your analysis?

13  *A.*  This is another one I've added later on, so I need to check

14  on that one.  No.

15  *Q.*  So what we've just looked at as Exhibits 101 to 129 --

16        Your Honor, I'd offer these into evidence for the

17  limited purposes that we discussed already.

18        *THE COURT:*  Thank you.

19        Voir dire or objection?

20        *MR. KOPEL:*  Given Your Honor's ruling on the previous

21  ruling, no objection.

22        *THE COURT:*  All right.  They're received, then.

23        (Exhibits 101-129 admitted.)

24  *BY MR. GROVE:*

25  *Q.*  That's 28 incidents, correct?

1  *A.*  Isn't it 29?  Exhibits 101 through 129.

2  *Q.*  Correct.

3  *A.*  That's 29.

4  *Q.*  You're better at math than I am.  Thank you for the

5  correction.  And 29 represent about 50 percent of the total

6  that you actually analyzed, correct?

7  *A.*  No.

8  *Q.*  Does it represent --

9  *A.*  I'm sorry, I'm sorry.  I wasn't listening to the question

10  carefully enough.  Yes, it's about 50 percent of the ones I

11  analyzed.  It's not 50 percent of the total we know of so far;

12  but, yes, it's 59 percent of the ones I analyzed.

13  *Q.*  And there could be other incidents other than these 29,

14  correct?

15  *A.*  In fact, I'd bet a paycheck on it.  It's almost certain.

16  *Q.*  And so your statement in your report, that you relied on

17  every mass shooting between 1994 and 2013, is in fact not

18  accurate?

19  *A.*  No, that's not true.  I tried to be as comprehensive as I

20  could, and I relied on all of the ones I could find.

21  *Q.*  You submitted an expert report in this case, correct?

22  *A.*  Correct.

23  *Q.*  And that had a written analysis in addition to Exhibit 44,

24  correct?

25  *A.*  I'm not sure what you're referring to.

1   *Q.* It had --

2   *A.* Exhibit 44 is the whole report, right?

3   *Q.* Exhibit 44 is the analytical part, but you also --

4   *A.* Is it just the appendix? Oh, yeah, in addition, I had some

5   text.

6   *Q.* And in that text, isn't it true that you wrote, "All

7   shooting incidents involving more than six victims shot,

8   fatally or non-fatally, not including the offenders, for the

9   period 1994 through July of 2013, inclusive, were examined

10  based on news media."

11  *A.* Well, I suppose if I had been a little more careful in my

12  phrasing, it would have said, all that I knew of, or all that I

13  could discover.

14  *Q.* That's what your report said, though, what I just read?

15  *A.* Well, I can't tell. I don't have that portion with me.

16  *Q.* Would it help to look at it?

17  *A.* Yes, it would. Thank you.

18      *MR. GROVE:* If I could refresh the witness's

19  recollection.

20      *THE COURT:* You may.

21  *BY MR. GROVE:*

22  *Q.* Before I do that, you also said there were a total of 58

23  mass shootings in the U.S. in 1994 to 2013, correct?

24  *A.* Yes.

25  *Q.* When you've had a chance to refresh your recollection,

1  please put that aside and let me know.

2  *A.*  Okay.

3  *Q.*  So, in fact, you did say all shooting incidents were

4  examined, correct?

5  *A.*  Again, if I had been more precise -- I mean, yes, I did say

6  all.  Had I been more precise, I would have said, all that I

7  knew of, or all that I could discover, or words to that effect.

8  Obviously, you cannot make reference to cases you don't know

9  about.

10  *Q.*  "All" would suggest every one, though, right?

11  *A.*  It could suggest -- well, to me, it suggested all that I

12  knew about.

13  *Q.*  Let's talk about rate of fire.  One of the primary reasons

14  that you believe that magazine capacity makes little difference

15  in a mass shooting situation is that a mass shooter's average

16  rate of fire is not all that high?

17  *A.*  Correct.

18  *Q.*  And you have a particular method for calculating right?

19  *A.*  Yes.

20  *Q.*  First you determine the time between the first and the last

21  shots fired?

22  *A.*  Right.

23  *Q.*  And this time period is based on what is reported in the

24  media accounts that you read?

25  *A.*  Right.  Occasionally there is other reports; but almost

1   always the media.

2   *Q.* And then you take the number of rounds that the shooter

3   fires, again, based on media reports, right?

4   *A.* In that case, that's something that the few official

5   reports that I consulted would almost always have.

6   *Q.* If you didn't consult an official report, which seems to be

7   the majority --

8   *A.* Yes.

9   *Q.* -- you looked at the newspaper?

10   *A.* That's correct, or news media.

11   *Q.* And based on that division, that gives you the number of

12   shots per minute?

13   *A.* Yes.

14   *Q.* Or the number of shots per second, as the case may be?

15   *A.* Right.

16   *Q.* And for the purposes of this analysis, you assumed that the

17   rate of fire is more or less constant throughout the entire

18   reported duration of the event, correct?

19   *A.* No.

20   *Q.* You don't --

21   *A.* I don't make any assumption at all. It's described as an

22   average. In fact, it's almost certain it's not a constant

23   rate, because an average necessarily involves there is some

24   figures lower and some figures higher. In this case, it means

25   some parts of the incident where fire was more rapid than

1    average, and some parts where it was less rapid than average.

2    *Q.* Turn to Exhibit 130, please.

3    *A.* Okay.

4    *Q.* You prepared this document, correct?

5    *A.* Yes.

6        *MR. GROVE:* Your Honor, we'd ask that 130 be moved

7    into evidence.

8        *THE COURT:* *Voir dire* or objection?

9        *MR. KOPEL:* We not only do not object, we urge it's

10   adoption as an exhibit.

11       *THE COURT:* 130 is received.

12       (Exhibit 130 admitted.)

13       *MR. GROVE:* I'm going to need just a moment, Your

14   Honor. I'm sorry.

15       *THE COURT:* All right.

16   *BY MR. GROVE:*

17   *Q.* Okay. Let's look at Exhibit 130. So, there are five

18   columns here. First is the date of incident, second is shots

19   fired, third is time of firing, fourth is shots per minute, and

20   fifth is seconds per shot. There is nothing in this table that

21   indicates that there is a variable rate of fire during any of

22   these incidents, correct?

23   *A.* No, not in this table.

24   *Q.* Let's talk about a couple of these incidents. I'd like to

25   direct you to page 21 of Exhibit 44.

1   A.   Okay.

2   Q.   And do you see "Two suspects in Wendy's shooting arrested

3   May 26, 2000."

4   A.   I do.

5   Q.   And in this incident, this has enough to make your rate of

6   fire calculation?  Correct?

7   A.   It did, for the purposes of that table.

8   Q.   Correct.  So let's look at Exhibit 130 again.  And you'll

9   see this incident reflected in the sixth line, 5/24/00.  Are

10  you with me?

11  A.   Yes, I am.

12  Q.   So that's the date.  Shots fired, approximately five.

13  There were five killed and two wounded in this incident,

14  correct?

15  A.   Yes.

16  Q.   For your calculation, though, you estimated that there were

17  only five shots fired?

18  A.   Yes.

19  Q.   So you assumed that the shooters had an accuracy rate of

20  greater than 100 percent?

21  A.   Not necessarily.  People might have been wounded -- more

22  than one person might have been wounded by one round.

23  Q.   You have no idea whether that's the case, do you?

24  A.   I don't know.

25  Q.   From the newspaper report, you determined that this event

1    took less than 90 minutes; is that right?

2    A.   Yes, that's correct.

3    Q.   That is less than 90 minutes from the first shot to the

4    last shot?

5    A.   That's correct.

6    Q.   You don't know whether it took 89 minutes?

7    A.   Correct.

8    Q.   You don't know whether it took 10 seconds?

9    A.   That, I'm not sure about.

10          Yeah, really, all I know is less than an hour and a

11   half.  That's all that was reported.

12   Q.   Yet for the purposes of this calculation, you used the

13   entire 90 minutes, correct?

14   A.   Well, no, I don't use it as sort of a single point

15   estimate.  Many of those estimates are -- it's somewhere below

16   such and such an amount, or it's somewhere above such and such

17   amount, because it takes into account the imperfections of the

18   information.

19   Q.   So the rate of fire here based on the amount of time is

20   somewhere above .06 shots per minute?

21   A.   Correct.

22   Q.   But if the entire incident took 10 seconds, it could have

23   been one shot every 1.2 or 1.3 seconds, correct?

24   A.   Could be.

25   Q.   In any event, after determining that the perpetrator shot

1   seven people with five shots in 90 minutes, you calculated a

2   rate of fire of somewhere less than 1,080 seconds per shot,

3   correct?

4   *A.*   Correct.

5   *Q.*   That's an average of one shot every 18 minutes?

6   *A.*   Right.

7   *Q.*   And --

8   *A.*   That would be the upper limit.

9   *Q.*   -- any firearm could shoot at that rate, correct?

10  *A.*   Correct.

11  *Q.*   Doesn't take 18 minutes to reload a gun, does it?

12  *A.*   That's correct.

13  *Q.*   I'd like to direct you to page 35 of your analysis.

14  *A.*   Okay.

15  *Q.*   Mass shootings in 2011, this is the Tucson shooting.

16  You're familiar with the circumstances of this shooting,

17  correct?

18  *A.*   Which one are we talking about?  Sorry.

19  *Q.*   Mass shootings in 2011.

20  *A.*   Yep.

21  *Q.*   Tucson shooting?

22  *A.*   Gotcha.  Yes, definitely, yeah.

23  *Q.*   This mass shooting took place in an outdoor location,

24  right?

25  *A.*   Right.

1   *Q.* People could have escaped by running away?

2   *A.* They could.

3   *Q.* I see the number of shots is listed as unknown.  Beyond

4   reading those two articles that are cited in Exhibit 44, you

5   didn't make any effort to determine how many shots were fired,

6   did you?

7   *A.* No, I did.  I probably consulted a lot of news sources on

8   that one.  It's just that the ones that I found didn't reveal

9   that information, number of shots fired.

10  *Q.* Let's turn to Exhibit 131.  This is an FBI press release.

11  If you look about six paragraphs in, tell me when you find the

12  number of bullets fired.

13  *A.* The FBI report says 33.

14  *Q.* Thirty-three.  So going back to Exhibit 44, you say time

15  from start to end, five minutes.  Did I read that correctly?

16  *A.* Yes, you did.

17  *Q.* And that's 300 seconds, right?

18  *A.* Right.

19  *Q.* So using the method that we've already discussed and

20  assuming that the shooter fired 33 rounds before being tackled

21  while attempting to reload, I get one shot every 9.3 seconds?

22  *A.* Yes.

23  *Q.* You find it plausible that the Tucson shooter took five

24  minutes, that is, one shot every 9.1 seconds from the first

25  shot to the last?

1   *A.* I don't find it implausible.

2   *Q.* And your conclusions about the durations of other mass

3 shootings is based on the same type of analysis that we've been

4 discussing here?

5   *A.* You mean, in determining rate of fire?

6   *Q.* Yes.

7   *A.* Yeah, the rate of fire was determined the same in all

8 instances.

9   *Q.* Please turn to page 38, Exhibit 44.

10   *A.* Got it.

11   *Q.* Top of the page is "12 shot dead, 58 wounded in Aurora

12 movie theater shooting during *Batman* premier." Do you see

13 that?

14   *A.* Yes, I do.

15   *Q.* For this you say that the number of shots is unknown,

16 correct?

17   *A.* Yes.

18   *Q.* But the duration of the event was approximately six

19 minutes?

20   *A.* Right.

21      *MR. GROVE:* Your Honor, at this point I'd like to

22 publish Exhibit 49. It's an audio recording, and the parties

23 have stipulated to its authenticity.

24      *THE COURT:* Is that correct? No objection?

25      *MR. KOPEL:* Wait just one second, Your Honor.

1    Your Honor, we've stipulated to the authenticity of

2 this, and we have also offered -- accepted to stipulate to the

3 number of rounds fired in the number of seconds covered in that

4 tape.  We believe, in light of that, that under Rule 403, this

5 is not admissible and is admitted primarily -- offered

6 primarily for its sensational rather than evidentiary value,

7 and we would object.

8    THE COURT:  Response.

9    MR. GROVE:  This is a bench trial, Your Honor.  I'm

10 certain that the Court will be able to give this recording

11 weight it's due, no more, no less.

12    THE COURT:  What's the relevance of this?

13    MR. GROVE:  Dr. Kleck on direct testified as to the

14 rate of fire in the Aurora theater shooting.

15    MR. KOPEL:  And Dr. Kleck also testified on direct

16 examination --

17    THE COURT:  I didn't ask for a response yet.

18    MR. KOPEL:  Sorry.

19    THE COURT:  All right.  Is that all the relevance is,

20 is that he testified as to the rate of fire, and -- and you

21 want me to listen to the rate of fire in order to determine

22 whether that was accurate?

23    MR. GROVE:  I'd like to ask Dr. Kleck a couple of

24 questions about it.

25    THE COURT:  Okay.  So he needs to hear this in order

1    to answer the questions?

2         *MR. GROVE:*  Yes, he does, Your Honor.

3         *THE COURT:*  All right.  Then I'll allow it.

4    *BY MR. GROVE:*

5    *Q.*  So Dr. Kleck, I'll represent to you this is a recording of

6    the 911 call taken from inside the Aurora theater.  I will also

7    represent to you that it's approximately 27 seconds long.  I'm

8    only going to play it once.  I'd like you to try and count how

9    many shots you hear.

10        Fair warning, I don't know how loud this is going to

11   be over the speakers.  But I will say that from the instant

12   that we hit play, you need to start counting.

13        I'm sorry.  We're experiencing technical difficulties.

14        Take two.

15        (Audio played but not reported.)

16   *BY MR. GROVE:*

17   *Q.*  How many did you get?

18   *A.*  Well, at first, I was hearing something that sounded like

19   the telephone -- what I interpreted as a telephone banging

20   against something, which might have been the gunshots.  By the

21   time I started counting after that point, it was 22.  But I'm

22   not sure how many I missed because I was interpreting that as

23   something that happened before the shooting began.  But at

24   least 22, certainly.

25   *Q.*  To make the math easy, let's round up to 30 seconds and

1  assume for the purposes of the next question that there were 30

2  shots fired in that period.  Is that fair?

3  *A.*  Sure.

4  *Q.*  That's a rate of one shot per second, right?

5  *A.*  Sure.

6  *Q.*  There are 360 seconds in six minutes, correct?

7  *A.*  Right.

8  *Q.*  And if we assume that the rate of fire in a mass shooting

9  event is more or less steady, there would have been 360 shots

10  fired in that six-minute period?

11  *A.*  Steady at the rate during the interval you just played.

12  *Q.*  If we assume that the rate of fire is steady --

13  *A.*  Yeah, assuming one round per second.

14  *Q.*  Now, when you calculate an average rate of fire, do you

15  mean to assert that the actual rate of fire was constant

16  throughout the incident?

17  *A.*  No, not at all.

18  *Q.*  In fact, you agree that the actual rate of fire during some

19  parts of the incident was probably less than the average?

20  *A.*  Right.  Both less and more.  They'd have to be.  It's an

21  average.

22  *Q.*  So you'd agree that the average rate of fire was barely

23  equal to the average during the incident?

24  *A.*  I wouldn't know that one way or the other.  It would tend

25  to cluster around the average, certainly.

1  *Q.*  Well, you agree that victims in an incident would rarely be

2  exposed to the average rate of fire that you calculate?

3  *A.*  No, I wouldn't.  Not at all.  I'm -- quite the contrary.

4  I'd assume, as I say, the rate of fire would probably cluster

5  around the average.  It's just the nature of what an average

6  is.

7  *Q.*  Okay.  That's all I was going for.  Thank you.

8  Your third opinion in this case is that, "Limits on

9  magazine capacity will impair the ability of citizens to engage

10  in lawful self-defense.  Self-defense may require a larger

11  number of rounds being fired, either because of multiple

12  adversaries and/or because the citizen will not fire accurately

13  under stressful conditions."  Did I read that correctly?

14  *A.*  That's correct.

15  *Q.*  There are just a few things I'd like to ask you about with

16  respect to this conclusion.  You're not aware of anything in

17  Colorado's law that prohibits a person from carrying more than

18  one magazine with them, right?

19  *A.*  Not aware of it one way or the other.

20  *Q.*  And there is nothing in Colorado's law that prohibits a

21  person from carrying a backup gun?

22  *A.*  Not aware of it.

23  *Q.*  And you mentioned that larger numbers of rounds might be

24  necessary in some situations because of multiple adversaries?

25  *A.*  Correct.

1    *Q.* As you sit here today, you're unable to identify any

2    incident in which a civilian facing multiple adversaries has

3    been required to discharge more than 16 rounds in self-defense?

4    *A.* Right.  Given there is no research on it, that's

5    inevitable, yeah.

6    *Q.* You also mentioned that stressful conditions can lead to a

7    loss in accuracy?

8    *A.* Yes.

9    *Q.* And when you fire a bullet at something and miss, it hits

10   something else, right?

11   *A.* Correct.

12   *Q.* And the more times you miss, the more times you hit

13   unintended targets, correct?

14   *A.* Correct.

15   *Q.* And those unintended targets could include personal

16   property, right?

17   *A.* Personal property, you said?

18   *Q.* Sure.

19   *A.* What does that mean?  You mean, like, somebody's television

20   or something, personal property?

21   *Q.* I won't go back to my 1L years, if I can help it.  Yes,

22   sure, it can hit somebody's television.

23   *A.* Sure, absolutely.

24   *Q.* All right.  And unintended targets could also include

25   innocent bystanders, correct?

1    *A.* Could.  Could.

2    *Q.* It's more likely that you would hit bystanders if you were

3    firing in a public place, correct?

4    *A.* No, not necessarily.

5    *Q.* Say, here in downtown Denver, versus your home.

6    *A.* That becomes more likely as the number of people present

7    increases.

8    *Q.* Let's talk about the frequency of defensive gun use.  Your

9    opinion is that defensive gun use is more frequent than

10   criminal uses of guns, correct?

11   *A.* Yes.

12   *Q.* But the vast majority of defensive gun uses don't involve

13   any firearms discharged at all?

14   *A.* Correct.

15   *Q.* And you performed some work in this area?

16   *A.* Yes.

17   *Q.* In that work, you did not attempt to track the number of

18   discharges by defensive gun users.

19   *A.* No, I did not.

20   *Q.* Instead, you only considered whether or not the defensive

21   gun user had fired his or her weapon?

22   *A.* Yes.

23   *Q.* You're not aware of any empirical studies that have

24   attempted to tabulate the number of times defensive gun users

25   have fired their weapons in those rare instances where

1  discharges do occur, correct?

2  *A.*  No, I'm not.

3  *Q.*  And your opinion about the relative numbers of defensive

4  versus criminal uses of large-capacity magazines is based in

5  part on your own research on defensive gun use?

6  *A.*  Yes.

7  *Q.*  And you maintain that your work shows that defensive gun

8  use is fairly common?

9  *A.*  I don't use that term.  It's, I guess, specific numbers.

10  *Q.*  Sure.  So, about one and a quarter million a year at the

11  current time?

12  *A.*  That would be a reasonable approximation, because my

13  estimate that was evidence based was based on a 1993 survey,

14  largely pertaining to '92.

15  *Q.*  That's right.  And the study that you rely on this for --

16  that you rely on for this conclusion was published by you in

17  1995?

18  *A.*  Correct.

19  *Q.*  And it was based on survey data that you collected in 1993?

20  *A.*  Spring of '93, that's right, February through April of '93.

21  *Q.*  And I think you mentioned this, but given that violent

22  crime rates are about half now what they were then, you expect

23  that defensive gun use frequency has likewise dropped?

24  *A.*  Yes, that would be my expectation.

25  *Q.*  Let's turn to Exhibit 42, please.

1  *A.*  Okay.

2       *MR. GROVE:*  We'd offer this as well, Your Honor.

3       *THE COURT:*  *Voir dire* or objection?

4       *MR. KOPEL:*  We do not object and urge its

5  introduction.

6       *THE COURT:*  Exhibit 42 is received.

7       (Exhibit 42 admitted.)

8  *BY MR. GROVE:*

9  *Q.*  You're a member of the Academy of Criminal Justice

10  Scientists, correct?

11  *A.*  Yes.

12  *Q.*  And you're aware that the Academy of Criminal Justice

13  Scientists has a code of ethics, right?

14  *A.*  Yes.

15  *Q.*  The Code of Ethics states that, "Members of the academy

16  should fully report all sources of financial support and other

17  sponsorship of the research."

18  *A.*  I'm not aware of that.

19  *Q.*  Would it refresh your recollection of the ethics code to

20  read it?

21  *A.*  No, I take your word for it.

22  *Q.*  You agree that's what the code requires?

23  *A.*  Correct.

24  *Q.*  In this article you discuss 13 previous surveys that

25  addressed gun use either directly or indirectly, correct?

1    A.  Could you ask that again, please.

2    Q.  You discussed 13 previous surveys that had addressed

3    defensive gun use, correct?

4    A.  Yes.

5    Q.  And you noted in your article that some of those studies

6    had been sponsored by some organizations that favor gun

7    control?

8    A.  Yes.

9    Q.  Please take a look at Exhibit 42 and identify where you

10   disclosed your funding source for this work.

11   A.  I did not.

12   Q.  I understand you don't necessarily agree with them, but

13   there are other survey instruments out there that make

14   estimates of defensive gun use, correct?

15   A.  To the second part of your question, yes; but I don't

16   necessarily disagree with them.

17   Q.  Well, one of them is the National Crime Victimization

18   survey?

19   A.  Oh, I'm sorry.  Well, if you're asking, is that an estimate

20   of defensive gun uses?  Then, no.

21   Q.  Right.  You don't believe that it provides a reliable

22   estimate?

23   A.  I don't believe it provides an estimate at all.

24   Q.  And --

25   A.  They didn't specifically ask about defensive gun use.  You

1   can't estimate frequency of a phenomenon in a survey that

2   doesn't actually ask about it.

3   *Q.* One of the reasons for that is that the survey is not

4   anonymous, correct?

5   *A.* That's an additional reason to doubt all sorts of things

6   that people say in that survey, sure.

7   *Q.* But that's one of the reasons that you have some issues

8   with its reliability?

9   *A.* Yes.

10  *Q.* And you understand that NCVS, as I will refer to it in

11  short, respondents are told their responses are confidential,

12  though, correct?

13  *A.* They are. But they're not assured of anonymity. That's

14  what I mean.

15  *Q.* Well, you don't know of any instance in which the promise

16  of confidentiality has been violated, do you?

17  *A.* No. All that matters is what the respondent thinks.

18  *Q.* And a related concern is that NCVS respondents are told

19  that they can be recontacted, correct?

20  *A.* Yes.

21  *Q.* Your study utilized a phone survey, right?

22  *A.* Yes.

23  *Q.* You kept track of who you contacted, right?

24  *A.* Yes -- well, let me back up. Of who, meaning, by name?

25  No, we did not. We kept track by telephone number.

1    Q.  Well, you recontacted every respondent who reported

2    defensive gun use?

3    A.  Correct, by telephone number.

4    Q.  And you could find out, if you wanted to, who owns the

5    telephone number?

6    A.  You could, but we did not.  And we assured the respondents

7    we did not know who they were.

8    Q.  The title of this article is "Armed Resistance to Crime:

9    The Prevalence and Nature of Self-Defense with a Gun."

10   Correct?

11   A.  Yes.

12   Q.  And the primary focus of the survey instrument was to

13   determine how often guns are used defensively, right?

14   A.  Yes.

15   Q.  Please turn to page 184 of Exhibit 42.  And, again, we

16   start at page 150 here.

17   A.  All right.

18   Q.  And this is table 2, correct?

19   A.  Correct.

20   Q.  And this table contains the most important results of the

21   paper, correct?

22   A.  The left half does.  The right half, I didn't use any of

23   those numbers.

24   Q.  In general, though, you would say that this is the most

25   important table in the paper?

1   *A.*  Yes.  Again, the left half.

2   *Q.*  And the conclusions that you reached about defensive gun

3   use in this study form the foundation for some of the testimony

4   in this case, correct?

5   *A.*  Yes.

6   *Q.*  And the methods used to calculate the estimates in table 2

7   are very simple and straightforward, right?

8   *A.*  Yes.

9   *Q.*  They required multiplying the prevalence figures by the

10  appropriate U.S. population base?

11  *A.*  Right.

12  *Q.*  Multiplication is a pretty basic skill, right?

13  *A.*  Sure is.

14  *Q.*  It's arithmetic.

15  *A.*  Yes.

16  *Q.*  This table is eight columns across, right?

17  *A.*  Yes.

18  *Q.*  And it's the last four rows that contain your calculations?

19  *A.*  The results of the calculations, yes.

20  *Q.*  And how many total entries is that?

21  *A.*  That would be 32.

22  *Q.*  You're unable to replicate the calculations in 14 of these

23  32 entries, correct?

24  *A.*  Actually, no, I can.  Because after the deposition, I went

25  over my notes as to why the -- there was a discrepancy in the

1   person-based estimates -- I'm sorry, the past year estimates.

2   In other words, in the left half of the table, which are the

3   only ones I used.  And it was -- it was due to the fact that

4   that number that's recorded as the population estimate, it's

5   accurate as the Census Bureau estimate, but it wasn't available

6   at the time I did the computations.

7           And what I had forgotten was, I used my own estimate.

8   And my own estimate was, like, nine-tenths of a percent higher

9   than what the final official Census Bureau estimate was.  So it

10  basically goosed up all of those numbers by nine-tenths of a

11  percent.

12  Q.  Nonetheless, sir, 14 of the 32 entries in this table are

13  incorrect?

14  A.  Sure.

15  Q.  And you attribute some of these discrepancies to potential

16  rounding error; is that right?

17  A.  That wouldn't be a significant source of error.  I would

18  say in the past year estimates, it's entirely attributable to

19  that one issue.  That is, what was the estimated resident

20  population age 18 and over in 1993?  And I used what I could

21  estimate based on an extrapolation of previous official U.S.

22  Census Bureau estimates.  But my mistake was, then when I wrote

23  it up two years later, I had forgotten that's what I used.  And

24  the note -- the first line of the note to the table gives an

25  erroneous figure -- not erroneous.  It's erroneous in the sense

1   it's not the number I used.  It's the number a little less than

2   a percent lower.

3   Q.  And that's why almost half the entries in this key table

4   are wrong?

5   A.  It's why all of the past year numbers that are wrong by a

6   little under 1 percent are wrong.  It's entirely due to that

7   single flaw.

8   Q.  Well, regardless of potential rounding error and potential

9   incorrect information from the census, the calculations

10  described in the paper don't deal with the numbers and the

11  entries we discussed in table 2, correct?

12  A.  They yield the numbers almost, but not quite, identical,

13  nine-tenths of a percent off.

14  Q.  You've been aware of these errors for several months now,

15  correct?

16  A.  Well, whenever you did the deposition, since then, yeah.

17  Q.  And you've not published a correction in that time?

18  A.  No, I have not.  It's a trivial error.

19  Q.  That's right.  The reason that you haven't published a

20  correction is because you believe the errors have a negligible

21  effect?

22  A.  I do, indeed.

23  Q.  You teach graduate students, right?

24  A.  I sure do.

25  Q.  Sat on committees for doctoral dissertations?

1  *A.*  I have.

2  *Q.*  In your experience, do doctoral candidates present their

3  presentations in an oral presentation or examination?

4  *A.*  It would be an oral presentation that, in effect,

5  summarizes a written document.

6  *Q.*  Have you ever --

7  *A.*  Which is also available to the committee members.

8  *Q.*  Have you been present at an oral presentation of doctoral

9  research in which the principal results suffered from

10  arithmetic errors?

11  *A.*  Not that I know of, no.

12  *Q.*  What would your response be if you were confronted with

13  that situation?

14  *A.*  I would say, if they have any consequence, you should tell

15  people about it.  And if it didn't have any consequence, I

16  probably wouldn't even bother to mention it.

17  *Q.*  So you would recommend conferring a doctoral degree on

18  someone who couldn't do arithmetic?

19  *A.*  If their numbers were off by nine-tenths of 1 percent and

20  it had no consequential effects, then, yeah, it wouldn't make

21  any difference at all in my decision.  It would be absurd to

22  deny them a dissertation and a doctoral degree on the basis of

23  something so frivolous.

24  *Q.*  These errors were errors of arithmetic, correct?

25  *A.*  No.  They were errors of recollection of which population

1    estimate I had.  It's not a computational error.  The

2    computations were all correct.  But the presupposition behind

3    the computations was that that was the population estimate I

4    had used, and I didn't use the one that is cited here, because

5    it wasn't available at the time of computations were done.

6    Q.  Okay.  Let's look at table 2 again.  Let's look at the

7    right side of the column.  Under "past five years," "person,"

8    "all guns," do you see where I am?

9    A.  I do.

10   Q.  Now, that is a five-year estimate that is based on your

11   survey results, correct?

12   A.  Correct.

13   Q.  And in the fifth row down, we see "persons" slash

14   "households" in row A, is 6,374,655, correct?

15   A.  Correct.

16   Q.  That number should be exactly five times of annual uses,

17   row A, which is two rows below that, and is 1,884,348, correct?

18   A.  Say again.  Which was the second number you mentioned?

19        MR. GROVE:  It might help if I could put this on the

20   Elmo, Your Honor.

21        THE COURT:  Please feel free.

22   BY MR. GROVE:

23   Q.  So I am -- under "past five years," the first figure is

24   6,374,655.  Do you see that?

25   A.  Yep.

1    Q.   And then two rows below that is 1,884,348.

2    A.   Okay.  I see what you mean.  Yes.

3    Q.   The 6.3 million should be precisely five times higher than

4    the 1.88 million figure, correct?

5    A.   It should be, yes.

6    Q.   And it is not.

7    A.   That's correct.

8    Q.   And that is also true with almost all of the other figures

9    on the right side of the table, correct?

10   A.   Well, I don't know that to be correct.

11   Q.   Okay.  Let's go through.

12        So the next line down is 5,717,872.  And that should

13   be precisely five times higher than the one two rows below

14   that, which is 1,683,342, correct?

15   A.   That's correct.

16   Q.   And it is not.

17   A.   That's correct.

18   Q.   The next row over is "handguns," figure of 5,099,724 should

19   be exactly five times higher than the figure two rows below it,

20   which is 1,442,941, correct?

21   A.   Yes.

22   Q.   And it is not, is it?

23   A.   That's correct.

24   Q.   The figure immediately below what we just discussed,

25   4,442,941 should be exactly five times higher than the number

1   two rows below that, 888,588, correct?

2   A.   It should, correct.

3   Q.   And it is not exactly five times higher, correct?

4   A.   It's very close.  I think very close, but I don't know if

5   it's exactly the same.  It should be exactly one-fifth, but

6   it's very close to that.

7   Q.   And let's look at the far lower right side of the table,

8   where we have these two 500,000 figure numbers.  Those numbers

9   are supposed to be one-fifth of the two -- the 2 million

10  figures right above it, correct?

11  A.   Correct.

12  Q.   And those are not either?

13  A.   That's correct.

14  Q.   Those are errors of arithmetic, correct?

15  A.   Probably not, although I wouldn't be prepared to say 20

16  years later what they're attributable to.

17  Q.   You're unable to replicate them as you sit here today?

18  A.   Yes.  As I say, it's almost certainly not a calculation

19  error, because it's just -- as you say, it's a very simple

20  computation.  It's likely attributable to something else.  But

21  20 years later, I wouldn't be prepared to say.  As I say, I

22  didn't use any of these numbers, so it's one reason why I never

23  looked very closely at them.

24  Q.   It's fair to say that this study involved other more

25  complex calculations than simple arithmetic we've been

1  discussing?

2  *A.*  Not really, no.  I mean, it's a very simple article in

3  statistical terms.  I've certainly done many research studies

4  that involved very advanced statistics, but this was not one of

5  them.  About as complicated as the computations get is, they're

6  percentages.

7  *Q.*  Let's turn to Exhibit 43.

8  *A.*  Okay.

9  *Q.*  This exhibit is the survey instrument that you used for

10  your 1993 national self-defense survey, correct?

11  *A.*  Yes, it is.

12      *MR. GROVE:*  We'd ask that this be admitted as well.

13      *THE COURT:*  *Voir dire* or objection?

14      *MR. KOPEL:*  No objection, Your Honor.

15      *THE COURT:*  It is received.

16      (Exhibit 43 admitted.)

17  *BY MR. GROVE:*

18  *Q.*  On the first page of this, question one reads, "What do you

19  regard as the most important problem facing your community

20  today?"  Did I read that correctly?

21  *A.*  You did.

22  *Q.*  And the answers listed in this survey instrument are, one,

23  crime, violence, et cetera; two, other problems; and, nine, no

24  opinion or no answer.  Is that correct?

25  *A.*  Correct.

1  *Q.* And you agree that this survey instrument contains no

2  instructions regarding the coding of this question?

3  *A.* This survey instrument, no; but the instructions to the

4  interviewers, yes.

5  *Q.* Well, for example, there is no instruction to the effect

6  that the respondent should be allowed to offer any answer that

7  they might want?

8  *A.* It never would have occurred to us that anything else was

9  true. Of course, it's an open-ended question. They can say

10 anything they'd like.

11 *Q.* Well, it's true, isn't it, at other points in the survey

12 instrument, the instrument does include written instructions to

13 the surveyors regarding how to elicit the respondent's answers?

14 *A.* Yes. This is a throw-away question, so there aren't any

15 specific instructions, because we had no intention of doing

16 anything with it.

17 *Q.* For example, here, underneath question 7, which is on page

18 3, it says, in parentheses, "Encourage the respondent to guess

19 if necessary."

20 *A.* Yes, that's correct.

21 *Q.* And it's also true, isn't it, that the survey instrument

22 includes written instructions regarding how to code responses?

23 *A.* Yes.

24 *Q.* For example, again, underneath question 7, the instrument

25 says, "Write 98 if unknown because they never saw anyone, et

1   cetera.  Write 99 if large number of respondents can't even

2   guess how many."

3   *A.*   That's correct.

4   *Q.*   And there are no instructions of this sort associated with

5   the first question?

6   *A.*   It wouldn't be relevant to the first question.

7   *Q.*   Well, in your deposition, you testified that question 1 was

8   actually open-ended and that respondents could give any answer

9   that they wanted; is that right?

10  *A.*   Right.

11  *Q.*   And you're confident that you remember this correctly, even

12  though you published this article almost 19 years ago?

13  *A.*   Yes, because this is basic survey research.

14  *Q.*   And --

15  *A.*   And I haven't forgotten the fact that this was a throw-away

16  question, so we didn't particularly care how respondents

17  answered the question.

18  *Q.*   You can't recall the results of question 1, correct?

19  *A.*   No.

20  *Q.*   That doesn't shake your confidence in what the surveyors

21  were instructed to say?

22  *A.*   Not at all.  No.

23  *Q.*   Now, you also don't remember what number you used for the

24  U.S. population age 18 and above in your calculations for table

25  2 in the article itself, correct?

1   *A.*  It's a number exactly -- well, I wouldn't say exactly.  But

2   it's nine-tenths of a percent -- of 1 percent higher than the

3   figure that appears there.

4   *Q.*  And you also don't remember how you estimated the number of

5   annual uses from your data regarding the number of defensive

6   gun uses in the five years prior to your survey, correct?

7   *A.*  Yeah, I don't remember the details of it that pertained to

8   the discrepancies you're pointing to.

9   *Q.*  You'd agree that respondents tend to want to be helpful,

10  right?

11  *A.*  Yes.  Because you've kind of selected the people who

12  cooperate by virtue of the fact that they've agreed to

13  participate.

14  *Q.*  Sure.  They've agreed to do an interview, so they're trying

15  to be helpful?

16  *A.*  Correct.

17  *Q.*  So if respondents to the first question thought that you

18  might want them to identify crime as the most important facing

19  their community today, they might be inclined to give you that

20  answer, right?

21  *A.*  There is no basis for that at all.  We gave them no

22  inclination that that was the kind of answer we wanted.  We

23  didn't read the first choice, crime, violence, et cetera.

24  There was nothing to give them a clue that that is what we

25  would have wanted to hear.

1  *Q.*  You've opined in this case that criminals obey laws at a

2  lower rate than non-criminals, right?

3  *A.*  Correct.

4  *Q.*  So when you reach this opinion, you're contrasting the

5  behavior of criminals and non-criminals, right?

6  *A.*  Yes.

7  *Q.*  So, then, you must have a clear distinction in mind between

8  who is and who is not a criminal?

9  *A.*  Yes.

10  *Q.*  What is that distinction?

11  *A.*  Well, there is the legalistic distinction.  Those who have

12  committed forbidden acts under the criminal law are by

13  definition criminals.  And criminologists would regard the more

14  of those acts a person has committed, the more criminal they

15  are.  There is no specific cutoff.  It's a continuous variable.

16  And the more crime you engage in, the more criminal you are.

17       But technically speaking, on legal grounds, you could

18  say, well, just anybody who has been convicted of a crime.

19  *Q.*  So how many criminals are there in the United States?

20  *A.*  Certainly millions.

21  *Q.*  Is that your best guess?

22  *A.*  Well, again, because there is no particular cutoff, the

23  question is kind of meaningless.  I mean, it would depend on

24  what cutoff set.  If you set -- I guess, the legalistic cutoff,

25  which would be, if you've committed one crime, you're a

1  criminal, then my answer would be probably just about everybody

2  over the age of 5 -- everybody over the -- over the age of

3  consent, or whatever the legalistic term is, the age of

4  responsibility, or whatever.  In short, some kind of criminal

5  behavior is virtually universal.

6  *Q.* Well, in your deposition you said, if it's a violation of

7  criminal law, that's a crime, and a person who does that is a

8  criminal.  Right?

9  *A.* Yes.  Legalistically, sure.  That's my understanding.

10 *Q.* You're a criminologist, right?

11 *A.* Right.

12 *Q.* Do you know how many people in the U.S. have committed

13 crimes?

14 *A.* As I say, it's probably in the hundreds of millions.  It's

15 virtually everybody who could technically be considered

16 responsible for their acts.

17 *Q.* So you made a distinction between criminals and

18 non-criminals for your opinions in this case.

19 *A.* Yes.

20 *Q.* What cutoff do you have in your mind when you draw the

21 distinction between criminals and non-criminals?

22 *A.* No specific cutoff.  In that context, it's just that the

23 more criminal you are, the more you would fit that description.

24 It's just a shorthand, a verbal shorthand, a convenient verbal

25 device.  So instead of saying, persons who have fallen above

1  some arbitrary cutoff point that I defined, a number of

2  criminal acts, we'll call those criminals.  My point is, there

3  is no cutoff.  Any cutoff you name would be arbitrary.

4  *Q.*  So if I told you that there were 50 million people who had

5  criminal histories in the United States in 1995, would you be

6  in a position to disagree with that?

7  *A.*  Criminal history, meaning a conviction or arrest?

8  *Q.*  Something with a -- either one.

9  *A.*  If it were arrests, I could believe that's plausible.  If

10  it were conviction, probably not.

11  *Q.*  If I told you that in 2001, there were 64 million people in

12  the United States that had a rap sheet, would you be in a

13  position to disagree with that?

14  *A.*  No, I would not.

15  *Q.*  So there might have been 64 million criminals, under your

16  definition, in the United States in 2001?

17  *A.*  Easily.

18  *Q.*  So there are a lot of criminals out there?

19  *A.*  Yeah.

20  *Q.*  And they could have all been respondents in your survey?

21  *A.*  Could be, although they tend to self-select themselves out

22  of surveys.

23  *Q.*  Did you ask the respondents in your survey whether they

24  were criminals or not?

25  *A.*  No.

1  *Q.*  It's your opinion that criminals are more likely than

2  ordinary citizens to need to carry a weapon for

3  self-protection, right?

4  *A.*  Yes, because they're victimized more often.

5  *Q.*  You anticipated my next question.  When -- we know from

6  studies of victims of violence, that most victims are in fact

7  criminals, correct?

8  *A.*  Yes -- could you repeat it.  I want to hear the details

9  again.

10 *Q.*  We know from studies of victims of violence, that most

11 victims are in fact criminals?

12 *A.*  Well, we know that of homicide victims, and we know that of

13 gunshot -- victims of gunshot assaultive wounds, regardless of

14 what crime it was connected with.  I don't know that we know

15 that in connection with all victims of violence.

16      *MR. GROVE:*  Could we have Dr. Kleck's deposition

17 again, volume 1.

18      *COURTROOM DEPUTY:*  I'm sorry, which volume?

19      *MR. GROVE:*  Volume 1.

20 *BY MR. GROVE:*

21 *Q.*  We discussed before the deposition in your case, so I'll

22 just have you turn to page 29.

23      *COURTROOM DEPUTY:*  I hand the witness volume 1 of his

24 deposition, taken October 25, 2013.

25      *THE WITNESS:*  Okay.

1  *BY MR. GROVE:*

2  *Q.* And at lines 19 to 20 –– this is you talking, you say ––

3  page 29, lines 19 to 20 –– are you there?

4  *A.* Yes, I am.

5  *Q.* You say, "Well, we know from studies of victims of violence

6  that most victims are criminals." Did I read that correctly?

7  *A.* You did.

8  *Q.* And it's your opinion that self-defense is self-defense.

9  And, in fact, if anything, it's probably most necessary and

10  important for criminals, because they are the most frequently

11  victimized, correct?

12  *A.* Yes.

13  *Q.* You can put your deposition aside for now.

14      And you would agree, too, that offenders are more

15  likely to have experience in violent situations because they,

16  in fact, initiated them?

17  *A.* Yes, and are victims of many.

18  *Q.* So it's possible that some of the defensive gun uses

19  reported in your survey could have been committed by criminals?

20  *A.* Could be. It's possible. I'll go beyond that. I mean,

21  certainly at least a few are. I mean, not all criminals would

22  self-select themselves out of a survey. The evidence is that

23  that is a common thing, let's say.

24  *Q.* In your 1995 paper, you didn't ask the respondents if they

25  had committed crimes?

1  *A.*  No, we did not -- well, I don't think we did, no.  I looked

2  that up after the deposition, and I don't think we did, no.

3  *Q.*  And in your 1995 paper, you didn't ask the respondents if

4  they were in fact criminals?

5  *A.*  No.

6  *Q.*  In your 1995 paper, you didn't ask the respondents if they

7  were in fact in lawful possession of the guns that they were

8  using?

9  *A.*  No.

10 *Q.*  In your paper, you wrote that 88 percent of violent crimes

11 which respondents reported to NCVS interviewers in 1992 were

12 committed in a location where it would ordinarily be a crime

13 for the victim to even possess a gun, never mind, use it

14 defensively.  Do you recall that?

15 *A.*  Yes.

16 *Q.*  And you also wrote that respondents usually could not

17 mention their defensive use of a gun without, in effect,

18 confessing to a crime, correct?

19 *A.*  Now, are we back on my survey or the NCVS?

20 *Q.*  This is what you wrote about the NCVS.

21 *A.*  Yes.  That's correct.

22 *Q.*  And you also wrote that, even for crimes that occurred in

23 the victim's home, possession of a gun would still often be

24 unlawful, correct?

25 *A.*  Correct.

1    *Q.* So as a general matter, a defensive gun use involving an

2    unlawfully possessed gun would, itself, involve crime, correct?

3    *A.* Correct.

4    *Q.* And you made no effort to assess either the lawfulness or

5    morality of the respondents' defensive actions, correct?

6    *A.* That's correct.

7    *Q.* So many of the defensive gun uses that you reported in your

8    1995 paper may have been themselves crimes, correct?

9    *A.* It's possible. I just say, there is no affirmative

10   evidence of it.

11   *Q.* Many of the defensive gun uses that were reported to your

12   survey and that would have been reported to the NCVS were

13   potentially committed by criminals?

14   *A.* Sure.

15        *MR. GROVE:* No further questions.

16        *THE COURT:* Thank you.

17        Redirect?

18        *MR. KOPEL:* Just a minute, Your Honor, while I gather

19   my papers.

20                    **REDIRECT EXAMINATION**

21   *BY MR. KOPEL:*

22   *Q.* Professor Kleck, could you turn to the exhibit which has

23   the Kleck and Gertz study. And go to page 166, which is the

24   page where you report that many households and persons had more

25   than one defensive gun use in a five-year period.

1    *THE COURT:* Let's make sure we have, for the record, a

2  good reference to the exhibit that you're referring to.  Are

3  you referring to Exhibit 42?

4    *MR. KOPEL:* Yes, Your Honor.  Exhibit 42, please.

5  Sorry.

6  *BY MR. KOPEL:*

7  *Q.* Dr. Kleck, would you please turn to Exhibit 42, and then

8  page 166 of that article.

9  *A.* Yes, I'm there.

10  *Q.* Could you please read the first paragraph -- the first

11  complete paragraph of that article.

12  *A.* "We also had information on the number of times that

13  DGU-involved households had experienced DGUs during the

14  five-year recall period.  While it was necessary in computing

15  previous estimates to conservatively assume that each

16  DGU-involved person or household experienced only one DGU, our

17  evidence indicates that repeat experiences were not uncommon,

18  with 29.5 percent of DGU-involved households reporting more

19  than one DGU in the previous five years.  The average number of

20  DGUs in the time span was 1.5 per DGU-involved household.  This

21  information alone could count for roughly" -- "could account

22  for a roughly 50 percent increase in DGU incident estimates

23  based on the five-year recall period."

24  *Q.* Okay.  So thank you.  Let me see if I understand what

25  you're saying.  Let's just use some easy figures.

1      If a defensive gun use was something that occurred in

2   each household one and only one time per five years, and then

3   you reported, let's say, that in a one-year period, there was

4   100,000 defensive gun uses, then, necessarily, in a five-year

5   period, there would be 500,000 defensive gun uses per

6   household.  Would that be accurate?

7   *A.*  If there was a steady rate from year to year.

8   *Q.*  Exactly.  Everybody had one defensive -- some magic limit

9   that only -- a defensive gun use could only occur, at most, one

10  time in a household.

11      On the other hand, you found that households had about

12  1.5 DGUs in a five-year period.

13  *A.*  That's correct.

14  *Q.*  Correct?  Now, would that explain why your one-year and

15  your five-year figures in table 2 are not one -- not in a

16  one-to-five ratio, because some households have multiple

17  defensive gun uses within a five-year period?

18  *A.*  Yes.  Didn't even occur to me.  I need to read my own

19  material, I guess.  Yes.

20  *Q.*  Thank you.  So that's not a math error -- a simple

21  arithmetic, is it?  It's just --

22  *A.*  Right, it's definitely not a computational error.

23  *Q.*  In fact, it's what your article says on page 156 in

24  reference to table 2.

25  *A.*  Right.

1  *Q.*  Thank you.  You testified on direct about a -- we were very

2  careful to limit what we talked about on direct to the expert

3  reports you had submitted in August and September of last year.

4  *A.*  That's correct.

5  *Q.*  You also testified, I believe on cross-examination, that

6  this -- the study of mass shootings is something you have

7  continued to do since then; is that also correct?

8  *A.*  Yes.  Each time I've learned about a new qualifying case,

9  I've added it to the database.  And if I get information that

10  indicates it doesn't qualify, I've removed it from the

11  database.

12  *Q.*  Did you send me -- after the discovery cutoff in this

13  case -- so, I represent to you was November 1.  After

14  November 1, did you send to me a supplemental report?

15  *A.*  Yes.

16  *Q.*  Did that supplemental report include something that was --

17  you had never before shown to me, which was what we've seen as

18  the exhibit that is table 1?

19       *MR. GROVE:*  Objection to the extent that counsel is

20  attempting to elicit information that was not timely disclosed

21  during the course of discovery in this case and which did not

22  form the foundation for Dr. Kleck's opinions as disclosed to

23  the defense.

24       *THE COURT:*  I don't know what the purpose of this is,

25  and the question by itself is not objectionable.  We'll have to

1  wait and see.

2  *BY MR. KOPEL:*

3  *Q.*  So you sent -- did you send me table 1 sometime after

4  November -- table 1, along with an appendix, along with an

5  updated report on shooting incidents, after November 1, 2013?

6  *A.*  Correct.  I wasn't really thinking about discovery rules

7  and all of that.  I just sent you the latest stuff I had.

8  *Q.*  Sure.  So table 1 was not part of your September and August

9  research.  That was something that happened later?

10 *A.*  Right.  I hadn't done it yet, so --

11 *Q.*  And we may infer that that was supplied to the defendant,

12 in that the defendant has table 1 and introduced it as an

13 exhibit.

14 *A.*  Well, yeah, obviously.

15 *Q.*  Okay.  When we talked on direct examination about your

16 September and October report, you mentioned that you have added

17 incidents, subtracted incidents, based on your continuing

18 research.

19 *A.*  Yes.

20 *Q.*  And so there are things you know today that you -- and have

21 known for a while, perhaps, but that you didn't know them in

22 September; is that accurate?

23 *A.*  That is correct.

24 *Q.*  Okay.  I'd like to recapitulate a little bit of the

25 Attorney General's -- defendant's examination of some of the

1    incidents you reported there.

2         If I may grab -- excuse me, a moment, Your Honor,

3    while I take the exhibit notebook.

4         Could we open up that notebook you were given -- let's

5    turn to Exhibit 101.

6    *A.*  Okay.  Got it.

7    *Q.*  Now, that -- what is the date of that newspaper article?

8    *A.*  February 16, 2001.

9    *Q.*  The incident that it writes about -- that it describes,

10   when did that event occur?

11   *A.*  December 26, apparently, of the previous year.

12   *Q.*  Now, Mr. Grove got you to admit on cross-examination that

13   you hadn't included that even in your September report.  Could

14   you please now go to Exhibit 44, which is your September

15   appendix, and turn to page 22.

16   *A.*  Okay.

17   *Q.*  Would you take a look at the only full item on page 22.

18   *A.*  Yes.  I got it.

19   *Q.*  Would you compare what is in that with the incident that is

20   described in this February 26 article -- February 16 article,

21   2001, from the *Los Angeles Times*.  Are those the same incident?

22   Which appear both occurred on December 26, 2000 --

23        *THE COURT:*  Counsel.

24        *MR. KOPEL:*  Sorry.

25        *THE COURT:*  Let's let the witness answer the question.

1    MR. KOPEL: Sorry.

2    THE WITNESS: Yes, it appears to be the same incident.

3  So I was mistaken.  It was covered in the database I was using

4  for the September report.

5  BY MR. KOPEL:

6  Q.  Thank you.  Do you remember the methodology for the search

7  terms you requested for your September report -- or, actually,

8  originally filed in August, but the -- the search criteria.

9  A.  Yes.  I mean, these are electronic or digitized databases,

10  and so you have to give words or phrases that would be searched

11  for that are likely to yield the relevant stories.  And so the

12  first obvious one, and the one I used most myself, is "mass

13  shootings."  But I also looked for those that said "mass

14  murder," because a lot of those would be mass shootings.

15  "Massacre" is a term that is commonly used in news stories.  I

16  think there was a fourth phrase beyond that I used.  And so

17  those were the phrases I thought likeliest to turn up relevant

18  cases.

19  Q.  Do you remember if you used the phrase "mass killing" as an

20  additional search term?

21  A.  Yes, mass killing.  So they were basically synonyms.

22  Q.  And it does seem clear that using those as key words for

23  searches does not yield every incident in which seven or more

24  people were shot or wounded?

25  A.  Right.  Absolutely.  I'd have to miss some, because some

1    people just use eccentric phrasing; they don't use any of those

2    phrases or anything that you might expect.  They might only say

3    something like "killing" or "shooting," but it's not "mass

4    shooting."

5    *Q.*  Could you turn to Exhibit 105, please.

6    *A.*  Got it.

7    *Q.*  On cross-examination you mentioned that you were -- that

8    that seemed familiar to you, the Wisconsin incident?

9    *A.*  Yes.

10   *Q.*  Was that included in the supplemental report which you sent

11   me?

12          *MR. GROVE:*  Objection to the extent it calls for

13   information that was not timely disclosed during the discovery

14   period and formed the basis for the report submitted in this

15   case.

16          *MR. KOPEL:*  The issue in this case is not --

17          *THE COURT:*  Are you responding?

18          *MR. KOPEL:*  I apologize, Your Honor.

19          *THE COURT:*  Do you care to respond?

20          *MR. KOPEL:*  Yes, please.

21          *THE COURT:*  Please do so.

22          *MR. KOPEL:*  The information -- all of these exhibits

23   of 101 through 129 were not admitted -- were admitted only for

24   the purpose of assessing Dr. Kleck's credibility and the

25   reliability of his research and his methodology.  It is of some

1   relevance to that, that he has continued to perform research

2   and continually update the incidents that he bases his

3   continuing opinions on.

4            THE COURT:  So why does that have anything to do with

5   whether he sent you something that was used in an expert

6   report?  That was your question.

7            MR. KOPEL:  I think the -- what I'm -- that Exhibit

8   105 is not something that is new to Dr. Kleck, but is something

9   he in fact has discovered on his own, albeit after September.

10  And that goes to the skill he has as a researcher.

11           THE COURT:  Reply.

12           MR. GROVE:  Exhibits 101 through 129, Your Honor, were

13  offered only for the purpose of showing that Dr. Kleck did

14  not -- did not rely upon them in reaching his expert

15  conclusions in this case.

16           THE COURT:  I understand that.

17           MR. GROVE:  And anything beyond that is not relevant

18  or admissible.  Frankly, it's a discovery violation.

19           THE COURT:  I don't see how this is relevant.  If you

20  want to address these exhibits in the context of a 702 inquiry,

21  feel free to.  But I am receiving them solely for the purpose

22  of what has just been noted, that they were news reports that

23  were not included in this witness's examination of data that

24  formed the basis of his opinion.

25           MR. KOPEL:  Okay.  Thank you, Your Honor.

1    *BY MR. KOPEL:*

2    *Q.* Dr. Kleck, in those exhibits, 101 through 129, some of

3    which you knew about, some of which you had actually included

4    in your report, as you read those articles, did they mention

5    the number of -- how many -- magazine capacity, how many

6    magazines there were, and so forth?

7    *A.* Sometimes they did.

8    *Q.* Did most of them, or -- well, how did you --

9    *A.* I was -- go ahead. Sorry.

10   *Q.* Do you recall about how many of those mentioned the size of

11   magazines or the number of magazines or even the type of

12   firearm?

13   *A.* My casual, quick impression from that very quick reading

14   was that most of them did not.

15   *Q.* Okay. Now, your opinions in this case on what difference,

16   if any, magazines of particular sizes -- what difference they

17   make or do not make, are those based on -- solely on reports

18   where that information is known, whether -- how many

19   magazines -- such as how many magazines there were, what size

20   they were, and so on?

21   *A.* Yes, in the sense that we didn't guess on anything. We

22   always relied on the facts that were agreed upon in the news

23   media reports. So that's what my opinion would be based on,

24   what was known about the incidents, including details like

25   number of guns, number of magazines, magazine capacity, and so

1    forth.

2    Q.  So if you had found all of these -- the ones that you know

3    about but were not in your September report, that would have

4    changed the number of total mass shootings by your definition

5    you would have reported; is that correct?

6    A.  Correct.

7    Q.  If you would have found that in September?

8    A.  Correct.

9    Q.  But would it have changed your opinions about magazines,

10   because most of these don't tell you anything about magazines,

11   or are the opinions affected by the admission of these

12   articles?

13        MR. GROVE:  Objection.  Foundation, calls for

14   speculation.

15        THE COURT:  I overrule as to speculation.  I sustain

16   as to foundation.

17        MR. KOPEL:  May I confer?

18        THE COURT:  You may.

19        (Off-the-record discussion between counsel.)

20   BY MR. KOPEL:

21   Q.  So to ask what might be an obvious question, Dr. Kleck,

22   have you read all of the articles in Exhibits 101 through 129?

23   A.  Yes.

24   Q.  Do these articles cause you to consider revising or

25   changing your opinions which are based on information about the

1    use of magazines in mass shootings?

2              *MR. GROVE:*  Objection, foundation.

3              *THE COURT:*  Overruled.

4              *THE WITNESS:*  No.

5    *BY MR. KOPEL:*

6    *Q.*  Why is that?

7    *A.*  Well, again, this is based solely on that very quick

8    reading I did.  I didn't want to hold up the court and drag

9    things out.  But based on that quick reading, my impression was

10   that they -- they confirmed my position rather than

11   disconfirming it, because they indicated that -- the cases that

12   have larger number of victims also had multiple guns and/or

13   multiple magazines, when they mentioned it.  And it confirmed

14   the impression that there were very few incidents where it was

15   affirmatively known that there was a large-capacity magazine as

16   defined in this case involved in an incident.  And so those

17   were my main conclusions.

18            The big conclusion is that the possession of a

19   magazine with a capacity over 15 rounds does or does not --

20   doesn't make a difference in number of people killed or

21   injured.  And I didn't see any incidents where I saw any reason

22   to change that.  Although if I found one or two cases over a

23   20-year period, that still wouldn't change my view, because I

24   don't deny there are never any cases like that.  My position

25   was, they're extremely rare.  So maybe rather than once every

1   ten years, it might be once every seven or eight years, or

2   something like that, once I gave these a careful reading and

3   consulted additional sources.

4   Q.  Thank you.

5       Dr. Kleck, could you please turn to Exhibit 130.

6   That's the table in your supplemental report.

7   A.  Got it.

8   Q.  Apparently the defendant's favorite part of your

9   supplemental report.  Mr. Grove asked you about your

10  calculations on the Gabrielle Giffords murders in Tucson.  And

11  I'm -- I have to say, I'm confused.  Could you please also turn

12  to page 35 your -- of Exhibit 44.  That's the September report.

13  A.  Got it.

14  Q.  Based on that, what day did the Tucson murders take place?

15  A.  January 8, 2011.

16  Q.  Does table 1 have any information about anything that

17  happened on January 8, 2011?

18  A.  No.

19  Q.  Thank you.

20      THE COURT:  Mr. Kopel, when you reach a convenient

21  stopping point, would you please let me know so we can take a

22  noon recess.

23      MR. KOPEL:  I think this is an excellent stopping

24  point, Your Honor.  Thank you.

25      THE COURT:  All right.  Let me get an idea what the

1    afternoon holds.

2         Mr. Kopel, how long will your redirect take?

3         *MR. KOPEL:*  I would guess that my redirect will be

4    under half an hour, and might be on the lower side rather than

5    the higher side of that estimate.

6         *THE COURT:*  Okay.  And that will complete this

7    witness's testimony.

8         For the State, what is your estimate of the time

9    you'll be using?

10        *MR. GROVE:*  We have two witnesses on direct.  I think

11   they will probably take between them two hours, hour and 45

12   minutes.  And so I think we should be in pretty good shape.  I

13   think the cross of at least the first one will probably be 45

14   minutes to an hour, would be my guess.  I think we're in good

15   shape.

16        *THE COURT:*  Great.  Then we will take our noon recess

17   at this time and reconvene at 1:15.

18             (Recess at 12:04 p.m.)

19             (In open court at 1:30 p.m.)

20        *THE COURT:*  Are you ready to proceed?

21        *MS. SPALDING:*  Your Honor, before we begin, there is a

22   matter that we'd like to bring to the Court's attention

23   involving the sequestration order and the witness who was

24   called to testify yesterday.  We would ask the Court's

25   permission to approach the bench.

1    THE COURT:  You may.  Please approach.

2    (Hearing commenced at the bench.)

3    MS. SPALDING:  Yesterday, Your Honor, Dan Montgomery

4  testified, former police chief of Westminster.  Mr. Montgomery

5  spent a lot time out in the hall because he was here at 1:30,

6  wasn't called until about 4:00.  And I had a couple of

7  conversations with him this morning because he was very upset

8  about an incident that involved when he was out in the hallway

9  involving Mr. --

10    THE COURT:  You don't need to whisper.  This is our

11  speaker for the court reporter so she can hear.

12    MS. SPALDING:  Okay.  As Mr. Montgomery related to me,

13  during the afternoon break, he was sitting on the bench

14  outside.  Mr. Colin and a group of counsel and the clients, I

15  suppose -- witnesses were talking very close to him.  Mr. Colin

16  knows Mr. Montgomery, who used to be hired by his law firm to

17  work on cases.  Mr. Montgomery now does a variety of defense

18  and plaintiffs.  I gather he's ceased his association with

19  Mr. Colin's law firm.

20    THE COURT:  I was going to say, sometimes he's been in

21  here as your witness.

22    MR. COLIN:  He has.

23    MR. GROVE:  In any event, Mr. Montgomery overheard

24  Mr. Colin speaking with this group, explaining that

25  Mr. Montgomery would be testifying in the afternoon, that he

1  was a former police chief from Westminster, and that since he

2  retired, he had become a plaintiffs' whore.  Mr. Montgomery

3  approached Mr. Colin, is what I'm told, said he didn't know

4  what he was talking about, this wasn't so.  They had an

5  exchange, as related to me, which was, yes, you are; no, you're

6  not; that kind of thing.  And then they parted.  He testified,

7  I'm guessing, within an hour or so later.

8         I can't say he was intimidated, but he was rattled and

9  mad.  Goes beyond mad, I think.

10         *THE COURT:*  Was this before his testimony or after?

11         *MS. SPALDING:*  This was before his testimony.  Yes.

12         We've had good relationship with counsel, and I don't

13  want that to change.  I want the sequestration order to be -- I

14  want folks to be careful about it.  I don't want this to happen

15  again.

16         *MR. COLIN:*  What I can tell you is, I was talking to a

17  group of co-counsel, and Sheriff Cooke commented to me that

18  Mr. Montgomery was going to be a witness, asked me what I

19  thought of him.  I told him what I thought of him.  I said I

20  thought he was a great chief of police, and we supported him

21  when he wanted to come out into the expert area, but I feel

22  like he's kind of a traitor, has become a plaintiffs' whore.  I

23  said that to Sheriff Cooke.  I didn't know Montgomery was

24  behind me.

25         Sheriff Cooke pointed out he was behind me.

1   Mr. Montgomery said to me, you don't know what you're talking

2   about.  I said, yes, I do, and that was the end of it.

3          THE COURT:  Do you believe that Mr. Montgomery's

4   testimony is influenced by this?

5          MS. SPALDING:  No.  I think he was rattled.  I have to

6   say, he looked mad to me.  I have to say, when he left the

7   stand, he looked mad.  That isn't his normal demeanor.

8          MR. COLIN:  I don't think he's an angry guy.

9          MS. SPALDING:  I think he was rattled.

10         THE COURT:  I don't find an infringement of the

11  sequestration order, but it does point out something that all

12  of us have to constantly keep in mind, and that is, those

13  things that we say without a great deal of thought and

14  consideration may come back to haunt us.

15         MR. COLIN:  I understand.  If I had known he was

16  behind me, I wouldn't have said it.

17         THE COURT:  Well, I'm hoping you won't say it in the

18  future, even if he isn't behind you.

19         MR. COLIN:  I understand.

20         THE COURT:  Because that's the kind of comment, quite

21  frankly, that undermines confidence in the whole litigation

22  system.

23         MR. COLIN:  I understand.

24         THE COURT:  When we, as legal professionals, take an

25  opportunity to disparage some participant in the process, we

1 disparage the process.

2     *MR. COLIN:* You're right. I fully agree.

3     *THE COURT:* So in that event, it's a learning

4 circumstance for all of us.

5     *MR. COLIN:* I appreciate it.

6     *THE COURT:* Thank you.

7     (Hearing continued in open court.)

8     *THE COURT:* All right. Let's resume.

9     Please retake the stand, sir. You remain under oath.

10     Mr. Kopel, please continue your redirect examination.

11     *MR. KOPEL:* Thank you very much, Your Honor.

12     Before I begin the redirect, I would like to apologize

13 for a remark about defendant's attitude towards table 1 that I

14 made shortly before lunch. That was inappropriate, and I

15 apologize.

16     *THE COURT:* Thank you. I'm sure it won't happen

17 again.

18     *MR. KOPEL:* I, too, am sure. Thank you.

19 *BY MR. KOPEL:*

20 *Q.* Professor Kleck, we were talking about some of the

21 additional incidents that meet your criteria, seven or more

22 killed or wounded, that were not included in your September

23 report, some of which you found later, some of which you did

24 not. And these are Exhibits 102 through 109.

25     You had testified on direct examination on Wednesday,

1   that besides the news media reports, you had also consulted

2   some other sources.  Do you recall that testimony?

3   *A.*  Yes, I do.

4   *Q.*  Okay.  You testified that you had looked at a report on

5   mass shootings by the Congressional Research Service.  Were any

6   of those incidents in the Congressional Research Service report

7   that you studied?

8   *A.*  No.

9            *MR. GROVE:*  Objection, relevance.

10            *MR. KOPEL:*  Highly relevant --

11            *THE COURT:*  Response.

12            *MR. KOPEL:*  Quite relevant to the 702 issue of the

13   competence of his research methods compared to other scholars

14   who studied the same issue.

15            *THE COURT:*  I'll allow the witness to answer.

16            *THE WITNESS:*  None of the incidents that I missed were

17   found in any of those other five sources, including the

18   Congressional Research Service.

19   *BY MR. KOPEL:*

20   *Q.*  Do you recall the name of the other five sources?

21   *A.*  *Mother Jones* magazine was one, the Violence Policy Center

22   was another, the Citizens Crime Commission of New York was

23   another.  I need to see my report -- well, the report is right

24   here, if I could refresh my recollection, so --

25   *Q.*  That would be permissible.

1   *A.* Well, maybe not. It's not the full report. It's only the

2   appendix here, so I guess that won't be of any help.

3   *Q.* Okay.

4   *A.* But there were, I think, five total, as -- except for my

5   media search, news media search.

6   *Q.* Do you recall the criteria that *Mother Jones* used for

7   its -- what it included?

8   *A.* I think theirs was four deaths or more.

9   *Q.* Okay.

10  *A.* If that's --

11  *Q.* Do you recall the criteria that Violence Policy Center

12  included?

13  *A.* They were primarily concerned with magazine capacities. So

14  they included every one they could find that had a capacity --

15  an incident with a magazine with a capacity of 11 or more

16  rounds.

17  *Q.* None of those in the 102 to 129 were included in that?

18  *A.* No.

19  *Q.* Okay. Also -- before we talked about -- another issue that

20  came up on cross-examination was situations where, in your

21  September report, the magazine capacity was known or not known.

22  I'd like to clarify some of those. Could you please turn to

23  page 23 of your September report.

24  *A.* Okay.

25  *Q.* And look at No. -- the second one down, the one that begins

1    "ABC News exclusive:  Santana."

2    *A.*  Okay.

3    *Q.*  What firearm was used there?

4    *A.*  .22-caliber revolver.

5    *Q.*  Would the exact magazine capacity be known just based on

6    the fact that it was a .22-caliber revolver?

7    *A.*  No.

8    *Q.*  Based on the fact that it is a .22-caliber revolver, can

9    you be certain that it was of a -- within a particular range?

10   *A.*  Certain, no.  But I certainly would have definitely been

11   pretty confident it wasn't anywhere near or -- anywhere near

12   15.  I would have probably guessed five or six.

13   *Q.*  Okay.  Could you turn to page 27, the one item that is

14   there --

15   *A.*  Got it.

16   *Q.*  Is .38 caliber -- well, what are the types of guns listed?

17   *A.*  Maverick Arms Model 88, 12-gauge shotgun, and a Smith &

18   Wesson .38-caliber pistol.

19   *Q.*  Do 12-gauge shotguns have a magazine of over 15 rounds?

20          *MR. GROVE:*  Objection, Your Honor.  Foundation.

21          *THE COURT:*  Response.

22   *BY MR. KOPEL:*

23   *Q.*  Professor Kleck, do you know --

24          *THE COURT:*  Did you care to respond?

25          *MR. KOPEL:*  I'm sorry.  I believe Professor Kleck's

1    expertise in firearms and violence research gives him a

2    foundation to know the magazine sizes of many common firearms.

3            THE COURT:  Reply.

4            MR. GROVE:  It's outside the scope of his expert

5    opinions in this case.

6            THE COURT:  Okay.  I have two different objections

7    here.  One is foundation.  Foundation is something laid in the

8    courtroom.  I find that sufficient foundation for this has not

9    been established.

10           Now, the next question is, can you establish it?  I

11   assume that the reply really goes to the question of whether

12   you can lay adequate foundation.  And I understand the

13   objection to be that whatever would be the foundation was not

14   previously disclosed; is that correct?

15           MR. GROVE:  That's correct, Your Honor.

16           THE COURT:  All right.  I overrule the objection.

17   What has to be disclosed is the opinions and the basis for the

18   opinions, not all the person's background or experience.  And

19   as a consequence, I do not find that there is a failure of

20   pretrial disclosure sufficient to prohibit a laying of an

21   appropriate foundation.

22   BY MR. KOPEL:

23   Q.  Professor Kleck, do you own guns personally?

24   A.  Yes.

25   Q.  Have you had experience seeing, shooting, examining

1    firearms other than the ones you personally own?

2    *A.*   Yes.

3    *Q.*   Would you say -- how much experience do you have looking at

4    guns in general, other than the ones you own personally?

5    *A.*   I have personally fired all the major varieties,

6    semiautomatic pistol, revolver, semiautomatic shotgun,

7    double-barreled shotgun.  I even fired a legally owned fully

8    automatic weapon at one point, although I'm certainly no expert

9    on that.  And I've fired both a medium-caliber and a

10   small-caliber rifle.  So, you know, I have fairly wide

11   experience.

12   *Q.*   Do you have a guess for -- in the course of your life,

13   approximately how many handguns, either revolvers or

14   semiautomatics, you've personally examined?

15   *A.*   Probably in the dozens, I would imagine.

16   *Q.*   Okay.  Is a 12-gauge shotgun available, to your knowledge,

17   with more than 15 rounds?

18   *A.*   I am not aware of any such weapon.

19   *Q.*   Is a .38 -- is a .38 caliber a pistol caliber or -- is

20   .38 caliber, a .38 caliber -- in .38 caliber, is .38 caliber a

21   revolver caliber or a semiautomatic caliber?

22   *A.*   It's a revolver caliber.

23   *Q.*   Thank you.  Based on what we've just discussed for the *New*

24   *York Times* incident we're talking about, do you -- can you --

25   do you have an opinion on whether the magazines involved were

1    or were not of 15 -- 16 or more rounds?

2    A.   Yes.

3    Q.   And what is your opinion on that?

4    A.   Probably not.

5    Q.   Because?

6    A.   Because -- well, I coded it as unknown, because I was very

7    conservative in stating whether I knew something from these

8    news accounts.  So it's coded as unknown.  But based on the gun

9    size, which I've never even heard of, of using -- well, in the

10   case of a revolver, it wouldn't use a detachable magazine at

11   all.  Certainly doesn't have a capacity of over 15 rounds.  And

12   I'm unaware of any 12-gauge shotgun, including the Maverick

13   Arms model, that would have a capacity like that.  So although

14   I couldn't say what the capacity was, I'd be confident in

15   saying it's not over 15 rounds.

16   Q.   Okay.  Thank you.

17        Could we turn to page 28 in the incident that spans

18   pages 28 and 29.

19   A.   All right.

20   Q.   Would you read that for a second and refresh yourself while

21   I -- refresh your recollection while I pick up my notebook.

22        MR. GROVE:  I'd object, Your Honor, to the witness

23   refreshing his recollection without a prior indication that

24   he's forgotten anything.

25        THE COURT:  I agree.

1    *MR. KOPEL:*  I apologize.

2    *THE COURT:*  What are you doing here?

3    *MR. KOPEL:*  I'm merely asking him to -- my next

4    question should indicate it.

5    *BY MR. KOPEL:*

6    Q.  Does that incident on --

7    *THE COURT:*  Excuse me.  I'd like an explanation.

8    *MR. KOPEL:*  The explanation is, I would just like to

9    inquire further about his analysis of that incident.

10   *THE COURT:*  All right.  Is there an admitted document

11   you want him to look at?

12   *MR. KOPEL:*  No -- yes, he's looking at Exhibit 44.

13   *THE COURT:*  All right.  Thank you.

14   *BY MR. KOPEL:*

15   Q.  So in Exhibit 44, page 28, that begins, "7 News, Ammo

16   shipped to PO box," Mr. Grove, had cross-examined you about

17   that.  Does that incident in fact meet your criteria of seven

18   or more killed or wounded in a single location?

19   A.  No.  That's one of the ones I later excluded, because it

20   only has five victims -- I'm sorry, wait a minute.  No, it

21   does -- yes, it does.

22   Q.  Well --

23   A.  It has nine victims.

24   Q.  Were all nine victims --

25   A.  Wait a minute.  I'm sorry, I'm not reading the relevant

1    part.  This is one of the ones that I excluded because it's a

2    spree shooting, because it occurred at two different locations,

3    and there wasn't seven or more victims at any one location.  So

4    I initially included it, but it's one of three that I later

5    excluded on the basis of them being spree shootings rather than

6    mass shootings.

7    Q.  Had you mentioned in your Wednesday testimony that you

8    did -- you had incorrectly included some items in that

9    September report?

10   A.  Yes, I did.

11   Q.  Okay.  Could you turn to Exhibit 99.

12   A.  Okay.

13   Q.  And could you simultaneously turn to Exhibit 44 and look at

14   the bottom of page 39.

15   A.  All right.

16   Q.  Are -- those are both -- are those both about the same

17   incident?

18   A.  Yes, they are.

19   Q.  And does that incident meet the criteria you selected for

20   your study, in fact?

21   A.  No, that's another spree killing.

22   Q.  Okay.

23   A.  So there were no points -- there were no individual

24   incidents at which there were more than six victims shot.

25   Q.  Okay.  And if you could briefly flip back to Exhibit 98.

1  *A.*  All right.

2  *Q.*  That was -- to make it clear, did your methodology include

3  submitting Open Records Act requests to government -- any

4  government entity?

5  *A.*  No.

6  *Q.*  Okay.  Let's return to your study of defensive gun uses.

7  Your -- how many, approximately, defensive gun uses did you

8  find in -- that had taken place in 1993, I believe, based on

9  your study?

10  *A.*  From spring of '93 -- spring of '92 to spring of '93, that

11  would be the recall period.

12  *Q.*  How many were there?

13  *A.*  How many sample cases?

14  *Q.*  How many -- no, what was your estimate for the total number

15  nationally?

16  *A.*  2.5 million.

17  *Q.*  How many -- how many gunfights with shots in both

18  directions did you --

19  *A.*  About 3 percent of those involved both parties shooting.

20  *Q.*  Okay.  So you testified on cross-examination that was

21  almost never, but that --

22  *A.*  Right.  You know, it's a subjective assessment.  3 percent

23  would be a better way to describe it.

24  *Q.*  About how many -- is 3 percent of 2 1/2 million?

25  *A.*  That would be about 75,000.

1  Q.  Okay.

2  A.  Per year.

3  Q.  The Kleck and Gertz study, which we're talking about, who

4  funded that?

5  A.  It was basically Professor Gertz and his -- I guess, and

6  his brother, because they co-owned the survey research firm

7  that did the work.  So I didn't have to pay anything.

8  Q.  Okay.

9  A.  So it came out of their pockets.

10  Q.  You testified at some detail on cross-examination about the

11  potential criminality of people -- broadly defined, of people

12  who engaged in defensive gun use.  And I think -- is that true?

13  A.  Yes.

14  Q.  And your -- you just said that your study period was '92 to

15  '93?

16  A.  Correct.

17  Q.  At that time -- do you know at that time whether -- how

18  prevalent the availability of concealed carry permits was in

19  the United States?

20  A.  Yes.

21      MR. GROVE:  Objection, relevance.

22      THE COURT:  The objection is a little untimely.  The

23  witness has answered.  The fact that he knows is not clear what

24  the relevance is, so I'm going to reserve ruling on the

25  relevance objection until we hear the next question, which I

1 | think will follow thereafter.

2 | *BY MR. KOPEL:*

3 | *Q.*  In that '92 to '93 period, would the simple -- would it be

4 | true that in much of the United States, the simple carrying of

5 | a firearm for otherwise lawful protection was itself a crime?

6 | *A.*  Yes.  In most places in the United States, it would have

7 | been difficult to get the permit that would make it legal.

8 | *Q.*  And, therefore, by the -- is it true that under the

9 | criteria by which you were discussing criminality of defensive

10 | gun use on cross-examination, people like that would have been

11 | included and in your definition of criminal?

12 | *A.*  Yes.

13 | *Q.*  Okay.  Do you know of information indicating -- data,

14 | research, whatever, indicating how often innocent bystanders

15 | are shot by defensive gun uses?

16 | *A.*  Do I know of data on it?

17 | *Q.*  Yes.

18 | *A.*  No, I don't know of any data on it.

19 | *Q.*  Do you know of any studies on the subject?

20 | *A.*  No.

21 | *Q.*  Does the absence of such data or studies affect your

22 | opinion on how frequently you think this might or might not

23 | happen?

24 | *A.*  Well, it's not just the absence of studies, it's the

25 | absence of just even anecdotal evidence appearing in news

1  outlets.  You would expect a tragic event like somebody

2  being -- an innocent person being shot to definitely be

3  newsworthy.  And they, of course, the victims or their

4  survivors, would have no reason to conceal it.  So, yes, I

5  infer something from the fact that you never hear about such

6  incidents.  The most reasonable explanation is that they don't

7  occur -- or often enough to come to anyone's attention.  So

8  that's my inference.

9  Q.  Thank you.  Your cross-examination began with a rather

10  in-depth discussion of the research of Professor Koper.  What

11  did -- did Professor Koper do a study for the United States

12  Department of Justice in 2004?

13  A.  Yes, he did.

14  Q.  Could you summarize what he studied and what he found.

15      MR. GROVE:  Objection, Your Honor.  This is in the

16  record, and it speaks for itself.

17  BY MR. KOPEL:

18  Q.  Could you please provide your analysis --

19      THE COURT:  Sir --

20      MR. KOPEL:  I -- sorry.

21      THE COURT:  -- do you care to respond?

22      MR. KOPEL:  It is true that Professor's -- Professor

23  Koper's study speaks for itself and can be read by anyone; and,

24  therefore, I was conceding the legitimacy of Mr. Grove's

25  question --

1    *THE COURT:*  You're expecting me to read it, right?

2    *MR. KOPEL:*  Perhaps his question presumed that you

3  would read it.  I'm not.

4    *THE COURT:*  You can presume that I'm going to read all

5  admitted evidence.  So has it been admitted?

6    *MR. KOPEL:*  Yes, it has.

7    *THE COURT:*  Then I'm going to read it, so this witness

8  doesn't need to tell me what it says.

9    *MR. KOPEL:*  Thank you.

10 *BY MR. KOPEL:*

11 *Q.*  Professor Kleck, do you have -- what is your analysis of

12 the validity of Professor Koper's 2004 study?

13 *A.*  Well, it would be the same as the assessment of any study

14 that used that research design and tried to assess the impact

15 of that kind of policy.  Its salient characteristic is that

16 he's trying to evaluate the impact of one unique policy in one

17 place at one time period, and it's almost impossible to draw

18 any strong conclusions on the basis of what amounts to a single

19 case.

20    If you have multiple tests of the hypothesis that that

21 sort of legislation had an impact on crime or the use of larger

22 magazines, or whatever, then you have something of a foundation

23 to draw a conclusion.  But, you know, it's -- even with the

24 best will in the world and the greatest amount of ability and

25 skill, it's probably impossible to draw anything but the

1  weakest kind of conclusions about that sort of intervention.

2  Q.  That's the 2004 study you were talking about; is that

3  correct?

4  A.  Right.

5  Q.  Now, his 2013 study, could you also provide your analysis

6  of that.

7  A.  Well, he doesn't add anything really -- well, you know, the

8  intervention -- the nature of the intervention didn't change,

9  and the nature of the research design didn't change, so it's

10  basically the same assessment as for the earlier study.  The

11  only difference is, he wrote it up with, I guess, more

12  speculation added in, more, you know, optimistic speculation.

13  For example, the notion that if it were only kept in effect

14  long enough, it would start to show its beneficial effects.

15  Q.  Now, the -- would it be fair to characterize the gist of

16  your opinions -- of some of your opinions in your expert report

17  as suggesting that magazine bans don't accomplish much, if

18  anything, in terms of public safety?

19  A.  That was, essentially, his conclusion -- well, to put it

20  very precisely, it was -- he was asserting there wasn't any

21  affirmative evidence of beneficial effects.  He wanted to hold

22  out the possibility that there would be detectable good effects

23  if we only, you know, let it exist long enough and not be

24  sunsetted in 2004.

25  Q.  And that's what he was saying in 2013, if --

1   *A.*   Yes.

2   *Q.*   Why do you disagree with that?

3   *A.*   Well, because it's speculative.  You know, it's not based

4   on any additional evidence, hard evidence.  It's based on more

5   wishful thinking than anything else.

6           And, indeed, drawing a firm conclusion about even the

7   period we already had in the past, that was difficult enough.

8   But, you know, to base a conclusion on, you know, expectations

9   about the future is hopeless.

10  *Q.*   Okay.

11          Thank you very much, Dr. Kleck.

12          Your Honor, may the witness please be excused?

13          *THE COURT:*  Any objection?

14          *MR. GROVE:*  No objection, Your Honor.

15          *THE COURT:*  Thank you very much, sir.  You may step

16  down.

17          *THE WITNESS:*  Thank you.

18          *THE COURT:*  And you are excused.

19          That concluded the presentation of evidence in

20  conjunction with the plaintiffs' case.  We began presentation

21  of evidence in the defense case.  Would you call your next

22  witness, please.

23          *MR. GROVE:*  James Spoden, Your Honor.  He's in the

24  witness room.

25          *THE COURT:*  Please step up and be sworn.

1      (**JAMES SPODEN, DEFENDANT'S WITNESS, SWORN**)

2      *COURTROOM DEPUTY:*  Please be seated.

3      Please state your name and spell your first and last

4  name for the record.

5      *THE WITNESS:*  James Spoden, J-A-M-E-S, S-P-O-D-E-N.

6      *THE COURT:*  Please proceed.

7      *MR. KOPEL:*  Your Honor, for the record, we would

8  object for the continuing same reasons as for Mr. Montgomery,

9  that Mr. Spoden did not testify before the legislature.

10      *THE COURT:*  Thank you.

11                    **DIRECT EXAMINATION**

12  *BY MR. GROVE:*

13  *Q.*  Mr. Spoden, where do you work?

14  *A.*  For the Colorado Bureau of Investigation InstaCheck unit.

15  *Q.*  What's your job title?

16  *A.*  InstaCheck examiner supervisor, Technician 4.

17  *Q.*  What did you do before working at CBI?

18  *A.*  My college experience was Metropolitan State College of

19  Denver, and prior to that, I was in the United States Marine

20  Corps.

21  *Q.*  Please describe for the Court what the InstaCheck unit

22  does.

23  *A.*  The CBI InstaCheck unit is a point of contact for the

24  Federal Bureau of Investigation National Instant Criminal

25  Background Check System program.  We process comprehensive

1  background checks pursuant to state and federal law on behalf

2  of Colorado licensed gun dealers for those persons attempting

3  to purchase a firearm in the state.

4  *Q.* You mentioned that InstaCheck is the point of contact for

5  the National Instant Criminal Background Check System, which I

6  will refer to as NICS. What does "point of contact" mean?

7  *A.* Point of contact means we're responsible for following NICS

8  procedures. The NICS program was established in 1993, pursuant

9  to the Brady Act, and implemented in 1998. And all they do is

10 they process firearm background checks for FFLs and attempt to

11 establish quickly whether the potential buyer will be able to

12 purchase a firearm or not.

13 *Q.* You also used another acronym, FFL. What does that mean?

14 *A.* Federal firearm licensees, otherwise known as a gun dealer.

15 *Q.* If they're a licensee, who licenses them?

16 *A.* The ATF.

17 *Q.* Another term I think we'll be using during this course here

18 is transfer. Can you please explain whether transfer is the

19 same thing as a sale.

20 *A.* A transfer is to sell or deliver a firearm from one person

21 to another.

22 *Q.* Is that a statutory definition?

23 *A.* I believe that's the federal definition.

24 *Q.* Okay. So you talked about NICS earlier. Does federal law

25 require a licensed gun dealer to run a background check on a

1 prospective buyer prior to making a retail sale?

2 A. Yes, they do.

3 Q. Let's run through how that process works and how

4 InstaCheck, your unit, is involved. Let's say that I want to

5 purchase a firearm, and I go to a gun store to do it, what

6 happens when I'm ready to buy?

7 A. When you're ready to buy, the buyer would fill out the ATF

8 form 4473. The licensed gun dealer, or FFL, would then verify

9 the information with a valid driver's license or identification

10 card. And that information would be transmitted to CBI either

11 over the internet via our web application or over the phone.

12 Q. Okay. And what happens after the information gets

13 transmitted from the FFL to InstaCheck?

14 A. Once it's received by the InstaCheck unit, that -- the

15 buyer's information is automatically queried through seven

16 different databases. And then it's presented to our staff

17 ready to review the results and return the final approval,

18 denial, or delay back to the gun dealer.

19 Q. So does the FFL actually submit 4473 itself to InstaCheck?

20 A. No, they submit specific information from the 4473 to

21 InstaCheck.

22 Q. What's the interface? How do they get it there?

23 A. Two ways. They could either call it in over the phone, or,

24 commonly, 96 percent of our checks are submitted via the

25 internet application.

1  *Q.*  What does InstaCheck do when it receives information about

2  a potential purchaser from a gun dealer?

3  *A.*  Our system will, basically, automatically run the buyer's

4  information through seven different databases and then make a

5  final determination to return to the gun dealer whether to

6  proceed, delay, or deny that transaction.

7  *Q.*  I want to put you on the spot here.  Can you name the seven

8  databases?

9  *A.*  The first database is the National Crime Information

10  Center, the Interstate Identification Index, the FBI NICS

11  Index, the State Judicial Database, Colorado Crime Information

12  Center, the Department of Motor Vehicles, and Immigration and

13  Customs Enforcement database.

14  *Q.*  Better than I could have done.  How long does that process

15  take?

16  *A.*  That process of running the buyer's information through the

17  databases is almost instantaneous.  Currently, right now, the

18  time for us to process a background check is anywhere between

19  four and thirteen minutes from the time the FFL submits the

20  information to us to when we return the result back.

21  *Q.*  How is it possible that InstaCheck can go through all of

22  those databases in that short a time?

23  *A.*  In August 2013, we made significant improvements to our

24  system.  What was basically prior to that a manual system, is

25  now, basically, automated.  So as soon as the FFL submits that

1  information, there is an automatic validation of the buyer's

2  information with DMV.  If it passes that validation, then it's

3  automatically submitted to those databases, and the results are

4  returned in a color-coded manner.  So when we look at the

5  checks waiting for our troops to review, they're in a green, a

6  yellow, or a red color-coded appearance, and those indicate a

7  possible anticipated result.

8  *Q.*  So why don't you tell us what each of those colors might

9  mean.

10  *A.*  If the check comes back green, that's an anticipated

11  approval.  And that means that through all of those databases,

12  no matching hits or records were found.  And in that situation,

13  that check may take less than a minute or two to process,

14  because our troops simply open up the check and then return the

15  results.  So they query State Judicial first, that's the only

16  manual query we have, and then return back to the gun dealer.

17  *Q.*  You mentioned "hits."  What do you mean by that?

18  *A.*  That would be a match on the buyer's identifiers, such as

19  name, date of birth, social security is optional.

20  *Q.*  Is it a good thing or a bad thing to get a hit?

21  *A.*  It could be a bad thing.  Because it's a name-based search,

22  you could have false positives and false negatives.  That means

23  that with those buyers' identifiers, we did have matching

24  information.

25  *Q.*  And so that might be potential disqualifiers for firearms

1    purchases?

2    *A.*   Correct.

3    *Q.*   What are InstaCheck's hours of operation?

4    *A.*   InstaCheck hours of operation are 9 a.m. to 9 p.m.

5    *Q.*   What happens if a firearms retailer is open outside of

6    those business hours?

7    *A.*   Our internet application, they can submit that 24 hours a

8    day.  So if they submit after business hours, they're allowed

9    to submit that background check.  And then at 9:00 a.m. the

10   following morning, our troops will come in and finish it up,

11   review the results, and send it back.

12   *Q.*   So there was a period a while ago where checks were taking

13   substantially more than four minutes.  Do you recall that?

14   *A.*   Yes I do.

15   *Q.*   What's the approximate time frame for that?

16   *A.*   The time frame we were experiencing overwhelming volume

17   was, I believe, starting in July 2012 until the middle of

18   February of 2013.

19   *Q.*   Do you recall when the Aurora theater shooting occurred?

20   *A.*   I believe July 2012.

21   *Q.*   How about Sandy Hook shooting?

22   *A.*   December 2012.

23   *Q.*   Do you know if there was legislative activity around gun

24   control issues during this period?

25   *A.*   I believe so.

1   *Q.* So if things were taking a really long time then, what has

2   changed in terms of the demand that is put on your unit in

3   terms of the number of background checks that you're currently

4   running?

5   *A.* Currently, due to the automated processing, it's reduced

6   the time that it takes for us to actually process that

7   background check and get the results back to them.  During that

8   high-volume period, we were experiencing about a 75 percent

9   increase in volume, which is now lessened.  But due to the

10  automated system that we put in -- and we do have more

11  improvements on the way -- it has definitely reduced the amount

12  of time that Colorado FFLs and gun buyers were waiting for

13  those checks.

14  *Q.* What were the -- when the backlog -- and I apologize if I

15  have to use that word.  When there was a backlog, how long was

16  the longest period in which somebody might have to wait to get

17  a yes or no answer?

18  *A.* During that backlog, which it was, we had overwhelming

19  volume.  That was up to ten days to wait for us to process that

20  background check.

21  *Q.* Was there a backlog of ten days for every single check?

22  *A.* At that time, yes.

23  *Q.* Let's say we had another event that triggered a large

24  increase in firearm sales, would InstaCheck have the same

25  difficulties?

1  *A.*  No, not at this time.

2  *Q.*  Why not?

3  *A.*  Based upon the improvements we did, in addition to the

4  color coding of the results that come back and the automatic

5  processing, the queue -- we are able to manipulate the checks

6  that we see in the queue.  We can pull out all the green checks

7  and run them very quickly, depending upon volume; we can stick

8  other personnel -- we can manage that queue.  We can put other

9  personnel in the yellow checks, the red checks, that need more

10  experienced personnel.  And then we have -- we have more

11  improvements on the way.

12  *Q.*  Okay.  I'm sorry, I got us a bit off track there.  We were

13  talking about how you buy a gun, and so --

14  *A.*  Okay.

15  *Q.*  -- I'll refocus this.  My fault.  So the FFL submits the

16  buyer's information to you by the phone or the internet, and

17  you run the check.  Let's assume the buyer is not prohibited,

18  what happens next after you get the green go ahead from the

19  system?

20  *A.*  Okay.  We would then return that result back to the FFL,

21  the gun dealer.

22  *Q.*  And from there, does the FFL hand the gun over the counter?

23  What happens?

24  *A.*  Correct.  At that point in time, the 4473 would be filled

25  out appropriately, then the FFL may transfer the firearm at

1  that time.

2  *Q.* And what kind of records does the FFL keep of the

3  transaction?

4  *A.* They will -- they must maintain the ATF form 4473, and they

5  would have to make an entry into their acquisition and

6  disposition book.

7  *Q.* Is the acquisition and disposition book, is that also known

8  as a bound book?

9  *A.* Yes.

10 *Q.* Does InstaCheck charge any money for running the background

11 check?

12 *A.* There currently is. There is a $10 fee to run the Brady

13 NICS check.

14 *Q.* And can that cost be passed on to the customer?

15 *A.* Yes.

16 *Q.* Is an FFL permitted to charge any fee to the customer in

17 addition to that $10 for running the background check?

18 *A.* For a private transfer, they are -- pursuant to statute,

19 they can charge an additional $10 to facilitate that transfer.

20 *Q.* So the customer can in fact be charged up to $20, $10 for

21 the FFL and $10 for the pass-through to CBI?

22 *A.* For private transfer, yes.

23 *Q.* Okay. So that's the process for a background check for a

24 retail sale. Let's talk about checks on private sales. And

25 we'll start with the narrow category, private sales at gun

1  shows.  First, does federal law require a private sale at a gun

2  show to have a NICS check performed?

3  *A.*  Private sale, no.

4  *Q.*  What about a retail sale at a gun show?

5  *A.*  Yes.

6  *Q.*  So Colorado does actually require private sales at gun

7  shows to be checked, correct?

8  *A.*  Yes.

9  *Q.*  And that's not something that started with 1229, is it?

10  *A.*  No.

11  *Q.*  When did it start?

12  *A.*  2001, there was a requirement for private sales at gun

13  shows to be background checked.

14  *Q.*  So in terms of what InstaCheck does, are there any

15  differences between private and retail sales at a gun show?

16  *A.*  No, there is not.

17  *Q.*  Who is responsible for making sure that someone is

18  available to perform background checks at a gun show?

19  *A.*  The promoter must ensure there is at least one FFL, gun

20  dealer, at the gun show who would be able to process private

21  background checks for that show.

22  *Q.*  And is an FFL offering private checks at a gun show allowed

23  to charge anything?

24  *A.*  They are allowed to charge the $10 fee to facilitate that

25  transfer.

1    *Q.*  Is that in addition to the $10 fee that can be passed

2    through to the customers?

3    *A.*  Yes.

4    *Q.*  So it's the same deal that we were talking about with

5    private checks in a store, correct?

6    *A.*  Correct.

7    *Q.*  Does InstaCheck keep tabs on when gun shows are scheduled?

8    *A.*  We do.

9    *Q.*  Why?

10   *A.*  To make sure we're staffed appropriately, that we have

11   enough personnel on hand so that there is not an overwhelming

12   wait or queue time for those checks to be processed.

13   *Q.*  Is it common, in your experience as an InstaCheck

14   supervisor, for there to be only one FFL running background

15   checks at a particular gun show?

16   *A.*  No.  Generally, there are more than one.

17   *Q.*  And over the years, has the number of FFLs running private

18   checks at gun shows increased or decreased?

19   *A.*  I believe increased.

20   *Q.*  How much does an FFL typically charge for a private check

21   at a gun show?

22   *A.*  $10.

23   *Q.*  Have you ever seen them charge less?

24   *A.*  Yes, I have.

25   *Q.*  Please describe that.

James Spoden - Direct

1   *A.*   I have been at gun shows, and I've seen them have signs

2   posted above their tables saying "CBI checks free," so that

3   they were processing private background checks with no fee.

4   *Q.*   You walked us through the process for a retail sale from an

5   FFL a few minutes ago.  Let's talk about how that is different

6   for a private sale at a gun show and the retail store.  If you

7   could turn to Exhibit 22.

8           Which has been stipulated, Your Honor.

9           Do you recognize this document, sir?

10   *A.*   Yes, I do.

11   *Q.*   What it is?

12   *A.*   The ATF procedure 2013-1 to facilitate the private transfer

13   of firearms between two unlicensed persons.

14   *Q.*   When was it issued?

15   *A.*   It was issued in March of 2013.

16   *Q.*   Was it well publicized when it came out in March?

17   *A.*   No, it was not.

18   *Q.*   When was InstaCheck informed of it?

19   *A.*   This procedure was brought to our attention by a Colorado

20   FFL in late June or early July of 2013.

21   *Q.*   So what does the guidance do?

22   *A.*   It provides instructions for FFLs to process or facilitate

23   private transfers between two unlicensed persons and gives them

24   additional instructions on how that can be accomplished.

25   *Q.*   Let me define one more term, here.  You said "unlicensed

1  persons," what does that mean in the context of firearms

2  transfers?

3  *A.*  People who are not licensed FFLs who are transferring

4  firearms.

5  *Q.*  We talked about the process and how it works for retail

6  sales.  What are the differences between an unlicensed seller

7  and buyer at a gun show?

8  *A.*  At a gun show, if two unlicensed persons would want to

9  transfer firearms, one to another, they would have to go to a

10  licensed FFL at that gun show, the FFL would have the buyer

11  fill out the ATF form 4473, that information would be submitted

12  to CBI, we would review the results and provide the answer back

13  to the FFL as far as whether that weapon can be transferred or

14  not.

15  *Q.*  Did this guidance that is in Exhibit 22 do anything to

16  change the purchase process for a transaction between two

17  unlicensed individuals?

18  *A.*  It did.  It significantly reduced -- one of the main

19  problems with that -- facilitating that transfer was the

20  licensed FFL is no longer required to immediately take that

21  firearm into their own inventory and enter it into their A and

22  D book if the buyer fails the background check.  If the buyer

23  fails, they can now simply give that firearm back to the seller

24  without that person having to do a background check through

25  CBI.

1  Q.  So how did it work before this change came out?

2  A.  Before the change, they were required to take it into their

3  inventory as an acquisition.  If the buyer failed the

4  background check, then the original seller would have to then

5  undergo a background check to be approved for the return of

6  that firearm to them.

7  Q.  So it sounds like -- I just want to make sure I have this

8  right -- that under this guidance, the FFL doesn't have to log

9  the firearm into the bound book until the buyer has actually

10 passed the check?

11 A.  Correct.

12 Q.  Prior to this policy change by ATF, were you aware of any

13 situations in which a gun dealer got stuck with a firearm

14 because both the buyer and the seller were prohibited?

15 A.  Absolutely.  That frequently occurred at gun shows.

16 Q.  Did people ever call InstaCheck asking for advice?

17 A.  They did.  They called in and asked what they were supposed

18 to do with that firearm now that the seller could not purchase

19 and the buyer could not accept the weapon back.

20 Q.  What was InstaCheck's position on that?

21 A.  We would advise them, for both the seller and the buyer, to

22 complete the CBI field process so that hopefully one of those

23 could be cleared.  If not, that weapon would have to remain in

24 the FFL's inventory at that time.

25 Q.  We talked a little bit about denials so far.  And one of

1  the phrases I've seen in this context is initial denial.

2  That's usually the way I see it.  What is the difference

3  between a denial and initial denial?

4  *A.*  Well, you have initial denial.  That's where on the first

5  run of the background check, deniable or prohibiting

6  information was located, and the denial was issued pursuant to

7  state and federal law.  Generally, some of the initial denials

8  may be denial on arrest.  But the final prohibiting denial, if

9  someone appeals, and then we confirm the prohibiting

10  information, that would be a prohibited individual and

11  prohibited denial.

12  *Q.*  So about how often are appeals successful?

13  *A.*  Just over 50 percent of the time.

14  *Q.*  So does that mean that there are a lot of errors in the

15  background check process?

16  *A.*  No, not at all.

17  *Q.*  So, what does it mean, then?

18  *A.*  It just means that at the time that background check was

19  run, deniable information was located, such as an open arrest,

20  there may be an open felony arrest that was discovered on a

21  record.  And with no disposition, pursuant to Colorado state

22  law, we would issue a denial based upon that.

23  *Q.*  So as time goes by, that open arrest might be resolved?

24  *A.*  That's correct.  If that person appeals, then it's up to

25  CBI's responsibility to go out and confirm the final

1  disposition of that charge.  If we found that it was reduced or

2  dismissed, then that denial would be reversed.

3  *Q.*  Could the same apply for, say, restraining orders?

4  *A.*  It could.  For many of the previous categories, such as a

5  protection order, at the time the check was ran, that person

6  may have been subject to a domestic violence protection order.

7  However, on appeal, we go back and research, and we can then

8  determine if it was vacated.  Another example would be juvenile

9  felony adjudications.  At the time the check was ran, that

10  person may have a felony juvenile adjudication.  When they

11  appeal, we inform them that's there, and they can have it

12  expunged.  So that would be another example of a reversal of an

13  initial denial.

14  *Q.*  Okay.  So we've gone over the procedure for running a

15  private background check at a gun show.  Does that process

16  differ in any way for a private check under 18-12-112, in which

17  two unlicensed individuals go into a gun store and ask the gun

18  store to run the check?

19  *A.*  No.

20  *Q.*  Earlier we talked about what FFLs can charge at gun shows.

21  Is that any different for -- is that any different from what a

22  private dealer may charge in his store?

23  *A.*  No, it is not.

24  *Q.*  How long should the background check process take for a

25  private sale?

1   *A.* Same amount of time as any retail sale, anywhere between

2   four and thirteen minutes is our current processing time.

3   *Q.* And plus any time, I guess, to fill out the form; is that

4   right?

5   *A.* That is correct.

6   *Q.* Fair to say you could be in and out in half an hour?

7   *A.* Yes.

8   *Q.* Less, if you're lucky?

9   *A.* Yes.

10  *Q.* We heard testimony earlier from an FFL about interstate

11  transfers of firearms between unlicensed sellers.  Does

12  InstaCheck run background checks for these type of transfers?

13  *A.* Yes, we do.

14  *Q.* Does your process differ at all for that type of transfer?

15  *A.* No, it does not.

16  *Q.* Please turn to Exhibit 26.

17          I believe this has been stipulated and entered already

18  as well.

19          *THE COURT:*  Mr. Keech, would you check that.

20          *COURTROOM DEPUTY:*  Yes, Your Honor, that's correct.

21          *THE COURT:*  Thank you.

22  *BY MR. GROVE:*

23  *Q.* Do you recognize this document?

24  *A.* Yes, I do.

25  *Q.* What is it?

1    *A.*  This is an ATF list of Colorado FFLs.

2    *Q.*  And is it current?

3    *A.*  Current as of March 2014.

4    *Q.*  Okay.  So how many federal firearms licensees were there in

5    Colorado for the month of March 2014?

6    *A.*  This document shows 1,930.

7    *Q.*  Does that mean that there are 1,930 locations where an

8    unlicensed seller and buyer could potentially go to have a

9    private background check done in Colorado?

10   *A.*  Currently, only 1,905 FFLs are registered with CBI to run

11   background checks.

12   *Q.*  Okay.  So you have to be registered with the state to be

13   able to do it?

14   *A.*  Yes.

15   *Q.*  Sounds like there are 25 that aren't?

16   *A.*  Yes.

17   *Q.*  Are all of those 1,905 FFLs actively running checks?

18   *A.*  Not at this time.  The active number of FFLs running checks

19   per month is approximately a thousand, according to our billing

20   invoices.

21   *Q.*  So there is still probably a thousand places that you could

22   potentially go to get a background check done?

23   *A.*  Yes.

24   *Q.*  Now, are the FFLs who are running background checks

25   concentrated here on the front range, or are they distributed

1    evenly throughout the state?

2    *A.* I believe they're distributed throughout the state.

3    *Q.* I'd like to go through a couple of these columns on Exhibit

4    26, just so I understand what they mean.

5         Let me just ask, first of all, is this spreadsheet all

6    of the information that ATF makes available about a dealer?

7    *A.* No, it is not.

8    *Q.* Is there any critical information that is omitted from

9    there?

10   *A.* There can be contact numbers for the store, phone numbers,

11   fax numbers.

12   *Q.* On column C -- and, actually, I see that you don't have

13   letters on top here, but the third column from the left says,

14   license sequence, L-I-C space S-E-Q-N.  And then underneath

15   that in that column, there are a series of numbers, one in each

16   row.  What does that number mean?

17   *A.* That number represents the last five digits of the federal

18   firearms licensee's license.

19   *Q.* Is that a unique number?

20   *A.* It is.

21   *Q.* City, state, zip are self-explanatory, so I think I'll move

22   on.

23        Let's look at Exhibit 25.  I believe, Your Honor, has

24   also been admitted and stipulated to.

25        *COURTROOM DEPUTY:*  That is also correct, Your Honor.

1         *THE COURT:* Thank you.

2    *BY MR. GROVE:*

3    *Q.* Did you create this document in response to a subpoena

4    issued by the plaintiffs in this case?

5    *A.* Yes, I did.

6    *Q.* To your knowledge, was this document produced subject to

7    the protective order in this case?

8    *A.* Yes, it is.

9    *Q.* What is it?

10   *A.* This is a summary of FFLs who have processed private

11   transactions in the state of Colorado from July 2013 through

12   February of 2014.

13   *Q.* So when you said private sales, what types of sales might

14   that include?

15   *A.* That could be private sales at gun shows, private sales at

16   non-gun shows, private sales between two individuals, or

17   private sales interstate.

18   *Q.* Does the data that InstaCheck receives from firearms

19   dealers allow you to break the distribution down any further

20   than that?

21   *A.* It does not.

22   *Q.* Are you able to distinguish between gun show and non-gun

23   show sales?

24   *A.* Yes.

25   *Q.* So there is a little bit of additional breakdown?

1    *A.*  There is, yes.

2    *Q.*  So why doesn't CBI keep more data than it does here?

3    *A.*  The information regarding private sales was initially put

4    into place in 2001, after the private sales of at gun show laws

5    were passed.  So we collected whether a transaction occurred

6    at -- was it a private sale or a dealer sale since that time.

7    However, we've never compiled it; we've never examined it.  No

8    one requested that information, so we really haven't tracked it

9    at all until such time as 1229 was passed and that information

10   was requested.

11   *Q.*  How many FFLs reported running a private background check

12   of any type between July 1, 2013, and the end of February 2014?

13   *A.*  For that time period, this document indicates 635 FFLs.

14   *Q.*  And how many checks did they run?

15   *A.*  8,653.

16   *Q.*  Were any of those initially denied?

17   *A.*  Yes.

18   *Q.*  Let's look at the columns on this exhibit, which is, again,

19   25.  So the first column on the left side says "count."  What

20   does "count" mean?

21   *A.*  Count indicates how many transactions they processed.

22   *Q.*  And the next column says "FFL ID."  What does that mean?

23   *A.*  And that is, once again, their last five of their federal

24   firearms license number.

25   *Q.*  Does that correspond to the license sequence that was on

1    the ATF list that we looked at a moment ago?

2    *A.*   Yes, it does.

3    *Q.*   Which is Exhibit 26.

4          Based on the number that we see in Exhibit 25, under

5    "FFL ID," are we able to cross-reference the ATF list that's in

6    Exhibit 26 and identify the FFL by name?

7    *A.*   Yes.

8    *Q.*   And how do you do that?

9    *A.*   By looking up the last five numbers of the FFL license,

10   comparing those two documents.

11   *Q.*   Let's do it.  So I'll direct your attention about halfway

12   down the page on Exhibit 25 to FFL ID No. 01332.  Do you see

13   that?

14   *A.*   Yes, I do.

15   *Q.*   So it's the first listing next to the city name of Aurora.

16   And the first thing I notice is that 01232 is listed twice

17   here.  Why is that?

18   *A.*   It's listed each time for approvals and denials.  So that

19   FFL looks like they issued both approvals and denials for

20   private sales.

21   *Q.*   How many approvals did that FFL provide?

22   *A.*   Seventy-four.

23   *Q.*   And how many denials?

24   *A.*   Two.

25   *Q.*   And so if the dealer ran a total of 76 checks during this

1  period?

2  *A.*  That is correct.

3  *Q.*  If we were going to identify this dealer by name, how would

4  we do that, if you were going to go back to Exhibit 26?  And

5  you don't need to do it, just describe for me.

6  *A.*  If we went back to document 26, I would look up the license

7  sequence of the last five and then go over to the business

8  name.

9  *Q.*  Let's try that for a different dealer.  If I could direct

10  you to the second page of this exhibit, which has Gov 05053 at

11  the bottom right.  Are you there?

12  *A.*  Okay, yes.

13  *Q.*  About ten lines down there is a listing for FFL ID No.

14  03891.  Do you see that?

15  *A.*  Yes, I do.

16  *Q.*  How many checks has this dealer run?

17  *A.*  This dealer has run 64 total checks.

18  *Q.*  What was the breakdown between approval and denial?

19  *A.*  Sixty-three approvals and one denial.

20  *Q.*  Let's go back to page 31 of the ATF spreadsheet, which is

21  Exhibit 26.

22  *A.*  Which page was that?

23  *Q.*  31.  And for those whose page numbers may be hole punched,

24  let's look at line 840.

25  *A.*  Okay.

1   *Q.*   I'm sorry, page 29.

2   *A.*   Line 840?

3   *Q.*   Yes.

4   *A.*   Okay.

5   *Q.*   Are you with me?

6   *A.*   Yes.

7   *Q.*   So is that the same number, 03891, we just looked at on the

8 other sheet?

9   *A.*   Yes, it is.

10   *Q.*   What's the name of that retailer?

11   *A.*   License name is CJ1 Enterprises.  Business name is USA

12 Liberty Arms.

13   *Q.*   And so USA Liberty Arms has run 64 total background checks?

14   *A.*   Yes.

15   *Q.*   And these are private checks, right?

16   *A.*   That's correct.

17   *Q.*   I won't make you go through that exercise for all the

18 plaintiffs.  Let's turn to Exhibit 20.  Do you recognize this

19 document?

20   *A.*   Yes, I do.

21   *Q.*   And what is it?

22   *A.*   This is a summary sheet of FFL private background checks

23 from July 1 of 2013 through February 28 of 2014.

24   *Q.*   What are the -- what are the documents that this

25 information is compiled from?

1    *A.*  Okay.  This document is compiled from the private sale

2    reports, 25 and 26.

3    *Q.*  And have you confirmed that the information on this, which

4    is Exhibit 20, is accurate?

5    *A.*  Yes.

6         *MR. GROVE:*  Your Honor, we'd offer Exhibit 20.

7         *THE COURT:*  *Voir dire* or objection?

8         *MR. KOPEL:*  Can I have a moment, Your Honor?

9         If I could ask just a question of counsel, defense

10   counsel -- Mr. Grove.

11        The -- this is reported to be plaintiff FFL private

12   background checks.  This is a 1006 summary; is that correct?

13        *MR. GROVE:*  Your Honor, can I address Mr. Kopel?

14        *THE COURT:*  You may.

15        *MR. GROVE:*  Yes.

16        *MR. KOPEL:*  I would point out, then, that the last

17   item for Grand Prix Guns might be inappropriate, because Grand

18   Prix Guns was terminated as a plaintiff.

19        *THE COURT:*  The question is whether this exhibit is

20   admissible for not.

21        *MR. KOPEL:*  We do not object to the admissibility of

22   this exhibit, although we do note that it is overinclusive, in

23   that --

24        *THE COURT:*  There is no notation at this point.  If

25   you want on cross-examination to inquire as to this exhibit or

1  point out flaws in the exhibit, you're free to do so.

2          MR. KOPEL:  Thank you, Your Honor.

3          THE COURT:  It's either admitted or it's not.

4          MR. KOPEL:  We do not object.

5          THE COURT:  Okay.  It is received.

6          (Exhibit 20 admitted.)

7  BY MR. GROVE:

8  Q.  So I'll represent to you that each of these FFLs was listed

9  as a plaintiff in this case at the outset of this case.

10 Between them, how many private sale background checks has this

11 group reported performing?

12 A.  I don't have totals on here.  Ninety-eight.

13 Q.  Would it help if I hand you a calculator?

14 A.  Sure.

15         MR. GROVE:  If I could, Your Honor, for Mr. Keech.

16         THE COURT:  You may.

17         THE WITNESS:  It's 108.

18 BY MR. GROVE:

19 Q.  And I got 103, but --

20 A.  Okay.

21 Q.  That's fine.  Let's just call it 103.

22 A.  Okay.

23 Q.  How many of those -- this, I promise will be easier.

24 A.  Yes.

25 Q.  -- have been initial denials?

1   *A.*   Initial denials?  Three.

2   *Q.*   Yes.  So that's a denial rate of about 3 percent?

3   *A.*   Yes.

4   *Q.*   How does that figure compare to InstaCheck's average denial

5   rate?

6   *A.*   InstaCheck's average denial rate is around 2 percent.

7   *Q.*   So it's a little higher?

8   *A.*   Yes.

9   *Q.*   In general, how do numbers compare between private checks

10  and retail sales in terms of initial denial rate?

11  *A.*   Initial denial rate is relatively the same; however, the

12  private transfers is slightly higher at this time.

13  *Q.*   What do you mean by slightly higher?

14  *A.*   3.41 percent.

15  *Q.*   Was that for -- can you give us a time frame for that?

16  *A.*   That was for the month of February.

17  *Q.*   And do you have any idea if that trend is going to

18  continue?

19  *A.*   That, I do not know at this time.

20  *Q.*   InstaCheck compiles its data on a monthly basis; is that

21  right?

22  *A.*   Yes, we do.

23  *Q.*   Let's turn to Exhibit 24.

24          And, Your Honor, I believe has been stipulated and

25  admitted as well.

1        *COURTROOM DEPUTY:*  That's correct.

2    *BY MR. GROVE:*

3    *Q.*  Do you recognize this document?

4    *A.*  Yes, I do.

5    *Q.*  What is it?

6    *A.*  These are CBI InstaChecks of private firearm transaction

7    data as reported by Colorado FFLs from July 2012 through

8    December 2013.

9    *Q.*  So non-gun show, which is the top line here, would include

10   when two unlicensed individuals come into the store for a

11   private check, correct?

12   *A.*  That's correct.

13   *Q.*  And it would also include interstate transfers that go

14   through an FFL?

15   *A.*  Yes.

16   *Q.*  Are -- can you break down the number -- can you compare how

17   many interstate FFLs transfers versus two people walking into

18   the store occur?

19   *A.*  That I cannot.  I can only tell that it occurred at their

20   FFL license.

21   *Q.*  Do you know whether any private checks with two people

22   walking into the store actually occurred?

23   *A.*  Yes, they have.

24   *Q.*  How do you know that?

25   *A.*  As reported by Colorado FFLs, they have called into the

1    unit explaining that they processed two private sale

2    transactions -- transactions between two private individuals in

3    their store.

4    *Q.* Do you know how many initial denials InstaCheck has issued

5    for private sales between July 1, 2013, and the end of

6    February?

7    *A.* Not offhand, no, I do not.

8           *MR. GROVE:* Thank you. That's all I have, Your Honor.

9           *THE COURT:* Thank you.

10          Cross-examination.

11                        **CROSS-EXAMINATION**

12   *BY MR. KOPEL:*

13   *Q.* Good afternoon, Mr. Spoden.

14   *A.* Good morning, sir.

15   *Q.* I wonder if we could start off asking about the list of

16   Colorado FFLs that you talked about on your direct examination.

17   Is that a comprehensive list of FFL license holders in

18   Colorado?

19   *A.* Which exhibit would that be?

20   *Q.* I believe that's Exhibit 24. I'm sorry, that's not -- I've

21   misled you. Exhibit 26, please.

22   *A.* Yes, I believe that's a comprehensive list. Pursuant to

23   the ATF, this is what they have on file for Colorado FFLs.

24   *Q.* So -- okay. I'm going to just read the different

25   categories of -- are you familiar with the ATF -- in the course

1  of your job, are you familiar with ATF's various categories for

2  federal firearms licensees?

3  *A.*  Somewhat, yes.

4  *Q.*  Okay.  So does this list include type one, which is, dealer

5  in firearms other than disruptive devices, parentheses,

6  includes gunsmiths?  I'm reading from the ATF list of types.

7  *A.*  Uh-huh.  That, I do not know.

8  *Q.*  How was this list prepared?

9  *A.*  I believe this list was requested from the ATF.

10  *Q.*  And did you make the request?

11  *A.*  I did not.

12  *Q.*  Do you know who did?

13  *A.*  I believe the Attorney General's Office may have.

14  *Q.*  Do you know what the request asked for?

15  *A.*  No, I don't.

16  *Q.*  Would a comprehensive list of FFLs in Colorado necessarily

17  include type 1, namely, the category, dealer in firearms other

18  than destructive devices?

19        *MR. GROVE:*  Objection, calls for speculation.

20        *THE COURT:*  Overruled.  He can answer if he knows.

21        *THE WITNESS:*  That, I do not know.

22  *BY MR. KOPEL:*

23  *Q.*  Would a comprehensive list of FFLs in Colorado include FFL

24  category 2, pawnbroker in firearms other than destructive

25  devices?

1    *A.*   Yes.

2    *Q.*   Would a comprehensive list of FFLs in Colorado include FFL

3    type 3, collector of curios and relics?

4    *A.*   No.

5    *Q.*   Would a comprehensive list -- why not?

6    *A.*   We do not process -- as far as checks ran through CBI, we

7    would not process curios and relics checks.

8    *Q.*   I understand why a collector of curios and relics wouldn't

9    process checks through CBI, because they are exempt for curios

10   and relics from the check process.  But I'm asking you a

11   separate question.  Would a comprehensive list of FFLs in

12   Colorado include people who hold FFL type 3, collector of

13   curios and relics?

14   *A.*   It may.

15   *Q.*   Would a comprehensive list of FFLs in Colorado include

16   license type 6, manufacturer of ammunition for firearms?

17   *A.*   It may.

18   *Q.*   Would a comprehensive list of FFLs in Colorado include FFL

19   license type 7, manufacturer of firearms -- manufacturer of

20   firearms other than destructive devices?

21   *A.*   It might.

22   *Q.*   Would a comprehensive list of FFL type -- FFLs in Colorado

23   include FFL license type 8, importer of firearms other than

24   destructive devices?

25   *A.*   It may.

1  *Q.* Would a comprehensive list of FFLs in Colorado include FFL

2  license type 9, dealer in destructive devices?

3  *A.* It might.

4  *Q.* Would a comprehensive list of FFLs in Colorado include FFL

5  license type 10, manufacturer of destructive devices?

6  *A.* It may.

7  *Q.* Would a comprehensive list of FFLs in Colorado include FFL

8  license type 11, importer of destructive devices?

9  *A.* It might.

10 *Q.* Do you know which of these license -- of these different

11 FFL license types are authorized by federal law to initiate a

12 background check for a sale to a customer?

13 *A.* The ones when we look at an FFL license?

14 *Q.* Yes.

15 *A.* The ones that are designated 584 are the ones that we

16 process background checks for firearms.

17 *Q.* Okay. And then to make sure I'm understanding correctly,

18 when you said 584, that's -- might be something in the number

19 of the FFL license or something like that. That's not the --

20 is that correct?

21 *A.* Correct.

22 *Q.* That's -- so you're -- am I right in assuming that you

23 don't -- you personally don't know which of these various types

24 of FFL licensees may or may not initiate background checks and

25 contact the Colorado Bureau of Investigation for a sale of

1    something to a customer?

2    *A.*   The only ones that are licensed 584 with the appropriate

3    last five and registered with our system are the only ones we

4    process background checks.

5    *Q.*   Okay.  Just to doublecheck, you don't know which -- what

6    you call the 584s, you don't know where they fit in any of

7    these various categories that we just talked about; is that

8    true?

9    *A.*   Yes.

10   *Q.*   Okay.  Do part of your duties involve providing information

11   about the background check system to the Colorado state

12   government?

13            *MR. GROVE:*  Objection.  Outside the scope of direct.

14            *THE COURT:*  Response.

15            *MR. KOPEL:*  The exhibits are -- that Mr. Spoden has

16   talked about are exhibits that were produced pursuant to those

17   duties, some of them at the Governor's request, some of them

18   for other purposes.  He's -- he is the person who provides us

19   all with information about the statistics around the operation

20   of the background check system.  And I would like to inquire

21   about the processes and how he does that and the things he has

22   discovered in doing so.

23            *THE COURT:*  Reply.

24            *MR. GROVE:*  My direct didn't cover that.

25            *THE COURT:*  I'll allow inquiry.

1    You may answer the question. Would you like to have

2  it read back?

3    *THE WITNESS:* Yes, please.

4    *THE COURT:* Would you read the question back, please.

5    (Question read back by court reporter.)

6    *THE WITNESS:* Yes, it is.

7  BY MR. KOPEL:

8  *Q.* Are you the lead person at the Colorado Bureau of

9  Investigation responsible for that duty in a statistical data

10  sense?

11  *A.* Yes.

12  *Q.* Could you please turn to Exhibit 24. Are you familiar with

13  this -- you testified about this document. Did you prepare

14  this document?

15  *A.* Yes.

16  *Q.* Okay. For the -- we know what gun shows are, so let's look

17  at the non-gun show line. In the months that you report data

18  for from July 2012 through June of 2013 for non-gun show

19  private checks -- true?

20  *A.* Yes. The report goes from July 2012 to December 2013.

21  *Q.* Right. And at the moment I'd just like to ask you about

22  the -- up until July 1, so not talking about after that. Just

23  the data that's reported in that July 2012 through June 2013,

24  that's what I'm asking about only at the moment, and only about

25  the ones on the non-gun show line.

1    What types of transactions would be included in that

2  data there?

3  *A.*  Okay.  That would include private transfers at the FFL's

4  establishment between two private individuals, or they could

5  also include interstate purchases between residents of

6  different states.

7  *Q.*  Would there be anything else?  It could be, to your

8  knowledge, factual types -- types of activities that might have

9  been captured by that data?

10  *A.*  Those are the two general private transfer activities that

11  would be recorded in that line.

12  *Q.*  Could things -- would there be any other -- if those were

13  the two main things, can you think of anything else that might

14  fill in the miscellany of those numbers?

15  *A.*  No, not beyond the two that I gave, no.

16  *Q.*  So let me -- just so we can be clear on the interstate

17  aspect of that.  Tell me if this is accurate, that by the Gun

18  Control Act of 1968, federally, a

19  private-person-to-private-person sale of a firearm may not take

20  place across state lines.  And so that if a private individual

21  in Missouri wants to sell a firearm to a private individual in

22  Colorado, that sale must be routed through an FFL -- from the

23  private man in Missouri, to the FFL in Missouri, to the FFL in

24  Colorado, to the buyer in Colorado; is that accurate?

25  *A.*  Yes.

1   Q.  And so these kinds of -- FFL processing of interstate

2   private sales have been going on since 1968?

3   A.  They may have -- they may have.

4   Q.  Would they have been required by law from 1968?

5   A.  Yes.

6   Q.  Was that a yes?

7   A.  Yes.

8   Q.  All right.  And the other type of material -- transactions

9   covered in the July 2012 to June 2013 period in the data you

10  have here, you said the other would be two individuals walking

11  into a gun store to do a private transaction.

12  A.  Yes.

13  Q.  Now, was that required by law before July 1, 2013?

14  A.  If it did not occur at a gun show, no.

15  Q.  Okay.  Right, so we're on the non-gun show line?

16  A.  Correct.

17  Q.  One thing we can be sure about is that none of that

18  happened at a gun show, the data we're talking about; is that

19  true?

20  A.  Yes.

21  Q.  Okay.  So why would two individuals walk into a store to do

22  that if they didn't -- well, you're saying they would walk in

23  and do it even though they're not legally required; am I noting

24  that correctly?

25  A.  Some would, yes.

1    *Q.* Okay. Please tell me if I'm understanding what you said

2    accurately. Therefore, the data in this July 2012 to June 2013

3    period includes two types of transactions. One is interstate

4    private sales which were legally required to be processed by

5    FFLs before -- by federal law, and voluntary private sales,

6    buyers and sellers -- private sales, buyers and sellers

7    voluntarily going into stores, for whatever reason they chose,

8    to use an FFL to facilitate that transaction. Is that an

9    accurate reflection of what -- do I understand you correctly?

10   *A.* Yes.

11   *Q.* Okay.

12       *THE COURT:* Mr. Kopel, we're getting close to

13   3 o'clock. So if there is a convenient stopping point, would

14   you please let me know when we get there so we can take an

15   afternoon recess.

16       *MR. KOPEL:* Yes. I have one very quick question,

17   then -- it's never one with a lawyer, but we're very close.

18   *BY MR. KOPEL:*

19   *Q.* After House Bill 1229, Colorado Revised Statutes 18-12-112,

20   went into effect on July 1, did the number of non-gun show

21   private sales transactions processed by FFLs increase according

22   to the data you have here?

23       *MR. GROVE:* Objection, vague. There is no time frame.

24       *THE COURT:* The objection is as to the form of the

25   question. Would you like to rephrase it?

1    *MR. KOPEL:*  Okay.  Yes.

2    *BY MR. KOPEL:*

3    *Q.*  Compared to the period of July 2012 to June 2013, did the

4    number -- compared to the period of July 2012 to June 2013,

5    when intrastate private sales processing by FFLs was purely

6    voluntary, comparing that to the period after July 1, when

7    C.R.S. 18-12-112 was in effect, did the number of private sales

8    processed by FFLs increase?

9    *A.*  I would say not initially, but they seem to be trending up

10   after July of 2013.

11   *Q.*  In that every month after July 2013 was higher than

12   July 2013?

13          How about the number of -- what are -- putting aside

14   private sales in general, what part of time of year are

15   firearms sales highest?  Is there a seasonality to them?

16   *A.*  There is.

17   *Q.*  Please tell us about that.

18   *A.*  I would say, generally, from August through the end of the

19   year, because you encompass hunting season, and then you

20   encompass high retail season for holiday sales.

21   *Q.*  So I would get -- is it true that you might say, August,

22   September, October, they're big months in the firearms business

23   because of hunting season; is that true?

24   *A.*  Yes.

25   *Q.*  And then November, December are big seasons for holidays,

1    Christmas, Hanukkah, Kwanzaa, all of those things?

2    A.   Correct.

3    Q.   Let's take a quick look at this, and then we'll be done.

4    Let's compare August 2012 to August 2013.

5         What are the figures for that?

6    A.   Could you repeat that question, please.

7    Q.   Sure.  We're now going to take a look at comparative

8    hunting seasons.  What is the number of non-gun show private

9    checks in August of 2012 compared to the number of non-gun show

10   private checks in 2013?

11   A.   I would say August 2013 is slightly higher.

12   Q.   How many?

13   A.   By 30.

14   Q.   What is the August 2013 number?

15   A.   August 2013 is 584.

16   Q.   Okay.  Great.  Now let's do another hunting month,

17   September 2012 to September 2013.

18   A.   I would say September 2013 is down.

19   Q.   Okay.  Now, let's do October 2012 to October 2013.

20   A.   October 2013 is less than October 2012.

21   Q.   And now let's do -- get into holiday season, November 2012

22   to November 2013.

23   A.   November 2013 is higher.

24   Q.   And let's do now December 2012 to December 2013.

25   A.   December 2013 is higher.

*Q.* Without going through the pain of having to add these all up on a calculator, would it be plausible if I told you that the second half of 2012 compared to the second half of 2013, the second half of 2013 was about a dozen fewer private checks, does that --
*A.* Yes.
*Q.* Okay.
*A.* Possible.
*MR. KOPEL:* Let's take a break. Thank you.
*THE COURT:* All right. The court clock is showing 3 o'clock. We'll stand in recess until 3:15.
(Recess at 2:59 p.m.)
(In open court at 3:19 p.m.)
*THE COURT:* Please proceed.
*BY MR. KOPEL:*
*Q.* Good afternoon again, Mr. Spoden.
*A.* Good afternoon.
*Q.* Hopefully, we're at least past -- at the halfway point, we're beyond. So we were talking about -- we earlier talked about the list of FFLs which you had created for Colorado. Are all of these FFLs storefronts?
*A.* Was that the list from the ATF or --
*Q.* Yes, the ATF list.
*A.* Okay. The ATF list.
*Q.* Yes.

1 | *A.* They could be.

2 | *Q.* Do you know?

3 | *A.* I do not.

4 | *Q.* Based on your -- do you ever go to gun stores as part of

5 | your professional duties?

6 | *A.* No.

7 | *Q.* Okay. Do you know as a matter of law if an FFL is required

8 | to have a storefront?

9 | *MR. GROVE:* Objection. Calls for improper legal

10 | conclusion.

11 | *MR. KOPEL:* It's simply the ATF --

12 | *THE COURT:* Did you want to respond?

13 | *MR. KOPEL:* Yeah. All I'm asking for is a description

14 | of black letter federal firearms licensing law, which I suspect

15 | that Mr. Spoden, based on his professional duties, has a

16 | reasonably good awareness of, in that he interacts on a daily

17 | basis with Colorado's FFLs and may have some knowledge of the

18 | federal laws that apply to them.

19 | *THE COURT:* Unfortunately, a lay witness cannot

20 | testify as to the law.

21 | *MR. KOPEL:* Okay.

22 | *BY MR. KOPEL:*

23 | *Q.* Mr. Spoden, are you personally aware of any FFLs which

24 | operate as home-based businesses?

25 | *A.* I'm not aware of any specific FFLs, although I know there

1    are some FFLs that do operate from a home.

2    *Q.*  Okay.  How many of those do you personally know of?

3    *A.*  None personally.  However, I do know over the years, that

4    that topic has come up.

5    *Q.*  Okay.  Do you know which, if any, of these FFLs on the list

6    here have a storefront which is open to the public?

7              *MR. GROVE:*  Objection, cumulative.

8              *THE COURT:*  Response.

9              *MR. KOPEL:*  Cumulative in the sense of asked and

10   answered?  I'm sorry, I don't understand -- perhaps Mr. Grove

11   could clarify the objection, which I'm not quite understanding.

12             *MR. GROVE:*  Asked and answered.

13             *MR. KOPEL:*  I don't believe I've asked that question

14   of that particular exhibit.

15             *THE COURT:*  Any reply?

16             *MR. GROVE:*  If that's in fact the case, I will

17   withdraw the objection.

18             *THE COURT:*  All right.  We'll let the witness answer.

19   *BY MR. KOPEL:*

20   *Q.*  Do you know which, if any, of the FFLs listed in that

21   exhibit have storefronts that are open to the public?

22   *A.*  I have not examined the entire list.  However, I do know

23   there are FFLs that would be -- in that list that have

24   storefronts that are open to the public, but I can't tell you

25   how many.

James Spoden - Cross

1  *Q.* Sure.  I think you mentioned Gander Mountain in Aurora in

2  your direct testimony, that would be one?

3      *MR. GROVE:*  Misstates, Your Honor.

4      *THE COURT:*  Misstates what?

5      *MR. GROVE:*  Misstates the prior testimony.

6      *THE COURT:*  I'll note that for the record.

7  *BY MR. KOPEL:*

8  *Q.*  I'll withdraw the question.

9      Would you please take a look at Exhibit No. 25.

10  According to Exhibit 25, how many FFLs have performed at least

11  one private check of some type in Colorado between -- since

12  July 1, 2013?

13  *A.*  Okay.  635 FFLs.

14  *Q.*  Thank you.  Can you tell for any of those FFLs what type of

15  private check it was, whether it was a gun show private check,

16  or a -- checks, or an interstate private check, or an

17  intrastate non-gun show private check?

18  *A.*  Not according to this document, no.

19  *Q.*  Do you have -- do you know of any figure saying how many

20  FFLs in Colorado since July 1, 2013, have performed intrastate

21  non-gun show private checks?

22  *A.*  No.

23  *Q.*  Okay.  In your direct examination, you were able to use

24  Exhibits 25 and 26 put together to discern the identity of at

25  least one store that was performing private checks of some type

1   in Colorado.  Can you tell whether Cabela's is performing

2   private checks in Colorado, based on Exhibits 25 and 26?

3   *A.*  I would have to review 26 to check the last five.

4   *Q.*  Would you be able to do that now, please?

5   *A.*  Sure.

6        Okay.  There is a lot of pages here.

7   *Q.*  No hurry.

8        *MR. KOPEL:*  I believe we have -- Your Honor, we might

9   have a stipulation that would save us some time.

10       *THE COURT:*  Okay.

11       *MR. GROVE:*  We'll stipulate that Cabela's is not doing

12  private checks, Your Honor.

13       *THE COURT:*  Thank you.

14       *MR. KOPEL:*  To save time, I might also ask Mr. Grove,

15  would you also stipulate that for Sportsman's Warehouse?

16       *THE COURT:*  Go ahead and respond, it's all right.

17       *MR. GROVE:*  I actually don't know that one way or the

18  other.

19  *BY MR. KOPEL:*

20  *Q.*  So, Mr. Spoden, you can skip the Cabela's project.  Now if

21  you would use 25 and 26 to give us the answer on Sportsman's

22  Warehouse, please?

23  *A.*  Which store?  There is multiple.

24  *Q.*  I suppose if you find one that has done a single check,

25  that would give us one answer.  The first one you can

1  conveniently find.

2  *A.*  Okay.

3  *Q.*  Mr. Spoden, I've been informed by my co-counsel that there

4  is a Sportsman's Warehouse in Loveland.  If you could just

5  check that one, please.

6  *A.*  Yeah, this list does not break it up specifically by city

7  for --

8  *Q.*  Mr. Spoden, Mr. Grove helpfully informs us that the

9  Sportsman's Warehouse in Grand Junction is 901.

10  *A.*  901?

11  *Q.*  Loveland's Grand Junction [sic] is No. 901.

12  *A.*  Okay.

13      Okay.  00308, Sportsman's Warehouse processed five

14  private transfers for --

15  *Q.*  That was the period July 1 to March of this year?

16  *A.*  Correct, July 2013 through February 20, 2014.

17  *Q.*  Great.  Thank you.  I promise I will not put you or the

18  Court through anything like this again.

19      Could you turn to Exhibit 20, please.

20  *A.*  Okay.

21  *Q.*  That's the Rule 1006 report you prepared.  Is that true?

22  *A.*  Yes.

23  *Q.*  Do you know for these private checks that these FFLs

24  performed whether they were interstate private sales,

25  intrastate private sales, gun shows, or intrastate other

1 private sales?

2 *A.* No, I do not.

3 *Q.* Okay. I had a question on denial data that Mr. Grove

4 talked about on cross-examination. I think you said that the

5 majority of appeals result in a reversal of the denial, is

6 that -- did I understand that accurately?

7 *A.* I said slightly over 50 percent result in reversal.

8 *Q.* Do you know -- do you have a precise number?

9 *A.* Just over 50.

10 *Q.* Would that be 51, 57, or you're not sure?

11 *A.* Approximately 54 percent, is probably as close as I can

12 come.

13 *Q.* Okay. Do you know approximately what percent of denials

14 are appealed in the first place?

15 *A.* Just over 50 percent, as well.

16 *Q.* Okay. You had mentioned on direct examination the denial

17 rate on the private sales versus the FFL inventory sales, I

18 think for the last month. Do you have any figures from July 1

19 to sometime in the recent past that provides those numbers in a

20 consolidated way?

21 *A.* I do not.

22 *Q.* So do you know since July 1 whether the denial rate on

23 private sales compared to the denial rate on FFL inventory

24 sales has been higher, lower, or the same?

25 *A.* I believe our statistics have reported -- showed that the

1  denial rate on private firearm transactions has been increasing

2  the last few months.

3  Q.  Right.  Which is an interesting fact, but not exactly the

4  question I asked.

5  A.  Okay.  Repeat your question, please.

6  Q.  Sure.  Based on the data from July 1 to whenever you have

7  the most recent data, is the overall rate of denials -- how

8  does the overall rate of denials for FFL inventory, retail

9  sales, compare to the overall rate of denials for private

10  transfers?

11  A.  The overall rate for private transfers, I'm not -- I don't

12  know.

13  Q.  Okay.  You had mentioned that you've been to a gun show

14  where they offered, I believe you said, CBI checks for free?

15  A.  Yes.

16  Q.  When was that?

17  A.  The last gun show I was at was approximately two years ago,

18  Tanner.

19  Q.  And was that where you saw the free gun checks sign?

20  A.  Yes.

21  Q.  Okay.  Was that before House Bill 1228 created the $10 fee

22  to CBI went into effect?

23  A.  Yes.

24  Q.  Do you know of any gun shows since then that there are

25  doing gun checks for free?

1    *A.*  Not personally, no.

2    *Q.*  Okay.  By the way, does the law allow a gun show operator

3    to pay an FFL to be at the show and do the checks and pay the

4    operator whatever -- what the FFL -- whatever the FFL wants and

5    then provide free checks to the buyer?

6    *A.*  That, I do not know.

7    *Q.*  Okay.  You've talked about in your direct testimony, about

8    the $10 fee cap that is placed on interstate -- that House

9    Bill -- that 1229, Colorado Revised Statute 18-12-112 places on

10   gun dealers who perform -- FFLs who perform intrastate private

11   checks at their store.  And I believe you said that that fee

12   cap is $10.  Is that an accurate characterization of your

13   testimony?

14   *A.*  Yes.

15   *Q.*  And did I also understand your testimony correctly that

16   that fee cap similarly applies to an FFL who does a private

17   check at a gun show?

18   *A.*  Yes.

19   *Q.*  Does that fee cap apply to an FFL who does a private check

20   for an interstate transfer?

21   *A.*  I would think it would apply to that private transfer as

22   well.

23   *Q.*  Okay.  Your job includes telling FFLs some of the things

24   they need to do to comply with the laws for how to properly

25   sell firearms, is that true, providing information to them?

1   *A.* We provide information, yes.

2   *Q.* Okay. In order for a private sale, or, for that matter,

3   private loan that is outside the exemptions in House Bill 1229

4   to take place, do the buyer and the seller have to both be

5   physically present in the gun store at the same time?

6   *A.* That is my understanding.

7   *Q.* Okay. And that would also be true for something that

8   wasn't a sale, but was, say, a loan that was covered by House

9   Bill 1229?

10  *A.* Yes.

11  *Q.* Okay. I'm a little confused, perhaps, by -- I think you --

12  I'm going to tell you what I think I heard, and you tell me if

13  you think I'm hearing correctly. That you had said, there is

14  this $10 fee that the CBI charges to the FFL for the cost of

15  processing the check. Am I right so far?

16  *A.* Yes, process the NICS check, yes.

17  *Q.* Right, exactly. And not just for the NICS check, but for

18  the general service provided by CBI; would that be true? The

19  other databases you check, not just NICS?

20  *A.* Correct. But it's specifically to process that NICS

21  background check.

22  *Q.* Okay. And you'd also pointed out that -- I think you

23  pointed to the point of -- in Section 112 of the new law,

24  (2)(d), that a licensed gun dealer may charge a fee for

25  services rendered, and which fee shall not exceed $10.

1    Did I understand you correctly on that?

2    *A.  Yes.*

3    *Q.  What I don't understand is where it says that the $10 that*

4    the FFL can charge as part of this processing is different

5    from, above and beyond, the fee that the FFL has to pay to CBI.

6    Could you help me understand that.

7    *A.  Well, I can speak to specifically the Brady fee, the NICS*

8    check fee.

9    *Q.  Okay.*

10   *A.  $10, which is in 1228.  The $10 additional fee for a*

11   private transfer, that's -- I think it's on its face states

12   they can charge an additional $10 for that.  I believe them to

13   be two separate things.

14   *Q.  Would you be able to point me to anywhere in the statute --*

15   in either of the statutes that explains that?

16        *MR. GROVE:*  Objection, Your Honor.  The Court has the

17   statutes.

18        *THE COURT:*  Any response?

19        *MR. KOPEL:*  May I confer?

20        *THE COURT:*  You may.

21   *BY MR. KOPEL:*

22   *Q.  Let me withdraw the previous question and just ask you:*

23   How do you know that the $10 the FFL can charge under 1229 is

24   separate from -- is on top of the $10 -- the other $10 you

25   mentioned?

1   *A.   Okay.   The first $10 mentioned I believe is in a separate*

2   *bill, 1228, for the cash funding of CBI to process the Brady*

3   *NICS check.*

4   *Q.   Okay.   Thank you.*

5          Let's go back to Exhibit 24.   We were talking about

6   things in that non-gun show private transaction criteria.   Do

7   these figures include checks that are undertaken when law

8   enforcement returns a lost or stolen firearm to its rightful

9   owner?

10  *A.   No.*

11  *Q.   That aren't -- isn't law enforcement required to do that by*

12  *House Bill 1229?*

13         *MR. GROVE:*   Objection.   Calls for legal conclusion.

14         *THE COURT:*   Response.

15         *MR. KOPEL:*   I'd like to confer again, Your Honor.

16         *THE COURT:*   That's fine.

17         (Off-the-record discussion between counsel.)

18  *BY MR. KOPEL:*

19  *Q.   Why are the law enforcement checks not included in these*

20  *numbers?*

21  *A.   We have no authority to run a NICS background check on a*

22  *law enforcement property return.   So, therefore, I cannot run*

23  *those checks through NICS, and they would not be included in*

24  *these numbers.*

25  *Q.   Oh, I see.   These are only things where you contacted the*

1   National Instant Criminal Background Check system; is that

2   correct?

3   *A.*   That is correct.

4   *Q.*   I'm just wondering if you could explain the distinction.

5   So CBI does -- also does -- am I correct in believing that CBI

6   does checks on firearms transfers that are not things which

7   access NICS, and that the -- the law enforcement return of

8   property would be in that category?

9   *A.*   Yes.

10  *Q.*   Okay.  Why is it you can't contact the FBI's National

11  Instant Criminal Background Check system, or NICS, when a

12  police chief is returning stolen property to the rightful owner

13  and is required to do that background check?

14  *A.*   As we have to go through FBI NICS to run that check, we

15  have to use specific purpose codes.  And at this time there is

16  no purpose code or authorization to run for an evidence or

17  property return check for law enforcement.

18  *Q.*   What does FBI NICS allow you to access that system for?

19  *A.*   We're allowed to access it for firearm background checks

20  for licensed FFLs, and we're allowed to access that system for

21  concealed carry permit background checks.

22  *Q.*   Do the data here, the non-gun show line, do they include

23  private transfers that go on, say, within a police property

24  room, that the property custodian gives the firearm to another

25  property custodian, or gun from the police armory is given to a

1  patrol deputy, things like that, are those included in there?

2  *A.*  No, they're not.

3  *Q.*  Is there a law enforcement exemption in House Bill 1229, to

4  your knowledge?

5         *MR. GROVE:*  Objection, relevance.

6         *THE COURT:*  Response.

7         *MR. KOPEL:*  The question is, what are these -- what is

8  in this data that was introduced on direct examination?  I'm

9  trying to find out what is in the data.

10        *THE COURT:*  Well, actually what you asked is, what's

11 in House Bill 1229?

12        *MR. KOPEL:*  True.  But House Bill 1229 is what would

13 be responsible for some of the data in the period from July 1

14 to the present.

15        *THE COURT:*  I understand that.  But your question was,

16 "Is there a law enforcement exception in House Bill 1229, to

17 your knowledge?"  This witness's knowledge about the contents

18 of 1229 and any exceptions in it is not relevant.

19        *MR. KOPEL:*  Okay.

20        Thank you very much, Mr. Spoden.  I'm done, and I

21 appreciate your time.  And I apologize for the length of the

22 Sportsman's Warehouse project.

23        *THE WITNESS:*  Thank you, sir.

24        *THE COURT:*  Redirect?

25        *MR. GROVE:*  Very briefly, Your Honor.

**REDIRECT EXAMINATION**

*BY MR. GROVE:*

*Q.* Mr. Spoden, you were asked a series of questions asking you to compare on Exhibit 24 the period between August 2012 and December 2012 with the period of August 2013 through December 2013. Do you recall that series of questions?

*A.* Yes, I do.

*Q.* What was the overall -- what was the comparison of the overall volume that InstaCheck was dealing with between August to December of 2012 and August to December of 2013?

*A.* The later time period, at that point in time we were faced with overwhelming background checks. We were running at least 75 percent higher during the later times, the last part of 2013. So at that point in time, we were -- our volume was 75 percent higher at that point in time.

*Q.* I asked a poor question. During which of those periods was your volume 75 percent higher?

*A.* The August 2013 through December 2013.

        *MR. GROVE:* Thank you, Your Honor.

        I'd actually like to keep Mr. Spoden subject to recall in case anything comes up during the director's testimony that requires some numbers.

        *THE COURT:* Thank you.

        Then, sir, you may step down; but you are not excused. You are subject to being recalled later in this trial.

1    *THE WITNESS:*  Thank you, Your Honor.

2    *THE COURT:*  Next witness.

3    *MS. SCOVILLE:*  State calls CBI director Ronald Sloan.

4    *THE COURT:*  Please step up and be sworn.

5         (**RONALD SLOAN, DEFENDANT'S WITNESS, SWORN**)

6    *COURTROOM DEPUTY:*  Please be seated.

7         Please state your name and spell your first and last

8    name for the record.

9    *THE WITNESS:*  My name is Ronald Sloan, R-O-N-A-L-D,

10   S-L-O-A-N.

11   *THE COURT:*  You may proceed.

12                    **DIRECT EXAMINATION**

13   *BY MS. SCOVILLE:*

14   *Q.*  Good afternoon, Director Sloan.

15   *A.*  Good afternoon.

16   *Q.*  In what capacity are you currently serving the state of

17   Colorado?

18   *A.*  I currently serve as the Director of the Colorado Bureau of

19   Investigation.

20   *Q.*  How long have you been the director?

21   *A.*  Five years and about seven months.

22   *Q.*  Okay.  And what did you do before you became the director?

23   *A.*  Immediately preceding becoming the Director of the Colorado

24   Bureau of Investigation, I served for three months as the

25   executive director of security for Jefferson County Schools.

1    For ten months preceding that, I was conducting private

2    consulting, working as a private public safety consultant, if

3    you will.  For 13 years prior to that, I served as the chief of

4    police in Arvada, Colorado.  And for 20 years prior to that, I

5    served as a police officer and -- in various capacities

6    throughout the Aurora Police Department.

7              MR. KOPEL:  Your Honor, if we might, for the record,

8    repeat our same objection.  Mr. Sloan has testified -- did

9    testify before the legislature.  We would -- before two

10   committees.  We would object to the extent that his testimony

11   goes beyond the scope of what he testified to in the

12   legislature, simply for the record.

13             THE COURT:  Thank you.

14   BY MS. SCOVILLE:

15   Q.  Director Sloan, on what years were you the Arvada chief?

16   A.  I was chief of police in Arvada from July of 1994 through

17   July of 2007.

18   Q.  So were you the chief in Arvada at the time of the

19   Columbine school shooting?

20   A.  Yes, I was.

21   Q.  Did you participate in any task forces related to the

22   Columbine shooting?

23   A.  I did.  I participated as the co-chair of the Jefferson

24   County Schools, school safety task force, which was convened as

25   a result of the Columbine High School shootings, about a month

1   or two after the shootings occurred.

2   *Q.* And what did that task force do?

3   *A.* The task force was actually put together by the

4   superintendent and the school board of Jefferson County Schools

5   in order to do a community-wide, comprehensive review, if you

6   will, of the circumstances around the school shooting and to

7   render recommendations on school safety, research, et cetera,

8   to the school board.

9   *Q.* Could you give us a brief overview, please, of what the

10  Colorado Bureau of Investigation does.

11  *A.* The Colorado Bureau of Investigation is fairly diverse in

12  the services that it provides to the state of Colorado.

13  They're all public safety services; and I would characterize

14  them in three separate components, if you will.

15          One of the components is our investigations section of

16  the Colorado Bureau of Investigation, in which we provide

17  criminal investigative services for local law enforcement, for

18  state agencies, and for federal agencies upon request

19  throughout the state of Colorado.

20          Another section, if you will, major section of the

21  Colorado Bureau of Investigation, is our forensic services

22  section, in which we provide forensic analysis and examination

23  of submitted criminal evidence in criminal cases and also crime

24  scene response upon request of local agencies.  And we also

25  maintain the state DNA database.  And we are the terminal

1  control agency, point of contact, for the FBI's NDIS system,

2  which is the national CODIS system.

3      And then the third component of CBI is diverse in and

4  of itself.  We refer to it at times as Criminal Justice

5  Information Services, or CJIS, portions of CBI.  And it's

6  actually broken out into three separate units, if you will.

7  One of the units is our identification unit, which does both

8  criminal and civil identification through -- biometric

9  identification services through the use of fingerprint

10 identification and the Automated Fingerprint Identification

11 System.  We also provide the firearms transfer and concealed

12 handgun permitting background services through Colorado

13 InstaCheck, which is one of our CJIS units within CBI.

14      And then the third CJIS unit we refer to as program

15 support unit, which is the internal control agency -- CBI's

16 internal control agency for the National Criminal Justice

17 Information Services provided through the National Crime

18 Information Center.  And we maintain and administer the

19 Colorado Crime Information Center, the databases associated,

20 and access through the Colorado Crime Information Center, CCIC.

21 And we also are the agency through which local agencies report

22 crime data as it's collected on an annual basis and assembled

23 into a report in Colorado referred to as Crime in Colorado.  We

24 actually assemble the local data submitted to us and report it

25 in that report.  And we also report it to the FBI for inclusion

1    in Crime in the United States, their UCR summary report of

2    crime throughout the United States on an annual basis.

3           Those are the major components of Colorado Bureau of

4    Investigation.

5    Q.  So is the InstaCheck check unit part of the third group of

6    services that you mentioned, the Criminal Justice Information

7    Services section?

8    A.  Yes, it is.

9    Q.  As the director of CBI, have you become familiar with

10   Colorado's process for individuals to obtain background checks

11   in order to possess firearms?

12   A.  Yes, I have.

13   Q.  And as the director of CBI, have you become familiar with

14   CBI's role in that process?

15   A.  Yes, I have.

16   Q.  Mr. Spoden was here this afternoon, and he walked us

17   through that process.  We're not going to trod that ground

18   again.  But are you generally familiar with the history of

19   background checks for firearms possession in Colorado?

20   A.  Could you repeat the question?  I missed the first part of

21   it.

22   Q.  Sure, that's fine.  Are you generally familiar with the

23   history of what has been required for a background check to

24   obtain a firearm in Colorado?

25   A.  Yes, I am.

Ronald Sloan - Direct

1    *Q.* All right. How long have background checks been required

2    for the purchase of a firearm from an FFL in Colorado?

3    *A.* In Colorado, they've been required, I believe, since 1993,

4    when the Brady -- when the Brady law was passed at the national

5    level, U.S. Congressional level, in the U.S. Code. In

6    Colorado, being conducted by CBI, I believe in 1994 was the

7    first year Colorado InstaCheck was created.

8    *Q.* After the Brady Bill passed, did Colorado require

9    background checks for private purchases, whether at the gun

10   show or between private individuals.

11   *A.* Not until, I believe, 2003 were private transfers and gun

12   show transfers of firearms required under Colorado law.

13   *Q.* All right. Well, there was a change in Colorado's law

14   following the Columbine school shooting relating to background

15   checks being required at gun shows; is that right?

16   *A.* That's correct.

17   *Q.* All right. Could you describe what -- what that change

18   required.

19   *A.* Well, there were several changes that occurred around the

20   time of the Columbine High School shootings, which was in April

21   of 1999. Prior to that, I believe it was in March of 1999 or

22   somewhere earlier in the year in 1999, the functions of

23   Colorado InstaCheck, I believe, sunset under Colorado statutes

24   and ceased to exist as a point of contact for the National

25   Instant Background Check System through the FBI.

1   *Q.* Is that something that was suspended by the state

2   legislature?

3   *A.* Well, I -- it was, in essence, by the Colorado state

4   legislature. And I believe the law itself had a sunset

5   provision, and it was not reinstated, and so it went away.

6   *Q.* So when the -- could you describe for us, I guess, what --

7   what it was that sunsetted at that time.

8   *A.* What sunsetted was the authorization for the Colorado

9   Bureau of Investigation to conduct those background checks at a

10  state level, as a point of contact for the National Instant

11  Background Check system, or the NICS system, that the FBI

12  operates on a national level.

13  *Q.* So when Colorado suspended CBI as a point of contact, were

14  all of the databases that CBI currently uses searched for a

15  background check and for a transfer of a firearm?

16  *A.* Once that -- the background check process reverted to the

17  NICS system, I -- I am not intimately familiar with the

18  databases that the NICS system was using in 1999. I'm familiar

19  with what the -- what they are using right now, so I don't know

20  that I can answer that question completely. But I do know that

21  right now, the NICS system -- the federal NICS system checks

22  four databases, and Colorado InstaCheck at the present time

23  checks seven databases.

24  *Q.* So during the period of time when Colorado suspended CBI as

25  the point of contact, would a database search when someone

1   obtained a check to obtain a firearm have searched whether any,

2   for example, restraining orders due to a domestic violence

3   issue -- withdraw that and start over.  It's clearly late on

4   Friday afternoon.

5           At the point at which Colorado suspended CBI as the

6   point of contact for NICS, would a database check at that point

7   have searched for domestic violence restraining orders?

8   *A.*  Well, my understanding is, if a domestic violence

9   protection order or restraining order were contained in the

10  National Crime Information Center, or the NICS, database, then

11  it would have located that.  Problematically, not all

12  protection orders or restraining orders, domestic violence

13  restraining orders, that were issued at the time were contained

14  in NCIC or in the NICS system.

15  *Q.*  Are you aware of any examples of individuals who were not

16  prohibited from obtaining a firearm due to a lack of a

17  comprehensive background check and who committed a crime?

18  *A.*  Yes.  There was a landmark case, if you will, that occurred

19  in the early summer of 1999.  And it was after the Columbine

20  high school shootings.  A situation where an individual who was

21  the subject of a restraining order, domestic restraining order,

22  domestic violence restraining order, acquired a firearm from an

23  FFL, a federally licensed firearms dealer, while he was under

24  an active restraining order.  And subsequently, and very

25  tragically, he murdered his three young female daughters and

1    engaged in a shootout, if you will, with the Castle Rock Police

2    Department at the Castle Rock -- at the location of the Castle

3    Rock Police Department.

4    *Q.* And what was the Colorado legislature's response to that

5    crime?

6    *A.* Well, initially, the response came from the Governor's

7    office.  Later in the year, in 1999, then Governor Owens issued

8    an executive order reinstating Colorado InstaCheck because of

9    the hole in the system, if you will, in not detecting the

10   active restraining order in that case on the individual who

11   purchased the firearm.  And subsequently, the next legislative

12   session, the Colorado General Assembly also reinstated

13   InstaCheck legislatively through the passage of a law

14   reinstating Colorado InstaCheck.

15   *Q.* So in about the year 2000, I think you testified, Colorado

16   closed the gun show loophole, right?

17   *A.* And I didn't -- again, I'm not hearing the first part of

18   the question.  I'm -- I don't know --

19   *Q.* I'm sorry.

20   *A.* -- if I'm not listening well enough or not.

21   *Q.* I'm sorry.  I wore flatter shoes today, and I'm still too

22   tall.

23          I believe you testified this afternoon in about the

24   year 2000, Colorado closed the loophole for background check

25   checks at gun shows, right?

1   *A.*   That's correct.

2   *Q.*   How did that change come about?

3   *A.*   The change was initiative driven.  As I understand it, in

4   the latter -- in November of 2000, there was a voter initiative

5   on the ballot to -- for a constitutional amendment to close

6   that loophole, if you will, in the gun show transfer of

7   firearms and private transfers that occurred at gun shows.

8   That was codified the next legislative session, in 2001, again,

9   closing that gun show loophole.

10  *Q.*   And what was the level of public support for the initiative

11  to close the gun show loophole?

12  *A.*   My understanding was that the initiative passed by over a

13  two-to-one margin for closing the gun show loophole.

14  *Q.*   After the gun show loophole was closed, did the background

15  check process cover firearms transactions between two private

16  individuals?

17  *A.*   It did at gun shows.  And there was one other provision

18  that I believe existed in federal law and Colorado law even

19  prior to the passage of legislation closing the gun show

20  loophole, if you will.  And that is for interstate sale of a

21  firearm -- internet driven, interstate sale of a firearm that

22  has to be done, even if it's -- the transfer is from one

23  private individual to another, has to be done through an FFL

24  here in Colorado to transfer it to a Colorado resident.

25  *Q.*   Okay.  Were transactions between two private individuals in

1  the state of Colorado covered at that point?

2  *A.* Other than the gun show loophole and the interstate sales,

3  no, I don't believe they were.

4  *Q.* Now, when a background check is run, what are some of the

5  reasons that would disqualify someone from being able to have a

6  firearm transferred to them?

7  *A.* Well, there are a number of what we refer to as prohibitors

8  that would classify an individual as being prohibited by law to

9  possess a firearm.  Most of those are articulated under the

10  federal law, and they are for situations such as a person who

11  has been convicted of an offense that would require

12  incarceration for more than a year, or we classify it as a

13  felony here in Colorado.  If someone is a subject of a domestic

14  restraining order or protection order.  If someone has been

15  adjudicated, as the federal law refers to it, I believe, as a

16  mental deficient, or has been adjudicated mentally ill to the

17  extent of being a danger to themselves or others.  There are

18  other prohibitors.  If you're dishonorably discharged, if you

19  are unlawfully in the United States, if you have disavowed your

20  citizenship, I believe, is one.  I don't know them for

21  verbatim, but crimes of domestic violence, those are the ones

22  that are in federal law.

23          There are -- there are two that are unique to Colorado

24  law that I'm aware of at this point in time.  One is, if you

25  have an adjudication for an offense while you were a juvenile

1  that would be considered a felony if it was committed as an

2  adult.  And the second one we refer to as being denied on

3  arrest law that exists in Colorado, where a person who has an

4  arrest for a prohibiting offense without a matching disposition

5  showing a conviction, and we're unable to determine whether or

6  not there was a conviction upon the background check, that

7  person is prohibited from possessing in Colorado, unless that

8  is resolved through an appeal.

9  Q.  What about someone who has an outstanding warrant for

10  either a misdemeanor or a felony, would that person be able to

11  pass a background check to obtain a firearm?

12  A.  Yes, that's true.  And that's referred to as being a

13  fugitive from justice -- fugitive of justice.

14  Q.  Okay.  I think that we need to clarify that, perhaps.  If

15  someone has an outstanding warrant, would that person be able

16  to obtain a firearm?

17  A.  No, they would not.  I -- I'm sorry.  I must have

18  misunderstood the question.  That is a prohibitor for a person

19  possessing a firearm.

20  Q.  What about someone who has been convicted for use or

21  possession of controlled substances within the last year, would

22  that person be able to obtain a firearm?

23  A.  Yes, that is also a prohibitor from someone possessing a

24  firearm.

25  Q.  Why is it important that people who fall into these

1  prohibited categories not be able to obtain firearms?

2  *A.*  The -- the law is established the way it is because those

3  categories represent individuals who are in a position where

4  they represent a greater public safety risk.  And, therefore,

5  it has been determined legislatively that they, creating a

6  greater public safety risk, are prohibited from possessing a

7  firearm.

8  *Q.*  Are you familiar with House Bill 1229, or Section

9  18-12-112?

10  *A.*  Yes, I am.

11  *Q.*  And you've read that before?

12  *A.*  I have.

13  *Q.*  Following the passage of 18-12-112, how does the process

14  differ for someone to go through a background check for a

15  purely private transfer versus someone who is going through a

16  background check to buy a firearm from an FFL in a retail sale?

17  *A.*  Again, to repeat the question, you're asking, how does the

18  process differ now, since the passage of 18-12-112?

19  *Q.*  Right.  My question is, are there any differences in the

20  two processes?

21  *A.*  From Colorado InstaCheck standpoint, there is absolutely no

22  difference.  When we receive those from an FFL -- because

23  18-12-112 requires that private transaction, transfer of a

24  firearm from a private individual to another private individual

25  who is not a licensee, it is -- has to be conducted through an

1    FFL, if you will, a licensed -- federally licensed firearms

2    dealer.  So when CBI receives that request for a background

3    check from an FFL, there is absolutely no difference in the way

4    it is handled than a retail sale, where the FFL is transferring

5    a weapon -- a firearm, if you will, to a private individual.

6    Q.  And is there a benefit to having those two processes work

7    the same way?

8    A.  Well, the benefit is that the process is established to --

9    to the best of our ability to provide that service of not

10   allowing the transfer of a firearm to someone who is prohibited

11   by law and ostensibly represents a greater risk to public

12   safety from possessing that firearm.  And the benefit to it is

13   that the process is equitable across the board, whether it's an

14   FFL transferring the firearm, or whether it's a private party

15   transferring the firearm.

16   Q.  Now, when a background check reveals that a person who is

17   seeking a firearm is a fugitive from justice, does CBI receive

18   that information?

19   A.  We do.

20   Q.  And what does CBI do with that information?

21   A.  Whenever we are -- during conduct of a background check

22   related to a firearms transfer, whenever we are aware of an

23   active warrant for someone's arrest, they are a fugitive of

24   justice, what we attempt to do as expeditiously as possible is

25   notify the law enforcement agency -- the local law enforcement

1    agency with jurisdiction where that individual lives for them

2    and request that they respond to the location where they are so

3    that they can in fact execute that warrant and bring that

4    person to justice as the court has commanded in the -- in the

5    actual warrant itself.

6    Q.   And does that lead to the person's arrest?

7    A.   In those cases where the local law enforcement agency

8    responds and does confirm those warrants, it does in fact

9    result in an arrest of that fugitive.

10   Q.   How often does it happen that someone is arrested for being

11   a fugitive as a result of the information that was obtained

12   during the background check process?

13   A.   Our records show, and our data shows that it happens to the

14   extent of more than ten times a month, if you will, ten to

15   fifteen times a month.  I believe there were over 200 arrests

16   as a result of warrants detected through the InstaCheck process

17   in 2012, and I believe there were over 180 in 2013.

18   Q.   Do other Colorado statutes require background checks in

19   other wholly separate circumstances?

20   A.   Yes, they do.

21   Q.   And what are some of those circumstances?

22   A.   In our identification section, as I was -- identification

23   unit, as I was explaining the functions that CBI conducts, the

24   civil side of our identification unit deals with over 60

25   occupations or classifications for employment that are

1    statutorily required by Colorado state law to undergo a

2    biometrically based, fingerprint based, background check

3    through CBI.  And as I say, there are over 60 occupations.  And

4    they run the gamut from educational employees, including

5    teachers, to, I believe, real estate brokers, to taxicab

6    drivers, to law enforcement employees, including police

7    officers.  As I say, there is over 65 occupations that are

8    required.

9    Q.  So how does the background check process for -- differ for

10   someone who is going through an occupationally based background

11   check, how does that process differ from someone who is going

12   through a background check in order to possess a firearm?

13   A.  The basic difference is that the background checks

14   conducted on employment checks, such as the ones I described

15   through our identification section, are biometrically based.

16   They have to submit fingerprints, ten-print fingerprints, and

17   they are classified, entered in through the automatic --

18   automated fingerprint identification system, and checked

19   against criminal history records both within the state of

20   Colorado and nationally, the national criminal history records

21   system through NCIC.

22        The background checks that are done on firearms

23   transfers are biographically conducted.  They are conducted by

24   name and personal identifiers only.  They are not biometric

25   identification.

Ronald Sloan - Direct

1    *Q.* And which of those two processes takes more time?

2    *A.* The background checks for employment, obviously, does.  It

3    is -- it takes more time, and it's more expensive.  It's more

4    cost to the individual undergoing those background checks to

5    get their fingerprints taken and then also to pay for the

6    checks that are done through the NCIC system on a national

7    criminal history.  There are costs associated with all of that.

8    *Q.* And do you know what the cost is for someone to undergo an

9    employment-based background check?

10   *A.* I don't know exactly what it is.  There is a range of

11   costs, depending on what the nature is.  Some of those are

12   required to be what we refer to as flagged background checks,

13   so that you get subsequent notification if there is a

14   subsequent arrest of the individual.  For example, teachers and

15   employees in day-care centers and the like, once they go

16   through the background check, the biometric-based background

17   check, you may get a clearance up front.  But if there is a

18   subsequent arrest, let's say six months down the road or a year

19   down the road, for an offense that would disqualify them for

20   that position, we will get notification that the arrest has

21   been made, if it's in Colorado.  That's Colorado only.  And so

22   that is one of the reasons that there is more cost associated

23   with that system, and it's more comprehensive.

24   *Q.* Now, does CBI offer background checks on its website?

25   *A.* It does.  It offers a public-facing background check that

1    is very limited in nature.  But the public can access that and

2    for a fee -- can pay a fee and get a public-facing background

3    check.

4    *Q.*  Is there information that would not be picked up in a

5    background check that is run off the CBI website?

6    *A.*  Yes.  There is a significant amount of information that is

7    available through a law enforcement or criminal justice query

8    into the Colorado criminal history records versus what is

9    available for Colorado criminal history records through the

10   public-facing website.

11   *Q.*  Would the background check that is done of the CBI website

12   include, for example, whether anyone had any out-of-state

13   arrests?

14   *A.*  No, it would not.  It is a Colorado only background check.

15   It also wouldn't reflect any protection orders that are entered

16   into the CCIC system, any mental health adjudications entered

17   into the Colorado CCIC system.  There are a number of -- a

18   number of criminal history records, if you will, that are

19   available on a criminal justice, law enforcement secure access

20   that are not available through the public-facing system.

21   *Q.*  So, in other words, the information that's obtained through

22   the website background check is not as comprehensive, as I

23   understand your testimony, with the information from the

24   firearms background check?

25   *A.*  That's correct.

1   *Q.* I'd like to go back to Section 18-12-112 for a moment.

2   That -- that legislation included a 72-hour exemption for

3   transfers of firearms for less than 72 hours. Are you familiar

4   with that provision?

5   *A.* Generally familiar with it.

6   *Q.* Why is it important that transfers greater than 72 hours be

7   covered by the background check requirement?

8   *A.* Well, it would be my assessment of that, that lawmakers had

9   to draw a line somewhere in terms of a temporary transfer of a

10  firearm. If it was left indefinitely, then it would -- I think

11  it would have a potential for creating a huge loophole to

12  requiring private firearms transfers to undergo a background

13  check. An individual could claim that they indefinitely loaned

14  a firearm to another individual over a period of time, and

15  thereby not have to go through a background check in doing that

16  transfer.

17  *Q.* All right. I'd like to take you through some of the

18  statistics relating to background checks. Could you -- the

19  exhibit book in front of you, if you could take that, please,

20  and turn to Exhibit 27. This is an exhibit that has been

21  stipulated to and has been admitted.

22        Are you there?

23  *A.* I am.

24  *Q.* Great. Director Sloan, would you take a look at Exhibit

25  27. And tell me, first, are you familiar with this document?

1  *A.*  I am.

2  *Q.*  What does this document show?

3  *A.*  Well, it shows a number of things.  It is a comparison of

4  calendar year 2012 to calendar year 2013, in total for 2013.

5  And it has data related to the number of transactions and the

6  type of transactions that were received by Colorado InstaCheck,

7  broken down in several different ways, handgun, long gun, both

8  in the same transaction, and other, as well as total

9  transactions, total denials, appeals, reversals after appeal,

10  and total upheld after appeal.

11        And then the exhibit goes on --

12  *Q.*  You know, I think I can probably stop you right there.

13  *A.*  Okay.

14  *Q.*  This shows that the total number of transactions in 2013

15  was 396,955, right?

16  *A.*  That's correct.

17  *Q.*  And then the total denials are 7,351, right?

18  *A.*  That's correct.

19  *Q.*  Does the 7,351 represent the number of prohibited

20  individuals who were not able to obtain a firearm in the year

21  2013?

22  *A.*  It represents the total number who were denied upon the

23  initial background check conducted by CBI InstaCheck.

24  *Q.*  So following the initial denial, as I understand it, there

25  is an appeal process, right?

1  *A.*  That is correct.

2  *Q.*  And then some of those appeals are sustained and some are

3  reversed?

4  *A.*  That is correct.

5  *Q.*  Could you tell us what the rough percentages of the number

6  of people who appeal?

7  *A.*  Well, it -- going from just the figures that are on this

8  page -- and I know them to some extent off the top of my head,

9  because I have testified to them in the legislature in the

10  past.  But going from the numbers that are here, there is over

11  50 percent of the denials in 2013 were appealed.  And of that

12  50 plus percent, a little over half of those were reversed.

13  *Q.*  And if someone's appeal was reversed, does that mean that

14  that person was wrongly denied access to a firearm?

15  *A.*  Upon the initial -- I'm sorry, upon the initial denial?

16  *Q.*  Correct.  If someone were initially denied.

17  *A.*  No, that's not what the reversal represents.

18  *Q.*  What does the reversal represent?

19  *A.*  The reversal represents the work that is done by CBI as a

20  result of legislation that passed in 2010 requiring that CBI

21  conduct the investigation, or the review, if you will, of the

22  factors for denial on the initial denial.  And if it's

23  determined that either the factors have changed since the

24  initial denial had occurred, or there was further research that

25  could be done to determine whether or not the lack of a

1  matching disposition, which is a lawful denial on the front

2  end, under "deny under arrest," for a felony -- a felony arrest

3  without a matching conviction to it, whether or not that can be

4  resolved, whether or not there was a conviction or not.

5        And there are other reasons why appeals are reversed,

6  the denial is reversed.  Another example would be, a denial for

7  an individual whose personal identifiers, their name, their

8  date of birth, are very close, if not identical, to another

9  individual who does show a prohibitor, be it a felony

10  conviction, a crime of domestic violence, etc.  And upon

11  appeal, through the appeal process, we make it very clear to

12  individuals that it -- who fit into that category, their

13  personal identifiers could not be discerned to be different

14  from someone having a prohibitive arrest.

15        We walk them through what we refer to as a records

16  challenge.  And they will physically come to CBI, submit

17  fingerprints to CBI, and then we conduct a biometric background

18  check, which is a much more extensive, as I described before,

19  background check.  And if we can determine through that

20  biometric check that they are not the same individual, even

21  though the personal identifiers are identical, but they are not

22  the same individual, we will reverse that denial for that

23  particular conviction.

24  Q.  I'd like you to take a look next at Exhibit 24.

25        Mr. Spoden testified about this document earlier, so

1   we're not going to rehash everything here.  But I do want to

2   ask you about the bottom row of numbers, which represent the

3   number of private firearms checks done at gun shows from

4   July 2012 to December 2013.

5           Does -- do the numbers in that gun show category

6   include any checks on sales at gun shows that would have not

7   been captured prior to the passage of 18-12-112?

8   *A.*  I can't answer that question.  I don't know whether they do

9   or they don't.

10  *Q.*  I'd like to ask you also about the general overall volume

11  of checks done at CBI during the last half of 2012.  What was

12  the overall volume of checks done at CBI during that period?

13  *A.*  During the period -- again, if you can repeat that.  The

14  overall volume of private transactions, or overall volume in

15  2012 of total transactions?

16  *Q.*  How would you characterize the overall volume of background

17  checks done at CBI during the last half of 2012?

18  *A.*  Oh, okay.  During the last -- the final six months of 2012,

19  we were already experiencing on an annual basis a steady

20  increase in volume annually since 2008.

21          In the last six months of 2012, that steady increase

22  was increasing even more markedly.  And then in December of

23  2012, there was what I would characterize as a profound change

24  in the volume, with an increase that became to some extent

25  overwhelming to our staff in conducting the background checks,

1  the volume was so great.

2  *Q.* Were there any current events happening in December of 2012

3  to which you would attribute that jump?

4  *A.* Well, the jump occurred right after the Sandy Hook

5  Elementary School shootings in Newtown, Connecticut.

6  *Q.* What was the overall volume of checks done by CBI in early

7  2013?  How would you describe that?

8  *A.* In the early months of 2013, January through March, we saw

9  continuing level of volume that was very high.  And just to

10  give a comparison, as we were going through calendar year 2012

11  and heading into December, we were calculating averages per

12  month of -- and, of course, they fluctuate, and they ebb and

13  flow on a monthly basis.  But we have an average daily volume

14  of around 950 or 960 transactions per day, which was a

15  significant increase from the prior year.

16          In December alone, in December of 2012, we averaged

17  over 1,800 background checks transactions per day.  In January,

18  we were very close to that 1,800.  February, it started to tail

19  off.  We were probably closer to 1,500 per day.  And March, we

20  were down to about 13 to 1,400 per day.  So you could see the

21  volumes were very high for what we were experiencing during the

22  course of 2012 in those first few months of 2013, but they were

23  starting to taper off from that elevated volume in December and

24  January.

25  *Q.* In the time that you've been the director of CBI, has CBI

1   ever experienced any similar jumps in the volume of background

2   checks required?

3   *A.* Not to that extent. We experienced different variations

4   over periods of time. We experienced them during the 2012, in

5   July of 2012, late July, and then again in November of 2012,

6   but nothing to the extent that we experienced in December of

7   2012.

8   *Q.* I'd like you to look at Exhibit 24 again. And I'd like you

9   to look at the top line, which is the non-gun show line. What

10  does this data show about the trend in the volume of private

11  non-gun show background checks from July of 2012 to December of

12  2013?

13  *A.* Well, the numbers, just from a general perspective, looking

14  at them across that 18-month period, are fairly flat. I mean,

15  there are variations from one month to another. But over the

16  course of that 18 months, I would characterize them as being

17  very comparable.

18  *Q.* And then I'd like you to look at the same thing for the gun

19  show line. What does the data show in terms of the trend in

20  volume for gun show private background checks from July 2012 to

21  December of 2013?

22  *A.* Well, just looking at them, again, there is a difference

23  from the non-gun show line. Very clearly, there is a

24  difference in that July 2012 through February of 2013, there

25  was a steadily increasing number in terms of the raw numbers on

1    the volume of transactions.  It tapers off a little bit after

2    that time, not a whole lot, until July of 2013, and stays at a

3    much lower level in the last six months of 2013.

4    Q.  So if we look at just the year 2013, the number of private

5    checks done at gun shows has declined?

6    A.  Yes.

7    Q.  I'd like you turn next to Exhibit 23.

8         This is also an exhibit that has been stipulated to

9    and admitted.

10        Are you familiar with Exhibit 23?

11   A.  Yes.

12   Q.  What does this exhibit show?

13   A.  This exhibit is the -- it shows InstaCheck private sales

14   from July of 2013 through February of 2014.  And it

15   indicates -- breaks it down by the number of approvals per

16   month, the number of denials per month, and the total

17   transactions per month.

18   Q.  Now, just to be clear, Exhibit 23, the private sales that

19   are included in this exhibit, would include both non-gun show

20   and gun show private checks, correct?

21   A.  That's my understanding, yes.

22   Q.  All right.  And what does Exhibit 23 show in terms of the

23   trend of the number of overall private checks being done?

24   A.  Well, with the exception of July of 2013, they're fairly

25   comparable across the board, with the highest month being

1  November.  I don't know -- I'm sorry, December, which is not

2  unusual for us.  We peak during those months in hunting season

3  and gift giving season, and then they taper back off in January

4  and February of this year.

5  Q.  And I'd like you to look at the denial column.

6         And I would like to hand the witness a calculator and

7  have him do some very quick math for us that is not represented

8  in Exhibit 23.

9         THE COURT:  Any objection?

10        MR. KOPEL:  No, Your Honor.

11 BY MS. SCOVILLE:

12 Q.  Mr. Sloan, it's getting too late in the day, I think, for

13 those of us who are not the economists to do math in our head.

14 So I would like for you to take the calculator and add up for

15 us the number of denials for private sales from July 2013 to

16 February 2014.

17 A.  Hopefully I haven't made an error.  I think I've got it

18 done.

19 Q.  And what did you come up with?

20 A.  I came up with 182.

21 Q.  All right.  And are those the number of denials for private

22 sales since Section 18-12-112 has been implemented?

23 A.  Yes.

24 Q.  I'd like you to take a very brief look at Exhibit 28.

25 A.  28?

1   *Q.*  Yes.  This is also an exhibit that has been stipulated to

2   and admitted.  Are you familiar with Exhibit 28?

3   *A.*  Yes, I am.

4   *Q.*  All right.  And does this exhibit show the number of people

5   who were denied firearms in attempted private transactions for

6   various reasons?

7   *A.*  Yes, that's one -- one of the pieces of data or columns

8   that is on here, yes.

9   *Q.*  All right.  You can go ahead and set aside the exhibit

10  notebook.

11          Has CBI received any complaints from citizens that

12  they could not transfer a firearm because they couldn't find an

13  FFL to do a background check for them in a private transfer?

14  *A.*  Not personally to me, they have not; but I've been made

15  aware that that has been communicated to some of my staff.

16          *MS. SCOVILLE:*  I have no further questions.  Thank

17  you.

18          *THE COURT:*  Thank you.

19          Cross-examination.

20  *MR. KOPEL:*  Thank you, Your Honor.  I would just like

21  to ask for the convenience of the Court and the witness, on --

22  I'm certain that the cross-examination will go on longer than

23  20 minutes, and wondered if you would prefer that we terminate

24  now, or that I start with Mr. Sloan and go for 20 minutes, and

25  then we resume at some future time at his convenience.

1    THE COURT: Let me ask you all, are you ready to end

2    for the day? I'm seeing nodding heads over on the left-hand

3    side.

4    MS. SPALDING: Your Honor, I think the State would

5    prefer to push through, if -- it's not going to be

6    substantially more than 20 minutes, we would prefer to push

7    through so Mr. Sloan may be excused.

8    THE COURT: How long is it going to be?

9    MR. KOPEL: I think it will be substantially more than

10   20. We have some important things to talk about. We can

11   certainly make a start of things. It's not like the difference

12   between 5:00 and 5:05 is going to resolve this.

13   MS. SCOVILLE: The State would probably prefer to push

14   through and take care of as much as we can this afternoon.

15   THE COURT: All right. Then we'll run until

16   5 o'clock.

17                    **CROSS-EXAMINATION**

18   BY MR. KOPEL:

19   Q.  Good late afternoon, Mr. Sloan. Is the Colorado Bureau of

20   Investigation part of the Department of Public Safety?

21   A.  Yes, sir, it is.

22   Q.  Could you please explain the relationship there.

23   A.  The Department of Public Safety is a department, if you

24   will -- the department level is a larger component of state

25   government than the division level. It is a department in the

1  Executive Branch of the state of Colorado.  Colorado Bureau of

2  Investigation is one of, I believe, four divisions -- five

3  divisions within that Department of Public Safety.  So it's on

4  a level or a tier below the department level.

5  Q.  Okay.  And you would testify -- you had testified in the

6  legislature about what was then House Bill 1229; is that

7  correct?

8  A.  That's correct.

9  Q.  Were you responsible -- were you the lead person at the

10  Department of Public Safety -- within the Department of Public

11  Safety in terms of the Department of Public Safety's

12  presentation of information of the legislature on that issue?

13  A.  Yes, I was.

14  Q.  And would that be in all aspects of the information that

15  would be provided from Department of Public Safety about all

16  aspects of 1229?

17  A.  I believe so.  I don't believe there was anyone else in the

18  department who gave testimony in the legislative hearings

19  related to that.

20  Q.  Okay.  Thanks.  I had a question, you had talked on your

21  direct examination about the -- what one might call the

22  auto-check service which is offered by the Colorado Bureau of

23  Investigation.  Does that ring a bell, what I'm referring to?

24  How an individual can check himself on the -- on his records?

25  A.  The public-facing background check, if you will, criminal

1    history record, that is on our website, I did testify about

2    that, yes.

3    Q.   Okay.

4    A.   I believe that's what you're referring to.

5    Q.   Exactly.  A witness from yesterday talked about how he had

6    done that on himself -- maybe it was Wednesday -- he had done a

7    check on himself.  If we can start by describing -- explaining

8    to us how that -- how that works in some detail.

9         MS. SCOVILLE:  Objection, asked and answered.

10   BY MR. KOPEL:

11   Q.   Well, the -- no.  So the person pays a fee --

12        THE COURT:  Did you want to respond to the objection?

13        MR. KOPEL:  I'm -- I guess I was withdrawing -- Your

14   Honor, I guess I was withdrawing that question and asking a new

15   one.

16        THE COURT:  All right.  Please proceed.

17   BY MR. KOPEL:

18   Q.   How does CBI verify that the person who is seeking to do a

19   check of his or her arrest records actually is that person?

20   A.   I would have to ask you, are you still talking about the

21   public-facing records check?

22   Q.   Yes, public-facing.  I'll use that word from now on because

23   that's the proper -- yes.

24   A.   Okay.  My understanding is, there is no verification of it.

25   And, again, this is my understanding of it, that if you know my

1 name and date of birth, you can run a background check on me,

2 and there is no verification of who you are.

3 Q. Okay. Does -- I will represent to you that Mr. Coglazier

4 from the Colorado Farm Bureau talked about doing this, and said

5 that he had to put in his social security number in order to do

6 that -- is it something that Mr. Spoden would know about in

7 more detail than you would?

8 A. If he has used it frequently, or if he's used it lately,

9 yes, he would know a lot more about it than me. I know

10 generally what's required, and it's -- he would know more than

11 I what's required to put -- to enter into that.

12 Q. This is -- may turn out to be an important topic in this

13 case. Do you know what databases specifically are checked when

14 a person does that public-facing check for themselves?

15 A. I do.

16 Q. And could you describe those databases, please.

17 A. It's the Colorado -- CCIC, Colorado criminal history

18 records, but it's a version of the Colorado criminal history

19 records which has information that is not available to the

20 general public that is criminal justice sensitive information

21 that has been removed from that Colorado criminal history check

22 by a contracted vendor that enables that system to be accessed

23 in an automated fashion.

24 Q. I see. So the public-facing check, the individual is

25 looking at the CCIC, which is the Colorado criminal history

1   records, but they're looking at a, let's say, expurgated

2   version of that, where some criminal justice sensitive

3   information has been removed.  Is that accurate?

4   *A.*  To some extent.  It's information that is not available

5   either as criminal justice record or records that are otherwise

6   protected records from public access are taken out of what the

7   general public can view on that check.  If that's what you're

8   saying, then that would be a correct --

9   *Q.*  We may be in a loop, because I was trying to say what you

10  were saying, and you're trying to do the same.  May be in a

11  hall of mirrors here.

12          So there is criminal justice information available to

13  the general public, a newspaper reporter, or anybody else.  I'm

14  talking -- looking for something narrower than that.  And do

15  you know or do you not know -- do you know whether the

16  public-facing records check consists exclusively of information

17  that is available to the public at large?

18  *A.*  That's what I believe it to be, is information that is

19  available to the public at large.

20  *Q.*  And Mr. -- is it true that Mr. Spoden might know -- might

21  have -- I asked and answered that.  He will know more about

22  that.

23          Could you tell me something about the databases that

24  are checked as part of a firearms transaction that are not the

25  CCIC.  And I know there is a lot of them.  Let's do them one at

1  a time.

2  *A.*  Well, the databases that are checked in our InstaCheck

3  section on firearms transfer, there are four nationally

4  maintained databases, and that would be the National Crime

5  Information Center, NCIC.

6  *Q.*  Let's stop right there.  We'll go through each one

7  methodically.  What is the national —— you were about to say,

8  what does NCIC stand for?

9  *A.*  National Crime Information Center.

10  *Q.*  Thank you.  Who maintains that database?

11  *A.*  I believe that the FBI does.

12  *Q.*  What sort of information is in that?

13  *A.*  Well, you're going to have national criminal history

14  records, nationally maintained records on uploaded protection

15  order and restraining order data, also nationally maintained

16  records on mental health adjudications as mental health

17  deficient, I believe it's characterized under federal law.

18  There is probably others.

19       I know that NCIC also contains those warrants for

20  fugitives of justice that are posted at a national level.  And

21  it's typically felonies that are posted at a national level.

22  *Q.*  All right.  So that's a lot of information in there, the

23  national criminal history, protection orders, mental health,

24  and at least felony warrants.  What rules does the FBI have

25  about who may access the NCIC?

1    *A.*  They're very strict rules under the FBI rules and

2    regulations under the federal code for access.  And it has to

3    be for a legitimate criminal justice purpose by a criminal

4    justice agency, my understanding on the CJIS rules.

5    *Q.*  You mentioned CJIS.  Could you explain, what is CJIS?

6    *A.*  It is a section of the FBI.  CJIS stands for Criminal

7    Justice Information Services, I believe.  I believe that's the

8    acronym for it.  And they establish administrative rules that

9    are based in federal code.

10   *Q.*  Is CJIS a department -- a subdivision of the United States

11   Department of Justice?

12   *A.*  It's a subdivision within the FBI of the United States

13   Department of Justice.

14   *Q.*  Okay.

15   *A.*  I believe that's the way it's organized.

16   *Q.*  Okay.  And I believe you also said that NCIC is a

17   subdivision of the FBI?

18   *A.*  It is -- the NCIC is a name for the system that exists in

19   which databases are maintained and accessed, databases of hot

20   files and wanted persons and criminal history records, et

21   cetera, as I explained before.  I don't know that it's a

22   subdivision in and of itself.  It's an acronym for National

23   Crime Information Center, maintained by the FBI.

24   *Q.*  So it's the name of the database, rather than the agency?

25   *A.*  Right.  That's what I believe it to be.

1  *Q.* Okay. And you testified -- I think you were not quoting a

2  statute verbatim, but you were stating the purpose, which is,

3  NCIC is only accessible by a criminal justice agency for a

4  legitimate criminal justice purpose.

5  *A.* That's my understanding.

6  *Q.* And the NCIC believes that the conduct of -- CBI's,

7  obviously, doing background checks on gun sales is a legitimate

8  criminal justice purpose; is that true?

9          *MS. SCOVILLE:* Objection, foundation.

10          *THE COURT:* Response.

11          *MR. KOPEL:* I believe our foundation is that he's

12  testifying about the checks that are done pursuant to the CBI

13  system.

14          *THE COURT:* I sustain the objection. The question

15  asks what NCIC believes.

16          *MR. KOPEL:* Okay.

17  *BY MR. KOPEL:*

18  *Q.* Does NCIC allow CBI to access -- does CJIS allow CBI to

19  access NCIC for the purpose of conducting background checks on

20  gun sales?

21  *A.* Yes.

22  *Q.* Would -- to your understanding of the CJIS rules you must

23  comply with, would it be a violation of the CJIS rules if CBI

24  allowed people to, via a CBI operator, do a check on

25  themselves --

1    *MS. SCOVILLE:*  Objection, foundation.

2   *BY MR. KOPEL:*

3   *Q.*  -- for legitimate criminal justice purpose?

4    *THE COURT:*  The objection is foundation.  Respond --

5    *MR. KOPEL:*  May I confer, Your Honor?

6    (Brief off-the-record discussion between counsel.)

7   *BY MR. KOPEL:*

8   *Q.*  I'd like to withdraw that question.

9    The -- you had testified that the CJIS criteria is

10   more or less -- is a legitimate criminal justice purpose by a

11   criminal justice agency.  Do you know of any guidelines or

12   regulations or any specifications where that has been described

13   in -- specified in more detail by CJIS or the FBI?

14    *MS. SCOVILLE:*  Objection, relevance.

15    *THE COURT:*  Response.

16    *MR. KOPEL:*  The relevance is the least restrictive

17   alternative issue, which is, perhaps, one of the core issues in

18   this case.

19    Mr. Sloan testified about why the public-facing

20   records check, which Mr. Colglazier performed with CBI, is

21   different from the kind of check that -- is less comprehensive

22   than the kind of check that is performed by CBI and the

23   additional databases that it accesses in performing a

24   background check on a gun sale.

25    What I'm trying to explore and find out the answer to

1    is, to what extent does CBI have the ability or the option to

2    perform, if it chose or state law allowed, background checks on

3    individuals privately buying guns without them having to be

4    routed through an FFL.  If we, in our least restrictive

5    alternative proposal that we've offered in the brief -- in the

6    trial brief and the evidence, wanted to say, rancher A can sell

7    a handgun to rancher B by doing an online check without having

8    to drive an hour to a gun store, what databases are going to be

9    available and usable?  What is the quality of that check going

10   to be, compared to the quality of the check you can get by

11   going into town and going to the gun store?

12           And this is exploring that and finding out whether

13   things like the NCIC check could be made available via CBI in

14   some fashion for rancher-to-rancher sales or whether they

15   necessarily by law must only go through an FFL.

16           THE COURT:  Reply.

17           MS. SCOVILLE:  Certainly, Your Honor.

18           This trial is about 18-12-112, not about every

19   alternative that the legislature did or did not consider.  And

20   so the State stands by its relevance objection.

21           THE COURT:  I'm going to overrule the relevance

22   objection for the time being.  But the scope of the questions

23   that are being asked with regard to that purpose are too broad.

24           And we're going to recess for the day.  And I'll hope

25   that by Monday, the questions can be narrowed to ask pinpoint

1   questions as to what background searches can be conducted and

2   what information would be produced if such searches were

3   conducted.

4          *MR. KOPEL:*  Thank you, Your Honor.

5          *THE COURT:*  Thank you.

6          What's your pleasure for reconvening on Monday, 8:30

7   or 9 o'clock?

8          *MR. KOPEL:*  Its since it's the defendant's turn, we

9   defer to their decision.

10         *MR. GROVE:*  8:30, Your Honor.  Although we would need

11   to check with Director Sloan on his availability for Monday.

12   It's not something we discussed.  We will have a witness,

13   regardless.

14         *THE COURT:*  Director Sloan, can you be here at 8:30?

15         *THE WITNESS:*  May I quickly check my calendar

16   electronically?

17         *THE COURT:*  Do you have it on your phone?

18         *THE WITNESS:*  I do.

19         *THE COURT:*  Why don't you turn it on.

20         *THE WITNESS:*  Thank you, Your Honor.

21         Yes, I'm available.

22         *THE COURT:*  All right.  Then 8:30 it will be.

23         I wish you a good weekend, and I'll see you at 8:30 on

24   Monday morning.  We'll stand in recess until then.

25         (Recess at 4:57 p.m.)

1

**INDEX**

2

**Item**                                                                **Page**

3

GARY KLECK
4        Cross-Examination Continued By Mr. Grove        933
         Redirect Examination By Mr. Kopel               1032
5    JAMES SPODEN
         Direct Examination By Mr. Grove                 1065
6        Cross-examination By Mr. Kopel                  1093
         Redirect Examination By Mr. Grove               1118
7    RONALD SLOAN
         Direct Examination By Ms. Scoville              1119
8        Cross-examination By Mr. Kopel                  1147

9                          EXHIBITS

10   Exhibit      Offered  Received  Refused  Reserved  Withdrawn

11
     42                    1011
12   43                    1022
     44                     949
13   101-129                993
     130                    998
14   20                    1090

15

16                    REPORTER'S CERTIFICATE

17

18       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
19

20       Dated at Denver, Colorado, this 12th day of June, 2014.

21                                     s/Therese Lindblom

22                          _____

23                          Therese Lindblom,CSR,RMR,CRR

24

25