THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-CV-1300-MSK-MJW

COLORADO OUTFITTERS ASSOCIATION,
COLORADO FARM BUREAU,
NATIONAL SHOOTING SPORTS FOUNDATION,
MAGPUL INDUSTRIES,
COLORADO YOUTH OUTDOORS,
USA LIBERTY ARMS,
OUTDOOR BUDDIES, INC.,
WOMEN FOR CONCEALED CARRY,
COLORADO STATE SHOOTING ASSOCIATION,
HAMILTON FAMILY ENTERPRISES, INC.,
d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
DAVID STRUMILLO,
DAVID BAYNE,
DYLAN HARRELL,
ROCKY MOUNTAIN SHOOTERS SUPPLY,
2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
BURRUD ARMS INC. D/B/A JENSEN ARMS,
GREEN MOUNTAIN GUNS,
JERRY'S OUTDOOR SPORTS,
SPECIALTY SPORTS & SUPPLY,
GOODS FOR THE WOODS,
JOHN B. COOKE,
KEN PUTNAM,
JAMES FAULL,
LARRY KUNTZ,
FRED JOBE,
DONALD KRUEGER,
STAN HILKEY,
DAVE STONG,
PETER GONZALEZ,
SUE KURTZ,
DOUGLAS N. DARR,

    Plaintiffs,

vs.

JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT - DAY EIGHT
_____

1    Proceedings before the HONORABLE MARCIA S. KRIEGER,

2  Judge, United States District Court for the District of

3  Colorado, continuing at 8:48 a.m., on the 9th day of April,

4  2014, in Courtroom A901, United States Courthouse, Denver,

5  Colorado.

6

7                          **APPEARANCES**

8    RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
   at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9  Denver, Colorado, 80202, appearing for the Plaintiffs.

10   DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
   555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11 for the Plaintiffs.

12   MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
   P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13 appearing for the Plaintiffs.

14   ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
   Street, Castle Rock, Colorado, 80104, appearing for the
15 Plaintiffs.

16   DAVID BENJAMIN KOPEL, Attorney at Law, Independence
   Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17 appearing for the Plaintiffs.

18   MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
   SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19 General, Colorado Attorney General's Office, Ralph L. Carr
   Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20 80203, appearing for the Defendant.

21

22

23

24            THERESE LINDBLOM, Official Reporter
              901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1    **P R O C E E D I N G S**

2         *THE COURT:*  We are reconvened in Case No. 13-cv-1300.

3    This is our eighth day of trial.

4         Could I have entries of appearance for today's

5    proceedings.

6         *MR. COLIN:*  Good morning, Your Honor.  Mark Colin on

7    behalf of the federally licensed firearms dealer plaintiffs.

8         *THE COURT:*  Good morning.

9         *MR. KRUMHOLZ:*  Good morning, Your Honor.  Peter

10   Krumholz and Richard Westfall here on behalf of David Bayne,

11   Dylan Harrell, and the nonprofits.

12        *THE COURT:*  Good morning.

13        *MR. KOPEL:*  Good morning, Your Honor.  David Kopel on

14   behalf of David Strumillo, John B. Cooke, Ken Putnam, James

15   Faull, Larry Kuntz, Fred Jobe, Donald Kroger, Stan Hilkey, Dave

16   Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

17        *THE COURT:*  Good morning.

18        *MR. ABBOTT:*  Good morning, Your Honor.  Doug Abbott on

19   behalf of Magpul Industries and the National Shooting Sports

20   Foundation.

21        *THE COURT:*  Good morning.

22        *MR. FABIAN:*  Good morning, Your Honor.  Anthony Fabian

23   on behalf of Colorado State Shooting Association and Hamilton

24   Family Enterprises.

25        *THE COURT:*  Good morning.

1    *MR. GROVE:*  Good morning.  Matthew Grove, Stephanie

2  Scoville, LeeAnn Morrill, and Katherine Spalding on behalf of

3  the defendants.

4    *THE COURT:*  Are you all ready to proceed?

5    *MR. COLIN:*  Plaintiffs are ready.

6    *THE COURT:*  All right.  We had Chief Fuchs on the

7  stand when we recessed yesterday afternoon.  We'll resume with

8  his cross-examination.

9    So, Ms. Glover -- there you are, right back there in

10  the courtroom.  Please come on up, take a seat.  You remain

11  under oath.

12    *MR. KOPEL:*  Your Honor, before proceeding with

13  Mr. Fuchs' cross-examination -- Chief Fuchs' cross-examination,

14  I was wondering if we could formally introduce the legislative

15  history exhibits which we had discussed yesterday morning, or

16  would you prefer that --

17    *THE COURT:*  I think we need not inconvenience Chief

18  Fuchs with that right now.

19    *MR. KOPEL:*  Okay.

20    (**DOUGLAS FUCHS, DEFENDANT'S WITNESS, PREVIOUSL SWORN**)

21                **CROSS-EXAMINATION CONTINUED**

22  *BY MR. COLIN:*

23  *Q.*  Good morning, Chief.

24  *A.*  Good morning, sir.

25  *Q.*  Before we get rolling and finalizing your

1    cross-examination, I want to make sure we're on the same page

2    as to the opinion we're talking about.  My understanding is

3    that the opinion that you rendered yesterday is, "Limiting

4    magazines to 15 rounds provides victims in a mass shooting

5    situation with an opportunity to escape or overcome a shooter."

6    Is that accurate?

7    A.  It could be a mass shooting, sir, or virtually any

8    shooting.

9    Q.  I understand it could be.  But your previous opinion, I

10   believe I just quoted; is that accurate?

11   A.  It's accurate, with the caveat that it's any shooting.

12   Q.  So you're modifying your original opinion?

13   A.  If that's, indeed, what I said yesterday, then, I guess

14   that I am adding that to that, yes.

15   Q.  So you're modifying the opinion to include other shootings

16   other than mass shootings?

17        THE COURT:  That's what he just said.

18        MR. COLIN:  Okay.  I'm just trying to clarify.  I

19   apologize.

20   BY MR. COLIN:

21   Q.  And that's because a pause associated with a magazine

22   exchange provides a few seconds when the suspect is unable to

23   fire; is that accurate?

24   A.  Any pause that's created by virtue of what we discussed

25   yesterday provides law enforcement or civilians with the

1  opportunity to either flee, to tactically relocate, to take

2  tactical action, or to overpower or overcome the aggressor,

3  yes, sir.

4  Q.  Your opinion, however, goes specifically to pauses

5  associated with magazine exchanges, does it not?

6  A.  Pauses associated with magazine exchanges make mandatory,

7  if you will, the -- that pause.

8  Q.  Well, a weapons malfunction, for example, is not associated

9  with a magazine capacity limitation in any way, is it?

10  A.  No, that's correct.  I think we talked about that

11  yesterday.

12  Q.  All right.  In addition to pauses associated with magazine

13  exchanges, I understood you to say that there are other things

14  that can create pauses which might give victims an opportunity

15  to flee or intervene, such as a malfunction?

16  A.  Correct.

17  Q.  And with regard to the original opinion that we just

18  articulated, you provided several examples yesterday, six, to

19  be exact, of incidents in which you contend that limiting

20  magazines to 15 rounds provided a victim or more victims a --

21  an opportunity to escape or intervene.  Is that accurate?

22  A.  I'm sorry.  Could you repeat that one more time?

23  Q.  Sure.  You gave us six examples yesterday.  And what I

24  understood those examples to be were examples supporting your

25  opinion that in those cases, limiting magazines to 15 rounds

1  provided victims an opportunity to flee or intervene; is that

2  accurate?

3  *A.*  Victims or bystanders.

4  *Q.*  Okay.  We talked about Sandy Hook, and we'll talk about it

5  again in a minute.  That's one of those examples?

6  *A.*  Yes, sir.

7  *Q.*  And in the Sandy Hook incident, I think you acknowledged

8  yesterday that we're not sure whether there was a magazine

9  exchange involved in that opportunity or pause at all, are we?

10  *A.*  Correct.  There is a discrepancy in the reports as to

11  whether or not there was a malfunction of the weapon which

12  would have caused that pause or whether there was a magazine

13  exchange that would have caused that pause.

14  *Q.*  And the Long Island railroad incident that you mentioned,

15  the suspect in that case simply ran out of ammunition; isn't

16  that true?  He had two full magazines, they ran out, he was

17  trying to refill the magazines.

18  *A.*  The -- there were two exchanges I think about which I spoke

19  yesterday.  The first exchange afforded individuals on the

20  train the opportunity to flee.  And that second magazine

21  exchange, if you will, afforded individuals on the train the

22  opportunity to overpower.

23  *Q.*  But there was no second magazine exchange, correct?  He was

24  actually trying to refill a magazine with loose rounds; isn't

25  that accurate?

1   *A.* I'm not quite sure.

2   *Q.* All right. So, once again, we don't know for sure whether

3   this second incident as part of the Long Island railroad event

4   involved a magazine exchange?

5   *A.* What I do know --

6          *MS. SPALDING:* Objection, Your Honor. Misstates the

7   testimony.

8          *THE COURT:* Noted for the record.

9          *THE WITNESS:* Can I answer?

10  *BY MR. COLIN:*

11  *Q.* Yes.

12  *A.* What I do know is that he ran out of bullets. And at that

13  time, when he ran out of bullets and was refilling, that gave

14  pause, which gave the opportunity.

15  *Q.* Okay. So the North Carolina shooting we talked about, that

16  was one where the suspect was shot three times, the last of

17  which he dropped to the ground and collapsed. So that did not

18  involve a magazine exchange or an attempt to reload at that

19  point?

20         *MS. SPALDING:* Objection, asked and answered.

21         *THE COURT:* Sustained.

22  *BY MR. COLIN:*

23  *Q.* With regard to the Penn State shooting that you

24  discussed -- do you recall that testimony yesterday?

25  *A.* I believe so, sir.

1  *Q.* And the Penn State shooting is not a mass shooting, was it?

2  It was -- one individual was shot and wounded, one individual

3  was shot and killed; is that right?

4  *A.* I believe you're correct, sir.

5  *Q.* So that doesn't fit within your original opinion that

6  limiting magazines to 15 rounds provides victims in a mass

7  shooting situation with an opportunity to escape or intervene,

8  does it?

9  *A.* Again, my opinion is that in any shooting, that pause

10 created gives one an opportunity to do what we talked about

11 before.

12 *Q.* Okay. And the shooter -- the female shooter in the Penn

13 State incident was carrying a Mauser rifle; is that right?

14 *A.* I believe the shooter was.

15 *Q.* And the shooter fired five shots before she was intervened

16 on; isn't that accurate?

17 *A.* I don't know the exact number of shots the shooter fired.

18 *Q.* Do you know what capacity a Mauser rifle has?

19 *A.* I do not.

20 *Q.* And if the suspect only fired five shots, do you know

21 whether that would have required any type of magazine exchange

22 in a Mauser?

23 *A.* I do not.

24 *Q.* Did you do any additional research since your second

25 deposition on the Penn State incident?

1    *A.*  I believe I read another news article on it.  I did not

2    obtain any police report as in some of the others.

3    *Q.*  And did you provide a copy of that news -- additional news

4    article that you reviewed to counsel?

5    *A.*  I would not have, no, sir.

6    *Q.*  So of the six incidents that you mentioned, the only one

7    that we didn't talk about was the -- two, I apologize, I

8    skipped one.  The Aurora theater incident, that's another

9    incident that you mentioned, is it not, which is supportive of

10   your opinion?

11          *MS. SPALDING:*  Objection, Your Honor.  It was not.

12   That was not in his testimony.

13          *THE COURT:*  Thank you.  That's not a basis for an

14   objection.  The witness can answer that that was not the basis

15   of his opinion, if, indeed, it was not.

16          *THE WITNESS:*  I'm sorry, could you repeat the

17   question?

18   *BY MR. COLIN:*

19   *Q.*  Sure.  Is the Aurora theater shooting another example of an

20   incident where a 15-round-magazine-capacity limit would have

21   provided, in your opinion, victims an opportunity to flee or

22   intervene?

23   *A.*  That was the end of the question?  I'm sorry.

24   *Q.*  Isn't --

25   *A.*  That was the end of the question?  I wanted to make sure.

1  Q.  I'm sorry?

2  A.  That was the end of the question?

3  Q.  Yes, I'm sorry.

4  A.  Yes, that's correct, sir.

5  Q.  Okay.  And in the Aurora theater shooting, in fact, the

6  magazine that was being used, the 100-round magazine, jammed;

7  isn't that accurate?

8  A.  That is correct, sir.

9  Q.  So this was not an incident in which a magazine capacity

10 limit would have had any effect; isn't that true?

11 A.  In that specific jam, that is correct, sir.

12 Q.  All right.  So in the six incidents you gave as examples

13 yesterday, the only incident in which, arguably, a magazine

14 exchange provided victims an opportunity to intervene or escape

15 is the Giffords shooting; isn't that correct?

16 A.  Well, no.  Because if in Aurora he was limited to a

17 15-round magazine, that would have created ample additional

18 pauses, even before that, I think, 45-round jam of his weapon.

19 He would have had to exchange magazines -- if it was limited to

20 15, you've got the first 15, you've got an exchange, you've got

21 the second 15, you've got an exchange, that would have been 45.

22 So there would have been magazine exchanges having to take

23 place in Aurora, as well.

24 Q.  That's just speculation.  You don't know if that's true.

25 A.  I do know that if his magazine was limited to 15, he would

1  have had to exchange magazines.

2  Q.  But that isn't your opinion in this case.  Your opinion is,

3  limiting magazines to 15 rounds provides victims in a mass

4  shooting situation with an opportunity to flee or intervene.

5  We're not talking about situations in which that might have

6  occurred.  That did not occur in the Aurora theater shooting,

7  did it?

8  A.  No, because he had a drum with 100 rounds in it.  If he had

9  been limited to 15 rounds, every 15 rounds he would have had to

10  exchange magazines, as opposed to being able to kill or injure

11  45, I believe it was -- or 55, one of the two -- individuals

12  before that weapon malfunctioned.

13  Q.  And we'll get to that aspect of your opinion in just a

14  couple of minutes.  I'd like to explore how your experience in

15  Sandy Hook has contributed to your expertise on the impact of

16  gun control on gun violence.  That was your testimony, wasn't

17  it, that your Sandy Hook experience contributed to your

18  expertise in the area of gun control and gun violence?

19  A.  I think you were really focusing on magazine capacity and

20  not overall gun violence.

21  Q.  Okay.  You -- well, maybe you can explain.  How did your

22  experience at Sandy Hook contribute to your expertise on

23  magazine exchanges, then?

24  A.  An individual walked into the Sandy Hook Elementary School

25  with 30-round magazines.  He was able to shoot, kill, injure 30

1  individuals before he needed to exchange that magazine, if they

2  were back to back, he was able to do it fairly quickly, with

3  60.  He fired more than 150 rounds.  And if you look at a

4  30-round magazine, that would mean that he only needed to

5  exchange his magazine five times -- three times -- five times.

6  If he was limited to 15-round magazine, obviously, that

7  exchange rate would have doubled.  Thereby, the amount of time

8  that one would have had to flee, to overpower, or if law

9  enforcement had arrived by then, to take tactical action, would

10  have doubled.  Not only in the instances or the frequency, but

11  also in the amount of time.  So that's a significant amount of

12  time.

13  Also, the six children who were able to run out of the

14  school, ran out of the school during one of those pauses.  And,

15  arguably, we don't know what created that pause.  But that

16  pause would have been mandated had one had to exchange a

17  magazine after 15 rounds.

18  *Q.*  And I appreciate your answer, but that wasn't what I asked.

19  *A.*  I'm sorry.

20  *Q.*  I asked you how your experience -- not what happened at

21  Sandy Hook, but how your personal experience in Sandy Hook

22  contributed to your expertise in the area of magazine capacity

23  limits.

24  *A.*  I guess one could talk about a philosophical look or

25  research look at any topic.  And then one looks to see whether

1    or not in history, or in practice, your theory, your philosophy

2    has played out.  So if I have a belief which says that at 15

3    rounds, you must exchange your magazine, that creates a pause,

4    that creates an opportunity, and I go back, and we talk about

5    those six incidents, we talked about Sandy Hook, as well, in

6    which that pause was created for whatever reason, that pause

7    gives -- in Sandy Hook, it gave six kids an opportunity to

8    live, who wouldn't have had it.

9        Now, whether or not that pause was created by a

10   magazine exchange or whether or not that pause was created by a

11   malfunction, if that shooter was limited to fifteen- or

12   ten-round magazines but in this case, fifteen-round magazines,

13   that would have given double the amount of reloading

14   requirements, which would have potentially let other kids run

15   out of that school.

16       So how did this impact me?  It took what I knew to be

17   a fact, and to hear small children even recognize that fact,

18   that during that pause, they knew enough to run, I would

19   suggest that that bolsters that statement.

20   Q.  All right.  Let's just talk about your personal experience

21   at Sandy Hook to get at the answer that way.  Your agency was

22   not primarily responsible for investigating the incident, was

23   it?

24   A.  No, the Connecticut State Police were.

25   Q.  And you were not present during the active shooter phase of

1  the event, were you?

2  *A.*  No, sir.

3  *Q.*  My understanding of your testimony was that your sole

4  involvement in Sandy Hook was that you picked up four teachers

5  who you encountered as you were driving to the school, you took

6  them, I think, to a firehouse, and than you went to the parking

7  lot of the school and assisted in reuniting children with their

8  parents.  Is that accurate?

9  *A.*  On a very high-level overview, sure.

10  *Q.*  And then after that, you have a conversation with a couple

11  of parents.

12  *A.*  There was a lot in between those two; but for the purposes

13  of this discussion, then that would be accurate.

14  *Q.*  Okay.  And anything about picking up the teachers,

15  reuniting children, or talking to these parents that

16  contributes to your expertise in the area of magazine capacity

17  limits?

18  *A.*  I think that I just described that the conversation with

19  the parents and the fact that two of those parents have

20  children who are alive today because they were able to run out

21  of the school, and the kids described the fact that they --

22  that when he was playing with his gun -- although, one of the

23  statements actually says reloading -- that those children knew

24  enough to flee goes right to the heart of that opinion.

25  *Q.*  Well, let's talk about where you received that information.

1    There were two investigative reports that were generated as a

2    result of the Sandy Hook incident; isn't that true?

3    A.   There were a plethora of investigative reports.

4    Q.   Well, let's -- I understand that there are lots of police

5    reports.  But there were two comprehensive investigative

6    reports prepared regarding the Sandy Hook incident; isn't that

7    true?

8    A.   Could you be more specific?

9    Q.   Sure.  Let's get specific.  The first was prepared by the

10   Connecticut State's Attorney and released on November 25 of

11   2013; isn't that accurate?

12   A.   Are you talking about -- I think it was about four pages,

13   kind of high-level overview?

14   Q.   Yes.

15   A.   That was released in advance of the report?

16   Q.   Yes.

17   A.   I don't recall the date, but I know that Steve Sedensky,

18   who is the state's attorney for the judicial district of

19   Danbury, did release that.

20   Q.   Okay.

21   A.   I don't know the date.

22   Q.   And that's the first report in which it was determined that

23   the pause was associated with a malfunction, rather than a

24   reload; isn't that accurate?

25   A.   That's the first report of the first released report.

1  Q.  Yes.  And then there was a nine-volume report, very

2  extensive report, that was ultimately released on December 27,

3  2013, that was prepared by the State of Connecticut Department

4  of Emergency Services and Public Protection, correct?

5  A.  That's the Connecticut State Police.

6  Q.  Yes.

7  A.  There was.  I think there were -- the release is in that

8  order, because the state's attorney's report, or high-level

9  overview, came out in advance of the state police report.

10  Q.  In that report, they, too, then concluded that the pause

11  was associated with firearms malfunction and not a magazine

12  exchange; isn't that right?

13  A.  I believe there is a dispute between the emergency services

14  unit folks who arrived and the lab as to what that malfunction

15  or exchange would have been.  That they're not certain.

16  Q.  Well, within the nine-volume report, there is a report from

17  the ESU, as you indicated, that indicates that they didn't find

18  a malfunction; but nonetheless, the conclusion in the report

19  was -- based upon all of the evidence in the nine volumes, that

20  there was a weapons malfunction; isn't that accurate?

21  A.  I can't say that it is.

22  Q.  Have you read the entire nine volumes?

23  A.  I have not read every page of it, sir.

24  Q.  Okay.  Then, thank you.

25        Other than what we just spoke to -- so you did read

1  the four- or five-page original report issued by the states

2  attorney?

3  A.  I did.

4  Q.  In its entirety?

5  A.  I did.

6  Q.  But not the nine-volume report.  And just to -- as I

7  understand it, the nine-volume report was a compilation of all

8  of those hundreds or thousands, even, of witness statements,

9  police reports, evidence, forensic evidence reports,

10 everything?

11 A.  Photographs, many of which were redacted.  So in reading

12 it, you've got a lot of blank pages and blackened out.

13 Q.  Sure.

14 A.  I also did read one of the statements that was obtained,

15 but was not a part -- was a part of the report, but not a part

16 of the report that was publicly released.

17 Q.  Okay.  And that was the report that you talk about

18 yesterday, where you couldn't tell if it was by one of the same

19 parents that you talked to?

20 A.  Right.  It was a statement of a parent -- of one of the six

21 children's parents.

22 Q.  Right.

23 A.  Who ran out of the school, which says that they fled when

24 the student said he was reloading.  But I have no way of

25 knowing, because I don't know which parent authored that

1  statement, whether or not it is one of the two with whom I had

2  spoken or one of the other four.

3  Q.  I understand.  Thank you.

4      Even though you didn't make it through all nine

5  volumes, you would agree, would you not, that both Sandy Hook

6  reports indicate that there were seven partially or completely

7  spent magazines found at the scene?

8  A.  I believe that is the correct -- you mean, from the AR-15?

9  Q.  Yes.

10 A.  Okay.  Because there were other weapons there that had

11 magazines in them.

12 Q.  I don't care what they were from.  There were seven either

13 partially or completely spent magazines at the scene that were

14 found by investigators; isn't that true?

15 A.  I think there were more.  I think you're only talking about

16 the AR-15 magazines.

17 Q.  Okay.  So there may even have been more magazines that were

18 either partially or completely expended from a different

19 firearm?

20 A.  There were, I believe, seven from the AR-15, I think three

21 of which were completely expended, and I think three were

22 partially expended.  There were also two other weapons there,

23 the Glock 10 millimeter, I believe, which had a single round

24 fired out of it, and a Sig 9, which I don't believe was used.

25 Q.  All right.  So the magazines would have been from the AR,

1   then, that were found?

2   *A.*   Right.  I didn't know if you were asking me only if there

3   were seven magazines there, and there were more than that.

4   *Q.*   If there were seven partially or completely spent magazines

5   that had been left on the ground by Mr. Lanza, that would

6   indicate to you, would it not, that Mr. Lanza performed at

7   least seven magazine exchanges during the incident; isn't that

8   true?

9   *A.*   I would believe that would be the case.

10  *Q.*   And do you recall reviewing any evidence or information in

11  any of the reports that you reviewed that indicates that the

12  pauses associated with these seven magazine exchanges resulted

13  in victims fleeing or successfully intervening before his

14  weapon malfunctioned?

15  *A.*   Again, I -- I did not say that I knew for certain his

16  weapon malfunctioned.  And I do not believe that anybody else

17  was able to flee or escape during any of those instances.

18  *Q.*   So at least in the seven prior magazine exchanges, whatever

19  the last one was, in those previous seven exchanges, no one

20  escaped, no one was able to intervene successfully?

21  *A.*   The school was pretty much in lockdown.  Nobody was --

22  except for those who fled out the back who were not immediately

23  near where the shooting was taking place, everybody was in

24  lockdown and hide mode, so to speak, so there was no fleeing

25  going on.  But, again, the opportunity for that to happen would

1   have been doubled had he only had a 15-round magazine, not a

2   30-round magazine.

3   Q.  Let's talk about the person who actually followed your

4   advice and attempted to intervene.  The only person who

5   attempted to intervene was a teacher who was one of the very

6   first people killed; isn't that true?

7   A.  I think I have to back up.  Followed my advice?  I'm not

8   quite sure I understand.

9   Q.  Well, haven't you suggested that these pauses provide an

10  opportunity for victims to flee or intervene?

11  A.  I have.

12  Q.  Okay.  And the first person who attempted to intervene in

13  the Sandy Hook shooting was shot and killed; isn't that true?

14  A.  Not sure that she really was intervening.  Certainly, she

15  was not intervening during any kind of a pause in the shooting.

16  That's when the shooting first started.

17  Q.  Well, let's talk about how the pauses in shootings under

18  your scenario assist people.

19          Your suggestion is that victims or bystanders should

20  wait for the first opportunity when the magazine is either

21  expended fully or the suspect is engaging in a tactical reload

22  and take that opportunity to either flee or intervene; isn't

23  that true?

24  A.  That is an opportunity.  That's correct.

25  Q.  Okay.  All right.  And in order to get that opportunity, in

1   order for the victims or bystanders to avail themselves of this

2   pause, they have to wait until the shooter has expended the

3   rounds that are in the magazine; do they not?

4   A.  That would be one of those.

5   Q.  And that means that in a 15-round capacity situation, the

6   shooter would have shot and killed or seriously injured 15

7   people before the pause that you're suggesting they wait for;

8   isn't that correct?

9          MS. SPALDING:  Objection, Your Honor.  Argumentative.

10         THE COURT:  Sustained.

11  BY MR. COLIN:

12  Q.  Am I correct that in your direct examination, when speaking

13  of training with regard to -- law enforcement officer training

14  with regard to effecting magazine exchanges, quote, the amount

15  of time needed to change a magazine is the amount of time you

16  are out of the gunfight.  Did I state that accurately?

17  A.  I believe I also indicated that -- potentially out of the

18  gunfight, because there are some weapons that still will fire

19  without the magazine in it, depending on the type of handgun

20  you have.

21  Q.  And we'll have a chance to talk about those in just a

22  second.  And this is why law enforcement officers change --

23  train to effect magazine exchanges quickly; isn't that correct?

24  A.  It's really why we train more to do tactical reloading

25  than -- which I think is more important than a quick magazine

1    exchange.

2    *Q.* Okay. So it's not important, are you saying, that law

3    enforcement officers and civilians learn how to conduct

4    magazine exchanges swiftly?

5    *A.* No, it's important. But what I'm suggesting is, we would

6    like to see our officers do a tactical reload when possible so

7    they're not confronted with that need to reload when they have

8    no more ammunition.

9    *Q.* That's because when you're out of bullets, you're

10   vulnerable; isn't that true?

11   *A.* Again, depends on whether or not you've got one in the

12   chamber or not. But, yes. And the fact that you're out of

13   bullets, you're vulnerable, that's exactly what we are training

14   the civilians. When that active shooter is out of bullets,

15   that shooter is vulnerable. That's exactly right.

16   *Q.* That's exactly right when it comes to the defensive gun

17   user, too, isn't it? When a person is attempting to save their

18   life and the lives of someone else in self-defense runs out of

19   ammunition, they, too, are rendered temporarily defenseless;

20   are they not?

21   *A.* That goes back to the discussion we just had a few minutes

22   ago, which is looking at, all right, you have a philosophy or a

23   theory, and let's look at the history to find out whether or

24   not there -- the philosophy or theory has ever played out. And

25   certainly, in the law enforcement realm, unfortunately, law

1    enforcement a multitude of times has needed far more than 15

2    rounds to defend themselves against others who have more than

3    15-round magazines.

4         *MR. COLIN:* Object as nonresponsive, Your Honor.

5         *THE COURT:* I agree.

6         *MR. COLIN:* Thank you.

7    *BY MR. COLIN:*

8    *Q.* Could you answer my question, sir.

9         *THE COURT:* Would you like to have the question read

10   back?

11        *THE WITNESS:* I would, please.

12        *THE COURT:* All right. "That's exactly right when it

13   comes to the defensive gun user, too, isn't it? When a person

14   is attempting to save their life and the lives of someone else

15   in self-defense runs out of ammunition, they, too, are rendered

16   temporarily defenseless; are they not?

17        *THE WITNESS:* I don't believe that's a simple yes or

18   no question.

19   *BY MR. COLIN:*

20   *Q.* Why don't you answer it. If you want to answer it, go

21   ahead and answer it.

22   *A.* I was trying to.

23   *Q.* Well, let's see if I can phrase it more succinctly, then.

24        In a defensive gun use situation, regardless of

25   whether or not it's a law enforcement officer or a civilian,

1  I'm simply asking you whether the pause associated with

2  effecting a magazine exchange is a pause during which the

3  defensive gun user is rendered temporarily defenseless.

4  *A.*  If that person is trained properly -- again, we train to

5  tactically reload, which is what I talked about before -- and

6  you would not be rendered useless -- you would not be rendered

7  without ammunition.

8  *Q.*  Chief, I wasn't asking about tactical reloads.  Let me try

9  one more time.  Isn't it true that during the pause associated

10  with a magazine exchange, regardless of the circumstances of

11  the magazine exchange, a defensive gun user is rendered

12  temporarily defenseless?

13         Just so we address your tactical magazine exchange

14  issue, there are certain firearms which with the magazine out

15  of the gun will allow you to fire one single round that is

16  still in the chamber.  That's what you're referring to in your

17  previous response?

18  *A.*  That's correct.  I think you said that correctly, yes.

19  *Q.*  Okay.  So unless a civilian or law enforcement officer

20  happens to have one of those firearms that allows one more

21  round to be fired during a magazine exchange, the gun won't

22  fire.  They're out of bullets.  They're temporarily

23  defenseless.  Wouldn't you agree?

24  *A.*  I have to go back to the training.  I mean, there is a

25  reason that law enforcement, we train so heavily that when you

1  tactically reload, you change positions, you maintain target

2  acquisition so we don't get ourselves in that position.

3  Q.  Thanks, Chief.

4       Even when a civilian or a law enforcement officer is

5  very fast at effecting a magazine exchange, two seconds, very

6  fast, that means during that two seconds -- assuming they don't

7  have one of those special guns that you referred to -- they're

8  rendered temporarily defenseless; isn't that right?

9  A.  What is a special gun?

10 Q.  I'm sorry?

11 A.  What do you mean by a special gun?

12 Q.  You indicated in your prior testimony there are certain

13 firearms that allow a single round to be fired when the

14 magazine is out of the weapon, correct?

15 A.  There are.  I don't think they're special.  It's the gun

16 manufacturer.  I wouldn't suggest they are special.

17 Q.  So that was your problem with my last question?  Let me ask

18 again.  During the two seconds that a very fast, proficient law

19 enforcement officer or civilian is effecting a magazine

20 exchange, they can't fire in self-defense, absent the fact that

21 they may have one of these firearms that allows them to fire

22 one round; isn't that true?

23 A.  They can't fire if the gun has no bullets in it.

24 Q.  There you go.  Thank you.

25       And the two seconds that they're out of the gunfight,

1    a trained law enforcement officer can fire six, seven rounds in

2    two seconds accurately; isn't that right?

3    A.   Would depend what kind of weapon he has.

4    Q.   On average, using any authorized law enforcement

5    semiautomatic pistol, a trained law enforcement officer or

6    civilian can fire six to seven rounds in two seconds; isn't

7    that accurate?

8    A.   I wouldn't -- I wouldn't know those numbers, sir.

9    Q.   Okay.  Give me your estimate.  How fast can you fire,

10   effectively and accurately, a semiautomatic pistol in two

11   seconds?  How many rounds can you fire on the range?

12   A.   I would suggest accurately, probably two -- average two and

13   a half per second.

14   Q.   Okay.  So using your number, someone who is unable to fire

15   defensively for two seconds during a magazine exchange loses

16   the ability to fire approximately four rounds in self-defense

17   or defense of others; isn't that true?

18   A.   If the gun is out of ammunition, then, yes, sir, you can't

19   fire it.

20   Q.   And an empty firearm presents, essentially, the same risk

21   as a malfunctioning firearm, doesn't it?  Meaning, the gun is

22   rendered ineffective for defensive use?

23   A.   No, not necessarily.  Because a malfunctioning weapon may

24   be one that has to be cleared, and you could start using it

25   again.  And if you're out of bullets, you're out of bullets.

1  So if you don't know how to clear that malfunction, the gun may

2  be useless to you at that point.  But assuming all you did was

3  run out of bullets, you would just have to know how to reload

4  it.

5  Q.  In fact, in your deposition, you've responded that you've

6  got a really nice paperweight to throw at the suspect under

7  those circumstances; isn't that right?

8  A.  If you can't clear it, you mean?

9  Q.  Yeah.

10  A.  If you can't clear a malfunction -- I believe we were

11  talking about a different scenario at that point.  But if you

12  can't clear a malfunction for whatever reason, then, obviously,

13  the gun is useless to you.

14  Q.  Well, the same is true if the gun is out of bullets, right?

15  A.  Well, I would like to think before you threw it at

16  somebody, you would take the opportunity to reload it,

17  but . . .

18       MR. COLIN:  I have no further questions of this

19  witness.

20       Thank you, Chief.

21       THE WITNESS:  Thank you.

22       THE COURT:  Thank you.

23       Redirect?

24       MS. SPALDING:  Thank you, Your Honor.

25

**REDIRECT EXAMINATION**

1  *BY MS. SPALDING:*

3  *Q.* Just a few questions, Chief Fuchs.

You were describing on cross-examination what you personally did at Sandy Hook. And I think after the question about you taking teachers to the firehouse and then returning to the school, there seemed to be sort of a large blank of what occurred then. Could you describe what you did with respect to responding to the events at Sandy Hook after you took those teachers to the firehouse.

11  *A.* Sure. After the teachers were reunited with their students, went back to the school, met with the Newtown police chief and other officers prior to the calvary, essentially, coming in from other departments and the state police. Talked about what we had to do next. We did have one person who was in custody who we thought might have been involved. There were reports there was a second shooter at that point. That individual was an ambulance chaser, if you will. He heard the call, and he just showed up. So we took that person into custody, transferred the custody of that individual eventually over to the state police.

I, then, wound up at the firehouse, where I became, essentially, in charge of all of the kids and the victims, to reunite them with their parents, their caregivers, sort of take attendance, if you will, before we released them. A part of

1   that process included identifying those who were in the school

2   who might have some evidentiary value to the state police.  So

3   we really started parsing folks out into different groups.

4   Group one would be kids whose parents were there.  Then we had

5   to figure out whether they were in a position where they could

6   provide any kind of a statement to the state police.  Group two

7   were the teachers.  Group three were the parents who were

8   showing up who did not have any children, and they were taken

9   somewhere else.  Group four were adults whose loved ones were

10  still in the school, and they were taken somewhere else as

11  well.  And then we had some kids whose parents had not yet

12  shown, which is fine, and we housed them somewhere.  That was

13  kind of the reunification process.

14         During that process, obviously, had the opportunity to

15  speak with quite a few individuals who were in the school, or

16  out of the school, who were responding as we put those people

17  in the right group of individuals, so to speak, really, to

18  identify if there was anybody who could speak to what had

19  happened.

20  *Q.*  How long did that process take?

21  *A.*  I would estimate about two hours or so, before we really

22  had a decent accounting, and that number 26 started coming up

23  time and time again.  And we had all of the 26 victims'

24  families excluded in a back room.  And when we had the number

25  26, and there were 26 of them, we were pretty confident we had

1  the right number.

2  *Q.*  All right.  And subsequent to taking that role and

3  determining which children had information that might be of

4  interest to the -- to the state investigators, what did you do

5  with respect to the Sandy Hook investigation or the aftermath

6  of the event?

7  *A.*  Immediately that day, one of the things that I kind of

8  tasked myself with, along with one of the commanders from the

9  state police and the three school resource officers from

10  Newtown, was doing victim identification.  We were desperately

11  trying not to have the parents have to do face-to-face or

12  photographic identification of the victims.  So we put together

13  file folders on every single victim.  The medical examiner or

14  coroner came and did a makeshift morgue in the school parking

15  lot.  And we produced by probably about 10 o'clock that night a

16  file of -- for each one of the victims, which had photographs

17  and what they were last wearing and different descriptions of

18  them so that the coroner could do preliminary investigations,

19  and could do death notifications that night, which was able to

20  be accomplished.  That took place that night.

21      For the following ten days or two weeks, most will

22  tell you that I pretty much ran the Newtown Police Department,

23  along with three other administrators.  Their chief was buried

24  in this incident.  Not so much in the investigative side, but

25  in the town aid side, if you will.  We brought in -- for a

1  department that normally puts out five to seven officers, we

2  were putting out 50 to 70 officers per shift through mutual aid

3  departments.  We had over 1,000 officers respond during the

4  course of those subsequent two weeks to assist in that

5  endeavor.  We did things like guard victims' families, funeral

6  escorts, normal patrol, because the town still was there, every

7  other function, guarding scenes, traffic control, that would

8  have needed to take place because you're in a town that

9  normally has less than 30,000 people, which had a visiting

10 population, then, of an additional 30,000 people.

11 *Q.*  Okay.

12 *A.*  So I was very much involved with the day-to-day operation

13 of that department.

14 *Q.*  All right.  And did your opportunity to speak with the

15 parents, and I think one opportunity to speak to a child that

16 you referred to, did that occur at the firehouse when you were

17 sorting out students or witnesses who could be helpful to the

18 state investigating authorities?

19 *A.*  It occurred at a couple of different junctures.  I did

20 speak with somebody at the firehouse.  I did speak with

21 somebody on a telephone.  I did speak to a parent -- actually,

22 two, a parent and an uncle, I believe, when the President came

23 to Hartford, and we were up there with the surviving families,

24 as well.  So there were multiple opportunities where that same

25 information came back to me.

1    *Q.*  Okay.  Thank you.

2         You were asked about whether -- well, you were asked

3    about the seven magazines that were found at the school, three

4    of which were partially expended, correct?

5    *A.*  Yes, ma'am.

6    *Q.*  All right.  Do you know if there was anybody present, any

7    children, any adults present when those magazines were changed?

8    *A.*  I would have no way of knowing.  But my belief is, and I've

9    read the beliefs of others, that Lanza was engaged in what we

10   talked about before, which was tactical reloading.  So he was

11   not in a position where he was ever out of ammunition.

12   *Q.*  All right.  And the time that we do know that either a

13   magazine exchange was being done in front of kids or there was

14   an incident where the shooter was playing with his gun,

15   whichever it was, we know at that time kids escaped, right?

16   *A.*  We know that when he was in one of the classrooms, when he

17   was, quote, unquote, playing with his gun or doing a reload, as

18   the statement indicates, that is when those six kids knew

19   enough to run and fled the school.

20   *Q.*  And so far as we know, that's the only time that he

21   actually either exchanged a magazine in front of people or his

22   gun jammed in front of people; is that correct?

23              *MR. COLIN:*  Foundation.

24              *THE COURT:*  Response.

25              *MS. SPALDING:*  He's testified that he read the police

1    reports and -- and spoke to witnesses.

2         THE COURT: All right. It's not uncommon for

3    witnesses who were not present to testify based upon their

4    belief as to what happened. Most investigators of crimes do

5    exactly that. I understand this testimony to be in that vein.

6         MS. SPALDING: All right. Thank you, Your Honor.

7    BY MS. SPALDING:

8    Q. So, Chief, we do know of one time during this shooting when

9    either a magazine was exchanged in front of kids or a gun

10   jammed and the shooter was playing in front of kids, right?

11   That's your belief?

12   A. We do know that there was one such instance, for sure, when

13   he did something in front of the children and -- which gave

14   them the opportunity to flee the school, correct.

15   Q. Thank you.

16        You were asked some questions about civilians being

17   rendered helpless by running out of rounds. Are you aware of

18   any situation in which a civilian ever required more than 15

19   rounds to defend themselves?

20   A. I am not, no.

21   Q. Ten rounds?

22   A. I am not, no.

23   Q. You were asked about whether the incidents that you

24   referred to in your direct examination were mass shootings.

25   Let me ask you this: Do you consider an event in which an

1 individual attempts to shoot multiple people to be a mass

2 shooting situation?

3 A. I'm not sure there is any clear-cut definition of what a

4 mass shooting is. I think, unfortunately, our tolerance, if

5 you will, for that definition has increased as time has gone

6 on. Sandy Hook has now set a new bar for what school shootings

7 are. You see many that don't even make the national media

8 anymore, because they don't come close to that 26 number.

9 Q. Okay.

10 A. But I don't think that it -- it makes a difference, because

11 what -- what I have talked about is the opportunity -- whether

12 it's one life or twenty-six lives, it doesn't matter, it's that

13 opportunity to save additional lives during that time, where

14 there is a pause.

15 Q. Okay. Is it fair to say that you haven't established in

16 your own mind a definition of what a mass shooting is?

17 A. No, ma'am, I have not.

18     MS. SPALDING: Thank you very much, sir.

19     THE COURT: Can this witness step down and be excused?

20     MR. COLIN: I have no objection.

21     MS. SPALDING: Yes.

22     THE COURT: Thank you, sir.

23     THE WITNESS: Thank you, Your Honor.

24     THE COURT: You are excused.

25     THE WITNESS: Thank you.

1      *THE COURT:*  You may call your next witness.

2      *MR. GROVE:*  Your Honor, our next witness is

3   Dr. Jeffrey Zax.  I  understand the plaintiffs, again, have a

4   couple of motions in limine that maybe we should resolve before

5   he takes the stand.

6      *THE COURT:*  Okay.

7      *MR. KRUMHOLZ:*  Your Honor, Mr. Grove is correct, there

8   were two motions in limine.  It seems to me that one has been

9   subsumed in the other.

10      We filed one Monday morning titled Plaintiffs' Motion

11   in Limine to Exclude Untimely Disclosed Expert Opinion

12   Testimony.  And, Your Honor, that is -- that is based on the

13   untimely disclosure of a supplemental report produced to us on

14   January 30, 2014.  It was based on data which Professor Zax

15   received sometime in November, after the discovery deadline had

16   closed.  Professor Zax testified that he completed his report

17   in December, and there is no explanation for why we received it

18   on January 30.

19      *THE COURT:*  How have you been prejudiced?

20      *MR. KRUMHOLZ:*  We've been prejudiced, Your Honor,

21   because had we timely received the supplemental report, we

22   would have had the opportunity to designate our own rebuttal

23   expert, who could have examined the quality of Professor Zax's

24   progression analysis and provided some context for it.

25      *THE COURT:*  What efforts did you make to address this

1   after January 30?

2       *MR. KRUMHOLZ:* Well, Your Honor, we took a

3   belt-and-suspenders approach, which is to say that we accepted

4   Mr. Grove's offer to take a short deposition of Professor Zax

5   concerning his late disclosed supplemental report. And then

6   the next thing we did was confer with counsel regarding this --

7   this motion over the weekend. We filed, with some reluctance,

8   Your Honor. We understand from the pretrial conference on

9   February 20 that you did not want motions in limine, and so it

10  was with some reluctance that we filed it. We believe that

11  based on the application of the rules, that this is an

12  important enough and clear enough circumstance that a motion

13  was warranted.

14      And I know you have the motion. We've cited the

15  relevant case law on that.

16      *THE COURT:* But this is -- what I'm asking is

17  something different than what I'm hearing. I don't see -- and

18  perhaps I've overlooked it -- any effort on your part to retain

19  another witness that you were unable to retain. I don't see in

20  the record any effort to extend deadlines or to seek an order

21  authorizing the retention of another witness. I see no --

22  nothing in the record that seeks any kind of sanctions for the

23  late disclosure. What I see is only a motion filed mid-trial

24  to exclude an expert opinion that the defendants had,

25  essentially, 45 days before trial. Fair?

1    MR. KRUMHOLZ:  Your Honor, that's a fair

2  representation.

3    THE COURT:  Okay.  So why didn't you take any of those

4  actions during that 45-day period?

5    MR. KRUMHOLZ:  Well, Your Honor, all I can say is, in

6  the press of preparing for trial, and especially with a case in

7  which we have five different plaintiffs' groups and five

8  different sets of lawyers, this is a litigation decision that

9  we made at the time we did.  And, ideally, we would have made

10  it earlier, but this is -- this is the timing.

11    THE COURT:  And to what extent is the opinion

12  different based on the January 30, 2013, report than the

13  opinion you previously had?

14    MR. KRUMHOLZ:  Well, it's completely different.  It

15  presents data that Professor Zax did not have at the time he

16  submitted his initial expert report and his supplemental expert

17  report in September.

18    THE COURT:  Okay.  Let's start with the conclusion.

19  Is the conclusion different?

20    MR. KRUMHOLZ:  The conclusion is not different, Your

21  Honor.

22    THE COURT:  Okay.  Now, there was data that was relied

23  upon, I assume, in the first report; is that right?

24    MR. KRUMHOLZ:  Not with respect to the opinion that

25  this regression analysis relates to.

1    THE COURT:  Okay.  So tell me the difference between

2  this report and the prior report.

3    MR. KRUMHOLZ:  Well, this report presents a regression

4  analysis of data received after the discovery deadline

5  concerning firearms confiscated because they were suspected in

6  the commission of a crime in Virginia.

7    THE COURT:  Okay.

8    MR. KRUMHOLZ:  The supplemental report then describes

9  a regression analysis that Professor Zax conducted concerning

10  that firearms data.  And Professor Zax's conclusion is that

11  based on his regression, the 1994 federal law that's been the

12  topic of much discussion in this case eventually resulted in a

13  decline in the proportion of firearms with large-capacity

14  magazines confiscated in Virginia.

15    THE COURT:  Well, I'm a little confused.  You referred

16  to "this report" presents a regression analysis, and then you

17  said the supplemental report describes a regression analysis.

18  When was the regression analysis performed?

19    MR. KRUMHOLZ:  December.

20    THE COURT:  Okay.  Did you have the -- the description

21  of the regression analysis that was performed prior to

22  January 30?

23    MR. KRUMHOLZ:  No, Your Honor.

24    THE COURT:  Okay.  So when you talk about the

25  regression analysis being in the report, you're talking about

1    it being in the January 30 report?

2            MR. KRUMHOLZ:  Yes, Your Honor.

3            THE COURT:  Okay.  And had you had the opportunity --

4    you say the prejudice to the plaintiffs is, you could have

5    obtained another expert --

6            MR. KRUMHOLZ:  That's correct.

7            THE COURT:    -- to address the -- what?  The

8    regression analysis?

9            MR. KRUMHOLZ:  Correct.

10           THE COURT:  Who would you have obtained?

11           MR. KRUMHOLZ:  I believe we would have retained a

12   professor named Carl Moody from George Mason University.

13           THE COURT:  But you made no attempt to obtain his

14   assistance, correct?

15           MR. KRUMHOLZ:  We contacted him, Your Honor, and have

16   had conversations.

17           THE COURT:  Was he unable to assist you?

18           MR. KRUMHOLZ:  No, I don't believe he was unable.  I

19   think by the time we had those conversations, we were too close

20   to trial to officially designate him as an expert.

21           THE COURT:  When did you contact him?

22           MR. KRUMHOLZ:  I can't answer that, Your Honor.

23           Can I confer with counsel?

24           THE COURT:  Sure.

25           (Off-the-record discussion between counsel.)

1    MR. KRUMHOLZ:  Your Honor, my apologies for the delay.

2  I wonder if we might have a very short recess so we can discuss

3  this.

4    THE COURT:  Well, we'll move on to something else.

5  There is no reason to take a recess at this time.  You can

6  discuss it over the morning recess.

7    MR. KRUMHOLZ:  Very well.  Thank you, Judge.

8    THE COURT:  All right.  I want to hear a response to

9  the motions, there are actually two of them, one at 148 and one

10  at 150.

11    MR. GROVE:  Yes, Your Honor.  So, my understanding of

12  the two motions is, one has to do with the demonstrative

13  charts.  This is similar to what we dealt with with

14  Dr. Webster.  We're not admitting those for anything other than

15  to -- for the witness to illustrate as he goes along.

16    The second is the more substantive motion, I believe,

17  that's 150.  And so at the outset, as the Court has previously

18  held with respect to the plaintiffs' other mid-trial motions in

19  limine, the train, in my view, has left the station.  The

20  plaintiffs' decision to wait until the second week of trial is

21  problematic.  This could have been raised at the pretrial

22  conference; it could have been raised at any time.

23    We indicated at the beginning of January -- actually,

24  this additional data was discussed at Dr. Zax's deposition

25  during the discovery period.  He hadn't received it yet.  And

1  as Mr. Krumholz indicated, it relates directly to the first

2  opinion that he's going to discuss today.

3       For that reason, I believe the Court should view the

4  additional disclosure here as appropriate supplementation under

5  Rule 26(a)(1)(E) and 26(e).

6       That said, even if we do have a Rule 26 issue here,

7  the Court should still permit the testimony.  The Tenth Circuit

8  has held that a trial court has broad discretion to determine

9  whether a Rule 26(a) violation is either, one, justified, or,

10  two, harmless.  The seminal case on this appears to be

11  *Woodworkers Supply, Inc.*, which is at 170 F.3d 985, which is

12  from 1999.  For the reasons I've already discussed, I believe

13  the timing of disclosure here was justified.  But even if it

14  wasn't, it certainly was harmless.

15       Under *Woodworkers Supply*, the Court should look at

16  four factors to guide its discretion.  First, prejudice or

17  surprise to the party against whom the testimony is offered;

18  second, the ability of the party to cure the prejudice; third,

19  the extent to which introducing the testimony would disrupt the

20  trial; and, fourth, the moving parties' bad faith or

21  willfulness.

22       All of these factors tilt in favor of admitting the

23  testimony here.  Plaintiffs certainly can't claim they're

24  surprised by it.  We disclosed the existence of this promptly.

25  I wish that I had been a little more prompt in disclosing the

1  report, but we had some issues with communication around this

2  period, given some of the timing of what else was going on and

3  the Christmas break.

4      We disclosed the data and the accompanying

5  supplemental report well before the trial date.  And we agreed

6  with the plaintiffs that it was appropriate for them to take a

7  supplemental deposition of Dr. Zax.  This opportunity cured any

8  prejudice that the plaintiffs might have suffered.

9      Aside from dealing with this motion, there has been no

10  disruption to the trial here, so the third factor also favors

11  admitting the testimony.

12      And there is certainly no bad faith.  Bad faith would

13  have been sitting on this and disclosing the week or the day

14  before trial.  That's not how we operate, and it's not

15  something that we were attempting to do here.

16      We did this on the level, in order to ensure that the

17  plaintiffs would have a fair opportunity to explore this area

18  with Dr. Zax in an additional deposition.  Plaintiffs made a

19  strategic decision to take advantage of that opportunity, and

20  it's -- they shouldn't now be able to rethink that decision and

21  move to exclude it.

22      That also raises another issue, and that's waiver and

23  opening the door.  Even if the Court doesn't agree with our

24  analysis under the *Woodworkers Supply* case, plaintiffs opened

25  the door to this testimony by asking Dr. Kleck about it during

1    his direct examination.  The Court will likely recall his

2    testimony about the Virginia Firearms Clearinghouse and how in

3    his view the data gathered from that source is incomplete and

4    unreliable.  The data that Dr. Kleck criticized is precisely

5    the data that Dr. Zax acquired and that we would like him to

6    address today.

7           If the Court has any questions, I'd be happy to

8    address them.

9           THE COURT:  Thank you.

10          Response.

11          Counsel, it's the same attorney who argues the motion

12   and does the reply.

13          MR. KRUMHOLZ:  Thank you, Your Honor.

14          Dr. Kleck did not testify about the Virginia

15   clearinghouse data.  He testified about two Washington Post

16   articles.  And so the topic of the Virginia clearinghouse data

17   did not come up during his testimony.

18          As to the -- as to our strategic decision, Your Honor,

19   I hardly think we can be blamed for taking a

20   belt-and-suspenders approach.  If they offered the deposition,

21   and we declined to take it, we would have been in the position

22   that they're now -- they're then saying that we declined a

23   perfect opportunity to take his deposition.

24          So I don't think we were -- the strategic decision

25   here is not one we can be blamed for.  We wanted to make sure

1    that we were protected on all sides.

2                THE COURT:  Thank you.

3                MR. KRUMHOLZ:  Thank you.

4                THE COURT:  The motion in limine found at Docket No.

5    150 seeks to exclude opinions by Dr. Zax found in a report that

6    was disclosed on January 30, 2013.  This was a supplemental

7    report.  Apparently it contained discussion of a regression

8    analysis that had not been previously disclosed, based on data

9    that was obtained by Dr. Zax after the close of the discovery

10   period.

11               The plaintiffs here exclude his opinions and testimony

12   at this time on the grounds that the report was late disclosed.

13   There is no doubt it was late disclosed.  It was disclosed a

14   good 45 days -- actually, close to 60 days before trial.  And I

15   believe the appropriate legal standard that has to be applied

16   with regard to a request of this nature is, indeed, set out in

17   *Woodworkers Supply*.  That's a Tenth Circuit binding case with

18   regard to this.

19               I find that the only prejudice that the plaintiffs

20   contend has happened is that they have not retained a

21   responsive expert to express a responsive opinion.  They were

22   provided by the defendant with the opportunity to take a

23   deposition based on this new report and did so.  And their

24   concern at this juncture is not based upon the deposition that

25   was taken or the report per se, it is only that they did not

1    have -- did not obtain a responsive expert.

2            I find that they had time to do so, have not heard

3    that there was inability to do so based upon the time.  I think

4    they had ability to cure that prejudice.  It does not disrupt

5    the trial to allow this witness to proceed to testify, and

6    there has been no showing of bad faith.

7            I, therefore, deny the motion in limine and find that

8    Mr. Zax -- Dr. Zax may testify and offer any opinion that was

9    disclosed in the January 30, 2013 report.  At the close of his

10   testimony, the plaintiffs, if they choose, may make a proffer

11   of the testimony that they believe would have been offered had

12   they obtained an expert in response.

13           Any need for clarification or further explanation?

14       *MR. KRUMHOLZ:*  No, Your Honor.  Thank you.

15       *THE COURT:*  Thank you.

16       *MR. GROVE:*  I think we probably still need a ruling on

17   Docket No. 148, which has to do with the charts.

18       *THE COURT:*  Thank you.  Is there any more argument

19   with regard to 148?

20       *MR. KRUMHOLZ:*  Your Honor, with respect to that

21   motion, in light of your ruling on this motion, we withdraw

22   that, 148.

23       *THE COURT:*  All right.  148 is withdrawn.  I think

24   that cleans up our pending motion list.

25           Please call your next witness.

1    MR. GROVE:  Dr. Jeffrey Zax, please.

2    THE COURT:  Mr. Zax, please step up and be sworn.

3    (**JEFFREY ZAX, DEFENDANT'S WITNESS, SWORN**)

4    COURTROOM DEPUTY:  Please be seated.

5    Please state your name and spell your first and last

6 name for the record.

7    THE WITNESS:  My name is Jeffrey Zax, J-E-F-F-R-E-Y,

8 Z-A-X.

9                    **DIRECT EXAMINATION**

10 BY MR. GROVE:

11 Q.  Dr. Zax, what do you do for a living?

12    MR. KRUMHOLZ:  Your Honor, my apologies for the

13 interruption, but I do need to make a short objection, just for

14 the record.

15    This witness did not testify before the General

16 Assembly.  Plaintiffs, therefore, object to the testimony of

17 this witness in this case for the reasons articulated in our

18 trial brief, as well as by Mr. Abbott at the beginning of the

19 State's case last Thursday.

20    Thank you.

21    THE COURT:  Thank you.

22 BY MR. GROVE:

23 Q.  I'll repeat the question.  Dr. Zax, what do you do for a

24 living?

25 A.  I am an economist.  I'm employed by the University of

1  Colorado at Boulder.  I'm a full professor in the department of

2  economics.  I'm the associate chair of that department in

3  charge of the undergraduate instruction program.

4  Q.  Please describe your educational background.

5  A.  I have a bachelor of arts degree from Harvard University,

6  magna cum laude, conferred in 1976.  I have a doctoral degree

7  in economics from Harvard University, conferred in 1984.

8  Q.  Broadly speaking, what does an economist do?

9  A.  Economists study the response of people and groups to

10  incentives and changes in incentives.

11  Q.  Does economics have subspecialties?

12  A.  Yes.

13  Q.  Such as?

14  A.  Well, for example, the *Journal of Economic Literature*,

15  which is the journal of reference regarding the structure of

16  the profession, separates the profession into approximately 20

17  major fields.  Among them are labor economics, urban economics,

18  public economics -- those are all fields in which I've been

19  active -- macro economics, and so forth.  They are each

20  designated by a capital letter.  Capital letter K is law and

21  economics.  Within each of these 20 major divisions, there are

22  subspecialties.  Law and economics, for example, has one

23  subspecialty, I believe it's K42, which is the study of

24  criminal behavior.  It has another subspecialty, I think it may

25  be K32, which is the study of the effects of laws on economic

1    behavior.

2    Q.  Are you a referee for any academic journals?

3    A.  Yes.

4    Q.  What does refereeing a journal involve?

5    A.  Refereeing is the act of evaluating a submitted paper for

6    the purpose of evaluating its credibility, its contribution,

7    and its appropriateness for the journal to which it's been

8    submitted.  One is designated as a referee by the editors of

9    the journal, who, on receipt of a submission, look for

10   professionals whose opinions they respect who can help them

11   evaluate whether or not that submission is an appropriate -- is

12   appropriate for publication in their journal.

13   Q.  When you're asked to referee papers, are those restricted

14   only to those specific topics in which you, yourself, have

15   published?

16   A.  That certainly has not been my experience.

17   Q.  Approximately how many journals have you refereed?

18   A.  Fifty, a few more.

19   Q.  How wide is the variety of those publications?

20   A.  In my experience, it's been quite wide.  Most of them are

21   in economics, but across all -- most fields in economics.  I've

22   also refereed for journals in regional science, in geography,

23   in political science, and in sociology.

24   Q.  Any particular journals that might be relevant to your

25   expertise in this case?

1    *A.*  Well, for example, I have refereed for *Sociological Methods*

2    *and Research*, which is a top methodological journal in

3    sociology.  I've refereed for *Social Science Quarterly*, which

4    might also -- which also publishes sociological material.

5    *Q.*  In obtaining your degrees, did you have any special

6    emphasis in a particular field or focus of study?

7    *A.*  Yes.  My designated fields during my doctoral study were

8    labor economics and econometrics.

9    *Q.*  How would you describe the field of econometrics?

10   *A.*  Econometrics is the application of statistical methods to

11   economic problems, economic issues.  Statistical methods --

12   well, statistics is the science of prediction, essentially.

13   Statistics is how we understand the relationship between causes

14   and effects in a rigorous way.

15   *Q.*  Does the study of econometrics involve analysis of

16   empirical data?

17   *A.*  The study of econometrics has two branches.  First, there

18   is the theoretical branch, in which the fundamental properties

19   of statistical techniques are examined and verified.  Then

20   there is the empirical branch, which is where those techniques

21   are applied to data.

22   *Q.*  Do any of your other fields of concentration involve

23   analysis of empirical data?

24   *A.*  Virtually everything I do has to do with analysis of

25   empirical data.  I have written only two or three theoretical

1  papers in my career.

2  *Q.*  Since obtaining your Ph.D., could you just run us through

3  the jobs that you've held.

4  *A.*  Yes, it's brief.  I -- upon graduating from my doctoral

5  program, I took a position as assistant professor at Queens

6  College of the City University of New York.  A year or two

7  thereafter, I was given a parallel appointment at the same

8  level at the graduate center, the City University of New York.

9  I think that was in 1984 and 1986, perhaps.  In 1988 or 1989, I

10 was promoted to associate professor in both of those

11 capacities.  In the spring of 1990, I served as a Fulbright

12 professor at the University of Ghana, G-H-A-N-A, in West

13 Africa, after which I came to the University of Colorado at

14 Boulder as an associate professor in the spring of 1990.  I've

15 been there ever since.

16 *Q.*  Do you know a lot about the mechanics of firearms?

17 *A.*  No.

18 *Q.*  Do your opinions in this case depend on knowledge of how

19 firearms work?

20 *A.*  No.

21 *Q.*  What knowledge or expertise do your opinions require?

22 *A.*  My opinions require the ability to understand how people

23 and organizations respond to incentives and the ability to

24 understand responsible analysis of quantitative data.

25 *Q.*  Have you ever been retained as an expert witness before?

1    *A.*  Yes.

2    *Q.*  And have you ever been qualified as an expert witness

3    concerning a topic in which you have not published independent

4    research?

5    *A.*  In every case where I have been -- I'm sorry.  In every

6    field of litigation in which I have been qualified as an

7    expert.  In the first instance of such qualification, at that

8    time I had not previously published research of my own in that

9    field.  In some of those fields, I have subsequently --

10   subsequent to my first employment as an expert witness, I have

11   published, but not in all.

12   *Q.*  Have you considered conducting additional scholarly

13   research based upon your experience in this case?

14   *A.*  Actually, I believe I've already conducted worthy scholarly

15   research in this case.  That is, I expect to testify on two

16   analyses that I believe make novel and substantial

17   contributions to the existing criminological literature.

18   *Q.*  And were you retained by the defendant to offer expert

19   opinions in this case?

20   *A.*  Yes.

21   *Q.*  There are two laws at issue here.  One is the limitation on

22   magazine capacity, and another is -- has to do with an

23   expansion of Colorado's background check requirements for

24   firearms transfers.  Which of these laws do your opinions

25   pertain to?

1  A. My opinions pertain to what I believe is HB 13-1224, the

2  restriction on magazine transfers and sales.

3  Q. And I'll represent to you, that's been codified as

4  18-12-302. If we talk about 1224 -- well, we both know what

5  we're talking about, under either the statute or the bill

6  number. But we're discussing the same thing when we use those

7  two phrases, right?

8  A. Yes. Thank you.

9  Q. So let's first outline your opinions, and then come back

10  and discuss them.

11       First, did you reach an opinion concerning the likely

12  effect of the magazine capacity limitation on the number of

13  large-capacity magazines that may be used in crime in Colorado?

14  A. Yes. The magazine restriction will reduce the number of

15  LCMs that are in circulation and use in the state of Colorado

16  below what they would have otherwise have been in the absence

17  of law.

18  Q. Did you reach an opinion as to what impact the magazine

19  capacity limitation will have on the self-defense capabilities

20  of firearm owners?

21  A. Yes. The restriction on large-capacity magazines will have

22  no discernible effect on the capacity of Coloradans to engage

23  in appropriate self-defense.

24  Q. Can you sum up why that might be in a couple of sentences?

25  A. There is -- there is -- there is no example in the last ten

1  years of any individual in Colorado requiring anything like the

2  capacity of even the legal LCMs in order to defend themselves.

3  And there is no record in the -- in the criminological

4  literature of that necessity elsewhere.

5  *Q.*  Did you reach an opinion as to the effect of the magazine

6  capacity limitation on the safety of law enforcement officers?

7  *A.*  Yes, I did.  The restriction should improve the safety of

8  law enforcement officers and allow them to conduct their

9  business at less risk to their own health and safety.

10  *Q.*  And, finally, did you reach an opinion as to whether the

11  magazine capacity limitation will have an impact on public

12  safety when shots are fired in connection with criminal

13  activity?

14  *A.*  Yes.  The reduction in the maximum size of allowable

15  magazines will increase the -- reduce the risk that the public

16  will encounter when aggressors fire rounds.

17  *Q.*  Okay.  So that's sort of a summary of what your opinions

18  are in this case.  Let's go through them in detail.

19         Your first opinion was that the magazine capacity

20  restriction will reduce the numbers of large-capacity magazines

21  in circulation relative to what the numbers would be without

22  the law, correct?

23  *A.*  Yes.

24  *Q.*  What sources did you rely upon to reach this opinion?

25  *A.*  I relied on three sources.  First, there is the fundamental

1  economic logic.  Second, there is the somewhat meager

2  literature analyzing the effects of the so-called federal ban

3  on large-capacity magazines.  And, then, lastly, there is my

4  own original analysis of the data from the Virginia Firearms

5  Clearinghouse regarding the impact of the so-called federal ban

6  on the frequency with which large-capacity magazines were

7  encountered in potential criminal use by law enforcement

8  agencies in the state of Virginia.

9  *Q.*  Okay.  So you mentioned three sources.  Let's start with

10  the first, basic economic theory.  Given the provisions of the

11  law, which include a grandfather clause, why would economic

12  principles dictate a statewide decline in the stock of

13  large-capacity magazines over time?

14  *A.*  The fundamental economic principle here is called the

15  demand curve.  It's something that freshmen learn about in the

16  second week of their economic study.  The demand curve slopes

17  down.  And what that means is, when something becomes more

18  expensive, people want to do less of it.  That is a general

19  proposition that holds across virtually all forms of behavior.

20      Its application here is the following:  The effect of

21  the law is to make the acquisition and the use of LCMs more

22  expensive.  That expense comes both in the form of the material

23  expense of acquiring an LCM; the amount of time that is

24  required to acquire an LCM; the risk that if an LCM is used, it

25  will be challenged as -- under illegal possession by law

1   enforcement agencies; and the risk that if it is in fact

2   illegally possessed and illegally used, it will led to further

3   legal sanctions applied to the possessor.

4   Q.  Just so the record is clear, when you say "LCM," what are

5   you referring to?

6   A.  Under the Colorado statute, I understand an LCM to be a

7   magazine whose capacity is 16 rounds or greater.

8   Q.  And that's short for large-capacity magazine?

9   A.  I'm sorry, yes.  I use LCM as an abbreviation of

10  large-capacity magazine.

11  Q.  Okay.  Thanks.  So, what would economic theory predict

12  about the stock of large-capacity magazines in Colorado if this

13  law hadn't been passed?

14  A.  Well, the effect of the law is to make the cost of

15  acquisition and use of LCMs greater.  In the absence of the

16  law, that cost would have not increased in the same way; and,

17  therefore, the demand for LCMs would have been greater.

18  Q.  Well, what if people just ignore the law?

19  A.  "Ignore" is a big word in that context.  Ignoring the law

20  would mean disregarding it entirely.  That is, if firearms

21  stores in Colorado continue to sell LCMs exactly as they had

22  before the law was passed; if mail order vendors of firearms

23  equipment continued to ship LCMs into the state of Colorado

24  exactly as they had prior to the adoption of the law; if gun

25  shows continued to circulate through Colorado and display the

1    same wares they had exactly as they prior to the law; if all --

2    and implicit in all of that, let me make it explicit -- if law

3    enforcement agencies uniformly refused to enforce any of the

4    provisions of the law; if all of that were to occur, then the

5    law would have no effect.  That is, if the law were,

6    essentially, null and void, then it wouldn't affect the cost of

7    acquiring an LCM or using it, therefore, wouldn't change

8    anyone's behavior.

9    *Q.*  Well, that sounds like a zero-compliance scenario.  Do you

10   think that's likely?

11   *A.*  Not only do I think it's not likely, I think the evidence

12   probably demonstrates that it hasn't occurred that way.  If

13   even a single firearm shop has ceased to stock LCMs subsequent

14   to the ban, already, there is some compliance.  I'm not in a

15   position to judge how much there is, but I certainly haven't

16   heard anything here to suggest that that hasn't happened.

17   *Q.*  Is there any reason to believe that people who own guns

18   legally would be particularly sensitive to compliance with laws

19   like this?

20   *A.*  Yes.

21        *MR. KRUMHOLZ:*  Objection, Your Honor.  Foundation.

22        *THE COURT:*  Response.

23        *MR. GROVE:*  Dr. Zax is an expert in economics and

24   incentives.  This is a question about incentives.

25        *THE COURT:*  The question is whether or not you've laid

1    the foundation for that.  Do you care to supplement?

2         *MR. GROVE:*  I believe the foundation has been

3    adequately laid.

4         *THE COURT:*  I sustain the objection.

5         You may continue to supplement if you'd like.

6    *BY MR. GROVE:*

7    *Q.*  Let's talk about incentives.  What does economic theory

8    tell us about human behavior and what causes people to act in

9    the way that they do?

10        *MR. KRUMHOLZ:*  Objection, vague.

11        *THE COURT:*  Overruled.

12        *THE WITNESS:*  We understand people to have

13   preferences.  That is, when we present people with choices

14   between two actions, two objects, two alternatives, we

15   understand them to be able to answer that question.  That is,

16   they can say, I prefer one thing to another, I prefer the

17   second thing to the first, or I'm indifferent.  That's all we

18   really require.

19        Once we accept that individuals can offer those kinds

20   of responses, then we're in a position to say how those

21   responses would vary if the incentives were changed.

22        So, for example, if I offer you two objects, two

23   items, and say, which would you prefer?  That's going to depend

24   on the cost.  If you choose one, then I say, all right, now

25   let's raise the price of the one you chose.  Do you still

1  prefer it?  And the answer might be yes over some range of

2  price.  But at some level I can say, if I make the item you

3  prefer so costly -- the item you originally preferred so

4  costly, would you still prefer it over the other item?  At some

5  point there is going to be a price where the answer is going to

6  be no, I'm going to reverse my choice.

7  BY MR. GROVE:

8  Q.  And do those choices that you're talking about, do they

9  affect an individual's decision, for example, to comply or not

10  comply with the law?

11  A.  Of course.  The question of compliance is, again, a

12  question of costs.  That is, failing to comply with any kind of

13  restriction obligation, law, failing to comply, can incur two

14  types of costs.  First, there is the internal cost.  If one has

15  any moral or ethical commitment to those standards, then

16  failure to comply creates a psychological harm, an internal

17  psychological harm.  But, second, there is the possibility of

18  external sanctions.  If failure to comply raises the

19  possibility of suffering sanctions, that creates a cost to

20  noncompliance.  And if that cost is sufficiently high, that

21  will certainly deter noncompliance in any context.

22  Q.  So based on what you've just discussed, is there any reason

23  to believe that people who own guns legally would be

24  particularly sensitive to compliance with the law?

25       MR. KRUMHOLZ:  Objection, foundation.

1       THE COURT:  Overruled.

2       THE WITNESS:  Yes.

3  BY MR. GROVE:

4  Q.  Please elaborate.

5  A.  The legal ownership of guns requires -- of firearms, I'm

6  sorry, requires adherence to the laws that govern that

7  possession.  Violating those laws, for example, through

8  acquiring illegal large-capacity magazine, might put the

9  ownership of the firearm itself in legal jeopardy.  So in order

10 to protect the right to retain the firearm, someone who owns a

11 firearm legally would presumably be especially cautious with

12 regard to violating laws that might threaten that ownership.

13 Q.  Would the same principles apply to licensed firearms

14 dealers and what they stock?

15 A.  Absolutely.  They -- my understanding is that they also are

16 subject to fairly extensive legal regulation.  And if they

17 violate those -- those laws, their capacity -- their ability to

18 continue as firearms dealers could itself be threatened, so

19 that's a pretty strong deterrent to the -- to illegal conduct

20 among gun shop owners.

21 Q.  Well, from the perspective of an economist, what role do

22 retail storefronts play in consumer markets?

23 A.  Of course, that's evolving pretty rapidly with the

24 availability of internet shopping.  But, nevertheless, retail

25 outlets are still, to my mind, a fundamental component of the

1    retail market.  That's where -- you know, in general, I think

2    many people still think of retail outlets as the first place to

3    go when they want to buy something.

4    *Q.*  Do you have any reason to believe that firearms markets are

5    qualitatively different than markets in general?

6    *A.*  No.

7    *Q.*  Would taking large-capacity magazines off the shelves of

8    FFLs affect the market for those items?

9    *A.*  Absolutely.  It would make them less available, less

10   readily available, more costly to acquire, and that would deter

11   some people from acquiring them.

12   *Q.*  The FFLs in this case have alleged that they've ceased

13   selling large-capacity magazines.  Would that be consistent

14   with your analysis?

15   *A.*  Yes.  It would, first, be evidence of compliance, which I

16   think is one thing.  Second, it would certainly demonstrate

17   that the costs of acquiring LCMs has increased.  The extent to

18   which it's increased would depend on the number or the extent

19   to which FFLs comply.  But the fact that any of them comply at

20   all means it's harder to get an LCM, and that means people will

21   have fewer of them.

22   *Q.*  When you say the cost has gone up, do you mean the price

23   sticker on the object has gone up?  What are you talking about?

24   *A.*  No, no.  The cost -- well, first, that may be the case.

25   Presumably, if they're only available illegally right now,

1 anyone selling them would want to sell them at a higher sticker

2 price in order to provide them with some compensation -- in

3 order to provide the seller with some compensation for the risk

4 that they're running by engaging in an illegal transaction.

5 But, moreover, the cost is much more than just the

6 out-of-pocket cost to complete the transaction.  There is the

7 cost of locating a vendor; there is the cost of appearing in

8 the presence of a vendor; and then, in this case, there is the

9 cost of illegally importing an LCM or illegally possessing an

10 LCM in the state of Colorado and running the risk of legal

11 sanctions as a consequence of that.  All of those are a part

12 of -- all of those combine to create the full realized,

13 actualized cost that someone would experience if they wanted to

14 acquire an LCM.

15 Q.  Are you aware of any empirical support for your conclusion

16 that a ban on certain types of firearms or large-capacity

17 magazines might drive up the cost of those items?

18 A.  Yes.

19 Q.  Please describe that work.

20 A.  The sources, apart from my own work to which I refer for

21 this support, are the analyses of Dr. Koper regarding the

22 effect of the federal -- the federal ban on assault weapons and

23 so-called ban on LCMs and two *Washington Post* articles by David

24 Fallis and a co-author -- F-A-L-L-I-S -- and a co-author,

25 regarding, again, the effect of the so-called federal ban on

1   large-capacity magazines, Virginia firearms data.

2   *Q.*  You keep saying "so-called ban," why do you use that

3   phraseology?

4   *A.*  Because it's inappropriate -- I'm sorry.  Let me say it

5   this way:  Effectively, with regard to LCMs, the federal law

6   functioned as a ban only on domestic manufacturers.  It was not

7   effective -- I'm sorry, it was not -- it was not largely

8   effective with regard to the acquisition of LCMs for the

9   following reasons:  First, it allowed for the -- not just the

10  possession of LCMs purchased prior to the introduction of the

11  ban, but it also allowed for the transfer, the legal transfer

12  of those LCMs, provided they had originally been acquired

13  legally.

14      Moreover and more damagingly, the ban was interpreted

15  by the Bureau of Alcohol, Tobacco and Firearms to allow for the

16  importation of LCMs produced, manufactured elsewhere prior to

17  the date of the ban.  The practical effect of that, according

18  to Dr. Koper, was that the stock of LCMs in the United States

19  grew from about 20 million in 1994 to 25 million in 2000.  In

20  other words, in the first six years of the so-called ban, the

21  stock grew by 20 percent.  As you can see, that's -- it's

22  really hard to think of that as a ban in the conventional

23  sense.

24      Moreover, as of 2000, Dr. Koper reports that there

25  were over 40 million import licenses issued by the ATF, not yet

1   exercised.  In other words, the permission to import was such

2   that even while the ban was in effect, it was potentially

3   possible that the stock of LCMs circulating legally in the

4   United States could have tripled from where it was at the

5   beginning of the ban.  Again, it's not much of a ban.

6   *Q.*  So given what you've just described, how strong an effect

7   would you have expected to see associated with the 1994 federal

8   assault weapons ban?

9   *A.*  Well, as I've said, I don't expect there to be any decline

10  at all in the number of LCMs that were circulating.  However,

11  you could imagine a decline in the frequency of their use.  And

12  the reason is this:  While the ban didn't seem to have any

13  appreciable impact on the cost of acquiring LCMs, it may have

14  increased the cost of using one.  And that's because, if you

15  used an LCM, you did encounter the risk that you would interact

16  with law enforcement agencies.  The consequence of that use and

17  that law enforcement agencies might challenge your right to

18  possess the LCM.

19          Now, the law as I read it, placed the burden of proof

20  for such challenge on law enforcement.  And so I imagine if you

21  legally possessed an LCM, you could have reasonable confidence

22  that were you -- were that possession challenged, you would be

23  able to retain possession after the challenge was resolved.

24  Nevertheless, you have to undergo the challenge; and that would

25  likely be a pain in the ass.  So that's a pretty substantial

1    deterrent from encountering that risk.

2         THE COURT:  Counsel, we're getting kind of close to

3    10:30, and I know you're in the middle of this examination.

4    When you reach a convenient stopping point, would you let me

5    know, and we'll take our morning recess.

6         MR. GROVE:  This is a good point.

7         THE COURT:  Okay.  Then, the court clock is showing

8    about 10:25.  We'll stand in recess for 20 minutes, and plan on

9    reconvening at a quarter to 11:00.

10        (Recess at 10:24 a.m.)

11        (In open court at 10:53 a.m.)

12        THE COURT:  Please continue.

13   BY MR. GROVE:

14   Q.  Dr. Zax, when we left off, we were discussing theoretical

15   discussion of the federal large-capacity magazine ban and

16   assault weapons ban.  Has anyone reviewed empirical evidence on

17   the question of whether federal ban affected the number of

18   large-capacity magazines in circulation?

19   A.  Yes.  In my reading, the principal source of that is the

20   work of Dr. Koper, K-O-P-E-R.  And there are also two articles

21   from the *Washington Post* by David Fallis and a co-author.

22   Q.  What was the effect of the federal assault weapons ban on

23   assault weapons?

24   A.  My memory is that Dr. Koper found during the ban that the

25   price of assault weapons went up initially and then came back

1  down and that the frequency with which assault weapons were

2  found in trace data declined consistently through out the

3  period of the ban.

4  *Q.* As an economist, what does a rise in price suggest about

5  supply?

6  *A.* Price goes up when supply goes down. In other words,

7  that's an indication that it was hard to get these things, so

8  people had to pay more money in order to acquire one.

9  *Q.* Did Dr. Koper make any findings about the prices of

10  large-capacity magazine?

11  *A.* I think that finding was similar. As the ban -- at the

12  beginning of the ban, the price went up. Subsequently, it

13  drifted back down again. And that would be consistent with the

14  evidence that subsequent to the introduction of the ban,

15  imports began to occur at a substantial rate.

16  *Q.* Did Dr. Koper's report make any findings about the use of

17  large-capacity magazines?

18  *A.* Yes. The most relevant had to do with data that he

19  acquired from the City of Baltimore. These, I understood to be

20  records of all firearms confiscated for suspicion of being used

21  in criminal activity. And there was a fairly large sample

22  there; I think it was 33,403 firearms, something like that. So

23  that's a lot of information. It was only during the period of

24  the ban itself, so he wasn't able to compare the experience

25  during the ban with the experience before or after.

1    But the evidence from that -- from that data was that

2    the frequency with which large-capacity magazines appeared

3    among guns suspected of criminal use declined slowly, but

4    consistently throughout the period.

5    *Q.* Did he review evidence of large-capacity magazine use in

6    any other cities?

7    *A.* Yes. He had data from, if I remember this correctly,

8    Milwaukee, Louisville, and Anchorage. Those samples were all

9    substantially smaller, on the order of 300 to 700 firearms

10   spread out over multiple years, so they didn't have the same

11   informational content. In addition, they were more peculiar

12   samples. I believe the Milwaukee sample was firearms used in

13   fatal shootings, and in Louisville and Anchorage they were

14   trace data, firearms whose origins had been traced.

15   *Q.* There has been some discussion of trace data in this case.

16   Do you share the same concerns as Dr. Kleck with respect to its

17   use?

18   *A.* There are certainly concerns. My understanding is that

19   when you -- there is a choice that law enforcement officers

20   make when they decide whether or not to confiscate a firearm,

21   and there is another choice when they decide whether or not to

22   send that firearm on for tracing. And that means that the

23   collection of firearms that are confiscated and then traced

24   are -- that collection is conditioned by two sets of choices.

25   And those choices, you know, could be driven by lots of things

1    we can't observe.  And so it's important to be cautious about

2    how one interprets what one sees when the possibility of what

3    one sees is being distorted by choices that you can't really

4    reproduce.

5    Q.  Have you done of your own independent work on the issue of

6    large-capacity magazines and how their prevalence was affected

7    by the federal assault weapons ban?

8    A.  Yes, I have.

9    Q.  And was it similar to the work that Dr. Koper reported in

10   his 2004 study?

11   A.  It was actually similar in spirit, particularly to the work

12   he did with the Baltimore data.  My work is more extensive,

13   both in that -- both in that it covers a brief period prior to

14   the ban and several years subsequent to the ban.  Also, I have

15   a large sample to work with; that is, this is the data from the

16   Virginia Firearms Clearinghouse.  And I believe I have 101,326

17   firearms.

18   Q.  So let's talk about the data set.  You mentioned the

19   Virginia Firearms Clearinghouse.  Tell us what that is.

20   A.  My understanding is that the Virginia Firearms

21   Clearinghouse is an informational repository, managed by the

22   State of Virginia.  The intent is to collect an individual

23   record referring to every firearm confiscated by law

24   enforcement agencies in that state under suspicion that it had

25   been involved in criminal use.

1  *Q.*  So you said every firearm.  Does that mean that this data

2  set is likely to suffer from selectivity problems that can

3  plague ATF trace data?

4  *A.*  It certainly is not going to suffer from that problem.

5  That is, these are not traced weapons.  So the weapons that I'm

6  looking at weren't selected by someone choosing whether or not

7  to send them on for tracing purposes.

8          There is some question -- as I said, David Fallis of

9  the *Washington Post* wrote two articles using the same data.  In

10  one of those articles, he made reference to some agencies, law

11  enforcement agencies, in Virginia that did not participate in

12  the Firearms Clearinghouse.  My understanding is that,

13  formally, all are obligated to.  And I personally do not have

14  any knowledge of whether or not some agencies are not

15  participating, so there is that question.  But my understanding

16  is that of the agencies that do participate, they're reporting

17  everything.

18  *Q.*  And would leaving some of the agencies out, would that

19  matter to the numbers that you eventually reached when you do

20  the analysis?

21  *A.*  I'm a little curious about that.  It would be interesting

22  to know which agencies were not participating and why.  But

23  that -- their omission would only distort the results if

24  somehow the weapons they were confiscating were systematically

25  different from the weapons confiscated throughout the state as

1  a whole.  There is no reason to suspect that, *a priori*.

2  Q.  So from this data set, was -- you said you had, what,

3  101,000 trace -- trace is the wrong word -- 101,000 firearms

4  that were reported to the Virginia Firearms Clearinghouse?

5  A.  Reported and confiscated, yes.  101,000, I think, -326.

6  Q.  Did every one of those reported firearms also contain a

7  description of the magazine?

8  A.  The reporting form requires a description of the magazine.

9  And I was actually surprised -- I have a fair amount of

10  experience with administrative data by -- collected by various

11  state agencies.  This data was relatively clean, surprisingly

12  clean.  I think 7,981, I believe, of the firearms did not have

13  magazine size information associated with them.  So that's a

14  missing rate of 7.9 percent.  That's actually quite good,

15  again, by the standards I've encountered in state

16  administrative data.

17  Q.  So there was some data missing?

18  A.  Yes, 7.9 percent.

19  Q.  Did you account for that data in your analysis?

20  A.  Yes.

21  Q.  How?

22  A.  In the analysis that I presented in the document that's

23  been distributed, in what was my report, I treated the small

24  number of weapons whose magazine sizes were not identified as

25  not being equipped with large-capacity magazines.

1  *Q.*  Okay.  What was the -- what was the time frame for the data

2  that you reviewed?

3  *A.*  So, the data that I reviewed began in, I think, July of

4  1993.  I believe that was the inception of the clearinghouse.

5  I requested data through 2013.  However, I only used data

6  through 2010 because the data -- reporting standards seemed to

7  have changed radically in 2011.  I wasn't able to -- under the

8  time constraints, I wasn't able to identify what was going on

9  with 2011, '12, and '13, so I omitted that data.

10  *Q.*  Let's talk a little bit about your analysis.  What did you

11  do?

12  *A.*  As I said, I began with these records of individual

13  firearms, identifying for each whether or not it was equipped

14  with a large-capacity magazine.  And a large-capacity magazine

15  in this context meant 11 rounds or more.  That was the

16  threshold set by the federal ban.  So I looked at each firearm

17  and identified whether or not the magazine had been identified;

18  and if it had, whether or not it had a capacity of greater than

19  ten rounds.

20       Then I compiled for each calendar year the percentage

21  of all confiscated weapons that were equipped with

22  large-capacity magazine.  So that's the basic data, percentage

23  of all confiscated firearms equipped with large-capacity

24  magazines in each year of the analysis, beginning the partial

25  year of 1993 and continuing through 2010.

1  *Q.*  Putting on the Elmo, Exhibit 66.  What -- what is this

2  document?

3  *A.*  This is a graphical representation of precisely that data

4  that I just described.

5  *Q.*  And what's the source of the data?

6  *A.*  So, this is my compilation or my calculations from the

7  Virginia Firearms Clearinghouse data.

8  *Q.*  And is this a fair and accurate graphical representation of

9  that data?

10  *A.*  Yes, it is.

11        *MR. GROVE:*  For demonstrative purposes, we'd move to

12  admit Exhibit 66, Your Honor.

13        *THE COURT:*  Any objection?

14        *MR. KRUMHOLZ:*  No objection.

15        *THE COURT:*  It's received.

16        (Exhibit 66 admitted.)

17  *BY MR. GROVE:*

18  *Q.*  Please tell us what we're looking at here.

19  *A.*  This is, as I said, a graphical representation of the

20  percentage of confiscated firearms that are equipped with

21  large-capacity magazines.  The blue line represents that

22  portion starting in 1993, at the left of the graph, and

23  continuing on to 2010 at the right of the graph.

24        As you can see from the left-hand axis here, that

25  represents -- gives us the percentages.  This percentage, that

1  is, the share of confiscated firearms that were equipped with

2  large-capacity magazines, varied from a low of about 10 percent

3  in 2004 to a peak of close to 20 percent in 2009.

4  *Q.*  What is significant about the 2004 date?

5  *A.*  Well, 2004, of course, is the year in which -- it was the

6  final year in which the federal ban was in force.  And it is, I

7  think -- it is -- it anticipates the results that I'm going to

8  show in my regression analysis to observe that at the end of

9  the ban, the share of firearms -- confiscated firearms equipped

10  with large-capacity magazines reached its lowest level.

11  *Q.*  So you said regression analysis.  I think you're going to

12  have to tell us what that means.

13  *A.*  Regression analysis is the favorite toy of empirical

14  economists and of, I think, most empirical social scientists.

15  It's a statistical technique which allows us to take an outcome

16  in which we're interested, such as the percentage of

17  confiscated firearms equipped with large-capacity magazines,

18  and ask, of the things that might cause this outcome, how much

19  influence does each of them have?

20  *Q.*  Putting Exhibit 67 on the Elmo.  What is this, Professor

21  Zax?

22  *A.*  This is the formal representation of my regression

23  analysis.  This is the numerical representation of what I hope

24  to make a little more accessible in some further graphs after

25  we talk about this.

1    *Q.* So this is the equation that you used to discuss graphs

2    that are coming up in a few minutes?

3    *A.* Yes.

4         *MR. GROVE:* We'd move to admit this document for,

5    again, demonstrative purposes.

6         *MR. KRUMHOLZ:* No objection.

7         *THE COURT:* It is received.

8         (Exhibit 67 admitted.)

9    *BY MR. GROVE:*

10   *Q.* Again, tell us what we're looking at here.

11   *A.* Sure. This is a specific regression analysis. And as I

12   said, regression analysis begins with the thing you want to

13   explain. Here what we want to explain is the variation from

14   year to year in the percentage of confiscated firearms that are

15   equipped with large-capacity magazine. So that's what we're

16   trying to explain.

17        The next the thing you need is the things that will

18   explain that. And there, in the left-most column, here, there

19   are, essentially, three components to the explanation. The

20   first is a baseline. That's represented here by the constant.

21   The constant is what you might think of as the baseline share

22   of confiscated firearms that would be equipped with

23   large-capacity magazines if nothing else was changing over the

24   course of this period. So that's the first component of the

25   explanation.

 1          The second component of the explanation is the

 2     expectation that over this entire period, the 19 years that I'm

 3     examining, there was some fundamental evolution in the

 4     distribution or ownership of large-capacity magazines.  So my

 5     understanding is that large-capacity magazines were relatively

 6     uncommon towards the beginning of this period, they became more

 7     and more common as the period increased.  And I'm trying to

 8     capture that by what I call the trend and the trend squared --

 9     sorry, that's in the wrong place.  Oops.  Let's try this again.

10          The trend, which is the first variable here, and the

11     trend squared, which is just below it.  Together, they're

12     intended to capture the underlying evolution for the use of

13     LCMs over the entire period.  That's the second component of

14     the explanation.

15          And then the third component of the explanation is the

16     effect of the ban itself.  And that's represented by three

17     pieces.  The first is, this here -- I don't know what I just

18     did.

19          *THE COURT:*  It's okay.  I see it.

20          *THE WITNESS:*  Okay.  Thank you.

21          Where I say ban -- simply ban, that's a change in the

22     baseline that would have been imposed by the effects of the

23     ban.  So that's a shift in the baseline throughout the period

24     of the ban.  And then the two rows below it are trends during

25     ban and trend squared during ban.  And those capture the

1   possibility or the expectation that during the ban itself, as

2   response to the ban evolved, the appearance of large-capacity

3   magazines among confiscated weapons would also evolve.

4       So there are three components to the explanation I'm

5   going to offer.  One of them is the baseline, and the other two

6   are basically trends that affected the ownership of large --

7   the appearance of large-capacity magazines throughout the

8   period.

9   *BY MR. GROVE:*

10  *Q.*  Okay.  Let's look at the graphs.  This is Exhibit 68.  What

11  is this document?

12  *A.*  This document graphically represents the explanation that

13  my regression analysis provided for the evolution of the

14  proportion of large-capacity magazines that appeared in

15  confiscated weapons.

16  *Q.*  Is it a fair and accurate depiction of that analysis?

17  *A.*  It is.

18      *MR. GROVE:*  Move to admit for demonstrative purposes

19  Exhibit 68.

20          *THE COURT:*  Any objection?

21          *MR. KRUMHOLZ:*  No, Your Honor.

22          *THE COURT:*  It's received.

23          (Exhibit 68 admitted.)

24  *BY MR. GROVE:*

25  *Q.*  Please go ahead and tell us what we're looking at here.

1    *A.*  Well, this graph is very similar to the first graph we saw

2    two exhibits ago, in that, as you can see along the horizontal

3    axis, we're looking at the various years over which I examined

4    the data.  On the vertical axis, we're again looking at --

5    that's over here -- we are again looking at the percentages of

6    confiscated weapons equipped with large-capacity magazines.

7    And then in the body of the graph, we have three colored lines.

8    Each one of them represents one of the three components I

9    described a moment ago of my explanation for how the proportion

10   of confiscated firearms equipped with large-capacity magazines

11   evolved over this period.

12        The first component is represented by this orange

13   line.  That's the baseline percentage that was estimated by my

14   regression.  So my regression analysis estimated that in the

15   absence of any other effects, 14.93 percent of confiscated

16   firearms would have been equipped with large-capacity magazines

17   at each point during this period.  That's the baseline effect.

18        The green curve -- the green curve represents the

19   trend that I estimated in my regression analysis that carried

20   on throughout the entire period of the analysis.  So this trend

21   expresses the idea that early on in the period, years 1993

22   through 1998 or 2000, even 2002, the underlying evolution of

23   demand for large-capacity magazines was relatively flat.  But

24   after 2002, there was a more pronounced increase in the

25   underlying interest in owning -- having -- in having

1   large-capacity magazines.  So the green line is the trend

2   throughout the period, and then the blue line -- the blue line

3   represents the effect of the ban itself.  And that's why this

4   line doesn't continue through the whole period.  It begins in

5   1995, which it might -- maybe should have come back to 1994,

6   but it begins at the beginning of the ban period and continues

7   to 2004, when the ban ended.  And this blue line is what my

8   regression reveals to be the effect of the ban on

9   large-capacity magazines.

10  Q.  This is Exhibit 69.  What is this document?

11  A.  So, this document is, as you can see, just the previous

12  document -- actually, it's the previous -- it's the previous

13  document with the addition of this red line here.  The red

14  line, as I hope I get to explain in a moment, is the summation

15  of the three lines that we saw in the previous exhibit.

16  Q.  And this is the fair and accurate representation of the

17  underlying data?

18  A.  Yes.

19      MR. GROVE:  Move to admit for demonstrative purposes

20  Exhibit 69.

21      MR. KRUMHOLZ:  No objection.

22      THE COURT:  Received.

23      (Exhibit 69 admitted.)

24  BY MR. GROVE:

25  Q.  Please proceed and, again, tell us what we're looking at.

1   *A.*  So this is the cumulative explanation produced by my

2   regression analysis for the effects -- for the -- this is a

3   cumulative explanation of the variation across this period in

4   the proportion of confiscated firearms that were equipped with

5   large-capacity magazines.

6           So first we see the components of that explanation

7   that came from the regression analysis.  We have the flat

8   baseline here, the orange line; we have the overall trend,

9   which in the beginning of the period was, if anything,

10  suggesting a modest reduction in the income of LCMs; and then

11  at the end, an increase.

12          Then we have a trend, a trend that occurred during the

13  ban.  And let me make sure that I explain what this represents.

14  What this trend shows is that when the ban began, there was an

15  immediate increase in the proportion of confiscated weapons

16  that were equipped with LCMs.  My interpretation of that is

17  that because LCM possession was now potentially illegal, that

18  is, the possession of some LCMs was illegal, the appearance of

19  LCMs in potential criminal activity was of heightened interest

20  to law enforcement agents, and so they found themselves

21  confiscating a greater proportion of them.

22          As we see, following the blue line along as time goes

23  on, we see that over time, the effects of the ban was to begin

24  to reduce the proportion of LCMs found among confiscated

25  weapons.  That happened in about 1997 and 1998.  And then that

1    reduction accelerated to the point at -- by 2002, the effect of

2    the ban was to reduce the proportion of LCMs among confiscated

3    firearms below what it would have otherwise been.  And then you

4    see in 2004, this blue line is quite some distance -- actually,

5    4 percent or more -- a little more than 4 percent below the

6    axis.  What that says is that the effect of the ban at the --

7    at its very last year was to reduce the percentage of

8    confiscated firearms that were equipped with large-capacity

9    magazines by over four percentage points.  And a

10   four-percentage-point reduction is pretty big when the baseline

11   was just 50 percentage points.  So those, again, are the three

12   components of the explanation.

13        And then the red line, which is the only thing that is

14   new in this exhibit, that red line is the summation of those

15   three components.  So that red line shows what the regression

16   predicts would have been the evolution of the share of

17   confiscated firearms equipped with large-capacity magazines.

18        In other words, the red line is the summary of all of

19   the influences that I account for in my regression analysis on

20   that proportion.

21   Q.  And so -- go ahead.

22   A.  And you can see that when you add those three together,

23   although the baseline itself is a straight line, a flat line,

24   the curve -- the trend throughout the period is this green line

25   that has a nice, smooth curve -- upward sloping curve to it

1    throughout.  And the effect of the ban is this blue line,

2    which, again, has a smooth downward sloping curve through most

3    of it.  When you add those three together, what you get is a

4    predicted history of the proportion of confiscated firearms

5    that are large-capacity magazines that is actually pretty

6    regular.

7            So the red line shows that proportion declining

8    slightly at the beginning of the period.  That's picking up the

9    slight decline in the green line.  Then in 1994, that red line

10   shifts up, because it's capturing the beginning effect of the

11   ban.  Then from '94 to 2004, you see that line slope slowly

12   downwards.  And the reason for that is there is, first, a

13   slight downward slope to the green line, and then a slight

14   upward slope to the green line.  That is being dominated by the

15   blue line.  So between 1994 and 2004, what is driving the

16   downward slope of that red line is the downward slope of the

17   blue line.

18           And then in 2004, the blue line goes away, so there is

19   a very rapid increase in that red line.  And the red line

20   continues to increase from 2004 on, and that's reflecting

21   purely the green line, the overall trend -- increasing trend in

22   LCM usage in the post-ban period.

23   Q.  So let me just make sure I've got this straight.  The red

24   line in Exhibit 69 is the regression analysis prediction of

25   what the proportion of confiscated magazines that are

1  large-capacity magazines would be?

2  *A.*  That's exactly right.  It's the summary of all the three

3  components of my explanation.  And it says, these three things

4  together would have predicted that the proportions of

5  confiscated weapons equipped with large-capacity magazines

6  would have looked like this at each of those years.

7  *Q.*  And --

8  *A.*  That's what the red line is showing us.

9  *Q.*  Did you, then, proceed to compare the prediction to the

10  actual data?

11  *A.*  Yes.  A natural question to ask here would be:  How

12  effectively does the regression explain what I'm trying to

13  explain with it?  And a natural way to answer that question

14  would be to look at how what I predict for the evolution of the

15  proportion of confiscated firearms equipped with large-capacity

16  magazines, how that prediction compares to what was actually

17  experienced.

18  *Q.*  This is Exhibit 70.  What are we looking at here?

19  *A.*  Exhibit 70 is showing us two lines we've already seen.  So

20  the red line is that prediction -- that overall prediction that

21  we just discussed from the previous exhibit.  The blue line is

22  the actual experience that we saw in the first exhibit.  So

23  this graph brings them together, the actual experience and the

24  prediction from my regression.

25         *MR. GROVE:*  Move to admit Exhibit 70, again, for

1  demonstrative purposes.

2          *MR. KRUMHOLZ:*  No objection.

3          *THE COURT:*  Received.

4          (Exhibit 70 admitted.)

5  *BY MR. GROVE:*

6  *Q.*  Anything else we should know about this one?

7  *A.*  Yes.  What this shows visually, what you can see, is that

8  these two lines are largely coincident.  That is, the red line,

9  which is my constructed -- this is my constructed history of

10  the proportion of confiscated firearms equipped with

11  large-capacity magazines, that red line very closely tracks the

12  actual experience as presented in the blue line.

13          Now, we could have known this way back when we saw the

14  table which gave a numerical representation of the regression,

15  because that table contained lots of quantitative indices about

16  the effectiveness of the regression explanation.  We didn't

17  look at them, and in some sense it's not really necessary,

18  because all of that is summarized in what you see visually

19  here.  The regression does a very good job of predicting what

20  actually occurred.

21          And one implication of that is that what the

22  regression says about the effect of the federal ban is -- I'm

23  sorry, what the regression says about the effect of the federal

24  ban tracks very closely what the experience -- actual

25  experience of LCMs appearing in confiscated firearms was during

1    that period.

2    *Q.* And what did the regression predict?

3    *A.* Again, what the regression predicted was that as the ban

4    proceeded, the appearance of LCMs among weapons believed to be

5    involved in criminal activity, that appearance dropped first

6    slowly and then dramatically. If the ban had continued, it

7    would -- the regression predicts that the decline would have

8    accelerated further, even to the point where the trend predicts

9    that in a couple of years, there would have been no LCMs among

10   confiscated firearms.

11          Now, that's probably not likely. But that experience

12   is sufficiently far out of -- because -- so far -- that

13   experience is sufficiently far beyond when the ban actually

14   ended that the regression can't -- can't predict that as

15   convincingly as we would like it to.

16   *Q.* Let's look at one last graph here. This is 71. Does this

17   add anything?

18   *A.* This is, as we would say in Yiddish, the *ganze mischpache*,

19   the whole family. That is, this is simply the compilation of

20   all the lines that we have seen in the previous exhibits. So,

21   here, you can see both the -- you can see the actual

22   experience, that's the upper most blue line -- let's see if I

23   can -- we see the actual experience in the upper most blue

24   line. We see the three components of my regression

25   explanation, the orange line, which is the baseline. The green

1  line, which is the underlying trend.  And this line, which is

2  the trend -- the effect of the ban itself.  And then, lastly,

3  we see in the red line, the -- sorry, that's not quite the

4  right place.  The red line, which as I said, is the summary of

5  my regression explanation.

6  *Q.*  So what, if anything, does this analysis suggest about the

7  likely impact that Colorado's law would have?

8  *A.*  In my opinion, this analysis indicates that the Colorado

9  law will also reduce the frequency of use of large-capacity

10  magazines below what it would have otherwise been in the

11  absence of the law.  And, in addition, I believe that reduction

12  will be more pronounced, bigger than it was under the federal

13  ban.

14  *Q.*  Well, let me explore that a little bit.  The federal ban

15  was national in scope, right?

16  *A.*  Yes.

17  *Q.*  And so wouldn't you expect that something that is federally

18  imposed or state imposed have a greater impact?

19      *MR. KRUMHOLZ:*  Objection, leading.

20      *THE COURT:*  I'm sorry, I didn't hear the objection.

21      *MR. KRUMHOLZ:*  Sorry, Your Honor.  Leading.

22      *THE COURT:*  I sustain the objection.  It's a leading

23  question.

24  *BY MR. GROVE:*

25  *Q.*  How would you compare -- how would you expect the impacts

1    of a federal ban to compare to the impacts of a state imposed

2    ban?

3    *A.*  Superficially, you might expect a federal ban to be more

4    effective.  And the reason for that, of course, is, with a

5    state ban, with any kind of local ban, your concern would be

6    that items of any sort that were illegal -- LCMs in particular,

7    that were illegal within a single state might nevertheless leak

8    into that state, so to speak, from surrounding states where

9    possession and sale was legal.

10         So you might think of this as a concern with the

11   ability to import.  So a ban -- so a state like Colorado with a

12   ban like the one we have enacted, one of the things we would

13   have to be vigilant about in order to enforce it, is to be

14   careful about the possibility that LCMs being imported from,

15   for example, surrounding states.

16         Now, you might think that that would be less of a

17   problem with a national ban, because they would be illegal

18   everywhere throughout the country.  And you might believe that

19   it would be easier to restrict the importation of LCMs from

20   other countries into the U.S. than it would be to restrict the

21   importation from other states into Colorado.  Now, that belief,

22   however, in context, is unsupported, unjustified as false.  The

23   reason is, as we've already said, the -- the ATF -- the

24   Alcohol, Tobacco and Firearms Bureau authorized literally

25   massive legal importations of LCMs from abroad during the

1    course of the federal ban.  So not only did the government make

2    no effort to restrict imports during the federal ban, they

3    actually encouraged them.

4         So as a consequence, the problem of having imports in

5    some sense countered the intent of the ban.  That problem in

6    practice turned out to be much more severe during the federal

7    ban than I understand it to be for the Colorado state ban.

8    *Q.*  Are there any other provisions of the Colorado state ban

9    that might make it more effective than the previous federal

10   ban?

11   *A.*  Yes.  The federal ban, so-called, if I may -- if I may

12   refer to it that way.  The federal ban, banned the purchase of

13   new LCMs, but did not ban the transfer of LCMs that had

14   previously been acquired legally.  So even in the absence of

15   importation, there could still have been an active market

16   transferring ownership of LCMs from those who felt like they

17   needed them less to those that felt like they needed them more.

18        The law in Colorado, as I understand it, although it

19   allows continued possession of LCMs that were purchased legally

20   prior to the ban, it prohibits transfers, and, as a

21   consequence, makes it harder for those who have not yet

22   acquired an LCM, but for some reason feel like they have an

23   urge -- a need to acquire one, makes it much harder for them to

24   do so legally, impossible.

25   *Q.*  Let's shift gears.  You said that -- you mentioned someone

1  that might need an LCM.  Let's talk about the use of

2  large-capacity magazines in self-defense.  That's your second

3  opinion.  You testified earlier that the use of firearms in

4  self-defense is uncommon.  What facts and data did you consider

5  in reaching that conclusion?

6  *A.*  I considered my review of the various reports and documents

7  submitted to this case, and I considered my independent

8  analysis of the -- of the reports submitted by the 54 sheriffs

9  who were, I guess, at one time plaintiffs in this case and were

10 asked in the form of interrogatories to document their

11 experience with self-defense.

12 *Q.*  And what type of information did those interrogatory

13 requests contain?

14 *A.*  Well, the interrogatories asked sheriffs to report on each

15 instance -- each reported instance of home invasion experienced

16 within their jurisdiction over the prior ten years.  It asked

17 for detailed descriptions of, in particular, the nature of the

18 firearm use within those home invasions.  That is, did the

19 invader display a firearm?  If possible, what was the identity

20 of the firearm?  Was it equipped with a large-capacity

21 magazine?  Were shots discharged?  How many shots were

22 discharged?  And it requested, as I recall, the same

23 information about the residents of the home suffering the

24 invasion.  Did they have a gun?  Did they show it?  What was it

25 equipped with?  Did they fire?

1    *Q.* So according to the responses that you reviewed, how common

2    were home invasions in the jurisdictions covered by the

3    sheriffs?

4    *A.* Home invasions in the jurisdictions covered by the sheriffs

5    are very uncommon. There were -- over the ten-year period

6    covered by the request, there were 327 reports of home

7    invasion. One hundred of them are of dubious credibility,

8    because the sheriffs were not even able to assign a date to the

9    occurrence. Nevertheless, if we accept them, that's 327 home

10   invasions over ten years, over a range of Colorado geography

11   that I estimate has a population of approximately 3 million

12   people. So what that amounts to is, roughly speaking, 300 per

13   3 million over ten years. That's 30 per year. That's 1 per

14   100,000 Colorado residents.

15   *Q.* Would those numbers change in any way if it turned out that

16   the sheriffs didn't have reporting authority for their entire

17   county?

18   *A.* Yeah. There is a question as to whether -- first, whether

19   the sheriffs were responsible for law enforcement within, for

20   example, maybe -- some of the urbanized areas in their

21   counties. There is a second question as to whether or not --

22   whether or not they were responsible for law enforcement,

23   whether their records included data regarding the criminal

24   activities or home invasions that might have taken place in

25   parts that they didn't have active jurisdiction over.

1    Now, unfortunately, the sheriffs were silent about all

2  of this.  So there is no way to estimate the effects of these

3  uncertainties.  I think it's fair to say, though, the net

4  effect is that the population to which I'm referring is

5  probably slightly smaller than the population I'm actually

6  using.  And so the estimates I'm giving are probably slightly

7  under the truth.

8  *Q.*  Why did you focus on home invasions?

9  *A.*  I focused on home invasions for two reasons.  First, there

10  was the practical reason that the –– I guess the second

11  interrogatory addressed that specifically, and so that was the

12  data that came to me.  But the second reason is, first, that I

13  think we understand, home invasions –– or, rather, defense of

14  the home to be at the core of what is protected by the Second

15  Amendment.  I think it's also at the core of what we are

16  concerned about when we think about our personal safety.  And

17  lastly, my understanding is that the rules regarding personal

18  possession and use of firearms are typically least restrictive

19  with regard to the use within the home.

20  *Q.*  So let's take a look at the sheriff's data.  This is

21  Exhibit 59.  What are we looking at here?

22  *A.*  This is a table from my rebuttal report of, I believe,

23  early September.

24  *Q.*  And what's the source of the numbers here?

25  *A.*  These numbers are my calculations based on the data

1  disclosed by the sheriffs in response to your interrogatories.

2      *MR. GROVE:* I'd move to admit this document, Your

3  Honor.

4      *THE COURT: Voir dire* or objection?

5      *MR. KRUMHOLZ:* If I may *voir dire* for a moment, Your

6  Honor?

7      *THE COURT:* You may.

8      *MR. KRUMHOLZ:* Professor, it's your testimony that in

9  the third column, concerning population in plaintiff counties,

10 that the numbers shown for each of those years is the

11 population for which the sheriff responded; is that correct?

12     *THE WITNESS:* No.

13     *MR. KRUMHOLZ:* Okay. And it's not correct because

14 there were jurisdictions -- may have been jurisdictions for

15 which the sheriffs did not have -- for which the sheriffs did

16 not respond because the police departments had responsibility

17 for those jurisdictions, correct?

18     *THE WITNESS:* Again, I understand that there are in

19 some counties jurisdictions within the counties for which the

20 sheriffs are not necessarily responsible for law enforcement.

21 I believe the interrogatories asked for all instances within

22 the county. It's unclear to me whether or not the sheriffs

23 responded for the county -- only the parts of their counties

24 for which they had jurisdiction or whether they responded for

25 the entire county.

1    *MR. KRUMHOLZ:*  Thank you, Professor.

2         If I may ask, with respect to the interrogatories --

3    with respect to the interrogatories, it's your memory that it

4    requested responses for all home invasions within the county

5    for which the sheriff is responsible?

6         *THE WITNESS:*  That's my vague memory.  I could be

7    incorrect about that.

8         *MR. KRUMHOLZ:*  Thank you, Professor.  Would it be

9    useful to refresh your recollection by looking at the actual

10   interrogatory?

11        *THE WITNESS:*  Yes.

12        *MR. KRUMHOLZ:*  Your Honor, I wonder if I may show

13   Professor Zax a copy of the interrogatories to refresh his

14   recollection.

15        *THE COURT:*  You may.

16        *MR. KRUMHOLZ:*  Ms. Glover, do you know what exhibit

17   we're on?

18        *COURTROOM DEPUTY:*  The next one would be 139, unless

19   Mr. Kopel, have you marked the ones you were going to give me

20   yet?

21        *MR. KOPEL:*  I started with 141 to give us some

22   breathing room.

23        *COURTROOM DEPUTY:*  139 is fine.

24        *MR. KRUMHOLZ:*  Thank you.

25        Professor, to refresh your recollection, would you

1    please look at page 3, interrogatory 1.

2           *THE WITNESS:*  Yes.  I see that I was incorrect.  It

3    says, "With respect to each and every home invasion or robbery

4    in the home to which your department has responded."  So this

5    would only be -- the counts that I represent here would be

6    counts only of those -- those home invasions to which the

7    sheriff and his employees had, themselves, responded to.

8           *MR. KRUMHOLZ:*  I appreciate that.  Thank you,

9    Professor.

10          Your Honor, we would object to the admission of this

11   document as being inaccurate.

12          *THE COURT:*  Overruled.  That's something you can

13   explore on cross-examination.  This is the basis for his

14   opinion.

15          *MR. KRUMHOLZ:*  Thank you, Your Honor.

16          (Exhibit 59 admitted.)

17   *BY MR. GROVE:*

18   *Q.*  What are we looking at here, Dr. Zax?

19   *A.*  So, the second column entitled "number of home invasions,"

20   that is my count based on the sheriffs' responses of the number

21   of home invasions to which they responded in each of these

22   years.  As you can see, those numbers are -- they fluctuate,

23   within a relatively narrow band.  That is, the maximum number

24   of responses was 34 in 2007.  The minimum number was half that,

25   17, achieved in several years, 2005, 2006, and 2011.  There

1    were 100 home invasions -- I'm sorry, there were 100 reports of

2    responses to home invasions for which no date was provided.  If

3    we sum those for which dates were provided, there are 237

4    instances.  With the home invasions that were undated, in

5    addition, that's 327 instances in the ten years of reporting.

6    That's the second column.

7            Now, the third column, as we've already discussed, is

8    my compilation of the reported population.  These are figures

9    from the state demographer, I believe, of the population in the

10   counties associated with each of these sheriffs.  As I

11   previously testified, and I guess as we've now verified, that

12   is probably an overestimate of the populations that the

13   sheriffs actually covered.  The extent of the overestimate is

14   unknown, because the sheriffs did not provide any information

15   specifically regarding which parts of their counties they were

16   and were not responsible for.

17           My guess is that this overestimation is not excessive,

18   because my understanding is that the major urban areas in the

19   state were not included among these 55 -- 54 responding

20   counties.  I could be wrong about that, but I'm pretty sure

21   Denver is not part of it, and I'm pretty sure Boulder is not

22   part of it, Colorado Springs I suspect was not part of it, but

23   I don't recall specifically.  So the population counts are as I

24   described them.

25           And then in the right most column, the fourth column,

1  I estimate the number of home invasions per million population.

2  That's simply the ratio of the second column, the number in the

3  second column for each year divided by the number in the third

4  column for each year.  And as I've already testified, that's

5  probably a slight underestimate of the frequency with which the

6  exposed populations were exposed -- or experienced, rather,

7  home invasions.

8  Q.  Let's just suppose for the sake of hypothesis that your

9  number -- your population numbers here are double what they

10 should be.  So, say, sheriffs are only responsible for

11 responding to -- it would be 1.7 million people instead of 3.4

12 people in 2004.  What effect would that have on the right most

13 column, which is home invasions per million population?

14 A.  It would double the estimated rate of home invasions per

15 million population.  So my current calculations show that rate

16 as being somewhere between four and ten home invasions per

17 million population.  If it were to double, that would change

18 the estimate to something between eight and twenty home

19 invasions per million population.  As we'll see later, even a

20 doubling of that nature would indicate that the risks of

21 experiencing a home invasion are quite small.

22      MR. GROVE:  Your Honor, I'm not sure if Exhibit 59 was

23 formally admitted.  Let me make sure.

24      COURTROOM DEPUTY:  I think it was, because you

25 overruled the objection, so I put it down as admitted.

1    *THE COURT:* It's been admitted.

2    *MR. GROVE:* Thank you.

3  *BY MR. GROVE:*

4  *Q.* This is Exhibit 60. What are we looking at here?

5  *A.* So this was a comparison -- that is, the numbers on the

6  previous slide -- on the previous exhibit suggest that

7  numerically, home invasions are uncommon. I wanted to give a

8  sense of scale to that suggestion by tabulating the frequency

9  of other events that I think of as uncommon but they're more

10  familiar to us.

11      So this table tabulates from reports by the Colorado

12  Department of Transportation -- actually, I'm sorry, it's not

13  the Colorado Department of Transportation, this is the federal

14  tabulation of fatal automobile accidents. As you can see in

15  the left most column, I'm looking at years that were comparable

16  to those for which we had reports of home invasions from the

17  sheriffs. They -- these reports go only to 2011 because more

18  recent data had not been released at the time I wrote the

19  report.

20      The second column is the total of traffic fatalities

21  that occurred in the state in each of those years. And as you

22  can see in each of those years, the number of traffic

23  fatalities exceeded the total number of home invasions reported

24  over all ten years by the sheriffs on the previous slide. It

25  is on the previous slide we saw a total of 327 home invasions.

1    What we're seeing here is that traffic fatalities vary from a

2    high of 667 per year in 2004 to 447 in 2011.

3           The third column gives the population of the state in

4    each of these years.  And the fourth column gives the risk of

5    incurring a traffic fatality per million population.

6           What you can see there is, first, that risk has

7    dropped dramatically during the period, for which we can all be

8    grateful.  But, nevertheless, the risk even in 2011 was 87 per

9    million population.

10          If you look back at the previous exhibit, you'll see

11   that the risk of home invasion -- of suffering a home invasion,

12   I estimated to range between 4 and 9 per million.  As we said,

13   even if that estimate -- those estimates were off by half, the

14   appropriate range would be between 8 and 20 million per

15   million.  So even with that adjustment, the risk of dying in a

16   traffic accident in Colorado is at least four times as great as

17   the maximum possible risk of experiencing a home invasion.

18   Q.  And does this chart fairly and accurately depict the data

19   that you gathered underlying it?

20   A.  Yes, it does.

21          MR. GROVE:  We'd offer this as well, Your Honor.

22          MR. KRUMHOLZ:  No objection.

23          THE COURT:  Received.

24          (Exhibit 60 admitted.)

25   BY MR. GROVE:

1  *Q.*  This is Exhibit 61.  What are we looking at here?

2  *A.*  This is an elaboration of the previous exhibit.  That is,

3  the previous exhibit tabulated all traffic fatalities recorded

4  in the state of Colorado between 2004 and 2011.  This tabulates

5  only those fatalities that occur as a consequence of a driver

6  who was legally intoxicated.  And what you can see is that if

7  you compare the second column here to the second column in the

8  previous exhibit, roughly speaking, about a third of traffic

9  fatalities in the state of Colorado occur because the driver

10  was intoxicated.

11        If you look over at the right most column, you see the

12  risk of being killed by an intoxicated driver in the state of

13  Colorado.  And you can see that over the, I guess, eight

14  years of this data, that risk varies from about 25 per million

15  population to 44 per million population.  Regardless, in every

16  year, the risk of being killed by a drunk driver is greater

17  than the risk of encountering a home invasion, even accounting

18  for extreme overcounts of the population served by the sheriffs

19  who reported the interrogatory.

20        *MR. GROVE:*  Move to admit this as well.

21        *MR. KRUMHOLZ:*  No objection.

22        *THE COURT:*  Received.

23        (Exhibit 61 admitted.)

24        *MR. GROVE:*  That was 61.

25  *BY MR. GROVE:*

1    *Q.*  62.  What are we looking at here?

2    *A.*  This is a second tabulation from the data provided by the

3    sheriffs in response to your interrogatories.  In this

4    tabulation, I am counting the number of home invasions --

5    reported home invasions in which the perpetrator was reported

6    to have possessed a firearm.  That information is in the third

7    column -- I'm sorry, let's start again at the left.  The first

8    column, of course, again, gives the year of the report.  The

9    second column reproduces the number of home invasions from the

10   first of these exhibits, what was earlier called Table 1.

11          The third column is the new information.  That reports

12   the number of home invasions in which the perpetrator was

13   reported to possess a firearm.  As we can see, first, not all

14   home invaders possess firearms.  Second, the number of home

15   invasions in which a firearm is in the possession of a

16   perpetrator fluctuates from year to year.  On average, about --

17   well, there are, I believe, 161 -- 170 home invasions in which

18   the perpetrator possessed firearms.  That's out of a total of

19   327.  So roughly speaking, about 60 percent of these home

20   invasions were ones in which the perpetrator possessed

21   firearms.

22          Over in the right-most column, once again, I offer

23   that calculation regarding the risk of encountering a home

24   invasion in which the perpetrator was possessed of a firearm --

25   possessed a firearm.  That risk, as you can see, is calculated

1  here as running between 2.58 and 7.11 per million.

2  　　　If, as we've discussed already, my population numbers

3  were -- overestimated the Colorado population by as much as a

4  half, then the risks here in the right most column would range

5  from approximately 5 per million to about 14 per million.  That

6  is, the risk that you would experience a home invasion in which

7  the invader possessed a firearm would be in -- in none of these

8  years, any greater than 14 per million.

9  　　　As a standard of comparison, in 2012, I believe the

10  Colorado state lottery awarded 22 prizes of $1 million.  So

11  that would say that you are more likely to win a million

12  dollars in the Colorado state lottery than you are to

13  experience a home invasion in which the perpetrator is armed

14  with a firearm.

15  Q.  I think we all know which one of those we would prefer.

16  A.  I sure hope so.

17  　　　MR. GROVE:  Move to admit Exhibit 62, Your Honor.

18  　　　MR. KRUMHOLZ:  No objection.

19  　　　THE COURT:  Received.

20  　　　(Exhibit 62 admitted.)

21  BY MR. GROVE:

22  Q.  This is 63.  Please tell us what we're looking at here.

23  A.  Here, as with the previous exhibit, we are narrowing our

24  focus from all home invasions, which, again, are tabulated here

25  in the second column, to those that are of specific interest to

this case. In the previous exhibit, we were looking at those home invasions in which the perpetrator was armed with a firearm. Here, in the third column, we're looking at those home invasions which the perpetrator was not only armed with a firearm, but actually discharged it. And we can see that that is a very rare experience. I believe it's 46 occurrences in all ten years, but give me just a moment to add -- yes, 46 instances in ten years across 54 counties, in which a home was invaded and in which the aggressor actually discharged a firearm.

Q. And let's assume that our population numbers are double what they should be, what would the range be for the number of discharges per million population?

A. Well, that would be given by the right-most column on this table. And as you can see, the estimates here range from about one-quarter of an experience per million to 2.74 instances per million. Doubling that would raise it to about -- in 2008, the risk would have been about 1 per 2 million. In 2007, the risk would have been about 5 1/2 such instances per million population.

As -- again, as standards of comparison, my research demonstrated that you are more likely to give birth to triplets, quadruplets quintuplets, sextuplets, octuplets than you are to encounter a home invasion in which a perpetrator discharged a firearm. You are also more likely to experience

1  an organ transplant than a home invasion in which the

2  perpetrator discharged a firearm.  And, for that matter,

3  reports of unidentified flying object sightings were more

4  common than firearm discharges by perpetrators in house -- in

5  home invasions.

6      *MR. GROVE:*  Move to admit 63, Your Honor.

7      *MR. KRUMHOLZ:*  No objection.

8      *THE COURT:*  Received.

9      (Exhibit 63 admitted.)

10 *BY MR. GROVE:*

11 *Q.*  Let's talk about the use of firearms in self-defense by

12 home invasion victims.  This is 65.  What are we looking at

13 here?

14 *A.*  This, again, is a compilation of the data that were

15 reported by the sheriffs in response to the interrogatories.

16 Much of this is familiar.  So, again, the first column is the

17 year of the data.  The second column is the total number of

18 home invasions.  The fourth column is the population of the

19 plaintiff counties.  The new information here is in this third

20 column.  The new information is in the third column, where I

21 tabulate the number of home invasions in which the victim was

22 known to possess firearms.  So -- and you can see that that

23 number varies from six in 2004 to fifteen in 2012.  In other

24 words, if you compare that to the information in the third

25 column to the information in the second column, roughly --

1    well, a little under half of those homes that suffered

2    invasions were homes in which the residents possessed firearms.

3    Q.  So what do we know about the rates at which this phenomenon

4    occurred?

5    A.  That's in the right most column, again.  And the rates

6    published here range from 1.67 per million to 3.28 per million.

7    Again, if the populations in the fourth column are double the

8    populations that were actually served by the sheriffs, these

9    rates would double as well.  And that would take them to a

10   range of about 3.3 per million up to 6.5 per million.

11   Q.  And to put that in perspective, how does that compare, to,

12   say, being struck by lightning in Colorado?

13   A.  The probability of incurring an injury or a fatality

14   through a lightning strike is greater than the probability of

15   experiencing a home invasion as a gun owner while in possession

16   of a firearm.

17          MR. GROVE:  Move to admit 65, Your Honor.

18          MR. KRUMHOLZ:  No objection.

19          THE COURT:  Thank you.  Received.

20          (Exhibit 65 admitted.)

21   BY MR. GROVE:

22   Q.  You talked about home invasion victims possessing firearms.

23   Was there any data available about discharges of firearms by

24   home invasion victims?

25   A.  Yes, there was.

1    *Q.* And what did that reveal?

2    *A.* I believe -- excuse me. I believe, as I testified, that

3    there were 46 instances in which the perpetrator discharged a

4    firearm. I believe there were 19 instances in which the victim

5    discharged a firearm. So that would be less than two

6    occurrences per year. The number of rounds discharged in all

7    reported cases was less than the maximum available in currently

8    legal large-capacity magazines. That is, there was no report

9    of anyone, either perpetrator or victim, discharging as many as

10   15 rounds. And there were only two instances in which a

11   perpetrator was equipped with an LCM, that is, an LCM that

12   would currently be illegal, and two reported instances in which

13   a defender was equipped with a LCM.

14   *Q.* Did anyone come close to firing 15 rounds or more?

15   *A.* As far as the reports go, the answer to that is no. There

16   was one instance in which I believe a perpetrator was reported

17   to have fired one or more rounds, so I can't be absolutely

18   certain that that individual did not exhaust the capacity of a

19   currently illegal large-capacity magazine, but I think it's

20   likely.

21   *Q.* What does this data suggest to you about the frequency of

22   defensive gun use in Colorado?

23   *A.* Defensive gun use, in response to home invasions, is rarer

24   than many other events that we think of as being almost

25   impossible to experience.

1  *Q.*  Well, Dr. Kleck opines that defensive gun uses are a lot

2  more frequent than you do.  Do you agree with this conclusion?

3  *A.*  His estimates of the frequency, both from his 1995 paper

4  and his modifications of those estimates to fit the

5  contemporary environment, suggest -- well, I'm sorry.  Let me

6  start again.  I disagree, and I agree.  I disagree with his

7  counts of the number of defensive gun uses.  That is, even his

8  most conservative estimates in the contemporary environment

9  suggest numbers of defensive gun uses that are many times in

10  excess of those reported by the sheriffs in the state of

11  Colorado.  So even if they are valid for the country as a

12  whole, they clearly are not representative of the experience in

13  Colorado.  That's where I disagree with him.

14          Where I agree with him is that, according to his

15  testimony, he's unaware of any defensive gun uses in which a

16  large-capacity magazine was needed or the number of rounds

17  expended were equivalent to those you would expend with a

18  large-capacity magazine.  And I agree with him there, that is,

19  there is no record in Colorado of anyone defending themselves

20  with the number of rounds that are now -- that would exceed

21  what are now legal LCMs.

22  *Q.*  Well, let's say we did agree with Dr. Kleck's results --

23  that you did, would that have any bearing on the issues in this

24  case?

25  *A.*  No.

1    *Q.* Why not?

2    *A.* Well, again, what is at issue in this case is not the

3    number of defensive gun uses. What is at issue in this case is

4    whether large-capacity magazines are necessary for effective

5    self-defense. Professor Kleck has no information about the

6    number of rounds fired in self-defense. He has no information

7    about the type of weaponry and, in particular, the type of

8    magazines that self-defenders employ in self-defense. So his

9    opinion actually has no information regarding the central issue

10   in the case.

11         *MR. GROVE:* Your Honor, I don't know if you were

12   planning on stopping at noon, but this would be a good time for

13   us.

14         *THE COURT:* Okay. As I said, this is our longer lunch

15   hour, because it is the day that the judges of the court meet.

16   And so we will be looking at reconvening at about 1:40.

17         Let me ask you what the rest of the day looks like.

18         *MR. GROVE:* I'd guess we have another hour with

19   Dr. Zax, maybe. He's raising his eyebrows like we may have

20   more. And then I assume there is going to be a pretty lengthy

21   cross. We have two very short witnesses after that. And then

22   my understanding is that the plaintiffs might have one short

23   rebuttal witness.

24         *THE COURT:* Okay. All right. We can continue for

25   another five or ten minutes, if you want, and utilize this

1  time.

2          *MR. GROVE:*  Let's do that.

3          *THE COURT:*  Okay.

4  *BY MR. GROVE:*

5  *Q.*  What do you know about the basis for Dr. Kleck's opinions

6  on defensive gun use?

7  *A.*  The foundation of those opinions, as I understand it, is

8  his 1995 article with his colleague, Mark Gertz.  And the

9  foundation for that article, of course, is his 1993 survey

10 regarding defensive gun uses.

11 *Q.*  Do you have any experience with survey design?

12 *A.*  Yes.

13 *Q.*  Would you please describe that.

14 *A.*  Well, I was part of the team that designed the 1988 China

15 household income project survey and the 1995 -- the 1995 China

16 household income project survey.  Those were, actually,

17 landmark surveys in the study of the Chinese economy.  They

18 were the first household surveys there, and they are the

19 foundation of everything we know about inequality in China.

20 That's a pretty big deal.

21          Now, I will admit that I was not the lead in the

22 survey design in either endeavor; but I was certainly an active

23 participant.  Apart from that, I am a frequent consumer of

24 surveys and have extensive experience in reading, interpreting,

25 and analyzing the data generated by surveys.

1  *Q.* Did you read, interpret, and analyze the data generated by

2  Dr. Kleck's survey?

3  *A.* Yes, I did.

4  *Q.* In your opinion, is his estimate of the frequency of

5  defensive gun use reliable?

6  *A.* The estimate that he derives from his data is not reliable.

7  *Q.* And were the results of your analysis of the sheriffs' data

8  consistent with Professor Kleck's survey findings?

9  *A.* Certainly not. They showed far fewer defensive gun uses

10 than any of the numbers that Professor Kleck has offered.

11 *Q.* The sheriffs' data shows far fewer uses?

12 *A.* Yes, thank you.

13     *MR. GROVE:* This might really be a good stopping

14 point, Your Honor.

15     *THE COURT:* All right. As I indicated, we'll stand in

16 recess until 1:40.

17     *MS. SPALDING:* Your Honor, I've just got a quick

18 housekeeping matter, if I could.

19     *THE COURT:* Sure.

20     *MS. SPALDING:* The parties have some stipulations, and

21 we can certainly enter those as an exhibit, or we can --

22     *THE COURT:* We can do them right now if you'd like.

23     *MS. SPALDING:* Okay. I'm prepared to read it into the

24 record now, but I don't have the exhibit prepared. I'm

25 actually just asking for the Court's preference. Don't care?

1    Okay.

2    THE COURT:  I have realtime, so I've got the

3  transcript coming up as it is being developed.

4    Mr. Kopel, I know you wanted to get some exhibits

5  admitted.  Maybe this is a good time to do that.

6    Sir, you may step down from the witness stand.  Thank

7  you very much.

8    THE WITNESS:  Thank you.

9    MS. SPALDING:  Okay.  Parties stipulate as follows:

10    An individual entered a movie theater in Aurora,

11  Colorado, in the early morning of July 20, 2012, with three

12  weapons:  A 12-gauge shotgun, a .40 caliber handgun, and a

13  semiautomatic rifle.  The theater had 415 seats set in

14  stadium-type seating.  The theater was filled to near capacity.

15  The theater patrons were watching a movie.

16    The individual carried a 100-round drum magazine for

17  the semiautomatic rifle.  He was also carrying five 30-round

18  magazines for the rifle and one 15-round magazine for the

19  handgun.  The 100-round magazine and ten 30-round .223

20  magazines were purchased legally via internet sales.  Ten

21  22-round magazines for a handgun were also purchased legally on

22  the internet.  Three additional 30-round .223 magazines and

23  four 15-round magazines for a handgun were purchased legally

24  from local retail outlets.

25    The individual fired all three weapons at moviegoers.

1    He first fired six rounds from the shotgun.  He then

2    transitioned to the rifle, firing 65 rounds at moviegoers from

3    the 100-round drum magazine before the drum magazine jammed.

4         While the shooter was attempting to clear the

5    malfunction and reload the rifle with an overloaded 30-round

6    magazine, many people escaped from the theater.  After failing

7    to reload the rifle, the shooter transitioned to the handgun

8    and fired five rounds at fleeing moviegoers.  Twelve moviegoers

9    were killed and fifty-eight injured by shotgun or rifle fire.

10   Nobody was kill or injured from fire by the handgun.  The movie

11   patrons who died were seated in rows 8 through 18.

12        Chief Daniel Oates is unaware of the use of a

13   100-round drum magazine in the city of Aurora other than the

14   magazine used in the July 20, 2012, Aurora theater shooting.

15   Chief Daniel Oates is unaware of any other incident in the city

16   of Aurora in which more than 15 shots were fired by the

17   perpetrator in the commission of a crime.

18        That's it.

19        THE COURT:  Thank you.

20        Are those so stipulated?

21        MR. ABBOTT:  Yes, Your Honor.

22        THE COURT:  Thank you.

23        Okay, Mr. Kopel.

24        MR. KOPEL:  Thank you, Your Honor.  We would at this

25   time like to provide the Court with the fuller legislative

1  history of the two bills that are at issue here.  And we have

2  exhibit sets for all of these, including for defendants, of

3  course.

4          We would like to offer Exhibit 141, which is the

5  relevant pages from the --

6          THE COURT:  Mr. Kopel, you don't have to identify

7  these.

8          MR. KOPEL:  Okay.

9          THE COURT:  Simply go by number.  I will then ask the

10  defendants at the close of your listing of the numbers whether

11  they stipulate to the admission of these documents.

12          MR. KOPEL:  So just read the numbers?

13          THE COURT:  Yes.

14          MR. KOPEL:  Thank you, Your Honor.  Nos. 141, 142,

15  143, 144, 145, 146, and 147.

16          THE COURT:  Thank you.

17          MR. GROVE:  Your Honor, if we could take a look over

18  lunch.

19          THE COURT:  Okay.  That sounds good.

20          MR. KOPEL:  Thank you, Your Honor.

21          THE COURT:  We'll stand in recess.

22          (Recess at 12:08 p.m.)

23          (In open court at 1:46 p.m.)

24          MS. SCOVILLE:  Your Honor, we've run up against a

25  little scheduling issue for this afternoon.  The State has one

1   very short witness, and the plaintiffs have been kind enough to

2   not object to us taking him out of turn.

3          *THE COURT:*  All right.

4          *MS. SCOVILLE:*  Thank you.

5          *THE COURT:*  Please call your witness.

6          *MS. SCOVILLE:*  The state calls Andy Logan.

7          *THE COURT:*  Please step up and be sworn.

8              (**ANDREW LOGAN, DEFENDANT'S WITNESS, SWORN**)

9          *COURTROOM DEPUTY:*  Please be seated.

10         Please state your name and spell your first and last

11  name for the record.

12         *THE WITNESS:*  My name is Andrew Logan, A-N-D-R-E W,

13  L-O-G-A-N.

14         *MR. FABIAN:*  At this time we would interpose our

15  objection.  We would note that this witness has testified

16  before the General Assembly, but we would object to anything

17  that exceeds the scope of that evidence he presented to the

18  General Assembly.

19         *THE COURT:*  Thank you.  You may proceed.

20                        **DIRECT EXAMINATION**

21  *BY MS. SCOVILLE:*

22  *Q.*  Good afternoon, Mr. Logan.

23  *A.*  Good afternoon.

24  *Q.*  What is your occupation?

25  *A.*  I'm a bioprocess engineer.

1   *Q.*  What does that mean?

2   *A.*  I work for a biotechnology company.

3   *Q.*  What does your biotech company do?

4   *A.*  The short story is, we grow bacteria that have a high

5   protein content in them, and that protein goes into animal

6   feeds.

7   *Q.*  Are you also a hunter?

8   *A.*  Yes.

9   *Q.*  Fair to say you're an avid hunter?

10  *A.*  Yes.

11  *Q.*  How often do you hunt?

12  *A.*  I hunt probably 30 days a year.

13  *Q.*  What species do you hunt?

14  *A.*  I hunt mostly big game, deer, antelope, elk.  I hunt wild

15  pigs, turkeys.  I also hunt waterfowl, ducks and geese, a

16  little upland hunting.

17  *Q.*  And you own a variety of firearms for your hunting,

18  correct?

19  *A.*  I do.

20  *Q.*  I'd like to ask you about only one of those in particular.

21  Do you own an AR style rifle?

22  *A.*  I do.

23  *Q.*  What is that rifle?

24  *A.*  It's a Bushmaster AR-15.

25  *Q.*  What species do you hunt with that rifle?

1    *A.*  I hunt exclusively wild hogs with that.

2    *Q.*  Anything else?

3    *A.*  No.

4    *Q.*  Have you ever used that rifle to hunt any other species?

5    *A.*  No.

6    *Q.*  What size magazine is on your AR style rifle?

7    *A.*  It's 15 rounds.

8    *Q.*  And what magazine was on the rifle when you purchased it?

9    *A.*  Fifteen rounds.

10   *Q.*  Do you have any other magazines that fit that particular

11   rifle?

12   *A.*  I do.

13   *Q.*  And could you describe that magazine for us.

14   *A.*  Yeah.  I have a total of two, and they're both 15 rounds.

15   *Q.*  Where did you purchase your AR style rifle?

16   *A.*  I purchased it from an FFL out near Limon, Colorado.

17   *Q.*  And as I understand it, the 15-round magazine, was that the

18   magazine that was offered with the rifle when you purchased it?

19   *A.*  It was.

20   *Q.*   And how have you found that 15-round magazine to be in

21   terms of reliability?

22   *A.*  Flawless.

23   *Q.*  Have you ever experienced any problems with it?

24   *A.*  Neither of them, no.

25   *Q.*  Have you ever attempted to insert 16 rounds into your

1   15-round magazine?

2   *A.*   I have.

3   *Q.*   And what did you find?

4   *A.*   That the 16th round will not fit.

5   *Q.*   In terms of your hunting activities in Colorado, will House

6   Bill 1224, which is section 18-12-112, have any impact on your

7   activities as a hunter in Colorado?

8          *MR. FABIAN:*  Objection, foundation.

9          *THE COURT:*  Sustained.

10  *BY MS. SCOVILLE:*

11  *Q.*   Mr. Logan, are you familiar with House Bill 12 -- 1224,

12  which is section 18-12-112?

13  *A.*   I am.

14  *Q.*   Have you read that before?

15  *A.*   I have.

16  *Q.*   Have you considered whether it will impact your activities

17  as a hunter in Colorado?

18  *A.*   I have.

19  *Q.*   And will there be any impact to your hunting activities as

20  a result of that legislation?

21  *A.*   None whatsoever.

22         *MS. SCOVILLE:*  Thank you.  I have no further

23  questions.

24         *THE COURT:*  Thank you.

25         Cross-examination.

**CROSS-EXAMINATION**

*BY MR. FABIAN:*

*Q.* Good afternoon, Mr. Logan.

*A.* Good afternoon.

*Q.* Okay. Now, you say you have hunted with your AR-15 type rifle, correct?

*A.* Correct.

*Q.* And you've hunted with other hunters who have used AR-15 rifles, correct?

*A.* Yes.

*Q.* Now, you originally hunted wild pigs in Texas with a bolt-action rifle, correct?

*A.* Yeah.

*Q.* That was a 30-06?

*A.* Correct.

*Q.* But after seeing the other hunters use AR-15 rifles and borrowing those rifles yourself, you decided to get your own AR-15, right?

*A.* I'm not sure that cause and effect is exact. But having hunted with them and having an interest in firearms and hunting, I decided to buy an AR-15, yes.

*Q.* Now, I was unclear from your testimony, do you have two magazines or just -- or three magazines for your AR-15?

*A.* I have two total.

*Q.* And they're both 15-round magazines, right?

1    *A.*   Yes.

2    *Q.*   And those are the only magazines you've ever used in that

3   rifle, correct?

4    *A.*   Correct.

5    *Q.*   Now, the bolt-action rifle you originally used to hunt wild

6   pigs, that had a magazine capacity of five rounds, correct?

7    *A.*   It has a magazine capacity of five, yes.

8    *Q.*   So the AR rifle you use now has a magazine capacity three

9   times that rifle, correct?

10   *A.*   That's correct.

11   *Q.*   Now, AR platform style rifles, both .30 caliber and

12   .223 caliber, are used for hunting in Colorado, correct?

13   *A.*   I'm sorry, I missed the very last part of that.

14   *Q.*   The AR type platform rifles, both .30 caliber and .223

15   caliber, are used for hunting in Colorado, right?

16   *A.*   Are used for hunting, you're saying?

17   *Q.*   Yes.

18   *A.*   Yes.

19   *Q.*   And there is not a magazine capacity limit on pig hunting

20   in Texas, correct?

21   *A.*   There is not, to my knowledge.

22   *Q.*   And in Colorado, there is no magazine capacity limit for

23   using a rifle to hunt varmints or small game, correct?

24      *MS. SCOVILLE:*   Objection, foundation.

25      *THE COURT:*   Sustained.

1    *BY MR. FABIAN:*

2    *Q.* Well, Mr. Logan, you said you've hunted in Colorado for

3    quite some time?

4    *A.* Yes.

5    *Q.* Okay. And that hunting also, does that include hunting

6    small game and varmints?

7    *A.* I do not hunt varmints, because I think it's unethical,

8    because you don't eat them. So --

9    *Q.* I understand.

10   *A.* And I do hunt small game, yes.

11   *Q.* And for hunting small game in Colorado, there is no

12   magazine capacity limit for hunting small game, is there?

13        *MS. SCOVILLE:* Objection, foundation.

14        *THE COURT:* Sustained.

15   *BY MR. FABIAN:*

16   *Q.* Do you know what -- if there are magazine capacity limits

17   for hunting small game in Colorado?

18   *A.* I believe that I do know, yes.

19   *Q.* And what are they?

20   *A.* I believe that there are not magazine limits for mammals,

21   small game mammals; but for shotguns, there are limits.

22   *Q.* Okay. And I --

23        *MR. FABIAN:* If I may have a moment, Your Honor.

24        *THE COURT:* Sure.

25   *BY MR. FABIAN:*

1  *Q.*  Now, you belong to a group called Hunters Against Gun

2  Violence, correct?

3          *MS. SCOVILLE:*  Objection beyond the scope.

4          *MR. FABIAN:*  Goes to bias and interest, Your Honor.

5          *THE COURT:*  I overrule the objection.  The witness can

6  answer.

7          *THE WITNESS:*  Yes.

8  *BY MR. FABIAN:*

9  *Q.*  And as a representative of that group, you've publicly

10  announced your support for the magazine limitations contained

11  in House Bill 1224, correct?

12  *A.*  Correct.

13  *Q.*  Now, that group, Hunters Against Gun Violence, that was an

14  informal organization started by an acquaintance of yours,

15  correct?

16  *A.*  That's correct.

17  *Q.*  A Don Macalady, correct?

18  *A.*  Yes.

19  *Q.*  But you're not familiar with the detail of the

20  organization, correct?

21  *A.*  Incorrect.

22          *MR. FABIAN:*  I'd ask that the witness's deposition be

23  unsealed.

24  *BY MR. FABIAN:*

25  *Q.*  Sir, do you recall your being taken on November 5, 2013?

1    *A.*  I do.

2    *Q.*  And you testified and answered questions under oath at that

3    time?

4    *A.*  Correct.

5         MR. FABIAN:  Ask the witness be shown his deposition.

6    *BY MR. FABIAN:*

7    *Q.*  I'd like you to turn to page 30, please.

8    *A.*  Okay.

9    *Q.*  And were you not -- note that you were asked -- were you

10   not asked a question on page -- I'm sorry, on line 18, "And

11   when was this group started?"

12        Answer:  "I don't know the ins and outs of the group.

13   And, you know, if it's even -- if it's just a word-of-mouth

14   group of 50 or so hunters now or even if it's a formal entity.

15   So I don't -- I don't know that I can give you a starting

16   date."

17        *MS. SCOVILLE:*  Objection.  I don't know that this is

18   actually an inconsistent statement.

19        *THE COURT:*  Response.

20        *MR. FABIAN:*  I believe it is an inconsistent

21   statement.  I asked him if he was familiar with the details of

22   the organization, and this goes to show that he is not familiar

23   with the details of the organization.

24        *THE COURT:*  I don't know that the details of the

25   organization has a definitive meaning so as to make the

1   statement in the deposition inconsistent.  However, it has been

2   read into the record, and I overrule the objection.

3   *BY MR. FABIAN:*

4   *Q.*  And, sir, you don't know when the group started, correct?

5   *A.*  That's incorrect.  So --

6   *Q.*  I'm sorry, sir.  Again, are you still looking at your

7   deposition?

8   *A.*  Yes.  This deposition was November 5, 2013, and you used

9   the present tense to pose your question.

10  *Q.*  Okay.

11  *A.*  And so --

12  *Q.*  So at the time of your deposition, you did not know when

13  the group started, correct?

14  *A.*  I didn't know the exact date.

15  *Q.*  Thank you, sir.

16  *A.*  I think in the deposition I told you that it started --

17  *Q.*  Thank you.

18  *A.*  -- after the Sandy Hook massacre.

19          *THE COURT:*  Folks, I'm going to ask you not to talk

20  over each other.  The reason is our court reporter can't

21  transcribe two people talking at the same time.

22          As to the witness, let me advise you that the State's

23  attorney will have an opportunity to ask you further questions.

24  If she believes there is some supplementation to your responses

25  that is appropriate, I'm sure she'll ask you a question, giving

1    you the opportunity to supplement.

2         Counsel, I will ask that you not talk over the

3    witness.

4         *MR. FABIAN:*  I understand, Your Honor.  Thank you.

5         *THE COURT:*  Thank you.

6    *BY MR. FABIAN:*

7    *Q.*  This group, Hunters Against Gun Violence, doesn't have a

8    formal membership application or enrollment procedure, correct?

9    *A.*  Correct.

10   *Q.*  And you don't have regular meetings, correct?

11   *A.*  We have irregular, spontaneous meetings.

12   *Q.*  Sir, my question was, you don't have regular meetings,

13   correct?

14   *A.*  That is correct.

15   *Q.*  And you personally don't believe that a magazine

16   restriction such as that contained in House Bill 1224 will stop

17   or even limit the number of mass shootings, correct?

18   *A.*  That's -- I'm sorry.  Say the question again, please.

19   *Q.*  Sure.  You do not believe that the magazine restrictions in

20   House Bill 1224 will stop or even limit the number of mass

21   shootings, correct?

22        *MS. SCOVILLE:*  Objection.  Beyond the scope and

23   foundation.

24        *THE COURT:*  Sustained.  Beyond the scope.

25        *MR. FABIAN:*  If I may have just one more moment, Your

1    Honor.

2          I have nothing further.

3          *THE COURT:*  Thank you.

4          Redirect.

5          *MS. SCOVILLE:*  None, Your Honor.

6          *THE COURT:*  Can this witness step down and be excused?

7          *MS. SCOVILLE:*  He may.

8          *MR. FABIAN:*  No objection.

9          *THE COURT:*  Thank you, sir.  You may step down.  You

10   are excused.

11         *THE WITNESS:*  Thank you.

12         *THE COURT:*  Are we ready to return to the examination

13   of Dr. Zax?

14         *MR. GROVE:*  Yes, Your Honor.

15         *THE COURT:*  Thank you.  Would you please retake the

16   stand.  You remain under oath.

17         *THE WITNESS:*  Thank you.

18         (**JEFFREY ZAX, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**)

19                **DIRECT EXAMINATION CONTINUED**

20   *BY MR. GROVE:*

21   *Q.*  Let's move to your third opinion, that limiting magazine

22   capacity will have a beneficial impact on the safety of law

23   enforcement officers.

24         First, to your knowledge, is there any restriction on

25   the bill on what law enforcement officers may carry after

1    July 1, 2013?

2    *A.*  I've read the bill, and my understanding is that there is

3    no restriction on what law enforcement officers can carry.

4    *Q.*  In the course of preparing your report and preparing for

5    your testimony in this case, did you examine any sources that

6    shed light on the frequency of large numbers of discharges by

7    police officers?

8    *A.*  Yes, I did.  In particular I read three -- three of the

9    most recent annual firearm reports of the New York Police

10   Department.

11   *Q.*  And those detail discharges in the line of duty?

12   *A.*  Yes, they do.

13   *Q.*  And when you did this analysis, did you assume that police

14   officers and civilians have similar self-defense needs?

15   *A.*  No, I did not.

16   *Q.*  Why?

17   *A.*  Well, the most important reason is because the New York

18   Police Department's document asserts that they don't; and I

19   have no reason to disagree with that.  The document spoke at

20   some length about the obligation of police officers to actually

21   pursue circumstances of great risk in the course of enforcing

22   public safety; whereas, private citizens actually have an

23   obligation to avoid risk to the reasonable extent before they

24   engage in self-defense.

25   *Q.*  Are you aware of any evidence suggesting that

1   large-capacity magazines are of particular threat to police

2   officers?

3   *A.* Yes, I am.

4   *Q.* What is that evidence?

5   *A.* I believe it was in the article by Dr. Koper, the 2013

6   article, in which he asserts that between 31 and 41 percent of

7   police murders are accomplished with large-capacity magazines.

8   *Q.* You mentioned that you reviewed NYPD firearms discharge

9   data. What did that data show about the frequency and

10  intensity of firearms discharges by police officers in the line

11  of duty?

12  *A.* It showed the frequency and intensity are quite limited.

13  The city of New York has a population of 8 million or more.

14  The police force is typically around 33, 34,000 officers in the

15  course of a year. Over the three years that I looked at, 2009,

16  2010, 2011, there were 116 recorded incidents of police

17  discharging their firearms in the line of duty. In only six of

18  those incidents -- there were six incidents in which an

19  individual officer discharged 16 rounds. There were no

20  incidents in which any individual officer discharged more than

21  16 rounds.

22  *Q.* Mr. Ayoob testified earlier in this trial, and he said -- I

23  believe I'm remembering this right -- that something on the

24  order of, like, 3 percent of all incidents in New York in the

25  period that he reviewed involved the firing of more than 16

1  rounds.  Is that accurate or inaccurate?

2  *A.*  In the three years that I reviewed, as I said, no

3  individual officer fired more than 16 rounds, and only in six

4  instances did they fire that many.  Now, it's possible that in

5  those incidents, more than 16 rounds were fired; but that would

6  be because there were multiple officers discharging their

7  firearms, and the sum of the total discharged exceeded 16.

8  *Q.*  Did you review firearms discharge statistics from any other

9  police departments?

10  *A.*  Yes, I did.  From -- the police departments in Milwaukee,

11  Los Angeles, San Diego, and Albuquerque, I believe.  The

12  reports from those four cities are much less detailed than

13  those from New York.  They are consistent with -- to the extent

14  they have detail, they are consistent with New York reports.

15  Law enforcement officers rarely fire their firearms in the line

16  of duty.  When they do, they rarely fire large numbers of

17  discharges.

18  *Q.*  Did the discovery in this case contain information about

19  discharges in the line of duty?

20  *A.*  Yes, it did, in fact.

21  *Q.*  What did that reveal?

22  *A.*  Well, there was another interrogatory addressed to the

23  sheriffs, requesting reports from them regarding the number of

24  instances in which -- in which sheriffs and sheriffs deputies

25  discharged their firearms in the line of duty.  I compiled that

1    data and found only 62 instances in the 54 reporting counties

2    over the past -- well, I was going to say ten years, but the

3    range on that question might actually have been longer.  So,

4    certainly, over the last ten years, maybe over a longer period,

5    only 62 instances.

6    *Q.*  Okay.  Let's move on.

7         We touched on the public safety component of the

8    large-capacity magazine ban a few times already, but I'd like

9    to address it more squarely.  Do you have an opinion as to the

10   effect of the magazine capacity limitation on public safety?

11   *A.*  Yes.  It will enhance public safety.

12   *Q.*  Why?

13   *A.*  Because the number of rounds fired will decline.  In the

14   absence of a large-capacity magazine, the number of rounds

15   fired will be less.

16   *Q.*  Does that apply only to mass shooting situations?

17   *A.*  No.

18   *Q.*  Okay.  So let's discuss that moderating effect, whether or

19   not it's a mass shooting.  What is the basis of that opinion?

20   *A.*  There are four bases for my opinion.  The first is basic

21   economic theory.  The second is the apparent evidence regarding

22   the efficacy of reloading.  The third is the evidence presented

23   by Reedy and Koper in their 2003 article in *Injury Prevention*

24   regarding the number of discharges and the consequences thereof

25   from pistols and revolvers.  And the fourth is the evidence

1 from mass shootings.

2 *Q.* Okay. Let's go through those one at a time. What's the

3 relevant economic theory?

4 *A.* Well, the relevant economic theory is the theory of

5 opportunity costs. And perhaps I can motivate this first with

6 an illustration.

7 We've all seen scenes in movies where an individual

8 seems to be in control of the situation. He pulls the trigger

9 on his gun, and it turns out he's out of ammunition. Control

10 of the situation changes radically at that point. Nobody wants

11 to be that person. Nobody wants to be down to their last

12 bullet. And that's all about economics.

13 The issue is the following: One of the costs of doing

14 anything is the opportunity cost. That is the fact that by

15 making one choice, you forgo other choices. And the loss of

16 those other choices is something you have to consider when you

17 choose to make the choice that you made.

18 Well, in the present context, the relevance is that

19 when you shoot -- when you discharge a round, there is, of

20 course the expense of the bullet. But the other expense is the

21 fact that a round discharged now is not available to you to

22 discharge later.

23 Now, the reason that's important is because if you're,

24 for example, an aggressor in a violent interaction, those

25 interactions tend to be unscripted, unplanned, and they can

1    evolve in ways that are unexpected.  So when you discharge a

2    round now, you have to weigh, is it better for me to shoot it

3    now and not have it later, or should I hold it in reserve in

4    case my victim turns out to be more -- more aggressive in

5    defense than I expected, someone comes to their aid, the police

6    show up.  There are a variety of unpredictable circumstances in

7    which I might wish I hadn't shot that round now.  I wish I

8    rather had it.

9         Now, the opportunity cost of these bullets goes up the

10   fewer -- the fewer bullets you have left in your magazine.  So,

11   for example, if you have a 30-round magazine, you can fire the

12   first couple of rounds, maybe the first five or ten rounds

13   recklessly.  You don't have to think, I need to keep something

14   in reserve in case things go badly for me, because you've still

15   got 20 rounds or more.

16        On the other hand, if you have a 15-round magazine,

17   then you have to be a lot more careful.  For example -- this is

18   oversimplifying a bit.  But if, for example, you decided I want

19   to keep six rounds in reserve because I don't know who is

20   coming around the corner, I don't know how I'm going to make my

21   escape, I don't know all of those things.  Well, if you have a

22   30-round magazine and you want to keep 6 in reserve, you can

23   fire 24.  If you've got a 15-round magazine, you want to keep 6

24   in reserve, you can only fire 9.  With a smaller magazine, the

25   opportunity cost of each round is greater.  The opportunity

1  cost of each round grows more rapidly as you discharge rounds.

2  And, therefore, your reluctance to go to the end of the

3  magazine increases.

4        So, yes, fundamental economic theory says that with a

5  smaller magazine, you will ordinarily discharge fewer rounds.

6  *Q.* What's your understanding of the evidence regarding

7  reloading time?

8  *A.* Well, the evidence regarding reloading times --

9        *MR. KRUMHOLZ:* Objection, Your Honor. Foundation.

10        *THE COURT:* Response.

11        *MR. GROVE:* We can move on.

12        *THE COURT:* Okay.

13  *BY MR. GROVE:*

14  *Q.* So you mentioned the results of the Reedy and Koper study

15  from 2003. What's your understanding of what that study found?

16  *A.* The Reedy and Koper study examined firearm injuries over a

17  period of, I think, four years, 1992 to 1996, in Jersey City.

18  They had access to data which described not only the extent of

19  the injuries, but the firearms that were used and the number of

20  rounds discharged. They used this data to compare the outcomes

21  of -- outcomes of violent interactions where the firearms were

22  revolvers and those where the firearm were pistols with,

23  presumably, larger magazines.

24  *Q.* And we heard testimony from Dr. Kleck that semiautomatic

25  pistols do on average have a higher capacity than revolvers.

1  Do you have any basis to disagree with that opinion?

2  *A.* No, I heard that testimony, and Reedy and Koper make the

3  same comparison.

4  *Q.* So what was the outcome of the study comparing revolvers

5  and semiautomatic pistols?

6  *A.* The outcome of the study was that in incidents involving

7  pistols, the number of shots discharged -- the average number

8  of shots discharged was in the vicinity of 3.2 to 3.7. With

9  revolvers, the average number of shots discharged was between

10  2.3 and 2.6, I believe. The conclusion was that incidents

11  involving pistols involved the discharge on average of one

12  additional round, which is an increase of, roughly speaking,

13  45 percent over the number of rounds that were discharged in

14  the typical incident using only a revolver. That was the first

15  conclusion.

16      The second conclusion was that in incidents involving

17  a pistol, the number of -- average number of injured parties

18  was 1.15; whereas, in incidents involving the revolvers the

19  average number of injured individuals was one. So incidents

20  involving pistols caused an increase in the number of injured

21  individuals of .15 per incident, which is an increase of

22  15 percent.

23  *Q.* So what does that research suggest about the capacity of a

24  firearm and what effect it might have in a violent encounter?

25  *A.* Well, it agrees with the economic theory that I just

1  expostulated a couple of minutes ago.  Aggressors with smaller

2  capacities husband that capacity more carefully and expend

3  fewer rounds; because they expend fewer rounds, they injure

4  fewer victims.

5  *Q.*  So my understanding of Professor Kleck's testimony or his

6  position on this, is that he believes that any conclusions that

7  are in the Reedy and Koper analysis aren't relevant, because

8  the average criminal incident in which the perpetrator actually

9  shoots only involves a few rounds and usually comes nowhere

10  near to exhausting the capacity of, say, a 15-round magazine.

11  Do you agree with him?

12  *A.*  No, that's incorrect.  Apart from mass shootings, the

13  objective is never to exhaust the magazine.  The objective is

14  to accomplish your objective while holding enough fire power in

15  reserve to protect yourself if things go bad.  So as an

16  economic matter, you would never expect anyone to go into these

17  kinds of interactions with the intent of exhausting their

18  magazine.

19  *Q.*  Well, so why does it matter if use of a larger-capacity

20  firearm versus a smaller-capacity firearm might only result in

21  one or two extra shots being fired?

22  *A.*  Well, it wouldn't matter at all if we could be certain

23  those shots would always miss.  But if shots always missed, we

24  wouldn't need to defend ourselves either.  For example, if the

25  hit rate was as low of 15 percent, the probability of getting

1 shot when two rounds are being fired at you is about

2 28 percent, getting hit once. The probability of getting hit

3 once when four rounds are fired at you is about 48 percent. So

4 the addition of two more discharges increases your probability

5 of getting hit by 20 percentage points. And that's actually a

6 60 percent increase in your risk of being hit. That's

7 substantial.

8 Q. Professor Kleck also testified that mass shooters do not

9 need large-capacity magazines to carry out their goal. Do you

10 agree with that opinion?

11 A. No.

12 Q. Why?

13 A. Well, Professor Kleck didn't have any direct evidence to

14 support that. The direct evidence he does have, that we have,

15 is that it appears that the majority of mass shooters, maybe

16 the vast majority of mass shooters, for whom their weapon can

17 be identified carry with them large-capacity magazines. Now, I

18 did hear Professor Kleck testify that mass murderers tend to be

19 deliberate, methodical, to plan their ghastly expeditions over

20 extended periods of time. I think the evidence there is one of

21 what we call revealed preference. If having thought carefully

22 about how to wreak the carnage that they aspire to, they choose

23 to equip themselves with LCMs, what we're being told is that

24 they believe they'll be more effective in achieving their goals

25 if that's the weaponry they carry.

1    And, you know, it's awful to say, but they're,

2  unfortunately, the experts in this kind of behavior.  It's hard

3  to contradict them without something more substantial.

4  *Q.*  Are you familiar with the methodology that Professor Kleck

5  used to compile the information that he based his review of

6  what mass shooters need on?

7  *A.*  Yes.

8  *Q.*  And it was newspaper reports, right?

9  *A.*  That's what I heard him testify to, yes.

10 *Q.*  What's your expert opinion regarding the design of his

11 methodology?

12 *A.*  It seems inadequate to address the questions that he wants

13 to answer.

14 *Q.*  Why is that?

15 *A.*  Well, as I understand it, one of the pieces of his analysis

16 is what he calls the average discharge rate, or the average

17 shot rate.  I understand that he took calculations of a number

18 of discharges and divided that by the elapsed time of the

19 entire incident and called that the average discharge rate.

20     While I don't quibble with that definition, but it is

21 very difficult for me to see why that is relevant to anyone.

22 That is, the victims in these -- in these instances did not

23 typically experience the average rate.  They experienced the

24 actual rate.  And I did hear the tape of the recording of the

25 911 call from the Aurora incident.  It was quite clear that at

1   that time, the rate of fire was well in excess of the average

2   rate that Dr. Kleck calculated for that incident.  And while

3   that actual rate of fire was taking place, it's easy to imagine

4   that the defensive opportunities of the victims were very

5   limited.  The opportunity to move, to get out of the way, to

6   tackle when the bullets were being fired more than one per

7   second would be very limited.  Yet, in that circumstance,

8   Professor Kleck would assert that the relevant fire rate was

9   much slower.  And that would suggest that the victims had

10  defensive opportunities that in fact were not available to

11  them.

12  *Q.*  Did you have any concerns about the representativeness of

13  the sample of newspaper articles that Dr. Kleck relied upon?

14  *A.*  Yes, I did.

15  *Q.*  What were those?

16  *A.*  Well, it became clear in the course of his testimony that

17  what -- he asserted that he had found all relevant instances,

18  but, in fact, he had not.

19      Now, I'm not much disturbed by the fact that he didn't

20  get every instance.  It's very hard to be comprehensive in that

21  kind of situation.  What does bother me is that he asserted

22  first that he had been comprehensive.  And that raises the

23  possibility that the instances that he did examine had been

24  selectively chosen, that he had deliberately ignored the other

25  instances and chose to represent that no other instances were

1   relevant in order to avoid examining what -- instances that

2   might have been contradictory to his assertions.

3       So the question is not comprehensiveness; it's

4   representativeness.  The way he presented it, it seems to me

5   that the -- that it's -- the question of whether or not his

6   sample was representative of mass shootings is very much

7   unanswered.

8   *Q.*  What do you think of Professor Kleck's opinion that

9   reloading is so easy that multiple smaller magazines are just

10  as effective as large-capacity magazines?

11  *A.*  As I understand it, that opinion is based on reloading

12  times that are recorded under controlled circumstances, in gun

13  shops, on firing ranges, but in circumstances where there is no

14  risk of aggressive responses or anything else.

15      Under those circumstances, it wouldn't surprise me if

16  people's dexterity is such that they can perform at the speeds

17  that Professor Kleck represents.  However, I know we've had

18  evidence in this trial about the effect of stress in violent

19  circumstances on people's reactions.  And I see nothing in the

20  evidence to suggest that the reloading times that Professor

21  Kleck claims are relevant are actually reloading times that

22  someone could expect -- expect in the heat of a violent event.

23  *Q.*  Professor Kleck also used a definition of mass shooting

24  that I'd like to ask you about.  And I think it was seven or

25  more killed or wounded in a single incident.  What's your

1    opinion of whether that's a valid way to measure whether

2    something is or is not a mass shooting?

3    *A.* Well, it's --

4        *MR. KRUMHOLZ:* Objection, Your Honor. Foundation.

5        *THE COURT:* Response.

6        *MR. GROVE:* I can lay some more foundation.

7        *THE COURT:* Okay.

8    *BY MR. GROVE:*

9    *Q.* Dr. Zax, are you familiar with the term -- phrase

10   "selecting on the dependent variable"?

11   *A.* Yes, of course.

12   *Q.* What does that mean?

13   *A.* Selecting on the dependent variable is what happens when

14   you choose your sample based on the outcome that you want to

15   explain. So -- I'm sorry.

16   *Q.* And did Dr. Kleck select on the dependent variable when

17   doing his analysis?

18   *A.* Yes.

19   *Q.* What are the concerns with that?

20   *A.* Well, the outcome that you wanted to explain was the event

21   of the mass shooting. He defined mass shooting by the outcome,

22   that is, seven or more injured. The problem there is that that

23   definition biases his sample in the direction of finding a

24   reduced difference between the effectiveness of those using

25   LCMs and those not.

1    The reason for that is the following:  What we're

2  really concerned about is not those who succeed in being mass

3  shooters, but, rather, those who intend to be mass shooters.

4  What we would like to do is deter those who intend.

5    Now, if it's true that LCMs are more effective

6  weaponry for executing a mass shooting, then of those who

7  intend to be mass shooters, those who are not equipped with

8  LCMs are less likely to achieve the threshold that Dr. Kleck

9  established for his sample.  That is, if their weaponry isn't

10  good enough, even though their intent may have been to

11  annihilate large numbers of people, they may have failed to do

12  so.  And by failing to do so, they wouldn't have found their

13  way into Dr. Kleck's example.

14    Now, moreover, they failed to do so because they

15  didn't have LCMs.  And so Dr. Kleck's strategy for creating the

16  sample means that those who wanted to kill lots of people but

17  failed to do so because their magazines were small, don't show

18  up.  And that means he doesn't count the people who wanted to

19  wreak havoc but failed to do so because a restriction like that

20  in Colorado prevented them from having weaponry that would

21  allow them to.

22  Q.  Let me make sure I've got this straight.  So, for example,

23  somebody wants to commit a mass shooting.  He decides that he's

24  going to do it with a revolver, which is all that he has, that

25  has a capacity of six rounds, which is all that he has, that

1    has a capacity of six rounds.  He decides that he's going to

2    kill as many people as possible, or at least shoot them.  Fires

3    all six, misses with three, so he actually hits three people,

4    then does that mean that he would or would not be included in

5    Dr. Kleck's sample?

6    *A.*  He would not be included in Dr. Kleck's sample.  And the

7    problem with that is, he wanted to be a mass murderer, and he

8    didn't make it, fortunately.  And the reason he didn't make it

9    was, he don't have an LCM.  But Dr. Kleck isn't going to see

10   that.  So Dr. Kleck's sample is going to be those people with

11   LCMs that made it in some sense easier for them to achieve

12   their grizzly objective and those without LCMs, whose weaponry

13   put them at a disadvantage with regard to this objective, but

14   for whatever reason managed to succeed anyhow.

15         So Dr. Kleck's sample is comparing those with LCMs

16   against only in some sense the most skilled or the most

17   fortunate of those without LCMs.  It's ignoring those who are

18   equally murderous in intent, but whose -- but whose lack of

19   LCMs made it impossible for them to achieve that intent.

20   *Q.*  Based on that analysis, does it surprise you at all that

21   approximately 80 percent of the incidents that qualify for

22   Dr. Kleck's sample and which we knew the capacity of the

23   magazine actually involved an LCM?

24   *A.*  No, that's exactly what you'd expect.  The LCM makes it

25   easier to discharge more rounds.  Discharging more rounds makes

1  it easier to hit more people.  Hitting more people makes it

2  easier to make Dr. Kleck's arbitrary threshold as to what is

3  and is not a mass shooting.

4       THE COURT:  Counsel, I'm a bit confused here.  I think

5  the reference here to LCM really is an HCM.  Could you inquire,

6  please?

7       MR. GROVE:  I'm sorry, we've --

8  BY MR. GROVE:

9  Q.  When you say LCM, what do you mean?

10  A.  Large-capacity magazine.

11       THE COURT:  Okay.  Thank you.

12       MR. GROVE:  Thank you, Your Honor.

13  BY MR. GROVE:

14  Q.  So we had some discussion earlier, you touched on

15  Dr. Kleck's study of defensive gun use.  This is the 1995 Kleck

16  and Gertz study.  And you were here while he discussed the

17  testimony as well.  Are there any problem areas that concern

18  you with the -- with the way that study was conducted?

19  A.  Yes, there are.

20  Q.  What are those?

21  A.  Well, there are many.  The three biggest are that I believe

22  the questionnaire was designed so as to encourage exaggerated

23  responses regarding the number of DGUs.  I believe that the

24  principal results -- I know that the principal results are

25  miscalculated, and that miscalculation has not been corrected.

1    And, lastly, the survey failed to -- the survey and the study

2    failed to distinguish between defensive gun uses that were

3    legitimate and legal and those that were illegitimate or

4    illegal.  And certainly failed to distinguish between defensive

5    gun uses by people that Dr. Kleck in other contexts would refer

6    to as criminals themselves.

7    *Q.*  One word that came up in Dr. Kleck's testimony was priming.

8    Do you know what that word means?

9    *A.*  Yes.

10   *Q.*  And what is it?

11   *A.*  Priming is the phenomenon where one becomes predisposed to

12   answer a question a particular way because one has previously

13   been exposed to a similar concept and a like concept, a like

14   intention, and that predisposition may interfere with what the

15   facts actually are.

16   *Q.*  Why does priming matter in a survey?

17   *A.*  Well, let me give you a quick illustration.

18           When my son was 6 years old, he was interviewed in a

19   pediatric nutrition study.  When he came out of the interview,

20   I asked what they had spoken of.  He said, They asked me what I

21   had for breakfast.  I said, What did you tell them?  He said, I

22   told them I had two eggs, a banana, toast, and orange juice.

23   And I said, You've never had that for breakfast in your entire

24   life.  And he said, I know.  And I said, Why did you tell them

25   that?  And he said exactly these words, he said, I could tell

1  that's what they wanted to hear.  That's 60 percent of what you

2  need to know about priming right there.

3       Now, this is a phenomenon familiar to us in lots of

4  other circumstances as well.  Trial attorneys I think put great

5  care into the questions they ask, the phrasing of the

6  questions, and the order of the questions, all motivated by the

7  idea that the answers you get depend on the way in which the

8  questions are asked.  On top of that, of course, there is

9  scholarly research as to how this all works out.  So in the

10 end, you can predispose the answers, you can get the answers

11 you want, regardless of whether or not they're entirely true,

12 by posing the question the right way.

13 *Q.*  You've reviewed Dr. Kleck's survey instrument, correct?

14 *A.*  Yes.

15 *Q.*  Do you have any concerns about priming?

16 *A.*  Absolutely.  The first question says -- the first question

17 is, I believe, What do you believe to be most important problem

18 facing your community?  The answers, as given on the survey

19 instrument, are:  One, crime; two, other; three, no opinion.

20 Well, so, the very first question puts respondents in a

21 position where it's either crime or everything else.  That's

22 going to predispose your respondents to thinking in terms of

23 threat.

24 *Q.*  Now, Dr. Kleck testified that that was actually an

25 open-ended question.  After reading the survey instrument, do

1    you have any reason to disagree with that?

2    *A.*  Yes.  That's not a credible opinion, and the reason is that

3    the survey instrument is a script.  It's replete throughout

4    with explicit instructions to the surveyor as to how they

5    should interpret various answers, how they should proceed from

6    question to question based on previous answers.  It has

7    instructions throughout to assist the surveyor in responding to

8    the questions.  If it was truly an open-ended question, then it

9    should have been represented as an open-ended question with,

10   for example, a blank space and then a parenthetical instruction

11   to the surveyor saying, characterize anything that sounds of

12   illegal activity as crime.  Characterize anything else they

13   talked about, cost of living, unemployment, war, climate

14   change, whatever it is, characterize that as other.  And that's

15   how you proceed.  That instruction is not there.

16          And while Professor Kleck claims to remember the

17   conduct of this, his memory with regard to lots of other

18   aspects of this survey was very fragile.  I don't see any

19   reason to credit it in this context, given the evidence to the

20   contrary.

21   *Q.*  Aside from priming, are there any other design problems in

22   the survey instrument?

23   *A.*  Yes, there are.  There are a variety of problems with

24   regard to the -- I'm sorry.  There are -- the biggest

25   additional problem with regard to the design is that there is

1  substantial ambiguity regarding defensive gun uses that were

2  the acts of someone other than the actual respondent.

3  Questions regarding that, coding of all of that was ambiguous

4  in such a way that it is not actually possible to recover which

5  of those -- which acts were actually reported by someone other

6  than the participant.  That's a problem.

7  *Q.*  What about the potential culpability of the respondent,

8  does that matter?

9  *A.*  Well, it doesn't matter to Professor Kleck, apparently.

10 But the question of self-defense in this survey is

11 self-reported.  Well, everyone has a tendency to justify

12 themselves.  And so it's easy to imagine that in responding to

13 these questions, individuals interpreted violent encounters as

14 encounters in which they were somehow justified and their

15 adversary was not.  So without any external validation of the

16 defensive character of the interaction, it's a little -- it's

17 uncomfortable accepting individual self-assertion as the extent

18 to which they defended themselves.

19 *Q.*  This is Exhibit 78.  What are we looking at here?

20 *A.*  Here, we're looking at my tabulation of numbers that are

21 reported in the article by Professor Kleck and his colleague,

22 Gertz -- Professor Gertz.  What we have here is, first in the

23 right-most bar --

24 *Q.*  Is that actually the left-most bar?

25 *A.*  Left-most bar.  Thank you.  I was confused by the sudden

1    inability of my finger to elicit the arrow that I had hoped

2    would appear here.

3            These are all numbers from the Kleck and Gertz

4    article.  The left-most bar, the one that is entirely blue, is

5    labeled NCVS reports.  This represents Professor Kleck's

6    summary of the typical number of defensive gun uses reported to

7    the national criminal -- NCVS, National Criminal Victimization

8    Survey, I believe.  Roughly speaking, during the period he was

9    talking about, there were 70,000 reports, approximately.

10           And the next bar, which is partially blue but mostly

11   red -- there is the arrow -- that bar represents Professor

12   Kleck's description of other defensive gun use surveys.  That

13   is, surveys other than the one that he, himself, conducted and

14   reported on in this paper.  His summary of those surveys was

15   that 700,000 -- was that typically they showed at least 700,000

16   defensive gun uses in a year.

17           Well, then, the question is, why does the NCVS here

18   have 70,000 and these other surveys have at least 700,000?

19   Dr. Kleck's explanation of that is, as we heard, that

20   individuals involved in defensive gun uses which might have

21   been of dubious legality would be reluctant to report those to

22   the NCVS because the NCVS is a federally sponsored, federally

23   conducted survey, and respondents would be uncomfortable

24   exposing themselves to federal scrutiny despite the promise of

25   confidentiality.

1    So taking -- simplifying that, and taking Professor

2  Kleck's explanation at face value, what he's saying is that in

3  a sense, the 70,000 NCVS reports you could think of as

4  presumably legal.  The difference between those 70,000 NCVS

5  reports and the 700,000 reports gathered by the other defensive

6  gun use surveys, that difference represented defensive gun uses

7  that were of dubious legality.

8    So as you could see in this middle bar, the lower blue

9  portion represents the 70,000 that would have been of,

10  presumably, legal character.  The much larger red bar above it

11  is the part -- is the portion of the response to these surveys

12  that represent defensive gun uses of dubious legality.  And

13  according to Dr. Kleck's interpretation of these numbers, what

14  he's saying is that in these other defensive gun use surveys,

15  approximately 90 percent of the reported incidents of defensive

16  gun uses are, themselves, of dubious legality, 630,000 out of

17  700,000.

18    The right-most column represents the Kleck and Gertz

19  survey itself.  As we heard, Professor Kleck estimates that 2.5

20  million defensive gun uses -- instances of defensive gun use

21  occurred in 1993, the year of his survey.  Once again, he

22  explains the difference between his tabulation and that in the

23  national -- in the NCVS as being driven by the reluctance of

24  defensive gun users to reveal themselves to federal authorities

25  when they're uncertain about the legality of their defensive

1  gun use.

2      So, once again, in this right-most bar, we have at the

3  bottom the 70,000 defensive gun uses that Professor Kleck

4  asserts are presumably legal.  And the remainder of that bar

5  represents the excess of defensive gun uses reported to him

6  above those that are reported to NCVS.  And you can see it's

7  mostly red there, because by Professor Kleck's own testimony in

8  his article, of the 2 1/2 million defensive gun uses he

9  reports, approximately 2,430,000 of them are of dubious

10  legality.

11      And to put that in percentage terms, according to

12  Professor Kleck's explanation of his results, only about

13  3 percent of the defensive gun uses that he reports are

14  sufficiently legal that their perpetrators would have felt

15  comfortable reporting them to the NCVS survey.  The other

16  97 percent of defensive gun uses were revealed to Professor

17  Kleck and his co-author only because their guarantee of

18  confidentiality was sufficiently convincing that these

19  individuals didn't feel uncomfortable admitting to acts that

20  were of dubious legality.

21  Q.  Let's talk about problems with execution.

22      I'm sorry.  Your Honor, could we admit 78 just for the

23  purpose of demonstrative?

24          THE COURT:  Any objection?

25          MR. KRUMHOLZ:  No objection.

1        THE COURT:  Thank you.  It's received.

2        (Exhibit 78 admitted.)

3  *BY MR. GROVE:*

4  *Q.*  This is Table 2 from the Kleck and Gertz study, which has

5  already been admitted, and so I won't -- we won't try to flip

6  through that and find it.  I've got it here.

7        MR. KRUMHOLZ:  What's the exhibit number?

8        *MR. GROVE:*  78.

9        THE COURT:  Might be helpful to identify it for the

10  record.

11        MR. GROVE:  This is No. 73.  Since this is marked on,

12  we will, actually, ask that it be admitted too, just so the

13  record is clear.

14  *BY MR. GROVE:*

15  *Q.*  What are we looking at here, Dr. Zax?

16  *A.*  This is the central presentation of the central results

17  from this particular article.

18  *Q.*  And as you may recall, since you were here, I had a

19  discussion with Dr. Kleck about which of these calculations may

20  have been incorrect.  And then on redirect, there was some

21  additional discussion in which he said that -- actually, the

22  numbers on the right side of the table were actually -- he had

23  come up with the reason that they might have been -- might have

24  appeared to have been miscalculated.  Have you gone back

25  through and checked his work?

1   A.   Yes.

2   Q.   And what did you conclude?

3   A.   The correction that Dr. Kleck accepted in the redirect

4   testimony is wrong.  That is, it doesn't explain the errors in

5   this table, and wouldn't be expected to.  It's not relevant.

6           MR. GROVE:  Your Honor, I'd ask that 73 be admitted.

7           THE COURT:  Any objection?

8           MR. KRUMHOLZ:  No objection, Your Honor.

9           THE COURT:  It's received.

10          (Exhibit 73 admitted.)

11  BY MR. GROVE:

12  Q.   Dr. Kleck's Opinion No. 6 was as follows:  "The

13  large-capacity magazine limitation will reduce possession of

14  large-capacity magazines more among law-abiding citizens than

15  it will among criminals."

16          From the perspective of a social scientist, are there

17  any problems with the way that Dr. Kleck formulated and

18  expressed this opinion?

19  A.   Yes.  That's not a valid opinion from the perspective of a

20  social scientist.

21  Q.   Why is that?

22  A.   Let me explain how science works -- social science works.

23  In its simplest form, social science is about saying, people of

24  one sort will be behave one way; people of another sort will

25  behave another way.  And that's an assertion or hypothesis.

Jeffrey Zax – Direct

1    And then one would attempt to verify that hypothesis by

2    actually observing people of one sort and measuring their

3    behavior; observing people of the other sort, measuring their

4    behavior; and looking to see if the observed contrast is

5    consistent with the asserted contrast.  That's how science

6    works.

7         Now, the problem with this statement is that

8    superficially, it appears to draw a distinction between two

9    well-defined sorts of people, those who are law-abiding, and

10   those who are criminals.  The problem with it from a scientific

11   perspective is, Professor Kleck was not willing to make that

12   distinction operational.

13        That is, for example, if the act of buying an illegal

14   LCM makes one a criminal, then that statement is a tautology.

15   That is, there is nothing to test.  Once you buy an LCM, you

16   are a criminal; therefore, criminals are more likely to buy an

17   illegal LCM than noncriminals.  Because you can't be a

18   noncriminal and buy an LCM illegally.  That's one way to think

19   of it that renders it inoperable.

20        The way to make it operable would be to actually

21   propose or adopt a meaningful distinction between law-abiding

22   citizens and criminals.  Professor Kleck was asked to draw that

23   distinction.  He was asked who a criminal was.  His first

24   response and the only definitive response he gave was, everyone

25   is a criminal.  Well, if everyone is a criminal, then there is

1    no contrast.  There are no law-abiding citizens to compare them

2    to.

3        So until you have a well-defined distinction between

4    criminals and law-abiding citizens, you can't tell which -- who

5    is in each of those two groups; and, therefore, you can't test

6    this hypothesis.

7        Professor Kleck, I have to say, was very reluctant,

8    simply refused to define that distinction.  And if you can't

9    define that distinction, you can't test it; and if you can't

10   test it, it's not science.

11   Q.  Do you accept Professor Kleck's opinions regarding the need

12   for large-capacity magazines in mass murders and self-defense?

13   A.  No.

14   Q.  Why not?

15   A.  Professor Kleck's opinions are that mass murderers don't

16   need LCMs, even though they're usually equipped with them.  And

17   that self-defenders need LCMs, even though there are hardly any

18   examples of them ever using one.  His assertions are completely

19   contradictory with what we observed and, therefore, can't be

20   plausible.

21   Q.  Do you believe that multiple discharges are often necessary

22   for self-defense?

23   A.  No.

24       MR. KRUMHOLZ:  Objection, Your Honor.  Foundation.

25       THE COURT:  Response.

1    *MR. GROVE:*  We went through this with the sheriffs'

2    data, Your Honor.  The -- opinion two is, essentially, that

3    large numbers of rounds aren't necessary for self-defense.

4        *THE COURT:*  I understand that.  But what is the

5    foundation that you're relying on for this particular question?

6        *MR. GROVE:*  I can lay more foundation.

7        *THE COURT:*  Okay.

8    *BY MR. GROVE:*

9    *Q.*  Dr. Zax, earlier we discussed the information that you

10   considered when you reached your second conclusion in this

11   case, is that the need for large-capacity magazines in

12   self-defense is virtually non-existent.  Did I state that

13   fairly correctly?

14   *A.*  Yes.

15   *Q.*  What information did you rely on to reach that conclusion?

16   *A.*  I relied on the reports of self-defense in the context of

17   home invasions provided by the 54 sheriffs who replied to your

18   interrogatories.  As I said, at the time, there were 19

19   instances in which individuals discharged firearms in

20   self-defense, none in which they -- none reported in which they

21   discharged as many as 15 rounds, and only two examples in which

22   self-defenders in those contexts were equipped with a

23   large-capacity magazine.

24   *Q.*  Did the law enforcement data that you reviewed contain

25   similar data?  I'm sorry.  Let me be more specific.  You

1    reviewed New York City Police Department firearms discharge

2    reports, correct?

3    *A.*   Yes.  Yes.

4    *Q.*   Did that contain similar data?

5    *A.*   Yes, it -- with regard to police officers themselves, as I

6    testified, the demonstration there was that out of 33,000 odd

7    policemen in each of three years, there were a total of six

8    incidents in which individual policemen discharged 16 rounds.

9    *Q.*   So based on that background, do you accept Professor

10   Kleck's opinions regarding the need for multiple discharges in

11   self-defense?

12   *A.*   No.  There are no examples of discharge of multiple --

13   of -- discharge of many rounds -- there are very few -- sorry,

14   let me start again.  There are very few examples of the

15   discharge of many rounds in self-defense.  And in particular,

16   Professor Kleck, himself, testified that he believed there were

17   300,000 instances of armed self-defense, I guess, per year.

18   And he couldn't identify a single example in which an armed

19   self-defender had discharged the capacity of a legal LCM in

20   Colorado.

21   *Q.*   Well, leaving aside discharge, do you agree that defensive

22   gun use is as common as Professor Kleck claims?

23   *A.*   No.

24   *Q.*   Why not?

25   *A.*   As I said, I think there are many reasons to doubt the

1  results from his 1995 article.  As he, himself, agreed, that

2  1995 article is out of date, so to speak.  The violent

3  crime -- the climate of crime today is much less, and

4  criminal -- I'm sorry, defensive gun uses are much less common.

5  I'm sorry.  I'm beginning to tire.  Would you repeat the

6  question, please.

7  *Q.*  Commonality of defensive gun use.

8  *A.*  Thank you.  And, regardless, the numbers that Professor

9  Kleck cites are clearly inconsistent with the experience in

10  Colorado.  The experience in Colorado, as reported by the

11  sheriffs, indicates that defensive gun use, at least in the

12  context of home invasion, is rarer than -- rarer than many

13  things we think of as being extremely unlikely.

14  *Q.*  What about the effect of 18-12-302 on the stock of

15  large-capacity magazines in circulation in Colorado?  Professor

16  Kleck has opined it won't make a difference.  Do you agree with

17  that?

18  *A.*  No.  It's clear that the federal ban, which was much

19  weaker, had a marked statistically significant effect on

20  reducing the number of LCMs in circulation.  I expect the

21  Colorado ban will be more successful in that direction.

22  *Q.*  Do you believe that the ban on large-capacity magazines

23  will protect Coloradans from aggression?

24  *A.*  Yes.

25  *Q.*  Why?

1    *A.* Again, if magazines are smaller, the number of rounds

2    discharged will be fewer, and the number of individuals struck

3    by rounds will be fewer, as well.

4    *Q.* What about mass shootings, do you think that the ban on

5    LCMs will have an effect on that?

6    *A.* Yes. Actually, mass shootings are rare enough --

7    fortunately, they're rare enough, to predict them is difficult.

8    Nevertheless, as I said, the revealed preference -- the

9    large-capacity magazines are the mass murderer's weapon of

10   choice. We have to believe that if we deny them their weapon

11   of choice, they will be less effective at achieving their

12   horrific goals.

13              *MR. GROVE:* That's all I have, Your Honor.

14              *THE COURT:* Thank you.

15              Cross-examination.

16              *MR. KRUMHOLZ:* Thank you, Your Honor.

17                          **CROSS-EXAMINATION**

18   *BY MR. KRUMHOLZ:*

19   *Q.* Good afternoon.

20   *A.* Good afternoon.

21   *Q.* You have not attempted to quantify the number of 16-plus

22   magazines that might come into Colorado illegally, have you?

23   *A.* No.

24   *Q.* You're not aware of anyone else having done so, correct?

25   *A.* That's correct.

1  *Q.*  Now, if you had data on monthly sales of 16-plus magazines

2  before July 1, 2013, in the state of Colorado, you could

3  estimate what the future sales would have been in the absence

4  of 18-12-302, correct?

5  *A.*  Yes, one could.

6  *Q.*  But there is no such data that you're aware of, correct?

7  *A.*  That's correct.

8  *Q.*  You're not aware of any studies that address the subject of

9  the rate at which magazines drop out of circulation, correct?

10  *A.*  That's correct.

11  *Q.*  You've not reviewed any literature or studies specifically

12  addressing that topic, the depreciation rate of magazines,

13  correct?

14  *A.*  That's correct.

15  *Q.*  And you're not aware of any data that bears on that topic?

16  *A.*  I am not.

17  *Q.*  And you already testified on direct that you have no

18  expertise with respect to the mechanics of firearms, correct?

19  *A.*  That's correct.

20  *Q.*  So, of course, you have no expertise in how quickly various

21  parts of a firearm wear out, including magazines, correct?

22  *A.*  That's also correct.

23  *Q.*  And absent any data on the rate at which magazines drop out

24  of circulation, you cannot estimate the rate at which the

25  existing stock of 16-plus magazines will diminish in Colorado,

1   correct?

2   *A.*  I personally cannot, that's correct.

3   *Q.*  You testified at length that you expect in your expert

4   opinion that 18-12-302 will reduce the number of magazines --

5   of 16-plus magazines in Colorado, correct?

6   *A.*  I testified that it would reduce the number of those

7   magazines relative to what they would have otherwise been in

8   the absence of the law.

9   *Q.*  Thank you for that clarification.  But you haven't

10  quantified that expected reduction, correct?

11  *A.*  That's correct.

12  *Q.*  Now, you testified about your -- how your opinions in this

13  case are informed in part by the application of bedrock

14  economic principles, correct?

15  *A.*  Yes.

16  *Q.*  And in particular, there is the principle that behaviors

17  which become more costly in terms of time, money, effort are

18  less likely to be engaged in, correct?

19  *A.*  Yes.

20  *Q.*  And I believe you described that as the demand curve.

21  *A.*  Yes.

22  *Q.*  The principle that the college freshmen learn in the second

23  week of class, correct?

24  *A.*  Yes.

25  *Q.*  I believe you've also described that kind of principle as

1    being in the category of Econ 101, correct?

2    *A.* I don't believe I said that here, but I may well have said

3    it in my deposition.

4    *Q.* Thank you. And I think on direct you did say -- you do use

5    the phrase "fundamental economic logic," correct?

6    *A.* It's quite likely.

7    *Q.* And so you would consider that economic principle to be

8    supportive of your opinion that the number of 16-plus magazines

9    in Colorado will decrease, at least in comparison to what that

10   number would have been in the absence of the law, correct?

11   *A.* Yes.

12   *Q.* And you talked about -- you talked about incentives. And I

13   believe you mentioned that with respect to gun owners, one

14   incentive for not wanting to violate 18-12-302 is the incentive

15   of avoiding having their gun rights taken away, correct?

16   *A.* Yes. I testified that I imagined illegal possession of an

17   LCM might jeopardize what might have been otherwise legal

18   possession of other forms of firearms.

19   *Q.* And so it's your understanding, then, that violation of

20   12 -- 18-12-302 results in a gun owner losing his right to

21   possess a firearm?

22   *A.* No. I have -- although I have read that law -- that bill

23   with some care, I have not read the other rules and regulations

24   governing gun possession in the state of Colorado. So as a

25   general proposition, being found in possession of the illegal

1  large-capacity magazine would open one up to further scrutiny.

2  Whether that scrutiny would be to further charges of illegal

3  gun possession, it's certainly a risk.  I am not ready to state

4  how much of a risk it is.

5  *Q.*  However, you understand that the violation of 18-12-302 is

6  a misdemeanor, correct?

7  *A.*  I believe I remember that, yes.

8  *Q.*  You testified that evidence can come in two forms, correct?

9  And by that I mean, it can come in the form of empirical

10  evidence on the one hand and theoretical evidence on the other,

11  correct?

12  *A.*  Yes.

13  *Q.*  And so would you consider -- is it true that you consider

14  the application of the demand curve principle that we just

15  talked about as being in the theoretical domain of evidence?

16  *A.*  My discussion of the demand curve itself, yes, I agree was

17  in the theoretical domain of evidence.  My analysis of the

18  Virginia firearms clearing data -- clearinghouse data, I regard

19  as empirical verification of that theoretical discussion.

20  *Q.*  Now, the demand curve, the idea that behaviors which become

21  more costly are less likely to be engaged in, might apply to

22  different subsets of the population in different ways, correct?

23  *A.*  Yes.

24  *Q.*  For instance, if a cable -- TV cable subscription to the

25  Golf Channel resulted in an increase in one's bill of, say,

1    $50, many people would be unwilling to bear that cost, correct?

2    *A.*   Yes.

3    *Q.*   Maybe even most people?

4    *A.*   Certainly myself.

5    *Q.*   But there might be a subset of the population for whom the

6    Golf Channel is of sufficient importance that they might be

7    willing to pay that extra amount, correct?

8    *A.*   I would expect so.

9    *Q.*   Now, if we apply the principle we've been discussing,

10   demand curve, to the -- to this case, to the -- to the

11   situation of 18-12-302, the behavior that's being made more

12   costly is the acquisition of magazines of rounds of 16 or more,

13   correct?

14   *A.*   Yes.

15   *Q.*   And so your point is that 18-12-302 will make it more

16   costly for Colorado citizens to acquire 16-plus magazines,

17   correct?

18   *A.*   Yes.

19   *Q.*   And so one added cost of -- one added cost is that Colorado

20   citizens now must drive all the way to Wyoming or some other

21   bordering state in order to acquire a 16-plus magazine,

22   correct?

23   *A.*   That would be one added element of the cost.

24   *Q.*   And it's safe to assume that at least some Colorado

25   citizens will not be sufficiently motivated to make that trip,

1  correct?

2  *A.* Correct.

3  *Q.* And another added cost is the fact that if -- we just

4  discussed this -- is the fact that now if a Colorado citizen

5  wants to acquire a 16-plus magazine, he or she must violate the

6  law to do so, correct?

7  *A.* Yes.

8  *Q.* One would hope, at least, that most Coloradans are

9  unwilling to bear the cost of violating state law and risking

10  prosecution, correct?

11  *A.* Yes.

12  *Q.* But it's true that there will still be people in Colorado

13  who are sufficiently motivated to bear that cost in order to

14  acquire an illegal magazine, correct?

15  *A.* Unless the cost is enormous, I believe that's correct.

16  *Q.* Now, you submitted three expert reports in this case,

17  correct?

18  *A.* Yes.

19  *Q.* There was an initial one in August of last year, then a

20  supplemental report you submitted in September, and then there

21  is the one that we discussed this morning at some length that

22  was submitted sometime earlier this year.  Correct?

23  *A.* Yes.

24  *Q.* With respect to your initial expert report in which you

25  opined that 18-12-302 will reduce the number of 16-plus

1  magazines in Colorado, at least in the absence of that law, you

2  failed to account for the possibility that 16-plus magazines

3  could still be illegally imported from other states, correct?

4        MR. GROVE:  Objection.  Assumes facts not in evidence.

5        THE COURT:  Response.

6        MR. KRUMHOLZ:  Well, I'd be happy to show the witness

7  his expert report, Your Honor.

8        MR. GROVE:  The report is not in evidence.  Dr. Zax's

9  testimony today here is the expert opinion that he's expressed

10  in this case.

11        THE COURT:  I overrule the objection.  With regard to

12  this expert's opinion, it is as important what he did not

13  consider as it is what he considered; and it is appropriate for

14  plaintiffs' counsel to inquire as to that.

15        You may answer the question.  Do you need to have it

16  read back?

17        THE WITNESS:  Yes, please.

18        (Question read back by reporter.)

19        THE WITNESS:  Originally, yes, that's correct.

20  BY MR. KRUMHOLZ:

21  Q.  In fact, you cannot rule out the possibility that illegal

22  importation might be of significant magnitude so as to

23  nevertheless maintain the stock of 16-plus magazines at its

24  pre-bill level, correct?

25  A.  That's correct.

1   *Q.* Let's move on to the Virginia clearinghouse database that

2   you discussed with Mr. Grove.  The Virginia clearinghouse data

3   you obtained consisted of annual spreadsheets from 1993 to

4   2013, correct?

5   *A.* Yes.

6   *Q.* And those spreadsheets list individual firearms that had

7   been reported to the clearinghouse?

8   *A.* Yes.

9   *Q.* And the -- as I understand it, the entry for each firearm

10  also includes several characteristics of those firearms,

11  correct?

12  *A.* Yes.

13  *Q.* One of which, as you discussed, was the size of the

14  magazine?

15  *A.* Yes.

16  *Q.* On the form that the police use to report a firearm to this

17  database, there is also a field to describe how the firearm

18  came into the possession of police, correct?

19  *A.* Yes.

20  *Q.* And the firearms were reported to this clearinghouse

21  pursuant to Virginia law; is that right?

22  *A.* That's my understanding.

23  *Q.* And it's also your understanding, is it not, that the

24  law -- the Virginia law established a central repository of

25  information regarding all firearms, and I quote from the law,

1    "seized, forfeited, found, or otherwise coming into the

2    possession of Virginia law enforcement, which are believed to

3    have been used in the commission of a crime."  Does that sound

4    accurate?

5    *A.*  That is -- I recall having read that also.

6    *Q.*  And it's your understanding, correct, that all of the

7    firearms included in the database were included because they

8    were suspected of being used in the commission of a crime,

9    correct?

10   *A.*  It's my understanding that all of the firearms recorded in

11   that database were recorded in accordance with the regulations

12   governing the database.

13   *Q.*  Thank you.  That was my next question, which is, the sole

14   source of your understanding is based on the statute, correct?

15   *A.*  That's correct.

16   *Q.*  You did not review the spreadsheets to confirm that

17   understanding, did you?

18   *A.*  I do not see how the contents of the spreadsheets would

19   bear on the question of whether or not the firearm was entered

20   in accordance with the statute.

21   *Q.*  Well, weren't there entries, for example, in that -- in

22   that description field that explained how the firearm came into

23   the possession of the police?

24   *A.*  You asked me to read about that.

25   *Q.*  And so some of those descriptions might indicate, for

1    example, that the person who turned in the firearm to the

2    police had found it in -- in the attic of a new home that he

3    purchased?

4    *A.*  That doesn't preclude the possibility that it had been

5    involved in the commission of a crime.

6    *Q.*  But in that circumstance that I just -- that circumstance

7    that I just described, there would be no reason for the police

8    to suspect that, right?

9    *A.*  I don't -- I'm not aware of the laws governing firearm

10   possession in the state of Virginia, whether or not it is legal

11   to leave an unattended firearm in an attic of an unoccupied

12   home is a question that I can't answer.  The one thing that I

13   can say for certain is that if the description of the manner in

14   which the firearm came into their possession did not say, this

15   was not involved in the crime, the presumption has to be that

16   it was added to the database in accordance with the statute

17   governing the database, and there was a suspicion that it was

18   involved in a crime.  As I understand the statute, it seemed

19   pretty clear to me that what was, essentially, a suspicion, not

20   a determination.

21   *Q.*  Well, at any rate, your opinion is that the exercise of

22   reviewing the spreadsheets in order to try to determine whether

23   your understanding of the reason for its inclusion in the

24   database, that exercise would not be useful, correct?

25   *A.*  Again, unless there are entries that assert that the gun

1    was not suspected of being involved in a crime, I can't think

2    of any reason to overturn the presumption that the database was

3    maintained as the statute required it to be.

4    Q.  There appear to be no standardized systems for the person

5    filling out the form to describe how the firearm came into the

6    possession of the police, correct?

7    A.  That's my observation as well.

8    Q.  And so -- I apologize if I already asked this -- but there

9    is no way to tell from the spreadsheets themselves whether each

10   particular firearm was in fact listed because it was suspected

11   of being used in the commission of a crime, correct?

12   A.  The fact that it is included in the spreadsheet is a

13   presumption that it was done so because it was suspected of

14   being included in a crime.  My impression of state employees in

15   a variety of different capacities is that they do not go out of

16   their way to fill out unnecessary forms.

17   Q.  Now, even though you received spreadsheets from Virginia

18   through 2013, you testified that you only included in your

19   regression analysis the data from '93 to 2010, correct?

20   A.  Yes.

21   Q.  So you omitted from your analysis three years' worth of

22   data, correct?

23   A.  That's correct.

24   Q.  And that's because, as you testified on direct, starting in

25   2011, there was a marked decrease in the number of firearms

1   that had been reported to the database, correct?

2   *A.*  Yes.  To be more specific, the number of reports from 2010

3   seemed to be on the order of 3- to 7,000 per year.  The reports

4   in 2011 and 2012 I think were both 396, and in 2013, it was 700

5   and some.  So that contrast seemed so radical, that suggested

6   that there had been a change in the way the database was

7   administered.  And I wasn't able to identify the source of that

8   change, so --

9   *Q.*  In other words, you were provided no explanation for the

10  apparent change?

11  *A.*  I was provided no information.  And I did find the

12  officials in charge of the database to be somewhat elusive, at

13  least via e-mail.

14  *Q.*  You didn't do a regression analysis that included those

15  years; is that correct?

16  *A.*  That's correct.

17  *Q.*  Now, if the number of firearms reported changes

18  significantly, as you just explained they did after 2010, that

19  would not necessarily affect the proportion of firearms with

20  LCMs that came into the possession of the police, would it?

21  *A.*  Not necessarily.  But a change that radical suggests that

22  something substantial happened in the reporting standards.

23  It's possible that that wouldn't have changed the proportions

24  of confiscated weapons that were equipped with LCMs, but the

25  likelihood was that -- I'm sorry, the change was of

1    sufficiently great scope that I felt it was -- it would be

2    improper to assume that the underlying process had not been

3    disturbed.

4    Q.   In your view -- are you testifying that it's impossible for

5    the data for the years 2011 to 2013 to be relevant?

6    A.   No.

7    Q.   You did not examine those 2011 through 2013 spreadsheets to

8    determine whether the proportion of confiscated firearms

9    with -- equipped with ten-plus magazines increased or

10   decreased, did you?

11   A.   No, I did not.

12   Q.   So it's possible, isn't it, that the proportion of

13   confiscated firearms equipped with ten-plus magazines increased

14   during those years?

15   A.   It could have gone in any direction.  The relevant question

16   is, would any changes have been motivated by the same factors

17   that dictated the evolution of that percentage over the period

18   of time that I did examine.  I wasn't sufficiently confident

19   that I could answer that question affirmatively, to include

20   those years in my analysis.

21            MR. KRUMHOLZ:  Your Honor, this might be a good place

22   for a break.  I'm not sure if you want to take one, though.

23            THE COURT:  We can take a mid-afternoon recess.

24   That's fine.

25            MR. KRUMHOLZ:  Thank you.

1    *THE COURT:*  Court clock is showing about quarter after

2    3:00, and we'll reconvene at 3:35.  We'll stand in recess until

3    then.

4              (Recess at 3:14 p.m.)

5              (In open court at 3:41 p.m.)

6              *THE COURT:*  You may resume.

7         *MR. KRUMHOLZ:*  Thank you, Your Honor.

8    *BY MR. KRUMHOLZ:*

9    *Q.*  Professor, if we could go back to the spreadsheets for a

10   moment.  We were talking about those earlier.  And I wanted to

11   ask you, in compiling the data based on the spreadsheets, there

12   was a column for -- that listed the magazine size, correct?

13   *A.*  Yes.

14   *Q.*  And so I just wanted to ask you -- and I know on direct you

15   mentioned that there were many entries that did not contain a

16   description of the magazine size, right?

17   *A.*  I believe I testified that there were 7,981 out of 101,326.

18   *Q.*  Thank you.  And I know you explained on direct how you

19   accounted for those missing -- those missing data.  And you

20   just counted those ones that were missing as being firearms

21   with less than 11 -- magazines with less than 11 rounds,

22   correct?

23   *A.*  That's how I accounted for them in the regression that you

24   see in document -- the document that has been disclosed.

25   *Q.*  Right.  Thank you.  I just wanted to ask, then, did you

1  also correct for entries that may have been in error?  And let

2  me give you an example.  If there were one that said that the

3  magazine limit was 380, and it was apparent that that was --

4  that was a description for the caliber and not the magazine,

5  did you account for any obvious errors like that?

6  *A.*  Thank you for asking.  I did notice extreme values that I

7  thought of as implausible, and I did exclude them.  I do not

8  remember what the range was, but I know there was some maximum

9  value above which I chose to conclude that the magazine size

10 had been misreported.  And it was large, it was certainly in

11 the hundreds, but I don't remember specifically what it was.

12 *Q.*  Thank you.  We talked about the example of -- for example,

13 a firearm that was found in an attic by a new homeowner.  And I

14 just wanted to ask you, because you indicated you didn't know

15 the specifics of Virginia laws on gun ownership, correct?

16 *A.*  Yes.

17 *Q.*  You're not aware of a Virginia law that would require a

18 license just to own a gun, are you?

19 *A.*  No.  I'm not aware.

20 *Q.*  I wanted to ask you, have you heard of something called

21 Project Exile?

22 *A.*  No.

23 *Q.*  I'll just represent to you that Project Exile was a

24 campaign centered in Richmond, Virginia, and coordinated

25 between federal, state, and local law enforcement to

1  aggressively prosecute gun crimes.  Did your regression

2  analysis account for the potential influence of Project Exile

3  on the proportion of confiscated firearms equipped with

4  ten-plus magazines?

5  *A.*  No.  Excuse me.  No.

6  *Q.*  So it's possible, isn't it, that the decline in the

7  proportion of confiscated firearms with LCMs was influenced by

8  the success of Project Exile?

9      *MR. GROVE:*  Objection, foundation.  Dr. Zax has

10  testified that he has no knowledge of Project Exile.

11      *THE COURT:*  Sustained.

12      *MR. KRUMHOLZ:*  Thank you, Your Honor.

13  *BY MR. KRUMHOLZ:*

14  *Q.*  Professor, have you heard of a project called Virginia

15  Exile?

16  *A.*  No.

17  *Q.*  And I'll represent to you, then, that Virginia Exile was an

18  expanded --

19      *THE COURT:*  Counsel, if he doesn't know what this is,

20  I don't know where it leads.

21      *MR. KRUMHOLZ:*  Thank you, Your Honor.  I'll move on.

22      *THE COURT:*  Thank you.

23  *BY MR. KRUMHOLZ:*

24  *Q.*  I just wanted to confirm, Professor, that -- I believe you

25  testified on this -- on direct, your analysis of the Virginia

1 clearinghouse data is in support of your Opinion 1, correct?

2 *A.* I believe that's true, but it would be helpful at this

3 point in the day for someone to remind me what number I

4 attached to which of my opinions.

5 *Q.* That's fair. And so let me do that for you.

6 Opinion 1 is the opinion -- this is from defendant's

7 proffered expert opinions, "HB 1224 will reduce the number of

8 large-capacity magazines in circulation relative to the number

9 that would be in circulation without the legislation."

10 *A.* Thank you. Yes, then my analysis of the Virginia firearms

11 data was in support of that opinion.

12 *Q.* Thank you. And your regression analysis does not relate to

13 any of your other three opinions, correct?

14 *A.* That's correct.

15 *Q.* Now, you did not correlate your findings from the -- sorry.

16 Let me start over. You did not correlate your findings from

17 the regression analysis to crime rates in Virginia during the

18 same time period, did you?

19 *A.* No.

20 *Q.* And you did not correlate your findings from the regression

21 analysis with homicide rates either, correct?

22 *A.* Correct.

23 *Q.* Now, even if the number of confiscated firearms with LCMs,

24 by which we mean large-capacity magazines, decreased in

25 Virginia, as your analysis suggestions, it is not necessarily

1  the case that the overall number of crimes being perpetrated

2  with such firearms was also decreasing, correct?

3  A.  I'm sorry, the first part of that question is incorrect.  I

4  didn't demonstrate that the number of firearms with

5  large-capacity magazines declined --

6  Q.  Let me rephrase that.  I understand that, and thank you.

7       Even if -- even if it's true that the 1994 ban did

8  have an influence on the declining number of confiscated

9  firearms with LCMs, it is not necessarily the case that the

10  overall number of crimes being perpetrated with such firearms

11  was also decreasing, correct?

12  A.  Let me assist you here.  What I showed was that the ban

13  reduced the proportion of confiscated firearms that were

14  equipped with the large-capacity magazines.  My results do not

15  speak to the question of what may have happened to the either

16  proportioned or numbers of crimes that were committed with

17  large-capacity magazines.

18  Q.  I appreciate your help.  Thank you.

19  A.  You're welcome.

20  Q.  You discussed with Mr. Grove the fact that the 1994 ban was

21  a federal law, so it applied nationally, correct?

22  A.  I'm sorry, could you repeat that?

23  Q.  Yes.  You discussed with Mr. Grove the fact that the 1994

24  federal law was federal and, therefore, it applied nationally,

25  correct?

1    *A.*   Yes.

2    *Q.*   And in contrast, I think you acknowledge that Section

3    18-12-302 only applies within the boundaries of the state of

4    Colorado, correct?

5    *A.*   Yes.

6    *Q.*   And it's true, isn't it, that there are no limitations on

7    magazine size in the states that border Colorado, correct?

8    *A.*   I don't know that as a fact, but I have no reason to

9    disagree.

10   *Q.*   Okay.  Thank you.  And so it's true, isn't it, that the

11   number of 16-plus magazines that might be imported into

12   Colorado is not finite, correct?

13          *MR. GROVE:*  Objection, vague.

14          *THE COURT:*  Sustained.

15          Would you rephrase.

16          *MR. KRUMHOLZ:*  Yes, Your Honor.

17   *BY MR. KRUMHOLZ:*

18   *Q.*   It's true that you cannot quantify the number of 16-plus

19   magazines that might be imported into Colorado, correct?

20   *A.*   Imported illegally, yes, that's correct.

21   *Q.*   In fact, so long as bordering states do not enact a similar

22   to Colorado, the supply of 16-plus magazines that would could

23   be imported to Colorado is inexhaustible, correct?

24   *A.*   I agree that there are many large-capacity magazines not

25   currently available in Colorado that under appropriate

1    conditions could become available in Colorado.  Of course, how

2    many actually became available would be -- would depend on the

3    cost of acquiring them.  And as we've spoken, my understanding

4    is that the law will make that cost quite high.

5    *Q.*  Professor, one must use care in drawing inferences for

6    Colorado based on the experience in another state, correct?

7    *A.*  One must use care whenever one draws inferences.

8    *Q.*  Colorado has different demographics from Virginia, for

9    example, correct?

10   *A.*  I haven't looked at that explicitly, but I would certainly

11   believe it.

12   *Q.*  And you probably haven't looked at this either, but,

13   presumably, it also has a different dispersion of population,

14   correct?

15   *A.*  Yes, I'd expect to find that as well, were I to look.

16   *Q.*  Let's turn to the sheriffs' interrogatories.  You compiled

17   some interrogatory responses that were provided by the

18   plaintiff sheriffs in this case, correct?

19   *A.*  Yes.

20   *Q.*  And you would -- you would characterize what you did with

21   the interrogatory responses as an analysis of empirical data,

22   correct?

23   *A.*  Yes.

24   *Q.*  In fact, I think -- I think you called the sheriffs'

25   interrogatory responses "reports," correct?

1    *A.*  I may have used that word.  I don't recall.

2    *Q.*  And based on that compilation of interrogatory responses,

3    you arrived at some conclusions concerning the frequency of

4    home invasions in the areas represented by the responding

5    sheriffs, right?

6    *A.*  Yes.

7    *Q.*  Now, you personally had no contact with the sheriffs in

8    connection with the responses, correct?

9    *A.*  Yes.

10   *Q.*  So you don't know what methodology each of the sheriffs

11   used to compile the necessary information to respond to the

12   interrogatories, correct?

13   *A.*  I thought the interrogatories were clear and

14   straightforward.  It hadn't occurred to me to characterize the

15   effort necessary to respond as a methodology, but it is true

16   that I have only their submitted responses.  I know nothing

17   further about how those responses were compiled.

18   *Q.*  I appreciate that.  Thank you.

19   *A.*  I do expect that they responded to the interrogatories with

20   appropriate respect for our request, duly authorized by the

21   court in these proceedings.

22   *Q.*  Nor do you know, Professor, what filing and retention

23   policies each of the sheriffs have in place with respect to

24   their records, correct?

25   *A.*  I certainly don't know what practices they have.  I have a

1    strong sense as to what practices they should have.

2    *Q.*  Now, the interrogatory that gave rise to the sheriffs'

3    responses asked them to identify all home invasions to which

4    their respective departments responded since January 1, 2004,

5    correct?

6    *A.*  Yes.

7    *Q.*  It also asked them to identify any of those home invasions

8    in which any person, quote, used or displayed, unquote, a

9    firearm, correct?

10   *A.*  Without a document in front of me, I can't be certain.  But

11   I'm a little suspicious of a question that did not distinguish

12   between perpetrators and victims.  It may have been phrased

13   that way, but I don't recall it.

14   *Q.*  Would it help, Professor, to take a quick look at the

15   interrogatories just to refresh your recollection?

16   *A.*  If you wish me to testify as to its contents, yes, that

17   would be helpful.

18   *Q.*  Well, I don't -- well, I appreciate that.

19          Your Honor, may we have Exhibit 139 shown to Professor

20   Zax.

21          *COURTROOM DEPUTY:*  Book 139?

22          *MR. KRUMHOLZ:*  You know, I don't know --

23          *COURTROOM DEPUTY:*  Oh, interrogatories.

24   *BY MR. KRUMHOLZ:*

25   *Q.*  Thank you.  Professor, if you could turn to page 3.

1  *A.*  Yes.

2  *Q.*  And just look at paragraph B, the first -- paragraph 1B,

3  the first line.

4  *A.*  Yes.

5  *Q.*  Okay.  Now, let me -- having taken a look at it, Professor,

6  you can just put that aside.

7        Now, let me ask you, it's -- it's correct, isn't it,

8  that the interrogatory asks them to identify whether a firearm

9  was fired or otherwise, quote, used or displayed, unquote.

10  Correct?

11  *A.*  I believe that's correct.

12  *Q.*  Now, the word "used," the verb "used" was not defined in

13  the interrogatory, correct?

14  *A.*  I didn't see a definition, no.

15  *Q.*  It would be important to know if each of the 54 responding

16  sheriffs interpreted the word "used" in the same way, correct?

17  *A.*  In some sense, yes.  Although it's hard for me to imagine

18  that the range of possible interpretations is very broad.

19  *Q.*  Well, in that case, Professor, how would you -- how would

20  you define the word "used" as it was used in the interrogatory?

21  *A.*  I'm sorry, could you -- the last bit of that, could you

22  repeat?

23  *Q.*  Sorry.  How would you define the verb "used" as it was used

24  in the interrogatory?

25  *A.*  I think that the interrogatory, as you say, does not

1 restrict what "use" might mean. So if it were -- I to be

2 answering it, I would report any instance in which any of the

3 participants had displayed a gun or a firearm or done anything

4 more of -- had used it with any greater intensity. I guess

5 it's hard for me to imagine that "use" would refer to anything

6 other than either the initiation or the response to some

7 violent interaction. I mean, I don't think they're using them

8 as planters. So it's hard to imagine a use that wouldn't be

9 relevant to my analysis.

10 *Q.* I understand. Just so we're clear, then, you would include

11 within the verb "used," a use of the firearm that doesn't

12 include actually discharging it, correct?

13 *A.* Yes.

14     *MR. KRUMHOLZ:* Your Honor, pardon me for just one

15 second.

16 *BY MR. KRUMHOLZ:*

17 *Q.* It's possible, though, Professor, that the sheriffs may not

18 have understood the word "used" in the way that you just

19 described it?

20 *A.* The range of --

21     *MR. GROVE:* Objection, Your Honor. Foundation.

22     *THE COURT:* Response.

23     *MR. KRUMHOLZ:* Your Honor, I -- Professor Zax has

24 testified at length about these interrogatory responses from

25 the sheriffs. They form a significant part of his expert

1    report and his expert opinions.  I think he has a foundation to

2    answer this question.

3              THE COURT:  Well, it's a rhetorical question.

4              MR. KRUMHOLZ:  Would you like me to move on?

5              THE COURT:  Yes.

6              MR. KRUMHOLZ:  I will.

7              THE COURT:  Thank you.

8    BY MR. KRUMHOLZ:

9    Q.  Professor, I already said, there were 54 sheriffs who

10   responded, correct?

11   A.  Yes.

12   Q.  Representing counties from all over the state, correct?

13   A.  Yes.

14   Q.  And the representative counties included rural counties

15   with very small populations, correct?

16   A.  Yes.

17   Q.  As well as counties along the Front Range, for example,

18   with much larger populations, correct?

19   A.  Yes.

20   Q.  And it's reasonable to assume that some of the sheriffs in

21   the larger counties, at least in terms of population, have much

22   larger staffs, correct?

23   A.  Yes.

24   Q.  And, conversely, the sheriffs in the smaller counties in

25   terms of population would have smaller staffs, correct?

1  *A.*  That would be reasonable.

2  *Q.*  So some sheriffs might have much more limited resources

3  available to them to gather the necessary information to

4  respond to the State's interrogatories, correct?

5      *MR. GROVE:*  Your Honor, I object to this line of

6  questioning to the extent that it implies that the

7  interrogatories were somehow incomplete.  It's been represented

8  by the plaintiffs that the interrogatory responses were in fact

9  complete.

10      *THE COURT:*  I'm not sure that's an objection to the

11  question that's posed.  I think that's an argument to be made

12  later on.

13      I think the problem may pertain to the way the

14  questions are framed.  You're certainly free to ask this

15  witness what he considered and what he didn't consider, but you

16  cannot ask for him to speculate about what someone else

17  considered or did not consider.

18      *MR. KRUMHOLZ:*  Thank you, Your Honor.

19  *BY MR. KRUMHOLZ:*

20  *Q.*  Professor, were you aware that every sheriff's

21  interrogatory response included the specific objection that the

22  verb "used" was ambiguous?

23      *MR. GROVE:*  Objection, relevance.

24      *THE COURT:*  Response.

25      *MR. KRUMHOLZ:*  Your Honor, the definition of "used" in

1    this case is very pertinent to the question of the necessity

2    for possession of firearms.

3         THE COURT:  Okay.  I'm not sure, listening to your

4    question, what the verb "used" was contained in.  We've used

5    "used" in a number of different contexts, and you've most

6    recently been discussing an interrogatory.  Now, it's possible

7    that that's what you're referring to.  I don't know.  Is it?

8         MR. KRUMHOLZ:  It is.

9         THE COURT:  Okay.  And perhaps the way to get at this

10   is to ask the witness whether he saw the responses to the

11   interrogatories.

12        MR. KRUMHOLZ:  I appreciate that.

13        THE COURT:  Thank you.

14   BY MR. KRUMHOLZ:

15   Q.  Professor, did you see the responses to the

16   interrogatories?

17   A.  Yes.

18   Q.  And so I'll ask you the question again.  Were you aware,

19   then, having reviewed the interrogatory responses, that the

20   sheriffs specifically objected as ambiguous to the use of the

21   word "used"?

22        MR. GROVE:  Objection, relevance.

23        THE COURT:  Overruled.

24        THE WITNESS:  Yes, I noticed that objection.  And I

25   have to say, I found it difficult to take seriously.  I felt

1    "used" was relatively open-ended and invited report of almost

2    any use -- invited the report of almost any action involving

3    the use of a firearm, which to me seemed appropriate --

4    *BY MR. KRUMHOLZ:*

5    *Q.*  Thank you, Professor.

6    *A.*  -- for the purpose at hand.

7    *Q.*  Thank you.  Let's move on to a different topic.  Still on

8    the interrogatory responses.

9         Could you turn to -- actually, I don't know if he has

10   it.

11        Ms. Glover, I'd like Professor Zax to take a look at

12   Exhibit 59.

13        *COURTROOM DEPUTY:*  Sure.

14        *MR. KRUMHOLZ:*  Thank you.

15   *BY MR. KRUMHOLZ:*

16   *Q.*  Professor, do you have Exhibit 59 in front of you?

17   *A.*  Yes, I do.  I recognize it.

18   *Q.*  Now, if we look at the third column, it shows population in

19   plaintiff counties by year, correct?

20   *A.*  Yes.

21   *Q.*  And by population in plaintiff counties, you meant that

22   those were the populations of the counties for each of the

23   sheriffs who responded to the interrogatories, correct?

24   *A.*  Yes.

25   *Q.*  Now, we had some discussion about this earlier.  In your

1  supplemental report in which you discussed these interrogatory

2  responses, you were careful to note that the population numbers

3  shown in column 3 of Exhibit 59 may be overstated to the extent

4  the sheriffs answering the interrogatory did not have reporting

5  responsibility for the entire county, correct?

6  *A.* Yes.

7  *Q.* And you mentioned that you weren't sure of the extent to

8  which that was true, because the interrogatory responses didn't

9  say anything about that issue, correct?

10  *A.* That's correct.

11  *Q.* Now, were -- I want to ask, do you know whether there was

12  interrogatory that actually asked the sheriffs to identify

13  that -- that issue?

14  *A.* My memory is that there was not. However, if I were

15  reporting this data, I would certainly want to report the

16  jurisdiction to which it was relevant. So it would seem like a

17  natural -- it would seem like a requirement for interpreting

18  the data correctly.

19  *Q.* And so, Professor, your point was that -- in acknowledging

20  that the numbers in column 3 might be overstating, your point

21  was that, for example, the sheriff of Weld County may have no

22  reporting responsibility for the city of Greeley, correct?

23  *A.* That's possible.

24  *Q.* And because the city of Greeley has its own police force,

25  correct?

1   *A.*  I have no personal knowledge of that, but I have no reason

2   to disagree.

3   *Q.*  Thank you.  And the same could be true for Colorado

4   Springs, correct?

5   *A.*  It could be.  Although, at the same time, there may also be

6   joint responsibilities that, again, are not reported here.

7   That is, it's possible that even if a municipality has its own

8   law enforcement agency, that the sheriff's office might have

9   responsibility over that jurisdiction in some domains as well.

10  None of that is in my investigation.

11  *Q.*  What you're saying is, you don't know that to be true?

12  *A.*  I don't know it to be true, and I don't know it to be

13  false.

14  *Q.*  Okay.  Now, you acknowledge, wouldn't you, Professor, that

15  to the extent large urban areas like Colorado Springs were not

16  included in the sheriff's -- not covered by the sheriff's

17  interrogatory responses, that the numbers reported in column 3

18  might be significantly overstated?

19  *A.*  Well, the population of Colorado Springs is several hundred

20  thousand.  Yes, if the sheriff of that -- the county which

21  Colorado Springs is located did not have any responsibility for

22  Colorado Springs, then the population -- that population in

23  Colorado Springs would -- it should not have been included in

24  these totals.

25  *Q.*  Do you have any data, Professor, that speaks to the

1    incidents of home invasions in urban areas versus rural areas?

2    *A.*  No.

3    *Q.*  And the numbers shown in column 3 of Exhibit 59 obviously

4    don't include the counties whose -- whose sheriffs were not

5    plaintiffs in this lawsuit, correct?

6    *A.*  That's correct.

7    *Q.*  So that would include, for example, the city and county of

8    Denver?

9    *A.*  That's my understanding, yes.

10   *Q.*  So you had no data on how many invasions for the city and

11   county of Denver, correct?

12   *A.*  That's correct.  At least -- I'm sorry, at least not for

13   the purposes of this analysis.

14   *Q.*  Right.  And it would be reasonable to assume, wouldn't it,

15   Professor, that home invasions are more frequent in Denver than

16   many other parts of the state?

17          *MR. GROVE:*  Objection, foundation.

18          *THE COURT:*  Response.

19          *MR. KRUMHOLZ:*  Well, Your Honor, I only asked if

20   that's reasonable.  I'm not asking for his personal knowledge.

21   I'm asking him to express whether that's a reasonable

22   assumption.

23          *THE COURT:*  Well, the problem is, whether something is

24   reasonable enough has -- reasonable or not has to be based on

25   something.  So, here, I agree with the defendants that there

1   needs to be some foundation laid for how this witness would

2   determine something to be reasonable.

3           *MR. KRUMHOLZ:*  Thank you, Your Honor.

4           *THE COURT:*  Thank you.

5   *BY MR. KRUMHOLZ:*

6   *Q.*  Professor, you testified that you have no knowledge of the

7   incidents of home invasions in urban areas like the city and

8   county of Denver?

9   *A.*  That's correct.

10  *Q.*  And wouldn't it be important to know that in trying to

11  determine the frequency of home invasions in the entire state

12  of Colorado?

13  *A.*  It would certainly be useful.

14  *Q.*  Let's go to Exhibit 62, Professor.  Do you have that?

15  *A.*  Yes.

16  *Q.*  This is a table entitled Home Invasions in Plaintiff

17  Counties in which Perpetrators Displayed Firearms, correct?

18  *A.*  Yes.

19  *Q.*  And I assume that with respect to all of these tables that

20  have this column titled "population of plaintiff counties,"

21  that they're subject to the same caution that you noted with

22  respect to the table we just looked at, correct?

23  *A.*  It is the same data in each of these tables.

24  *Q.*  Now, look at the title.  It says, Home Invasions in

25  Plaintiff Counties in which Perpetrators Displayed Firearms.

1  But then if we look at the headings for column 3 and column 5,

2  they both use the verb "possessed," correct?

3  *A.*  I noticed that, yes.

4  *Q.*  And I think this is implicit in a conversation we had just

5  a moment ago.  But just to make it explicit, you do not

6  consider the display of the firearm and the possession of a

7  firearm to be synonymous, do you?

8  *A.*  Ordinarily not.  It is possible that I used them as

9  synonyms in constructing this table, in which case that was an

10  inaccuracy that I regret.

11  *Q.*  And do you recall which verb, "displayed" or "possessed,"

12  was used in the interrogatory to the sheriffs?

13  *A.*  I do not have a firm recollection of that.  My sense is

14  that possession would not necessarily have been known.  That

15  is, if someone was concealing a weapon on themselves as they

16  invaded a home and left without displaying it, it wouldn't have

17  been apparent to anyone else, and therefore wouldn't have been

18  recorded.  So if I had to choose right now as to which of these

19  was more appropriate, I would go for display.

20  *Q.*  Professor, you also have a table where you showed for

21  comparison the number of lightning casualties in Colorado for

22  this same period, correct?

23  *A.*  Yes.

24  *Q.*  And your calculations are that from 2004 to 2012, an

25  average of just under three people per million Coloradans --

1  three Coloradans per million were killed or injured by

2  lightning, correct?

3  *A.* I would have to see the table again to be certain of the

4  quantity; but that's in the right range, certainly.

5  *Q.* And your point in using that table and showing it here in

6  court was that the number three lightning casualties per

7  million population is rare, correct?

8  *A.* Yes.

9  *Q.* And from those numbers, you drew a comparison to home

10 invasions, and you concluded that casualties inflicted by

11 lightning were about as frequent as home invasions in which

12 victims displayed firearms, correct?

13 *A.* I believe so.

14 *Q.* And you also noted that casualties inflicted by lightning

15 were twice as likely as home invasions in which perpetrators

16 discharged firearms?

17 *A.* Again, to be certain, I would have to refer to the specific

18 table; but that does sound like the right order of magnitude.

19 *Q.* I appreciate that. And in the interest of efficiency, I

20 appreciate your willingness to take my word for it.

21      So your conclusion is that, based on the sheriffs'

22 interrogatories, interrogatory responses, the need for a

23 firearm in self-defense in a home, at least in the areas of

24 Colorado represented by those responses, is as rare as being

25 injured by lightning, correct?

1    *A.* No.  I believe my conclusion was that the experience of

2    using a firearm in response to a home invasion was as unlikely

3    as the experience of suffering an injury or fatality due to a

4    lightning strike.

5    *Q.* And I appreciate that clarification.  And now we're back to

6    a conversation we had a moment ago.  When you just answered my

7    question just now, you used the word "used."  How did you mean

8    it?

9    *A.* Again, I am simply repeating the representation that the

10   sheriffs made when they responded to the interrogatories.  I

11   guess to the extent that I thought about it, "use" to me meant

12   anything from display through discharge.

13   *Q.* Okay.  Thank you for the clarification.

14            Now, after all of this talk of home invasions, it's

15   your opinion that the benefits of 18-12-302 will be limited

16   with respect to home invasions, correct?

17   *A.* I'm pretty sure I never framed my opinion in that way.

18            *MR. KRUMHOLZ:* Ms. Glover, I wonder if we can have the

19   October 31 deposition of Professor Zax handed to him.

20   *BY MR. KRUMHOLZ:*

21   *Q.* Professor, could you turn to page 127, line 23.

22   *A.* Yes.

23   *Q.* And I'll just read that, that question and answer on pages

24   127 and 128.

25            Question:  "Then what benefit is determined from

1  having a 15-round limitation regarding home invasions?"

2       Answer:  "With regard to home invasions, I think these

3  data suggest that the benefits would be limited.  That is, home

4  invasions -- what few home invasions take place do so without

5  the aid of large-capacity magazines.  The absence of

6  large-capacity magazines would probably not have much effect on

7  the frequency with which they occur in the future."

8       Did I read that correctly, Professor?

9  A.  Yes, you did, and quite gracefully.

10 Q.  Thank you.

11      Let's move to a different topic, Professor.

12      This question about the frequency of home invasions

13 relates to the issue of defensive gun use, correct?

14 A.  Yes.

15 Q.  And in your supplemental report, you noted that Professor

16 Kleck estimates that there were five times as many defensive

17 gun uses as there were crimes in which offenders used guns,

18 correct?

19 A.  I -- yes, I believe I quoted him to that effect.

20 Q.  And your point in quoting Professor Kleck to that effect

21 was that if his estimate is correct, then at least 80 percent

22 of the instances in which individuals claim to be defending

23 themselves with firearms, their alleged assailants were not

24 similarly armed, correct?

25 A.  I believe that's correct.

1    *Q.*  And you wrote in your supplemental report -- I'm going to

2    quote from it, Professor.  And I'll represent to you this is

3    what it says:  "This raises the substantial question of what

4    threats these individuals thought they faced and why they

5    understood those threats to be so substantial as to require

6    armed response."

7            Does that sound close to what you remember including

8    in your report?

9    *A.*  That sounds like my golden prose.

10   *Q.*  Now, it's certainly possible that criminals can use weapons

11   other than firearms to accomplish their crimes against their

12   victims, correct?

13   *A.*  Yes.

14   *Q.*  A butcher knife, for example?

15   *A.*  Yes.

16   *Q.*  And it's possible to imagine the scenario in which an

17   elderly person would feel that a much younger and stronger

18   assailant, even one unarmed, is enough of a threat to warrant

19   an armed response, correct?

20   *A.*  Yes.

21   *Q.*  Professor, you opined that law enforcement will benefit

22   from 18-12-302 because law enforcement will be less likely to

23   have adverse interactions with citizens possessing firearms

24   with magazines greater than 15 rounds, correct?

25   *A.*  I believe I did say that, and I certainly agree with it.

1  *Q.* And in your original report, you stated that HB 1224, which

2  we now refer to as 18-12-302, will confer an advantage on law

3  enforcement, because they may continue to use high-capacity

4  magazines into the future, but private citizens with whom they

5  might have an adversarial interaction will be less likely to

6  possess them.

7  *A.* That certainly sounds familiar, and I -- I have every

8  reason to believe that's an accurate quote.

9  *Q.* Thank you. Now, that assumes, doesn't it, that private

10 citizens with whom law enforcement might have an adversarial

11 interaction will actually abide by 18-12-302, correct?

12 *A.* To at least some degree, yes.

13 *Q.* Citizens likely to have adversarial interactions with law

14 enforcement, especially interactions that involve firearms, are

15 not likely to be constrained by an external constraint like a

16 Class 2 misdemeanor, are they?

17     *MR. GROVE:* Objection, foundation.

18     *THE COURT:* Response.

19     *MR. KRUMHOLZ:* Your Honor, I listened to Professor

20 Zax's direct, and I think his direct established more than

21 sufficient foundation for him to answer this question.

22     *THE COURT:* In particular, what do you think qualifies

23 him to answer this question?

24     *MR. KRUMHOLZ:* His review of the literature, of the

25 Koper study, his criticisms of Dr. Kleck, which are also

1    informed by the literature that he's read, his expertise as an

2    economist who deals in -- who deals in the application of

3    economic principles to subsets of populations.

4           *THE COURT:*  I overrule the objection.

5    *BY MR. KRUMHOLZ:*

6    *Q.*  Would you like to have the question read back, Professor?

7    *A.*  Please.

8           (Question read back by reporter.)

9           *THE WITNESS:*  Everyone responds to costs.  Even

10   addicts respond to costs.  If the cost, however calculated, of

11   possessing a large-capacity magazine goes up, everyone will be

12   less likely to possess one, regardless of their predilection to

13   interact adversarially with the police.

14          Now, it is possible that that predilection -- that

15   people who vary in that predilection will also vary in their

16   response to the cost, but everybody responds to the cost.

17   *BY MR. KRUMHOLZ:*

18   *Q.*  Well, but the premise of my question is what the cost is in

19   this case is a Class 2 misdemeanor, and so as your -- is the

20   answer that you just gave, are you suggesting that everyone

21   will respond to a Class 2 misdemeanor?

22   *A.*  I don't agree that the Class 2 misdemeanor is the sum of

23   all the costs associated with possessing an illegal

24   large-capacity magazine, so I can't answer the rest of the

25   question.

1  *Q.* By that do you mean to suggest that there are other costs

2  like the ones we already discussed, like driving to Wyoming, so

3  forth?

4  *A.* There are those costs.  There are the additional costs that

5  someone who engages in an adversarial interaction with the

6  police is probably violating other laws as well.  I'm not in a

7  position to testify as to how the additional second class

8  misdemeanor to which you refer would compound the penalties to

9  which this individual was likely subject to based on all of the

10 other illegal elements of his or her activities.

11 *Q.* Professor, you agree that citizens who are generally

12 law-abiding are more likely to obey a statute like 18-12-302,

13 correct?

14 *A.* I think that's a tautology.  There is nothing to agree to.

15 *Q.* And conversely, Professor, you would -- citizens who are

16 not generally law-abiding are less likely to obey 18-12-302,

17 correct?

18 *A.* Again, that's a tautology.  Agreement is not an issue.

19 *Q.* Well, to put it in more economic terms, you would accept

20 that there are some people who do routinely abide by external

21 constraints, correct?

22 *A.* I accept there are variations across the population in the

23 extent to which individuals respect or do not respect external

24 constraints, such as legal requirements.

25 *Q.* Well, would you accept, then, Professor that the cost of

1  acquiring a now banned magazine is higher for someone who

2  routinely abides by external constraints, as opposed to someone

3  who does not?

4  *A.*  I'm hesitating here because I'm not familiar with

5  sentencing rules, and I am -- what I'm struggling with is, if

6  someone does not typically adhere to external constraints that

7  have prior convictions for other violations, the cost to them

8  of being convicted of -- or found to have an illegal LCM might

9  be different than the cost to an otherwise similar person who

10  does not present with the same prior criminal history.

11  *Q.*  There is no empirical evidence that bears on that question,

12  is there?

13  *A.*  That bears on the question of how the penalties associated

14  with illegal possession of a LCM would vary depending upon the

15  prior criminal history of an individual found to be in illegal

16  possession?

17  *Q.*  No.  Thank you for clarifying.  That bears on the question

18  of whether the cost of going to acquire a now banned magazine

19  is higher for someone who routinely abides by external

20  constraints, as opposed to someone who does not.

21  *A.*  I'm not aware of any evaluation of that question.

22  *Q.*  Professor, you talked about the -- your opinion that the

23  magazine ban would reduce the number of shots fired in a mass

24  shooting incident, correct?

25  *A.*  Yes.

1    *Q.*  Is -- isn't it inconsistent, Professor, to say that LCMs

2    are not needed and never used with respect to your Opinions 2

3    and 3, and then argue in Opinion 4 that the ban will reduce

4    shots fired?

5    *A.*  I would need you to remind me which opinions are attached

6    to these numbers, please.

7    *Q.*  All right.  Opinion 4 is "HB 1224 will enhance public

8    safety by reducing the number of rounds fired in mass shooting

9    events."  And then Opinions 2 and 3 are about HB 1224 not

10   adversely affecting self-defense capabilities.  Opinion 3, "Law

11   enforcement officers will have fewer interactions with criminal

12   suspects carrying LCMs."

13   *A.*  I don't see the inconsistency.

14   *Q.*  Professor, you have no expertise in the psychology of mass

15   shooters, do you?

16   *A.*  No.

17   *Q.*  And just so we're clear, by mass shooters, I am referring

18   to the perpetrators of mass shootings.  Are we on the same

19   page?

20   *A.*  I think we may have been better off if we hadn't defined

21   it.  That is, if you want to engage in that discussion, I would

22   require you to return to the conversation we had earlier about

23   selection on the dependent variable.  That is, the interesting

24   class to me is individuals who aspire to mass murder, which is

25   a larger class than the class of those who actually succeed in

1  perpetrating mass murder.

2  *Q.*  And I appreciate that clarification, and I remember that

3  conversation that you had with Mr. Grove.  And so let me ask it

4  in a different way.  Regardless of how we define it, you have

5  no expertise in the psychology of mass shooters, however we

6  define it, correct?

7  *A.*  Apart from the basic economic principle of revealed

8  preference, that's correct.

9  *Q.*  In other words, to the extent you have any insight into the

10  psychology of mass shooters, it's in an application of the

11  theoretical principles that we discussed earlier?

12  *A.*  That's correct.  It's the idea that what people choose to

13  do is what suits their goals most effectively.

14  *Q.*  And it would be -- it would be fair to say here that mass

15  shooters are really the policy relevant group when we're

16  talking about 18-12-302, correct?

17  *A.*  No.

18  *Q.*  You don't accept that mass shooters are the policy relevant

19  group for purposes of 18-12-302?

20  *A.*  I certainly accept that they are a policy relevant group.

21  *Q.*  Well, you've already testified that criminals who invade

22  homes rarely use 16-plus magazines to perpetrate their crimes,

23  correct?

24  *A.*  That's correct.

25  *Q.*  And although you have no expertise, aside from your

1  knowledge of the economic theories applicable to subsets of the

2  population, the -- you did testify on direct that you had some

3  idea of the characteristics of mass shooters, correct?

4  *A.*  I am aware of some of the characteristics of mass shootings

5  as they have been reported in the various documents to which

6  I've been exposed through this case.

7  *Q.*  And so you know, for example, that with respect to mass

8  shooters, their crimes often involve meticulous planning,

9  correct?

10  *A.*  I have formed that impression, and I heard Dr. Kleck

11  testify to that effect.

12  *Q.*  And that meticulous planning at least implies a high level

13  of motivation, correct?

14  *A.*  Yes.

15  *Q.*  And you testified on direct about the preference of mass

16  shooters for LCMs in the context of that meticulous planning,

17  correct?

18  *A.*  Yes.

19  *Q.*  Now, in your initial report, you said that, "In sum,

20  available evidence suggests that mass shootings are more lethal

21  when executed using large-capacity magazines.  If these

22  magazines become less widely available, there is some chance

23  that mass shootings will become somewhat less horrific."  Does

24  that sound accurate, Professor?

25  *A.*  Yes, it does.

1  *Q.* And there are a couple of qualifications in that statement,
2  are there not?

3  *A.* Yes, there were.

4  *Q.* You say "if these magazines become less widely available,
5  there is some chance," correct?

6  *A.* Yes.

7  *Q.* And you agree that you did not try to quantify that chance,
8  correct?

9  *A.* That's correct.

10  *Q.* You didn't say, for example, a 40 percent chance?

11  *A.* That's correct.

12  *Q.* Similarly, in your report you said that there is
13  "suggestive evidence that the reduction in the supply of
14  large-capacity magazines imposed by HB 13-1224 may have a
15  moderating effect on the rare but extremely traumatizing events
16  of mass shootings."  Does that sound accurate?

17  *A.* Sounds familiar, yes.

18  *Q.* And you used the word "may" in that statement because you
19  cannot quantify the extent to which 18-12-302 would actually
20  prevent mass shooters from somehow obtaining a 16-plus
21  magazine, correct?

22  *A.* Not at this time.  Rather -- I'm sorry.  At this time, I am
23  not able to make that quantification.

24  *Q.* Thank you.  Professor, you have no data to support the
25  notion that mass shooters will be affected by the increased

Jeffrey Zax - Cross

1  cost of obtaining 16-plus magazines in the same way that the

2  rest of the population will, do you?

3  *A.*  That's correct.

4  *Q.*  And you have no data to support the notion that mass

5  shooters will be affected by the increased cost of obtaining a

6  16-plus magazine at all, correct?

7  *A.*  I don't agree with that.  Everyone responds to price, even

8  addicts.

9  *Q.*  And I appreciate that, and you mentioned that earlier.  So

10  you have no data to support the notion that mass shooters will

11  be affected by the increased cost of obtaining a 16-plus

12  magazine that has been imposed by 18-12-302, correct?

13  *A.*  I hope that I am not misunderstanding the question.  It

14  sounds very much like the last one, and my answer is still the

15  same.  We have the entire record of economic analysis to remind

16  us that when prices go up, people do less.  How much less is an

17  open question, but they do less.

18  *Q.*  Professor, I wanted to talk to you for a moment about the

19  Koper study from 2004.  I'll represent to you, because you may

20  not remember at this time of day, anyway, that that report --

21  that study reported that 31 percent to 41 percent of police

22  shootings involved LCMs.  Does that sound accurate?

23  *A.*  Yes, I believe I quoted that earlier -- in my earlier

24  testimony today myself.

25  *Q.*  And I didn't remember that, so thank you.

1    The definition used for LCMs in that study was

2 magazines of 11 or more rounds, correct?

3 *A.* I don't remember that, but it wouldn't surprise me.  That

4 was certainly the threshold size that was relevant to the

5 federal ban.

6 *Q.* And the study actually -- the study didn't actually report

7 on magazine -- on the magazine use, correct?

8 *A.* I don't recall.

9 *Q.* And isn't it correct that the Koper study said that the --

10 the use of large-capacity magazines in the murder of police was

11 very rare?

12 *A.* I don't recall that.  It certainly wouldn't surprise me if

13 the murder of police in general was very rare.  Still, if 30 --

14 if 30 to 40 percent of those murders were accomplished with

15 LCMs, that seems like a disproportionate use of that particular

16 form of weaponry to commit the crime of murder.

17 *Q.* Professor, there is no data for the notion that there are

18 people who wanted to commit a mass shooting but were unable to

19 because he didn't have an LCM, correct?

20 *A.* Maybe I need to clarify this.  There is most certainly

21 data.  There are the experiences that have been reported

22 through Dr. Kleck's testimony, through Mr. Groves'

23 cross-examination, through *Mother Jones*, through Mayors Against

24 Illegal Guns.  Now, that data has not been assembled in such a

25 way as to make the inquiry that you propose feasible; but that

1    data does exist.  And, in principle, could be assembled in such

2    ways to make that inquiry feasible.

3         And one of the striking elements of this entire

4    proceeding is how many opinions are being offered on matters

5    which could be quantified, but which no one has expended the

6    effort to do so.

7    Q.  And your testimony, then, is that no one has done so with

8    respect to the question I asked?

9    A.  To this point, no.

10   Q.  Okay.

11   A.  But that does not mean that it couldn't be done.

12   Q.  I understand.

13        Your Honor, may I have a moment to confer with

14   counsel?

15        THE COURT:  You sure may.

16        (Off-the-record discussion between counsel.)

17        MR. KRUMHOLZ:  Nothing further.  Thank you.

18        THE COURT:  Thank you.

19        Redirect.

20        MR. GROVE:  Very briefly, Your Honor.

21                      **REDIRECT EXAMINATION**

22   BY MR. GROVE:

23   Q.  Mr. Krumholz asked if the appropriate target for Section

24   18-12-302 was mass shooters, and you said no.  What did you

25   mean by that?

1   *A.* I'm not sure I said no. I think I said that they were one

2   of the groups to which the law was directed.

3   *Q.* That was a poor question. My understanding of the question

4   was, if mass shooters were the only appropriate target group,

5   and you said no. Could you please explain why.

6   *A.* Because I believe the law will discourage anyone carrying a

7   weapon to -- from carrying a large-capacity magazine. That

8   will reduce the number of shots fired in any circumstance,

9   whether the intent is to scare someone or murder tens of

10  people. So I believe the law would be effective in reducing

11  the number of discharges issued by anyone carrying a firearm.

12          *MR. GROVE:* Thank you, Dr. Zax.

13          May Dr. Zax be excused?

14          *THE COURT:* Any objection?

15          *MR. KRUMHOLZ:* No objection, Your Honor.

16          *THE COURT:* Thank you, sir. You may step down. You

17  are excused.

18          *MR. GROVE:* Our last witness is very brief. If we

19  could give it a shot, we'd love to be able to.

20          *THE COURT:* Please do so.

21          *MR. KOPEL:* Your Honor, we had one question. You had

22  mentioned the plaintiffs offering their proffer regarding what

23  they -- what this witness would have testified regarding

24  Dr. Zax. Did you want that now?

25          *THE COURT:* No, we can do it after this witness.

1       *MR. KOPEL:* Okay. Thank you.

2       *THE COURT:* Please step up and be sworn.

3          (**RANDY HAMPTON, DEFENDANT'S WITNESS, SWORN**)

4       *COURTROOM DEPUTY:* Please be seated.

5       Please state your name and spell your first and last

6  name for the record.

7       *THE WITNESS:* Randy Hampton. First name, R-A-N-D-Y,

8  last name Hampton, H-A-M-P-T-O-N.

9       *MR. FABIAN:* Excuse me, Your Honor. At this time we

10 would interpose an objection to this witness inasmuch as he did

11 not provide evidence to the General Assembly. So we would

12 object to his testimony for reasons stated in the trial brief

13 and our previous objections.

14      *THE COURT:* Thank you.

15                    **DIRECT EXAMINATION**

16 *BY MS. SCOVILLE:*

17 *Q.* Good afternoon, Mr. Hampton. Thank you for being so

18 patient today.

19      How are you currently serving the state of Colorado?

20 *A.* I am the public information and website manager for

21 Colorado Parks and Wildlife.

22 *Q.* And how long have you been the public information officer?

23 *A.* I've been a public information officer with the agency for

24 ten years.

25 *Q.* And how long have you been with Colorado Parks and

1    Wildlife?

2    *A.*  Ten years.

3    *Q.*  Oh, I'm sorry.

4    *A.*  Yeah.

5    *Q.*  It's getting very late in the day.  As the public

6    information officer, what responsibility do you have for the

7    information that parks and wildlife communicates to the public?

8    *A.*  I'm responsible for overseeing all of our public

9    information.  I'm the statewide spokesman for the agency, so I

10   deal with all media relations.  In addition, I oversee our call

11   center.  We have nine full-time employees within this section,

12   twenty-four temporary employees within our call center, so we

13   take all telephone calls in-bound from the public.  I also

14   oversee the agency website and all of the content on the

15   website to educate the public.

16   *Q.*  So are you familiar with Colorado's hunting regulations?

17   *A.*  Yes.  In general, yes.

18   *Q.*  And are hunting regulations one of the topics on which you

19   communicate regularly with the public?

20   *A.*  Almost on a daily basis, if not a daily basis, yes, we

21   receive both telephone calls and inquiries through the website.

22   *Q.*  Could you give us a very brief overview of Colorado's

23   licensing system or permit system for hunters.

24   *A.*  Colorado uses a single license system.  Basically, it's one

25   license, one species, one method of take, one season.  So when

1  you either put into draw a license, purchase an

2  over-the-counter license, or purchase a leftover license, you

3  indicate when you want to hunt, where you want to hunt, what

4  species you want to hunt, whether that's the -- you know, male

5  of the species or the female of the species, the method of take

6  that you would utilize, bow, muzzleloader, rifle, and those

7  factors, and then you're issued a license for that.

8  *Q.* Now, when a hunter is issued a license, for how long is

9  that license valid?

10 *A.* It depends on the license itself. We have big game seasons

11 that are as short as five days; we have other big game seasons

12 that are a couple of weeks long. Small game license is kind of

13 a season -- what we call season year license. So small game

14 license is valid from April 1 of a calendar year to March 31 of

15 the following calendar year. So some -- some licenses are

16 valid for up to 12 months.

17 *Q.* After a hunter has successfully killed a species for which

18 he has a license, or she has a license, is that hunter required

19 to keep the license with them?

20 *A.* They maintain the license with them. They're required to

21 care for the game meat that is harvested, and so the license

22 is -- there is two sections to that license. At that point, a

23 carcass tag, which has to stay with the game meat, as well as

24 the license that has to stay in the hunter's possession.

25 *Q.* After the hunter successfully kills the species for which

1    he or she has the license, what are they required to do with

2    that animal?

3        MR. FABIAN:  Objection, Your Honor.  Relevance.  I

4    thought counsel was laying some type of foundation.  If we're

5    talking about hunting, I don't see how it deals with the issues

6    in this case.

7        THE COURT:  Response.  I'm lost too.

8        MS. SCOVILLE:  I'm laying the foundation for the

9    questions I'm about to ask Mr. Hampton about the hunting

10   exemption in Section 112.

11       THE COURT:  Could we get on with it.

12       MS. SCOVILLE:  Certainly.

13       THE COURT:  Thank you.

14   BY MS. SCOVILLE:

15   Q.  Mr. Hampton, are you familiar with House Bill 1229,

16   18-12-112?

17   A.  Yes.

18   Q.  To what activities does that exception apply?

19   A.  There is a hunting exemption; but it also extends to

20   hunting, fishing, trapping, or target shooting.

21   Q.  Now, that section provides that a background check is not

22   required for a temporary transfer of a firearm while hunting,

23   fishing, trapping, or target shooting, correct?

24       MR. FABIAN:  Objection, leading.

25       THE COURT:  Sustained.

1  *BY MS. SCOVILLE:*

2  *Q.* Mr. Hampton, could you please describe for us the exemption

3  contained in subsection (6)(e)(III).

4  *A.* Off the top of my head -- would it be possible to look at

5  the bill? I mean, I -- in general, I can explain that. I

6  don't know -- want to be inaccurate in restating that.

7          *THE COURT:* Can you stipulate to this?

8          *MR. FABIAN:* We'd be happy to stipulate to what the

9  statute says, Your Honor.

10          *THE COURT:* All right. Let's do it.

11          *MS. SCOVILLE:* Okay.

12          *THE COURT:* What is it you want to ask from this

13  witness? I'm still not understanding where you're going here.

14          *MS. SCOVILLE:* Certainly.

15          *THE COURT:* We know what the statute says. So what is

16  it that you want this witness to give information about?

17          *MS. SCOVILLE:* Certainly.

18  *BY MS. SCOVILLE:*

19  *Q.* Mr. Hampton, what does Colorado Parks and Wildlife consider

20  to be activities that are contained within the activity of

21  hunting?

22  *A.* In terms of this particular enforcement of this particular

23  action, if someone were to have borrowed a firearm, we would

24  consider them to be borrowing that firearm for hunting from the

25  time they left their home, headed to the woods, got to camp,

1  were there, were hunting, you know, were out looking around for

2  animals, whatever, and returning home.

3  Q.  So would Colorado Parks and Wildlife require -- does

4  Colorado Parks and Wildlife believe that a hunter would need a

5  background check to be loaned a firearm for personal protection

6  while hunting?

7  A.  No.

8  Q.  Does Colorado Parks and Wildlife believe that a hunter

9  would require a background check to be loaned a firearm for

10  personal protection for participating in an activity that does

11  not require a firearm, such as fishing or bow hunting?

12  A.  No.  Exemption includes fishing.

13  Q.  And does Colorado Parks and Wildlife believe that a

14  background check would be necessary for a hunter to be

15  transferred a firearm to poses while that hunter is in a

16  hunting camp in the evening, as opposed to during the daylight

17  while they're actively pursuing the game?

18  A.  As long as the hunter has any license, hunting, fishing,

19  and they're doing it in an area that that activity is legal,

20  not required to undergo a background check.

21  Q.  Does Colorado Parks and Wildlife provide hunter education?

22  A.  Yes.

23  Q.  And do you provide other hunter outreach activities?

24  A.  Yes, sponsor hunts, those kind of things.

25  Q.  After House Bill 1229 or 18-12-112 passed, did Colorado

1 Parks and Wildlife assess whether that legislation would have

2 an impact on the hunter outreach or hunter education activity?

3 *A.*  Certainly.  We took a look -- because background checks

4 were required in certain transfers, we wanted to make sure that

5 our agency's ability to offer hunter education courses, conduct

6 youth hunts, those kind of things would not be impaired by the

7 legislation.  We determined that our hunter education courses,

8 our hunter outreach programs, our -- all of our other programs

9 that the agency runs, the exemptions for hunting, family

10 transfer, you know, all of the other exemptions within the

11 bill, shooting range exemption, would not impact our agency's

12 ability to borrow weapons for that purpose.

13 *Q.*  Has Colorado Parks and Wildlife told any organizations that

14 it would not be able to borrow a firearm from that organization

15 because of Section 18-12-112?

16 *A.*  Not to my knowledge.

17 *Q.*  Does Colorado place limits on the number of rounds that

18 hunters may carry in a semiautomatic weapon?

19 *A.*  Yes.  There is a limitation for big game hunting with a

20 semiautomatic weapon of five rounds in the cartridge, one in

21 the chamber, so a limit of six rounds total.

22 *Q.*  And for how long has that requirement been in place?

23 *A.*  We were able to look back to 1978, so we know it's been in

24 place since 1978.  Our system of tracking regulations and when

25 those passed prior to that, it --

1  *Q.* May a hunter use a firearm for hunting big game that has a

2  capacity of greater than five plus one if the magazine on that

3  firearm has a limiter?

4  *A.* Yes, it is possible to limit a magazine if -- if the person

5  wants to do that.

6      *MS. SCOVILLE:* I have no further questions.

7      *THE COURT:* Thank you.

8      Cross-examination.

9                    **CROSS-EXAMINATION**

10 *BY MR. FABIAN:*

11 *Q.* Mr. Hampton, there is other species that are hunted in

12 Colorado other than just big game, correct?

13 *A.* Yes.

14 *Q.* Does that include small game and varmints, correct?

15 *A.* That is correct.

16 *Q.* There is no capacity limit for hunting small game or

17 varmints in Colorado, correct?

18 *A.* That is correct.

19 *Q.* And there is also no magazine capacity limit to hunt with

20 pistols, correct?

21 *A.* That is correct.

22 *Q.* And would you agree that people do use center-fire rifles

23 with detachable magazines with more than 15 rounds on small

24 game and varmints in Colorado?

25 *A.* Yes.

1  *Q.*  Now, many people, when they hunt, they hunt by themselves,

2  correct?

3  *A.*  Yes.

4  *Q.*  And that's -- and when they hunt, usually they're far away

5  from towns and civilizations, correct?

6  *A.*  They could be, yeah, if they're hunting in an area that's

7  far away from town and civilization, yes.

8  *Q.*  Hunters carry handguns for protection while they're in the

9  field, correct?

10  *A.*  Some may choose to, yes.

11  *Q.*  There is no limitation on the type, caliber, or magazine

12  capacity of those handguns carried for protection, correct?

13  *A.*  That is correct.  Colorado Parks and Wildlife places no

14  regulatory limit on that, yes, that's correct.

15  *Q.*  And you already testified that you're familiar with the --

16  well, just to be clear, are you familiar with the Colorado

17  Revised Statute 18-12-302, commonly referred to as House Bill

18  1224, limitation on magazine capacities?

19      *MS. SCOVILLE:*  Objection, Your Honor.  This is beyond

20  the scope of the direct.

21      *THE COURT:*  Response.

22      *MR. FABIAN:*  I believe they opened the door, Your

23  Honor, talking about capacities for big game hunting.

24      *THE COURT:*  I agree.

25      *THE WITNESS:*  Could you repeat the question for me.

1  *BY MR. FABIAN:*

2  *Q.* Sure.

3  *A.* Thank you.

4  *Q.* Are you familiar with the law that we've been referring to

5  it as House Bill 1224, but it's codified at 18-12-302,

6  regarding limitation on magazine capacities?

7  *A.* In general, yes.

8  *Q.* Now parks and wildlife employs enforcement agents in the

9  field, right?

10 *A.* That is correct.

11 *Q.* And these are full-fledged law enforcement officers, they

12 wear badges, they carry guns, correct?

13 *A.* That is correct.

14 *Q.* And they're authorized to make arrests?

15 *A.* Yes. They are level 1 peace officers within Colorado,

16 that's correct.

17 *Q.* And it's common for these officers, I think you call them

18 wildlife managers, to stop and check hunters in the field?

19 *A.* Yes.

20 *Q.* And that includes checking the firearms that hunters are

21 carrying, correct?

22 *A.* That is correct.

23 *Q.* If a wildlife manager checks a firearm of someone hunting

24 small game or varmints with a magazine of greater than 15

25 rounds, there is no way for that officer to know whether or not

1  that magazine is legal, correct?

2        *MS. SCOVILLE:*  Objection.  Lack of foundation.

3        *THE COURT:*  Response.

4        *MR. FABIAN:*  He testified he's familiar with the law,

5  Your Honor.

6        *THE COURT:*  Are you asking for a legal interpretation?

7        *MR. FABIAN:*  No.  I'm just asking him whether or not

8  an officer would know whether or not that magazine is legal by

9  looking at it.

10        *THE COURT:*  I sustain the objection.

11        *MR. FABIAN:*  I'll move on.

12  *BY MR. FABIAN:*

13  *Q.*  Now -- I'll just move on.

14        You already testified you're familiar with the

15  background check law, House Bill 1225?

16  *A.*  In general.

17  *Q.*  I'm sorry, 1229.

18  *A.*  In general, yes.

19  *Q.*  Okay.  And you testified regarding parks and wildlife's

20  interpretation of what the hunting exemption is, correct?

21  *A.*  Yes.

22  *Q.*  And so can you represent that the parks and wildlife

23  interpretation will be followed by all law enforcement agents

24  of parks and wildlife?

25  *A.*  It's -- it's what the agency has determined.  You know, I

1  can't specifically tell you, you know, what every single

2  officer does in every single circumstance, but I -- it is what

3  the agency has determined, and it is the course that officers

4  are expected to follow.

5  Q.  Well, it's true that you're telling people, basically, in

6  your information, public information that you're disseminating,

7  that it's okay to loan a neighbor a gun to go out hunting for a

8  nine-day elk season, correct?

9  A.  That is correct.

10  Q.  So it's your interpretation of the hunting exemption that a

11  person is engaged in hunting from the time they receive a

12  firearm for hunting until the time they give it back?

13          MS. SCOVILLE:  Objection.  I think that misstates the

14  witness's testimony.

15          THE COURT:  Noted for the record.

16          Counsel, I'm going to ask you to lower your voice.

17  BY MR. FABIAN:

18  Q.  Would you like --

19  A.  You --

20          THE COURT:  You may answer the question.

21          THE WITNESS:  Thank you, Your Honor.

22          What we're saying is that if a person is going

23  hunting, they can be loaned a firearm.  And as long as they're

24  headed to hunting, participation in the hunt, and returning

25  home, then they are, in our determination, in the act of

1  hunting.  We are not saying that that applies more broadly than

2  that.

3  *BY MR. FABIAN:*

4  *Q.*  So if I understand you correctly, if I am a hunter, and I

5  am in my automobile driving to the hunting site, while I'm

6  driving in my car, going to the hunting site, I'm hunting?

7  *A.*  You're participating in hunting, yes.

8  *Q.*  And regardless of what happens -- for example, we're

9  talking about this nine-day season.  If I'm -- if I'm hunting

10  that entire nine-day season, I'm hunting regardless of whether

11  I'm actually out in the field looking for game until that

12  season is over, correct?

13       *MS. SCOVILLE:*  Objection.  That also misstates the

14  witness's testimony.

15       *THE COURT:*  Noted for the record.  The witness can

16  answer.

17       *THE WITNESS:*  Thank you, Your Honor.

18       You are engaged in hunting.  If you're in the hunting

19  camp, all of those things, yes, you are hunting.  You could

20  have gone hunting and fallen ill and never left the camp,

21  you're hunting.

22  *BY MR. FABIAN:*

23  *Q.*  Well, if I hunt for a nine-day season, and I don't -- I'm

24  not successful, when does the hunt end for me?  When am I

25  through hunting?

1   *A.*  For the sake of our interpretation of this particular

2   issue, when you return home.

3   *Q.*  Now, you prepared this information that's being

4   disseminated regarding what you believe the hunting exemption

5   means, correct?

6   *A.*  I did not prepare -- I prepared the information, but it is

7   not my opinion.  It is the agency's.  It was vetted in the

8   agency.

9   *Q.*  Okay.  So is it fair to say it went all the way up to the

10   director?

11   *A.*  Yes.

12   *Q.*  Do you know if any legal consultation was made with respect

13   to the legal interpretation that you were promulgating to the

14   public?

15       *MS. SCOVILLE:*  Objection.  I am concerned about any

16   revelation of the attorney-client privilege.  I'm also unclear

17   what the relevance is.

18       *THE COURT:*  Response.

19       *MR. FABIAN:*  Your Honor, I have not asked for any

20   communication.  I just asked whether there was any kind of

21   legal authority consulted.

22       *THE COURT:*  Why is that relevant?

23       *MR. FABIAN:*  Well, this is an interpretation of the

24   law, Your Honor.  And I'm just asking from where -- what went

25   into the process of making this interpretation.

1    *THE COURT:*  I find that that's not relevant.  What is

2    relevant is that this is the representation that this agency is

3    making.

4         *MR. FABIAN:*  I understand, Your Honor.

5         If I may have a moment.

6         *THE COURT:*  Sure.

7         *MR. FABIAN:*  I have nothing further, Your Honor -- I'm

8    sorry.

9         *THE COURT:*  Just a little more.

10   *BY MR. FABIAN:*

11   *Q.*  I'm sorry.  Just a clarification.  We were talking about

12   the nine-day hunting -- the duration of nine-day hunting

13   season.  Any time a person returns home from the field -- say,

14   I want to take a couple of days off, and I go out in the field

15   and I hunt for a couple of days, and I come back.  While I'm

16   home, am I hunting?

17   *A.*  No.

18   *Q.*  Okay.  So your interpretation of hunting doesn't include

19   any kind of detours or breaks during the hunting season that

20   the hunter takes?

21   *A.*  It -- it's the hunting trip.  There are -- you know, the

22   possibility if you're going hunting in the Craig area, that you

23   drive up, you're going to stop maybe at a grocery store to buy

24   supplies, those kinds of things, we would not make someone

25   illegal because they're shopping not hunting, when they're in

1  the grocery store.  It's part of that hunting trip, and it is

2  our determination that that would be part of hunting.

3  *Q.*  So is it fair to characterize it that you're talking about

4  enforcement and not what the law actually means, but how it's

5  going to be enforced by parks and wildlife?

6  *A.*  Yes.

7  　　　　*MR. FABIAN:*  I have nothing further, Your Honor.

8  　　　　*THE COURT:*  Redirect.

9  　　　　*MS. SCOVILLE:*  No, thank you, Your Honor.

10  　　　*THE COURT:*  Can this witness step down and be excused?

11  　　　*MS. SCOVILLE:*  He may.

12  　　　*THE COURT:*  Thank you, sir, you may step down.

13  　　　*THE WITNESS:*  Thank you.

14  　　　*THE COURT:*  You are excused.

15  　　　All right.  Mr. Kopel, I think you wanted to make a

16  proffer here.  But I think the proffer needs to be made by the

17  attorney who was doing the examination.

18  　　　*MR. KOPEL:*  We agree, Your Honor.

19  　　　*THE COURT:*  Okay.

20  　　　*MR. KRUMHOLZ:*  Thank you, Your Honor.

21  　　　I have an e-mail on this that will make this way more

22  efficient.

23  　　　*THE COURT:*  Okay.  When is the e-mail dated?

24  　　　*MR. KRUMHOLZ:*  It's from today, this afternoon, an

25  e-mail that I received from Mr. Kopel.

1    THE COURT:  Okay.

2        MR. KRUMHOLZ:  I -- I should clarify, because I am

3    afraid I didn't make this clear this morning.  For the record,

4    Professor Zax's new study was not disclosed to us until

5    January 30, which is one day before the proposed final pretrial

6    order and witness lists were due.  But --

7        THE COURT:  And I was aware of that at the time I made

8    my ruling.  In fact, I included that date in my ruling.

9        MR. KRUMHOLZ:  Okay.  Thank you, Your Honor.

10       Regarding the expert that plaintiffs could have used,

11   Professor Carl Moody is a tenured professor at the College of

12   William and Mary department of economics.  His research was

13   cited in footnote 2 of Justice Alito's opinion in *McDonald v.*

14   *Chicago*, in a study he performed that is presented in *an amicus*

15   brief.

16       If Dr. Moody were to testify, he would testify as

17   follows:  Professor Zax's report on the Virginia Firearms

18   Clearinghouse data is defective based on the professional

19   standards of econometrics.  Dr. Zax's regression analysis

20   violates standard and accepted procedures of econometrics.

21       Had Professor Moody been able to testify, he would

22   have testified that he would conduct unit root tests and

23   examine differences for the Virginia data.  And he expected the

24   results would indicate that the regression analysis could have

25   been invalid.  He also would have testified about a regression

1    study he conducted -- would have conducted of data from all 50

2    states from 1977 to 2010 to examine the federal magazine ban in

3    Virginia from 1994 to 2004, or the California magazine ban

4    which went into effect in 2000, had any effect reducing violent

5    crime.  He would have found that these magazine bans had no

6    such effect.

7          Thank you, Your Honor.

8          *THE COURT:*  Thank you.

9          Counsel, when was that information supplied to

10   Mr. Kopel?

11         *MR. KRUMHOLZ:*  Would you like Mr. Kopel to respond?

12         *THE COURT:*  You can tell from the e-mail that you got.

13         *MR. KRUMHOLZ:*  Sorry?

14         *THE COURT:*  I think you can tell from the e-mail you

15   got, can't you?

16         *MR. KRUMHOLZ:*  I can't tell from the e-mail, Your

17   Honor.

18         *THE COURT:*  Okay.  Mr. Kopel, when did you receive

19   that information?

20         *MR. KOPEL:*  We contacted Dr. Moody shortly after the

21   March 19 deposition of Dr. Zax on the Virginia clearinghouse.

22         *THE COURT:*  Okay.

23         *MR. KOPEL:*  And received that -- the information

24   Mr. Krumholz has described came in not all in a single stage in

25   that -- in the succeeding days and weeks.

1  THE COURT:  When?

2  MR. KOPEL:  March -- approximately March 28 through

3  the past several days.

4  THE COURT:  Thank you.

5  Anything else we need to do today?

6  MS. SCOVILLE:  One thing very briefly, Your Honor.

7  Yesterday or the day before we had discussed stipulations

8  regarding the ATF document which was Exhibit 84.  I have that

9  stipulation, and we can mark it as an exhibit and move its

10  admission.

11  THE COURT:  All right.

12  Mr. Colin.

13  MR. COLIN:  Your Honor, just clarification about

14  closing --

15  THE COURT:  Wait a minute.  We need to deal with this

16  exhibit.  I thought you were rising to the --

17  MR. COLIN:  No.  I thought that issue was resolved.

18  THE COURT:  All right.

19  MS. SCOVILLE:  I think I need from Mrs. Glover,

20  please, the most recent exhibit number.

21  THE COURT:  Okay.

22  COURTROOM DEPUTY:  The most recent exhibit number

23  looks like 139.

24  MS. SCOVILLE:  All right.  I would mark this as

25  Exhibit 140 and move its admission.

1    THE COURT:  Thank you.

2    And there is no objection?

3    MR. COLIN:  No objection.

4    THE COURT:  It's received.

5    (Exhibit 140 admitted.)

6    THE COURT:  All right.  Are there more witnesses to be

7    called for the State?

8    MR. GROVE:  The defense rests.

9    THE COURT:  Thank you.

10   MR. GROVE:  My understanding, Your Honor, is that the

11   plaintiffs have indicated that they wished to call a rebuttal

12   witness.

13   THE COURT:  Well, that's what I'm going to ask them

14   next.  Thank you.

15   Any evidence to be presented in rebuttal?

16   MR. FABIAN:  We have one brief rebuttal witness, Your

17   Honor.

18   THE COURT:  You'll be prepared to call them first

19   thing tomorrow?

20   MR. KOPEL:  Yes, Your Honor.

21   THE COURT:  All right.

22   MR. GROVE:  Maybe we can bring this up with them.  We

23   just have no idea who it is or the topic, and so -- we can --

24   THE COURT:  Who is it you're going to call?

25   MR. FABIAN:  Mr. Shain will be recalled, Your Honor.

1    MR. GROVE:  And the subject?

2    MR. FABIAN:  Offer rebuttal evidence regarding

3  Mr. Salzgerber's testimony.

4    MR. GROVE:  Okay.  We'll discuss this off the record,

5  Your Honor.

6    THE COURT:  Thank you.

7    Okay.  And your question, then, is -- I know Mr. Colin

8  wants to ask, what about closing?

9    MR. COLIN:  That's my question.

10    THE COURT:  Okay.  What would you like to know?

11    MR. COLIN:  Well, first thing is, time.  If the Court

12  is, basically, saying however much time you have left, we each

13  out of our 30 hours, I don't anticipate --

14    THE COURT:  I don't have a restriction.

15    MR. COLIN:  Okay.

16    THE COURT:  But what I would say to you, I have been

17  here the entire trial.

18    MR. COLIN:  Understood.

19    THE COURT:  Therefore, what I need to know in your

20  closing is how the evidence pertains to what you want me to do.

21    MR. COLIN:  All right.

22    THE COURT:  I'm not -- I don't need you to repeat the

23  evidence to me.  I'm not a jury.  I'm not going to be deciding

24  this based on an emotional response to something.  What I need

25  to know is, based upon the legal framework that will be

1 applied, how does the evidence fit?

2        Does that help?

3        *MR. COLIN:*  It does, Your Honor.  I have one follow-up

4 question.

5        *THE COURT:*  Uh-huh.

6        *MR. COLIN:*  There are obviously five plaintiffs'

7 groups, and we have -- certainly don't intend to have all five

8 plaintiffs' groups present any kind of a closing argument.  We

9 would like, however -- three of us have very discrete areas

10 that we've been focusing on in the trial, and we'd like to

11 maintain that for closing.  It would not extend the closing

12 unnecessarily.  We're all talking about 15 to 20 minutes

13 apiece.  That's our thought.

14        *THE COURT:*  I don't have a problem with that.

15        *MR. COLIN:*  Great.  Thank you.

16        *THE COURT:*  How about for the State?

17        *MR. GROVE:*  Just me.

18        *THE COURT:*  Okay.

19        Then we'll move to closings after we have the last

20 witness tomorrow morning.

21        How long do you think that witness is going to last?

22        *MR. FABIAN:*  Your Honor, I would expect direct

23 examination to last no more than five minutes.

24        *THE COURT:*  Okay.  Then we'll start at -- the

25 leisurely hour of 9 o'clock.

1          *MR. WESTFALL:*  Thank you, Your Honor.

2          *THE COURT:*  Someone will bring cake, I know.

3          Then I'll look forward to seeing you all at 9 o'clock

4    in the morning.  We'll stand in recess until then.

5          (Recess at 5:14 p.m.)

6                              **INDEX**

7    **Item**                                                      **Page**

8

        DOUGLAS FUCHS
9           Cross-Examination Continued By Mr. Colin        1602
            Redirect Examination By Ms. Spalding            1627
10      JEFFREY ZAX
            Direct Examination By Mr. Grove                 1645
11      ANDREW LOGAN
            Direct Examination By Ms. Scoville              1710
12          Cross-examination By Mr. Fabian                 1714
        JEFFREY ZAX
13          Direct Examination Continued By Mr. Grove       1721
            Cross-examination By Mr. Krumholz               1753
14          Redirect Examination By Mr. Grove               1801
        RANDY HAMPTON
15          Direct Examination By Ms. Scoville              1803
            Cross-examination By Mr. Fabian                 1810

16

17                            EXHIBITS

18   Exhibit      Offered   Received   Refused   Reserved   Withdrawn

19   59                     1691
     60                     1695
20   61                     1696
     62                     1698
21   63                     1700
     65                     1701
22   66                     1670
     67                     1672
23   68                     1674
     69                     1676
24   70                     1681
     73                     1747
25   78                     1746
     140                    1822

1    REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

4

5        Dated at Denver, Colorado, this 15th day of June, 2014.

6                                    s/Therese Lindblom

7        _____

8                                    Therese Lindblom,CSR,RMR,CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25