1                    THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 13-CV-1300-MSK-MJW
3
   COLORADO OUTFITTERS ASSOCIATION,
4  COLORADO FARM BUREAU,
   NATIONAL SHOOTING SPORTS FOUNDATION,
5  MAGPUL INDUSTRIES,
   COLORADO YOUTH OUTDOORS,
6  USA LIBERTY ARMS,
   OUTDOOR BUDDIES, INC.,
7  WOMEN FOR CONCEALED CARRY,
   COLORADO STATE SHOOTING ASSOCIATION,
8  HAMILTON FAMILY ENTERPRISES, INC.,
   d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
9  DAVID STRUMILLO,
   DAVID BAYNE,
10 DYLAN HARRELL,
   ROCKY MOUNTAIN SHOOTERS SUPPLY,
11 2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
   BURRUD ARMS INC. D/B/A JENSEN ARMS,
12 GREEN MOUNTAIN GUNS,
   JERRY'S OUTDOOR SPORTS,
13 SPECIALTY SPORTS & SUPPLY,
   GOODS FOR THE WOODS,
14 JOHN B. COOKE,
   KEN PUTNAM,
15 JAMES FAULL,
   LARRY KUNTZ,
16 FRED JOBE,
   DONALD KRUEGER,
17 STAN HILKEY,
   DAVE STONG,
18 PETER GONZALEZ,
   SUE KURTZ,
19 DOUGLAS N. DARR,

20     Plaintiffs,

21 vs.

22 JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23     Defendant.
   _____
24
                       **REPORTER'S TRANSCRIPT**
25                   TRIAL TO COURT - DAY NINE
   _____

1827

1    Proceedings before the HONORABLE MARCIA S. KRIEGER,

2  Judge, United States District Court for the District of

3  Colorado, continuing at 9:08 a.m., on the 10th day of April,

4  2014, in Courtroom A901, United States Courthouse, Denver,

5  Colorado.

6

7                          **APPEARANCES**

8         RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
   at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9  Denver, Colorado, 80202, appearing for the Plaintiffs.

10        DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
   555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11 for the Plaintiffs.

12        MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
   P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13 appearing for the Plaintiffs.

14        ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
   Street, Castle Rock, Colorado, 80104, appearing for the
15 Plaintiffs.

16        DAVID BENJAMIN KOPEL, Attorney at Law, Independence
   Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17 appearing for the Plaintiffs.

18        MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
   SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19 General, Colorado Attorney General's Office, Ralph L. Carr
   Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20 80203, appearing for the Defendant.

21

22

23

24                 THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25           Proceedings Reported by Mechanical Stenography
                 Transcription Produced via Computer

1  **P R O C E E D I N G S**

2      *THE COURT:*  We're convened in Case No. 13-cv-1300.

3  This is our ninth day of trial.

4      Could I have entries of appearance for today's

5  proceedings.

6      *MR. COLIN:*  Good morning, Your Honor.  Mark Colin

7  appearing on behalf of the federally licensed firearms dealer

8  plaintiffs.

9      *THE COURT:*  Good morning.

10      *MR. WESTFALL:*  Good morning, Your Honor.  Richard

11  Westfall appearing on behalf of Colorado State Shooting --

12  excuse me.  David Bayne; Dylan Harrell; Outdoor Buddies, Inc.;

13  Colorado Outfitters Association; Colorado Farm Bureau; Women

14  for Concealed Carry; and Colorado Youth Outdoors.

15      *THE COURT:*  Good morning.  Welcome.  You look like

16  you're feeling a little better.

17      *MR. WESTFALL:*  I am, Your Honor.  Thank you very much

18  for noticing.

19      *MR. KOPEL:*  Good morning, Your Honor.  David Kopel on

20  behalf of David Strumillo, John B. Cooke, Ken Putnam, James

21  Faull, Larry Kuntz, Fred Jobe, Donald Kroger, Stan Hilkey, Dave

22  Stong, Peter Gonzalez, Sue Kurtz, and Douglas N. Darr.

23      *THE COURT:*  Good morning.

24      *MR. ABBOTT:*  Good morning, Your Honor.  Doug Abbott on

25  behalf of Magpul Industries and the National Shooting Sports

1    Foundation.

2         *THE COURT:*  Good morning.

3         *MR. FABIAN:*  Good morning, Your Honor.  Anthony Fabian

4    on behalf of Colorado State Shooting Association and Hamilton

5    Family Enterprises.

6         *THE COURT:*  Good morning.

7         *MR. GROVE:*  Good morning.  Matthew Grove, LeeAnn

8    Morrill, Stephanie Scoville, and Kathleen Spalding on behalf of

9    the defendants.

10        *THE COURT:*  Good morning.

11        Are you all ready to proceed?

12        *MR. COLIN:*  Plaintiffs are ready, Your Honor.

13        *THE COURT:*  I understand you're going to call one last

14   rebuttal witness; is that right?

15        *MR. KOPEL:*  Yes, Your Honor.  But before that, we were

16   hoping we could wrap up what we began yesterday, which was the

17   admission of the legislative history exhibits.

18        *THE COURT:*  I thought we finished that yesterday.

19        *MR. KOPEL:*  Ms. Scoville pointed out that -- these are

20   141 through 147.  There were some printing errors on 141.  If I

21   could now distribute the complete and corrected --

22        *THE COURT:*  Why don't you just substitute the copy for

23   the one that had the printing errors?

24        *MR. KOPEL:*  I believe -- perhaps I'm -- I'm

25   misunderstanding what happened.  I thought they hadn't been

1    admitted.  If they have been all admitted, we're set.

2         THE COURT:  I am confused.

3         MS. SCOVILLE:  They had not yet been admitted.  When

4    they were raised yesterday, the State had not had a chance to

5    review them.  So we have no objection to their being admitted.

6         THE COURT:  All right.

7         MR. GROVE:  I have one quick housekeeping matter, Your

8    Honor.  We were looking through exhibits just to make sure that

9    everything matched up with what we had hoped to get in.

10   Exhibit 49, which was the audiotape, we were thinking in order

11   for the clarity of the record, it should actually be in.  So

12   we'd like -- we'd like to move to admit that if possible.

13        THE COURT:  Any objection?

14        MR. ABBOTT:  No objection, Your Honor.

15        THE COURT:  All right.  It's received.

16        (Exhibit 49 admitted.)

17        Ms. Glover, do you have a record of all of the

18   legislative history documents?

19        COURTROOM DEPUTY:  I do.

20        THE COURT:  All right.  And they're all admitted.

21        COURTROOM DEPUTY:  Yes, 141 through 147 would now be

22   admitted.  So 49 we're admitting also?

23        THE COURT:  Exactly.

24        COURTROOM DEPUTY:  Thank you.

25        (Exhibits 141-147 admitted.)

1          MS. MORRILL:  Your Honor, one matter related to

2    plaintiffs' rebuttal witness, Mr. Shain.  The State would like

3    to make a motion to exclude his testimony.  I don't know if you

4    want us to do that before he is brought in or --

5          THE COURT:  Sure.

6          MS. MORRILL:  Thank you.

7          THE COURT:  This would be the time.

8          MS. MORRILL:  Thank you.

9          Your Honor, last night we requested and received an

10   offer of proof from plaintiffs regarding the subject of

11   Mr. Shain's rebuttal testimony.  Mr. Fabian represented to us

12   that Mr. Shain will testify as to whether the slides of Glock

13   pistols sometimes stick in the open position as a result of a

14   malfunction.  This is purported to be in rebuttal to

15   Mr. Salzgerber's testimony about his observations of the slide

16   in the Tucson shooter's Glock 19 being in the locked-back

17   position at the time he tackled the shooter.

18         This is clearly based on Mr. Shain's expertise as an

19   armorer, as a gunsmith, his knowledge of products -- firearms

20   malfunctions in connection with products liability cases that

21   he's worked on, and for other cases.  And at no time was any

22   opinion related to firearms malfunction disclosed to the

23   defendant during the course of discovery.

24         Additionally, Mr. Salzgerber was deposed by

25   Mr. Westfall in this case on November 6, 2013, before the

1    discovery cutoff deadline occurred.  And in the five months

2    since the deposition date, the plaintiffs simply have not

3    identified any opinion for Mr. Shain on firearms malfunctions.

4         THE COURT:  Can you all stipulate that on occasion the

5    slides on Glock pistols stick?

6         MS. MORRILL:  We don't know, is the problem.  And I

7    think one of the --

8         THE COURT:  Well, I'm going to be really honest with

9    you.  Every pistol I've ever handled occasionally malfunctions

10   or jams or sticks.  So the question here is whether you can

11   stipulate to that fact.

12        MS. MORRILL:  We could stipulate to the possibility

13   that it's possible for the slide on a Glock 19 pistol to jam

14   and, you know, stick back.

15        THE COURT:  To stick back?

16        MS. MORRILL:  Yeah.

17        THE COURT:  All right.  Is that the purpose of this

18   testimony?

19        MR. FABIAN:  That is, Your Honor.  We're happy to make

20   that stipulation.

21        THE COURT:  Okay.  Then I don't think we need to call

22   the witness.

23        MS. MORRILL:  That's fine, Your Honor.

24        THE COURT:  Okay.  Thank you.

25        Then I think that concludes the presentation of the

1    evidence on both sides.  Has all of the evidence been

2    submitted, all of the documentary evidence been provided to

3    Ms. Glover?

4        MR. COLIN:  We believe so.

5        THE COURT:  For the defense?

6        MR. GROVE:  Yes, Your Honor.

7        THE COURT:  Okay.  Then let's go to closing arguments.

8                          **CLOSING ARGUMENT**

9        MR. COLIN:  Good morning, Your Honor.

10       THE COURT:  Good morning.

11       MR. COLIN:  Your Honor, the first step of a

12   two-pronged analysis under *Heller*, *Reese*, and Patterson

13   requires the Court to determine whether the challenged law

14   imposes a burden on conduct falling within the scope of the

15   Second Amendment's guarantees.  The conduct at issue here is

16   the right to keep and bear magazines with a capacity of more

17   than 15 rounds.

18       The evidence is unrebutted that magazines are an

19   essential component of a firearm.  Mr. Shain established that

20   magazines are an essential component of a firearm from the

21   mechanical functioning perspective.  Mr. Ayoob, Mr. Fuchs,

22   Mr. Cerar, and others established that magazines are an

23   essential component for an operable firearm from the

24   operational perspective.  And defendant has provided no

25   evidence to the contrary with regard to magazines as an

1   essential component of an operable firearm.

2         Stipulation 20 establishes that semiautomatic pistols

3   and rifles cannot function as designed without a magazine.  It

4   is also stipulated that 16-plus magazines are and have been in

5   common use.  In stipulations 3 and 10, specifically, quote, the

6   number of lawfully owned semiautomatic firearms that utilize a

7   detachable box magazine with a capacity of greater than 15

8   rounds is in the tens of millions.  Stipulations 25, 17 and

9   others go to the same point.

10         It's also stipulated that these firearms equipped with

11   detachable box magazines with a capacity of more than 15 rounds

12   are used by law-abiding citizens for multiple lawful purposes,

13   including recreational target shooting, competitive shooting,

14   collection, hunting, and perhaps most importantly, are kept for

15   home defense and defense outside the home.  This is not in

16   dispute.

17         Hence, magazines are arms protected by the Second

18   Amendment, just as ammunition is entitled to Second Amendment

19   protection.  As stated by the Court in *United States v. Pruess*

20   and in *Ezell*, magazines needed for training, practice to

21   maintain proficiency are also protected.

22         There is much evidence here on the use of magazines

23   with a capacity of more than 16 rounds for target shooting.

24         The Second Amendment provides a right to keep and bear

25   arms, unlike machine guns, which are unusual firearms not

1835

1    commonly possessed.  A magazine with a capacity of 16 rounds or

2    more has been commonly possessed by law-abiding citizens for

3    well over a century.  The question to be asked, as the court

4    indicated in *Heller* and more recently the Ninth Circuit in

5    *Peruta*, does the law harmonize with the historical traditions

6    associated with Second Amendment guarantees?

7            We heard from Mr. Shain that firearms manufacturers

8    have been trying to address the dangers associated with the

9    delays associated with reloading since the late 1700s.

10           Mr. Cerar said he hadn't heard of any civilians

11   engaging in defensive gun uses requiring more than 15 rounds in

12   his vast research, by watching TV, networking with his friends,

13   other firearms people, and reviewing a daily blog authored by a

14   sergeant who is retired from NYPD.

15           Similarly, Mr. Fuchs claims he had never heard of such

16   an event either.  Although, what research he did to determine

17   this is still unclear.

18           As *Peruta* and *Heller* make clear, however, the scope of

19   the inquiry isn't limited to the last ten years or twenty years

20   or fifty years or one hundred years.  In fact, the scope of the

21   inquiry is more directed to the circumstances that existed

22   historically when the Second Amendment was adopted by the

23   States.  Then, as now, citizens kept and bore arms which they

24   determined were the most effective for their personal

25   protection.

1          This is true whether we're talking about settlers who

2    were fighting off attacks by robbers, Indians, with the

3    ubiquitous Winchester lever-action rifle; shop owners, fending

4    off mobsters who were toting Tommy guns in the '20s; or

5    citizens defending themselves against gang members in present

6    day.

7          The undisputed fact is that citizens and manufacturers

8    of firearms have been producing, keeping, and bearing firearms

9    and associated ammunition that were designed to provide more

10   readily available rounds without the need to reload for

11   self-defense for more than 200 years.

12         Hence, a regulation which renders magazines with a

13   capacity of 16 or more rounds illegal imposes a burden on the

14   Second Amendment rights.

15         Plaintiffs have met the first step in the

16   *Heller/Reese*/Patterson analysis adopted by most circuits in the

17   wake of *Heller* and *McDonald*.  Having established that a burden

18   on Second Amendment rights exists, the burden to justify this

19   burden moves to the defense.  And this burden is not a minor

20   burden; it's a significant burden, Your Honor.

21         Three of the most popular firearms sold by the

22   licensed firearms dealers and previously purchased by

23   law-abiding citizens of Colorado have been rendered

24   unobtainable.

25         As the evidence showed, the law also deprives

1    able-bodied and disabled law-abiding citizens of both the

2    choice of the arm with which they are most comfortable for

3    defensive purposes and the ability to defend themselves against

4    heavily armed or multiple attackers.  This is not a speculative

5    need, as the evidence showed.  Indeed, in the legislative

6    history -- and I cite to 13-1224, February 12, house committee

7    hearing starting at page 77.  Witness Charles Roblis was

8    attacked by three men.  And I quote from the legislative

9    history, "I fired 13 rounds in defense of my life in a magazine

10   and pistol that had 16 rounds."  A victim need not fire all 16

11   rounds, as claimed by Mr. Cerar and Mr. Fuchs, to use a firearm

12   in self-defense.

13        As the evidence showed and Mr. Fuchs testified, it's

14   prudent to have additional rounds available in the event that

15   unforeseen circumstances occur.

16        Dr. Zax reported that incidents of home invasions in

17   which attackers utilized firearms were rare and that incidents

18   in which defensive gun uses by homeowners succeeded in fending

19   off attackers by use of a firearm were similarly rare.  Mr. Zax

20   then concludes as a result that citizens really don't need

21   these magazines and associated firearms for home defense.

22        Of course, that wasn't Dr. Moore's experience.

23   Lightning struck for Dr. Moore when he was required to engage

24   in a defensive gun use to protect his own life.  Another

25   notable fact mentioned by Dr. Moore is that at the Newark, New

1    Jersey trauma center, multiple gunshot wounds have increased

2    from 10 percent of gunshot wound patients in 2000 to 23 percent

3    in 2011.  This is significant because it undermines the core of

4    the defendant's argument.

5        The problem is that New Jersey has had a magazine ban

6    since 1990, prohibiting magazines with a capacity of greater

7    than 15 rounds.  Thus, if gunshot wounds increased by

8    13 percent over a ten-year period, when a magazine capacity

9    limit precisely the same as that here in Colorado existed, it

10   shows that such a magazine capacity limit does not achieve the

11   public interest for which it is purported.

12       If the Second Amendment relied for justification on

13   the frequency of home invasions involving armed intruders or

14   armed victims, *Heller* would have permitted a comprehensive gun

15   ban.

16       As noted in our trial brief, the *Heller* court did not

17   think that Second Amendment rights depended on speculation of

18   social scientists.  Instead, the *Heller* court reaffirmed the

19   constitutional right of law-abiding citizens to keep and bear

20   arms as the core right of self-protection, regardless of the

21   number of occasions where home defense required a defensive gun

22   use.

23       The defendant's argument is that a law-abiding

24   citizens -- pardon me, a law-abiding citizen will only rarely

25   need to defend themselves in their homes; hence, laws which

1    adversely affect that ability to defend hearth and home are

2    acceptable.  And that simply isn't the case, as the Supreme

3    Court held in *Heller*.  Your Honor, plaintiffs have met the

4    first prong of the *Reese/*Patterson*/Heller* analysis, the

5    challenged legislation imposes a burden on conduct falling

6    within the Second Amendment's guarantees.

7         Moving on to the second prong.  It's defendant's

8    burden now to show that the public interest is served by the

9    challenged legislation.  And defendant argues that the magazine

10   capacity limitation serves this public interest by quoting,

11   "limiting magazine capacity to 15 rounds, the legislation

12   provides victims of mass shooting situations with an

13   opportunity to escape or overcome a shooter because reloading

14   requires those intent upon mass murders to pause briefly while

15   performing a magazine exchange, thereby giving potential

16   victims a chance to intervene or flee."

17        Problematic to this argument is that there is

18   absolutely no evidence to support this contention.  The

19   incidents cited by defendant's witnesses don't support this

20   claim.  Defendants cited four examples of such incidents in

21   their opening statement.  They mentioned the Aurora theater

22   shooting, the Newtown shooting, the Columbine shooting, and the

23   New Life Church incident.

24        As the evidence showed, however, the Aurora theater

25   shooting, the Columbine shooting, and the Newtown shooting did

1840

1    not involve incidents in which magazine exchanges provided

2    potential victims an opportunity to flee or intervene.  And

3    there was no evidence presented by the defense on the New Life

4    Church incident.

5           Mr. Fuchs.  Mr. Fuchs provided initially 47 examples

6    of incidents in which he claimed that a magazine exchange

7    allowed victims of an attempted mass murder to flee or

8    intervene.  After his second deposition on this issue in which

9    his knowledge regarding the facts of these incidents was

10   explored, this list was reduced to the six incidents he

11   testified to at trial, the Long Island railroad incident, North

12   Carolina shooting, the Penn State shooting, the Aurora theater

13   shooting, the Sandy Hook shooting, and the Giffords shooting.

14          We've already established that the evidence does not

15   support a contention that the Aurora theater shooting involved

16   a magazine exchange.  The Long Island railroad shooting, the

17   North Carolina shooting -- I'm sorry, the Penn State shooting,

18   which didn't involve a mass murder.  It involved a woman armed

19   with a Mauser.  We don't know whether she was trying to reload

20   or not.  The Long Island railroad shooting, the evidence is in

21   conflict.  The North Carolina shooting cited by the defendants

22   is an incident where a suspect had been shot three times, his

23   shin bone had been broken by the third shot.  He collapsed to

24   the ground before individuals intervened.

25          The Sandy Hook shooting is particularly problematic,

1    since Mr. Fuchs -- Chief Fuchs was offered as an expert

2    specifically based upon his involvement in the Sandy Hook

3    incident, which as we heard, was picking up four teachers and

4    making sure that the kids got reunited with their parents in

5    the parking lot of the school.

6         I question whether Mr. Fuchs' expertise based upon

7    such an experience is legitimate.  But, nonetheless, what we

8    now know is that contrary to his original testimony in which he

9    stated that Sandy Hook represented an event in which a mass

10   murderer was -- well, whether magazine reload by a mass

11   murderer allowed the children to flee, what we now know is that

12   both investigative reports prepared by the state's attorney and

13   the state's department of public safety resulted in a

14   determination that the shooter's firearm had malfunctioned and

15   that he was not effecting a reload when the incident occurred.

16        Thus, five of the six incidents proffered by the state

17   to support their contention that reloads save lives are false.

18        The last incident proffered by the defendant was the

19   Giffords incident.  This was the only arguable incident in

20   which a magazine exchange actually provided potential victims

21   the opportunity to flee or intervene.  And we heard from

22   Mr. Salzgeber that he was certain that the shooter was

23   engaging in a reload because his observation of the pistol

24   indicated that the pistol was in lock-back, which he

25   interpreted to mean, based upon his experience, with a

1    certainty, that the firearm was out of ammunition.  And we now

2    know based upon the stipulation this morning that this isn't

3    the case either.

4         As a result, there is an absence of any evidence of

5    public benefit served by the magazine limitation at issue.

6    Defendants can't establish a close fit, as required by *Ezell*,

7    between the magazine limitation and the public safety interest

8    it purportedly was designed to serve.

9         Your Honor, I'm not a mathematician, I'm not an

10   economist, and perhaps in my dotage, I have difficulty

11   following some of this social science evidence.  But I would

12   propose to you, Your Honor, that the social science evidence

13   that we have heard from multiple experts is a wash.  Everybody

14   challenges the opinions of everybody else.  Everybody

15   challenges the statistics of everybody else.  The basis upon

16   which these challenges are rendered is questionable from all

17   sides.  If social science is a wash, and the social science

18   data notwithstanding, it's clear from the evidence that the

19   circumstances for which this legislation was purportedly

20   adopted, mass shootings, are rare, just as defensive gun uses

21   are rare, involving rounds -- more than 15 rounds being fired

22   in an incident.

23        Mass shooting events in which potential victims are

24   able to flee or intervene during a magazine exchange are at

25   best a very small subset of these already rare incidents.  And

1    I would argue that there has been no evidence presented of any

2    incident in which potential victims were able to flee or

3    intervene during a magazine exchange thus far in this trial.

4        Your Honor, here is a significant point I think in my

5    review of *Heller* and *Peruta*.  If *Heller* and *Peruta* –– and if

6    the defendant is correct, as stated on page 6 of defendant's

7    trial brief at the bottom of the page, that *Heller* and *Peruta*

8    render any laws that, quote, prevent lawful self-defense with a

9    handgun unconstitutional, plaintiffs would argue that a

10    magazine limitation which forces a defensive shooter to reload

11    during an attack prevents lawful self-defense during the time

12    needed to reload and is, thus, unconstitutional.

13        The *Heller* court acknowledged that the purpose of

14    firearm use for lawful self-defense is confrontation.  The

15    *Heller* court found unconstitutional legislation which

16    prevented, quote, the possession of immediately operable

17    firearms –– immediately operable firearms –– which make it

18    impossible for citizens to use them for the core lawful purpose

19    of self-defense.

20        The magazine limitation at issue here renders a

21    firearm inoperable when the low-capacity magazine runs dry and

22    during the time period required for reloading based upon this

23    artificial 15-round-capacity limit.

24        Mr. Shain, Mr. Ayoob, Mr. Cerar, Mr. Fuchs all agree,

25    a citizen is rendered temporarily defenseless and unable to use

1  the firearm for the core purpose of self-defense while in the

2  process of reloading.

3        If under *Heller* II the availability of a wide variety

4  of firearms that were unaffected by the legislation is a key

5  element for the Court's consideration, here, every

6  semiautomatic firearm possessed by FFLs and the citizens of the

7  state of Colorado is impacted by the legislation, because the

8  statute limits magazine capacity as to all semiautomatic

9  firearms, not a small segment.  And every citizen who is forced

10 to carry a lower-capacity magazine is, thus, forced to reload

11 more often and, thus, rendered unable to defend themselves

12 during the magazine exchanges that are required by the

13 lower-capacity magazine limitation.

14       Your Honor, Mr. Ayoob and Mr. Shain both testified as,

15 again, did Mr. Cerar and Mr. Fuchs about the mechanical

16 functioning of a semiautomatic firearm and that most

17 semiautomatic firearms are rendered inoperable for self-defense

18 during the time needed for a magazine exchange, thus

19 "preventing" the core protection of self-defense.

20       Shain testified that this problem is recognized not in

21 the last ten years or the last twenty years, but in 1856, when

22 LeMat developed a two-barreled revolver, one barrel with a

23 nine-shot cylinder and the second with a single-shot

24 capability, such that there was always at least one round

25 available to fire in self-defense while reloading.  This has

1   been a common issue for which magazine manufacturers have

2   attempted to address for the last century and a half.

3          Under *Reese* part 2, as under any other form of

4   heightened scrutiny, the government bears the burden of showing

5   that Section 18-12-301 through 303 promote public safety.  It

6   was defendant's burden to establish that the public interest

7   that is served by this magazine limitation was significant, and

8   it did not meet this burden.  In fact, it hasn't met its burden

9   to show any public interest in 18-12-301 to 303.

10          As noted previously, the social science evidence was,

11   at best, a wash.  And it's the defendant's only other evidence

12   to support its contention that magazine limitations serve the

13   public interest because they compel a mass murderer to reload

14   more often, thereby giving victims an opportunity to flee or

15   intervene, ultimately not a single incident in which this

16   occurred has been proffered by the defense.

17          Ayoob's testimony regarding the burdens imposed by the

18   magazine capacity limitation on the disabled, infirm, aged or

19   handicapped was also unrebutted.  The evidence established that

20   individuals with upper body disabilities are placed at a

21   significant disadvantage by the magazine capacity limitation

22   because they're forced to reload more often.  And for a

23   disabled, aged, or infirm individual, reloading is more

24   difficult and more time consuming, and, as a result, exposes

25   them to the risk of death more often.

1846

 1          As already discussed, the time needed to reload may

 2   mean the difference between life and death in a defensive gun

 3   use by either an able-bodied or a handicapped person.

 4          Your Honor, certainly a more significant burden

 5   between life and death can't be imagined.

 6          Similarly, a disabled individual with lower body

 7   disabilities is also substantially disadvantaged by the

 8   magazine limitation, because they are unable to move to cover

 9   and concealment during a reload.  Hence, the evidence showed,

10   they must engage in suppression fire.  Limiting the rounds

11   available for a handicapped, wheelchair-bound individual to

12   engage in suppression fire during a defensive gun use places

13   that individual who is restricted to a wheelchair at the risk

14   of death.

15          As Mr. Fuchs said, when you're out of bullets, you are

16   vulnerable.  Your gun is converted to an ashtray that you can

17   throw at the suspect.

18          There is no evidence that any plaintiff here that has

19   been burdened by 18-12-302 is anything other than a law-abiding

20   citizen, unlike in *Reese* and -- pardon the pronunciation --

21   Huitron-Guizar.

22          The foundation for defendant's argument that

23   lower-capacity magazines save lives is because it provides

24   potential victims of mass murderers the opportunity to flee or

25   intervene also rests on the premise that mass murderers who

1    have no regard for the rights of the people who they are

2    shooting and who have no regard for the laws that prohibit

3    assault with deadly weapons are nonetheless going to follow a

4    magazine capacity limitation.

5          Mr. Zax's opinions ignore the subset to whom the law

6    is directed.  It's the criminals or the mentally ill who engage

7    in these mass murder events.  The foundational premise that

8    these mass murderers or mentally ill individuals will follow a

9    magazine capacity limitation, which will then serve the public

10   interest by requiring more reloads is flawed.

11         Because the defendant has presented no credible

12   evidence on social benefit and there is an abundance of

13   unrebutted evidence on social detriment, the defendant did not

14   meet its burden to show that 18-12-302 provides any public

15   benefit under any level of scrutiny.

16         As noted in *Ezell*, under circumstances where "the law

17   burdens law-abiding responsible citizens, a more rigorous

18   showing is required to justify that burden."  And here, there

19   has been no showing whatsoever.

20         Here, the statute doesn't prohibit magazine possession

21   by a narrow class of persons; but, rather, applies to every

22   law-abiding citizen, resident, or visitor to the state of

23   Colorado.

24         There must be a close fit between the challenged law

25   and the actual public interest it serves, and no such fit

1    exists here because the law serves no public interest.  There

2    has been no evidence at all that limiting the capacity of

3    magazines or -- to 15 or less will have any impact on lives

4    saved.

5         Notably, Your Honor, the legislature made no effort to

6    assess whether the magazine regulation in fact would advance

7    the public benefit.

8         Your Honor, the defendant's limited to the legislative

9    record for the reasons cited in our trial brief.  And as a

10   result, if the defendant's evidence which was not presented to

11   the General Assembly is excluded, there is, essentially, no

12   evidence whatsoever in support of the defendant's claims.

13        I want to move on to a different aspect of 1224.  The

14   magazine limitation not -- is not the only burden imposed by

15   18-12-301 to 303.  The statute also requires in-person

16   background checks between the transferor and the transferee for

17   routine temporary loans of more than 72 hours and imposes

18   additional liability by making the transferor jointly and

19   severally liable for damages caused by the transferee's use.

20        Once again, the defendant did not present any credible

21   evidence that there is a public interest served by this aspect

22   of the legislation.  However, the evidence showed that this

23   legislation imposes a significant burden on organizations like

24   Colorado Youth Outdoors, Anschutz Guest Ranch, Hamilton Family

25   Shooting Center, Outdoor Buddies, a number of outfitters, all

1    of whom have described the burdens imposed by the requirement

2    of in-person background checks for private transfers.

3            THE COURT:  Counsel, I'm going to interrupt for a

4    moment.

5            MR. COLIN:  Sure.

6            THE COURT:  Have you addressed the issue of whether

7    organizations such as Colorado Youth Outdoors, Anschutz Guest

8    Ranch, Hamilton Family Shooting Center, Outdoor Buddies, or

9    other entities have Second Amendment rights?

10           MR. COLIN:  I have not at this point.  Mr. Westfall is

11   going to address that in his segment of the argument, Your

12   Honor.

13           THE COURT:  Thank you.

14           MR. COLIN:  Your Honor, in addition to these

15   organizations, the law also imposes the burden on the licensed

16   firearm dealers.  And this goes to the same point that was

17   addressed in our standing arguments with regard to corporate

18   standing that had been previously presented in our trial brief

19   and upon which Mr. Westfall will speak in greater detail.

20           However, Your Honor, to address the burden itself on

21   the licensed firearms dealers, private transfer background

22   checks must be performed, essentially, for free by these FFLs.

23   Not only are they compelled to perform services with no

24   remuneration, they are also required by the statute to assume

25   the risks of errors associated with the process.  Those risks

1850

```
 1   can be administrative, they can lose their FFL license,

 2   criminal, or civil.

 3           THE COURT:  So what constitutional right is being

 4   impacted here?

 5           MR. COLIN:  With regard --

 6           THE COURT:  With regard to the FFLs?

 7           MR. COLIN:  It's to establish that the FFL has

 8   suffered an injury in fact, Your Honor.  The constitutional

 9   right is the right to possess and, arguably, provide to

10   citizens of the state of Colorado and their right to possess

11   lawfully firearms that they have decided are the best firearm

12   for their personal use in self-defense.

13           THE COURT:  So the FFLs don't have a constitutional

14   right at issue here.  What you're claiming here is they have

15   some derivative standing to assert on behalf -- to assert a

16   loss of some sort by citizens of Colorado?

17           MR. COLIN:  That's correct.  And, Your Honor, we cited

18   a couple of cases in our standing response -- the response to

19   the motion to dismiss based on standing which addressed the

20   issue of derivative standing based upon assertion of customer

21   rights or member rights.

22           THE COURT:  But performance of these duties without

23   compensation doesn't necessarily impact the citizens of

24   Colorado.

25           MR. COLIN:  Well, it does because it chills -- it
```

1   does, because the FFLs, because they aren't being compensated,

2   aren't performing those private transfer background checks.

3          THE COURT:  What evidence in the record is there that

4   the number of FFLs has diminished since the statute became

5   effective?

6          MR. COLIN:  There is no evidence in the record that

7   the number of FFLs has diminished.  However, there is

8   significant evidence in the record that the number of private

9   transfer background checks that have been performed by FFLs has

10  been significantly reduced.  And, certainly, there is evidence

11  that -- I'm getting out of my list here a little bit.  But

12  there was evidence that there were 684 private transfer

13  background checks performed in the past nine months in the

14  state of Colorado.  With regard to those private transfer

15  background checks, those fell into three categories:

16  Interstate checks, intrastate checks, and private transfers in

17  which there was no sale associated with the transaction.  So of

18  those 684, a significant portion of those 684 went to

19  interstate or intrastate transfers.  Thus, we have a universe

20  of less than 684 private transfer background checks performed

21  in the state of Colorado in the last nine months.

22         THE COURT:  And do we have -- is there any evidence in

23  the record that explains why this occurred?

24         MR. COLIN:  Well, I believe it can be inferred in the

25  record.  Certainly, the testimony has been that large stores

1852

1  like Cabela's refuse to do private transfer background checks

2  because of the lack of compensation and the risk associated,

3  that FFLs are declining to perform private transfer background

4  checks.  The evidence was -- I believe it was from Mr. Brough

5  that customers repeatedly were coming into his store seeking

6  private transfer background checks and reporting that they had

7  been unable to obtain that service elsewhere.  I believe

8  Mr. Kopel will also speak more specifically to some of the law

9  associated with this issue, Your Honor.

10          *THE COURT:*  Thank you.

11          *MR. COLIN:*  Uh-huh.

12          18-12-1122 does state, and I quote, a licensed gun

13  dealer may charge a fee for services rendered pursuant to this

14  section, which fee shall not exceed $10.

15          The statute doesn't say, as defendants contend, that

16  in addition to the $10 fee charged by the state of Colorado, an

17  FFL may charge a fee not to exceed $10.  At best, the statute

18  is ambiguous on this issue.

19          Your Honor, the FFLs have suffered an injury in fact

20  because they have been left with thousands of 15-plus magazines

21  they can't sell.  They've also been left with a dead inventory

22  of firearms, which are the most popular firearms that they

23  previously sold, such as the Springfield XDM, because they're

24  now unable to sell them because there are no compatible

25  compliant magazines available for those firearms.

1          Your Honor, the bottom line here is that this statute

2    serves no public interest whatsoever and imposes a significant

3    burden on the public, and that the evidence is clear that the

4    defendant has not met its burden to show that such public

5    interest exists and outweighs the burdens placed upon the

6    plaintiffs here.

7          THE COURT:  Thank you.

8          MR. COLIN:  Thank you.

9          MR. WESTFALL:  Your Honor, I will direct my attention

10   primarily to 1229.

11         As previously noted by Mark --

12         THE COURT:  Excuse me.  Previously noted by?

13         MR. WESTFALL:  Mr. Colin.

14         THE COURT:  Thank you.

15         MR. WESTFALL:  I'm sorry.  As previously noted by

16   Mr. Colin, the *Reese* and *Peterson* cases in the Tenth Circuit

17   control this Court's decision.  And applying those cases, as

18   Mr. Colin pointed out, it's very clear with regard to assessing

19   1229, just as it is with addressing 1224, that it's a two-part

20   test.  Our burden is to establish that there -- in the first

21   instance, that 1229 burdens the Second Amendment rights of a

22   large chunk of citizens of Colorado, law-abiding citizens of

23   the state of Colorado.

24         Once we have done that, the burden will then shift to

25   the defendant to justify the burdens that are placed.

1           There is one -- while it's set forth in our brief,

2    there is one key citation that I think is critical to the

3    analysis of 1229 and the Second Amendment rights at issue.  And

4    that is contained in *Ezell*, and it's at 651 F.3d at 704.  And

5    the key sentence here that we believe is completely apposite to

6    the analysis that the Court should use regarding 1229 is as

7    follows:  "The right to" -- and this is a quote.  "The right to

8    possess firearms for protection implies a corresponding right

9    to acquire and maintain proficiency in their use."  And I want

10   to underscore the use of the word "acquired," because that

11   is -- gets to the core of why 1229 imposes significant burdens

12   on law-abiding citizens in the state of Colorado.

13          In this case, plaintiffs have far more than met their

14   burden to show that 1229 substantially burdens the right to

15   acquire firearms in this state.

16          The background check -- universal FFL background check

17   requirement that is applied to every temporary transfer

18   exceeding 72 hours, except in a handful of very limited

19   situations, which the Court heard extensive testimony on, goes

20   much, much too far.

21          And as I start walking through this, I think I can

22   anticipate the question that will be posed, because I'm going

23   to -- the first organization that we mentioned that we

24   presented testimony on was Colorado Youth Outdoors.  And

25   Mr. Hewson testified not only about the impact on Colorado

1855

```
 1    Youth Outdoors, but, 4-H, Pheasants Forever, Parks and

 2    Wildlife, and other organizations.  And the question, Your

 3    Honor, that you posed to Mr. Colin was in fact, do these

 4    organizations have Second Amendment rights?  And the answer to

 5    that question is, I think, contained in two parts.

 6          Number one, it's my understanding that the gun ranges

 7    that were plaintiffs in Ezell were certainly recognized to have

 8    standing in their own right as being part of teaching

 9    proficiency in firearms.

10          THE COURT:  I'm going to interrupt right there.

11          MR. WESTFALL:  Certainly.  Go ahead.

12          THE COURT:  If I read those opinions correctly, one,

13    they were not the only plaintiff.  And, two, their rights were

14    not expressly addressed in the opinions.  Can you show me where

15    the rights of organizations under the Second Amendment were

16    expressly addressed in any of those opinions?

17          MR. WESTFALL:  It's not just so much their rights as

18    an organization -- in this case, Colorado Youth Outdoors,

19    4-H -- as an organization itself suffering injury, but it's

20    being a critical component of the right to acquire and the --

21    right to develop proficiency of the people that are part of

22    their program.  And in the case of Colorado Youth Outdoors,

23    Your Honor, it's the parents and the 13-, 14-year olds that

24    take part in that program.

25          Colorado Youth Outdoors is a gateway to facilitate --
```

1    every -- the 300 people a year that participate in their

2    program to for the first time actually touch a firearm, to

3    learn proficiency in its use, to learn how to handle it

4    responsibly and safely.  And when -- when the Colorado Youth

5    Outdoors, when 4-H, when Pheasants Forever, when all of these

6    organizations routinely engage in the transfer of firearms to

7    the children and to the parents as part of teaching responsible

8    gun ownership and proficiency, that is -- has to be part of

9    this implicit right of learning and possessing and acquiring a

10   firearm that's recognized under *Heller* and *McDonald* and the

11   Second Amendment.

12        THE COURT:  What I understand you to be saying is that

13   the individuals who participate in those programs may have

14   Second Amendment rights, and that Colorado Outdoors and other

15   entities are asserting representative standing for those

16   individuals.  Is that correct?

17        *MR. WESTFALL:*  That's correct, Your Honor.  And there

18   is one other component to this that I want to mention in

19   addition to that, with regards to each of these organizations.

20        Each of these organizations, as was testified to by

21   Mr. Hewson and also came out of the testimony of Ms. Eichler,

22   that as a result of having to actually obtain a firearm,

23   like -- every time they obtain new firearms or get firearms

24   transferred to them from out of state under existing law,

25   setting aside 1229 -- every time they do that, a person, in the

1857

1   case of Colorado Youth Outdoors, Mr. Hewson, has to go to

2   the -- to the FFL gun store and put his own personal name on

3   the background check.  And as -- there was extensive testimony,

4   both regarding Ms. Eichler, Mr. Hewson, it came out of the

5   testimony, I believe, of Mr. Brough, talking about from the

6   flip side, his experience with Colorado Youth Outdoors, in

7   dealing with Colorado Youth Outdoors under Section (1)(d) of

8   1229 and the ownership issue, it places a tremendous burden on

9   the Second Amendment rights of Mr. Hewson, and it places a

10   burden on the Second Amendment rights of every staff member who

11   is in fact possessing that firearm and not --

12           Yes, in one sense, the core is -- we recognize that

13   the core of the Second Amendment, Your Honor, is personal

14   protection under a "bearing" context in public and in a

15   "keeping" context in defense of home and hearth as set forth in

16   *Heller*.  But the -- the right has to also include just the

17   right of possession and for purposes of teaching another

18   person.

19           *THE COURT:*  Well --

20           *MR. WESTFALL:*  And so when 1229 places a burden on

21   Mr. Hewson, Ms. Eichler, every single staff member of Colorado

22   Youth Outdoors and every single staff member of Pheasants

23   Forever, 4-H, and et cetera, it is burdening the Second

24   Amendment rights of each individual who is keeping or bearing

25   an arm at that time.

1          *THE COURT:*  All right.  What I'm understanding is,

2    your definition of the right to be protected under the Second

3    Amendment is the right, as you say, to acquire.

4          *MR. WESTFALL:*  Correct.

5          *THE COURT:*  Well, when we're looking at the burden

6    here, if there is a burden on that Second Amendment right, it's

7    a burden on the acquisition of a firearm.  And the only people

8    who are acquiring the firearm here that deal with these

9    organizations are the transferees of the firearm, correct?

10         *MR. WESTFALL:*  At one point, Your Honor.  But then the

11   transferor becomes the transferee when the firearm is returned,

12   and they become the acquirer, Your Honor.

13         *THE COURT:*  Well, my understanding from the testimony

14   is that for each of these organizations, the transferor loans

15   the firearm to someone else.  Did I misunderstand that?

16         *MR. WESTFALL:*  If it's loaned for more than 72 hours,

17   under 1229, it is transferred.  And as we tried to elicit

18   through the discovery responses submitted to the Governor and

19   the line of questioning that I was trying to do with

20   Mr. Colglazier, which I think led to a stipulation, Your Honor,

21   we tried to establish a clarification under 1229 that this loan

22   that exceeded 72 hours in fact -- there would be no need to do

23   yet another background check for a return from the transferee

24   back to the transferor.  And, in fact, that clarification was

25   denied, Your Honor.

1          And under the plain language of 1229, that's one of

2     the most pernicious aspects of this, Your Honor, that every

3     single loan that exceeds 72 hours that does not contain -- that

4     is not done with a background check and does not contain an

5     exception, not only does it violate the statute at that time,

6     but there needs to be an additional background check to be

7     bringing it back to the original transferor.

8          It is a universal burden, Your Honor, on the right to

9     acquire firearms, because there is constantly going to be, for

10    example, a farmer or a rancher who is going to be transferring

11    a firearm to a hand, and the hand goes out into the field.  And

12    particularly in a rural ranch, where they're going to have to

13    go out and have to be gone for a few days, or in Ms. Eichler's

14    case, it's going to be scouts going out even before the hunting

15    season.  So, clearly, the while hunting exception doesn't

16    apply.  The scout is going to be out more than 72 hours.  Even

17    assuming a background check is done, there is still going to be

18    a transfer -- the original transferor, the farmer who owns the

19    firearm originally, the outfitting operation, the farmer, the

20    rancher, Colorado Youth Outdoors, they're going to become the

21    acquirer.

22          THE COURT:  I understand that's what the witnesses

23    fear.

24          MR. WESTFALL:  With regard to Outdoor Buddies, you

25    have unrebutted testimony that there are highly specialized

1860

1   firearms involving people with disabilities, and every single

2   person with a disability is entitled access to those

3   specialized firearms.  And the transfers that are going to take

4   place are almost all -- quite out -- they're three-day hunts,

5   but to deal with the logistics are almost going to exceed 72

6   hours, Your Honor.

7           With regards to the testimony of Ms. Dahlberg

8   regarding -- albeit something very general, regarding, you

9   know, the ability to loan a firearm to women who feel that they

10  are in a situation where they need a firearm, the important

11  point here with respect to that testimony is the -- it

12  highlights for the Court the one exception that the General

13  Assembly thought it was putting in to deal with this situation,

14  and that is the exception that deals with a, quote, imminent

15  threat.  But it's an imminent threat in the home.

16          And, Your Honor, when you're considering the evidence

17  and deciding on how to rule on this case, I ask you, Your

18  Honor, to go back and read the plain language of 1229 and read

19  that exception, and make a determination, yourself, Your Honor,

20  as to whether or not that exception can even remotely deal with

21  the myriad of situations where someone would legitimately in a

22  feeling -- in a threatened situation but not imminent, could be

23  tomorrow, it could be anyone -- it could be a spouse, it could

24  be a friend, it's somebody who is concerned, I need a firearm,

25  I feel like I am threatened, I feel like I'm -- I don't know

 1    what is going to happen, but I need a firearm.

 2          And to require in a situation, here, let me loan you a

 3    firearm, a few days, a week, a month, whatever it takes that

 4    you feel that is appropriate, to require a full FFL background

 5    check in that context to loan a firearm to a friend is far too

 6    much of a burden to allow that person to acquire a firearm to

 7    protect him or herself from what the person clearly perceives

 8    to be an individual threat.

 9          With regards to -- and then back, like I say, to

10    farmers and ranchers.  Farmers and ranchers, the testimony

11    showed by Mr. Colglazier from the Farm Bureau, farmers and

12    ranchers use firearms as a tool.  Virtually all farms and

13    ranches in the state of Colorado have at least a firearm on the

14    premises to deal with a predator, something that is going to

15    threaten their crops, something that is going to threaten their

16    livestock, and for the simply basic core *Heller* requirement --

17    core principle of home defense.

18          These farmers and ranchers are in rural Colorado.

19    They do not have gun stores open on weekends that are -- they

20    can just go down the road and get an FFL background check every

21    time they loan a firearm to a hand, to anybody beyond an

22    immediate family member for more than 72 hours.

23          *THE COURT:*  Well, Mr. Westfall, that was one of the

24    areas that I had some questions about.  If I were a farmer, and

25    I had a ranch hand, and I thought that ranch hand was going to

1   need to use the firearm as part of the performance of that

2   ranch hand's duties, wouldn't I go get a background check for

3   that ranch hand and then simply entrust that particular firearm

4   to the ranch hand?  Why would I have to do that every single

5   time I handed the ranch hand the firearm?

6            MR. WESTFALL:  Because 1229 requires it, Your Honor.

7            THE COURT:  Once it's done, isn't that sufficient?

8            MR. WESTFALL:  If it's ever transferred back to the

9   farmer or rancher, it triggers another FFL background check.

10           THE COURT:  What if both of those people have the FFL

11  background checks?  I have it for when I got the firearm, the

12  ranch hand had it before the first time I gave the ranch hand

13  that firearm, why isn't that sufficient?

14           MR. WESTFALL:  Because 1229 was written much too

15  strictly, Your Honor.  And I will get to the legislative

16  history in a moment.

17           It was intended that every time there be a transfer

18  exceeding 72 hours, that would trigger a new FFL background

19  check.  Because you want to know what, Your Honor?  In the

20  scenario you just outlined, the General Assembly wrote 1229 so

21  strictly that they -- they thought, you know what, yes -- if it

22  would just have been anybody on the farm and ranch who is going

23  to use the firearm can go in for one background check and

24  everybody then is allowed to pass the gun back and forth as

25  many times as they want, if they would have had a common sense

1    interpretation and put that into the plain language of 1229,

2    maybe that would be one thing.

3           And I understand Your Honor's point, but that's not

4    what 1229 does.  Because they wanted the 72-hour -- and I'll

5    get to that in a moment with respect to the 72-hour provision

6    -- they only trusted that this background check could be

7    applicable for a very short period of time.  Because, you want

8    to know what, Your Honor?  Especially implicit in the way that

9    General Assembly drafted 1229, it was drafted in such -- you

10   know what, Your Honor, you've known Joe Hand on your farm for

11   25 years.  And you know that he's a reliable person.  And

12   instead of drafting a law, you know, that Farmer Jones and Joe

13   Hand can go in and have it done one time and then, fine, you're

14   protected.  No.  You know what?  The law essentially presumes

15   that, you know what, Joe Hand may go out and do something that

16   would be a prohibitor in the next four or five days or next

17   week.

18          And so the law was written with such strictness -- and

19   I want to urge the Court to look at that.  That's one of the

20   reasons why this law is so absurd and why it really burdens the

21   Second Amendment rights of all law-abiding citizens, is it was

22   written with such strictness because it assumes that Joe Hand

23   and -- and Farmer Brown are going to have to go in every so

24   often, every few days, every time there is a transfer back.

25   Because you want to know what?  Even though they've known each

1   other for 25 years, somebody could have done something in a few

2   days, so we need a new fresh background check to make sure that

3   that transfer is okay.  That's the way, Your Honor, 1229 is

4   written.  That's why it's absurd, and that's why it unduly

5   burdens the Second Amendment rights of Colorado citizens, it

6   goes too far.

7        What is the core -- what are the core burdens that the

8   Second Amendment -- that -- on the Second Amendment rights that

9   1229 places is because FFLs are simply generally unavailable to

10  do private transfers in Colorado.  The only thing that the

11  state has been able to come up with -- and I'll address that in

12  a moment, because it's more of the State's burden, but I'd like

13  to touch upon it here -- is they've come up with a sheet of all

14  the FFL licensees.  And they say, hey, these folks are

15  everywhere in the state of Colorado.  Including, if you'll

16  recall, Your Honor, the testimony involving Ms. Eichler, where

17  there is cross-examination, and they presented her with an

18  exhibit.  And they said, Ms. Eichler, you don't have any issues

19  regarding Fulldraw Outfitters up in Aguilar.  You'll see here

20  there are two FFL licensees in Aguilar.

21        I asked Ms. Eichler on redirect, Ms. Eichler, do you

22  know any of these two people?  No.  She said their operations

23  have been there for a long time.  Are there gun stores in

24  Aguilar?  She answered no.  And are these folks available to

25  you?  Answer is no.

1        And so I use that as just one example, based upon the

2   way the State tried to show that these FFLs are ubiquitous,

3   just like going down to your 7-Eleven and getting your FFL

4   background check.  They are not available, Your Honor.  That's

5   the problem.  If you're going to come up with a regulatory

6   scheme -- even setting aside, you know, whether background

7   checks are good or are bad, if you're going to require a

8   background check every single time there is going to be a

9   transfer, then they better be readily available.  They are not.

10       They are especially not, as noted by the testimony of

11  Mr.  Colglazier on behalf of the Farm Bureau, for the farmers

12  and ranches who live and do their operations in rural Colorado.

13       As Mr. -- and as Mr. Colin point out, and I won't

14  belabor that, many FFLs are not performing because of the $10

15  fee and because of the liability to the FFLs.  I think he

16  already covered that.

17       There is one other aspect of 1229 that is also

18  critically important to understanding the burden it places on

19  law-abiding citizens in the state of Colorado.  And that is the

20  fact of the way it imposes, even on 72 hours, joint and several

21  liability if there is some, quote, unlawful use.  Ms. Eichler

22  testified that unlawful use in a outfitting situation could be

23  something so simple as an improper tag or something along those

24  lines.  Certainly, with regard to trespassing, trespassing can

25  happen at anyplace, at any time.

1866

1          Your Honor's been out in rural Colorado I'm sure at

2   least at some time.  You go out to northeastern Colorado, there

3   are just not fences separating property.

4          THE COURT:  Mr. Westfall, let's assume for a minute

5   there is a trespass.  What are the damages that arise from a

6   trespass that would be subject to joint and several liability?

7          MR. WESTFALL:  Here is the issue, Your Honor, and this

8   is why sooner or later someone in Colorado is going to be

9   innocently burned and potentially put out of business.

10          All it requires, if it's a 72-hours unlawful use -- if

11   it's beyond the 72 hours, and there is no background check,

12   there is a 1229 violation.

13          Yes, it's joint and several liability.  Joint and

14   several liability for what?  There will have to be, I

15   acknowledge, Your Honor, some other accident.

16          THE COURT:  An event.

17          MR. WESTFALL:  You're talking about an accident

18   involving a firearm.

19          THE COURT:  Right.

20          MR. WESTFALL:  Somebody gets mistakenly shot.  Right

21   now, the law is such that it puts a -- essentially, the person

22   who loaned the firearm had -- would be subject to liability

23   only under a negligent entrustment theory.  We're -- you know,

24   for example, if I loaned the firearm to Mr. Abbott, and

25   Mr. Abbott commits a -- does something, has an accident with

1    the firearm, and they go back to me, you know, am I -- I would

2    be liable only in the context of a negligent entrustment.  And

3    if I was completely reasonable in the loaning of the firearm,

4    I'm perfectly okay.

5          What 1229 does is it imposes joint and several

6    liability on me, especially without even the unlawful

7    limitation, if I don't do a background check before loaning

8    Mr. Abbott the firearm --

9          THE COURT:  I understand.  It's strict liability if

10   you don't do the background check.  The question is, however,

11   how that burdens a Second Amendment right.

12         MR. WESTFALL:  Because it will burden the ability to

13   loan and for Mr. Abbott to acquire a firearm in a situation he

14   should be allowed under the Second Amendment to acquire.  And

15   it creates a chill to impose the significant liability, where

16   I'm saying, I'm not loaning -- Mr. Abbott, I understand that

17   you have every right -- we should have -- before 1229, I could

18   have loaned you this firearm for going out and protecting --

19   you know, you have -- you know, he's a day farmer, and he wants

20   to go out, wants to borrow the firearm for a few days.  What

21   it's going to do is it's going to -- once there is one

22   liability established for -- because I think most people don't

23   know about this law.

24         And sooner or later, there is going to be a, quote,

25   violation.  An enterprising plaintiff's lawyer is going to say,

1    aha, I've got a hook to go to the deep pocket, and the way the

2    hook is, is 1229.  And you're going to see a significant drying

3    up of what should be routine loaning and borrowing of firearms

4    in the state of Colorado, which they should be allowed to do

5    under the Second Amendment, because of the chilling effect that

6    was created by the liability that is being imposed on 1229.

7         THE COURT:  So what you're saying is -- if I

8    understand correctly, is that a citizen has a right to -- has a

9    constitutional right to borrow a firearm without going through

10   a background check.

11        MR. WESTFALL:  A citizen in Colorado has a right to

12   acquire a firearm without having that right unduly chilled.  I

13   realize I'm borrowing the chilling context from the First

14   Amendment context, but that --

15        THE COURT:  That's fine.  We can use the word

16   "chilling."  But the chill applies to the transferor, not the

17   transferee, when you're talking about joint and several

18   liability.  It's the transferor who says, I don't want to be

19   liable.  I don't trust you, Mr. Westfall, with my rifle.  I

20   don't trust you, Mr. Westfall, with my revolver; therefore I'm

21   not going to loan it to you.  Then I'm looking at the Second

22   Amendment rights of Mr. Westfall and whether or not his right

23   to acquire a firearm is being infringed.  And if I say that

24   that's the case, what I'm really saying is, Mr. Westfall, you

25   have a right to acquire a firearm without going through a

```
 1    background check.  Is that what you're arguing?
 2         MR. WESTFALL:  I am arguing that the regulatory scheme
 3    by 1229 unduly restricts that.  I'm -- your question
 4    presupposes that there could be a reasonable background check
 5    scheme.  And I'll touch upon that in the least restrictive
 6    alternative section of my comments in a moment.
 7         The point that you're -- I think implicit in the
 8    question that you posed to me, Your Honor, is this idea of
 9    background check in general.  That's not what we are opposing
10    Your Honor.  What we are opposing is this background check
11    requirement, because this is too burdensome.
12         Getting back to my Mr. Abbott example, Your Honor,
13    if -- let's say this is truly a life and death or threatening
14    situation for Mr. Abbott.  I'm not particularly -- I know
15    Mr. Abbott, he's been my neighbor, I -- you know, I kind of
16    feel comfortable with him.  Without 1229, I'd have no -- if
17    Mr. Abbott approached me and said, you know what, I don't have
18    a handgun.  All I've got is a couple of varmint rifles.  I --
19    the folks like Mr. Colglazier's anhydrous ammonia example up in
20    Nebraska, where a guy comes in, and it looks like you've got
21    some person who likely doesn't belong there.  This person
22    looks, you know, maybe suspicious, like a meth person, and I --
23    I'm just concerned.  I -- listen, I'm not a big gun person.  I
24    have a varmint rifle, you know, to keep coyotes away.  I don't
25    have a self-defense weapon.  You know, that's Mr. Abbott.  He's
```

1    not really a gun person.  He has a varmint rifle.

2         He knows I have firearms that I use for self-defense,

3    and I know how to use the firearm for self-defense.  He comes

4    to me and says, I would like the ability to borrow from me.

5    And I'm -- if I'm -- let's say I'm a very, very cautious

6    person.  I go, you know what, Mr. Abbott, I trust you.  I think

7    you're a good guy and everything, but I am way too concerned --

8    you're talking about defending yourself against a meth head.

9    Those guys have lawyers and what have you.  I'm not comfortable

10   loaning you that firearm because I know that it could

11   potentially impose liability on me.  I'm just not comfortable

12   doing that.

13         And know what?  We just don't have -- we're up in

14   Holyoke, we're up in, you know, Yuma, we're up in -- somewhere

15   in Springfield.  We don't have an FFL gun store that is even

16   remotely close to us that we can go do a background check on.

17   I don't feel comfortable loaning you this firearm.  You want to

18   know what?  The next day the meth head comes in and attacks his

19   home.  That's what we're talking about, Your Honor.  That's the

20   absurdity of this law.

21         Here is the point that I think has to be made:  It

22   would be one thing if the State was able to point to any

23   evidence -- I'll kind of start segueing now into the issue

24   of -- you know, of one other aspect of this -- of the State

25   meeting their burden in a moment.  But it would be one thing if

1    the State could point to any evidence that, you want to know

2    what, these kind of private loans, if you will, have been a

3    problem.  People have died or people have been shot by access

4    to some of these, you know, temporary loans.  They can't point

5    to that, Your Honor.  They can't point to any evidence to

6    justify imposing the burden that they're placing.

7           It has not been a problem.  It has not been a problem

8    in Colorado for decades.  Yet, they have decided that, you know

9    what, we're going to impose this FFL background check

10   requirement, you know, consequences be darned.

11          Let me -- I talked about the burdens on private

12   transfers and the right of acquisition.  Let me briefly talk on

13   private sales.

14          The bulk of our case, Your Honor, on 1229 is focusing

15   on private transfers and the grossly unreasonable burden that

16   1229 places on private transfers.  But we also have taken --

17   have noted in our briefs, noted in the Complaint, and we do

18   have an issue with regards to private sales.

19          And the private sales issue really boils down, Your

20   Honor, to the least restrictive alternative.  And I know there

21   was a lot of back and forth involving Mr. Sloan and Mr. Kopel

22   on this point.  But -- and Mr. Colglazier testified about how

23   easy it was for him to get a certificate on the sheet, going to

24   the CBI web page.  I know that Mr. Sloan in his testimony tried

25   to belittle that.  I know that Mr. Webster in his testimony

1872

1   tried to belittle that.  It wasn't personal enough, it wasn't

2   hands on enough, it wasn't, you know, responsive enough.

3           There are things that can be done to make a system

4   available both -- either adding databases to the existing CBI

5   system, allowing individual citizens to call CBI and have CBI

6   do the background checks directly.  The judicial notice that

7   Mr. Kopel asked Your Honor to take with regards to the federal

8   regulations, we think sifting through all of that, it's very

9   easy for the state of Colorado to craft a much more workable

10  system to allow a much -- some very significant and important

11  and meaningful background check system that would allow private

12  sales to take place that falls well short of having two people

13  have to go in person to an FFL store.

14          I talked about our burden and the burdens that we

15  believe that 1229 places on the Second Amendment rights of

16  law-abiding citizens.  What has the defendant done to justify

17  those burdens on the Second Amendment rights?  We'd

18  respectfully submit that with respect to private transfers, the

19  central focus of our case on 1229, the defendant has wholly

20  failed.

21          Let me briefly touch upon, if I can, for Your Honor,

22  because it's not marked, and I think it may be helpful to Your

23  Honor if you would like -- if you don't find it helpful, I will

24  stop.  But I think in a minute or two, I could briefly

25  highlight for you the respective sections of the legislative

 1    history that are contained in volume 2 that may give you a

 2    little bit of road map in walking through it when you're

 3    reading --

 4         THE COURT:  Please tell me what you'd like me to look

 5    at, but please don't quote it for the record.

 6         MR. WESTFALL:  Okay.  I'm basically going to highlight

 7    for you the sort of key sections.

 8         THE COURT:  Okay.

 9         MR. WESTFALL:  At page 477 is the first committee in

10    the House.  Page 595 is the appropriations committee.  Page

11    611, second reading on the floor of the House.  669, third

12    reading on the floor of the House.  698, the first committee in

13    the Senate.  795, the second reading on the Senate floor.  864,

14    third reading on the Senate floor.  899, the House rejecting

15    Senate amendments and calling for a conference committee.  910,

16    the conference committee.  936, subsequent House consideration.

17    And 977, subsequent Senate consideration.

18         Your Honor, when you're -- when you look through the

19    legislative history, you will see virtually nothing, nothing by

20    the supporters of 1229 to justify regulations of private

21    transfers.  And except for a few uses of the term "transfers,"

22    just thrown in, in the entire transcript, the only real

23    references in the entire legislative history of 1229 relate to

24    private sale.

25         You will also notice, Your Honor, that throughout the

1    legislative history, the -- the representatives and senators

2    that were opposed to 1229 pointed out many of the flaws that we

3    brought before the Court -- in both our trial brief and in our

4    trial presentation.  For the most part, they were -- these

5    concerns were rebuffed or rejected.  And the Court will see

6    that, essentially, as I think I noted previously, the response

7    was, no, we want 1229 to be this strict.  We want people to go

8    through pure FFL checks, and we don't really care about the

9    consequences and the collateral damage that that's going to

10   cause, because this is what we want.

11       The specific amendments that were adopted regarding

12   nieces and nephews, modification of corporate ownership, for

13   reasons that we explored in our testimony don't solve the

14   problem.

15       Regarding the 72-hour provision, that was added as an

16   amendment.  I'd like to bring -- bring the Court's attention to

17   page 777, because there is a very telling statement by the

18   chairwoman of the committee that actually introduced the

19   amendment as explaining what the rationale was for the 72

20   amendment.  This is, again, at page 77 at Exhibit 2.

21       "I guess" -- "Thank you, Senator Harvey.  I guess I

22   really didn't think there was a magic number.  But, actually,

23   upon testimony -- and I think that more witness -- that one

24   witness said, is that an individual would have had that time to

25   be able to go themselves and get a firearm to protect

1    themselves.  So that's where the 72 hours is that magic number

2    that you were looking for."

3            It's not a magic number, Your Honor.  There is no

4    factual record to show that there is anything other than it was

5    just a simple, hey, I think this sounds good.

6            No witness at trial, Your Honor, including Messrs.

7    Webster and Sloan, offered any real substantive testimony

8    regarding private transfers.  Again, I call the Court's

9    attention, as you will, to you look at the transcript involving

10   Mr. Webster.  While there is some veiled references during his

11   testimony about, hey, essentially, gangbangers getting access

12   through family and friends, at the end of the day, the

13   questions were very carefully worded to sort of skirt the issue

14   from an evidentiary standpoint.  And all of the definitive

15   opinions that were offered by Mr. Webster all related to

16   private sales.

17           With Mr. Sloan, it was just closing a giant loophole.

18   What loophole existed that was being closed?  There is no

19   evidence, there is no definition of that.

20           In short, Your Honor, the evidence will just not

21   justify the burdens 1229 places on private transfers.

22           Let's look at some of the evidence that was

23   produced -- and I'm about to my end, I'm about to turn it over

24   to Mr. Kopel, Your Honor.

25           There was a lot going on with regards to the fiscal

1876

```
 1   note.  But the evidence is clear, and it's noted in the
 2   legislative history itself, that there was reliance on this
 3   idea that the whole idea was to expand greatly the scope of
 4   background checks.  And that was what was anticipated, and the
 5   system was gearing up for that.  In fact, the estimate was very
 6   clear that during 2013, 2014, there would be 200,000 new
 7   background checks that would result based upon the 1229 and the
 8   way that it was envisioned to occur.  As Your Honor knows, and
 9   as the evidence showed at trial, shows that background checks
10   have slightly decreased.
11          Now, defendant tried to explain that away.  Well, it
12   was sort of trending down, and -- Your Honor, they declined at
13   a time when they were to increase by 200,000.  This system is
14   system simply not working.  The reason the sheriffs --
15          THE COURT:  Mr. Westfall, this is a facial challenge.
16          MR. WESTFALL:  Your Honor, the facial challenge has
17   absolutely nothing to do with this point that I'm making, Your
18   Honor.  I think if you look to the Doe v. Albuquerque case, I
19   think my brother Kopel will be addressing it in more detail.
20   But if you go to Doe v. Albuquerque, it makes it clear that the
21   court, in assessing whether our challenge is facial or as
22   applied or a combination of both -- I submit at this point it's
23   a combination of both -- that what we have -- the Court is
24   required to look at the underlying legal standard itself, which
25   in this case is two-prong standard under Reese and Peterson.
```

 1          Your Honor, regarding the relief we seek on 1229, 1229

 2    should be struck down in its entirety.  The entire statutory

 3    scheme involves universal background checks, except if one of

 4    the very narrow exceptions in subsection (6) applies.  There is

 5    no way for this court to honor legislative intent in any way by

 6    only partially invalidating the law.  Your Honor, we

 7    respectfully request that the Court declare 1229

 8    unconstitutional as violative of the Second Amendment.

 9          Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. KOPEL:  Your Honor, I'm wondering if this might be

12    a prudent time to take a mid-morning break.

13          THE COURT:  I don't think so.

14                         **CLOSING ARGUMENT**

15          MR. KOPEL:  Okay.

16          Let's start with some of the issues that you've

17    addressed as important.

18          First of all, the question is, do gun stores have

19    Second Amendment rights in addition to being able to assert the

20    third-party rights of their customers?  And the answer is, yes.

21    As the briefing has shown, there is a split in the federal

22    courts on this issue.  The Seventh Circuit cases we think are

23    the best reason, not only *Ezell*, but also the *Kole*, K-O-L-E,

24    case from the Northern District of Illinois.  And for that

25    matter, the Ninth Circuit case from one of the -- I believe

1    from Santa Clara, that's cited in the brief also recognizes

2    that gun stores have Second Amendment rights.

3            And this is appropriate because the reason for -- one

4    of the reasons we have the Second Amendment was because of

5    attempts to interfere with firearms commerce.  The way that the

6    political dispute between Great Britain and the United States

7    turned into a shooting war was in part because of the British

8    embargo on the commerce, on the import of arms and gunpowder

9    into the United States in the fall of 1774.  And likewise, as

10   was well-known at the time the Second Amendment was written,

11   when the war was going on, the American revolution, in 1777,

12   and at the time thing were looking fairly good for the British,

13   the colonial undersecretary for America -- I'm getting his name

14   here -- the colonial undersecretary for the United States

15   authored a plan called What is Fit to be Done with America,

16   which is what they would do with America after they won the war

17   and made sure there could never be any further resistance.  And

18   part of that plan was the elimination of the commerce and

19   manufacture of arms.  The Second Amendment was intended to

20   overcome and prevent anything like that from taking place.

21           If you'd like the cites on that, they're in my

22   published article in the *Charleston Law Review* called "How

23   British Gun Control Precipitated the American Revolution."  And

24   there is a shorter and more focused piece on the right of

25   commerce in arms in particular forthcoming in an article I'm

1  writing for a Harvard -- that is ready to be published for a

2  Harvard Law Review online symposium which will hopefully be up

3  any day now.

4          And you can also tell that from *Heller* itself.

5          THE COURT:  That's where I'm going to start, Mr.

6  Kopel.

7          MR. KOPEL:  Okay.

8          THE COURT:  I think the historical background, as

9  interesting as it is, has been subsumed in *Heller*.

10         MR. KOPEL:  Exactly.  *Heller*'s famous list of

11 permissible gun controls tells us a great deal about the scope

12 of gun rights.

13         *Heller*, for example, says that it is constitutional to

14 prohibit gun possession by felons or the mentally ill.  That is

15 the yin and the yang of the fact -- the converse, or however --

16 the obverse.  It shows -- because *Heller* needs -- the *Heller*

17 court felt the need to state that exception to the Second

18 Amendment, that shows that the *Heller* court considered the

19 right of gun possession in general to belong to individual

20 Americans, and then they felt the need to cull out the special

21 exception for felons and the mentally ill not have any right to

22 arms.

23         THE COURT:  Mr. Kopel, are you suggesting that in the

24 writing of *Heller*, Justice Scalia and the other members of the

25 Court were enumerating the only exceptions or limitations to

1    Second Amendment rights?

2            *MR. KOPEL:*  Absolutely not.

3            *THE COURT:*  All right.

4            *MR. KOPEL:*  And I think beyond that, as Your Honor has

5    I think hinted also, the Tenth Circuit's later cases provide an

6    authoritative construction for how to apply *Heller*.

7            The *Heller* exception for -- that specifically

8    authorizes the prohibition of gun carrying in sensitive places,

9    such as schools and government buildings, was necessary to put

10   in the opinion because the *Heller* court recognized that the

11   right to bear arms includes a general right to carry firearms.

12   And, therefore, the Court wanted to make sure that although

13   there was the right in general to bear, to carry, it also

14   wanted to make clear the limitation, permissible limitation of

15   that particular right, which was the -- that carrying may be

16   prohibited in sensitive places.

17           And, likewise, the third item -- and this is the one

18   that is relevant for the gun stores -- is the prohibition is

19   the affirmed presumptive legitimacy, presumptive

20   constitutionality, of conditions and qualifications on the

21   commercial sale of firearms.  So just as the first two

22   exceptions show that there is a right to own and a right to

23   carry, this third exception also shows there is a right to

24   engage in commerce in firearms and that this right is not

25   violated by conditions and qualifications on the commercial

1881

1   exercise of the right.

2          So *Heller* itself points directly to the existence of a

3   Second Amendment right in firearms commerce.

4          A related question you asked about, Your Honor, was

5   the issue of organizational rights.  Not of commercial

6   organizations, but of organizations such as Outdoor Buddies,

7   Colorado Youth Outdoors, Colorado State Shooting Association,

8   and so on.

9          The structure of our constitutional system is that

10  organizations are people too.  This is, after all, why the

11  Fourteenth Amendment, protection of the rights of persons, was

12  correctly applied to corporations in general in a wide variety

13  of contexts, because it is coming together, whether in a formal

14  corporation or informal associations or partnerships or all the

15  myriad varieties of that, that people in practice do exercise

16  their individual rights, because sometimes the exercise of

17  that -- those individual rights necessarily happens -- has to

18  happen in a collective manner.

19          *THE COURT:*  And the Fourteenth Amendment concerns

20  rights other than Second Amendment rights, in which this has

21  been recognized.  There recently was a case addressing First

22  Amendment rights and whether entities have First Amendment

23  rights, *Hobby Lobby*.  But I've not been able to find, and

24  perhaps I've overlooked, any case that extends Second Amendment

25  rights to entities.

1        Can you direct me to something?

2        MR. KOPEL:  Just for a couple of recent ones, which

3   didn't even -- I would say, don't even say it so explicitly

4   because they view it as so obvious that the entity has standing

5   and the right to bring the case.

6        THE COURT:  Standing is not the issue.  The question

7   is, whose rights are being infringed?  So --

8        MR. KOPEL:  Your Honor -- to this -- I suppose it

9   appears like a case of first impression.  Let me -- if I could

10  backtrack some.  Since we are with *Heller*, post-*Heller* for the

11  first time, having federal courts actively involved in Second

12  Amendment cases, there are many issues that have -- are still

13  coming up.

14       And, yes, the argument has been made that, oh, it's an

15  individual right -- which, of course, it is -- and so,

16  therefore, associations where the right is exercised cannot

17  exercise that.

18       Let me suggest, your Honor, that while that is, at

19  least in the precise context of the Second Amendment, a case

20  for which the question I think you're asking may not have been

21  directly answered in detail by a court, I would suggest, Your

22  Honor, that it is inescapable that they must have -- that

23  associations must have rights.  And I would point Your Honor to

24  the First Amendment.

25       THE COURT:  Let me ask you, how do associations carry

 1   and bear arms?

 2          *MR. KOPEL:*  In the same way that associations are a

 3   medium for the exercise of the First Amendment rights of

 4   conscience.

 5          *THE COURT:*  Well --

 6          *MR. KOPEL:*  An association cannot have a conscience,

 7   because it's a group of people.  Consciences only exist in the

 8   individual mind.  And, yet, the First Amendment is -- is

 9   absolutely clear that when the people exercise their rights of

10   freedom of thought, freedom of religion, the most personal

11   interior things that can exist, and they come together to do

12   that, they, in a sense, have a collective conscience, or

13   whether you want to put it that way, they exercise their

14   individual consciences collectively.

15          So if you go to a meeting of the Elizabeth Jones Bible

16   Club, Bible Study Club, in somebody's basement or a meeting of

17   the Catholic Church or everything in between, there is in the

18   one sense just a collection of everybody in there, every

19   individual there with their individual consciences.  But they

20   are putting their consciences -- exercising their consciences

21   collectively in a way that amplifies that, that makes it

22   possible for them to further their exercise of their personal

23   consciences.  So it is indisputable that the Catholic Church or

24   the neighborhood Bible study club, as associations, as

25   corporations, whatever, have First Amendment rights of their

1   own, and not just of their members.  And the same is true for

2   Outdoor Buddies and all the rest.  That is how people come

3   together to exercise their individuals right to keep and bear.

4         *THE COURT:*  Well, that's the question that I have; and

5   I'm not persuaded by your analysis.  And this is why I'm not

6   persuaded:  The problem I'm having is this:  If we look at

7   everybody here in this courtroom, and we were to say that we

8   were an association, we might be able to craft a document or

9   have someone make a speech on behalf of all of us that would

10   represent a collective view.  But how do we collectively hold a

11   firearm, or fire the firearm?  That requires dexterity of an

12   individual's hand.  Not the action of a group, but, instead,

13   just an individual.

14         So I'm needing to understand in a practical sense how

15   a Second Amendment right to keep and bear, which is understood

16   to be carrying, a firearm can be fulfilled by a group of

17   people.

18         *MR. KOPEL:*  And I would suggest, Your Honor, that that

19   kind of literalism is excessive.  And we know it from the First

20   Amendment context.

21         When one goes to communion, there is only -- there is

22   a wafer and wine, and it is consumed by one person at one time.

23   You don't all eat the same wafer at once.  But there is also --

24   besides the activity of an individual engaging in communion,

25   that act is also a collective act of people engaging in

1    communion, although there is no physical item that one person

2    ingests which is similarly ingested by another person.  But it

3    is the nature of the exercise of that right that it is both

4    intensely individual and personal and is engaged in, in a

5    collective manner at the same time.

6         THE COURT:  So tell me how you collectively act to

7    carry and use a firearm.

8         MR. KOPEL:  When you train in firearms together, for

9    example.  For example, when you are all on the firing line

10   together and you're being instructed in safety at a Colorado

11   State Shooting Association event.  You might not physically --

12   two people may not physically hold the gun at the same time --

13   although sometimes they do, as when an instructor may be

14   providing hands-on instruction, standing back and helping one

15   person improve the grip or the stance with a gun.  But they can

16   be -- for one thing, they can be sharing the guns.

17        But, again, it is a collective activity, where their

18   knowledge of how to keep and bear is shared, where they watch

19   each other keep and bear, where they learn from each other, and

20   where the purpose of the organization is to engage in an

21   activity which is a one-at-a-time thing, necessarily.  Just as

22   speaking is always a one-at-a-time activity, and just as having

23   conscience is always a one-at-a-time activity.  But doing it

24   together in a group is part of that activity as well and is

25   by -- and is protected clearly under the First Amendment.  And

1   I would suggest that by analogy, the same principles apply to

2   the Second Amendment.

3          THE COURT:  Thank you.

4          MR. KOPEL:  I would also point, finally, Your Honor,

5   to one case which you might or might not find persuasive by

6   analogy.  But the case of *Boy Scouts of America v. Dale*.  In

7   particular, I'd invite your attention to 530 U.S. at 649, where

8   the Court says that the First Amendment protection of express

9   association is not reserved for advocacy groups, and explains

10  that the Boy Scouts' First Amendment associational protection

11  includes when they engage in the activities of camping,

12  archery, fishing, outdoor survival skills.  And I'd suggest

13  that that can be first of the First Amendment freedom of right

14  of assembly.

15         It's rather easier to see how what the Boy Scouts,

16  Colorado Youth Outdoors, Outdoor Buddies, Colorado State

17  Shooting Association, 4-H, and all the rest do with firearms,

18  and, for that matter, with bows and arrows as part of the

19  Second Amendment rights.

20         THE COURT:  I have to say, the plaintiffs here are not

21  challenging this as a violation of First Amendment rights; only

22  Second Amendment rights.

23         MR. KOPEL:  Yes, Your Honor.  This is an argument by

24  analogy.

25         THE COURT:  Thank you.

1          MR. KOPEL: Let me address briefly the Americans With

2     Disabilities Act.  And I will not repeat the arguments I made

3     in the -- at halftime, just supplement them briefly.

4          I think the legal and factual case on disparate impact

5     here is unrebutted.  And Ms. Longdon certainly has a right to

6     choose not to own a firearm for self-defense; but her personal

7     choice, which is really the only testimony we've had from

8     defendant on the ADA, does not negate the ADA rights of

9     disabled people who make different personal choices.

10          Besides showing disparate impact, plaintiffs have also

11     met their burden under the alternative standard of deliberate

12     indifference, for the reasons explicated in our trial brief.

13     And there would have been more examples of that from the

14     legislative history had not defense put some limitations on

15     testimony.  And in this regard, the Court at least has the

16     option of considering the Supreme Court's ruling from *Wallace*

17     *v. Jaffree* in 1985, that the constitutionality of a statute may

18     depend upon what the legislators put into the legislative

19     history and, more importantly, what they leave out.

20          As Your Honor explained in the *Grider* case, ADA

21     plaintiffs do not even need to prevail on disparate impact or

22     deliberate indifference in order to be entitled to a

23     reasonable -- entitled to a reasonable accommodation.  For

24     18-12-302, we've described the reasonable accommodation in our

25     trial brief.  For 18-12-112, the reasonable accommodation is

1    that Outdoor Buddies be allowed to loan its firearms to

2    disabled persons for the duration of the relevant hunting

3    season.

4        As detailed in our trial brief, California statute on

5    private sales and loans has this exemption for everyone, not

6    just for disabled persons.  And I would suggest that fact is of

7    high relevance to the application of even intermediate scrutiny

8    properly applied as per the details -- taking the intermediate

9    scrutiny standard seriously so that the restrictions on the

10   exercise of fundamental liberties are not broader than is truly

11   necessary.

12       The Colorado -- and likewise -- the Colorado

13   Department of Parks and Wildlife website announcement as

14   detailed by Mr. Hampton of the department's enforcement policy

15   for what constitutes a hunting trip is inadequate for two

16   reasons, at least under the ADA and perhaps, as well, under

17   intermediate scrutiny for Second Amendment rights in general.

18       First of all, the department's policy represents the

19   department's instructions to its own employees.  An

20   informational announcement of internal policy on the website

21   does not even rise to the level of a technical guidance.

22   Department policy for department employees has no effect, by

23   definition, on the enforcement decisions of city or county

24   local law enforcement agencies or district attorneys.  And

25   second, even if the website were a statute, it fails to address

1    the needs of disabled hunters.  They may need to have the gun

2    at home for several days to learn how to use the gun safely and

3    accurately, to practice at a range.  And, likewise, when they

4    return home from a hunting trip, it may be several days or more

5    before they can travel to Outdoor Buddies to return the

6    firearm.  For example, a blind person cannot just get in the

7    car and drive the gun over to Outdoor Buddies.

8          And, likewise, another reasonable accommodation or

9    alternative is the 30-day rule that California has, which says

10   that although they regulate -- are a notoriously strict state

11   on gun control laws, you can loan a gun for up to 30 days to

12   someone you know.  Mr. Sloan had no reason why 30 days, as

13   opposed to 72 hours, couldn't be the limit to prevent sham --

14   to prevent genuine permanent transfers under the sham that they

15   were loaned, like, you can borrow my gun for the next 25 years.

16         I'd suggest that intermediate scrutiny, even loosely

17   and weakly and inappropriately applied, suggests that the

18   72-hour limit on normal loans is impermissible.

19         To answer your question -- you asked Mr. Westfall, Is

20   there a right to acquire a firearm without a background check?

21   As he said, we have never argued there is a right to buy a

22   firearm, to permanently become the possessor of a firearm

23   without a background check.  Although we have said -- and this

24   is heart of our case on this issue -- there is a right to be

25   able to do so in a reasonable manner that is genuinely

1    accessible to people.

2          We do believe there is a right to borrow a firearm

3    under at least some circumstances without a background check.

4    We believe, for example, that the statute as it was -- the bill

5    as it was originally introduced, which didn't even have a

6    72-hour exemption, that would have criminalized me when I teach

7    firearms safety out of a range, and as part of that process, I

8    hand guns to people -- unloaded guns under my immediate

9    supervision all the time, and one gun may be handled in the

10   course of an hour by ten different people.  And under House

11   Bill 1229 as that was originally introduced, that would have

12   required a background check every step of the way.  Yes, we

13   believe that is unconstitutional, to require a background check

14   in situations like this.

15         The 72-hour exemption is a good step towards

16   constitutionality, but not a sufficient step towards

17   constitutionality, because we believe that the borrowing,

18   loaning, temporary transfer of firearms are, as *Peterson* tells

19   us to look at, part of the history and tradition of the use and

20   ownership of firearms in the United States, and they are

21   constitutionally protected.  And that a standard that says you

22   have to go to a gun store to loan a firearm to your neighbor

23   for four days is -- fails for the reasons detailed in our trial

24   brief, the Tenth Circuit's guidance -- rules in *Peterson*,

25   *Reese*, and the other -- *Kerr v. Hickenlooper*, and the rest of

1    the Tenth Circuit precedents.

2         If I may address the subject of continuous possession.

3    We will not belabor or repeat the -- although we do continue to

4    affirm -- the arguments we made last summer in our brief -- in

5    our briefing about the inadequacy of technical guidance and its

6    inappropriateness to contradict, indeed, the plain language of

7    the statute or the -- the -- the statutory language of the

8    statute.

9         It's -- as far as we know, this is unprecedented in

10   the history of the state of Colorado that the Attorney General

11   has purported to write something called technical guidance

12   which says that a statute means something very different from

13   what the statute says.  But let's put that aside for purposes

14   right now.

15        Let's imagine that even if 18-12-302 had actually said

16   "dominion and control," even then it would be

17   unconstitutionally vague.  The evidence in this case I think

18   shows two poles of the vagueness issue.  On the one hand, you

19   have, I believe, Mr. Hamilton's testimony.  He runs the Family

20   Shooting Center.  And although he has some qualms about

21   technical guidance in general, in practice, he is renting

22   magazines to customers on his business premises.  The magazines

23   stay there for several hours.  So, Your Honor could certainly

24   say, well, whatever your mental reservations, you seem to feel

25   comfortable enough doing that, and that doesn't appear to be a

1    violative -- a termination of dominion and control.

2         At the other end we have Mr. Maketa and his son, with

3    Mr. Maketa's law enforcement exemption soon to expire.  And

4    with them, where their magazines are intermixed so, indeed,

5    nobody knows precisely which magazine belongs to which person,

6    and the storage situation goes on for a period of years, I

7    think we're clearly at a situation where the dominion and

8    control standard does become vague and people cannot tell

9    whether their conduct is lawful or not.

10        And now in between those two poles, there is someplace

11   where dominion and control -- where that line is.  But the --

12   that's the point, we don't know where the line is.  Nobody

13   knows where that line is.  And that's why the term as a whole

14   is unconstitutionally vague.

15        In our trial brief, we've explained why we believe

16   that if this case were not about something that was -- under

17   the very standard rules for vagueness, if this were a case

18   about bowling balls rather than about items which are -- in

19   whose protection is enumerated in the Constitution -- there are

20   only two physical items, by the way, which the Constitution

21   specifically declares to be a human right to possess.  One is a

22   printing press, and the second are arms.

23        But if this case were about bowling balls instead, we

24   would suggest that the standard rules of vagueness show why the

25   continuous possession slash -- dominion and control standard is

1    vague.  We'd also suggest that dominion and control as

2    attempting to redefine continuous possession, perhaps to some

3    degree makes continuous possession into a mere superfluous

4    repetition of the standard that the owner has to be the owner.

5    And if that's it, then the statute has been -- the phrase has

6    been interpreted to a nullity and ought to be removed from the

7    statute as having no purpose other than to cause confusion.

8         As Your Honor explained accurately last summer, courts

9    have sometimes stated that especially protective rules for

10   vagueness apply to all constitutional rights.  And courts have

11   also sometimes also declared that this stringent protection in

12   the particular context of the First Amendment.

13        Your Honor also accurately observed that courts have

14   generally not yet decided whether the especially stringent

15   rules for the First Amendment do or do not apply in a Second

16   Amendment context.  So in this case of first impression,

17   plaintiffs suggest that this court can and should hold that

18   First and Second Amendment rights are equally protected by

19   anti-vagueness principles.

20        The First and Second Amendments are the core

21   provisions of the Bill of Rights' protections of personal

22   autonomy.  In contrast to the regulations on government

23   procedures in Amendments 4 through 8 and the broad rule of

24   interpretation which are supplied by Amendments 9 through 10,

25   choosing one's own church or non-church, reading, writing and

1    publishing, defending one's family and home from violent

2    predators, all of these are the core of the core of personal

3    liberties.

4         Aristotle, Cicero, Samuel Rutherford, John Lock,

5    Thomas Jefferson, and Oliver Wendell Holmes didn't agree on

6    everything; but they all agree that the right of self-defense

7    is foundational to the rule of law itself.  A vague law which

8    chills the exercise of First Amendment rights harms the

9    individual's fundamental right to liberty and intellectual

10   growth.  A vague law which chills the exercise of Second

11   Amendment rights harms the right to stay alive in the first

12   place.

13        Your Honor has discussed the issue of facial versus

14   as-applied challenges, and I'd like to provide the plaintiffs'

15   perspective on this.

16        The Tenth Circuit stated recently in *United States v.*

17   *Carel*, C-A-R-E-L, that a party "may challenge the

18   constitutionality of a statute by asserting a facial challenge,

19   an as-applied challenge, or both."  Similarly, in *Taylor v.*

20   *Roswell Independent School District*, decided last year, the

21   Tenth Circuit gave short shrift to the plaintiff's facial

22   challenge to the entirety of a school district's speech

23   policies and then conducted a lengthy analysis of some

24   particular policies as they actually applied to the plaintiff's

25   speech.  Our case is both a facial challenge and an as-applied

1        challenge.

2              THE COURT:  Mr. Kopel, how can that be?  You filed

3   this action before the statute became effective.  The framing

4   of the issues was made at the time that the Complaint was

5   filed, and there was no application at that time.  How can this

6   be an as-applied challenge?

7              MR. KOPEL:  Because it is -- because taking the

8   starting point that a challenge may be both --

9              THE COURT:  And in both of those cases, the action was

10  filed after the statute or regulation was effective; and,

11  therefore, the court could consider it in both veins.  But

12  perhaps you could direct me to some case law that says to me

13  that I can consider an action that is filed before an effective

14  date of a statute as being an as-applied challenge.

15             MR. KOPEL:  Your Honor, I'd point you both to *Doe v.*

16  *Albuquerque* and *Olson v. City of Golden* for the general

17  principle that the facial versus as-applied issue goes to the

18  breadth of the remedy employed by the court, not what must be

19  pleaded in the Complaint.

20             And I would also point you in particular to paragraph

21  G of our relief requested, which was written so as to encompass

22  the possibility for relief on an as-applied basis.

23             THE COURT:  What evidence have you presented with

24  regard to "as applied"?  I did not find in the record any

25  evidence of any enforcement against anyone.

1896

1          MR. KOPEL:  Well, I think you've seen in the record --

2     as a general matter in constitutional law, a person may

3     complain about the harms they have suffered and present

4     evidence to it even though they have not been, for example,

5     criminally prosecuted.  You certainly heard from the nonprofit

6     associations, for example, about how their activities have been

7     curtailed and in some cases eliminated because of the effect --

8     because of the actual ongoing effect of this -- these statutes.

9          THE COURT:  Well, that was a voluntary decision on

10    their part in compliance with the law as they interpreted it.

11    I did not hear any evidence that anyone directed or enforced

12    this statute against them.  Did I overlook something?

13         MR. KOPEL:  No, Your Honor.  But that's not -- that

14    is -- I would suggest to you that that is certainly not

15    required for anybody --

16         THE COURT:  Could you direct me to an example of a

17    case where the court looked at an -- an as-applied challenge

18    where there was no enforcement of a particular statute or

19    regulation.

20         MR. KOPEL:  Your Honor, if I may, I will search for

21    what you were looking for and perhaps be able to address your

22    concerns more fully on -- on rebuttal.

23         We would also ask that the Complaint be amended, as is

24    allowed under the federal rules, to conform to the evidence and

25    to conform to the final pretrial order.  And I will --

1        THE COURT:  Well, Mr. Kopel, it automatically

2   complies -- is merged into the final pretrial.  So what

3   amendment are you seeking at this point?

4        MR. KOPEL:  Your Honor, if I may, I might defer to --

5   I might ask my brother Westfall to explain it more fully,

6   because asking my -- my skills on -- on federal trials are

7   nearly equal to Professor Zax's knowledge of defensive gun use.

8        THE COURT:  Please confer.

9        (Off-the-record discussion between counsel.)

10       MR. KOPEL:  Your Honor, we would point out, first of

11  all, that the -- that the final proposed -- final pretrial

12  order does -- is a post-enforcement -- post-applicability --

13  post-enactment listing of the claims which the various

14  plaintiffs make about the harms they are then currently

15  suffering.  And I would also point out that the -- as the

16  Complaint has been amended and refiled, this includes the

17  Fourth Amended Complaint filed on December 23, which was filed

18  well after the effective dates --

19       THE COURT:  Well, Mr. Kopel, practically speaking, we

20  work from the final pretrial, which expressly states that all

21  claims are merged into it.  I approved it, and that's the

22  limitation of the issues to be determined.

23       MR. KOPEL:  Yes, Your Honor.  But I think that the

24  point I'm attempting to make is that the fact that the

25  Complaint was originally filed on May 17, and Your Honor views

1898

```
 1    that as precluding the possibility of a pretrial challenge, is

 2    negated or -- must be considered in the context of the fact

 3    that the operative Complaint in this case was filed on

 4    December 23, which was half a year after the effective dates of

 5    the statutes.

 6          THE COURT:  Then what as-applied challenge did you

 7    make in that Complaint?

 8          MR. KOPEL:  That as applied to the particular

 9    plaintiffs, these statutes are unconstitutional for the various

10    reasons stated, that we believe they are facially

11    unconstitutional, and because we -- as Carel says, we can

12    allege both, and we can do both, and that the pleadings are not

13    the -- do not require the formal statement of facial versus as

14    applied, that the statutes are not only unconstitutional in

15    general, facially, as applied to everyone, but also in

16    particular, as applied to these particular plaintiffs for the

17    reasons we have shown about how they particularly harm the

18    Second Amendment rights of the plaintiffs.

19          THE COURT:  All right.  Which of the individual

20    plaintiffs have made a request for individual relief?

21          MR. KOPEL:  Is -- that goes back to paragraph G of the

22    relief requested, which is a broad request for injunctive

23    relief as Your Honor deems fit to provide under the

24    circumstances.

25          THE COURT:  So no individual relief?
```

1           *MR. KOPEL:*  I believe that the G includes -- is broad

2    enough to ask for the possibility of both broad and narrow

3    relief for individuals and for everyone.

4           *THE COURT:*  Thank you.

5           *MR. KOPEL:*  Turning to the issue of facial challenges

6    in themselves.  Defendant relies heavily on a sentence from the

7    1987 *Salerno* case.  While the 2008 *Heller* decision was closely

8    divided, all nine justices were unanimous in recognizing that

9    facial challenges are appropriate in the Second Amendment

10   context without the slightest regard for the court's "no set of

11   circumstances" language that same year in the election law case

12   of *Washington State Grange.*

13          Indeed, the D.C. handgun prohibition was plainly

14   constitutional as applied to what was likely the vast majority

15   of prosecutions under that ordinance, handgun possession by

16   convicted felons or persons engaged in other crimes.

17          And it may be noted that *Heller* was written by Justice

18   Scalia, the author of *Salerno*, and he obviously did not view

19   the *Salerno* interpretation favored by defendants as having

20   anything to do with the Second Amendment facial challenge.

21          If I may make a few remarks on experts.  It has been

22   hypothesized that, given enough time, a group of monkeys could

23   eventually type the complete works of Shakespeare.  In this

24   case, it has been proven that given enough time, lawyers can

25   make a monkey of any social scientist.

1900

1     The Court cannot reasonably rely on Dr. Webster's

2  claims which are based on data about gun traces.  On the ATF

3  website, every state trace report for every year comes with a

4  conspicuous warning label which you heard and which

5  specifically warns people not to use trace information in the

6  manner that Dr. Webster does.

7     Dr. Webster's article on Missouri is the only social

8  science in this case that goes -- even attempts to meet the

9  burden that plaintiffs have -- excuse me, that the defendants

10  have under heightened scrutiny on 18-12-112.  And this article

11  is, of course, patently unreliable, given 3,600 data errors,

12  which eliminated the credibility of his assertion that a

13  six-month spike in Missouri gun homicides must have been caused

14  by a statutory change which took effect seven months before it.

15     Dr. Webster's instant and unequivocal assertion on

16  redirect that all of these errors cast no doubt on the validity

17  of his study demonstrates his dedication to his cause, but

18  perhaps his excessive zeal in his certitude as to what the

19  evidence must prove without even having a chance to reexamine

20  the corrected data.

21     Dr. Kleck's testimony about the cases in which mass

22  murderers are known to have used magazines of 16 or more rounds

23  does stand unrebutted.  Although, certainly his count of the

24  total number of his classifications of mass shootings was well

25  rebutted.

1    The additional incidents uncovered by defendant's

2  research, which impressively exceeded the depth of even the

3  Congressional Research Service, reinforce the point.   In

4  virtually none of these additional mass shootings was the

5  perpetrator known to have used a magazine of 16 or more rounds.

6    Dr. Zax imagines cases in which a perpetrator was

7  stopped before seven people were killed or wounded.   Defendants

8  searched diligently for these two and disclosed them as

9  proposed expert testimony of Chief Fuchs, approximately 47 such

10  cases.   But upon closer examination, perhaps prompted by Chief

11  Fuchs' second deposition, these incidents disappeared.   If

12  there were such cases, the Court would have heard about them

13  from Chief Fuchs.

14    Dr. Zax enjoyed the advantage of going last.   But on

15  cross-examination, his repeated platitude that even addicts

16  respond to changes in costs evaded a lesson from the third week

17  of economics class, that different groups have different demand

18  curves.   His assertion that persons who spend months planning a

19  mass murder will not spend an afternoon driving to a

20  neighboring state to acquire the tools they want has no

21  plausibility.

22    His Virginia report was technically defective and did

23  not even attempt to see if his purported reduction of magazines

24  had any benefit of reducing crime or victim injury.   Professor

25  Koper's 2004 study for the Department of Justice found that it

1    did not.

2            Moreover, the legislative history of 18-12-302 pays

3    essentially no attention to the use of magazines by ordinary

4    criminals.  The focus on magazines is exclusively on magazines

5    in mass shootings.  And every one of the examples cited by the

6    proponents during the legislative debates has been shown at

7    trial to be dubious.  A law which requires that firearms be

8    built so they malfunction would actually have a closer fit with

9    saving lives in mass shootings than do the examples cited in

10   the legislative history.

11           Social science is proper in Second Amendment cases

12   when an intermediate scrutiny in situations where the social

13   science really is beyond dispute.  For example, in *United*

14   *States v. Skoien* in the Seventh Circuit, the Court properly

15   recognized the social science that domestic violence

16   misdemeanants are abnormally likely to perpetrate violent

17   crimes.

18           Regarding Dr. Zax's Virginia study, which took into

19   account of Project Exile, the massive gun -- federal gun law

20   prosecution effort commenced in 1997 by the United States

21   Attorney for the District of Richmond, or the follow-up

22   project -- statewide Virginia Exile Project began in 2001 --

23           *THE COURT:*  Mr. Kopel.

24           *MR. KOPEL:*  Yes.

25           *THE COURT:*  Where in the record is there information

1903

1   about Project Exile or the effort commenced in 1997 by the

2   United States Attorney for the District of Richmond?

3       MR. KOPEL:  Mr. –– Dr. Zax was cross-examined about

4   Project Exile in 199 –– by Mr. Krumholz.

5       THE COURT:  Right.  And what he said was, he didn't

6   know about it, so he didn't consider it.  But I don't know

7   about it, and I can't consider it unless there is something in

8   the record.  Is there something in the record about it?

9       MR. KOPEL:  No, Your Honor, there is not.  I will

10  mildly suggest that items that are commonly known in the news

11  and which are discussed in authoritative newspaper articles may

12  be considered for judicial notice.  And Project Exile and

13  Virginia Exile were certainly widely reported in the media at

14  the time.

15      THE COURT:  That might be the case for purposes of

16  scholarly research, but it is not something I can engage in, my

17  own research as to what has been talked about in the press or

18  other studies that have been done.  That would be unfair to

19  both of the parties here, because the purpose of a trial is to

20  provide the opportunity to examine the witness and examine the

21  evidence that's presented.  And judges are not free to go out

22  and find their own evidence.

23      MR. KOPEL:  Then, Your Honor, let's focus precisely on

24  the reliability of what Dr. Zax has already shown about his

25  care regarding data.  And this doesn't require anyone to do

1    independent analysis of his data regressions and think about

2    heteroscedasticity or advanced econometric concepts.

3         You heard Dr. Zax testify about what an incompetent

4    boob Professor Kleck was because of Professor Kleck's famous

5    Table No. 2.  Professor Kleck cited -- used the 1990 census

6    projection for what the population would be in 1992 and then

7    failed to correct that when the actual interim census report

8    showing the precise population in 1992 came out.  And Dr. Zax

9    can tell you from this fact alone that Dr. Kleck is

10   incompetent.

11        Now, let's look at Dr. Zax's handling of data.  Based

12   on the interrogatories from the sheriffs, he created all of

13   these neat charts about the population versus defensive gun

14   uses in various counties.  He was plainly unaware that in

15   Lakewood, the typical responder to a burglary will be the

16   Lakewood Police Department and not the Jefferson County

17   Sheriff's Office.  And that, of course, Lakewood Police

18   Department and not the Jefferson County Sheriff's Office would

19   have the incident report on that.

20        He appeared to have no clue that the population of

21   unincorporated Jefferson County is only about -- where the

22   Jefferson County Sheriff's Office would be the typical first

23   responder, is only about a fifth of the population of the

24   county as a whole.  Nor does he seem to have any awareness of

25   the fact that in Clear Creek County, a great many of the

1    burglaries there will be responded to, not by the Clear Creek

2    sheriff, Mr. Krueger, a plaintiff, by the way, but by the Idaho

3    Springs Police Department or the Georgetown Police Department.

4        Now, what happened when these facts were pointed out

5    to him?  Well, when Dr. Webster found out that his data was

6    wrong, you could see he was mortified.  Dr. Zax shrugged it

7    off.  Didn't have a care in the world.  To him, it was a minor

8    error that his population statistics in the charts that he had

9    prepared in September, had around for the better -- for over

10   half a year, were enormously wrong.  Not even wrong of

11   3.4 million versus 1.7, but far wronger than that.  Data errors

12   of well over -- far over 100 percent didn't disturb him in the

13   slightest.

14       For most -- for us non-specialists, econometrics is a

15   black box of equations and formulas, and we can't really assess

16   how well that process operated in the black box.  But when you

17   see how casual he was about his data when it was shown to be

18   grossly wrong, his simple population data, you cannot prudently

19   rely on what he put in that black box.

20       If I may conclude with a thought on the Second

21   Amendment in general.

22       Some of the defense witnesses asserted that citizen

23   defenders using the standard magazines for their firearms will

24   spray and pray, and they'll hit innocent bystanders.  But

25   Dr. Kleck's unrebutted testimony on this point shows that such

1   scenarios virtually never occur.  Mr. Ayoob and Mr. Cerar both

2   testified that persons transitioning from a revolver to a

3   semiautomatic really are sometimes at risk of engaging in spray

4   and pray.  But in modern America, as the stipulations show, the

5   vast majority of new handguns are semiautomatic; and so the

6   transition issue is far less relevant than it might have been

7   20 years ago.  And as Professor Kleck has also testified, these

8   scenarios of innocent bystanders being shot by excessive

9   self-defense or incompetent self-defense are virtually unheard

10  of.

11          Mr. Cerar testified that if a police officer or a

12  citizen doesn't hit the criminal in the first 15 shots, she

13  might as well stop trying.  But that isn't the point.  One hit

14  does not equal one stop, as Mr. Ayoob's unchallenged testimony

15  explained in detail.  And nobody made a monkey out of

16  Mr. Ayoob.  Defendants didn't even attempt to cross-examine

17  him.

18          Moreover, as Dr. Zax, Mr. Ayoob, and other witnesses

19  agree, having reserved ammunition immediately available is

20  extremely important in a confrontation, regardless of how many

21  shots are fired.  Reserve ammunition is crucial for the reasons

22  Mr. Ayoob explained and Dr. -- Mr. Zax -- and Dr. Zax

23  implicitly accepts, although he only thinks about guns in

24  criminal hands, in terms of thinking about ammunition effects,

25  it seems.  Reserve ammunition is crucial even after the attack

1907

1    has been at least temporarily turned back.

2         Defendant argues that the magazine ban will also

3    disadvantage criminals, which might be true to the limited

4    extent they obey it.  Although, the criminals that were the

5    entire focus of the legislative history of House Bill 1224 are

6    not going to obey it.

7         But for criminals in general, rather than mass

8    shooters, reloading is much less difficult, relatively

9    speaking, when one is on the attack, especially since it is

10   criminals who choose the time and the place of the attack.  But

11   assume *arguendo* that this will have some effect on some of the

12   most casual and weakly motivated criminals -- because

13   there are different groups with different demand curves.  So

14   let's assume Professor Zax is at least right on some of the

15   most weakly motivated criminals, that the bill prevents them

16   from engaging in the cost of driving to another state or using

17   the black market to access a magazine of 16 or more rounds.

18   Let's take that as a given for at least some of them.

19        Even so, it's a violation of the Second Amendment to

20   infringe the self-defense rights of the law-abiding in the hope

21   of interfering with some criminals.  Defendant's legal theory

22   has no stopping point.  Nothing in defendant's trial brief or

23   trial evidence offers any reason to justify the 15-round limit,

24   which would not be equally applicable to the ten-round limit

25   first created in California in 2000 or the seven-round limit

1    enacted in New York state last year, or the five-round limit

2    for long guns that is imposed in New York City.

3         Should law-abiding citizens be treated like incipient

4    criminals?  That's what the D.C. ban did.  Criminals misuse

5    handguns.  Some people without criminal records might also and

6    do also misuse handguns.  Therefore, handguns are banned

7    equally for the criminal and the law-abiding.

8         *Heller* teaches and the Tenth Circuit follows that such

9    a blanket prohibition is categorically wrong.  *Heller* requires

10   that legislation -- certainly, the Tenth Circuit has

11   assiduously and faithfully followed *Heller.*  *Heller* requires

12   that legislation separate the sheep from the goats.  The

13   Supreme Court and the Tenth Circuit have distinguished the

14   First Amendment right and the Second Amendment right of the

15   law-abiding from the non-law-abiding.  Section 18-12-302 does

16   the opposite.  It is facially unconstitutional, and it is

17   unconstitutional as applied to plaintiffs in this case who are

18   exemplary law-abiding citizens who pose no conceivable danger

19   and have shown you their particular interest in possessing and

20   using magazines for legitimate purposes.

21        If I could briefly conclude with a point about least

22   restrictive alternative in terms of 18-12-112.

23        A great many states which have background check

24   systems, dealer-based ones, have an exemption for a person who

25   has a concealed carry permit.  The concealed carry permit is a

1909

```
 1    far stronger check than the identity-based check involved in a

 2    transaction at a gun store.  The concealed carry permit in

 3    Colorado is a biometric check.  It is based on fingerprints,

 4    which are sent to not only the Colorado Bureau of

 5    Investigation, but also to the FBI for a biometric fingerprint

 6    check.  That's one part of the least restrictive alternative,

 7    is to exempt from this rule that to borrow a gun for four days,

 8    you have to go to a gun store, at least should not apply to

 9    people who have a concealed carry permit.

10         THE COURT:  Where would I find that evidence in the

11    record?

12         MR. KOPEL:  You'd find the argument for that in the

13    trial brief.

14         THE COURT:  I'm not concerned about the argument.  I

15    still have to limit myself to the evidence that is presented.

16         MR. KOPEL:  You would find the evidence for the nature

17    of Colorado's concealed carry permit in the Colorado state

18    statute itself.

19         THE COURT:  Where would I find the evidence with

20    regard to the least restrictive alternative that you've just

21    suggested?

22         MR. KOPEL:  Well, the -- I think I'm having trouble

23    following the question.  The -- which -- the evidence is the

24    statute itself, which, presumably, all of Colorado state

25    statutes are within the scope of judicial notice.
```

1          THE COURT:  Well, what you've said is, "The concealed

2    carry permit is a far stronger check than the identity-based

3    check involved in the transaction at a gun store.  The

4    concealed carry permit in Colorado is a biometric check.  It is

5    based on fingerprints which are sent not only to the Colorado

6    Bureau of Investigation, but also to the FBI for a biometric

7    fingerprint check."

8          Where is the evidence in the record for that?

9          MR. KOPEL:  Thank you, Your Honor.  I -- the evidence

10   that the Colorado concealed carry permit is a fingerprint-based

11   check is in the statute itself.  And that -- because the

12   statute expressly requires fingerprinting for the check.  As to

13   the fingerprints being sent to the FBI, Your Honor is right,

14   that is not in the evidence.

15         THE COURT:  Okay.  Thank you.

16         MR. KOPEL:  Although in the evidence -- in the -- one

17   of the federal regulations which I asked you to -- Your Honor

18   to take notice of during Mr. Sloan's cross-examination, is the

19   regulation for access to the National Instant Criminal

20   Background Check System, and that -- which is another part of

21   the background check system.  And that, by the way, does

22   specifically show that that system is accessed not only for gun

23   sales, but also for concealed carry permit issuance as well,

24   and is also allowed for other forms of firearms permitting.

25         A second possible less restrictive alternative is for

1     people to be able to do an improved version of what

2     Mr. Colglazier did, which is to be able to access Colorado

3     criminal databases, perhaps with a system of identity

4     verification for the person who is doing that access in order

5     to check the CCIC and the PAS for the person's status.

6              And third, as the regulations which I asked for

7     judicial notice of demonstrate, the Colorado Bureau of

8     Investigation has the legal ability if state statute authorized

9     to perform background checks on private sales without –– with

10    all of the full set of state and federal databases it currently

11    looks at for a transaction that takes place at a dealer, but

12    without requiring that the two individuals walk into a gun

13    store.  It can do this –– provide the service for the fee it

14    chooses to charge to compensate itself for the services, for

15    the rancher to sell a firearm to his neighbor without requiring

16    the two of them to travel to the gun store to do that

17    transaction.  That is within the ability of the Colorado Bureau

18    of Investigation to do should the legislature so authorize it.

19    And that, too, is among the less restrictive alternatives that

20    are available, in which –– and which we believe, even

21    intermediate scrutiny as properly applied, as *Peruta* teaches

22    requires.

23              Thank you, Your Honor.

24              *THE COURT:*  Thank you.

25              The Court clock is showing about 11:30.  And I think

1    the better course at this juncture is to take a recess and

2    reconvene after the noon hour.  We will stand in recess until

3    1:30 and reconvene at that time.  Thank you very much.

4              (Recess at 11:27 a.m.)

5              (In open court at 1:32 p.m.)

6         THE COURT:  Have counsel for the plaintiffs completed

7    their initial argument?

8         MR. COLIN:  We have, Your Honor.

9         THE COURT:  Thank you.

10         Then let me hear from the State.

11                         **CLOSING ARGUMENT**

12         MR. GROVE:  May it please the Court.  I'd like to

13    start off by briefly addressing the issue surrounding

14    post-enactment evidence.  Since that was raised in the

15    plaintiffs' trial brief and we haven't yet had an opportunity

16    to respond in writing, I'll put it on the record now.

17         Plaintiffs rely on a racial classification case from

18    the Federal Circuit Court of Appeals called *Rose Development*

19    *Corp.*, which is 413 F.3d 1427.  They take the position that the

20    Governor is bound by the data and testimony that was presented

21    to the General Assembly at the time that Section 18-12-112 and

22    302 was enacted.

23         The crux of their argument is that the government

24    cannot offer post-enactment evidence to support its argument

25    either with respect to the State's interest in the subject

1    legislation or with respect to its likely effect.

2         As they put it, quote, the question is whether the

3    General Assembly found a sufficient nexus based on what it

4    considered.  The opinion of defense experts in a litigation

5    context based on newly developed analysis or information the

6    legislature never considered cannot answer that question.

7         The basis for this position appears to be the *Rose*

8    case and also a hard-line interpretation of *Shaw v. Hunt*, which

9    is 517 U.S. 899, in which the Supreme Court said that a

10   legislature making a racial classification must have "a strong

11   basis in evidence for doing so."  That language also appeared

12   in *City of Richmond v J.A. Croson Co.*, 488 U.S. 469.  Every

13   case in which it has appeared that I've been able to find has

14   involved racial classification.

15        Plaintiffs suggest that the "strong basis in evidence"

16   language not only precludes the presentation of post-enactment

17   evidence in the racial classification evidence, but they use

18   *Rose* as a springboard to argue that post-enactment evidence can

19   never be considered at all any time that any sort of heightened

20   scrutiny applies.  That position is flatly contrary not only to

21   legislative reality, but it's also foreclosed by binding Tenth

22   Circuit precedent.  The bottom line is the *Rose* series of cases

23   is a substantial outlyer even in the area of racial

24   classification, which is the only area in which plaintiffs'

25   argument gets any traction at all.

1           The most thorough recent treatment of this question

2   that I've been able to find is a D.C. District Court decision

3   from 2012 called *DynaLantic Corp. v. United States Department*

4   *of Defense*, 885 F.Supp. 2d 237.  The plaintiff in *DynaLantic*

5   made precisely the same argument that our plaintiffs assert,

6   that the "strong basis in evidence" language from *Shaw* means

7   that a court applying strict scrutiny can consider only what

8   was in front of the General Assembly and that any evidence that

9   was not presented to the general assembly is irrelevant and

10  inadmissible.

11          The *DynaLantic* court surveyed the state of the law on

12  this issue and concluded that, "Nearly every circuit to

13  consider the question post-*Shaw* has held that reviewing courts

14  may also consider post-enactment evidence."  In fact, the court

15  cited two Tenth Circuit cases for exactly that proposition,

16  *Adarand Constructors v. Slater*, 228 F.3d 1147 -- this, by the

17  way, is the opinion on remand after the U.S. Supreme Court case

18  of *Adarand Constructors v. Pena* -- and *Concrete Works v. City*

19  *and County of Denver*, 36 F.3d 1513.  Both *Slater* and *Concrete*

20  *Works* explicitly hold that even in the racial classification

21  context, post-enactment evidence is admissible.

22          *Concrete Works* noted that the Supreme Court in *Croson*

23  commented that a municipality must identify the discrimination

24  with some specificity before it may use race-conscious relief.

25  But the court went to hold that, "We do not read *Croson's*

1915

1    evidentiary requirements as foreclosing the consideration of

2    post-enactment evidence.

3           Collecting cases, the Court went on to state that,

4    "The strong weight of authority endorses the admissibility of

5    post-enactment evidence to determine whether an affirmative

6    action contract program complies with *Croson*."

7           That should be the end of the argument here.  The

8    plaintiffs have, indeed, found a single case that interpreted

9    the "strong basis in evidence" language as prohibiting

10   consideration of post-enactment evidence in the context of a

11   racial classification challenge.  But that case is not in the

12   Tenth Circuit, and is in fact directly contradicted by at least

13   two Tenth Circuit cases that address precisely the same

14   question.

15          Moreover, this isn't a racial classification case.

16   And the plaintiffs offer nothing to support the notion that the

17   reasoning in *Rose* carries over outside of that context.  In

18   fact, outside of the racial classification context, I could

19   cite you dozens of cases in which courts happily considered

20   evidence that was not presented to the legislature but was

21   nonetheless used by the government to defend the statute.

22          Since we're on the topic, Second Amendment cases seem

23   most appropriate.  In *NRA v. BATFE*, 700 F.3d 185, the Fifth

24   Circuit was evaluating the constitutionality of a provision of

25   the Federal Gun Control Act of 1968.  The opinion explicitly

1    relied upon studies published as recently as 2009.  No court

2    considering the constitutionality of firearms regulations or,

3    for that matter, any type of governmental regulation outside of

4    the racial classification context has considered itself bound

5    by what was in front of the legislature that passed the law.

6         This is true in other areas as well.  Take campaign

7    finance, for example.  In *Nixon v. Shrink Missouri Government*

8    *PAC*, 528 U.S. 377, the Supreme Court relied in part on

9    affidavits from state legislators and newspaper articles

10   suggesting the existence of *quid pro quo* corruption before

11   affirming the constitutionality of the contribution limits.

12        And in *Randall v. Sorrell*, 548 U.S. 230, the court

13   relied on expert testimony from the defense -- that is the

14   state -- about the manner in which Vermont's campaign finance

15   laws interacted with the candidate's ability to successfully

16   mount a campaign.  There was no suggestion in either case that

17   any of this extrinsic evidence was first offered to either the

18   Vermont or the Missouri legislature.

19        *THE COURT:*  Counsel, which of these cases involved a

20   facial challenge brought before the effective date of the

21   legislation?

22        *MR. GROVE:*  I don't think I could tell you off the top

23   of my head.  I can tell you that all of them, to my

24   understanding, involved facial challenges.  Certainly, the

25   campaign finance cases did.  There was no as applied -- I mean,

1   the statutes were either constitutional or they weren't in

2   those cases.

3        In any event, that approach should prevail here,

4   especially where we are not trying to come up with new

5   justifications for the law.  All of the rationales that the

6   State has relied on in this case appear in the legislative

7   history.  And through the evidence, we are trying to

8   demonstrate the required link between the General Assembly's

9   justifications and its legitimate interest in protecting public

10  safety.

11       Before wading into the specific facts here, I think it

12  would also be useful to discuss the appropriate analytical

13  framework for Second Amendment challenges.  But before we even

14  get there, we need to consider the nature of the constitutional

15  challenges in this case.

16       As the Court knows, plaintiffs have raised

17  constitutional challenges under the Second Amendment to

18  18-12-112 and 18-12-302.  They've also raised facial vagueness

19  challenges to a certain portion of Section 302.  I'll get to

20  that later.

21       In *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, the

22  Tenth Circuit held, "A litigant cannot prevail on a facial

23  challenge to a regulation or statute unless he at least can

24  show that it is invalid in the vast majority of its

25  applications."

1918

1          To apply that test here, we need to first determine

2     what exactly is protected by the Second Amendment.  That's easy

3     enough.  *Heller* and *McDonald* make it clear that the Second

4     Amendment protects the right to personal self-defense as

5     exercised through the possession of operable firearms.  That

6     expression of the core rights should guide this court's

7     analysis to the facial challenge.  Plaintiffs can only succeed

8     if they are able to show that either statute violates the right

9     to self-defense of a vast majority of Coloradans.

10          There have been a number of successful facial

11    challenges that have followed this approach under the Second

12    Amendment.  *Heller* and *McDonald* are the best examples.  Both

13    were facial challenges to handgun bans.  Those bans applied

14    more or less across the board and, thereby, deprived virtually

15    every law-abiding citizen of their right to self-defense.

16          Subsequent circuit court cases have taken a similar

17    approach.  In *Ezell*, for example, the restrictive licensing and

18    training requirements apply to every citizen in a manner that

19    prevented them from acquiring and/or maintaining facilities

20    with firearms for the purposes of self-defense.  And in *Peruta*

21    *v. County of San Diego*, the Ninth Circuit invalidated a

22    concealed carry permitting scheme that prohibited virtually

23    everyone from exercising a right to self-defense, at least as

24    that court recognized it.

25          This case is different because it doesn't involve a

law that regulates or prohibits firearm ownership or the right

to carry.  Instead, it touches on far more peripheral

components of the Second Amendment.  Moreover, as I'll discuss

in detail shortly, the evidence in this case shows that these

laws have no direct impact on the core right to self-defense

for anyone, much less a vast majority of Colorado's law-abiding

citizens.

        That, honestly, should be the end of the inquiry in

this case insofar as the plaintiffs' Second Amendment

challenges are concerned.  Unless they can show that either/or

both of the challenged statutes deprive the vast majority of

Coloradans of their core right to self-defense, their facial

challenge can't prevail.

        Plaintiffs, of course, have attempted to move the

goalpost for this today by arguing that in fact they are now

asserting an as-applied challenge.  I don't think it would be

appropriate for the Court to consider it at this point.  But,

actually, what they're arguing highlights some of the problems

of -- with the distinction between as-applied and facial

challenges as a general matter.

        What plaintiffs want you to decide is hypotheticals.

We could probably sit around in a room and throw things at the

wall and see what sticks.  And, surely, with this law, just as

with any -- with both of these laws, there are probably some

applications at the margins that might be questionable.  But

1   what they've brought is a facial challenge, and what this court

2   has to do when considering a facial challenge is to consider

3   the law by definition on its face.

4          Whether plaintiffs can come up with problematic

5   interpretations is something that is better saved for the

6   as-applied stage if someone actually is arrested or charged or

7   is faced with an implausibly broad interpretation of the

8   statute.

9          So let's move to 1224 and the appropriate framework

10   for constitutional challenges.  As a general matter, plaintiffs

11   are correct.  The Tenth Circuit has adopted the two-step test

12   that has prevailed in the remainder of the circuits.  First,

13   the Court has to decide whether the asserted right falls within

14   the scope of the Second Amendment's guarantee; and, then,

15   second, assuming that the first step is satisfied, the Court

16   has to apply some sort of means and scrutiny, as yet to be

17   determined.  If the burden on the right is substantial, then

18   the Government must satisfy a commensurate level of scrutiny.

19          So let's apply that to the facts here.  The first

20   question is whether the asserted right falls within the scope

21   of the Second Amendment's guarantee.  We've argued that in our

22   trial brief.  I'm not going to rehash it here.  I think it's

23   primarily a legal argument.  What we do know is that the core

24   right is the right to engage in self-defense.  There is a

25   guarantee under *Heller* that law-abiding citizens may use arms

1   in defense of hearth and home.

2       On that issue, *Heller* said two things of note.  First,

3   as I mentioned, the core of the right is defense of hearth and

4   home.  But, second, *Heller* stressed that the right is not

5   unlimited.  It is not a right to keep or carry any weapon

6   whatsoever in any manner whatsoever and for whatever purpose.

7       As I've already mentioned, and as I'll discuss in more

8   detail now, plaintiffs have not shown any widespread impact on

9   the ability of all citizens to engage in self-defense.  This

10  casts serious doubt on their facial challenge.  First, the

11  plaintiffs have stipulated, and the evidence clearly shows,

12  that 18-12-302 in no way is a ban on an entire class of

13  weapons.  That's demonstrated by the Bass Pro documents,

14  Exhibit 83, Stipulation No. 11.  The stips also rebut any

15  claim -- the stipulations, excuse me, also rebut any claim that

16  firearms can no longer be sold in Colorado.  Plaintiffs have

17  offered no numerical estimate of how many guns cannot be sold,

18  although they have identified a few isolated models which may

19  be affected by the law for new acquisition.

20      In fact, Major Abramson admitted during his

21  examination, he probably listed 15 models of Glocks that could

22  still be sold and were still available.  The bottom line is

23  that plaintiffs have thousands of options of handguns and long

24  guns available to them right now.

25      The law places no restrictions on who may carry them,

1922

1   where they may be carried, the manner in which they may be

2   carried, or anything else.  This makes this case

3   distinguishable from *Heller*, *McDonald*, *Peruta*, *Ezell*, *Moore v.*

4   *Madigan*, and any other case, although I'm not aware of any, in

5   which a facial challenge has prevailed in the Second Amendment

6   context.  Along with that, there is no denial of opportunity to

7   acquire and use a handgun or any other type of gun for the

8   purpose of self-defense.

9        So if the plaintiffs were able to show that, of

10  course, then I think we'd be facing a case in which the Second

11  Amendment right was destroyed.  That's the framework that we

12  proposed to the Court.  Under *Peruta* I think it's appropriate.

13  If plaintiffs were able to show that, then I think the case is

14  probably over.  I don't think that they've been able to, and

15  let me show you why.

16       There is no evidence at all in this case that more

17  than 15 rounds have ever been required by a civilian in

18  self-defense of home or on the street.  We heard three examples

19  from Mr. Ayoob, and they are not only ancient, unverified, but

20  involve, one, a gun shop owner running to defense of his gun

21  shop from several hundred yards away and unloading a fully

22  automatic machine gun on several people who were trying to

23  break in and steal guns.  Two, a jewelry store robbery in which

24  several defenders fired a large number of rounds.  It's not

25  specified how many.  And, third, a robbery of a Rolex

1923

1    dealership in which a defender had apparently staged guns

2    around the entire store in order to enable him to counter an

3    attempted break in.  That's it, ever, that the plaintiffs have

4    ever shown that a civilian needs large numbers of rounds in

5    self-defense.

6         THE COURT:  Counsel, at this juncture, I want to make

7    sure I understand your position clearly.  Do you concede that a

8    magazine is an arm that falls within the scope of the Second

9    Amendment?

10        MR. GROVE:  I think that we can draw a line between a

11   magazine and a large-capacity magazine.  I would agree that a

12   magazine in general is part of what is protected by the Second

13   Amendment, because firearms are designed -- at least

14   semiautomatic firearms are designed to function with a

15   magazine.  And I agree with the plaintiffs that if we turn that

16   into a one-shot weapon, that it is not functioning as designed,

17   and there are probably mechanical problems that go along with

18   it.

19        What the stipulations demonstrate in this case,

20   though, is that virtually all firearms will function with a

21   magazine that holds less than 15 rounds -- 15 rounds or less.

22        THE COURT:  And even those firearms that have

23   magazines can function with a single round in the chamber.

24        MR. GROVE:  That's true.  I think that what -- my

25   interpretation of Heller is that the Court was interested in

1  ensuring that semiautomatic firearms can be used as they were

2  designed to be used.  And so in that case, the Court mentioned

3  I think immediate operability, or something along those lines.

4  And the issue there was long guns, I think, had to be

5  disassembled; and pistols, if they were even able to be owned,

6  had to have a trigger lock.  So they could not be used in any

7  sort of immediate fashion.

8       That's not what the magazine restriction here does in

9  any sense.  At most, it means that instead of 30 rounds with

10  your AR-15 before reloading, now you can only fire 15.  The

11  magazine and the gun, regardless of the way -- regardless of

12  the size of the magazine, interacts in the same manner that

13  they always do.  It's just that there are fewer bullets in one

14  and more bullets in the other.

15       THE COURT:  So you would concede, then, that for

16  semiautomatic weapons, the magazine is part of the operative

17  weapon?

18       MR. GROVE:  Yes, I would concede that.

19       THE COURT:  Okay.

20       MR. GROVE:  Our position is that the -- that there is

21  a break point somewhere that converts the magazine from an arm

22  to not an arm.  The issue is, when the magazine is put into the

23  firearm, does the firearm operate as intended?  At some point,

24  you know, two, three, four bullets, we might have a problem.

25  We're on a much higher end of the spectrum here, especially

1925

1    when you compare Colorado's law to the laws of many other

2    states that have adopted similar regulations in the last

3    several years.

4         THE COURT:  Thank you.

5         MR. GROVE:  On that note, we would probably be having

6    a different discussion if there was evidence that a large

7    number of rounds were required on a consistent basis for

8    civilian self-defense.  But a wide array of witnesses on both

9    sides unanimously agree that 15 rounds is adequate for

10   self-defense.  And, of course, that's leaving out the potential

11   for reloading.  These witnesses have a wealth of different

12   experiences and are all in agreement on this point.

13         Substantially fewer rounds are used in the rare

14   instances -- substantially fewer rounds than 15 are used in the

15   rare instances in which law-abiding citizens have found

16   themselves in situations where they find it necessary to

17   discharge a firearm in self-defense.  Which is something that,

18   again, virtually every expert and every lay witness in this

19   case agrees is an extraordinarily rare occurrence.

20         Mr. Ayoob testified that in the vast majority of

21   defensive gun uses, the mere display of a firearm is sufficient

22   to end the altercation, with the perpetrator either fleeing or

23   submitting -- even submitting to a citizen's arrest.  He said,

24   and I quote, "Overwhelmingly in a great majority of the time,

25   when the gun comes out, the fight is over."

1          As I mentioned, plaintiffs were only able to name

2     three instances since, as far as I know, the beginning of time

3     when civilians were involved in high-volume shootouts with a

4     criminal.  This, of course, is consistent with the independent

5     analysis of Dr. Zax of instances of home invasions in the

6     plaintiffs' counties in the last ten years.  The State's other

7     witnesses, with many years of law enforcement experience among

8     them, Mr. Cerar, Fuchs, Kramer, Montgomery, all agree that 15

9     rounds are ample for civilian self-defense.

10          Even law enforcement officials who have to run to the

11    gunfire rarely fire more than 15 rounds in their official

12    duties.  That's what Dr. Zax's and, actually, Mr. Ayoob's

13    analysis of the NYPD discharge data demonstrated.

14          Of course, to even make that analogy, you have to

15    assume that police and civilians are situated similarly.  And I

16    think that there is no doubt, and I think there is agreement on

17    all sides in this case, that police and everyday citizens do

18    not face the same rate of gunfire and do not react to it in the

19    same way.

20          To run through the other witnesses, Heap, Maketa,

21    Dahlberg, also all have substantial law enforcement experience.

22    None of them could account for a single instance.  Now,

23    multiple plaintiffs did assert that they were more comfortable

24    or that they took psychological comfort in knowing that they

25    would have access to a weapon with a large-capacity magazine.

1927

1   The Second Amendment doesn't protect these subjective concerns.

2   And more to the point, this court only has jurisdiction over

3   controversies that have an actual injury.  As far as I know,

4   psychological concerns have yet to be recognized under the

5   Second Amendment at all.

6           The plaintiffs have also argued -- and this was a

7   fairly new one on me -- that the temporary pause to change

8   magazines by someone attempting to defend themselves amounts to

9   the complete disarmament, the lack of access to an immediately

10  operable firearm that the *Heller* court purported to protect.

11  This argument obviously proves far too much.  No firearm has

12  limitless capacity.  Every one will have to be reloaded at some

13  point.  If we accept plaintiffs' argument, no law could ever

14  regulate magazine size.  Also, the law does not restrict the

15  ability of civilians to carry as many magazines as they wish or

16  backup firearms.  Thus, there is no deprivation of the right to

17  bear arms.  There simply is no Second Amendment right to have

18  unlimited fire power with no pause.

19          Plaintiffs have also asserted that they can't get --

20  at least a few of them did, that they can't find lower-capacity

21  magazines for at least some of the firearms they currently own.

22  Some of the more popular that we've heard several times in this

23  case are the Kel-Tec PMR .22, the Springfield XD 9, the Glock

24  17, I think there were one or two more.  But to the extent that

25  this is actually true, this is a market issue more than

1       anything.  The statute doesn't ban the manufacture of

2       compliant magazines.  Citizens are free to purchase

3       after-market magazines.  And Michael Shain testified that

4       magazines are highly modifiable and customizable as well.

5              Nor does the Second Amendment protect the right of

6       federally licensed firearms dealers to sell.  That's addressed

7       in the briefing, so I'm not going to dwell on the legal

8       argument here.  But even if there is a Second Amendment right

9       here, the FFL plaintiffs did not prove their assertions of

10      financial injury, particularly on a statewide scale.  What we

11      heard was evidence from two FFL plaintiffs that business has

12      been down compared to last year.  While that's unfortunate,

13      it's hardly surprising given the enormous surge in the firearms

14      market that followed the Aurora and Newtown shootings, the

15      presidential election, and legislative debate both in Congress

16      and the Colorado General Assembly about new gun control

17      measures.

18             As Mr. Spoden and Mr. Sloan testified, background

19      checks were running 75 percent higher during this period.  So

20      is it possible that business has dropped off?  Sure.  Did the

21      two FFL plaintiffs that testified prove it?  They did not.

22      Neither could testify that their gross revenue was down in

23      2013, and they certainly didn't do anything other than offer

24      speculation in support of their assertions of lost business.

25             If they had actually wanted to prove that this

1   legislation had adversely affected them, they would have needed

2   to put on some sort of expert testimony that could speak

3   directly to that issue.  There is simply too many variables to

4   credit a lay witness's assumption about external influences on

5   their business model.

6        Along the same lines, there is also a fundamental

7   inconsistency here.  Many of the plaintiffs have argued that

8   they are unable to acquire magazines with a smaller capacity,

9   while at the same time, the FFLs, including -- I think Doug

10  Hamilton was another one, sat on the stand and complained that

11  they can't sell lower-capacity magazines at any price.  I find

12  those two claims difficult to reconcile with one another.

13        In addition -- and this is very important -- the

14  parties have already stipulated to two key facts that

15  contradict the plaintiffs' assertions about any inability to

16  acquire Colorado-compliant magazines.  Stipulation 27 states in

17  part, "With some exceptions, manufacturers of semiautomatic

18  pistols that have standard magazines that hold more than 15

19  rounds also manufacture magazines with a capacity of 15 rounds

20  or less.  After-market manufacturers also make and sell

21  magazines with a capacity of 15 rounds or less."

22        In addition, Stipulation 28 says, "Magazines with a

23  capacity of 15 or fewer rounds are available for purchase in

24  Colorado."

25        These are not plaintiffs' only complaints about

1930

1    smaller-capacity magazines.  Of course, they also claim that

2    they're not reliable, but haven't proved this point either.  At

3    best, the testimony was mixed.  Ms. Dahlberg says that she's

4    happy with magazines that have a lower capacity as long as they

5    were from the same manufacturers.  Andy Logan said that his

6    work just fine.  Magpul stipulated that their ten-round

7    magazines are just as reliable as every other product that they

8    make.  That's Stipulation No. 45.

9         Plaintiffs' expert on firearm and magazine design,

10   Mr. Shain, testified extensively about magazines and their

11   design; and he expressed no opinions about the lack of

12   reliability of lower-capacity magazines.  That absence of any

13   assertion from the only expert on this topic in this case is

14   significant.

15        Plaintiffs also presented no testimony that limiters

16   render firearms unreliable.  In fact, the Department of

17   Wildlife representative who was here yesterday, Randy Hampton,

18   testified that limiters had been used to reduce firearm --

19   magazine capacity for hunting since the 1970s and that hunters

20   commonly use limiters in the field.  This is not new

21   technology.  It's something that has been tested and proven

22   true for decades.

23        In addition, while we're on the topic of limiters,

24   plaintiffs presented no evidence that magazines cannot be

25   permanently altered to comply with Colorado law.  Notably,

1    their expert on magazine design testified that large-capacity

2    magazines could be permanently limited through the use of sonic

3    epoxy welding.  The average person cannot remove a limiter

4    installed with this technique without damaging the magazine.

5    Our interpretation is certainly that that qualifies for a

6    permanent alteration.

7         Now, the evidence is undisputed that reloading a

8    magazine forces a temporary pause by a shooter, whether

9    offensive or defensive.  This pause in a mass shooting

10   situation provides a crucial opportunity for escape or

11   offensive action, or defensive action, for that matter.

12        Now, this, of course, applies whether the shooter is

13   defending oneself or engaged in a criminal attack on others.

14   The critical difference is that evidence in this case shows

15   that the former, defense of oneself, will not have any impact

16   on defensive gun use because defensive gun use virtually never,

17   if ever, requires many rounds to be shot.  Of course, that is

18   clearly not the case with respect to the criminal misuse of

19   firearms.

20        Dr. Kleck's own analysis, which is Exhibit 44,

21   contained dozens of examples in which criminals fired large

22   numbers of rounds.  He further acknowledged during cross that

23   some shootings that wouldn't qualify as mass shootings, even

24   under his analysis, involved 17 or more discharges.

25        But the State's evidence shows that a pause of any

1    type has proven a critical window of opportunity in case after

2    case in criminal shootings to allow civilians to flee to safety

3    or to mount a successful attack to disarm the shooter.

4    Evidence from Salzgeber, Mr. Fuchs, Kramer, Cerar, and

5    Dr. Kleck all demonstrated this.

6         Mr. Colin, of course, discounts many of these

7    incidents.  What he neglected to mention is that Dr. Kleck

8    actually admitted during his cross and during his direct that

9    he had analyzed many of the same incidents and had determined

10   them to involve intervention or escape by bystanders or victims

11   when the shooter had paused to reload.

12        The General Assembly specifically cited the ability of

13   bystanders or potential victims to mount a successful attack or

14   escape as a basis for the legislation.  Such a pause can save

15   lives.  The evidence on this is undisputed.  And we heard it in

16   person from Roger Salzgerber, who tackled the shooter in the

17   Tucson incident when he paused to reload.  Lorne Kramer

18   described a similar incident under his watch as a police

19   department -- as a police chief in Colorado Springs.

20        Generally, I think the plaintiffs acknowledge the

21   pause, though they dispute the cause in many of the instances,

22   but this misses the point.  As Mr. Fuchs testified, the effect

23   of the large-capacity magazine limitation is to make pauses

24   mandatory in any shooting scenario.  We can't count on a

25   magazine malfunction.  We can't count on a firearms jam.  We

1    can't count on an individual dropping his firearm because he

2    runs into a door frame.  If magazine capacity is limited, what

3    we can count on is a pause of about 4 seconds every time 15

4    shots are fired from that gun.

5            Of course -- and I think this is a very important

6    point that the plaintiffs have completely overlooked.  House

7    Bill 1224 isn't just about reducing the magnitude of injuries

8    in mass shooting situations; it's also about reducing the

9    intensity of all armed criminal aggression.  Drs. Kleck and Zax

10   agree that firearm capacity is directly and positively

11   correlated with the average number of shots fired, even in

12   everyday gun violence.  Dr. Kleck dismissed this as unimportant

13   because the average number of shots fired in self-defense is

14   fairly low.

15           As Dr. Zax explained, however, the pertinent question

16   is not whether the shooter expends his entire magazine.  A

17   shooter with a larger reservoir of ammunition will tend to

18   shoot more bullets than a shooter in a comparable situation who

19   had less.  As a consequence, gun violence that involves the use

20   of large-capacity magazines results in more shots fired and

21   more people injured than comparable conflict with

22   smaller-capacity weapons.  This holds true whether it's a good

23   guy or a bad guy firing the shots.

24           And that's an important issue, because it raises the

25   concept of spray and pray.  Both Cerar and Ayoob testified at

1    length about the challenges faced in training a shooter who is

2    transitioning from a lower-capacity revolver to a

3    higher-capacity semiautomatic.

4         As Ayoob put it, in training he has to put more

5    emphasis in avoiding what he called spray and pray.  We've also

6    heard, and I love the term, hose the foes.  He trains civilians

7    to shoot as they were using a lower-capacity magazine.  The

8    tendency to empty the available magazine -- and these are his

9    words -- has to be trained out of civilians.

10        Mr. Cerar's experience in the NYPD was similar.  He

11   said that it took a few years -- a few years -- for that

12   training to sink in because law enforcement had the same

13   instincts when they were equipped with a firearm that can

14   discharge many rounds at once without being reloaded.

15        Of course, a person intent on claiming lives can use

16   powerful modern semiautomatics to maintain a high rate of fire.

17   That rate of fire was demonstrated in some detail here by the

18   recording of the Aurora theater 911 call.

19        And in the mass shooting context, the ability to shoot

20   more is the ability to kill more.  Large-capacity magazines

21   have been used to fire enormous numbers of rounds in a short

22   amount of time.  Sandy Hook had more than 150 rounds fired in a

23   space of several minutes, I think four.  There is a stipulation

24   for Oates -- I'm sorry, there is a stipulation concerning the

25   Aurora theater shooting that 65 rounds were fired from the

1935

1    100-round drum that was used in that case.  And there is

2    testimony from Roger Salzgeber that a 32- or 33-round magazine,

3    I can't remember which, was discharged in the space of 15

4    seconds in that shooting.  Nineteen people were injured --

5    sorry, six were killed, thirteen were injured.

6         Dr. Moore testified, of course, to the devastating

7    public health impact of gun violence and the likelihood that an

8    individual who is shot more than once and his chances of

9    survival versus an individual who is shot fewer times.

10        Dr. Zax testified that House Bill 1224 will make law

11   enforcement safer.  Lorne Kramer did the same.  That testimony

12   remains unrebutted.  And, importantly, Dr. Zax testified,

13   unrebutted, again, that House Bill 1224 will reduce the number

14   of large-capacity magazines in circulation.

15        Plaintiffs, of course, argue that House Bill 1224, the

16   magazine capacity restriction, is unenforceable, that it will

17   only affect law-abiding citizens.  Constitutionality, however,

18   has never been judged on that criteria.  In any event,

19   Dr. Zax's testimony demonstrated that they're wrong.  Dr. Zax

20   testified and presented data gathered from before, during, and

21   after the federal assault weapons ban and its accompanying

22   large-capacity magazine restriction.

23        Despite the fact that the federal ban was far less

24   restrictive than Colorado's law, permitting, for example, the

25   additional importation and unrestricted transfer of all

1936

grandfathered large-capacity magazines, Dr. Zax's analysis of
the most complete data set available demonstrated that the law
had a substantial impact on the use of large-capacity magazines
in crime, especially in the later years of the ban.  This is
precisely what Dr. Kleck testified that he would have expected
to see, given the assault weapon ban's generous grandfather
position.

          Now, plaintiffs have argued that a determined buyer
can simply drive perhaps to Jensen Arms' barn that's right
across the border.  And as Dr. Zax testified, some may do that.
On the other hand, Mr. Burrud testified that sales at that
location have been very slow.  Tim Brough likewise testified
that his own Wyoming location just across the border in
Cheyenne, again, had a large capacity of large-capacity
magazines that aren't selling.  This, along with the fact that
FFLs have taken LCMs off their shelves, per the allegations in
this case, suggest that Dr. Zax is correct.

          Plaintiffs also claim that this law is not adequately
tailored.  But the legislative record contradicts this.  In
fact, as legislative history shows, this law was originally
proposed as a ten-round limitation.

          Mr. Colin mentioned the testimony of Charles Roblis in
which he said that, "I fired 13 rounds in defense of my life."
And in fact, when he made that testimony, when he provided that
testimony to the legislature, the version of the bill that was

1   in front of the legislature had a capacity of -- had a magazine

2   capacity limitation of ten rounds.  After hearing that

3   testimony, the legislature -- the committee proposed an

4   amendment and increased the capacity limitation to 15, to

5   accommodate concerns like that.

6           That is very strong evidence of tailoring.

7           THE COURT:  Counsel, by using the word "tailoring" and

8   "adequately tailored," you suggest that it is the intermediate

9   standard that should be applied here.  Will you please address

10  the argument by the plaintiffs that it is a heightened scrutiny

11  standard that should be applied.

12          MR. GROVE:  Let me address that in a couple of parts.

13          First, we don't concede that any sort of -- well,

14  first of all, let me say that intermediate scrutiny in my view

15  is heightened scrutiny.  But second, we don't concede that

16  anything above rational basis should actually apply here.  And

17  let me tell you why.

18          And this is laid out in our trial brief, the way that

19  this is structured.  The key here is whether the plaintiffs can

20  show any adverse impact associated with this law on their right

21  to self-defense.  Regardless of the portion of the Bill of

22  Rights that you're talking about, the tiered scrutiny analysis

23  from Carolene Products, footnote 4, I think -- taking me back

24  to law school -- has always applied.  First, rational basis, if

25  there is no showing of a substantial impact on the right, and

1    then some sort of heightened scrutiny.  Usually depending on --

2    usually depending on the nature of the right that is impacted.

3        THE COURT:  Right.  And that's why I'm asking you

4    about this.  Not looking at the effect, but looking at the

5    nature of the right.  What I heard the plaintiffs argue is that

6    the right to hold and bear arms is akin to the most fundamental

7    rights that we have under the First Amendment and that it

8    should be protected with the same level of scrutiny.

9        What is your response to that?

10       MR. GROVE:  Again, I think that it depends on the

11   nature of the impact.

12       So let's compare it to the First Amendment.  The First

13   Amendment doesn't say that you can -- that speech is completely

14   unregulable.  There are plenty of things at the margin that can

15   be regulated, obscenity, for example.  You can't, as they

16   always say, run into a crowded theater and say fire.  You can

17   place time, place, and manner restrictions on where somebody

18   can actually speak.

19       This -- what we have here is most akin, I think, to a

20   time, place, and manner restriction, because it does not

21   prevent anyone from carrying a firearm anywhere.  It doesn't

22   prevent what they -- it doesn't restrict what they can carry.

23   In fact, it simply affects the manner in which they can carry

24   it.

25       THE COURT:  So does that mean that you agree with the

1    plaintiffs that this right, a Second Amendment right, is as

2    fundamental as a First Amendment right?

3         MR. GROVE:  I'm not sure that -- certainly, we agree

4    that the Second Amendment is a fundamental right.  But when you

5    put it in an abstract way like that, I think it's very

6    difficult to answer.  There is no question that *Heller* and

7    under the Second Amendment, *McDonald*, say that you can't

8    prevent somebody from -- law-abiding citizens, anyway, from

9    having a handgun.  And so in that sense, there is no question,

10   I think, that you can't ban somebody from having a handgun,

11   just in the same way that you can't prevent them from engaging

12   in most kinds of legitimate speech.

13        But when you're talking about activities that are

14   closer to the margins, then I think that those analogies are

15   apt as well.  And so as long as we understand that the right

16   that we are discussing in this case is more similar to the

17   peripheral First Amendment rights, just like things that can be

18   regulated in a time, place, and manner restriction, then I

19   would agree with the plaintiffs on that.

20        THE COURT:  Well, there is some regulation of speech,

21   for example, that is regulated based upon its content.

22   Obscenity, for example.  There are other regulations that are

23   time, manner, and place restrictions, which are permissible

24   because the scope of the restriction is not broad.  It is

25   narrow.  It doesn't regulate all of the speech; it just

1    regulates the time, manner, or place of the speech.

2          What I'm trying to understand is how you perceive the

3    Second Amendment right to keep and bear firearms and whether

4    the test that is used here -- you would suggest a rational

5    basis test, the lowest-tiered test, the plaintiffs would

6    suggest the highest level of scrutiny -- whether this relates

7    to essentially the essence of the right, like the nature of the

8    speech, or does it relate to the essence of the restriction,

9    the scope of the restriction?

10         A couple of different concepts going on, and I want to

11   make sure I understand where the parties are on each of them.

12   Have I been clear?

13         *MR. GROVE:*  Yes.  And something that you said -- and I

14   confess that my memory is fading at the end of this long

15   ordeal.  Something that you said about time, place, and manner

16   restrictions, I think, run very true.  And that is that this

17   law doesn't affect -- doesn't prohibit you from carrying a

18   firearm with you.  It just prohibits you from carrying a

19   firearm with a large-capacity magazine with you.  The nature of

20   your right is unchanged.  You can still carry a firearm for the

21   purposes of self-defense, you can still have one in your home,

22   you can still have multiple magazines to defend yourself with,

23   you can have multiple firearms, for that matter.  But it does

24   restrict the number of discharges that you can make without

25   reloading.  It doesn't change the nature of the right; it

1    doesn't impact that at all.  Instead, it merely, I guess,

2    limits it in a way that actually doesn't affect anybody's

3    ability to defend themselves.

4         So I agree it's a fundamental right.  I'm not sure if

5    I answered your question, however.

6         THE COURT:  Well, I'm still trying to understand

7    whether you are tying the level of scrutiny to the scope of the

8    restriction or to the nature of the right.

9         MR. GROVE:  I think I understand that better now.  I

10   think that the level of the -- the level of scrutiny should be

11   first decided based on what the impact of the restriction is on

12   the core of the right.  That's what this trial has been about,

13   as far as I know.  And that's why rational basis is an

14   appropriate approach here.

15        Now, plaintiffs will probably come back and say, well,

16   Heller ruled out rational basis.  And when you are talking

17   about a law that is actually a ban on something that is used

18   for the core right of self-defense, I agree, there is no doubt

19   about that.  If we were in the same situation as Heller was, I

20   don't think we would have made it this far.  But when you're

21   talking about something that is closer to the periphery of the

22   right, I think there is no doubt that sliding scale test

23   applies.

24        THE COURT:  Okay.  But that's what we're getting to

25   the mixing apples and oranges.  Your last statement is, this is

1942

1       at the periphery of the right, as compared to the extent of the

2       restriction.  Which is it that drives the level of scrutiny, or

3       is it a combination of both?

4               MR. GROVE:  It's both.  Because things that are on the

5       periphery of the right have very little effect, if any, on the

6       right to engage in self-defense.

7               THE COURT:  Okay.  So it's your contention, then, that

8       this is both -- the infringement is both at the periphery of

9       the right, and it is not an extensive restriction.

10              MR. GROVE:  Yes.  And the reason that it's not an

11      extensive restriction is because it's on the periphery of the

12      right.

13              By definition, I think, virtually nothing that could

14      be on the periphery of the right would be a substantial

15      restriction on the core right of self-defense.

16              THE COURT:  Have you given me all of the case law that

17      you intend to rely on with regard to the standard to be applied

18      and, particularly, this discussion that we've just been having?

19              MR. GROVE:  I think it's probably all in the trial

20      brief.  I mean, I will concede that our position that rational

21      basis should be applied is not something that has been adopted

22      widely at this point.

23              THE COURT:  Right.

24              MR. GROVE:  But it's also something that I don't think

25      has been raised.  So I think this court should take a close

1    look at the way that we have -- at the structure that we've

2    proposed, and reject it if you need to, but we think that it's

3    something that should be considered.

4           Now, if we move to some sort of heightened scrutiny --

5    and again --

6           THE COURT:  I know you're calling it a heightened

7    scrutiny.  I call it intermediate scrutiny.  And that's where

8    we need -- that's where we need to talk about tailoring.

9           MR. GROVE:  That's right.  And maybe tailoring is the

10   wrong word for me here.  But I did preface it by saying

11   "adequately," and that was a very intentional choice of words.

12          I do think that there has to be, under intermediate

13   scrutiny -- which, by the way, I think is the standard that has

14   been set by the Tenth Circuit -- some sort of demonstration

15   that the impact of the law will have a beneficial effect.  It

16   doesn't need to be narrowly tailored, certainly.  That is --

17   that's strict scrutiny, and no court has applied strict

18   scrutiny at all.  The closest has been -- the closest to that

19   has been *Ezell* and maybe *Moore v. Madigan* in the Seventh

20   Circuit.  But both of those cases involved what amounted -- and

21   it is discrimination.  They involved very intentional

22   establishment of laws that were designed to impede the ability

23   of firearm owners to own weapons.

24          So, for example, *Ezell* involved a training requirement

25   for firearms owners that had to be exercised at a gun range,

1    while at the same time banning gun ranges within the city.

2    That sort of trickery is not at all what we have here.  This

3    law is not in any way designed to prevent people from owning

4    firearms.  It's only designed to enhance public safety by

5    limiting their capacity.

6         I'd be happy to take any more questions on the

7    magazine capacity limitation.  If not, I will move on to 1229.

8         THE COURT:  Please move on.

9         MR. GROVE:  As far as 18-12-112 is concerned, there

10   are a couple of things that I think that we need to make clear.

11   First, there is not a vagueness claim with respect to that

12   statute.  There was certainly a lot of testimony about

13   confusion professed by various of the plaintiffs about how a

14   law might apply to themselves or to their organizations.  But

15   that's irrelevant to the claim asserted in this case, because

16   there is not a 1229 vagueness claim.

17        Another thing is that plaintiffs emphasized throughout

18   this trial one thing, and that's that they don't really

19   disagree in principle with the expansion of background checks

20   to cover private transfers.  Instead, they seem to disagree

21   more with the way that Colorado's General Assembly chose to

22   implement this policy.

23        That position, in my view, should bring into play the

24   political question doctrine.  Prudential limitations on

25   standing concern whether the complaint raises abstract

1945

1    questions more properly addressed by the legislative branch.

2    That's exactly what the plaintiffs here are urging the Court to

3    do with respect to the background check provision.  This

4    court's job is not to micromanage the policy goals of the

5    Colorado General Assembly and reach in and decide after just a

6    few months of implementation that the precise means that the

7    legislature deemed are appropriate are in fact inadequate.  To

8    decide otherwise would raise grave separation of powers

9    concerns.

10        So let's go back and take the same approach that we

11    did here, as we did in the context of the magazine capacity

12    limitation.

13        First, I think it's important to compare what was

14    alleged in this case to what was proven.  Plaintiffs alleged in

15    their Complaint that it would be impossible -- impossible --

16    for most Coloradans to comply with 18-12-112 and acquire a

17    background check.  At trial, they now contend that it is more

18    difficult for some people to do transfers, including some

19    farmers and some nonprofit agencies.  But what is missing here

20    is what is notable, and that is that no one testified that

21    Section 112 either has hampered or would hamper in the future

22    their ability to engage in self-defense.  No concrete examples

23    were offered.  No plausible scenarios were raised.  Again,

24    simply psychological concerns, I may not be able to find

25    someone to loan me a firearm for more than 72 hours in the

1946

1    event I somehow can't get to a federally licensed firearm

2    dealer.

3         For example, Ms. Dahlberg testified that she hadn't

4    ever loaned weapons to someone else, either before or after the

5    bill.  And she didn't know of any instances in which a woman

6    was prevented from borrowing a weapon for the purposes of

7    self-defense either before or after the law went into effect.

8    Without that showing, plaintiffs haven't shown any impact to

9    their core Second Amendment right.  And, again, our position is

10   that their claim should fail at the outset.

11        To touch, again, on facial -- the nature of this

12   challenge as a facial one, plaintiffs must show that the law is

13   invalid in the vast majority of its applications.  Here, they

14   have only shown that a few, not all, persons are even

15   inconvenienced by the private background check requirement.

16   But mere inconvenience isn't the standard.  And in fact,

17   plaintiffs recognized that in their Complaint when they alleged

18   that Section 18-12-112 would make firearms transfers impossible

19   for a great number of state residents.  Again, that prediction

20   simply hasn't come to pass.  Several witnesses testified that

21   they successfully completed private background checks on both

22   sides.  No one testified that he or she could not obtain a

23   needed weapon if he or she had to go through a check.

24        THE COURT:  Well, there is a little bit of the

25   difference in the wording here that I want to be sure we've

1    addressed.

2            Both sides have referred to the Second Amendment right

3    as being the right to self-defense.  Isn't the correct

4    description of the meaning of "to keep and bear firearms for

5    the purpose of self-defense"?  And how does that change what we

6    are focused on?

7            MR. GROVE:  I'm actually not sure that I would agree.

8    I think that -- and here is why:  I think that Heller

9    acknowledged that keeping firearms is one way of ensuring that

10   you have an ability to engage in self-defense.  But there are

11   plenty of other -- there are plenty of other weapons, knives,

12   for example, might very well be protected by the Second

13   Amendment.  I'm not sure if there are any cases on that yet,

14   but I'm sure that we will see some soon enough.  And so I would

15   not restrict it simply to firearms.

16           And the Second Amendment, as I said, certainly

17   protects the right to possess an immediately operable firearm

18   for the purpose of self-defense; but the core right is the

19   ability to engage in self-defense.

20           THE COURT:  Okay.  Well, let's use the same example

21   that I posed to the plaintiffs here.  And that is -- or they

22   may have raised in their argument.  And that is, the situation

23   where someone wants to borrow a firearm.  And we'll assume for

24   purposes of the question that they want to do it with the

25   anticipation that they're going to hold on to it for longer

1    than 72 hours.  We have -- we have the example of -- of a

2    person who has a restraining order against a former spouse, and

3    who is afraid of some kind of action by that spouse, or former

4    spouse, and wants to borrow the firearm.

5         Does that person have a constitutional right to borrow

6    the firearm in order to -- for the purpose of self-defense

7    under the Second Amendment, which would be impacted, then, by a

8    background check requirement?

9         MR. GROVE:  The first inquiry when you're looking at

10   that situation is whether the person who wants to borrow the

11   firearm is in fact permitted to own or possess a firearm in the

12   first place, and we can't know that unless a background check

13   is performed.  And so -- now, to get to the 72-hour point --

14   and I think this is actually important.  As the plaintiffs

15   pointed out -- and this is another example of the way that the

16   legislature took into account many of the concerns.  The way

17   that this bill was originally proposed contained no temporary

18   loan exception at all.

19        And I've got it written down over there.  I can get

20   you the page if necessary -- in fact, there it is.  Page Bates

21   No. 778.  This is the chairwoman of the committee saying, "I'm

22   trying to think about that 72 hours, oh, that there is no

23   perfect time frame.  But I think we open it up so much that we

24   would just be able to let anyone borrow it, and I think there

25   has to be a limit.  So I think  . . .  if you don't put any

1    time onto it, you may not want this amendment or want the bill

2    for sure.  But I do think that that's reasonable, 72 hours,

3    because when I was talking to the constituents in my district,

4    they were really talking about weekends where they were hunting

5    and those kind of sporting events, where they wanted to go to a

6    shooting range, they wanted to try out a gun for a short period

7    of time before they purchased it.  So that was just trying to

8    put my arms around a period of time that seemed to make sense,

9    and maybe there isn't a perfect time."

10        Now, that, of course, didn't explicitly refer to the

11   domestic violence situation or the restraining order that Your

12   Honor was just referring to.  But where it ties into that is

13   that what the General Assembly was trying to do when creating

14   the 72-hour exception was to provide an individual who is in

15   the circumstance that Your Honor described, for an opportunity

16   to have something that would enable them to defend themselves

17   before they went to an FFL in order to either get a private

18   transfer or before they went to an FFL to in fact purchase a

19   gun at retail.

20        The purpose of the law, though, is to ensure in the

21   first place that the individual who is borrowing the gun for

22   whatever reason, for an extended period of time, is in fact

23   eligible to possess a firearm under federal law.

24        *THE COURT:*  So what you're really saying, if I

25   understand correctly, is that this extends the same kind of

1    infringement that's been recognized in other situations, where

2    someone wants to acquire a firearm purportedly for the purpose

3    of self-defense, and they have to go through a background

4    check.  So if I go to the gun show, and I want to acquire a

5    firearm, I have a background check.  If I go to Cabela's, and I

6    buy a pistol, I'm going to have a background check.

7         So what I'm understanding the State to say is that

8    this is an extension of that burden to someone who is going to

9    borrow a firearm, if they are going to borrow it, putting aside

10   the other exceptions, for a period of longer than 72 hours.  Do

11   I understand it correctly?

12        MR. GROVE:  With the exception that I wouldn't agree

13   that this is a burden or an infringement.  I think that federal

14   law has for three generations now placed restrictions on who

15   can own a firearm and who can possess a firearm.  And putting a

16   law into place that is simply designed to effectuate that is

17   not in any way a burden.

18        THE COURT:  Well, actually, courts have recognized it

19   as being a burden and infringement, but they have sustained it

20   as a constitutional burden or infringement in virtually every

21   case that has addressed the issue.

22        MR. GROVE:  I'm okay with that characterization.  We

23   just are not in a position to say that we agree that it -- that

24   it is a substantial burden.

25        THE COURT:  I didn't say "substantial"; I just said

1    "burden."  But I want to make sure that we are on the same page

2    with that.

3         Are we talking about a burden that is similar to the

4    burden that is imposed on me when I go to the gun show and I

5    need to have a background check before I can buy the pistol?

6         MR. GROVE:  I think it is similar.  I think what

7    you'll hear from the plaintiffs is that is, however, completely

8    different.

9         THE COURT:  I understand that I'll hear that from

10   them.  I want to know where the State is on that, on this

11   issue.

12        MR. GROVE:  Then, yes.  The answer is that it's

13   virtually identical to a purchase at retail.  I mean, I think

14   the testimony on that was undisputed.  You fill out the same

15   form, you pay the same fee -- actually, you don't pay the same

16   fee.  But -- you fill out the same form, and it takes the same

17   amount of time.

18        But that actually brings up another point.  If you had

19   a question, I can wait.

20        THE COURT:  No.  Go ahead.

21        MR. GROVE:  The fee point is one that is surprisingly

22   hotly contested here.  The unrebutted testimony from -- well, I

23   guess -- I suppose it was rebutted, but not credibly so, from

24   Mr. Spoden was there are two separate fees here.  One is set by

25   House Bill 1229; the other is set by House Bill 1228.  I don't

1952

1    have the codification for that now.  But one is very clear, the

2    1228 fee is what goes to pay InstaCheck for the services that

3    it provides.  The other $10 that is set by House Bill 1229 can

4    go to the federally licensed firearm dealer who runs the check.

5         So the evidence in this case has shown that the State

6    has a substantial interest in expanding its background check

7    requirement.  Plaintiffs concede in their trial brief that

8    there is constitutionally legitimate purpose of preventing

9    possession of firearms by felons and the mentally ill, along

10   with a number of other categories.  So, in other words,

11   plaintiffs don't base their claim on a theory that background

12   check are *per se* unconstitutional.  And I think that's

13   consistent with the argument here today.

14        The evidence on the other side about the effect that

15   the expansion of background checks will have on public safety

16   was substantial.  As Director Sloan testified, the State has a

17   public safety interest in keeping firearms out of the hands of

18   prohibited individuals.  As Dr. Webster explained, checks are

19   important because persons in the prohibited categories are at

20   increased risk for the commission of future crimes.  Without

21   checks, risky private transactions happen in a manner of

22   minutes.  No-questions-asked sales can easily be started over

23   the internet and completed in very short order.  Guns can be

24   traded for money with no record and no checks and no way to

25   determine the source of the gun, if it is eventually used in a

1   crime.

2          Keeping prohibited persons from getting guns will

3   decrease gun violence, and background checks -- expanded

4   background checks requirements such as Colorado's will reduce

5   the burden of illegal guns to criminal activity.

6          Dr. Webster testified about three separate studies

7   that showed a strong association between checks on private

8   transfers and trafficking.  Lorne Kramer testified about the

9   considerable concerns that he had as police chief in Colorado

10  Springs with respect to the domestic violence cases and the

11  increasingly violent nature of these claims.

12          You know, Mr. Westfall was -- I think a very good

13  example when he was talking about Mr. Abbott and how he might

14  loan a gun to him.  He said -- I think these are his words, I

15  know Mr. Abbott pretty well, and he lives down the street from

16  me, and I think he's a nice guy.  And I'm sure Mr. Abbott is a

17  nice guy.  However, I don't know anything about his background.

18  I don't know if he has been -- don't take this personally,

19  please -- adjudicated a mental defective at some point in his

20  life.

21          MR. ABBOTT:  So stipulated.

22          MR. GROVE:  I don't know if he had a run-in with a

23  significant other 30 years ago that made him ineligible to

24  possess a firearm under the Lautenberg Amendment.  I don't know

25  if -- if he has renounced his United States citizenship.  I

1954

1    don't know if he was dishonorably discharged from the military.

2    There are a whole host of potential prohibiting factors that --

3    you know, I can know thy neighbor as much as I possibly can,

4    but there is simply no way that I can know everything about

5    everybody, no matter how close to them I am.

6         Now, the situation with respect to family is a little

7    bit different.  And I think that the statute appropriately

8    exempts nuclear and extended families for that reason.  But the

9    bottom line is that the legislature made a policy choice that

10   we should put checks in place to ensure that people who are

11   acquiring firearms for any extended length of time, except with

12   certain exceptions, to ensure that they are in fact not

13   prohibited.

14        Plaintiffs labeled the background check requirement

15   during their opening and in the briefing in this case as an

16   extreme imposition on their rights.  In fact, as I already

17   noted, they alleged in the Fourth Amended Complaint that as a

18   practical matter, it will be impossible for citizens to comply

19   with House Bill 1229.  That's not been borne out by the

20   evidence.

21        Mr. Spoden explained that it takes between four and

22   thirteen minutes plus the time to fill out the form and a max

23   of $20 -- maximum of $20 to get a background check and purchase

24   a firearm.  Director Sloan explained that this process is less

25   time consuming and less expensive than many other types of

1    everyday background checks.

2         The Colorado Farm Bureau claimed that farmers were too

3    busy to go to an FFL for the checks.  But beyond vague

4    assertions of the burden, the Farm Bureau hasn't collected any

5    information from its members about the actual costs of Section

6    112.

7         Case in point, in the example offered by

8    Mr. Colglazier, his own family farm, only one employee, the

9    hired hand, would have required a check.  And it only happened

10    on one occasion that he could recall that a loan of greater

11    than 72 hours was necessary.

12         Instead, the plaintiffs -- and I think this has been a

13    theme throughout the case -- willfully misinterpret the law to

14    claim that their activities would be criminalized by the

15    expanded background check requirement.  For example,

16    Ms. Eichler testified as to drop camp or bowhunting scenarios

17    that actually fall within the hunting exception, as explained

18    by Mr. Hampton and D.O.W. policy.

19         Mr. Harrell complained that he would no longer be able

20    to sight-in rifles for his friends.  But subsection (6)(f)

21    doesn't require being a gunsmith in order to repair or maintain

22    a rifle.  Mr. Harrell also claimed that the Outdoor Buddies

23    loans with specialized equipment would be hampered.  But per

24    Mr. Hampton, the Colorado Division of Wildlife has determined

25    that these loans would be covered by various exemptions.

1          Again, the plaintiffs claim that they can only collect

2     $10, and that must be passed through to the State.  Mr. Spoden

3     explained that it is actually 20, and they don't need to give

4     their services away for free.  The FFLs also claimed that they

5     have to take on additional risk by taking the firearm into

6     their inventory.  But the ATF procedure, 2013-1 -- I can't

7     remember the exhibit number off the top of my head -- and

8     Mr. Spoden's testimony established that that is not accurate

9     either.

10         Mr. Maketa explained that he holds firearms for his

11    son while his son is away for work, but those temporary

12    transfers would be covered by the family exception.  Mr. Maketa

13    also claimed that citizens could not transfer firearms during

14    natural disasters such as floods and fires.  Yet he admitted

15    that he would have discretion as sheriff as to whether to

16    enforce the law in extraordinary events and that his office in

17    fact exercised that type of discretion during the Black Forest

18    fire.

19         The evidence, instead, showed that the exceptions in

20    Section 112 are flexible to permit lawful transfers when

21    necessary.

22         The Maverick event hosted by Colorado Youth Outdoors

23    is covered by an exemption for shooting competitions, no matter

24    how those might be labeled by Mr. Hewson.  And those -- that

25    exception is not required to be less than 72 hours.  For use on

1957

1    corporate property, temporary loans would also be covered by

2    the exception for hunting, target shooting, or loans that are

3    in the owner's continuous presence.  The same goes for Outdoor

4    Buddies and their hunting trips.  CSSA events are likewise

5    covered by exemptions for target shooting competitions.

6         On a similar -- a similar demonstration is that

7    Mr. Hamilton and Family Shooting Center have continued to be

8    able to rent firearms to customers, even those with

9    large-capacity magazines.  They have not run into any problems.

10   And Colorado Parks and Wildlife found the law flexible enough

11   to permit all the transfers that the hunter education group

12   usually requires and has required in the past.

13        THE COURT:  Now, this particular area gets us into the

14   question of whether entities have rights under the Second

15   Amendment.  What's the State's position with regard to that?

16        MR. GROVE:  The Second Amendment protects the right to

17   self-defense.  And an entity -- I'm not really sure how an

18   entity engages in self-defense.  That is very distinguishable

19   from what Mr. Kopel, I think it was, was discussing with

20   respect to First Amendment rights.

21        The most apt analogy that I can bring to mind is

22   corporate speech.  And Citizens United, of course, is that.

23   When you're talking about something like money, it's clear that

24   a corporation has something that it can spend.  It can spend

25   money.  And so if speech is money, then it certainly makes

 1    sense -- sorry, if money is speech, it certainly makes sense

 2    that a corporation should be able to engage in that, if in fact

 3    the First Amendment reaches to cover that.

 4          But when you're talking about something that is

 5    corporate, that doesn't have a body, the Second Amendment, it

 6    doesn't make any sense to apply to it.

 7          Now, that's not to say that the organizations here

 8    might not be able to assert some sort of standing had they made

 9    the correct allegations in their Complaint and had they

10    attempted to prove the correct things.

11          THE COURT:  Well, I want to pause at this point,

12    because standing here is not really the issue.  Standing is a

13    jurisdictional issue.  What I'm talking about is whether they

14    have a right protected by the Second Amendment.  Not whether a

15    statute might impact them, not whether there might be some

16    effect, but is there a right, even before we get to the effect,

17    that is protected?

18          MR. GROVE:  Our position is, no.

19          THE COURT:  Thank you.

20          MR. GROVE:  What the plaintiffs' testimony did

21    highlight was the need for this law.  Colorado Youth Outdoors

22    permits firearms to leave their property on guided hunting

23    trips.  But Colorado Youth Outdoors testified that it didn't

24    know whether the persons that they had loaned firearms were

25    fugitives from justice, had mental health issues, had substance

1    abuse problems.  In fact, CSSA loaned guns for up to two years

2    before Section 112 existed; but they didn't know if the

3    transferee had domestic violence convictions, mental health

4    adjudications, felonies.

5         The law does provide exemptions, but it doesn't

6    provide exemptions for everything.  And that's for the reason

7    that the legislature made the policy decision that some sorts

8    of firearms transfers, whether temporary or not, should be

9    covered by a background check, because they're deemed to be a

10   public safety risk.  And that is a policy decision that the

11   legislature made; but it is not a policy decision that should

12   be driven by the plaintiffs' interpretations of 1229 in this

13   case to cover or not cover all sorts of scenarios that they

14   posit may now be problematic.

15        Plaintiffs' main argument appears to be that the

16   burden of Section 112 outweighs the benefits because citizens

17   are not actually engaging in transfers.  They focused heavily

18   on what the numbers suggest, but the evidence really shows that

19   that is sort of a mixed bag.

20        It's important to remember that the law has been in

21   effect for only nine months.  The constitutionality of the

22   statute, particularly in a facial challenge, can't turn on the

23   degree of compliance in the first few months of a new law.

24        Plaintiffs also point to the fiscal note that

25   accompanied House Bill 1229 when it was in front of the

1    legislature to point out the fact that the compliance was lower

2    than what the analysts forecast.  From this, they argue that

3    the system isn't working and therefore would fail the

4    least-restrictive-means test.

5         Again, I'm not aware that the least-restrictive-means

6    approach has ever been applied in a Second Amendment context.

7    And even if it were applicable, it would only come into play if

8    strict scrutiny applied.  Of course, it's impossible to

9    accurately compare the number of checks done before the law

10   passed with what happened after the law passed because the data

11   in the year leading up to the implementation has been so

12   skewed.  Mr. Spoden and Director Sloan both testified that the

13   number of checks prior to implementation were unprecedented, in

14   part due, ironically, to the discussion of this legislation.

15        Also, the evidence doesn't necessarily show what the

16   plaintiffs claim.  Exhibit 24 shows that the number of checks

17   for private transfers were flat, while gun show checks declined

18   during the same period.  And the data to date showed that the

19   number of private checks are in fact trending upwards on a

20   month-to-month basis.  To date, 182 persons have been denied

21   possession of firearms as a result of private checks.  Now,

22   that does include all three categories, person -- interstate

23   transfers, in-person checks, and gun shows.  But, nonetheless,

24   at least some people have certainly been denied based on

25   private checks.

1961

1          And although plaintiffs claim only that a small number

2     of FFLs are doing the checks, the reality is that 635 out of

3     the 1,000 active FFLs have run some sort of private background

4     check in the last nine months.  Among those 635 are 7 of the 9

5     plaintiff FFLs that were originally named as plaintiffs in this

6     case.

7          As to whether FFLs are actually doing transfers, the

8     testimony is a little bit mixed.  Mr. Harrell testified that he

9     had one done.  Mr. Hamilton testified that his FFL would do

10    checks.  Colorado Farm Bureau didn't know of any members who

11    have not been able to find an FFL for the transfer.

12    Mr. Montgomery has had two checks done.  And CBI witnesses

13    testified that they know that people are able to get them.

14         On the other side of the ledger, Mr. Hewson,

15    Mr. Harrell -- Messrs. Brough and Burrud both testified that

16    they would not do checks, although their reasons for doing so

17    were based, at least in part, on the fact that they believed

18    they couldn't be compensated at all for the time that was

19    associated with submitting the checks.

20         Plaintiffs also complained that Section 112 is

21    dysfunctional because it imposes joint and several liability

22    during temporary transfers that last less than 72 hours.  But

23    this was discussed -- discussed some during Mr. Westfall's

24    argument, tort and agency principles always apply to transfers

25    of this type.  It could be negligent entrustment, it could be

1    something else.  The point that the Court made is a good one.

2    There actually has to be an unlawful use of the firearm,

3    exactly -- for joint and several liability to apply under the

4    statute.  Now, what unlawful use actually means is something

5    that is yet to be determined.  I would posit that it's

6    unlikely -- it's certainly unlikely to include somebody walking

7    across a property line with a firearm in their hand.

8         On the other end of the spectrum, if you took a gun

9    and borrowed it from somebody and then went and shot somebody

10   else with it intentionally, I think it certainly would apply

11   under those circumstances.

12        In any event, plaintiffs haven't shown that this

13   provision imposes any substantial burden beyond what negligent

14   entrustment and tort and agency principles would already

15   impose.

16        Background checks for other types of firearm sales

17   have also been successfully working for a number of years in

18   Colorado.  As Mr. Spoden testified, the same $10 fee applies to

19   gun shows as applies to purely private background checks in

20   stores.  That system has been in place for 13 years.  There

21   have never been complaints about it.  There have been tens of

22   thousands of gun show checks that have been performed.  It's

23   exactly the same process.  It's exactly the same fee.

24        As Dr. Webster explained, the Colorado system is less

25   onerous than the system of law enforcement issued permits in

1    other states.  And contrary to what plaintiffs said, there was

2    testimony that the 72-hour loan provision is important.  Per

3    Director Sloan, we need to limit -- the legislature made the

4    decision to limit the loan period in order to avoid shams.

5         Now, could the legislature have made that period

6    shorter?  Sure.  Could they have made it longer, as in

7    California?  Yes.  But, again, that is the sort of specific

8    policy decision and micromanagement that this court, I would

9    posit, should stay away from.

10        Plaintiffs also argue that there are less restrictive

11   alternatives out there.  They had Mr. Colglazier go on to the

12   CBI website and make sure that he didn't have any felony

13   convictions.  Of course, the least restrictive alternative only

14   comes into play to the extent that the Court is using a strict

15   scrutiny analysis.  And while this alternative could

16   potentially be less onerous, the undisputed facts are that it

17   wouldn't accomplish the State's objectives either.

18        As Dr. Webster testified, background check systems are

19   based on accountability.  A web interface that requires no

20   identification confirmation has no such accountability,

21   particularly when you don't have law enforcement who you can

22   inherently trust, I would hope, or an FFL whose ATF licensure

23   rides on the accuracy of background check process and

24   compliance with ATF regulations.  Webster in fact called the

25   system that would work in the way the plaintiffs suggest

1964

1    grossly ineffective.

2         Further, Director Sloan testified that web-based check

3    would not search the databases that are available only for law

4    enforcement purposes, which would include a firearms background

5    check.  Most of the factors that would prohibit someone from

6    possessing a firearm simply won't show up on a check that is

7    based on the website and what is currently available under

8    federal law and state law.

9         If the Court has any questions about 1229, I'd be glad

10   to answer them.  Otherwise, I will move on to continuous

11   possession.

12        THE COURT:  I have no further questions.

13        MR. GROVE:  Claim 2 as contained in the Final Pretrial

14   Order described a Second Amendment challenge to the continuous

15   possession requirement of 18-12-302, in that plaintiffs stated

16   that Section 18-12-302 restricts the ability of a lawful owner

17   to loan magazines to other law-abiding citizens for lawful

18   purposes.

19        I'm not aware of any evidence at all on this claim

20   that was presented during trial.  In any event, I think this

21   claim is likely foreclosed by the State's official written

22   interpretation contained in the first and second technical

23   guidance letters.

24        I will move on from there to vagueness.

25        I view vagueness -- constitutional vagueness -- and

1965

 1   this is the continuous possession requirement of Section 302 --

 2   as a purely legal question.  As we argued in the trial brief,

 3   the Court shouldn't reach the merits of this claim at all

 4   because it is raised outside of the First Amendment context,

 5   and the Tenth Circuit has foreclosed the consideration of

 6   facial vagueness challenges outside of the First Amendment

 7   context.  But assuming that we get there, plaintiffs' factual

 8   arguments turn largely on the testimony of Mr. Shain.

 9           Mr. Shain continued with the plaintiffs' theme of

10   misinterpretation, intentional misinterpretation of both the

11   statute itself and the technical guidance issued by the

12   Attorney General.  He opined that continuous possession could

13   only mean actual physical possession, meaning that a magazine

14   owner would be required to keep a subject magazine not just

15   within arm's reach, but physically attached to him at all

16   times.

17           This sort of interpretive approach has it exactly

18   backwards, particularly in a vagueness context.  The rules of

19   statutory construction do not encourage courts to interpret

20   statutes in a manner that would provide an excuse to strike

21   them down as unconstitutional.  In fact, this court should do

22   just the opposite.  If there are questions about vagueness,

23   this court should adopt a narrow interpretation in order to

24   preserve the statute's constitutionality.  And an appropriately

25   narrow interpretation of the continuous possession requirement

1    at issue here demonstrates plainly that the statute has a

2    clearly defined core.

3          The grandfather clause very obviously prohibits some

4    conduct and plainly allows some other conduct.  In other words,

5    even if there are some questions about how the statute might

6    work at the margins, it is not incapable of valid application.

7    A statute challenged for vagueness does not depend on whether

8    the challengers can posit some obscure and difficult

9    application of the legislation that might confuse certain

10   people.  In fact, it's doubtful whether any criminal statute

11   could survive such scrutiny.

12         Here, consistent with the technical guidance and the

13   case law cited in our trial brief, continuous possession should

14   not be considered to be an act.  To the contrary, it's a course

15   of conduct.  The statute provides more than adequate guidance

16   to survive a facial constitutional challenge.

17         Finally, I'd like to touch briefly on the ADA.  I will

18   not dwell on it since it was the subject of our halftime

19   motion.  But I do think it's worth adding just a few points.

20         Our argument is not that the ADA cannot apply to a

21   state statute.  Of course it can.  If a statute actively

22   discriminates against people by reason of their disability and

23   the provision of public services or if by its terms it prevents

24   people from accessing services, programs, or activities by

25   virtue of their disability, then the ADA is implicated.

1          Thus, for example, in *Thompson v. Cooke*, which is

2     cited in the plaintiffs' trial brief, a state statute violated

3     the ADA because it imposed a special fee on disabled people as

4     a condition of accessing state-owned facilities.   The fee also

5     specifically violated the ADA implementing regulations.

6          In *T.E.P. & K.J.C. v. Leavitt*, the Utah case cited in

7     the plaintiffs' trial brief, the challenged statute violated

8     the ADA because it specifically, again, discriminated against

9     HIV-positive individuals with regard to the state-regulated

10    activity of marriage.   The provision of a marriage license is,

11    once again, a service, program, or activity of the state.   And

12    *Leavitt* in fact actually contains no analysis of the ADA claim

13    in any event.   In fact, the state in that case conceded the

14    invalidity of the law and requested that the court enter an

15    injunction against it.

16         This court's several decisions in *Grider* follow the

17    same mold.   As the plaintiffs have previously pointed out, that

18    case involved a challenge to city ordinances in Denver and

19    Aurora.   Critically, however, and as the Court's order of

20    March 30, 2012, made explicit, the Grider plaintiffs alleged

21    that the defendants had discriminated against them on the basis

22    of their disabilities insofar as the ordinances "denied

23    plaintiffs of the benefits, services, programs, and activities

24    of the cities.

25         It's on that last point that we have a complete

1968

1    failure of proof in this case.  Plaintiffs never made a similar

2    allegation and certainly did not prove at trial any connection

3    between either the magazine capacity limitation and the

4    provision of services, programs, or activities by the State.

5         Plaintiffs nonetheless point to the second clause of

6    Title II.  In context, that clause says, "No qualified person

7    with a disability shall by reason of such disability be

8    excluded from participation in or be denied the benefits of the

9    services, programs, or activities of a public entity or be

10   subject to discrimination by such entity."

11        Plaintiffs argue that this last clause is a

12   free-standing bar on any law that might have some impact on a

13   qualified individual with a disability.  We've already laid out

14   here why we don't believe that the plaintiffs are qualified --

15   the disabled plaintiffs are qualified.  But in any event, their

16   position is contrary to Tenth Circuit precedent and, for what

17   it's worth, similar cases in both the Seventh and Ninth

18   Circuits.

19        As we argued in the briefs, the Tenth Circuit's

20   decision in *Elwell v. Oklahoma Board of Regents* is controlling.

21   But the most concise statement of what that second clause means

22   that I've been able to find is from a recent Seventh Circuit

23   case that relies heavily on the Tenth Circuit's decision in

24   *Elwell*.  That case is *Brumfield v. City of Chicago*, 735 F.3d

25   619.  At page 627 of that opinion, the court held that, "The

1    second and most sensible way to read Title II's prohibition

2    against disability-based discrimination is to read it in

3    context and in conjunction with the applicable definition of

4    qualified individual with a disability.  Since the only people

5    who can invoke the protection of Title II are those who are

6    eligible to receive or participate in the services, programs,

7    or activities offered by the state and local governments, the

8    statute's prohibition against discrimination is properly read

9    to cover disability discrimination and the outputs of

10   government, their delivery of public services, programs, or

11   activities to eligible recipients."

12           As I mentioned, there has been a complete failure of

13   proof on this question.

14           The bottom line is this:  The regulations at issue

15   here are constitutionally permissible public safety

16   regulations.  They do not substantially burden, even

17   anecdotally, the core Second Amendment rights of any Coloradan.

18   They're justified by the state's compelling interest in

19   ensuring public safety and are adequately tailored to reach

20   that goal without unnecessary interference with the

21   constitutional rights of anyone.

22           I'd be glad to entertain any questions if the Court

23   has them.  Otherwise, I thank you for your time.

24           THE COURT:  I think I have asked my questions along

25   the way.

1    Rebuttal.

2                        **REBUTTAL ARGUMENT**

3        *MR. ABBOTT:*   Thank you, Your Honor.  I just want to

4    briefly touch upon the issue about the legislative history.

5    Obviously, I have not had a chance to read their cases.  I will

6    read them with interest and trust the Court will do the same.

7        I just wanted to note -- I wasn't quite sure -- I'm a

8    little surprised to hear all of our cases represented as racial

9    classification cases.  Just citing just one, the *Turner*

10   *Broadcasting System* case, which is a Supreme Court case from

11   1997, cited in our brief, an intermediate scrutiny case

12   involving whether or not cable companies have to carry local

13   programming.  Not a racial classification case.  And in that

14   case, the Supreme Court said the question is not whether

15   Congress as an objective matter was correct; rather, the

16   question is whether the legislative conclusion was reasonable

17   and supported by substantial evidence in the record before

18   Congress.

19       So I -- again, Your Honor, I'll let you read the

20   cases, and I will read theirs as well, and you'll make your own

21   determination of what they say.

22       The only other thing I would like to note is, I know

23   there are a number of cases that generally arise in this

24   context that are not about the legislature or the

25   representatives of the legislature attempting to introduce new

1    evidence, but are, rather, about either the people in our

2    situation attempting to introduce evidence to show why the

3    legislature's reasoning was wrong or the court itself going

4    outside the record to make that same kind of determination.

5    But that's fundamentally different.  It's really sort of the

6    flip side of what we're talking about here.

7              I think that, Your Honor, the -- I think that the

8    problem here is, when you read the legislative history -- and I

9    know that you will.  And I would like to point out just a

10   couple of small places I'd like to call your attention to.

11             But it is -- one can raise a valid question as to why

12   neither in the opening or closing did we really hear anything

13   about what the legislature did.  Because I believe that it's --

14   stripped of all the talk about level of scrutiny and all of

15   that, what Your Honor is doing as the representative of the

16   judicial branch in this case is, you are using the power of

17   judicial review to look at what the legislature did.

18             THE COURT:  No, sir.  I am not.  My role on this court

19   is to determine whether the statutes are constitutional.  I am

20   not evaluating the wisdom of the law, the practicality of the

21   law, the -- whether the law is a good law or a bad law.  I am

22   only determining whether it is constitutional.  That's it.

23             MR. ABBOTT:  I understand, Your Honor.  And I didn't

24   mean to speak quite that broadly.  But you are reviewing

25   whether or not there is a basis to determine whether these laws

 1     are constitutional.  And I certainly didn't mean to say

 2     anything beyond that.

 3           I would simply ask -- Your Honor, I would simply

 4     suggest, as a person who has in fact read the entire

 5     legislative history, that Your Honor will find that if you read

 6     the first day, both in the House and the Senate, when witnesses

 7     actually testified, and then the day following -- and on 1224,

 8     that is February 12 and the 15th.  And then for the Senate,

 9     it's March 4 and March 8.  That is -- the first day is when all

10     the witnesses testified.  The second day is when the principal

11     debate occurred.  And I would just suggest, Your Honor, that

12     you will probably find if you read all of the rest, you

13     wouldn't learn 1 percent more, because there is not

14     surprisingly a fair amount of repetition.

15           I would also suggest one other thing to Your Honor.

16     There are numerous places -- and we quoted just one in our

17     brief.  But there are numerous places where various members of

18     the legislature said, you know, where is the data?  Where is

19     the data that shows me, if we do this, it will save lives?

20     Where is that data?

21           And at one place, one of the sponsors of the bill took

22     up that challenge specifically and said, You say we have no

23     data.  Let me give you the data.  And that is at -- if you'll

24     give me one second here, I will tell you where it's at.  It's

25     on March -- February 15.  This is in the House hearings.  At

1    pages 97 to 100.  And I'm only pointing that out because it is

2    two and a half pages long.  And in that two and a half pages,

3    one of the sponsors of the bill takes up the challenge to

4    describe what the data is in support of that bill.  And if you

5    read it -- if you read only that, you would say to yourself,

6    this is surely just a summary.  Surely, somewhere else in this

7    1,000 pages there is the detail of all of this.  But I will

8    suggest to you that there really is not.  And that therein lies

9    the problem.

10        Therein is the problem.  That everything was rather

11   superficial, I think, because what they were -- the reason

12   these bills were passed -- and it's the stated purpose on day

13   one -- is the response to the Aurora theater shooting.  That

14   was the motivation.  But the motivation for a bill cannot be

15   the whole reason for the bill.  It cannot be both the means and

16   the ends for the analysis.  But what you will find when you

17   read the legislative history, I will submit to you, is that

18   there is very little more than that motivation.

19        That's all I have to say, Your Honor.  Thank you.

20        THE COURT:  Thank you.  And thank you for the

21   direction as to the record.

22                         **REBUTTAL ARGUMENT**

23        MR. KOPEL:  Your Honor, this morning you had asked

24   about cases where there were as-applied challenges accepted by

25   courts in situations where there had not been any specific

1    enforcement against the plaintiff.

2         THE COURT:  No, I said before the statute was

3    effective.

4         MR. KOPEL:  Yes.  *American Civil Liberties Union v.*

5    *Alvarez*, Seventh Circuit, 679 F.3d, an opinion by Judge Sykes

6    against an anti-eavesdropping statute.  I believe that was a

7    pre-enforcement and as-applied statute -- challenge.

8         THE COURT:  Just so I have the citation correctly, 679

9    F.3d, what page?

10        MR. KOPEL:  Oh, 583.

11        THE COURT:  Thank you.

12        MR. KOPEL:  *American Charities for Responsible*

13   *Fundraising Regulation v. Pinellas County*, I believe that was

14   pre-enforcement as well, 221 F.3d 1211, Eleventh Circuit, 2000.

15   That was one of these both cases of facial and as applied.  The

16   plaintiffs had received a statement from the county clerk that

17   they -- I believe they had to comply with the ordinance after

18   they asked, Does it apply to us?  And the county clerk said

19   yes, and here are the penalties.  But there hadn't been any

20   enforcement against them.

21        THE COURT:  So that was before enforcement.  But it

22   sounds like whatever the regulation was, was effective;

23   otherwise, the notice wouldn't have been issued.

24        MR. KOPEL:  I apologize for this, Your Honor.  I

25   believe it was before the -- the plaintiffs had raised this

1975

1    issue before the ordinance went into effect for them.

2         THE COURT:  Okay.

3         MR. KOPEL:  But I will also confess, Your Honor, I am

4    not certain about that.

5         THE COURT:  Okay.  I'll read them.

6         MR. KOPEL:  Okay.  Plaintiff -- defendant had raised

7    the -- on -- in defendant's argument, the fear that, well, if

8    these -- if our challenge to Section 302 is successful, then

9    there can never be any limits on magazines and on and on, there

10   is no upper limit.  I would point out, we carefully framed this

11   challenge to attempt to stay strictly within what we could

12   clearly prove under *Heller*'s common use standard.  This is a

13   case about 20 rounds for handguns and 30 rounds for rifles,

14   except for the ADA, for which we didn't set any upper limit for

15   that special situation.  But for the general public, this is

16   only 20 and 30.

17        Your Honor had asked --

18        THE COURT:  Where do I find that in the pleadings?

19        MR. KOPEL:  Oh, in -- throughout the Complaints that

20   we've specifically said -- I could get the Complaint, cite to

21   the paragraphs, but that's certainly repeatedly stated in our

22   Complaint, that it's 20 for handguns and 30 for rifles.

23        THE COURT:  Then, could you direct me to the evidence

24   in the record, please, that pertains to the distinction between

25   15 rounds and 20 rounds, and 15 rounds and 30 rounds.

1          MR. KOPEL:  I think in the stipulations, among other

2    things, is where the parties stipulate on the commonality and

3    common use of these -- the magazines and the sizes I indicated.

4          THE COURT:  Well, I understand that.  That's not what

5    I was asking.  Let me see if I can ask it in a clearer way.

6          Where in the record is there evidence that suggests

7    that 20 rounds or 30 rounds is essential for self-defense?

8          MR. KOPEL:  There is no claim that it is essential for

9    self-defense, and we don't believe that is the standard.  We

10   believe, certainly, that is the standard that defendants --

11   defendant has urged in a variety of forms, but we do not

12   believe that essential for self-defense is a Second Amendment

13   standard.  If that were the situation, *Heller* would have come

14   out the other way, because, as the opinion says, D.C. allowed

15   people to own rifles and shotguns for self-defense.  Well,

16   there was a separate provision on self-defense, but it

17   allowed -- D.C. allowed the ownership of rifles and shotguns.

18   And there is no question that rifles and shotguns can be used

19   for self-defense.  Handguns are handy for self-defense, but

20   they are not essential for self-defense.

21         THE COURT:  I don't think we're on the same

22   wavelength.  Is there any evidence in the record that

23   correlates 20 rounds or 30 rounds to self-defense?

24         MR. KOPEL:  Yes.  The testimony of -- the great

25   majority of our testimony on Monday and Tuesday from plaintiffs

1977

1    and other witnesses who believe that their particular firearms,

2    whether they're Mr. Heap's 17-round Glock or, I believe,

3    Mr. Harrell's 30-round -- 30 rounds for his AR-15, they believe

4    that those are crucial and by far the best choices for them

5    personally for self-defense in certain situations.

6             THE COURT:  Was there any statistical information

7    that -- statistical evidence that correlates 20 rounds or 30

8    rounds to self-defense?

9             MR. KOPEL:  By self-defense, do you mean, pulling --

10   Your Honor, do you mean, how many times people pull the

11   trigger, or do you mean what people choose to use?

12            THE COURT:  Rounds generally mean discharged rounds or

13   potentially discharged rounds.

14            MR. KOPEL:  On potentially discharged rounds, yes, the

15   stipulations take care of that, because they show the

16   widespread choice --

17            THE COURT:  I'm not asking about how widespread this

18   is.

19            MR. KOPEL:  Okay.

20            THE COURT:  I am asking about statistical evidence

21   that correlates 20 rounds or 30 rounds as it affects the

22   ability to engage in self-defense.

23            MR. KOPEL:  No, Your Honor.  I think, as Dr. Kleck

24   testified, and everyone else agreed, that data does not exist

25   and has never been gathered by anyone.

1978

1            THE COURT:  Okay.

2            MR. KOPEL:  Mr. Ayoob testified about that issue, but

3    not in a statistical way.

4            THE COURT:  Okay.   Thank you.

5            MR. KOPEL:  The question arose during Mr. Grove's

6    argument about whether the First Amendment standards -- sort of

7    a general principle in terms of the vigor of judicial

8    protection should apply to the Second Amendment as well.

9            I would point Your Honor to the *Valley Forge* case from

10   the Supreme Court in 1982, 454 U.S. 464, which is, one may not

11   create a -- as the Court said, "We know of no principled basis

12   upon which to create a hierarchy of constitutional values."

13   And that actually was a case saying there is special rules for

14   standing in First Amendment situations and -- First Amendment

15   situations, and the Court rejected that and said that the --

16   all the Bill of Rights -- the sun shines on all of it equally.

17           THE COURT:  But the Supreme Court often applies

18   different standards of review.  So let me ask you, as I did the

19   State, on what basis should I determine the standard of review?

20           MR. KOPEL:  The most core basis on which you should

21   determine the standard of review, Your Honor, we'd suggest, is

22   to follow what the Tenth Circuit instructs, including by its

23   favorable citations and discussions of *Marzzarella*, which is

24   you look -- I think in a very broad sense we agree with the

25   State on this -- that you look at how close you are to the core

1979

1    of the right, and the closer you are, the stricter the standard

2    of review.  That's what *Ezell* also does, which is target

3    practice is not quite at defending your home, but it's practice

4    towards it, so there it's not strict scrutiny.  And as you get

5    further and further out, the standard goes down, but never

6    disappears.

7           So, for example, *Marzzarella* itself, it was an

8    obliterated serial number.  Do you have a right -- is the

9    Second Amendment violated by having a gun with an obliterated

10   serial number?  The Court applied intermediate scrutiny out

11   there.  And, of course, that does not in any way limit what

12   guns one may own.  It simply means, don't have one that has the

13   serial number removed.  And there -- that's the standard we

14   would suggest.

15          Now, where the facts of these -- this case fit in

16   along that standard is a separate question, which I don't think

17   you were asking.

18          THE COURT:  No.  But if you'd like to address it, I'd

19   appreciate it.

20          MR. KOPEL:  Ownership -- taking the point Your Honor

21   expressed on -- with Mr. Grove, viewing the Second Amendment at

22   its core, a right to keep and bear firearms for the purpose of

23   self-defense, we see on the magazines that this is how many

24   people choose as the best method for them to exercise that

25   right.  So we are, therefore, similar to the situation in

1980

1    *District of Columbia v. Heller*, where many people chose to use

2    handguns rather than rifles or shotguns for self-defense.  So

3    I'd suggest on that, we are at the core -- not at the

4    destruction of the right, because even the D.C. handgun ban did

5    not destroy the right to have the gun in the home for

6    self-defense.  There was a separate D.C. ordinance that

7    prohibited unlocking one's gun in a self-defense emergency, but

8    that was separately struck down for other reasons in *Heller*,

9    the handgun ban was struck down on its own.

10        We are, in the magazine ban, we believe at the core of

11   the prohibition of a type of arm which is very widely chosen by

12   the American people for self-defense.  And in our view, it is

13   that choice which the Second Amendment itself protects.

14        On the -- 18-12-112, the acquisition of a firearm in

15   general certainly must be no more than a half step away from

16   the core right of keeping and bearing arms for self-defense.

17   Because unless one can acquire a firearm, it is impossible to

18   use it for that purpose.

19        There are other situations also described in here

20   where the acquisition by borrowing, for example, may not be

21   necessarily intimately related to lawful self-defense, taking

22   that to be the core of the home.

23        So, for example, Outdoor Buddies in its program to

24   loan firearms to families so that -- Outdoor Buddies and

25   Colorado Youth Outdoors and their loan programs are focused on

1   the sporting use of arms rather than on defensive arms.  So

2   that is not as close to the core as the situation of the --

3   Ms. Dahlberg was talking about, about the stalking victim who

4   wants to borrow a gun for a week and does not have the 72 hours

5   available in her life to go down to a gun store and procure a

6   firearm.

7         So the burdensome -- the standard might vary, in an

8   as-applied context, particularly, depending on the various

9   situations of these different plaintiffs.  But certainly

10  acquisition in general is something that is very close to the

11  right.  But, again, the fact that something is very close to

12  the right does not forbid all regulation of it.  But what it

13  does forbid is, even if we go down to the low level of

14  intermediate scrutiny under *Peruta*, is that --

15         THE COURT:  That's the intermediate level.

16         MR. KOPEL:  Yes, right.  And there is some back and

17  forth about least restrictive alternative, or whatever.  But I

18  think the practical result is the same, that if we formally

19  apply intermediate scrutiny the way *Peruta* correctly says it

20  should be done, then you don't -- the government act does not

21  burden substantially more of the right than is necessary to

22  achieve the government purpose.

23         And this is the -- our core problem with 18-12-112,

24  that it does so much more.  That the vast world of the loaning

25  of firearms is -- could just as easily have a 30-day rule

1982

1     rather than a 72-hour rule, and that would take care of all the

2     concerns about sham evasions of background checks on genuine

3     permanent private transfers of -- really, of dominion and

4     control.

5          And as a practical matter, in the way that Americans

6     do and always have used guns, there is a great difference in

7     the burden of saying, you must go through a government process,

8     and you must travel to a licensed firearms dealer for the act

9     of buying a gun, of permanently acquiring one, versus borrowing

10    a firearm.  If one looks at the -- instead of the red -- I

11    think the *Red Violin* movie, which followed the red violin's

12    travels around the world, if we follow -- take a typical gun

13    and follow its career over, say, 100 years before it rusts,

14    that gun may only be sold or permanently transferred once or a

15    few times.  But it may be borrowed scores of times in the

16    course of ordinary gun ownership and sharing in American

17    society.

18         And that's why the burden on short-term loans is so

19    important.  It is far more intrusive than is the burden on --

20    you buy a few guns -- buy two or three guns a year, perhaps, if

21    you're a fairly large consumer of firearms, but the loans can

22    be frequent.  That's -- that's the core of our concern.  And we

23    would therefore suggest that on the loaning issue, that gets

24    closer to the core than does the sales issue.

25         And, again, we've -- as defendants recognize, we have

1    never challenged the concept of background checks on private

2    sales.  We do say that this burden, if it is to be a legitimate

3    one on actual sales, must meet some form of means and scrutiny.

4    And, certainly, it would be implausible to argue that the

5    Second Amendment right does not include the right to buy or

6    sell a firearm to one's friends.

7            And given that it does matter, that this statute

8    actually has moved us backwards in practice.  In means and

9    scrutiny, there is a whole variety of tests and techniques that

10   are used on various constitutional issues, but even a rational

11   basis, unless -- if rational basis is taken seriously, then

12   it's not even rational to have an ordinance which has been

13   shown to move away from things.  It should have moved us

14   forward 200,000, and we actually moved backwards on this.  So

15   that cannot possibly, in our view, satisfy whatever burden

16   applies even down to rational basis, and certainly not anything

17   under even the weakest forms of intermediate scrutiny.

18           If I could briefly address the -- an issue that Your

19   Honor had talked about with concern this morning is the, is

20   there such a thing as a group right for firearms?  And as Your

21   Honor pointed out, normally, only one person at a time can hold

22   a gun, so how can -- although, in contrast, I suppose -- an

23   association of people can hold an opinion jointly at the same

24   time.

25           If I might suggest as we continue these analogies,

1984

1    that when petitions are being gathered, only one person can

2    hold the petition form at a time in order to sign it.  And,

3    likewise, for any given copy of a book, only one person at a

4    time normally can be reading that book.  But both petition

5    gathering groups and book clubs are fairly straightforwardly

6    considered within the First Amendment rights.

7         Its also might be noted that in the practical

8    operation of our firearms laws, corporations do own firearms.

9    Now, if we're going -- and they can lose their Second Amendment

10   rights as well -- they can lose -- whether they have Second

11   Amendment rights, they can lose their legal ability to possess

12   firearms for criminal convictions, just as natural persons can.

13   That is our federal firearms -- those are our federal firearms

14   statutes.

15        If a corporation doesn't have Second Amendment rights,

16   then we come to the odd situation that back -- back to our

17   ranchers, which maybe be organized as a corporation, the ranch

18   corporation acquires a firearm.  Well, there is nothing --

19   perhaps there is nothing Second Amendment involved there.  But

20   then they give the gun to the ranch hand and say, go out for a

21   week, and go take care of the coyotes that are bothering the

22   cattle and the sheep.  They go down to the gun store, an hour

23   away, the ranch hand takes the gun.  Now he's got the gun, now

24   he's an individual, so now this gun has a Second Amendment halo

25   around it while he's out for a week protecting the stock from

     1   predators.

     2          He then comes back, returns the gun to the

     3   corporation's gun safe.  He no longer has custody of it.  It's

     4   back in the custody of its owner, the corporation.  Do we now

     5   say the Second Amendment halo has vanished from that gun?  It

     6   seems implausible to think that the Second Amendment rules for

     7   that gun are going to be changing based on whether it is being

     8   carried and possessed by a natural person or whether it is in

     9   the custody of an association, corporation, or organization.

    10   That seems to make things more complicated in terms of

    11   understanding what the Second Amendment does.

    12          And, Your Honor, I will -- if I may briefly ask your

    13   indulgence.  As I took notes on cases involving as-applied

    14   challenges, I wrote all of these down as pre-enforcement

    15   challenges.  But I will also suggest to you that I can't

    16   remember them all well enough to be certain that they were --

    17   these cases were filed before the statute went into effect.  So

    18   if I might indulge you -- your patience one last time in just

    19   asking you to consider the possibility of a few other cases

    20   which I think -- I think but I'm not certain that are

    21   pre-enforcement in terms of when they were filed.

    22          *Milavetz*, M-I-L-A-V-E-T-Z, 559 U.S. 229; *Holder v.*

    23   *Humanitarian Law Project*, also from the Supreme Court in 2010,

    24   citing the *Milavetz* case.  I believe -- I think I cited the

    25   *Alvarez* case from the Seventh Circuit.  The *American Charities*

1986

1    case from the Eleventh Circuit; *Frazier v. Boomsma*,

2    B-O-O-M-S-M-A, the District of Arizona in 2008; *McGuire v.*

3    *Reilly*, R-E-I-L-L-Y, 230 F.Supp. 2d 189, District of

4    Massachusetts, 2002; *Doe v. Prosecutor, Marion County*, 566

5    F.Supp. 2d 862, Southern District of Indiana.

6         And that is all.  And thank you very much, Your Honor.

7         *THE COURT:*  Thank you.

8         Does that complete the rebuttal argument for the

9    plaintiffs?

10         *MR. COLIN:*  It does, Your Honor.

11         *THE COURT:*  Thank you.

12         Thank you, counsel, for your presentation, both your

13    argument orally and in writing, the presentation of the

14    evidence.  It has been a long two weeks, but it has been very

15    interesting along the way.  And I thank you for narrowing the

16    issues, presenting the evidence pertinent to them.  I'll take

17    the matter under advisement, and I'll be issuing a written

18    opinion.

19         We'll stand in recess.

20         (Recess at 3:34 p.m.)

21

22

23

24

25

1                                    **INDEX**

2    **Item**                                                    **Page**

3    CLOSING ARGUMENTS

4        By Mr. Colin                                             1834
         By Mr. Kopel                                             1878
5        By Mr. Grove                                             1913
         Rebuttal Argument By Mr. Abbott                          1971
6        Rebuttal Argument By Mr. Kopel                           1974

7                                  EXHIBITS

8    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

9
     49                        1831
10   141-147                   1831

11                          REPORTER'S CERTIFICATE

12

13        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
14

15        Dated at Denver, Colorado, this 23rd day of June, 2014.

16                                        s/Therese Lindblom

17                               _____

18                               Therese Lindblom,CSR,RMR,CRR

19

20

21

22

23

24

25